1  J. Noah Hagey, Esq. (SBN: 262331)
       hagey@braunhagey.com
2  Matthew Borden, Esq. (SBN: 214323)
       borden@braunhagey.com
3  Ronald J. Fisher, Esq. (SBN: 298660)
       fisher@braunhagey.com
4  Gunnar Martz, Esq. (SBN: 300852)
       martz@braunhagey.com
5  Athul K. Acharya, Esq. (SBN: 315923)
       acharya@braunhagey.com
6  BRAUNHAGEY & BORDEN LLP
   351 California Street, 10th Floor
7  San Francisco, CA 94104
   Telephone: (415) 599-0210
8  Facsimile: (415) 276-1808

9  ATTORNEYS FOR REPRESENTATIVE
   PLAINTIFFS SPECTRUM SCIENTIFICS LLC
10 and RADIO CITY, INC.

11

12                    **UNITED STATES DISTRICT COURT**

13                   **NORTHERN DISTRICT OF CALIFORNIA**

14                          **SAN JOSE DIVISION**

15

16

17  SPECTRUM SCIENTIFICS LLC, RADIO          Case No. _____
    CITY, INC., and those similarly situated,
18                                            **COMPLAINT FOR VIOLATIONS OF**
                Plaintiffs,                   **SHERMAN ACT; CARTWRIGHT ACT;**
19                                            **AND UNFAIR COMPETITION LAW**
            v.
20                                            **CLASS ACTION**
    CELESTRON ACQUISITION, LLC, SYNTA
21  CANADA INT'L ENTERPRISES LTD., SKY-       **JURY TRIAL DEMANDED**
    WATCHER USA, SKY-WATCHER CANADA,
22  SW TECHNOLOGY CORP., OLIVON
    MANUFACTURING CO. LTD., OLIVON USA,
23  LLC, COREY LEE, SYLVIA SHEN, JEAN
    SHEN, JOSEPH LUPICA, DAVE ANDERSON,
24  LAURENCE HUEN, and DOES 1-50,
25              Defendants.

26

27

28
                                                        Case No. _____
                              COMPLAINT

Plaintiffs Spectrum Scientifics LLC, and Radio City, Inc., on behalf of themselves and those similarly situated, allege as follows:

## **INTRODUCTION**

1.      Since the beginning of time, humans have looked beyond their world into the night sky.  But if you love astronomy and want to share your joy with others, you must pay a price – hundreds of millions of dollars in illegal overcharges.

2.      Plaintiffs Spectrum Scientifics and Radio City are small telescope distributors. They bring this antitrust class action against the dominant U.S. telescope distributor Defendant Celestron Acquisition, LLC ("Celestron") and its syndicate of co-conspirators.  A jury has already found that Celestron and its parent company in China, Synta,[1] conspired with their competitor Ningbo Sunny Electronic Co., Ltd. ("Ningbo Sunny") to fix prices, divide the market, retaliate against competitors, mislead U.S. authorities, illegally acquire assets and dominate the U.S. market so that they could rip off American purchasers.  For the last decade, Defendants and their cohorts have massively and illegally overcharged U.S. telescope distributors.

3.      Synta and Ningbo Sunny together manufacture over 80% of all consumer telescopes imported into the U.S.  Instead of competing, Synta and Ningbo Sunny agree on what prices to charge and which products their companies will produce.  They have used their unlawful cooperation and dominance over telescope supply to enable their subsidiaries to take over the U.S. distribution market.  As a result of this unlawful conspiracy, Celestron controls at least 70% of all U.S. consumer telescope sales, including sales to small distributors like Plaintiffs and their fellow class members, who are forced to pay supracompetitive prices.

4.      In addition to colluding on pricing, Defendants and their co-conspirators – who should have been competing against one another – operated their businesses as a conglomerate for the mutual benefit of one another.  For example, when the Federal Trade Commission blocked Celestron from acquiring its competitor Meade Instruments Corp., Celestron made a deal where it

---

[1] As detailed below, the term "Synta" connotes a conglomerate of entities owned and controlled by Dar-Tson "David" Shen and his close family members that include Synta Technology Corporation, Suzhou Synta, and a shadowy network of other factories and distributors.

agreed to help its co-conspirator Ningbo Sunny acquire Meade.  In exchange, Ningbo Sunny lied to the FTC about Celestron's involvement, secretly gave Celestron equity in Meade, provided Celestron and Synta access to Meade's IP and manufacturing techniques and ensured that Meade – which previously was an independent brand – no longer competed against Celestron.  At the same time, Ningbo Sunny funneled its customers' trade secrets to Celestron and Synta to help Celestron adjust its pricing and marketing strategies.

5.      Defendants' concealment of their conspiracy from consumers ended no earlier than September 2019, when documents were unsealed in an antitrust proceeding brought by Optronic Technologies, Inc. d/b/a Orion Telescopes & Binoculars® (the "Orion Litigation"), where a jury awarded over $52,000,000 in damages against Defendants' co-conspirators.  Some of the documents that the jury relied on in that litigation are attached to this complaint as **Exhibits 1-18**.

6.      To remedy Defendants' conspiracy and injury to the U.S. telescope market, Plaintiffs and their fellow class members seek compensatory damages to be trebled in accordance with the antitrust laws, injunctive relief, and attorneys' fees.

## JURISDICTION AND VENUE

7.      The Court has subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337, as well as 15 U.S.C. § 15.  The Court has supplemental jurisdiction over Plaintiffs' state-law claims pursuant to 28 U.S.C. § 1367.

8.      The Court has personal jurisdiction over the Defendants because they directed their tortious conduct at persons and activities within the State of California.  The Court further has jurisdiction over Defendants Celestron and Sky-Watcher USA because their headquarters are in California.

9.      Venue is proper in this district under 28 U.S.C. § 1391(b)(2) and 15 U.S.C. § 22, because a "substantial part of the events or omissions" on which the claims are based occurred in this district.

10.     Venue is further proper in this district under 28 U.S.C. § 1391(d) because California has more than one judicial district, Defendant Celestron is a California limited liability company subject to the personal jurisdiction of California courts, and Defendant Celestron has sufficient

1   contacts with this District that it would be subject to personal jurisdiction if this District were a

2   separate state.

3                                    **THE PARTIES**

4       **A.      Plaintiffs**

5       11.      Spectrum Scientifics LLC is a Pennsylvania limited liability company.  Spectrum

6   Scientifics had a physical retail store in Philadelphia that sold telescopes until it shut its doors in

7   January 2018.  It was forced to stop operating a retail store in part because cost pressures in the

8   telescope industry led to razor-thin margins that ultimately could not support a retail presence.

9   During the Class Period, Spectrum Scientifics bought telescopes that were manufactured by

10  Defendants.

11      12.      Radio City, Inc. is a Minnesota corporation.  Radio City had a retail store in

12  Minneapolis that sold telescopes until it shut its doors in December 2018.  It suffered from low

13  margins on telescope sales because of supracompetitive prices set by Defendants.  During the Class

14  Period, Radio City bought telescopes that were manufactured by Defendants.

15      **B.      Defendants and the Synta Co-Conspirators**

16      13.      Defendants are a group of related entities, holding companies, and shell corporations

17  controlled by an individual named David Shen, and his

18  henchmen.



