UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| SPECTRUM SCIENTIFICS, LLC, et al., Plaintiffs, v. CELESTRON ACQUISITION, LLC, et al., Defendants. | Case No. 5:20-cv-03642-EJD **ORDER GRANTING IN PART AND DENYING DEFENDANTS' MOTIONS TO DISMISS; GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO STRIKE** Re: Dkt. Nos. 63, 64, 96, 97 |

Plaintiffs Spectrum Scientifics, LLC and Radio City, Inc. ("Plaintiffs") brought this putative class action on behalf of themselves and a proposed class of direct purchasers ("DPPs") against Defendants (1) Synta Technology Corp. ("Synta Tech"), (2) Suzhou Synta Optical Technology Co., Ltd. ("Suzhou Synta"), (3) Nantong Schmidt Opto-Electrical Technology Co. Ltd. ("Nantong Schmidt"), (4) Synta Canada International Enterprises Ltd. ("Synta Canada"), (5) Pacific Telescope Corp. ("Pacific Telescope"), (6) Olivon Manufacturing Group Ltd. ("Olivon Manufacturing"), (7) SW Technology Corp. ("SW"), (8) Celestron Acquisition, LLC ("Celestron"), (9) Olivon USA LLC ("Olivon USA"), (10) Dar Tson "David" Shen, (11) Joseph Lupica, (12) David Anderson, (13) Corey Lee; (14) Jean Shen, (15) Sylvia Shen, (16) Jack Chen, (17) Laurence Huen, and (18) Ningbo Sunny Electronic Co. Ltd., ("Ningbo Sunny") (collectively, "Defendants") alleging antitrust violations arising out of a conspiracy to unlawfully monopolize and fix prices in the telescope market.

On October 19, 2020, Plaintiffs filed their Second Amended Complaint ("SAC"). Dkt. No.

54.  On November 16, 2020, Defendants Celestron, SW, Mr. Anderson, Mr. Lupica, and Mr. Lee filed (1) a Motion to Strike Allegations in the SAC ("Motion to Strike"), and (2) a Motion to Dismiss the SAC pursuant to Federal Rule of Civil Procedure 12(b)(6) ("First Motion to Dismiss").  Dkt. Nos. 63, 64.  The remainder of Defendants later joined in the Motion to Strike, with the exception of Ningbo Sunny, which has not appeared in this action.  Dkt. No. 98.

On January 20, 2021, Defendants Mr. Shen, Ms. Sylvia Shen, Mr. Chen, Mr. Huen, Suzhou Synta, Nantong Schmidt, Synta Tech, Olivon Manufacturing, Olivon USA, and Pacific Telescope filed a Motion to Dismiss the SAC ("Second Motion to Dismiss"), raising substantially the same arguments as the First Motion to Dismiss.  Dkt. No. 96.  On the same day, Defendants Jean Shen and Synta Canada filed a separate Motion to Dismiss the SAC for lack of personal jurisdiction and for failure to state a claim pursuant to Rule 12(b)(2) and (6) ("Synta Canada Motion").  Dkt. No. 97.  Following jurisdictional discovery, Ms. Shen and Synta Canada withdrew their motion as to personal jurisdiction.  Dkt. Nos. 140, 143.  The remainder of the Synta Canada Motion raises substantially the same arguments as the First and Second Motions to Dismiss.  The Court, therefore, considers all three motions to dismiss together.

The Court took all three motions under submission for decision without oral argument pursuant to Civil Local Rule 7-1(b).  For the reasons stated below, the Court GRANTS IN PART and DENIES IN PART the Motions to Dismiss and GRANTS IN PART AND DENIES IN PART the Motion to Strike.

## I.    BACKGROUND

The SAC generally alleges that Synta Technology and its affiliates (collectively, "Synta" or "the Synta Entities")[1] participate in a long-running conspiracy with Ningbo Sunny and its

---

[1] The SAC regularly refers to "Synta," defined as "a conglomerate of entities owned and controlled by Dar-Tson 'David' Shen and his close family members that include Synta Technology Corporation, Suzhou Synta, and a shadowy network of other factories and distributors."  SAC ¶ 2 n.1.  Defendants challenge the use of "Synta" and, as discussed further below, argue that such allegations do not adequately distinguish among corporate affiliates.  In summarizing the allegations of the SAC and without prejudging the arguments, the Court refers to Case No.: 5:20-cv-03642-EJD

ORDER GRANTING IN PART MOTS. TO DISMISS
AND MOT. TO STRIKE

affiliates ("the Ningbo Sunny Entities") to "to fix prices, divide the market, retaliate against competitors, mislead U.S. authorities, illegally acquire assets and dominate the U.S. market so that they could rip off American purchasers." SAC ¶ 2. The Synta Entities are "a group of related entities, holding companies, and shell corporations controlled by an individual named David Shen, and his henchmen," including his family members. *Id.* ¶ 13.

Both the Synta Entities and the Ningbo Sunny Entities are vertically integrated corporate families, that manufacture telescopes in China and distribute, market, and sell those telescopes around the world, including in the U.S. through U.S. subsidiaries. *See id.* ¶ 66. Plaintiffs allege that these two corporate families conspired to improperly dominate two relevant markets: (1) the consumer telescope and telescope accessory manufacturing for import into the United States ("the Manufacturing Market"); and (2) the market for consumer telescope distribution in the United States ("the Distribution Market"). *Id.* ¶¶ 55-59. Plaintiffs allege that Synta and Ningbo Sunny presently manufacture over 80% of all consumer telescopes imported into the United States. *Id.* ¶ 3.

In 2005, Synta acquired Celestron through a wholly owned subsidiary holding company, SW. *Id.* ¶¶ 23-24. From 2001 until 2005, Mr. Shen was not only the owner and Chairman of Synta but was also the Vice Chairman of and stakeholder in Ningbo Sunny. *Id.* ¶¶ 15-16. Mr. Shen transferred that interest and resigned from his position in 2005 in order to avoid any conflict of interest created by Synta's acquisition of Celestron, Ningbo Sunny's horizontal competitor. *Id.*

Before they were acquired by Synta, Celestron and Meade Instruments Corp. ("Meade") were the leading U.S. telescope manufacturers and distributors. In 1991, and again in 2002, Celestron attempted to merge with Meade. Both times, the FTC took action to block proposed combinations on antitrust grounds. *Id.* ¶ 74.

When Meade was offered for sale in 2013, a smaller manufacturer of telescopes, Jinghua

Synta where no affiliate is specified.

Optical Co. Ltd. ("Jinghua"), made a bid to purchase it.  *Id.* ¶¶ 73, 75.  Knowing that Jinghau's purchase of Meade would have allowed Jinghua to more substantially compete in the market, Ningbo Sunny and Synta conspired to prevent the acquisition.  *Id.* ¶ 77, Ex. 2.  Because Synta owned Celestron, a direct competitor of Meade, Synta could not purchase Meade directly.  Instead, Ningbo Sunny's CEO Peter Ni, and Synta's CEO Mr. Chen agreed that Ningbo Sunny would purchase Meade with financial and other assistance from Synta.  *Id.* ¶¶ 77-78.