David (Dar Tson) Shen
Founder/Owner/Chairman
of Synta & Celestron

19      14.      Dar-Tson "David" Shen owns and/or controls

20  various telescope manufacturing and distribution companies

21  discussed below (collectively "Synta").  Chairman Shen

22  regularly comes to this District and other places in the U.S.

23  to meet with U.S. distributors of Synta products.  Chairman

24  Shen directly or indirectly owns and/or controls each of the

25  Synta entities, as detailed below.  Chairman Shen is one of

26  the primary architects of Defendants' anticompetitive

27  conspiracy.  He regularly travels to the United States for meetings and other activities in

28  furtherance of this conspiracy.

15.     Even though he founded Synta and has run it since its inception, from 2001 to 2005, Chairman Shen was also concurrently an officer of Synta's supposed horizontal competitor, Ningbo Sunny.  As Chairman Shen's fixer, Defendant Laurence Huen, explained in an email, "David Shen was appointed as the Vice Chairman of Ningbo Sunny Electronic Co. Ltd. . . . on November 23 2001. . . . David resigned this position on July 2005, in order to avoid any conflict of interest after he acquired Celestron on April 2005." A true and correct copy of Mr. Huen's email is attached as **Exhibit 1**.

16.     Until 2005, Chairman Shen also held a 26 percent ownership stake in Synta's horizontal competitor Ningbo Sunny.  At that time, he transferred his shares to his sister-in-law, Dong Yun Xue.  Ms. Dong continues to hold that interest.

17.     Defendant Sylvia Shen is Chairman Shen's sister.  Chairman Shen exercises control over several Synta-related entities, including Celestron, through her.  Defendant Sylvia Shen is a member of Celestron's executive committee.  On information and belief, Defendant Sylvia Shen resides in British Columbia, Canada.  She participated in, planned, and carried out the conspiracy detailed below.

18.     Defendant Jean Shen is Chairman Shen's sister.  Chairman Shen exercises control over Olivon Manufacturing Corp., a Canadian telescope company with United States subsidiaries, and Olivon USA, LLC, through her.  Ms. Shen actively participated in the conspiracy, including by representing to telescope distributors that Synta's horizontal competitor and co-conspirator Ningbo Sunny Electronic Co., Ltd. was one of "my family's companies."  On information and belief, Defendant Jean Shen lives in British Columbia, Canada.  She participated in, planned, and carried out the conspiracy detailed below.

19.     Suzhou Synta Optical Technology Co., Ltd. ("Suzhou Synta") is a telescope manufacturing company located in Suzhou, China.  Suzhou Synta is owned and/or controlled by David Shen and his family, and has manufactured telescopes that were sold into this District during the Class Period.

20.     Nantong Schmidt ("Nantong Synta") is a telescope manufacturing company located in Nantong, China.  Nantong Synta is owned and/or controlled by David Shen, and has

manufactured telescopes that were sold into this District during the Class Period, including to Defendant Celestron.

21.     Synta Technology Corp. ("Synta Technology") is a company headquartered in Taiwan.  Together with its subsidiaries and affiliates, it has sold telescopes into the U.S., Canada, and the European Union during the Class Period.  Synta Technology has sold telescopes that were shipped into this District.  Its address in Taiwan is No. 89 Lane 4 Chia-An W. Road Lung-Tan Taoyuan Taiwan R.O.C.  Synta Technology is a member of Defendants' anticompetitive conspiracy.

22.     Defendant Celestron Acquisition, LLC ("Celestron") is the largest importer and seller of telescopes in the U.S. and abroad.  It is headquartered in Torrance, California, and it imports and sells telescopes in this District.  It is a wholly owned subsidiary of Synta Technology, and like all Synta entities, it is controlled by Chairman Shen.  Celestron has sold telescopes into this District during the Class Period.

23.     Defendant SW Technology Corporation ("SW Technology") is a Delaware corporation.  Upon information and belief, it is a wholly owned subsidiary of Synta Technology. Chairman Shen and his family members created it in 2005 to acquire Celestron, and they continue to operate it as a holding company.

24.     SW Technology acquired Celestron as a wholly owned subsidiary in 2005. Celestron issued a press release about the acquisition in which it stated that SW Technology is "an affiliate of Synta Technology Corporation" referred by name to Chairman Shen.  Chairman Shen owns and controls Celestron through SW Technology.  Defendant Sylvia Shen is the CEO, CFO, and Secretary of SW Technology.

25.     Defendant Synta Canada Int'l Enterprises Ltd. ("Synta Canada") is a Canadian company.  It is listed as a 20 percent owner of Suzhou Synta.  Upon information and belief, Synta Canada is owned and/or controlled by Chairman Shen and his family members.

26.     Upon information and belief, Defendant Olivon Manufacturing Co. Ltd. ("Olivon Canada") is a company registered in British Columbia, Canada and headquartered in Richmond,

Case No. _____

British Columbia, Canada.  Defendant Jean Shen is its principal.  Upon information and belief, Olivon Canada sells telescopes into the United States.

27.   Defendant Olivon USA, LLC ("Olivon USA") is a company registered in Nevada and headquartered in Las Vegas, Nevada.  Defendant Jean Shen is its principal.

28.   Olivon Canada and Olivon USA have participated in Defendants' conspiracy by falsely representing to telescope distributors that Synta's horizontal competitor and co-conspirator Ningbo Sunny Electronic Co., Ltd. is one of  Defendant Jean Shen's "family's companies," thereby unlawfully coordinating price fixing and market division among horizontal competitors.

29.   Upon information and belief, Good Advance Industries Limited ("Good Advance") is a company registered in the British Virgin Islands.  Chairman Shen is its Director.  Like Synta Technology, its address in Taiwan is also No. 89 Lane 4 Chia-An W. Road Lung-Tan Taoyuan Taiwan R.O.C.  Good Advance has shipped telescopes into this District and acted as a central hub for price-fixing between the Synta Entities and their co-conspirators.

30.   Upon information and belief, Defendant Sky-Watcher USA is owned by a Synta affiliate and is controlled by Chairman Shen.  Sky-Watcher USA is headquartered in Southern California.  Sky-Watcher USA has sold telescopes into this District during the Class Period.

31.   Upon information and belief, Defendant Sky-Watcher Canada is a wholly owned subsidiary of Synta Technology Corp. and/or another Synta affiliate, and is run by Defendant Sylvia Shen, the sister of Chairman Shen.

32.   Defendant Joseph Lupica is the former CEO of Celestron.  He subsequently became the CEO of Celestron's horizontal competitor Meade as the result of a conspiracy engineered by Chairman Shen and Defendants' co-conspirators.  Defendant Lupica lives in Palm Springs, California.  Defendant Lupica participated in, planned, and carried out the conspiracy detailed below.