After the acquisition, Celestron loaned considerable sums to horizontal competitor Ningbo Sunny.  *Id.* ¶ 88.  In exchange for these capital contributions, Celestron was granted an ownership interest in Meade, another horizontal competitor, which was memorialized in Celestron's "shadow books."  *Id.* ¶ 89.  David Shen and Peter Ni agreed that Defendant and then-Celestron CEO Joe Lupica would quit his role at Celestron on June 18, 2013 and become CEO of Meade after the deal closed.  *Id.* ¶ 83.  This transfer took place as planned, and other Celestron executives also joined Meade.  *Id.* ¶ 84.

The Synta Entities and Ningbo Sunny Entities effectively divided the telescope market by agreeing that Synta would manufacture and supply higher-end telescopes, that Ningbo Sunny would manufacture and supply lower-end telescopes, and that they would not compete.  *Id.* ¶ 96; *see also id.* Ex. 9 (email from Synta's CEO Mr. Shen informing Ningbo Sunny's CEO Mr. Ni and Celestron's CEO David Anderson that "[t]he best way in the future is to divide the products and sell them into different markets to reduce conflicts").  Ningbo Sunny also provided Celestron with Meade's trade secrets and pricing information, allowed Celestron engineers to tour Meade's factory, and continued to coordinate business activities with Mr. Shen and his trusted counselor and Celestron Executive Committee member Laurence Huen.  *Id.* ¶¶ 87, 100-101.  By dividing the market and sharing information in this way, Ningbo Sunny and Synta together controlled between 90% of the manufacturing market in 2018.  *Id.* ¶¶ 118.

On November 1, 2016, independent telescope distributor Optronic Technologies Co. ("Orion") filed suit in this District against its competitors Ningbo Sunny, Meade, and affiliate

Sunny Optics, Inc. (the "*Orion* Action"). *See Optronic Techs. Inc. v. Ningbo Sunny et al.*, No. 5:16-cv-06370-EJD (N.D. Cal.). The *Orion* Action involved largely the same causes of action and factual allegations as described in the SAC. Orion was also represented by counsel for Plaintiffs in this case. After a six-week trial in the *Orion* Action, a jury found Ningbo Sunny liable for violations of the Sherman Act and Clayton Act. *Optronic Techs. Inc. v. Ningbo Sunny et al.*, No. 5:16-cv-06370-EJD, Dkt. No. 501 (N.D. Cal. Nov. 26, 2019). While the *Orion* Action is relevant to the extent it affects the analysis of Plaintiffs' knowledge of the underlying factual allegations, none of the moving Defendants were parties to the *Orion* Action and the holdings of that case are not binding on this one.

Following the *Orion* trial, Plaintiffs filed the present action. Plaintiffs seek to represent a class consisting of all similarly situated retailers and distributors who purchased telescopes manufactured or sold by Defendants during the time period beginning from Synta's acquisition of Celestron in 2005 through such time as class notice is given. On October 19, 2020, Plaintiffs filed the SAC, raising four causes of action: (1) price fixing, credit term fixing, market allocation, product allocation, and other unlawful collusion between competitors in violation of § 1 of the Sherman Act (15 U.S.C. § 1); (2) monopolization, attempted monopolization, and conspiracy to monopolize in violation of § 2 of the Sherman Act (15 U.S.C. § 2) and § 7 of the Clayton Act (15 U.S.C. § 18); (3) unfair competition in violation of California Business & Professions Code §§ 17200 et seq.; and (4) price fixing, credit term fixing, market allocation, product allocation, other unlawful collusion between competitors, monopolization, attempted monopolization, and conspiracy to monopolize in violation of the Cartwright Act, California Business & Professions Code §§ 16700 et seq. Plaintiffs seek, among other things, their actual damages, treble damages, and injunctive relief.

As noted above, Defendants filed two separate motions to dismiss, which raise many of the same arguments and which the Court considers together. Several indirect purchaser plaintiffs ("IPPs") also filed complaints in this District against largely the same defendants ("the IPP

Action"), which were later consolidated and related to this case. *Hightower v. Celestron Acquisiton, LLC et al.*, No. 5:20-cv-03639-EJD (N.D. Cal.). The Defendants filed similar motions to dismiss and a motion to strike in the IPP Action, which this Court addressed in a separate order ("the IPP Order"). *Hightower*, No. 5:20-cv-03639-EJD, Dkt. No. 177 (N.D. Cal. June 2, 2021). Because many of the arguments Defendants raised are the same in both cases, the Court references and relies on its analysis in the IPP Order throughout this order.

## II.        LEGAL STANDARD

Rule 8(a)(2) of the Federal Rules of Civil Procedure requires a complaint to include "a short and plain statement of the claim showing that the pleader is entitled to relief." A complaint that fails to meet this standard may be dismissed pursuant to Rule 12(b)(6). Rule 8(a) requires a plaintiff to plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). While a plaintiff must allege "more than a sheer possibility that a defendant has acted unlawfully," the plausibility standard "is not akin to a probability requirement." *Id.*

For purposes of ruling on a Rule 12(b)(6) motion, the Court generally "accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). The Court need not, however, "assume the truth of legal conclusions merely because they are cast in the form of factual allegations." *Fayer v. Vaughn*, 649 F.3d 1061, 1064 (9th Cir. 2011) (per curiam). Mere "conclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss." *Adams v. Johnson*, 355 F.3d 1179, 1183 (9th Cir. 2004). The Court may also "look beyond the plaintiff's complaint to matters of public record" without converting the Rule 12(b)(6) motion into a motion for summary judgment. *Shaw v. Hahn*, 56 F.3d 1128, 1129 n. 1 (9th Cir.1995).

### III. MOTION TO DISMISS

Defendants seek to dismiss the SAC on three grounds (1) all of Plaintiffs' claims are barred under the applicable statutes of limitations; (2) Plaintiffs fail to raise sufficient allegations as to specific named defendants; and (3) Plaintiffs fail to sufficiently allege claims under the Sherman Act, the Clayton Act, or the relevant state laws.

### A. Statutes of Limitations

Plaintiffs have alleged violations of the Sherman Act §§ 1 and 2, Clayton Act § 7, the Cartwright Act, and California Business & Professions Code §§ 16700, 17200—all of which are subject to a four-year statute of limitations. *Garrison v. Oracle Corp.*, 159 F. Supp. 3d 1044, 1062–85 (N.D. Cal. 2016) (analyzing limitations period of these same claims). "Ordinarily, '[a] cause of action in antitrust accrues each time a plaintiff is injured by an act of the defendant and the statute of limitations runs from the commission of the act.'" *Intel Corp. v. Fortress Inv. Grp. LLC*, No. 19-CV-07651-EMC, 2020 WL 6390499, at *19 (N.D. Cal. July 15, 2020) (quoting *Oliver v. SD-3C LLC*, 751 F.3d 1081, 1086 (9th Cir. 2014); *see also Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1050 (8th Cir. 2000) ("An antitrust cause of action generally accrues and the statute begins to run when a defendant commits an act that injures a plaintiff's business.") (internal quotation marks omitted). A plaintiff is not required actually discover its antitrust claims before the statute of limitations begins to run. *Hexcel Corp. v. Ineos Polymers, Inc.*, 681 F.3d 1055, 1060 (9th Cir. 2012).

Defendants argue that Plaintiffs' claims are time-barred because Plaintiffs do not allege any wrongful acts within four years of when this action was first filed on June 1, 2020. Defendants further argue that Plaintiffs fail to plead facts to support fraudulent concealment or any other defense to the statute of limitations bar.