**Joe Lupica**
- Ex-CEO of Meade
- Ex-CEO Celestron

33.     Defendant Dave Anderson is the former CEO of Celestron.  Defendant Anderson lives in or near Minneapolis, Minnesota.  Defendant Anderson participated in, planned, and carried out the conspiracy detailed below.



**Dave Anderson**
Ex-CEO of Celestron

34.     Defendant Corey Lee is the CEO of Celestron, and lives in California.  Defendant Lee participated in, planned, and carried out the conspiracy detailed below.

35.     Defendant Laurence Huen is a board member of Celestron and a close advisor and confidante to Defendant Shen.  On information and belief, Defendant Huen resides in British Columbia, Canada.  Defendant Huen participated in, planned, and carried out the conspiracy detailed below.



**Laurence Huen**
Advisor to David Shen / Synta

36.     Upon information and belief, Defendants SW Technology, Synta Canada, Olivon Canada, Olivon USA, Celestron, Sky-Watcher USA, and Sky-Watcher Canada are part of a network of Synta entities directly and indirectly owned and controlled by Chairman Shen and his family members.  They are operated and run for the common benefit of one another and Chairman Shen and have aided, encouraged, and cooperated with Defendants and their co-conspirators to fix the prices of telescopes, and dominate and allocate the markets for telescope manufacturing and distribution.  Upon information and belief, there is no reasonable or legitimate business purpose for the proliferation of Synta-related holding companies and shell corporations.  Upon information and belief, they are designed to hide assets, obscure ownership, and divert assets and shift capital away from the People's Republic of China on behalf of their co-conspirators who are based in China.

**C.     The Ningbo Sunny/Meade Co-Conspirators**

37.     The Ningbo Sunny/Meade Co-Conspirators are a group of related entities controlled by Wenjun ("Peter") Ni.

38.     Ningbo Sunny Electronic Co., Ltd. is a company located in Yuyao, Zhejiang, China.  During the Class Period, Ningbo Sunny has exported and sold telescopes into this District through

1   its U.S. subsidiary, Meade Instruments Corp. ("Meade"), through Celestron, and through other U.S.

2   distributors.

3       39.     Meade Instruments Corporation is a wholly-owned U.S. subsidiary of Ningbo

4   Sunny.  Meade is located in Irvine, California, and has sold telescopes in this District.

5       40.     Peter ("Wenjun") Ni is the founder, owner,

6   and chief executive of Ningbo Sunny.  On information and

7   belief, Mr. Ni directly or indirectly owns and/or controls

8   each of the Ningbo Sunny entities detailed below.  Mr. Ni

9   coordinated, led, entered, and/or authorized the collusive

10  agreements at issue between Defendants and the Synta co-

11  conspirators and Ningbo Sunny, described herein, including

12  without limitation:  to jointly fix prices offered to

13  distributors, to jointly restrict and set distributors' trade and

14  credit terms, and to block competitors from purchasing



**Peter (Wenjun) Ni**
Founder/Owner/CEO of
Ningbo Sunny & Meade

15  Meade by orchestrating the acquisition of Meade using the Synta Defendants' support and

16  assistance to coordinate its pricing, sales, and manufacturing practices with Synta and Celestron to

17  effectively monopolize the U.S. market.

18      41.     Ningbo Sunny is an affiliate of a publicly traded company on the Hong Kong stock

19  exchange, Sunny Optical Technology Group Co., Ltd. ("Sunny Optical Group").  Sunny Optical

20  Group's director and ultimate controlling shareholder Wang Wenjian is the uncle of Chairman Ni.

21      42.     Chairman Ni helped fund the Meade acquisition and executed the acquisition

22  agreement under U.S. law.

23      43.     The Ningbo Sunny/Meade Co-Conspirators are controlled by Chairman Ni.

24  Through Chairman Ni and other agents, the Ningbo Sunny/Meade Co-Conspirators conspired with

25  one another and with their competitors, the Synta/Celestron Defendants and co-conspirators, to

26  engage in the acts and omissions alleged herein.  Each Defendant acted with knowledge of the

27  conspiracy and worked with each other and unknown third parties to accomplish their objective.

28

1    Each Defendant acted as the principal, agent, and/or joint venturer of, and on behalf of the other

2    Defendants, regarding the acts, violations, and common course of conduct alleged herein.

3          44.    DOES 1-25 participated as co-conspirators in the violations alleged herein and

4    performed acts and made statements in furtherance thereof.  Each of the Defendants actively

5    conspired with one another and are liable for each other's acts and omissions alleged herein.  Each

6    Defendant acted with knowledge of the conspiracy to monopolize the market for telescopes and

7    worked with each other and unknown third parties to accomplish their objective.  Each Defendant

8    acted as the principal, agent, and/or joint venturer of, and on behalf of, the other Defendants,

9    regarding the acts, violations, and common course of conduct alleged herein.

10          45.    DOES 26-50 worked with Defendant Shen, Defendant Huen, Defendant Lupica and

11    Defendant Anderson, and aided and abetted the unlawful Meade acquisition and other unlawful and

12    anticompetitive conduct set forth herein.

13          46.    Each Defendant headquartered outside the United States relied upon its domestic

14    agents, employees, and affiliates, and co-conspirators including without limitation Celestron, SW

15    Technology, Sunny Optics, and Meade to help implement and conceal the anticompetitive activities

16    alleged herein, including the conspiracy to fix prices, divide and dominate the market discussed

17    below.

18          47.    The agency relationships formed among the Defendants with respect to the acts,

19    violations, and common course of conduct alleged herein were consensually formed.  Defendants'

20    agents acted in the United States and abroad within the scope of their agency relationship with their

21    own principals, under the control and explicit authority, implied authority, or apparent authority of

22    their principals.  Accordingly, the Defendant principals are liable for the acts of their agents.

23    Likewise, the Defendant agents are liable for the acts of their principals conducted by the agents

24    within the scope of their explicit, implied, or apparent authority.

25          48.    On information and belief, Defendants, and each of their co-conspirators identified

26    above, conspired together to commit the antitrust violations set forth in this complaint, aided and

27    abetted one another, and acted in concert with one another.  Defendants conspired with one another

28    and their co-conspirators to engage in the acts and omissions alleged herein.  Each Defendant acted

with knowledge of the conspiracy and worked with each other and unknown third parties to accomplish their objective.  Each Defendant acted as the principal, agent or joint venturer of, and on behalf of the other Defendants, regarding the acts, violations, and common course of conduct alleged herein.

## FACTS

**A.   Consumer Telescopes**

49.     Astronomy is a popular hobby for many Americans.  The worldwide market for consumer astronomical telescopes (as opposed to the advanced telescopes used at universities and observatories) generates approximately $250–$500 million in telescope sales annually.  The U.S. is one of the largest markets for consumer telescopes in the world, if not the largest.

50.     Telescopes have two main optical components: the *objective*, the primary lens or mirror that collects and focuses the light into an image, and the *eye lens*, which is placed near the focal point of the objective to magnify its image.  In a *refracting* telescope, the objective is composed of concave lenses; in a *reflecting* telescope, it is one or more concave mirrors.