#### 1. Continuing conspiracy

Plaintiffs first argue that their claims are timely because they allege a continuing violation of antitrust laws, such that allegations of ongoing sales of price-fixed products are sufficient to restart the statute of limitations period. "[I]n the context of a continuing conspiracy to violate the

antitrust laws, . . . each time a plaintiff is injured by an act of the defendant[ ] a cause of action accrues to him to recover the damages caused by that act." *Oliver*, 751 F.3d at 1086 (quoting *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338 (1971)) (internal quotation marks omitted). "[A]s to those damages, the statute of limitations runs from the commission of the act." *Id.* (internal quotation marks omitted). To restart the statute of limitations, there must be a new overt act that: (1) is "new and independent . . . [and] not merely a reaffirmation of a previous act," and (2) "inflict[s] new and accumulating injury on the plaintiff." *Id.* (citing *Pace Indus., Inc. v. Three Phoenix Co.*, 813 F.2d 234, 238 (9th Cir. 1987)). "[T]he Supreme Court and federal appellate courts have recognized that each time a defendant sells its price-fixed product, the sale constitutes a new overt act causing injury to the purchaser and the statute of limitations runs from the date of the act." *Id.*

Plaintiffs argue that they have sufficiently alleged a continuing conspiracy, pointing to their allegation that "Defendants entered into a *continuing* combination or conspiracy to unreasonably restrain trade and commerce." SAC ¶ 142 (emphasis added); *see also id.* ¶ 120 ("Through their domination of the supply chain and unlawful agreements, Defendants have effectively prevented new market entrants at the distribution level, and forced many distributors to go out of business, thereby continuing to inhibit and restrict competition."); *id.* ¶ 144 ("Plaintiffs were and continue to be injured in fact by the conspiracies of Defendants."). The Court agrees that at the pleading stage, these allegations are sufficient to show that continuing violations are plausible.

Defendants argue that the Court should not interpret *Oliver* to mean that "each time a defendant sells its price-fixed product, the sale constitutes a new overt act causing injury to the purchaser and the statute of limitations runs from the date of the act." Dkt. No. 91, Reply in Supp. of Mot. to Dismiss DPP Second Amended Compl. ("First Reply"). at 9. But that is precisely what the Ninth Circuit held. *Oliver*, 751 F.3d at 1086 ("[E]ach time a defendant sells its price-fixed product, the sale constitutes a new overt act causing injury to the purchaser and the statute of

limitations runs from the date of the act."); *see also In re Cal. Bail Bond Antitrust Litig.*, No. 19-CV-00717-JST, 2020 WL 3041316, at *19 (N.D. Cal. Apr. 13, 2020) (relying on *Oliver* in holding that "each sale of a bail bond that was artificially inflated as a result of the alleged conspiracy thus constitutes an overt act restarting the statute of limitations").

Defendants cite to *In re Packaged Seafood Products Antitrust Litigation*, 242 F. Supp. 3d 1033 (S.D. Cal. 2017) in support of their argument. There, the court acknowledged *Oliver*'s holding that in a continuing conspiracy "each price-fixed sale constitutes an 'overt act' that starts the statute of limitations anew," but also noted that other Circuits require more, such as another meeting in furtherance of the conspiracy. *Id.* at 1098 (citing *Penn. Dental Ass'n v. Med. Serv. Ass'n of Penn.*, 815 F.2d 270, 277 (3d Cir. 1987)). In light of the split of authority, the court simply held that the continuing conspiracy did not save *all* of plaintiffs' claims from application of the statute of limitations.

The Court agrees with the court in *In re Packaged Seafood* that the continuing conspiracy doctrine does not entitle Plaintiffs to recover for all past injuries; rather, each new price-fixed sale triggers a new limitations period for Plaintiffs to recover "the damages caused by that act." *Zenith Radio Corp.*, 401 U.S. at 338–39; *see also Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189 (1997) ("[T]he commission of a separate new overt act generally does not permit the plaintiff to recover for the injury caused by old overt acts outside the limitations period."); *In re Packaged Seafood*, 242 F. Supp. 3d at 1098 ("It does not therefore necessarily follow that each new injury constitutes Sherman-Act-compensable harm that—when timely litigated—provides an avenue of redress for past, non-timely-pursued harms."). However, the Court departs from the *In re Packaged Seafood* analysis in finding that under *Oliver*, Plaintiffs may recover damages for alleged price-fixed sales throughout the last four years.

### 2. Fraudulent concealment

Other than the allegations discussed above regarding a continuing conspiracy, the SAC does not raise any allegations of specific unlawful acts in the four years prior to filing. Thus, to

United States District Court
Northern District of California

the extent Plaintiffs seek to recover damages for conduct that occurred before June 1, 2016, Plaintiffs must establish that the applicable statutes of limitations were tolled. *Hinton v. Pac. Enterprises*, 5 F.3d 391, 395 (9th Cir. 1993) ("The burden of alleging facts which would give rise to tolling falls upon the plaintiff."). However, "because resolving tolling disputes is a fact-intensive process, statute of limitations defenses 'may not be raised by motion to dismiss' unless they include 'no disputed issues of fact.'" *In re Cal. Bail Bond*, 2020 WL 3041316, at *17 (citing *Scott v. Kuhlmann*, 746 F.2d 1377, 1378 (9th Cir. 1984)). Plaintiffs argue that they have sufficiently alleged that Defendants fraudulently concealed their conspiracy and thus their claims are timely.

To toll the statute of limitations under a theory of fraudulent concealment, a plaintiff "must do more than show that it was ignorant of its cause of action. *In re Cathode Ray Tube (CRT) Antitrust Litig.* ("*In re Cathode Ray Tube II*"), No. C-07-5944 JST, 2016 WL 8669891, at *4 (N.D. Cal. Aug. 22, 2016). A plaintiff asserting fraudulent concealment must allege that: (1) the defendant took affirmative acts to mislead the plaintiff; (2) the plaintiff did not have actual or constructive knowledge of the facts giving rise to its claim; and (3) the plaintiff acted diligently in trying to uncover the facts giving rise to its claim. *In re Animation Workers Antitrust Litig.*, 123 F. Supp. 3d 1175, 1194 (N.D. Cal. 2015) (quoting *Hexcel Corp.*, 681 F.3d at 1060). Allegations of fraudulent concealment must be pled with particularity; conclusory statements are insufficient. *Conmar Corp. v. Mitsui & Co. (U.S.A.)*, 858 F.2d 499, 502 (9th Cir. 1988); *Reveal Chat Holdco, LLC v. Facebook, Inc.*, 471 F. Supp. 3d 981, 992 (N.D. Cal. 2020) (citing *Ryan v. Microsoft Corp.*, 147 F. Supp. 3d 868, 885 (N.D. Cal. 2015)).

### a.    Affirmative acts

With respect to the first element, Plaintiffs argue that they sufficiently allege several affirmative acts that Defendants took to mislead Plaintiffs, including:

- "The conspirators falsely told the FTC that Celestron, Synta, and David Shen were uninvolved in Ningbo Sunny's anticompetitive and illegal acquisition of Meade. In fact, Ningbo Sunny's counsel Sheppard Mullin was directed to take instructions

United States District Court
Northern District of California

from Synta and Celestron personnel, including Defendant Lupica, Defendant Anderson, Defendant Huen, and David Shen. These Celestron and Synta personnel orchestrated the illegal Meade deal behind the scenes." SAC ¶ 132; *see also id.* ¶¶ 91-93 (Ningbo Sunny's counsel stating in an email to the FTC that "except for the limited advice to Peter Ni regarding how to acquire a U.S. company . . . David Shen has no role in the proposed acquisition of Meade."); *id.*, Ex. 4, 8.