51.     In addition to optical components, telescopes have mounts that enable the user to move the telescope.  Some telescopes employ motorized mounts and software that can automatically move the telescope to point at objects in the sky.

52.     Over 80% of all recreational telescopes sold in the U.S. market are made by either Ningbo Sunny or Synta.

53.     By working in concert with their competitors, Defendants have dominated telescope sales in the U.S.

**B.   The Telescope Market**

54.     There are two relevant markets in this action.  The first is for consumer telescope and telescope accessory manufacturing for import into the United States (the "Manufacturing Market").  The geographic scope of this market is global.  The Synta/Celestron Defendants and co-conspirators and the Ningbo Sunny/Meade Co-Conspirators together control over 80 percent of that market.

55.     Synta and Ningbo Sunny are each capable of manufacturing all types of consumer telescopes.  Generally, however, Synta manufactures only higher-end products, while Ningbo Sunny manufactures only lower-end models.  Synta will not manufacture or offer to quote a competitive price on products offered by Ningbo Sunny, and vice versa.

56.     This arrangement is no accident:  It is the result of a long-standing agreement between the two, memorialized in dozens of emails.

57.     As a result of their unlawful agreement not to compete, both Synta and Ningbo Sunny can, and do, charge supracompetitive prices, restrict supply, and engage in other unlawful, monopolistic conduct.

58.     The second relevant market in this action is a downstream market from the Manufacturing Market.  It is the market for consumer telescope distribution (the "Distribution Market").  The geographic scope of this market is the United States.

59.     In 2005, Synta acquired Celestron.  Through Defendants' and their co-conspirators' efforts, Celestron became the dominant U.S. telescope distributor.  Then, as detailed below, Ningbo Sunny acquired Meade with Celestron's and Synta's help.  Synta and Ningbo Sunny sell their telescopes to distributors through distributor brands, including their wholly owned subsidiaries Celestron and Meade, which then sell the telescopes through stores, dealers, and the internet to astronomy enthusiasts in the U.S.  Together, Celestron and Meade account for the vast majority of consumer telescopes sold in the United States.

60.     Telescope distribution was not historically this concentrated.  But Synta and Ningbo Sunny transformed the market through their stranglehold over the Manufacturing Market.  Working together, they have prevented competitors from entering the market and have thereby ensured that they are the only meaningful sources of telescopes for U.S. telescope distributors – and, ultimately, for consumers.

61.     Synta and Ningbo Sunny conspired and leveraged their market power in the Manufacturing Market to control the Distribution Market.  As a result, Celestron rose to prominence over other distributors.  When Ningbo Sunny, aided by Celestron and Synta, acquired Meade, they took an independent supplier/distributor/competitor out of the market.  Meade has not

1   seriously competed with Celestron since the Ningbo Sunny acquisition and has not used its

2   manufacturing capabilities to diversify the supply of telescopes.

3        62.    Synta and Ningbo Sunny consolidated their subsidiaries' control of the Distribution

4   Market by fixing prices and engaging in anticompetitive conduct.  In specific, Synta and Ningbo

5   Sunny would offer supply to Celestron at prices far below those offered to independent distributors

6   and with far better credit terms, thereby raising telescope prices throughout the Distribution

7   Market.  With no other meaningful sources of supply, Plaintiffs and Plaintiff Class had no choice

8   but to pay the elevated prices caused by Defendants and their co-conspirators' unlawful collusion.

9        63.    Because of their respective market shares, agreements not to compete, and

10  significant barriers to entry, Synta and Ningbo Sunny have an effective monopoly over the

11  respective products each sells to distributors.

12       64.    Defendants' ability to control prices, influence output, and charge supracompetitive

13  rates is likely to last for years because significant barriers to entry exist.  These barriers to entry

14  arise from unique market conditions, including the history of collusion among Defendants.

15       65.    First, telescope manufacturing has high capital investment costs, and the two key

16  manufacturers (Synta and Ningbo Sunny) are vertically integrated with the largest distributors.

17  Given the size of the market, there are not enough independent distributors to make building an

18  independent manufacturing facility profitable.

19       66.    Second, telescope manufacturing requires key intellectual property rights.  One

20  important example is a portfolio of patents on software to automatically find celestial objects,

21  which beginning users demand.  Meade invented that software and originally owned the patents on

22  it.  But Defendants and Ningbo Sunny colluded to acquire Meade, specifically to block a small

23  manufacturer that might have been a competitor from acquiring this vital IP.

24       67.    No new manufacturers of any significance have entered the market in at least the

25  last 10 years.  With Ningbo Sunny's acquisition of Meade, which also had manufacturing

26  capabilities, the number of sources of supply essentially diminished to two:  Synta and Ningbo

27  Sunny.

28

68.     Synta and Ningbo Sunny have, on information and belief, restricted supply and charged monopoly prices because they have agreed to divide the supply market between themselves to eliminate any competition.  Moreover, demand is inelastic for telescopes and telescope manufacturing.  Because there are few or no substitutes for Defendants' manufacturing services and products, distributors and consumers have little choice but to pay higher prices.

**D.     Defendants' Anticompetitive Conduct**

69.     Defendants conspired with their co-conspirators to fix the prices of telescopes, to allocate the manufacturing and sales of telescopes, to unlawfully acquire assets, and to dominate and monopolize telescope supply and distribution.

70.     The anticompetitive acts include, without limitation:

      a.     Fixing the prices of telescopes and dividing the market;

      b.     Helping Ningbo Sunny acquire and operate Celestron's horizontal competitor, Meade;

      c.     Obtaining and sharing non-public, sensitive information with their co-conspirators, including information about Meade's intellectual property, business plans, and product pricing;

      d.     Obtaining and sharing non-public, sensitive information about its competitors' businesses, including intellectual property, business plans, and product pricing with their co-conspirators; and

      e.     Aiding and abetting their co-conspirators' coordinated action to maintain power.

71.     Through such activities, Synta and Ningbo Sunny – the only two major manufacturers of consumer telescopes – illegally combined and conspired with one another instead of competing against each other, and illegally helped Celestron dominate the Distribution Market. Each such activity, taken alone, represents an independent antitrust conspiracy.  Together, they are overwhelming.  *See Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*, No. 5:16-CV-06370-EJD, 2019 WL 1429631, at *3 (N.D. Cal. Mar. 29, 2019) ("[I]n cases such as this, plaintiffs should be given the full benefit of their proof without tightly compartmentalizing the various factual

components and wiping the slate clean after scrutiny of each.") (quoting *Russell v. Nat'l Collegiate Athletic Ass'n*, 2012 WL 1747496, at *3 (N.D. Cal. May 16, 2012); *see also Church & Dwight Co. v. Mayer Labs.*, Inc., 2011 WL 1225912, at *16 (N.D. Cal. Apr. 1, 2011) (collecting cases and stating, "the Court considers the effects of [the defendant's] conduct in the aggregate, including, as appropriate, cumulative or synergistic effects."); *see also, e.g.*, *United States v. Container Corp.*, 393 U.S. 333, 337 (1969) ("The inferences are irresistible that the exchange of price information has had an anticompetitive effect in the industry, chilling the vigor of price competition."); *In re Static Random Access Memory (SRAM) Antitrust Litig.*, 580 F. Supp. 2d 896 (N.D. Cal. 2008) ("The exchange of pricing information alone can be sufficient to establish the combination or conspiracy, the initial ingredient of a violation of § 1 of the Sherman Act") (quoting *Container Corp.*, 393 U.S. at 335); *In re Capacitors Antitrust Litig.*, 106 F. Supp. 3d 1051, 1067 (N.D. Cal. 2015) (allegations that two parties "conducted an exchange of competitively sensitive information" and agreed to exchange in the future is "enough to meet the *Twombly* pleading standard").