- "As part of their unlawful arrangement, Defendant Celestron took equity in its horizontal competitor Meade – which is memorialized in shadow books kept by Defendants' coconspirators." *Id.* ¶ 89, Ex. 7.

- "After the Meade acquisition closed, Synta and Celestron directed millions of dollars to Ningbo Sunny to finance its consolidation and control over Meade. Defendant Anderson (who was President of Celestron at the time) wrote his co-conspirators emails explaining that this arrangement could not be disclosed to Celestron's banking partners." *Id.* ¶¶ 135.
- "The co-conspirators also intentionally and fraudulently concealed their conspiracy from the public by filing disclosures with the SEC relating to the Meade transaction that failed to disclose Chairman Shen, Synta, and Celestron's involvement and role in the Meade acquisition." *Id.* ¶ 136.

Defendants argue that these allegations amount to nothing more than "passive concealment." Although the affirmative acts necessary to show fraudulent concealment "can be integral to the underlying conspiracy itself . . . passive concealment is not enough." *In re Cathode Ray Tube II*, 2016 WL 8669891, at *4. "Passive concealment of information is not enough to toll the statute of limitations, unless the defendant had a fiduciary duty to disclose information to the plaintiff." *Reveal Chat*, 471 F. Supp. 3d at 992–93 (citing *Conmar Corp.*, 858 F.2d at 505)). "An affirmative act of denial, however, is enough if the circumstances make the plaintiff's reliance on the denial reasonable." *Id.* "[T]he line between active and passive concealment is very fine indeed." *In re Cathode Ray Tube II*, 2016 WL 8669891, at *4.

By these standards, Defendants' failure to disclose details of the Meade transaction in public SEC filings is merely passive concealment, not an affirmative act. *See Volk v. D.A. Davidson & Co.*, 816 F.2d 1406, 1416 (9th Cir. 1987) ("[A]ppellees passively concealed the reports by not disclosing them to the investors. In such situations, the federal tolling doctrine does not apply."); *Reveal Chat*, 471 F. Supp. 3d at 992–93 ("[T]he mere failure to own up to illegal

conduct in response to an inquiry about whether the defendant engaged in illegal antitrust activity is not sufficient for fraudulent concealment, and to find otherwise would effectively nullify the statute of limitations in these cases.") (internal quotation marks omitted).

Ningbo Sunny's affirmative misrepresentation to the FTC regarding Mr. Shen's involvement, however, implies more than mere passive concealment. It is plausible that this affirmative misrepresentation to the FTC was calculated to avoid government scrutiny of the transaction and thereby to hide the alleged antitrust violations from the public. The Court finds that this allegation constitutes an affirmative act to mislead Plaintiffs. Similarly, the fact that Celestron took equity in its competitor Meade, but only maintained records of that transaction in "shadow books," and the fact that Celestron allegedly structured its payments to Ningbo Sunny to avoid raising red flags with its bank or auditors constitute affirmatively misleading conduct "above and beyond" the alleged conspiracy itself. *In re Animation Workers*, 87 F. Supp. 3d at 1215 (citing *Guerrero v. Gates*, 442 F.3d 697, 706–07 (9th Cir. 2006)).

The Court also notes that none of the alleged affirmative acts date back to the beginning of the proposed class period in January 2005; rather, they all revolve around the alleged conspiracy to acquire Meade in 2013. Thus, the Court finds that Plaintiffs have only sufficiently alleged affirmative acts to support the first element of fraudulent concealment as to the alleged misconduct that occurred in 2013 or later.

### b. Actual or constructive knowledge

Plaintiffs allege that they "had neither actual nor constructive knowledge of the pertinent facts constituting their claims for relief" and could not have discovered those facts until "September 2019, when some evidence revealing Defendants' secret conspiracy was first made public in the summary [judgment] briefing in the Orion Litigation." SAC ¶ 130. Defendants argue that it is implausible that Plaintiffs lacked knowledge of the conspiracy until 2019, because Plaintiffs' peer distributor, Orion, was aware of the conspiracy at least as of 2015. Defendants question "what circumstances would permit Orion, but prevent similarly situated Plaintiffs, from

becoming aware of the basis for the claims asserted in the SAC until 2019[.]"  First Reply at 8.

The specific facts giving rise to Orion's complaint are not alleged in the SAC and are not before the Court.  Although it is possible that Orion uncovered the conspiracy from observing public facts also available to Plaintiffs in this case, that is an inference the Court is unwilling to make at the pleading stage.  It is equally possible—and, indeed, Plaintiffs argue—that Orion had unique experiences and interactions with Defendants that provided insight into the alleged conspiracy.  It is not clear from the face of the SAC that Plaintiffs had constructive knowledge of the conspiracy, and at this stage, the Court must make all inferences in favor of Plaintiffs.  Thus, the Court finds that Plaintiffs have sufficiently alleged that they did not actually or constructively know about the alleged conspiracy before September 2019.

### c.        Diligence

Defendants argue that Plaintiffs failed to plead specific "acts of diligence."  First Mot. to Dismiss at 11.  Plaintiffs contend that diligent inquiry is only required "where facts exist that would excite the inquiry of a reasonable person."  *Reveal Chat*, 471 F. Supp. 3d at 994.  The Court agrees with Plaintiffs.  *Conmar Corp.*, 858 F.2d at 504.

Defendants argue there are facts alleged in the SAC that should have "excited the inquiry" of Plaintiffs   First Reply at 9 ("Surely, Plaintiffs recognized that the same companies had manufactured and distributed the telescopes they purchased for an uninterrupted 10 year period."). The Court does not find this argument persuasive.  The fact that two companies dominated a particular industry uninterrupted for ten years does not, without more, suggest any misconduct and would not lead a reasonable person to suspect an antitrust conspiracy in the market.

In the absence of any allegations on the face of the SAC that would raise the suspicions of a reasonable consumer, the Court finds that Plaintiffs were not required to plead specific acts of diligence.  *See In re Animation Workers*, 123 F. Supp. 3d at 1205 (noting "courts have 'been hesitant to dismiss an otherwise fraudulently concealed antitrust claim for failure to sufficiently allege due diligence,' because questions of inquiry notice are 'necessarily bound up with the facts

of the case.'").

Accordingly, the Court finds that Plaintiffs have plausibly alleged that Defendants' fraudulent concealment of their misconduct tolled the statutes of limitations as to claims arising out of conduct in 2013 or later.