### 1.    Defendants' Collusion to Acquire Meade

72.    For many years, Meade was the leading U.S. telescope brand.  It had a manufacturing facility in Mexico, where it had the ability to manufacture high- and low-end products.  It also owned significant patents, including patents for Goto technology, which uses computers and GPS to allow users to automatically direct their telescopes to celestial objects.  That capability is highly valued by hobbyist and amateur astronomers, especially beginners.  It was also the subject of substantial litigation between Defendant Celestron and Meade.

73.    The Federal Trade Commission blocked attempts by Celestron and Meade to merge in 1991 and 2002 because the mergers would have created monopolies and reduced competition.

74.    When Meade went up for sale in 2013, a small telescope manufacturer named Jinghua Optical ("JOC") submitted a bid to purchase it.  Although JOC was much smaller than Synta and Ningbo Sunny, it was a competitor of Synta and Ningbo Sunny.  If JOC had been able to complete the purchase, it would have gained key knowledge about how to make high-end products, as well as a patent portfolio with which to compete against Synta and Ningbo Sunny.  It also would have gained a brand to compete against Celestron in the Distribution Market.

75.     Because JOC's acquisition of Meade would have diversified manufacturing, preserved an independent distributor, and increased competition in the telescope industry, both Synta and Ningbo Sunny wanted to acquire Meade to keep it out of JOC's hands.

76.     However, the FTC had earlier blocked Celestron and Meade from merging. Because Synta owned Celestron, Synta too could not acquire Meade directly.  Instead, Chairman Shen made an agreement with Chairman Ni that if Ningbo Sunny would acquire Meade, Celestron and Synta would provide financial and other assistance to complete the purchase.

77.     Chairman Ni explained this plan in an email to Defendant Anderson (Celestron's then-CEO), and Celestron's Board members, Defendants Huen, Chen and Sylvia Shen, asking Celestron and Synta to continue providing financial support pursuant to their illegal agreement:

| | |
|---|---|
| **From:** | nbsunny <nbsunny@vip.sina.com> |
| **Sent:** | Friday, December 13, 2013 12:43 AM |
| **To:** | DAVE ANDERSON |
| **Cc:** | david shen; Laurence Huen; Jack chen; shentakuo1 |
| **Subject:** | Fw: Fw: Celestron Payments星特朗付款 |

Dear Dave,

Thanks for your email and supports!

At the end of June or beginning of July, I discussed with you about the case of purchasing meade in USA. To prevent JOC to buy MEADE, we decided to purchase MEADE by sunny after discussion. But the premise of this case is CELESTRON / SYNTA should be provided the financial support to SUNNY.

A copy of the email is attached as **Exhibit 2**.

78.     Before the acquisition took place, the Financial Industry Regulatory Authority (FINRA) opened an investigation into Ningbo Sunny.  Ningbo Sunny's disclosures to FINRA reveal the following timeline:

a.      On May 17, 2013, JOC announced its plan to acquire Meade.

b.      On May 23, 2013, Chairman Ni and Chairman Shen, along with Defendants Sylvia Shen, Joseph Lupica, and Dave Anderson, discussed Ningbo Sunny's possible purchase of Meade.

c.      On June 11, 2013, Ningbo Sunny submitted its bid to purchase Meade.

d.     Five days later, Chairman Ni emailed Celestron Board member Defendant Huen, asking Celestron to pay $2,000,000 for the transaction, a copy of which is attached as **Exhibit 3**.

79.     Celestron sent Ningbo Sunny the requested amount, as well as other sums, to fund its purchase of Meade.

80.     Documents and testimony from the Orion Litigation reveal that in addition to financially supporting the transaction, Synta and Celestron, with the help of Defendants Anderson and Lupica (who were working for Celestron at the time) were actively involved in setting up the deal structure, assisting with due diligence, and negotiations.

81.     Ningbo Sunny was represented in the Meade transaction by the law firm Sheppard, Mullin, Richter & Hampton, LLP.  According to the terms of the engagement letter, however, Sheppard Mullin was required to take instructions from Ningbo Sunny's horizontal competitor Chairman Shen and his employees, including Celestron executives Defendants Lupica and Anderson.  Defendants Lupica and Anderson worked with Sheppard Mullin to help structure and negotiate the transaction and to keep Chairmen Shen and Ni informed about its progress.  As stated in Sheppard Mullin's engagement letter, a copy of which is attached as **Exhibit 4**:

SHEPPARD MULLIN RICHTER & HAMPTON LLP
Junef 6, 2013
Page 2

engagements for the Client that we may undertake.  You have advised us that you will obtain tax advice regarding the Matter from a third party; accordingly, our firm will not be providing any tax advice in connection with the Matter, including, without limitation, tax structuring or tax consequences arising out of the Matter.  You have instructed us to take direction from and communicate directly with your advisors, Dave Anderson (President of Celestron), Laurence Huen, David Shen (head of Synta) and Joe Lupica.

82.     Chairmen Shen and Ni also agreed that Defendant Lupica, who was then CEO of Celestron, would be transferred to Ningbo Sunny and that, once Ningbo Sunny had acquired Meade, Defendant Lupica would become Meade's CEO.

83.     After the acquisition, Defendant Lupica became Meade's CEO.  He began replacing Meade's management with officers from Celestron, including Celestron's Vice President of Sales,

1    co-conspirator Victor Aniceto, who was hired as the Vice President of Sales for Meade.  Later,

2    when Defendant Lupica retired, co-conspirator Aniceto was promoted to President of Meade.

3        84.    Celestron Board member Defendant Huen also assisted Defendant Lupica and acted

4    as a conduit of information between horizontal competitors Ningbo Sunny and Synta.

5        85.    Defendant Lupica has admitted that Ningbo Sunny could not have acquired Meade

6    but for the collusive assistance it received from its horizontal competitor Synta.