### B.    Individualized Allegations

"Courts in this district do not require plaintiffs in complex, multinational, antitrust cases to plead detailed, defendant-by-defendant allegations; instead they require plaintiffs 'to make allegations that plausibly suggest that each Defendant participated in the alleged conspiracy.'" *In re Cathode Ray Tube (CRT) Antitrust Litig.* ("*In re Cathode Ray Tube I*"), 738 F. Supp. 2d 1011, 1019 (N.D. Cal. 2010).  An antitrust complaint "must allege that each individual defendant joined the conspiracy and played some role in it because, at the heart of an antitrust conspiracy is an agreement and a conscious decision by each defendant to join it." *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 586 F. Supp. 2d 1109, 1117 (N.D. Cal. 2008).  This is "because, at the heart of an antitrust conspiracy is an agreement and a conscious decision by each defendant to join it." *In re Cal. Title Ins. Antitrust Litig.*, No. C 08-01341 JSW, 2009 WL 1458025, at *7–8 (N.D. Cal. May 21, 2009).

Defendants argue that Plaintiffs fail to state any valid claims against the majority of Synta affiliates and certain individual defendants because they do not allege any misconduct or participation in the conspiracy specific to each defendant.  In the First Motion to Dismiss, Defendants challenge the allegations against SW and individual defendants Messrs. Anderson, Lupica, and Lee.

With respect to the individual defendants, Messrs. Anderson, Lupica, and Lee, Defendants argue that they cannot be held liable for antitrust violations "just because they served as CEO at the time."  First Mot. to Dismiss at 15 (citing *F.T.C. v. Swish Mktg.*, No. C 09-03814 RS, 2010 WL 653486, at *5–6 (N.D. Cal. Feb. 22, 2010)).  Defendants argue that Plaintiffs must instead plead that the individuals actively participated in "inherently wrongful conduct."  *Id.* (citing

*Murphy Tugboat Co. v. Shipowners & Merchants Towboat Co.*, 467 F. Supp. 841, 853 (N.D. Cal. 1979), *aff'd sub nom. Murphy Tugboat Co. v. Crowley*, 658 F.2d 1256 (9th Cir. 1981)). Defendants contend that the SAC contains no such allegations of inherently wrongful conduct by the individual defendants, such that they could be held liable for the corporations' antitrust violations.

Plaintiffs argue that "the SAC's claims against Defendants Lee, Lupica, and Anderson are not based upon the bare fact that they were all Celestron's CEO, but rather their actual acts in furtherance of the anticompetitive conspiracy." Dkt. No. 86, Opp'n to First Mot. to Dismiss ("First Opp'n"), at 18. For example, the SAC alleges that "[a]s part of their pricing coordination efforts, Celestron's current CEO, Defendant Corey Lee, worked with co-conspirators Synta and Ningbo Sunny to steal competitors' trade secret sales and pricing information." SAC ¶ 99; *see also id.*, Ex. 12 (email exchange showing Mr. Lee requesting confidential information regarding competitor Orion's order statistics from Ningbo Sunny).

The SAC also alleges that Messrs. Lupica and Anderson were highly involved in orchestrating Ningbo Sunny's acquisition of Meade. *See, e.g.*, *id.* ¶ 78 (Ningbo Sunny's Peter Ni sent an email to Mr. Anderson requesting that Celestron and Synta continue to provide financial support for the Meade transaction); *id.* ¶ 82 ("Defendants Lupica and Anderson worked with Sheppard Mullin to help structure and negotiate the [Meade] transaction and to keep Chairmen Shen and Ni informed about its progress."). After the acquisition, Mr. Lupica became Meade's CEO. *Id.* ¶¶ 83-84. In an email to Ningbo Sunny and Synta representatives, Mr. Lupica wrote: "if we take advantage of the strong relationships among Sunny, Synta, Celestron and Meade (under Peter's ownership) we can quickly turn the company around and the four companies can dominate the telescope industry." *Id.*, Ex. 17. Similarly, in an email to Ningbo Sunny's Mr. Ni and Mr. Anderson, Mr. Shen explained that "[t]he best way in the future is to divide the products and sell them into different markets to reduce conflicts." *Id.* ¶ 97, Ex. 10.

Thus, the SAC suggests that Mr. Anderson was directly involved in negotiating

Celestron's role in Ningbo Sunny's 2013 acquisition of Meade; that he was aware of and approved of Celestron's payments to Ningbo Sunny; and that he was aware of Mr. Ni's desire to "divide the products." Like Mr. Anderson, Mr. Lupica was involved in advising Ningbo Sunny's legal team on the acquisition of Meade, and he is alleged to have become Meade's CEO following Ningbo Sunny's acquisition of Meade. He appears on a number of communications in which conduct of the conspiracy is discussed. The Court further finds that the allegations against Mr. Lee, while less extensive, plausibly allege that he participated in the conspiracy. Taking these allegations as true, the Court finds that they plausibly allege that Messrs. Anderson, Lupica, and Lee played a role in the alleged conspiracy such that they may be held liable for its consequences.

With respect to SW, the SAC alleges that SW is a wholly owned subsidiary of David Shen's company Synta Tech, that Mr. Shen and his family created SW to acquire Celestron in 2005, that they operate it as a holding company, and that Mr. Shen's sister Sylvia Shen is SW's CEO, CFO, and Secretary. SAC ¶¶ 24-25. The SAC further alleges that all "Synta-related holding companies and shell corporations," including SW, "are operated and run for the common benefit of one another and Chairman Shen and have aided, encouraged, and cooperated with Defendants and their coconspirators to fix the prices of telescopes, and dominate and allocate the markets for telescope manufacturing and distribution." *Id.* ¶ 37. It further alleges that these Synta affiliates "are designed to hide assets, obscure ownership, and divert assets and shift capital away from the People's Republic of China on behalf of their co-conspirators who are based in China." *Id.*

The Court finds that these allegations are not sufficient to raise a plausible inference that SW participated in the alleged conspiracy. The fact that SW was created for the purpose of acquiring Celestron in 2005 does not raise any inference of wrongdoing given that, as explained further below, the SAC does not allege any particular misconduct with respect to that acquisition. It is common for companies to create special purpose entities or holding companies for the purpose of acquiring a target, and without more, there is nothing nefarious about the use of such a

holding company to acquire Celestron. The allegations that SW has "aided, encouraged, and cooperated with Defendants and their coconspirators to fix the prices of telescopes" merely offers a legal conclusion, which the Court need not accept as true. *Fayer*, 649 F.3d at 1064; *Adams*, 355 F.3d at 1183.

In the IPP Order, the Court analyzed a different and detailed set of allegations regarding how the Synta "corporate family" operated as a single enterprise. *See Hightower*, No. 5:20-cv-03639-EJD, Dkt. No. 113 ¶¶ 88-89 (N.D. Cal. Nov. 6, 2020). The Court found those allegations sufficient based on precedent from this District involving nearly identical allegations. *See, e.g.*, *Jones v. Micron Tech. Inc.*, 400 F. Supp. 3d 897, 923 (N.D. Cal. 2019); *In re Cathode Ray Tube I*, 738 F. Supp. 2d at 1019–22; *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 599 F. Supp. 2d 1179, 1184–85 (N.D. Cal. 2009). No such allegations are present in the SAC here. *In re Cal. Title Ins.*, 2009 WL 1458025, at *8 (finding insufficient allegations that "each of the Parent Corporations 'wholly owns and controls its affiliates and subsidiaries,' that each does business in California 'through' those subsidiaries, and that each of the subsidiaries 'engaged in the conduct challenged here with the approval' of the Parent Corporations"). Thus, the Court finds that Plaintiffs have failed to adequately allege claims against SW.