7        86.    After the Meade acquisition, Defendant Huen and Chairman Shen continued to

8    provide advice and assistance to horizontal competitors Ningbo Sunny and Meade, met with

9    Chairman Peter Ni about these issues, and toured Meade's facilities.  A copy of an email in which

10   Defendant Huen instructs Ningbo Sunny to remove Meade's CEO and to replace him with

11   Celestron's former CEO, Defendant Lupica, is attached as **Exhibit 5** at TX1303.002.

12       87.    Synta/Celestron made substantial payments and loans to Ningbo Sunny to facilitate

13   the Meade acquisition.  These payments were documented, for example, in an accounting provided

14   by Celestron's CFO, Paul Roth, a copy of which is attached as **Exhibit 6**.

15       88.    As part of their unlawful arrangement, Defendant Celestron took equity in its

16   horizontal competitor Meade – which is memorialized in shadow books kept by Defendants' co-

17   conspirators, a copy of which is attached as **Exhibit 7**.

18       89.    On November 26, 2019, a jury found that this acquisition, which was orchestrated

19   and aided and abetted by Defendants, their co-conspirators and their agents, violated the antitrust

20   laws.

21           **2.    Defendants' Misrepresentation to the FTC**

22       90.    The FTC began inquiring into whether Chairman Shen and Celestron were involved

23   with the Meade acquisition.  In response, on August 22, 2013, Sheppard Mullin partner Robert

24   Magelnicki represented to the FTC that "except for the limited advice to Peter Ni regarding how to

25   acquire a U.S. company . . . , David Shen has no role in the proposed acquisition of Meade."  This

26   email chain is attached as **Exhibit 8**.

27

28

91.     Mr. Magelnicki's statement to the government was false. As Peter Ni explained in **Exhibit 2**, prior to August 22, 2013, Chairman Ni and Chairman Shen had agreed that Chairman Shen and his companies – including Celestron – would provide financial support to Ningbo Sunny to assist in the acquisition, which they did:

| | |
|---|---|
| From: | nbsunny <nbsunny@vip.sina.com> |
| Sent: | Friday, December 13, 2013 12:43 AM |
| To: | DAVE ANDERSON |
| Cc: | david shen; Laurence Huen; Jack chen; shentakuo1 |
| Subject: | Fw: Fw: Celestron Payments星特朗付款 |

Dear Dave,

Thanks for your email and supports!

At the end of June or beginning of July, I discussed with you about the case of purchasing meade in USA. To prevent JOC to buy MEADE, we decided to purchase MEADE by sunny after discussion. But the premise of this case is CELESTRON / SYNTA should be provided the financial support to SUNNY.

92.     Moreover, as seen in **Exhibit 4**, Sheppard Mullin had been ordered to take instructions from Chairmen Shen and Synta/Celestron personnel regarding the Meade acquisition.

93.     The FTC was also concerned that Chairman Shen was previously a Ningbo Sunny shareholder.  To allay the FTC's concerns, Chairman Ni formed Sunny Optics, Inc., the entity used to acquire Meade, and became its sole shareholder.  Sheppard Mullin then represented to the FTC that Ningbo Sunny had nothing to do with the Meade acquisition.  Then, after the acquisition closed, Chairman Ni transferred his interest in Sunny Optics to Ningbo Sunny, for $1.

94.     The money used to fund the Meade acquisition came from a Hong Kong company jointly owned by Chairman Shen and Chairman Ni, named "Sky Rainbow."  This is another way that the conspirators' representations to the FTC that Chairman Shen was uninvolved in the Meade acquisition were false.

### 3. Defendants' Sharing of Trade Secrets, Price Fixing, and Market Allocation

95.     After the acquisition, Synta, Celestron, Ningbo Sunny, and Meade colluded not to compete with one another.  This conspiracy is revealed in numerous emails.  For example, an email between the principals of Synta and Ningbo Sunny shows Chairman Shen asking Ningbo Sunny's Chairman Peter Ni to work out what he calls a "tacit understanding" with Defendant Anderson (Celestron's then-CEO) about not competing against Celestron for sales to Costco:

A full, translated copy of this email is attached as **Exhibit 9** at TX1769.003.

96.     As Chairman Shen explained in another email to Chairman Ni and Defendant Anderson: "The best way in the future is to divide the products and sell them into different markets to reduce conflicts."  A copy of that email is attached as **Exhibit 10**.

97.     At all relevant times, the goal of the co-conspirators' conduct was to ensure that Celestron was able to dominate the U.S. market and keep their ill-gotten gains outside of mainland China.  To do so, the co-conspirators agreed not to compete against Celestron.  As Meade's then Vice-President of Sales Victor Aniceto explained the strategy to then-Meade CEO Defendant Lupica, "Mr. Ni. . . . doesn't want to disrupt Synta business. However, this promo will not be disruptive to Celestron business." A copy of this email is attached as **Exhibit 11**.

98.     As part of their pricing coordination efforts, Celestron's current CEO, Defendant Corey Lee, worked with co-conspirators Synta and Ningbo Sunny to steal competitors' trade secret sales and pricing information.

99.      Ningbo Sunny sells products to Celestron's competitors.  To assist Celestron, Ningbo Sunny provides Celestron with key business information on such customers' purchasing, such as information about the pricing of products, credit arrangement and order forecasts.  For example, in May 2015, James Chiu (Ningbo Sunny) provided detailed statistics for several recent years of Orion orders to Celestron's current CEO, Corey Lee:

A full, translated copy of this email chain is attached as **Exhibit 12**.

100.      In a deposition, Mr. Chiu admitted that the kind of information he shared with Celestron constituted trade secrets:

> Q. How about the volume of business that a customer does with Ningbo Sunny? Is that a trade secret, too?
>
> A. Certainly, that's also a trade secret.
>
> Q. How about even the fact that somebody is buying from Ningbo Sunny, is that a trade secret?
>
> A. I consider it a trade secret.

101.      Ningbo Sunny and Synta also share and fix prices.  In charging certain distributors, Synta and Ningbo Sunny negotiate together on how much to charge and then jointly fix the price.

For example, James Chiu of Ningbo Sunny and Joyce Huang of Synta discussed how Ningbo Sunny's prices should be higher.  This email is attached as **Exhibit 13**.

102.     Similarly, Ms. Huang of Synta wrote emails to Mr. Chiu of Ningbo Sunny informing him that Ningbo Sunny's "payment terms should be the same with Suzhou [Synta]," a direction with which Ningbo Sunny complied. This email is attached as **Exhibit 14**.

103.     Chairman Ni also has forwarded other Meade confidential information to Chairman Shen to assist with Synta's and Celestron's business.

104.     As a result of having no competition and by virtue of their unlawful agreements, Defendants have the ability to unilaterally set supracompetitive prices far above what they could command in a competitive market.

105.     Emails among Defendants and their co-conspirators show collusion on what products they will manufacture and distribute at both the manufacturing and distribution stage.  For example, emails written by Ningbo Sunny Vice Chairman James Chiu to Defendant Sylvia Shen discuss "how to avoid conflict with Celestron products" and state that "[i]f the customer visits our factory and confirms their intention to cooperate with us, we will consider the strategy of separation from Celestron products or adopt different product prices to protect Celestron." This email is attached as **Exhibit 15**.