In the Second Motion to Dismiss, Defendants challenge the allegations against Sylvia Shen, Jack Chen, Pacific Telescope, Nantong Schmidt, Olivon Manufacturing, Olivon USA, and Suzhou Synta. The SAC raises the following allegations as to each of these parties:

- <u>Sylvia Shen</u> is David Shen's sister, is a conduit through whom he "exercises control over several Synta-related entities," is a member of Celestron's executive committee, and personally "participated in, planned, and carried out the conspiracy" (SAC ¶ 17);

- <u>Jack Chen</u> is Sylvia Shen's husband, a member of Celestron's executive committee, and personally "participated in, planned, and carried out the conspiracy" (*id.* ¶ 18);

- <u>Pacific Telescope</u> is controlled by Sylvia Shen and it "participated in Defendants' conspiracy by distributing Synta telescopes" (*id.* ¶ 29);

- <u>Nantong Schmidt</u> "is owned and/or controlled by David Shen" and participated in

the conspiracy by "manufactur[ing] telescopes that were sold into this District during the Class Period, including to Defendant Celestron" at artificial, supracompetitive prices (*id.* ¶ 21);

- <u>Olivon Manufacturing</u> is controlled by Jean Shen and "participated in Defendants' conspiracy by falsely representing to telescope distributors that Synta's horizontal competitor and co-conspirator Ningbo Sunny Electronic Co., Ltd. is one of Defendant Jean Shen's 'family's companies,' thereby unlawfully coordinating price fixing and market division among horizontal competitors" (*id.* ¶¶ 27, 30);

- <u>Olivon USA</u> is controlled by Jean Shen and "participated in Defendants' conspiracy by falsely representing to telescope distributors that Synta's horizontal competitor and co-conspirator Ningbo Sunny Electronic Co., Ltd. is one of Defendant Jean Shen's 'family's companies,' thereby unlawfully coordinating price fixing and market division among horizontal competitors" (*id.* ¶¶ 28, 30);

- <u>Suzhou Synta</u> "is owned and/or controlled by David Shen and his family" and participated in the conspiracy by "manufactur[ing] telescopes that were sold into this District during the Class Period" at Defendants' artificial, supracompetitive prices (*id.* ¶ 20).

There are several other allegations throughout the SAC that are not raised in the briefing regarding Sylvia Shen, including that she sent or received several emails in which Ningbo Sunny representatives discussed "how to avoid conflict with Celestron products" (*id.* ¶ 106, Ex. 15) and in which Mr. Anderson discusses Celestron providing financial support to Ningbo Sunny during the Meade transaction (*id.*, Ex. 2), among others. The Court finds these allegations sufficient to state claims against Ms. Shen.

As to all other defendants listed above, the Court finds the allegations insufficient for the same reasons as stated above with respect to SW. Allegations merely stating that each defendant "participated in" the conspiracy are conclusory, and Plaintiffs have provided no additional factual allegations from which one could deduce that each defendant joined the conspiracy and played a certain role in it.

In the Synta Canada Motion, Jean Shen and Synta Canada challenge the allegations against them. With respect to Synta Canada, the SAC alleges that it is a 20% owner of Suzhou Synta and that David Shen and his family members own or control Synta Canada. SAC ¶ 26. The SAC

further alleges that all "Synta-related holding companies and shell corporations," including Synta Canada, "are operated and run for the common benefit of one another and Chairman Shen and have aided, encouraged, and cooperated with Defendants and their coconspirators to fix the prices of telescopes, and dominate and allocate the markets for telescope manufacturing and distribution." *Id.* ¶ 37. It further alleges that these Synta affiliates "are designed to hide assets, obscure ownership, and divert assets and shift capital away from the People's Republic of China on behalf of their co-conspirators who are based in China." *Id.* These are substantially the same allegations as those against SW, and for the same reasons the Court finds that Plaintiffs have not stated a claim against SW, it likewise finds that Plaintiffs have not stated a claim against Synta Canada.

With respect to Jean Shen, Plaintiffs allege that she is David Shen's sister, that she is a conduit through whom he "exercises control over" Olivon Manufacturing and Olivon USA, and that she personally actively "participated in, planned, and carried out the conspiracy" by "representing to telescope distributors that Synta's horizontal competitor and co-conspirator Ningbo Sunny . . . was one of 'my family's companies.'" SAC ¶ 19. The most that can be inferred from these sparse allegations is that Ms. Shen was aware of the connection between Synta and Ningbo Sunny. However, these allegations say nothing about any action that Ms. Shen may have taken to join the conspiracy, and it is not clear what role—if any—she played in it. Accordingly, the Court finds that Plaintiffs have failed to state a claim against Ms. Shen. *In re Cathode Ray Tube I*, 738 F. Supp. 2d at 1019; *In re TFT-LCD*, 586 F. Supp. 2d at 1117.

Thus, the Motions to Dismiss are GRANTED as to SW, Jack Chen, Pacific Telescope, Nantong Schmidt, Olivon Manufacturing, Olivon USA, Suzhou Synta, Jean Shen, and Synta Canada.

## C.      Sherman Act § 1 Claim

Section 1 of the Sherman Act provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or

with foreign nations, is declared to be illegal." 15 U.S.C. § 1. A plaintiff asserting a claim under § 1 must plead: (1) a contract, combination or conspiracy among two or more persons or distinct business entities (2) which is intended to restrain or harm trade; (3) which actually injures competition, and (4) harm to the plaintiff from the anticompetitive conduct. *Name.Space, Inc. v. Internet Corp. for Assigned Names & Numbers*, 795 F.3d 1124, 1129 (9th Cir. 2015) (quoting *Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1197 (9th Cir. 2012)). But "[b]ecause § 1 . . . does not prohibit all unreasonable restraints of trade but only restraints effected by a contract, combination, or conspiracy, the crucial question is whether the challenged anticompetitive conduct stems from independent decision or from an agreement, tacit or express." *Twombly*, 550 U.S. at 553.

Defendants argue first that Plaintiffs fail to allege which Defendants reached what agreements. The Court disagrees. The SAC raises numerous allegations that plausibly suggest a tacit or express agreement to restrain trade. *See, e.g.*, SAC ¶ 96 (alleging that "[a]fter the acquisition, Synta, Celestron, Ningbo Sunny, and Meade colluded not to compete with one another. . . . For example, an email between the principals of Synta and Ningbo Sunny shows Chairman Shen asking Ningbo Sunny's Chairman Peter Ni to work out what he calls a 'tacit understanding' with Defendant Anderson (Celestron's then-CEO) about not competing against Celestron for sales to Costco"); *id.* ¶ 97 (alleging that Synta's Mr. Shen informed Ningbo Sunny's Mr. Ni and Celestron's David Anderson, "[t]he best way in the future is to divide the products and sell them into different markets to reduce conflicts"); *id.* ¶ 107 (alleging that Ningbo Sunny's Mr. Chiu also explained to Synta's Ms. Sylvia Shen that Ningbo Sunny "will take prompt action to avoid conflict in the astronomical market," including "abandoning the small OEM customers so as to protect big customers."). The Court finds these allegations, along with others in the SAC, to sufficiently state a claim under § 1. ("Restraints that are per se unlawful include horizontal agreements among competitors to fix prices or to divide markets." *United States v. eBay, Inc.*, 968 F. Supp. 2d 1030, 1037 (N.D. Cal. 2013) (quoting *Leegin Creative Leather Prod., Inc. v. PSKS*,

*Inc.*, 551 U.S. 877, 886 (2007)) (internal quotation marks omitted).