106.     On other occasions, James Chiu of Ningbo Sunny explained to Chairman Shen of Synta that Ningbo Sunny "will take prompt action to avoid conflict in the astronomical market," including "abandoning the small OEM customers so as to protect big customers." This email is attached as **Exhibit 16**.

107.     In sum, as Defendant Shen explained in an email to Ningbo Sunny:  "Director Ni will not be a competitor and is trustworthy when it comes to business."  **Exhibit 9** at TX1769.001.

108.     Defendants coordinated and elevated their prices.  They sought to avoid conflict with each other's products and developed strategies to protect each other from competition.  As Defendant Lupica wrote, they did this to "dominate the telescope industry." A copy of this email is attached as **Exhibit 17**.

109.    Whenever any Defendants' and their co-conspirators' customers challenged the dominance of the conspiracy over the telescope market, Defendants used their market power to crush the opposition.  As Chairman Shen explained to Defendants and the Ningbo Sunny co-conspirators, "we do not need to wage a price war" because "[s]uspension of supply does not need any price wars.  We replace them."  A copy of this email is attached as **Exhibit 18**.

**E.     Defendants' Conduct Has Harmed Plaintiffs and Competition in the Relevant Market**

110.    As a result of Defendants' and their co-conspirators' conduct, the number of brands and consumer choices in telescopes has been reduced.

111.    Defendants' conduct has caused injury to both Plaintiffs and the relevant markets. Plaintiffs have been injured because they are paying supracompetitive, arbitrarily inflated prices for telescopes.  As a direct result of such conduct, Plaintiffs are losing sales, goodwill, and market share.

112.    In telescope manufacturing, price competition has been restrained or eliminated, particularly, as alleged above, for products where Synta and Ningbo Sunny have agreed to divide the market between them.  As a result, output has been restricted, and the prices of telescopes have been fixed, raised, stabilized, or maintained at artificially inflated levels, and purchasers of telescopes, including Plaintiffs, have been deprived of free and open competition.  This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

113.    Ningbo Sunny's plan to similarly dismantle Meade's manufacturing capabilities, and the failure of any replacement suppliers to emerge, demonstrates that the barriers to entry into the supply market, combined with Defendants' anticompetitive conduct, have effectively foreclosed competition at the supply level.

114.    At the telescope-distribution level, price competition has been restrained or eliminated, particularly, as alleged above, for products where Defendants have agreed to divide the market between them.  Further, by fixing prices and credit terms so that Plaintiffs always pay substantially more than Celestron, and by sharing Plaintiffs' confidential business information with

1    Celestron, Defendants and their co-conspirators have prevented Plaintiffs from fairly competing

2    against Celestron.

3        115.    Competition, innovation, and consumer choice have also been restrained due to

4    Ningbo Sunny's acquisition of Meade.  Since Ningbo Sunny acquired Meade, Meade has not

5    significantly competed with Celestron.  Moreover, the acquisition of Meade prevented companies

6    that are trying to compete against Defendants, such as JOC, from obtaining a potential

7    manufacturing facility and important intellectual property that would have increased competition.

8        116.    Ningbo Sunny and Synta have together controlled over 65% of the Manufacturing

9    Market since 2012.  In 2018, they controlled over 90%.

10       117.    As a result of the conduct alleged herein, Defendants have stifled competition, fixed,

11   raised, stabilized, or maintained prices at artificially inflated levels, and deprived consumers of free

12   and open competition.  This is an antitrust injury of the type that the antitrust laws were meant to

13   punish and prevent.

14       118.    Through their domination of the supply chain and unlawful agreements, Defendants

15   have effectively prevented new market entrants at the distribution level, and forced many

16   distributors to go out of business, thereby continuing to inhibit and restrict competition.

17   **F.    Defendants' Conduct Has Substantially Impacted Commerce**

18       119.    Defendants' anticompetitive acts involved United States domestic commerce and

19   import commerce, and have a direct, substantial, and foreseeable effect on interstate commerce by

20   raising and fixing prices for telescopes and diminishing competition throughout the United States.

21                              **CLASS ACTION ALLEGATIONS**

22       120.    This action is brought on behalf of Plaintiffs and all similarly situated retailers and

23   distributors who purchased a telescope manufactured or sold by Defendants from Synta's

24   acquisition of Celestron in 2005 through such time as class notice is given.

25       121.    **Numerosity**: The number of Class members is so large that the joinder of all its

26   members is impracticable.  The exact number of Class members can be determined from

27   information in the possession and control of the Defendants, but based on public records, the

28   number of class members is in the thousands.

122.   **Typicality:** Plaintiffs' claims are typical of the claims of the members of the Class. Defendants artificially raised the prices and restrained trade, and thereby injured all members of the Class in substantially identical fashion.

123.   **Adequacy**:  Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs' interests are not antagonistic to or in conflict with the interests they seek to represent as Class representatives.

124.   Plaintiffs' counsel is experienced in prosecuting class actions, is committed to fair and robust competition, and intends to prosecute this action vigorously.

125.   **Existence of Predominance of Common Questions of Fact and Law:** Numerous common issues of law and fact exist and predominate over questions affecting only individual members.  These issues include, without limitation:

    a.   Whether Defendants combined and/or conspired to fix, raise, maintain, or stabilize prices of telescopes sold to purchasers in the United States at any time during the Class Period;

    b.   Whether Defendants concertedly fixed, raised, maintained, or stabilized prices of telescopes sold to purchasers in the United States at any time during the Class Period, or committed other conduct in furtherance of the conspiracy alleged herein;

    c.   The duration and the extent of Defendants' conspiracy;

    d.   Whether Defendants fraudulently concealed their conspiracy from telescope distributors in the United States;

    e.   Whether the actions of Defendants in so conspiring violated Section 1 of the Sherman Act;

    f.   Whether Defendants' conduct caused the prices of telescopes sold at any time during the Class Period to purchasers in the United States to be artificially fixed, raised, maintained, or stabilized at noncompetitive prices;

Case No. _____
COMPLAINT

g.   Whether Plaintiffs and the other members of the Class were injured by Defendants' conduct and, if so, the appropriate class-wide measure of damages;

h.   Whether Plaintiffs and other members of the Class are entitled to, among other things, injunctive relief, and, if so, the nature and extent of such relief;

i.   Whether further relief, including an independent monitor, is necessary to prevent Defendants' ongoing violations of the laws detailed above; and

j.   Whether Defendants have acted or refused to act on grounds that apply generally to the class, so that final injunctive relief is appropriate respecting the class as a whole.

126.   These and other questions of law and fact are common to the Class and predominate over any questions affecting the Class members individually.

127.   Absent certification of a class, the equitable relief sought by Plaintiffs will create the possibility of inconsistent judgments and/or obligations among Defendants.