Defendants next argue that there "there is no pre-2013 conduct forming the basis for this cause of action." First Mot. to Dismiss at 18. Plaintiffs seek to bring this case on behalf of "all similarly situated retailers and distributors who purchased a telescope manufactured or sold by Defendants from Synta's acquisition of Celestron in 2005 through such time as class notice is given." SAC ¶ 122. The only pre-2013 conduct alleged in the SAC, however, is Synta's acquisition of Celestron in 2005. Just as in the complaint in the IPP Action, the SAC alleges no specific misconduct in connection with that transaction, nor does the SAC allege any particular misconduct occurring between 2005 and the Meade acquisition in 2013. Thus, the Court agrees with Defendants that Plaintiffs fail to sufficiently allege any violation of § 1 before the Meade acquisition in 2013.

Defendants' motions are GRANTED as to Plaintiffs' Sherman Act § 1 claim, to the extent it is based on pre-2013 conduct. The Court otherwise DENIES Defendants' motions as to the Sherman Act § 1 claim.

### D. Sherman Act § 2 Claim

Section 2 of the Sherman Act prohibits monopolization or attempted monopolization of trade or commerce. 15 U.S.C. § 2. A plaintiff asserting an attempt claim must plead: (1) a specific intent to control prices or destroy competition; (2) predatory or anticompetitive conduct directed at accomplishing that purpose; (3) a dangerous probability of achieving "monopoly power," and (4) causal antitrust injury" *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995); *Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*, No. 5:16-CV-06370-EJD, 2017 WL 4310767, at *3 (N.D. Cal. Sept. 28, 2017). A monopoly claim has two elements, aside from antitrust injury: (1) the defendant possessed monopoly power in the relevant market and (2) the defendant willfully acquired or maintained that power. *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1202 (9th Cir. 1997).

As with the § 1 claim, Defendants argue that Plaintiffs fail to raise any allegations of

United States District Court
Northern District of California

misconduct before the Meade acquisition in 2013.  To the extent Plaintiffs seek to base their § 2 claim on Synta's acquisition of Celestron, Defendants argue that Plaintiffs failed to allege any monopolization or threat of monopolization arising out of that merger.  In fact, Plaintiffs specifically allege that it was Ningbo Sunny's acquisition of Meade that ultimately gave the co-conspirators effective monopoly power over the market.  SAC ¶ 41 (alleging that Ningbo Sunny "orchestrat[ed] the acquisition of Meade using the Synta Defendants' support and assistance to coordinate its pricing, sales, and manufacturing practices with Synta and Celestron to effectively monopolize the U.S. market.").  Plaintiffs do not refute this point.  The Court finds that Plaintiffs have failed to state a § 2 claim for any conduct arising before 2013.

Defendants next contend that "the SAC fails to allege that Defendants either have a monopoly in the market . . . or the 'dangerous probability' of Defendants achieving such a monopoly."  First Mot. to Dismiss at 20.  Defendants argue that "the SAC simply alleges that Ningbo Sunny and Defendants, in the aggregate, control the distribution market without specifying Defendants' alleged share of the market."  *Id.*  This argument ignores several allegations in the SAC specifically describing Defendants' share of the relevant market as a result of the conspiracy.  *See, e.g.*, SAC ¶ 55 ("The Synta/Celestron Defendants and coconspirators and the Ningbo Sunny/Meade Co-Conspirators together control over 80 percent of that market."); *id.* ¶ 3 ("Synta and Ningbo Sunny together manufacture over 80% of all consumer telescopes imported into the U.S. Instead of competing, Synta and Ningbo Sunny agree on what prices to charge and which products their companies will produce.  They have used their unlawful cooperation and dominance over telescope supply to enable their subsidiaries to take over the U.S. distribution market.  As a result of this unlawful conspiracy, Celestron controls at least 70% of all U.S. consumer telescope sales, including sales to small distributors like Plaintiffs and their fellow class members, who are forced to pay supracompetitive prices."); *id.* ¶ 118 ("Ningbo Sunny and Synta have together controlled over 65% of the Manufacturing Market since 2012.  In 2018, they controlled over 90%.").

Finally, Defendants argue that "[a] mere showing of substantial or even dominant market share alone cannot establish market power sufficient to carry out a predatory scheme." First Mot. to Dismiss at 21 (quoting *Rebel Oil*, 51 F.3d at 1439) (internal quotation marks omitted). Instead, a plaintiff "must show that new rivals are barred from entering the market and show that existing competitors lack the capacity to expand their output to challenge the predator's high price." *Rebel Oil*, 51 F.3d at 1439. Plaintiffs point to several allegations in the SAC alleging barriers to entry as a result of the conspiracy. For example, they allege that "telescope manufacturing has high capital investment costs, and the two key manufacturers (Synta and Ningbo Sunny) are vertically integrated with the largest distributors." SAC ¶ 66. Additionally, "[g]iven the size of the market, there are not enough independent distributors to make building an independent manufacturing facility profitable." *Id.* The SAC also alleges that Defendants acquired key intellectual property rights through their acquisition of Meade, which prevented smaller distributors from seriously competing. *Id.* ¶ 67. The Court finds these allegations sufficient to show a dangerous probability of Defendants achieving monopoly power.

Thus, the Court finds that Plaintiffs have adequately stated a § 2 claim for the period starting in 2013.

### E.     Clayton Act § 7 Claim

"The Clayton Act § 7 prohibits a corporation from acquiring the stock or assets of another corporation 'in any line of commerce' in which the effect 'may be substantially to lessen competition, or to tend to create a monopoly.'" 15 U.S.C. § 18. When examining a § 7 claim, a court must be mindful that "[e]very merger of two existing entities into one, whether lawful or unlawful, has the potential for producing economic readjustments that adversely affect some persons." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 487 (1977). "But Congress has not condemned mergers on that account; it has condemned them only when they may produce anticompetitive effects." *Id.*

Plaintiffs bring a claim under § 7 arising out of Ningbo Sunny's acquisition of Meade,

alleging that Defendants helped to facilitate that transaction. As an initial matter, for the same reasons stated above, the Court finds that Plaintiffs have failed to allege any conduct giving rise to a § 7 claim before the Meade transaction in 2013.

Defendants argue that "Plaintiffs do not substantively allege a violation of Section 7 anywhere in the SAC," noting that "the only reference to this statute appears in the heading for the Second Cause of Action." First Mot. to Dismiss at 18. Defendants ignore the SAC's express allegation that "Defendant Celestron took equity in its horizontal competitor Meade – which is memorialized in shadow books kept by Defendants' coconspirators." SAC ¶ 89. Accepting this allegation as true, the SAC plausibly alleges that the Meade merger produced anticompetitive effects in violation of § 7 of the Clayton Act.

Thus, the Court GRANTS Defendants' motions as to Plaintiffs' § 7 Clayton Act claim to the extent that claim is based on conduct occurring prior to 2013, but DENIES the motions to dismiss the claim in all other respects.