128.   **Superiority**: A class action is also superior to other available methods for the fair and efficient adjudication of this controversy.  Requiring Class members to pursue their claims individually would invite a host of separate suits, with concomitant duplication of costs, attorneys' fees, and demands on judicial resources.  Furthermore, as the damages suffered by the individual members of the Class may be relatively small, the expense and burden of individual litigation make it impracticable for the members of the Class individually to seek redress of the wrongs perpetrated by Defendants.  Plaintiffs know of no difficulty that could be encountered in the management of this litigation that would preclude its maintenance as a class action.

### G.   Fraudulent Concealment

129.   Plaintiffs have neither actual nor constructive knowledge of the pertinent facts constituting their claims for relief asserted herein, despite their diligence in trying to discover such facts.  Plaintiffs and Class members could not have discovered through the exercise of reasonable diligence the existence of the conspiracy alleged herein until September 2019, when some evidence

revealing Defendants' secret conspiracy was first made public in the summary briefing in the Orion Litigation.

130.    Defendants engaged in a self-concealing conspiracy that did not give rise to facts that would put Plaintiffs or the Class on inquiry notice that there was a conspiracy among Defendants to artificially fix, raise, maintain, or stabilize prices for telescopes.  Defendants had secret discussions about price, market allocation, and preventing competitors from acquiring assets, and in furtherance of the conspiracy, they agreed not to discuss publicly the nature of the scheme, and put forth pretextual explanations about their pricing.

## CAUSES OF ACTION

### First Cause of Action
### Against All Defendants
### Price Fixing, Credit Term Fixing, Market Allocation, Product Allocation, and Other Unlawful Collusion Between Competitors
### (Violation of the Sherman Act Section 1, 15 U.S.C. § 1)

131.    Plaintiffs repeat and reallege the allegations of the Paragraphs above as if fully set forth herein.

132.    Section 1 of the Sherman Antitrust Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce."

133.    By engaging in the conduct described above, Defendants have knowingly and intentionally combined and conspired with their co-conspirators with the specific intent to unreasonably restrain trade in the market for consumer telescopes in the U.S.

134.    Defendants entered into a continuing combination or conspiracy to unreasonably restrain trade and commerce in violation of § 1 of the Sherman Act by artificially reducing or eliminating competition for the pricing of telescopes directly sold to United States purchasers; combining and conspiring to raise, fix, maintain, or stabilize the prices of telescopes sold to United States purchasers; fixing credit prices and terms; agreeing to divide the market between themselves to eliminate competition; selling telescopes to distributors in the United States at noncompetitive and artificial prices; and combining and conspiring to eliminate competition and solidify their monopoly power.

135.    Defendants further combined and conspired to unreasonably restrain trade and commerce in violation of § 1 of the Sherman Act by dividing distribution so as to eliminate competition with their co-conspirators; and by completing the merger between Ningbo Sunny and Meade with the intent and effect to lessen competition, control potentially competitive manufacturing capability, and create a monopoly.  The effect of that merger has already lessened competition, raised barriers to entry, and tended to create a monopoly in the market for telescopes in the U.S.

136.    Defendants' conduct has harmed competition in the U.S. for recreational telescopes by increasing the prices paid by telescope distributors, increasing the prices paid by consumers, reducing consumer choice, increasing barriers to entry, and stifling innovation.  Plaintiffs were and continue to be injured in fact by the conspiracies of Defendants.

137.    Plaintiffs have suffered an antitrust injury as a direct and proximate result of the combination and conspiracy between Defendants, and Defendants therefore are liable for treble damages, costs, and attorneys' fees in an amount to be proven at trial under Section 15 of the Clayton Act, 15 U.S.C. § 15.

**<ins>Second Cause of Action</ins>**
**Against All Defendants**
**Monopolization, Attempted Monopolization, and Conspiracy to Monopolize**
**(Violation of Sherman Act § 2, 15 U.S.C. § 2**
**and Clayton Act § 7, 15 U.S.C. § 18)**

138.    Plaintiffs repeat and reallege the allegations of the Paragraphs above as if fully set forth herein.

139.    Section 2 of the Sherman Antitrust Act prohibits any efforts to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations."

140.    Defendants have monopolized, attempted to monopolize, and/or conspired to monopolize the markets for telescopes in the United States.  By engaging in the conduct above, Defendants are willfully maintained and abused their market power to control distribution and price, and to prevent other market participants from acquiring competitive manufacturing potential.

141.    Defendants' willful conduct as described above has given them the ability to control prices and exclude competition.

142.    Defendants' willful conduct as described above has a dangerous probability of success in accomplishing its unlawful purpose of obtaining monopoly power.

143.    Defendants' conduct described above has caused Plaintiffs antitrust injury.

144.    As a result of Defendants' actions in violation of 15 U.S.C. § 2, Plaintiffs have been injured and continue to be injured in their business and property in an amount to be determined at trial, which amount is to be trebled in accordance with 15 U.S.C. § 15.

**Third Cause of Action**
**Against All Defendants**
**Unfair Competition**
**(Violation of Cal. Bus. & Prof. Code §§ 17200 *et seq.*)**

145.    Plaintiffs repeat and reallege the allegations of the Paragraphs above as if fully set forth herein.

146.    Defendants' conduct violates state law as described above and constitutes unfair, unlawful, and fraudulent competition against Plaintiffs.

147.    As a result of Defendants' unfair, unlawful, and fraudulent competition, Plaintiffs have lost money and customers, and continue to do so.

**Fourth Cause of Action**
**Against All Defendants**
**Price Fixing, Credit Term Fixing, Market Allocation, Product Allocation, Other Unlawful Collusion Between Competitors, Monopolization, Attempted Monopolization, and Conspiracy to Monopolize**
**(Violation of the Cartwright Act, Cal. Bus. & Prof. Code §§ 16700 *et seq.*)**

148.    Plaintiffs repeat and reallege the allegations of the Paragraphs above as if fully set forth herein.

149.    California's Cartwright Act prohibits any "combination of capital, skill or acts by two or more persons for" the purpose of restraining trade, including price maintenance.

150.    The conduct alleged above violates the Cartwright Act.

151.    Plaintiffs have suffered an antitrust injury as a direct and proximate result of the conspiracy between Defendants, and Defendants are therefore liable for treble damages, costs, attorneys' fees and punitive damages in an amount to be proven at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs prays that the Court issue the following relief:

A.    Equitable relief, including without limitation an injunction prohibiting Defendants' illegal practices;

B.    Compensatory damages;

C.    Treble damages;

D.    Restitution;

E.    Disgorgement of ill-gotten assets and property;

F.    Punitive Damages;

G.    Attorneys' fees and costs; and

H.    All such other and further relief as the Court may deem just, proper, and equitable.

Dated:  June 1, 2020                                 Respectfully submitted,

BRAUNHAGEY & BORDEN LLP

By:   /s/ Matthew Borden
                Matthew Borden

Attorneys for Plaintiffs

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiffs hereby demand a jury trial of all claims and causes of action triable before a jury.

Dated:  June 1, 2020

Respectfully submitted,

BRAUNHAGEY & BORDEN LLP

By:   _/s/ Matthew Borden_
        Matthew Borden

Attorneys for Plaintiffs

Case No. _____