### F. State Law Claims

Finally, Defendants argue that Plaintiffs fail to sufficiently allege a Cartwright Act claim or an unfair competition ("UCL") claim because they do not articulate the specific conduct underlying these claims. Plaintiffs contend that "because the SAC states valid Sherman Act claims, it also states valid Cartwright Act claims." First Opp'n at 25; *Cty. of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1160 (9th Cir. 2001) ("The analysis under California's antitrust law mirrors the analysis under federal law because the Cartwright Act . . . was modeled after the Sherman Act."). Similarly, Plaintiffs argue that the UCL claims "rise and fall" with Plaintiffs' federal claims. *Id.* The Court agrees.

"The UCL broadly prohibits 'any unlawful, unfair or fraudulent business act or practice.'" *Alvarez v. Chevron Corp.*, 656 F.3d 925, 933 (9th Cir. 2011) (quoting Cal. Bus. & Prof. Code § 17200). "By proscribing any unlawful business practice, [the UCL] borrows violations of other laws and treats them as unlawful practices that the unfair competition law makes independently

actionable." *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999) (citation and internal quotation marks omitted). Thus, the "unlawful" prong of the statute prohibits "anything that can properly be called a business practice and that at the same time is forbidden by law." *Id.*

Because the Court finds that Plaintiffs have stated valid Sherman Act and Clayton Act claims, as described above, the Court similarly finds that Plaintiffs state valid state law claims.

### G.     Leave to Amend

In their opposition brief, Plaintiffs request leave to amend any pleading deficiencies. "Requests for leave to amend should be granted with 'extreme liberality.'" *Brown v. Stored Value Cards, Inc.*, 953 F.3d 567, 574 (9th Cir. 2020); *see also* Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave when justice so requires."). Because it may be possible for Plaintiffs to allege additional conduct before 2013 which might support antitrust claims for the class period alleged, the Court finds that amendment would not be futile. Similarly, because it may be possible for Plaintiffs to add allegations regarding the participation of the Synta affiliates, the Court finds that further amendment as to those defendants would not be futile either.

The Court, therefore, grants Plaintiffs leave to amend to allege facts, if any, to support the alleged class period between 2005 and 2012, and to support a finding of liability as to the defendants dismissed herein.

## IV.     MOTION TO STRIKE

A court "may order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter" pursuant to Federal Rule of Civil Procedure 12(f). Fed. R. Civ. P. 12(f). "'Impertinent' matter consists of statements that do not pertain, and are not necessary, to the issues in question." *Fantasy, Inc. v. Fogerty*, 984 F.2d 1524, 1527 (9th Cir. 1993), *rev'd on other grounds*, 510 U.S. 517, 114 S. Ct. 1023, 127 L. Ed. 2d 455 (1994). "'Redundant' allegations are those that are needlessly repetitive or wholly foreign to the issues involved in the action." *Cal. Dep't of Toxic Substances Control v. Alco Pac., Inc.*, 217 F. Supp.

United States District Court
Northern District of California

2d 1028, 1033 (C.D. Cal. 2002). "Scandalous matters are allegations that unnecessarily reflect on the moral character of an individual or state anything in repulsive language that detracts from the dignity of the court." *Consumer Sols. REO, LLC v. Hillery*, 658 F. Supp. 2d 1002, 1020 (N.D. Cal. 2009) (internal quotations and citations omitted).

"[T]he function of a 12(f) motion to strike is to avoid the expenditure of time and money that must arise from litigating spurious issues by dispensing with those issues prior to trial." *Sidney-Vinstein v. A.H. Robins Co.*, 697 F.2d 880, 885 (9th Cir. 1983). In determining whether to grant a motion to strike, a district court views the pleadings in a light most favorable to the non-moving party, and "resolves any doubt as to the relevance of the challenged allegations" in the plaintiff's favor. *Cal. Dep't of Toxic Substances Control*, 217 F. Supp. 2d at 1033.

Defendants move to strike (1) allegations asserting the class period from 2005 to 2012, and (2) allegations concerning the jury verdict in the *Orion* Action.

### A. Class Allegations

Defendants argue that the Court should strike Plaintiffs' allegations asserting a class period beginning in 2005 because Plaintiffs fail to allege any actionable conduct prior to 2013. Given the Court's holdings above, the Court agrees that there is no actionable conduct alleged to have occurred before 2013. The Court has, however, granted Plaintiffs leave to amend their complaint to cure some of the deficiencies discussed herein.

For the same reasons articulated in the more in-depth analysis in the IPP Order regarding the motion to strike in that case, the Court DENIES AS MOOT the Motion to Strike, without prejudice to renewal should Plaintiffs fail to cure the pleading deficiencies as to the period between 2005 and 2012.

### B. *Orion* Action Allegations

Defendants also seek to strike allegations relating to the *Orion* Action and its verdict. They argue that because that action is not binding on Defendants, the allegations are therefore impertinent and prejudicial. Specifically, Defendants seek to strike the following allegations:

- Paragraph 122: class period beginning in 2005;

- From Paragraph 2: "A jury has already found that Celestron and its parent company in China, Synta,[] conspired with their competitor [Ningbo Sunny] to fix prices, divide the market, retaliate against competitors, mislead U.S. authorities, illegally acquire assets an dominate the U.S. market so that they could rip off American purchasers.";

- From Paragraph 5: "where a jury awarded over $52,000 in damages against Defendants' co-conspirators.";

- All of Paragraph 90: "On November 26, 2019, a jury found that this acquisition, which was orchestrated and aided and abetted by Defendants, their co-conspirators and their agents, violated the antitrust laws."

The Court finds that certain of these allegations provide background and context to the action, while others are indeed impertinent and overly prejudicial. *See In re Facebook PPC Advert. Litig.*, 709 F. Supp. 2d 762, 773 (N.D. Cal. 2010) ("Allegations 'supplying background or historical material or other matter of an evidentiary nature will not be stricken unless unduly prejudicial to defendant.'") (quoting *LeDuc v. Kentucky Cent. Life Ins. Co.*, 814 F. Supp. 820, 830 (N.D. Cal. 1992)). Specifically, the Court finds that Paragraph 2 improperly implies that Celestron and Defendants in this case have already been held liable for the same events alleged here, which is not true. While Plaintiffs argue that some of the holdings in the *Orion* Action may be admissible in this action against Ningbo Sunny, which was a defendant in the *Orion* Action, the allegation at issue is not specific to Ningbo Sunny. While the factual background of the *Orion* Action is pertinent to this case, allegations suggesting specific findings of liability against Defendants are not. The remainder of the *Orion* related allegations listed above simply provide background and context for the claims and the SAC as a whole.

Thus, the Court GRANTS IN PART Defendants' Motion to Strike. The cited portion of Paragraph 2 is hereby STRICKEN.

## V. CONCLUSION

For the reasons stated above, the Court GRANTS IN PART the First and Second Motions to Dismiss Plaintiffs' Sherman Act, Clayton Act, and state law claims to the extent those claims

are based on conduct arising before 2013.  The remainder of Defendants' Motions to Dismiss are DENIED.

In light of the Court's findings on Defendants' Motions to Dismiss, the Court DENIES AS MOOT Defendants' Motion to Strike allegations regarding the alleged class period.  The Court GRANTS IN PART and DENIES IN PART Defendants' Motion to Strike allegations regarding the *Orion* Action.

Plaintiffs may file an amended complaint, if any, by no later than **14 days** from the date of this order.

**IT IS SO ORDERED.**

Dated: June 2, 2021

EDWARD J. DAVILA
United States District Judge