1  J. Noah Hagey, Esq. (SBN: 262331)
       hagey@braunhagey.com
2  Matthew Borden, Esq. (SBN: 214323)
       borden@braunhagey.com
3  Ellen V. Leonida, Esq. (SBN: 184194)
       leonida@braunhagey.com
4  Ronald J. Fisher, Esq. (SBN: 298660)
       fisher@braunhagey.com
5  Gunnar Martz, Esq. (SBN: 300852)
       martz@braunhagey.com
6  Hunter B. Thomson, Esq. (SBN: 330533)
       thomson@braunhagey.com
7  BRAUNHAGEY & BORDEN LLP
   351 California Street, 10th Floor
8  San Francisco, CA 94104
   Telephone: (415) 599-0210
9  Facsimile: (415) 599-0210

10 ATTORNEYS FOR REPRESENTATIVE
   PLAINTIFF RADIO CITY, INC.

11

12                **UNITED STATES DISTRICT COURT**

13            **NORTHERN DISTRICT OF CALIFORNIA**

14

15  IN RE TELESCOPES ANTITRUST              Case No. 5:20-cv-03639-EJD
    LITIGATION
16

17  This Document Relates to:               Case No. 5:20-cv-03642-EJD

18  SPECTRUM SCIENTIFICS, LLC, RADIO        **RADIO CITY, INC.'S OPPOSITION TO**
    CITY, INC., and those similarly situated, **DEFENDANTS' MOTION TO DISMISS**
19                                          **THIRD AMENDED COMPLAINT**
              Plaintiffs,
20                                          **Date:**      February 24, 2022
          v.                                **Time:**      9:00 a.m.
21                                          **Judge:**     Hon. Edward J. Davila
    CELESTRON ACQUISITION, LLC, SUZHOU      **Crtrm:**     4, 5th Floor
22  SYNTA OPTICAL TECHNOLOGY CO., LTD.,
    SYNTA CANADA INT'L ENTERPRISES          **Third Am.**    August 31, 2021
23  LTD., SW TECHNOLOGY CORP., OLIVON       **Compl. Filed:**
    MANUFACTURING CO. LTD., OLIVON USA,     **Trial Date:**   None Set
24  LLC, NANTONG SCHMIDT OPTO-
    ELECTRICAL TECHNOLOGY CO. LTD.,
25  PACIFIC TELESCOPE CORP., COREY LEE,
    DAVID SHEN, SYLVIA SHEN, JACK CHEN,
26  JEAN SHEN, JOSEPH LUPICA, DAVE
    ANDERSON, LAURENCE HUEN, and DOES
27  1-50,

28            Defendants.

# **TABLE OF CONTENTS**

**Page(s)**

INTRODUCTION ................................................................................................................. 1

FACTUAL BACKGROUND ............................................................................................... 2

    A.    Defendants and the Co-Conspirators Dominate the Relevant Markets ................. 3

    B.    The Conspiracy Begins in 2005 ............................................................................ 3

    C.    The Conspirators Collude Regarding the Meade Acquisition .............................. 4

    D.    The Conspirators Mislead the Federal Trade Commission ................................. 5

    E.    The Conspirators Fix Prices, Divide Markets, and Share Trade Secrets ............... 6

    F.    The Conspirators Continue to Injure Plaintiffs and the Market ........................... 6

    G.    The Ninth Circuit Affirms This Court's *Orion* Verdict and Judgment ................. 7

ARGUMENT ...................................................................................................................... 8

I.    PLAINTIFFS STATE CLAIMS UNDER SHERMAN ACT §§ 1 & 2, CLAYTON ACT § 7, AND CALIFORNIA LAW FOR THE ENTIRE 2005 TO 2012 CLASS PERIOD ............................................................................................................................ 9

    A.    The TAC States Claims Under Sherman Act § 1 ................................................. 9

    B.    The TAC States Claims Under Sherman Act § 2 ............................................... 12

    C.    The TAC States Claims Under the Clayton Act § 7 ........................................... 14

    D.    The TAC States Claims Under California's Antitrust Statutes ........................... 15

II.    THE COMPLAINT SUFFICIENTLY STATES A CLAIM AS TO ALL THE INDIVIDUAL AND CORPORATE DEFENDANTS SINCE 2013 .............................. 16

    A.    The Corporate Defendants ................................................................................... 17

    B.    The Individual Defendants ................................................................................... 18

III.    THE COMPLAINT PROPERLY ALLEGES FRAUDULENT CONCEALMENT ....... 19

    A.    Affirmative Acts to Mislead ............................................................................... 20

    B.    Knowledge and Diligence .................................................................................... 21

    C.    The TAC Validly Alleges Fraudulent Concealment for 2013 to 2016 ................ 24

IV.    THE ARGUMENTS THAT THE COURT REJECTED IN PRIOR BRIEFING ON MOTIONS TO DISMISS REMAIN MERITLESS ...................................................... 25

CONCLUSION ................................................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Alvarez v. Chevron Corp.*,
  656 F.3d 925 (9th Cir. 2011) ............................................................. 15

*Arandell Corp. v. Centerpoint Energy Servs., Inc.*,
  900 F.3d 623 (9th Cir. 2018) ......................................................... 17, 18

*Bailey v. Glover*,
  88 U.S. (21 Wall.) 342 (1874) .......................................................... 20

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)......................................................................... 8

*Beltz Travel Serv., Inc. v. Int'l Air Transp. Ass'n*,
  620 F.2d 1360 (9th Cir. 1980) .......................................................... 16

*Cel–Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*,
  20 Cal. 4th 163 (1999) ............................................................... 15, 16

*Church & Dwight Co. v. Mayer Labs, Inc.*,
  2011 WL 1225912 (N.D. Cal. Apr. 1, 2011) ........................................... 9

*Cnty. of Tuolumne v. Sonora Comm. Hosp.*,
  236 F.3d 1148 (9th Cir. 2001) .......................................................... 15

*Conmar Corp. v. Mitsui & Co.*,
  858 F.2d 499 (9th Cir. 1988) ........................................................... 22

*Erickson v. Pardus*,
  551 U.S. 89 (2007)........................................................................... 9

*Hexcel Corp. v. Ineos Polymers, Inc.*,
  681 F.3d 1055 (9th Cir. 2012) ..................................................... 19, 20

*Hightower v. Celestron Acquisition, LLC*,
  No. 5:20-CV-3639-EJD, 2021 WL 2224148 (N.D. Cal. June 2, 2021) ..................... 2, 16, 17, 18

*In re Animation Workers Antitrust Litig.*,
  123 F. Supp. 3d 1175 (N.D. Cal. 2015).......................................... 20, 21, 22

*In re California Bail Bond Antitrust Litig.*,
  511 F. Supp. 3d 1031 (N.D. Cal. 2021)............................................. 9, 13

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
  308 F.R.D. 606 (N.D. Cal. 2015)........................................................ 12

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
  738 F. Supp. 2d 1011 (N.D. Cal. 2010).......................................... 8, 16, 20

*In re Graphics Processing Units Antitrust Litig.*,
  527 F. Supp. 2d 1011 (N.D. Cal. 2007)................................................ 13

*In re High-Tech Emp. Antitrust Litig.*,
  856 F. Supp. 2d 1103 (N.D. Cal. 2012).............................................. 9, 16

*In re Lithium Ion Batteries*,
  No. 13-MD-2420 YGR, 2014 WL 309192 (N.D. Cal. Jan. 21, 2014) .............. 20, 21

*In re Musical Instruments & Equip. Antitrust Litig.*,
  798 F.3d 1186 (9th Cir. 2015) .......................................................... 12

*In re Nat'l Football League's Sunday Ticket Antitrust Litig.*,
   933 F.3d 1136 (9th Cir. 2019) ............................................................................ 12
*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
   599 F. Supp. 2d 1179 (N.D. Cal. 2009).......................................................... 13, 16
*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
   820 F. Supp. 2d 1055 (N.D. Cal. 2011)................................................................ 11
*Leegin Creative Leather Prod., Inc. v. PSKS, Inc.*,
   551 U.S. 877 (2007)............................................................................................. 10
*Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*,
   No. 5:16-CV-06370-EJD, 2019 WL 1429631 (N.D. Cal. Mar. 29, 2019) ................... 9
*Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*,
   No. 20-15837, (9th Cir. Dec. 6, 2021) ............................................................... 1, 7
*Paladin Assocs., Inc. v. Mont. Power Co.*,
   328 F.3d 1145 (9th Cir. 2003) ............................................................................ 13
*Poller v. Columbia Broad. Sys., Inc.*,
   368 U.S. 464 (1962)............................................................................................. 13
*Raifman v. Wachovia Sec., LLC*,
   No. C 11-02885 SBA, 2012 WL 1611030 (N.D. Cal. May 8, 2012) ......................... 25
*Rebel Oil Co. v. Atl. Richfield Co.*,
   51 F.3d 1421 (9th Cir. 1995) ............................................................... 12, 13, 14
*Russell v. Nat'l Collegiate Athletic Ass'n*,
   2012 WL 1747496 (N.D. Cal. May 16, 2012).......................................................... 9
*Saint Alphonsus Medical Center-Nampa Inc. v. St. Luke's Health System, Ltd.*,
   778 F.3d 775 (9th Cir. 2015) ............................................................................. 15
*Silvas v. E*Trade Mortg. Corp.*,
   514 F.3d 1001 (9th Cir. 2008) ........................................................................ 8, 9
*Spectrum Scis., LLC v. Celestron Acquisition, LLC*,
   No. 5:20-CV-03642-EJD, 2021 WL 2224347 (N.D. Cal. June 2, 2021) ................... 15
*United States v. eBay, Inc.*,
   968 F. Supp. 2d 1030 (N.D. Cal. 2013)................................................................ 10

## <u>STATUTES</u>

15 U.S.C. § 18........................................................................................................ 15
Cal. Bus. & Prof. Code § 17200 ............................................................................. 15

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Plaintiff Radio City, Inc. ("Plaintiff" or "Radio City") respectfully submits this Opposition to Defendants' Motion to Dismiss.

**INTRODUCTION**

In its Order on Defendants' Motion to Dismiss the Second Amended Complaint, the Court rejected the bulk of Defendants' arguments and held that Plaintiffs stated claims under Sherman Act §§ 1, 2, Clayton Act § 7, and state law for the period from 2013 to the present. (ECF No. 173.) The Third Amended Complaint ("TAC") adds allegations explaining the role in the conspiracy of each of the previously dismissed Defendants during the period from 2013 to the present. It also adds further allegations concerning Defendants' pre-2013 misconduct, including that the Synta family of Defendants and the Ningbo Sunny co-conspirators began fixing prices and dividing the market in 2005, using the same mechanism—forcing distributors to buy Ningbo Sunny's telescopes through Good Advance and Joyce Huang—that the Ninth Circuit found to be sufficient to support price fixing in affirming this Court in the *Orion* litigation. *See Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*, No. 20-15837, ECF No. 75-1 (9th Cir. Dec. 6, 2021), at 20.[1] These amendments traverse Defendants' arguments about time and space.

Although it is not required at the pleading stage, Defendants repeatedly argue that Plaintiffs have not attached documentary evidence of Defendants' pre-2013 misconduct. But they neglect to mention that almost two years into this case, they have just begun to make a meaningful document production and have prevented any depositions from occurring. Defendants also do not explain that they recently admitted that Defendants Suzhou Synta and Synta Technology have spoliated evidence, including documents related to co-conspirator Joyce Huang—creating an evidentiary black hole to cover up the scheme.

Defendants' arguments seek to obscure the applicable Rule 12(b)(6) standard, which requires the Court to take all allegations in the TAC as true and to construe the pleadings liberally in favor of Plaintiffs. Defendants' Motion rests on three primary arguments. None has merit.

First, Defendants argue that the TAC contains inadequate allegations of pre-2013

---

[1] Because this opinion was issued the same day as this Opposition is filed, a true and correct copy of the slip opinion is appended hereto as Appendix 1 in order to aid the Court's review.

1   misconduct by all Defendants. As the Court already found, Plaintiffs' allegations that Ms. Huang

2   and Good Advance helped Ningbo Sunny and Synta fix prices sufficiently states a claim for price

3   fixing. The TAC alleges, *inter alia*, that Defendants put this price-fixing structure into place in

4   2005 and began fixing prices then. That allegation, alone, is sufficient to defeat their motion.

5        Second, Defendants argue that Ms. Huang's email address (in some emails

6   "hcsynta@sysnix.com.tw") should have put Plaintiffs on notice that Synta and Ningbo Sunny

7   secretly engaged in a conspiracy to fix prices and divide the market. (Mot. at 11:14-21.) This fact-

8   bound theory is refuted by Defendants' own argument a few pages earlier that Ms. Huang's role

9   was innocuous, because "use of a trading company, even one affiliated with a manufacturer, is not

10  wrongful, but rather standard in the industry" (Mot. at 4:2-4). Defendants' argument that the

11  arrangement through which Defendants concealed their anticompetitive conduct was in fact

12  "standard in the industry" is fatal to their argument. All plausible inferences must be drawn in

13  Plaintiffs' favor on a motion to dismiss, and even the Motion concedes that Ms. Huang's role from

14  an outsider's perspective would not have excited suspicion that she was in fact the hub of an

15  antitrust conspiracy.

16       Third, Defendants assert that allegations that the Court already has found stated a claim

17  against certain Defendants in *Hightower v. Celestron Acquisition, LLC*, 5:20-cv-3639-EJD (the

18  "IPP Action"), for the period from 2013 to the present do not adequately state a claim against the

19  same Defendants here. This argument lacks merit for the same reasons the Court already has given.

20  The TAC alleges that the Synta entities acted as part of a single coordinated corporate family. That

21  is sufficient to state a claim. *See Hightower v. Celestron Acquisition, LLC*, No. 5:20-CV-3639-EJD,

22  2021 WL 2224148, *11 (N.D. Cal. June 2, 2021).

23       In sum, the TAC plausibly pleads antitrust claims against all Defendants, and the Motion

24  should be denied.

25                      **FACTUAL BACKGROUND**

26       This action seeks to redress overcharges inflicted on U.S. telescope direct purchasers caused

27  by Defendants' and their co-conspirator's unlawful and anticompetitive price fixing and market

28  division with their horizontal competitor Defendant Ningbo Sunny Electronic Co., Ltd. ("Ningbo

Sunny"). (TAC ¶ 2.) Defendants are members or employees of Synta, a conglomerate of entities owned and controlled by Defendant Dar-Tson "David" Shen and his family members, including Synta Technology Corp., Suzhou Synta Optical Technology Co., Ltd., and a shadowy network of factories and distributors. (*Id.*) Synta wholly owns Defendant Celestron Acquisition, LLC ("Celestron") through its wholly owned subsidiary, Defendant SW Technology Corp. ("SW Tech."). (*Id.* ¶¶ 23-24.)

### A.   Defendants and the Co-Conspirators Dominate the Relevant Markets

There are two relevant markets at issue. The first is the global consumer telescope and telescope accessory manufacturing market for import into the United States (the "Manufacturing Market."). (*Id.* ¶ 71.) The second is a downstream market from the Manufacturing Market: the United States market for consumer telescope distribution (the "Distribution Market"). (*Id.* ¶ 75.)

The Manufacturing Market has been marred by illegal collusion for over 15 years. Before 2005, Synta's principal, Defendant David Shen, owned, and was an officer of Synta's horizontal competitor Ningbo Sunny. (*Id.* ¶ 15.) After acquiring a U.S. entity, Chairman Shen "resigned" from his position at Ningbo Sunny and "transferred" his interest to his brother to avoid scrutiny from U.S. regulators. (*Id.* ¶ 16.) All the while, the two horizontal competitors continued to coordinate their business strategies. (*Id.* ¶ 4.) At present, Synta and Ningbo Sunny manufacture over 80% of all consumer telescopes imported into the United States. (*Id.* ¶ 3.) They maintain this dominance by coordinating business strategies, retaliating against companies that try to compete with their businesses, and agreeing on what prices to charge and which products their respective companies will produce. (*Id.*) Synta and Ningbo Sunny used that dominance in the Manufacturing Market to enable Defendant Celestron to take over the Distribution Market. (*Id.*) Celestron controls at least 70% of all U.S. consumer telescope sales. (*Id.*)

### B.   The Conspiracy Begins in 2005

After Chairman Shen acquired Celestron in 2005, Suzhou Synta and the other Synta companies began colluding with Ningbo Sunny to fix prices and unlawfully coordinate their anticompetitive activities. Synta employee Joyce Huang coordinated with David Shen, James Chiu, Ningbo Sunny and Synta personnel to ensure that the fixed prices were imposed by the respective

1   conspirators on their customers. (TAC ¶ 89.) Beginning in 2005, Ningbo Sunny forced customers

2   (other than Celestron) to purchase Ningbo Sunny goods through Ms. Huang—an employee of

3   Ningbo Sunny's horizontal competitor Synta Technology, and who Chairman Ni testified answered

4   to and was controlled by Chairman Shen. (*Id*.) This paradigm was a primary means by which Synta

5   and Ningbo Sunny implemented their price-fixing regime. (*Id*.) Suzhou Synta and Synta

6   Technology have since admitted that all of their documents have been destroyed—all in the service

7   of concealing their conspiracy. (*Id*. ¶¶ 20, 22, 91.)

8          **C.     The Conspirators Collude Regarding the Meade Acquisition**

9          Before they were acquired by Defendant Synta, Defendant Celestron and Meade

10   Instruments Corp. ("Meade") were the leading U.S. telescope manufacturers and distributors. In

11   1991 and again in 2002, Defendant Celestron attempted to merge with Meade. Both times, the FTC

12   took action to block proposed combinations on antitrust grounds. (*Id*. ¶ 93.)

13          Synta bought Celestron in 2005. (*Id*. ¶ 76.) Around the same time, Chairman Shen resigned

14   as an officer of his horizontal competitor Ningbo Sunny. (*Id*. ¶ 15.) Mr. Shen also "transferred" his

15   26 percent of Ningbo Sunny to his brother, who then gave it to his sister-in-law. (*Id*. ¶ 16.)

16          In 2013, Synta and Celestron had weakened Meade's position in the market to the point that

17   Meade was seeking to be acquired. (*Id*. ¶ 92.) In May 2013, a small competitor of Ningbo Sunny

18   and Synta named Jinghua Optical ("JOC") announced an agreement to purchase Meade. (*Id*. ¶ 94.)

19   Because JOC's acquisition of Meade would have threatened Synta and Ningbo Sunny's

20   stranglehold on the Manufacturing Market, both Ningbo Sunny and Synta wanted to keep it out of

21   JOC's hands. (*Id*. ¶ 95.) Because Synta could not acquire Meade directly (because it owned

22   Celestron and the FTC had twice blocked Celestron from merging with Meade on antitrust

23   grounds), David Shen (head of Synta) and Peter Ni (head of Ningbo Sunny) agreed that Ningbo

24   Sunny would purchase Meade with secret assistance from Synta. (*Id*. ¶¶ 96-97.) Emails between

25   Ningbo Sunny, Synta, and Celestron memorialize the conspiracy, in which "[t]o prevent JOC to

26   buy MEADE," Ningbo Sunny would purchase Meade with "the financial support to SUNNY" from

27   "CELESTRON / SYNTA." (*Id*. ¶ 97 and Ex. 2.) The object of the conspiracy was to prevent JOC

28   from acquiring Meade's manufacturing facility and brand and thereby threaten the conspirator's

1  dominance in the Manufacturing Market. (*Id.*)

2  Ningbo Sunny was represented in the Meade transactions by Sheppard, Mullin, Richter &

3  Hampton LLP. (*Id.* ¶ 101.) Ningbo Sunny directed Sheppard Mullin in its engagement letter to take

4  direction from Synta and Celestron executives, including David Shen, Laurence Huen, Dave

5  Anderson, and Joe Lupica. (*Id.* ¶ 101 and Ex. 4.) Defendants and then-Celestron employees

6  Anderson and Lupica helped design the deal structure and bring it to completion. (*Id.*) To hide

7  Synta and David Shen's involvement, some of the funds to purchase Meade were sent from Sky

8  Rainbow, a Hong Kong company jointly owned by David Shen and Peter Ni. (*Id.* ¶ 114.) Synta,

9  through Celestron, also loaned considerable sums to horizontal competitor Ningbo Sunny. (*Id.*

10  ¶ 107.)

11  David Shen and Peter Ni agreed that Defendant and then-Celestron CEO Joe Lupica (who

12  was already working to help Ningbo Sunny purchase Meade) would quit his role at Celestron and

13  would become CEO of Meade after the deal closed. (*Id.* ¶ 102.) This transfer took place as planned,

14  and other Celestron executives also joined Meade. (*Id.* ¶ 103.) As part of Synta's and Celestron's

15  unlawful financial assistance of their horizontal competitor's acquisition of Meade, Celestron took

16  equity in Meade, which was memorialized in shadow books kept by the conspirators. (*Id.* ¶ 108 and

17  Ex. 7.)

18  **D.      The Conspirators Mislead the Federal Trade Commission**

19  After Ningbo Sunny's bid to acquire Meade was publicly announced, the Federal Trade

20  Commission began inquiring whether David Shen and Celestron were involved in the transaction.

21  The conspirators lied to the FTC, advising the agency that "David Shen has no role in the proposed

22  acquisition of Meade." (*Id.* ¶ 110 and Ex. 8.) As discussed above, this was false—in fact, Celestron

23  and Synta were providing financial support, Sheppard Mullin had been ordered to take instructions

24  from David Shen and Celestron/Synta personnel regarding the Meade acquisition, the transaction

25  was funded at least in part by Chairman Shen, and Celestron ultimately took equity in Meade. (*Id.*

26  ¶¶ 101, 108, 110-111.)

27  Because the FTC also expressed concern about Chairman Shen's economic interest in

28  Ningbo Sunny, Mr. Ni restructured the transaction so that Mr. Ni would buy Meade in his personal

1   capacity, rather than Ningbo Sunny. (*Id*. ¶ 113.) After this maneuver succeeded in avoiding U.S.

2   regulatory inquiry, Mr. Ni then transferred Meade to Ningbo Sunny for a dollar. (*Id*.)

3       **E.     The Conspirators Fix Prices, Divide Markets, and Share Trade Secrets**

4           After the Meade acquisition closed, Meade joined Synta's, Celestron's, and Ningbo

5   Sunny's conspiracy to divide markets, fix prices, and to share trade secrets of distributors outside

6   the conspiracy among themselves.

7           As detailed in internal communications, David Shen directed Peter Ni in an email to work

8   out a "tacit understanding" with Defendant Anderson (then CEO of Celestron) regarding not

9   bidding against Celestron for sales to Costco. (*Id*. ¶ 115 and Ex. 9.) In another email to Peter Ni

10  and Defendant Anderson, David Shen explained that "[t]he best way in the future is to divide the

11  products and sell them into different markets to reduce conflicts." (*Id*. ¶ 116 and Ex. 10.) And

12  former Celestron executives working at Meade assured Defendant Lupica—by then the CEO of

13  Meade—that "Mr. Ni . . . doesn't want to disrupt Synta business. However, this promo will not be

14  disruptive to Celestron business." (*Id*. ¶ 117 and Ex. 11.)

15          Ningbo Sunny also provided Celestron with Meade's trade secrets, let Celestron engineers

16  tour Meade's factory, and continued to coordinate business activities with David Shen and his

17  trusted counselor (and member of Celestron's Executive Committee), Laurence Huen. (*Id*. ¶ 106.)

18  Ningbo Sunny also provided Celestron with pricing and order information from its competitors. In

19  May 2015, Ningbo Sunny provided detailed "sales figures" for multiple years at the express request

20  of Defendant Lee, who is Celestron's current CEO. (*Id*. ¶ 119 and Ex. 12.) Ningbo Sunny

21  executives confirmed under oath that this information constitutes trade secrets. (*Id*. ¶ 120.)

22          The co-conspirators also fixed prices. Synta and Ningbo Sunny negotiated and discussed

23  how Ningbo Sunny's prices should be higher to certain customers, and at other times directed

24  Ningbo Sunny that "payment terms should be the same with Suzhou [Synta]." (*Id*. ¶¶ 121-122 and

25  Ex. 14.)

26      **F.     The Conspirators Continue to Injure Plaintiffs and the Market**

27          Defendants' anticompetitive conspiracy has had wide-ranging deleterious effects on the

28  Manufacturing Market and Distribution Market. Plaintiffs have been forced to pay

1   supracompetitive and arbitrarily inflated prices for telescopes. (*Id.* ¶ 131.) Fueled by the extremely

2   high relative margins obtained through the conspiracy's unlawful acts, Celestron has monopolized

3   the Distribution Market, even as Celestron's parent and co-conspirators monopolize the

4   Manufacturing Market. (*Id.* ¶¶ 132, 135.) As a result, it is now impossible for new market entrants

5   to challenge the conspirators. (*Id.* ¶ 139.) These harms are antitrust injuries that the antitrust laws

6   were designed to remedy. (*Id.* ¶ 138.)

7          The conspirators' unlawful acts continue to injure consumers and the market. In 2018,

8   Defendants controlled over 90% of the Manufacturing Market. (*Id*. ¶ 137.) Defendants continue to

9   conspire to maintain their dominance in the market. (*Id*. ¶ 77.)

10         **G.     The Ninth Circuit Affirms This Court's *Orion* Verdict and Judgment**

11         On December 6, 2021, the U.S. Court of Appeals for the Ninth Circuit affirmed the jury

12  verdict in *Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*, No. 20-15837, ECF No. 75-1 (9th Cir.

13  Dec. 6, 2021). The Ninth Circuit found that the evidence supported the jury's conclusion that

14  "Synta controls an entity called Good Advance, and that Sunny and Synta conspired to fix the

15  prices that they charged Orion and Synta's subsidiary Celestron using Good Advance," that Ms.

16  Huang, "who worked for Synta's David Shen, told Sunny to raise the prices it charged Orion to

17  match the prices that Synta was charging Orion," that "Sunny charged Orion fifty percent more

18  than it charged Synta subsidiary, Celestron, for identical items," and that this and other evidence

19  "supports the jury's verdict that Sunny and Synta committed a *per se* Section 1 violation by

20  conspiring to fix the prices . . . ." (App'x 1 at 20-21.) The Ninth Circuit noted that substantial

21  evidence "indicate[s] that [Sunny and Synta] had agreed to divide customers," such as email

22  correspondence that mentioned "consider[ing] how to avoid conflict with Celestron's products,"

23  and "divid[ing] the products and sell[ing] them to different markets to reduce conflicts"—

24  correspondence which the Ninth Circuit described as "quintessential evidence of a market

25  allocation conspiracy." (*Id*. at 22.)

26         The Ninth Circuit further affirmed the "jury's verdict finding that Sunny unlawfully

27  conspired to monopolize the global telescope manufacturing market in violation of Section 2 of the

28  Sherman Act" (*id*. at 29), noting, *inter alia*, that there was "evidence that Celestron was aware that

1    its conduct was, or could be perceived as anticompetitive . . . and Celestron admitted that it would

2    need to revert to its usual course of dealing with Sunny to avoid unwanted suspicion" (*id.* at 27).

3    The Ninth Circuit affirmed the judgment on the claim under Clayton Act § 7, finding that

4    Sunny's acquisition of Meade "enabled Sunny and its competitors to charge supracompetitive

5    prices for telescopes," which "was a major factor in the overcharges that Orion experienced in its

6    business dealings with Sunny, Synta, and Meade." (*Id.* at 30.)

7    The Ninth Circuit also affirmed that the Synta entities could be liable for their participation

8    in the conspiracy notwithstanding the Settlement and Supply Agreements that the Synta entities

9    entered into with Orion in September 2016, holding that the "conspiracy achieved its objective: a

10    highly concentrated market with fewer competitors and higher costs for telescope brands not yet

11    controlled by the co-conspirators," which resulted in post-2016 injuries to Orion. (*Id.* at 34.)

12    "[W]here an antitrust plaintiff suffers continuing antitrust injuries from anticompetitive changes to

13    market structure that arose from a proven antitrust violation," "the violation may be a material

14    cause of that injury, and so recovery of damages is permitted, *even after the last proven date of the*

15    *violative conduct*." (*Id.* at 35 (emphasis added).) "If a defendant has conspired to violate the

16    antitrust laws and thereby harmed a market's competitive structure, it remains liable for the

17    continuing injuries suffered by plaintiffs from the structural harm to competition that its unlawful

18    scheme brought about." (*Id.*) "It is no defense to argue that the conspiracy has ended, where the

19    conspiracy achieved its anticompetitive objective," and a plaintiff can "prevail by showing that an

20    overt pre-2016 conspiracy had residual market effects that resulted in post-2016 damages." (*Id.*)

21    ## ARGUMENT

22    "To survive a motion to dismiss for failure to state a claim, the plaintiff must allege 'enough

23    facts to state a claim to relief that is plausible on its face.'" *In re Cathode Ray Tube (CRT) Antitrust*

24    *Litig.*, 738 F. Supp. 2d 1011, 1017 (N.D. Cal. 2010) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S.

25    544, 547 (2007)). "All allegations of material fact are taken as true and construed in the light most

26    favorable to the nonmoving party." *Silvas v. E\*Trade Mortg. Corp.*, 514 F.3d 1001, 1003-04 (9th

27    Cir. 2008). "Specific facts are not necessary; the statement need only give the defendant[s] fair

28

1  notice of what the claim is and the grounds upon which it rests." *Id.* (quoting *Erickson v. Pardus*,

2  551 U.S. 89, 93 (2007) (internal alternations omitted)).

3          In antitrust cases, "plaintiffs should be given the full benefit of their proof without tightly

4  compartmentalizing the various factual components and wiping the slate clean after scrutiny of

5  each." *Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*, No. 5:16-CV-06370-EJD, 2019 WL

6  1429631, at *3 (N.D. Cal. Mar. 29, 2019) (quoting *Russell v. Nat'l Collegiate Athletic Ass'n*, 2012

7  WL 1747496, at *3 (N.D. Cal. May 16, 2012)); *see also In re California Bail Bond Antitrust Litig.*,

8  511 F. Supp. 3d 1031, 1041 (N.D. Cal. 2021) ("Nor should courts indulge antitrust defendants who

9  move to dismiss by 'tightly compartmentalizing the various factual components and wiping the

10 slate clean after scrutiny of each. . . . [T]he character and effect of a conspiracy are not to be judged

11 by dismembering it and viewing its separate parts, but only by looking at it as a whole.'") (*quoting*

12 *In re High-Tech Emp. Antitrust Litig.*, 856 F. Supp. 2d 1103, 1118 (N.D. Cal. 2012); *Church &*

13 *Dwight Co. v. Mayer Labs, Inc.*, 2011 WL 1225912, *16 (N.D. Cal. Apr. 1, 2011) ("[T]he Court

14 considers the effects of [the defendant's] conduct in the aggregate, including, as appropriate,

15 cumulative or synergistic effects.").

16 **I.   PLAINTIFFS STATE CLAIMS UNDER SHERMAN ACT §§ 1 & 2, CLAYTON ACT § 7, AND CALIFORNIA LAW FOR THE ENTIRE 2005 TO 2012 CLASS PERIOD**

17

18          Defendants make a series of baseless arguments to support their argument that the TAC

fails to state a claim for the pre-2013 class period. First, Defendants argue that the TAC fails to

19
allege pre-2013 conduct, ignoring the plausible allegations that Defendants' documented price-

20
fixing and market division began in 2005, which adequately states a claim under Sherman Act §§ 1

21
and 2 for the 2005-to-2012 period. Second, they claim that the TAC fails to allege market power,

22
again ignoring the allegations of the TAC. Third, Defendants contend that the TAC fails to allege

23
any pre-2013 violations of Clayton Act § 7, ignoring the TAC's allegations concerning Synta's

24
2005 acquisition of Celestron. Finally, because the TAC states valid Sherman Act claims for the

25
2005-to-2012 period, it also states valid Cartwright Act claims under California law.

26
     **A.   The TAC States Claims Under Sherman Act § 1**

27
The TAC alleges an unlawful conspiracy between Defendants, who were horizontal

28

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THIRD AMENDED COMPLAINT**

1    competitors, to divide markets and fix prices. These acts are *per se* unlawful under Section 1 of the

2    Sherman Act. *See United States v. eBay, Inc.*, 968 F. Supp. 2d 1030, 1037 (N.D. Cal. 2013)

3    (Davila, J.) ("Restraints that are per se unlawful include horizontal agreements among competitors

4    to fix prices or to divide markets.") (quoting *Leegin Creative Leather Prod., Inc. v. PSKS, Inc.*, 551

5    U.S. 877, 886 (2007)).

6        As the Court already held, price-fixing and market division is alleged throughout the TAC.

7    For example, the TAC alleges (and attaches exhibits showing) that Defendants and their co-

8    conspirators conspired to not compete for Costco business so that Celestron could win it (among

9    numerous other acts of market division). (TAC ¶¶ 115-118, 125-128 and Exhibits 9-11, 15-17.) The

10   TAC also alleges and attaches exhibits showing that Defendants and their co-conspirators fixed

11   prices to Celestron's competitors, with the effect that Celestron now enjoys monopoly power in the

12   telescope distribution market. (TAC ¶¶ 121-124, 135, and Exhibits 13-14.) The conduct is

13   documented for the period that was the subject of prior litigation. The TAC alleges that the

14   collusive price-fixing conduct began in 2005, after Synta acquired Celestron. (TAC ¶¶ 15, 89.)

15       Defendants inaccurately assert that "Plaintiffs fail to allege any wrongful conduct pre-2013"

16   (Mot. at 3:20). In fact, the TAC alleges that after Synta acquired Celestron in 2005, "Suzhou Synta

17   and the other Synta companies began colluding with Ningbo Sunny to fix prices and unlawfully

18   coordinate their anticompetitive activities." (TAC ¶ 89.) It further alleges that "from 2005 and

19   forward Ningbo Sunny forced customers (other than Celestron) to purchase Ningbo Sunny goods

20   through Ms. Huang—an employee of Ningbo Sunny's horizontal competitor Synta Technology,

21   and who Chairman Ni testified answered to and was controlled by Chairman Shen." (*Id.*)

22       Defendants advance various contradictory contentions purporting to explain that the

23   allegations of price-fixing from 2005 to 2012 fail to state a claim. None has merit. First,

24   Defendants claim that the TAC advances nothing more than a "bald allegation" of price-fixing that

25   need not be credited. (Mot. at 4:3-4.) Not so. The TAC attaches contemporaneous emails showing

26   that Defendants communicated about what prices they would set for their products in the market.

27   (*See* Exs. 13, 14.) As the Ninth Circuit held, these documents constitute substantial evidence that

28   during 2014 and 2015—the period when Plaintiffs have documents obtained through the *Orion*

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THIRD AMENDED COMPLAINT

1   litigation—Ms. Huang was the conduit through which Defendants Ningbo Sunny and Synta fixed

2   prices. Given these documents, it is at least plausible that Synta and Ningbo Sunny began fixing

3   prices in 2005, when Ningbo Sunny and Synta first implemented their system of using Ms. Huang

4   to place orders from Ningbo Sunny. Defendants offer no reason to conclude that Defendants only

5   started to use this system to fix prices beginning in 2013. There is no other logical reason for

6   forcing customers to purchase products through a horizontal competitor. Defendants' arguments

7   amount to little more than asking the Court to resolve factual disputes in their favor rather than

8   taking the complaint's allegations as true. The TAC includes documentary evidence of

9   anticompetitive collusion; the only question is whether it occurred beginning in 2005, which

10   Plaintiffs have plausibly alleged.

11          Defendants make the related claim that because the only emails showing *per se*

12   anticompetitive activity that are attached to the TAC occurred in 2014 and 2015, Plaintiffs cannot

13   plausibly allege that the illegal activity occurred earlier. (Mot. 4:10-5:2.) Defendants' argument

14   refutes itself. It is illogical to conclude that because Plaintiffs have proof of wrongdoing for the

15   period for which discovery in other litigation has taken place, they must be foreclosed from

16   alleging that the same misconduct occurred earlier simply because Defendants have thus far

17   withheld such discovery.[2] A complaint need only plausibly allege facts supporting its claims, not

18   attach documentary support for each claim. That Plaintiffs happen to have documentary support for

19   a portion of the class period does not serve to limit the class period for earlier plausibly alleged

20   misconduct. To the contrary, "once a defendant joins a conspiracy it is jointly and severally liable

21   for any actions taken in furtherance of the conspiracy . . . until the objectives of the conspiracy are

22   completed, or the defendant withdraws from the conspiracy." *In re TFT-LCD (Flat Panel) Antitrust*

23   *Litig.*, 820 F. Supp. 2d 1055, 1059 (N.D. Cal. 2011). The TAC alleges that the conspiracy began in

24   2005 and continues today, including for the period for which there is documentary evidence of the

25   collusion. (*See also* App'x 1 at 35 (holding that a co-conspirator is "liable for the continuing

26

27   _____

    [2] Although Plaintiffs' document requests were served more than a year ago, and even though
    Plaintiffs in this action and the related IPP Action have already substantially completed their
28   document productions, Defendants have barely started theirs, with their first substantial production
    on December 1, 2021.

1   injuries suffered by plaintiffs from the structural harm to competition that its unlawful scheme

2   brought about" "even after the last proven date of the violative conduct").)

3       Finally, the Motion argues that Sherman Act Section 1 claims require allegations of

4   monopoly power, and that the TAC fails to make any such allegations. But monopoly power is not

5   an element of a Sherman Act Section 1 claim. *See In re Cathode Ray Tube (CRT) Antitrust Litig.*,

6   308 F.R.D. 606, 620 (N.D. Cal. 2015) (noting elements of a *per se* price-fixing claim are "(1) a

7   conspiracy to fix prices in violation of the antitrust laws ("conspiracy"); (2) an antitrust injury—

8   i.e., the impact of the defendants' unlawful activity ("impact"); and (3) damages caused by the

9   antitrust violations ("damages").". Defendants cite *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d

10  1421, 1443-44 (9th Cir. 1995), to support their contention that a failure to allege market power is

11  fatal to a Section 1 claim. But the claim in *Rebel Oil* failed on the second prong (antitrust injury)

12  because the plaintiff alleged that the defendant conspired "to fix predatory, *below-cost* prices"—an

13  action that damages the market but is not an antitrust injury because it is a "boon to consumers."

14  *Id.* at 1444 (emphasis in original). Here, the TAC alleges a conspiracy, resulting in

15  supracompetitive prices in the relevant market, harming Plaintiffs in the form of higher prices than

16  they would have paid in a freely functioning market. *In re Musical Instruments & Equip. Antitrust*

17  *Litig.*, 798 F.3d 1186, 1191 (9th Cir. 2015) (Price-fixing and other "inherently anticompetitive

18  horizontal agreements violate the Sherman Act per se. Once the agreement's existence is

19  established, no further inquiry into the practice's actual effect on the market or the parties'

20  intentions is necessary to establish a § 1 violation.").

21      The TAC's allegations of illegal price-fixing that began in 2005 adequately states a claim

22  under Section 1 of the Sherman Act for the 2005-to-2012 period.

23      **B.    The TAC States Claims Under Sherman Act § 2**

24      "To establish a conspiracy to monopolize claim under Section 2, plaintiffs must plead: '(1)

25  the existence of a combination or conspiracy to monopolize; (2) an overt act in furtherance of the

26  conspiracy; (3) the specific intent to monopolize; and (4) causal antitrust injury.'" *In re Nat'l*

27  *Football League's Sunday Ticket Antitrust Litig.*, 933 F.3d 1136, 1159 (9th Cir. 2019), *cert. denied*

28  *sub nom. Nat'l Football League v. Ninth Inning, Inc.*, 141 S. Ct. 56, 208 L. Ed. 2d 291 (2020)

1    (quoting *Paladin Assocs., Inc. v. Mont. Power Co.*, 328 F.3d 1145, 1158 (9th Cir. 2003)).

2    Defendants' contention that the TAC fails to adequately allege market power for pre-2013

3    misconduct lacks merit.

4         First, as discussed *supra*, the TAC includes allegations of pre-2013 misconduct, in the form

5    of price-fixing and market division between Celestron and Ningbo Sunny. Second, Defendants'

6    argument that the exhibits attached to the TAC show no conduct pre-dating 2013 is both irrelevant

7    (as the standard on a motion to dismiss is whether the complaint alleges facts to allow a plausible

8    inference of liability) and doubly improper (given that Defendants have just begun to meaningfully

9    produce their documents). Courts regularly reject this line of argument in antitrust cases. *See In re*

10   *California Bail Bond Antitrust Litig.*, 511 F. Supp. 3d 1031, 1050 (N.D. Cal. 2021) ("Plaintiffs do

11   not provide specific emails or insight into closed-door meetings, but this is not necessary to survive

12   a motion to dismiss."); *In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d 1011,

13   1024 (N.D. Cal. 2007) ("This is not to say that to survive a motion to dismiss, plaintiffs must plead

14   specific back-room meetings between specific actors at which specific decisions were made."); *In*

15   *re TFT-LCD (Flat Panel) Antitrust Litig.*, 599 F. Supp. 2d 1179, 1184 (N.D. Cal. 2009) ("*Twombly*

16   [does not] require[ ] elaborate fact pleading. Further, the Supreme Court has recognized that 'in

17   complex antitrust litigation,' 'motive and intent play leading roles,' and 'the proof is largely in the

18   hands of the alleged conspirators.'") (quoting *Poller v. Columbia Broad. Sys., Inc.*, 368 U.S. 464,

19   473 (1962)).

20        The TAC plausibly alleges that the conspiracy began in 2005, after David Shen (a board

21   member of Synta's horizontal competitor Ningbo Sunny even while running Synta until July 2005)

22   purchased Celestron. (TAC ¶ 15.)

23        Nor are Defendants correct that the TAC fails to allege market power for the pre-2013

24   period. (*See, e.g.,* TAC ¶ 76 ("In 2005, Synta acquired Celestron. Through Defendants' and their

25   co-conspirators' efforts, Celestron became the dominant U.S. telescope distributor. Then, as

26   detailed below, Ningbo Sunny acquired Meade with Celestron's and Synta's help.").) "The

27   aggregation of market shares of several rivals is justified if the rivals are alleged to have conspired

28   to monopolize." *Rebel Oil Co.*, 51 F.3d at 1437. In 2005, Synta and Ningbo Sunny entered into a

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THIRD AMENDED COMPLAINT

conspiracy to monopolize orchestrated through Chairman Shen. Synta purchased Celestron—at that time a major U.S. telescope manufacturer—and removed it from the Manufacturing Market. Through their cooperation via Chairman Shen, the conspirators within a few years achieved substantial market power: Celestron became "the dominant U.S. telescope distributor," and co-conspirators Synta and Ningbo Sunny together controlled "over 65% of the Manufacturing Market" by 2012. (TAC ¶¶ 76, 137.) That far exceeds the minimum market concentration established by the Ninth Circuit. *See Rebel Oil Co.,* 51 F.3d at 1437-38 (holding that aggregated market share of 44% is sufficient as a matter of law to support a finding of market power where there are barriers to entry and existing competitors lack capacity to expand output); App'x 1 at 28 (citing *Rebel Oil Co.*).

Notably, in its opinion affirming the *Orion* verdict, the Ninth Circuit rejected the contention that "Synta would have no motive to help Sunny acquire monopoly power," because Sunny's ability to raise prices would permit Synta to "raise its own prices in turn." (App'x 1 at 27.) The Ninth Circuit found substantial evidence to support the jury's finding "that Celestron was aware that its conduct was, or could be perceived as anticompetitive . . . and Celestron admitted that it would need to revert to its usual course of dealing with Sunny to avoid unwanted suspicion" (*id.* at 27) and affirmed the "jury's verdict finding that Sunny unlawfully conspired to monopolize the global telescope manufacturing market in violation of Section 2 of the Sherman Act" (*id.* at 29).

## C.     The TAC States Claims Under the Clayton Act § 7

The Court previously found that Plaintiffs stated a claim under Section 7 of the Clayton Act for the period beginning in 2013, and Defendants do nothing to disturb that holding. (ECF No. 173 at 23:18-24:13; *see also* App'x 1 at 26 ("the evidence supports the jury's conclusion that Sunny unlawfully conspired with Synta to prevent JOC, a new, smaller competitor, from buying Meade").) Instead, the Motion argues that the Clayton Act claim must be dismissed for the pre-2013 period because, Defendants inaccurately assert, the TAC alleges "[n]o pre-2013 acquisition," and the "only acquisition alleged" in the TAC is the Meade acquisition in 2013. (Mot. at 2:25-27.) But this ignores the event triggering the conspiracy that is the anchor for the class period's beginning in 2005: Synta's 2005 acquisition of Celestron. (TAC ¶ 76.)

Section 7 of the Clayton Act "bars mergers whose effect 'may be substantially to lessen competition, or tend to create a monopoly.'" *St. Alphonsus Medical Center-Nampa Inc. v. St. Luke's Health System, Ltd.*, 778 F.3d 775, 783 (9th Cir. 2015) (quoting 15 U.S.C. § 18). The Federal Trade Commission blocked attempts by Celestron and Meade to merge in 1991 and 2002 because the mergers "would have created monopolies and reduced competition." (TAC ¶ 93.) Synta was one of the few other major players in this concentrated market, and Synta's acquisition of Celestron in 2005 removed Celestron as a competitor in the Manufacturing Market and added it to the Synta family in the Distribution Market. Although this led to Celestron's becoming "the dominant U.S. telescope distributor"—which is a subject of Plaintiffs' conspiracy to monopolize claim—it also substantially lessened competition in and further concentrated the Manufacturing Market, with co-conspirators Synta and Ningbo Sunny together controlling "over 65% of the Manufacturing Market" by 2012. (TAC ¶¶ 76, 137.)

In other words, the conspirators' acquisition of Celestron and removal of it from the Manufacturing Market was the blueprint for the subsequent unlawful Meade acquisition, which the Court has already ruled Plaintiffs' have plausibly alleged violated the Clayton Act. *Spectrum Scis., LLC v. Celestron Acquisition, LLC*, No. 5:20-CV-03642-EJD, 2021 WL 2224347, at *13 (N.D. Cal. June 2, 2021).

### D.    The TAC States Claims Under California's Antitrust Statutes

As explained above, because the TAC states valid Sherman Act claims for the 2005-to-2012 period, it also states valid Cartwright Act claims. "The analysis under California's antitrust law mirrors the analysis under federal law because the Cartwright Act . . . was modeled after the Sherman Act." *Cnty. of Tuolumne v. Sonora Comm. Hosp.*, 236 F.3d 1148, 1160 (9th Cir. 2001).

Similarly, Plaintiffs' UCL claims also rise and fall with Plaintiffs' federal claims. "The UCL broadly prohibits 'any unlawful, unfair or fraudulent business act or practice.'" *Alvarez v. Chevron Corp.*, 656 F.3d 925, 933 (9th Cir. 2011) (quoting Cal. Bus. & Prof. Code § 17200). "By proscribing any unlawful business practice, [the UCL] borrows violations of other laws and treats them as unlawful practices that the unfair competition law makes independently actionable." *Cel–Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999) (citation and

1   internal quotation marks omitted). Thus, the "unlawful" prong of the statute prohibits "anything

2   that can properly be called a business practice and that at the same time is forbidden by law." *Id*.

## II.   THE COMPLAINT SUFFICIENTLY STATES A CLAIM AS TO ALL THE INDIVIDUAL AND CORPORATE DEFENDANTS SINCE 2013

3
4           In addition to moving to dismiss the claims against all Defendants in the TAC for the period

5   covering 2005 to 2012, the Motion also separately moves to dismiss certain corporate members of

6   the Synta family and related individuals (SW Tech., Pacific Telescope, Nantong Schmidt, Olivon

7   Manufacturing, Olivon USA, Suzhou Synta, Synta Canada, Jean Shen, and Jack Chen). In response

8   to the Court's previous order dismissing these Defendants, the TAC contains more detailed

9   allegations about each of their role in the conspiracy. In specific, the TAC includes the same

10  allegations about the Synta corporate family and corporate Defendants' actions within it that the

11  Court previously held to be adequate against the same corporate Defendants in the IPP Action.

12  *Hightower*, 2021 WL 2224148, at *10-*13; TAC ¶¶ 47-65.[3] That is dispositive, and the Motion

13  should be denied. Defendants' attempts to release co-conspirators from this suit—before Plaintiffs

14  have taken a single deposition or received meaningful document production—are baseless.

15          "Courts in this district do not require plaintiffs in complex, multinational, antitrust cases to

16  plead detailed, defendant-by-defendant allegations." *In re Cathode Ray Tube (CRT) Antitrust Litig.*,

17  738 F. Supp. 2d 1011, 1019 (N.D. Cal. Mar. 30, 2010). Thus, "[a] co-conspirator need not know of

18  the existence or identity of the other members of the conspiracy or the full extent of the

19  conspiracy." *In re High-Tech Emp. Antitrust Litig.*, 856 F. Supp. 2d 1103, 1118 (N.D. Cal. 2012)

20  (citing *Beltz Travel Serv., Inc. v. Int'l Air Transp. Ass'n*, 620 F.2d 1360, 1366-67 (9th Cir.

21  1980)); *see also Beltz*, 620 F.2d at 1367 ("Participation by each conspirator in every detail in the

22  execution of the conspiracy is unnecessary to establish liability, for each conspirator may be

23  performing different tasks to bring about the desired result."). Thus, Plaintiffs need only "to make

24  allegations that plausibly suggest that each Defendant participated in the alleged conspiracy." *In re*

25  *Cathode Ray Tube*, 738 F. Supp. 2d at 1019 (quoting *In re TFT-LCD*, 599 F. Supp. 2d at 1185).

26

27  _____

28  [3] *Compare* ECF No. 173 at 17:5-15 (noting that "[i]n the IPP Order, the Court analyzed a different and detailed set of allegations regarding how the Synta 'corporate family' operated as a single enterprise . . . [and] found those allegations sufficient").

1   In its Order granting Defendants' motion to dismiss as to certain Defendants, the Court

2 found that Plaintiffs had inadequately alleged that "the Synta 'corporate family' operated as a

3 single enterprise" and on that basis granted the motion in part. (ECF No. 173 at 17:5-11.) The TAC

4 now includes allegations that the Synta corporate family operated as a single enterprise—the same

5 allegations that the Court found adequately pleaded in the IPP Action—and easily survives

6 Defendants' renewed motion. (*See* TAC ¶¶ 49-65; *Hightower*, 2021 WL 2224148, at *10-*13.)

7 Indeed, "[a] wholly owned subsidiary that engages in coordinated activity in furtherance of the

8 anticompetitive scheme of its parent and/or commonly owned affiliates is deemed to engage in

9 such coordinated activity with the purposes of the single 'economic unit' of which it is a part."

10 *Arandell Corp. v. Centerpoint Energy Servs., Inc.*, 900 F.3d 623, 632 (9th Cir. 2018).

11   **A. The Corporate Defendants**

12   Each of the moving corporate Defendants, SW Tech., Pacific Telescope, Nantong Schmidt,

13 Olivon Manufacturing, Olivon USA, Suzhou Synta, and Synta Canada, was part of the Synta

14 family branch of the conspiracy. The TAC alleges that each "directly and/or through its

15 subsidiaries, which it wholly owned and/or controlled—manufactured, marketed, and/or sold

16 telescopes at prices that were unlawfully inflated as a result of the anticompetitive conspiracy

17 alleged herein, and that were sold and purchased throughout the United States, including in this

18 District." (TAC ¶¶ 20-29.) The TAC further alleges that David Shen owns or otherwise controls

19 each of these entity Defendants. (*Id.*)

20   The TAC further alleges that the entities are part of the Synta corporate family, which

21 "operates not as separate corporate entities but as a single enterprise." (*Id.* ¶ 55.) The "entire" Synta

22 corporate family was "represented in meetings and discussions" with the Ningbo Sunny corporate

23 family "and was party to the agreements reached in those meetings." (*Id.* ¶ 59.) The "[p]articipants

24 in the conspiratorial meetings entered into agreements on behalf of, and reported these meetings

25 and discussions to their respective corporate families and United States affiliates." (*Id.*) "Further,

26 because of their generic uses of Defendants' and Co-Conspirators' names, individual participants in

27 the conspiratorial meetings and discussions did not always know the specific corporate affiliation

28 of their counterparts nor did they distinguish among entities within the respective corporate

1    families." (*Id.*) "Defendants and Co-Conspirators knew the individuals at the conspiratorial

2    meetings represented their entire respective corporate family." (*Id* ¶ 63.)

3         The Court held in the IPP Action that "[a]ccepting the allegations about the Synta corporate

4    family as true and taking them as a whole in the context of the full [Complaint], the Court finds that

5    such allegations serve as sufficient allegations against Pacific Telescope, Nantong Schmidt, Suzhou

6    Synta, Olivon Manufacturing, and Synta Canada." *Hightower*, 2021 WL 2224148, at *11. The

7    same allegations concerning the same entities are adequate in the TAC to survive the Motion to

8    Dismiss as to these same entities.[4] *See Arandell Corp.,* 900 F.3d at 632.

9         **B.    The Individual Defendants**

10        The TAC also pleads sufficient allegations against the moving individual Defendants, Jack

11   Chen and Jean Shen. In addition to identifying their roles within the Synta family of companies, the

12   TAC also includes further details concerning their conduct within the conspiracy. Jack Shen has

13   been a member of Celestron's executive committee at all relevant times who, "in collusion with

14   David Shen, Sylvia Shen, and Laurence Huen controlled strategic business decisions for Defendant

15   Celestron, including all of the anticompetitive activities, price fixing, market allocation, retaliation,

16   and conspiracy to monopolize alleged herein." (TAC ¶ 18.) For instance, he "authorized, approved,

17   and ratified Celestron's involvement in the unlawful acquisition of Meade, and was on the email

18   between Ningbo Sunny and Synta and Celestron personnel in which Peter Ni stated that 'to prevent

19   JOC to buy MEADE, we decided to purchase MEADE by sunny after discussion. But the premise

20   of this case is CELESTRON/SYNTA should be provided the financial support to SUNNY.'" (*Id.*)

21   He also "participated in numerous meetings after the acquisition of Meade in which Chairman Ni,

22   Chairman Shen, and other Celestron and Meade executives jointly planned the companies'

23   activities and strategies, including their price-fixing and market division," and "Chairman Ni and

24   his right-hand man Hank Qi continued to exchange correspondence with Chairman Shen and

25   Defendant Chen to develop a plan of cooperation between Meade, Synta Canada, Celestron, and

26   the rest of the Synta family of businesses," which included "taking advantage of Meade's

27

28   ────────────
     [4] The Order in the IPP Action denied the motion to dismiss SW Tech. and Olivon USA under the
     same reasoning. *Id.* at *10, *11, *13.

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THIRD AMENDED COMPLAINT

1   intellectual property in order to take over the U.S. telescope market through a new brand known as

2   'SkyWatcher' for the benefit of Synta and Ningbo Sunny." (*Id.*)

3          Jean Shen exercises control over Olivon Manufacturing Corp. and Olivon USA, and she

4   was a participant in the conspiracy. (*Id.* ¶ 19.) In particular, she demonstrated awareness of and

5   participation in the conspiracy "by using her influence with her brother to sell telescopes produced

6   by Ningbo Sunny through her own companies, Olivon USA, LLC and Olivon Manufacturing Co.

7   Ltd.," including "representing to telescope distributors that Synta's horizontal competitor and co-

8   conspirator Ningbo Sunny Electronic Co., Ltd. was one of 'my family's companies' in an effort to

9   obtain bids from these distributors." (*Id.*) Her "sales activities on behalf of the conspirators were

10  thus made with actual knowledge of the conspiracy and with the intent to advance its ends." (*Id.*)

11  The TAC further alleges that "Jean Shen's and the Olivon Defendants' acts to advance the

12  conspiracy were also repaid through preferential pricing from Ningbo Sunny and Synta beyond

13  prices afforded to other telescope distributors who were not members of the conspiracy." (*Id.*)

14         Allegations that Jack Chen and Jean Shen were aware of, participated in, and advanced the

15  goals of the conspiracy are adequate to survive a motion to dismiss. (ECF No. 173 at 15:14-16:9

16  (finding that allegations concerning negotiation of Ningbo Sunny's acquisition of Meade,

17  awareness and approval of Celestron's payments to Ningbo Sunny, and awareness of co-

18  conspirator's "desire to 'divide the products'" adequately alleged participation in the conspiracy).)

19  **III.   THE COMPLAINT PROPERLY ALLEGES FRAUDULENT CONCEALMENT**

20         Defendants concede that fraudulent concealment tolls the four-year statute of limitations for

21  antitrust claims, but argue that Plaintiffs' claims are time-barred because the TAC does not

22  adequately plead fraudulent concealment.[5] (Mot. at 8-13.) The TAC, however, far surpasses the

23  standard for pleading fraudulent concealment. The Motion therefore should be denied.

24         Under the fraudulent concealment doctrine, "[a] statute of limitations may be tolled if the

25  defendant fraudulently concealed the existence of a cause of action in such a way that the plaintiff,

26  acting as a reasonable person, did not know of its existence." *See Hexcel Corp. v. Ineos Polymers,*

27

28  _____
    [5] Though the Motion states that the allegations in the TAC are not sufficient to toll "Plaintiffs' state law claims" (Mot. at 10:1-2), the Motion appears to be directed at the federal claims.

*Inc.*, 681 F.3d 1055, 1060 (9th Cir. 2012). The doctrine exists to prevent a defendant from "concealing a fraud . . . until such a time as the party committing the fraud could plead the statute of limitations to protect it." *Bailey v. Glover*, 88 U.S. (21 Wall.) 342, 349 (1874).

"To plead fraudulent concealment, the plaintiff must allege that: (1) the defendant took affirmative acts to mislead the plaintiff; (2) the plaintiff did not have 'actual or constructive knowledge of the facts giving rise to its claim'; and (3) the plaintiff acted diligently in trying to uncover the facts giving rise to its claim." *In re Animation Workers Antitrust Litig.*, 123 F. Supp. 3d 1175, 1194 (N.D. Cal. 2015) (Koh, J.) (quoting *Hexcel*, 681 F.3d at 1060) (holding fraudulent concealment adequately pled and denying motion to dismiss).

The issue of fraudulent concealment can rarely be resolved on the pleadings. "The fact-intensive nature of fraudulent concealment makes disposition of that issue 'generally inappropriate' on the pleadings alone, 'particularly when the proof relating to the extent of the fraudulent concealment is alleged to be largely in the hands of the alleged conspirators.'" *In re Lithium Ion Batteries*, No. 13-MD-2420 YGR, 2014 WL 309192, at *16 (N.D. Cal. Jan. 21, 2014) (quoting *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 738 F.Supp.2d 1011, 1024 (N.D. Cal. 2010)).

Because the TAC advances detailed allegations supporting all three of the elements of fraudulent concealment, the Motion should be denied.

### A.     Affirmative Acts to Mislead

The Motion contends that the TAC does not provide detailed allegations of affirmative acts to mislead. (Mot. at 10-13.) That is not accurate. In fact, the TAC alleges that the conspirators committed numerous specific affirmative acts to conceal the existence of the conspiracy.

In addition to the post-2013 affirmative acts to mislead, Defendants engaged in a substantial act of misrepresentation by creating a new entity, Good Advance, controlled by Synta, that orchestrated the price-fixing and market-division scheme between Synta and Ningbo Sunny, and later destroyed the evidence. Ms. Huang was a Synta employee who acted as an enforcer within the conspiracy, controlling the prices that horizontal competitors Ningbo Sunny and Synta companies each charged, publicly referring to the company as "Good Advance" to conceal its true nature. (TAC ¶ 90; Exs. 13 & 14. *See also* App'x 1 at 20.) In addition to hiding behind the "Good

Advance" moniker, Defendants recently admitted that they destroyed documents from Synta

Technology— Ms. Huang's employer—and Suzhou Synta—another Synta co-conspirator. (TAC ¶

22.) Defendants stated that Synta Technology shut down "within weeks or a month after the

settlement agreement in the Orion case. That's what prompted it, is them saying we don't want to

have to deal with this nonsense anymore." (ECF No. 190-1 at 13:17-21.) Defendants also admitted

that "the aggravation of having to deal with a potential lawsuit was the straw that broke the

camel[']s back in terms of them finally saying, this is not worth it to have to own the business and

deal with the United States any further given what we've now been through." (*Id*. at 14:15-21.)

"And the fact that they had faced a lawsuit in the United States, a potential lawsuit in the United

States over that very business which they finally said this is just not worth the aggravation

anymore." (*Id*. at 22:9-13.)

The affirmative acts alleged in the TAC, if true, constitute fraudulent concealment.

Although "a plaintiff in this circuit must allege 'affirmative' acts or 'affirmatively misleading'

conduct' to conceal, . . . those acts do not need to be 'separate and apart' from the underlying

conspiracy itself." *In re Animation Workers*, 123 F. Supp. 3d at 1196. Accordingly, "the

combination of . . . misleading, pretextual statements and . . . affirmative efforts taken to destroy

evidence of the conspiracy or otherwise keep the conspiracies secret" are affirmative acts sufficient

to toll the statute of limitations under the fraudulent concealment doctrine. *Id*. at 1200 (discussing

*In re Lithium Ion Batteries Antitrust Litig.*, No. 13-MD-2420 YGR, 2014 WL 309192, at *16 (N.D.

Cal. Jan. 21, 2014)).

In sum, the TAC pleads more than sufficient facts to meet the fraudulent concealment

standard—which holds that the "the combination of . . . misleading, pretextual statements and . . .

affirmative efforts taken to destroy evidence of the conspiracy or otherwise keep the conspiracies

secret" suffice to plead the doctrine. (*Id.*).

## B.    Knowledge and Diligence

The Motion next contends that the TAC fails to adequately allege that Plaintiffs had no

actual or constructive knowledge of the facts underpinning their claims, because Joyce Huang's

email address should have put Plaintiffs on notice of the conspiracy. The knowledge and diligence

1   elements of fraudulent concealment frequently collapse into one another because "[t]he

2   requirement of diligence is only meaningful . . . when facts exist that would excite the inquiry of a

3   reasonable person." *Conmar Corp. v. Mitsui & Co.*, 858 F.2d 499, 504 (9th Cir. 1988).

4          Here, the TAC specifically alleges that Plaintiffs "have neither actual nor constructive

5   knowledge of the pertinent facts constituting their claims for relief," and could not have discovered

6   those facts until "September 2019, when some evidence revealing Defendants' secret conspiracy

7   was first made public in the summary [judgment] briefing in the Orion Litigation." (TAC ¶ 150.)

8   With respect to Ms. Huang's role in the conspiracy, the TAC further alleges that "Chairman Ni and

9   Ningbo Sunny kept up [the] charade [that Good Advance was an independent trading company]

10  until trial in the *Orion* Action, when Chairman Ni finally admitted that Good Advance was

11  controlled by David Shen and that Ms. Huang answered to Chairman Shen." (TAC ¶ 90.) Courts in

12  this District have held that this precise fact pattern is sufficient to allege lack of knowledge and

13  diligence. *See In re Animation Workers*, 123 F. Supp. 3d at 1204 (denying motion to dismiss on

14  fraudulent concealment grounds where complaint alleged that plaintiff "had no reason to know

15  Defendants had conspired to suppress compensation . . . until 2013, when incriminating documents

16  were unsealed and filed publicly in the *High–Tech* docket.").

17         These allegations are presumed true at the pleading stage and are dispositive. None of

18  Defendants' arguments to the contrary has any merit.

19         First, the Motion contends that because Ms. Huang used an email address in emails attached

20  as exhibits to the TAC that include "Synta" (in the user name, not in the domain name:

21  "hcsynta@sysnix.com.tw"), Plaintiffs should have been on notice of the conspiracy. This is not

22  only a factual issue that cannot support dismissal, it is also refuted by Defendants' own assertion

23  earlier in the Motion that "use of a trading company, even one affiliated with a manufacturer, is not

24  wrongful, but rather standard in the industry." (Mot. at 4:2-4.) Indeed, the TAC alleges that

25  Defendants held out Ms. Huang as an employee of "a trading company with no connection with

26  Synta" or other co-conspirators, and that the truth was not revealed until the *Orion* Action, "when

27  Chairman Ni finally admitted that Good Advance was controlled by David Shen and that Ms.

28  Huang answered to Chairman Shen." (TAC ¶ 90.)

Second, Defendants point to a ruling from Judge DeMarchi in a discovery dispute to support their claim that the Court has "rejected" the argument that the Synta Defendants' decision to destroy documents based on their concern about litigation risk was improper. (Mot. at 12:10-13:11.) That is not an accurate representation of the Judge DeMarchi's discovery ruling. That Order does not bless Defendants' spoliation; to the contrary, it requires Defendants to testify about the circumstances under which certain Defendants destroyed evidence. Defendants' Motion omits the key portion of the section of the Order on which they rely, which provides that when Defendants finally make available their 30(b)(6) witnesses who will testify about the spoliating Defendants' document destruction, Plaintiffs will be permitted to "inquire about (i) the Synta defendants' decision to destroy or discard their corporate records, including the reasons for that decision; (ii) the status of the *Orion* settlement at the time the documents were destroyed or discarded; and (iii) whether the Synta defendants anticipated further litigation as to which those documents would be relevant at the time the documents were destroyed or discarded." (ECF No. 192 at 4:10-14.) In other words, the Court *permitted* discovery into the circumstances surrounding the destruction of evidence and whether it was done to avoid anticipated litigation, instead of relying solely on counsel's admissions during a discovery conference.[6] (*Id*.) Defendants' representations that "having to deal with a potential lawsuit" was what pushed the companies to shut down and destroy their documents (ECF No. 190-1 at 14:15-21) so far represents the extent of what has been disclosed about the fact that key co-conspirators have apparently lost or spoliated all of the evidence in their possession relating to the conspiracy. Plaintiffs have not yet had the opportunity to take discovery on the matter, and Defendants' inconsistent, self-serving, and troubling representations about the spoliation do not disturb the plausibly alleged facts in the TAC.

Finally, Defendants reach beyond the universe of the TAC to contend that Good Advance was actually an entity created for the benefit of Orion, and that this was legitimate and known at the time. (Mot. at 4 n.2.) In addition to being far outside the orbit of the pleadings, the argument that Ms. Huang's role was to help Orion rings hollow when the email exhibits show that she

---

[6] Even if that were not so, Judge DeMarchi's discovery order does not bind this Court's analysis of the TAC's substantive allegations on this dispositive motion.

1    communicated with Ningbo Sunny to set prices (TAC Ex. 13) and ordered Ningbo Sunny to keep

2    the payment terms the same as its horizontal competitor and co-conspirator Suzhou Synta (TAC

3    Ex. 14). (*See also* App'x at 20.) Even if it were supported by evidence such as declarations, which

4    it is not, Defendants' assertion about the purpose of Good Advance would at most create an issue

5    of fact for trial—to the extent that Synta would be allowed to present any such evidence after

6    destroying documents to try to avoid this litigation. This unsupported argument strays far outside

7    the allegations of the TAC and is improper on a motion to dismiss. Alternatively, because it seeks

8    to raise "matters outside the pleadings," it should be converted to a motion for summary judgment

9    under Rule 12(d), and denied as unsupported by any evidence whatsoever.

10          Plaintiffs' first notice of their claims came when the Orion summary judgment documents

11   became public in September 2019. (TAC ¶ 150.) Plaintiffs filed their complaint approximately six

12   months later. That they have plausibly alleged a lack of prior knowledge of their claims and

13   diligence in investigating and prosecuting them once discovered cannot be questioned, particularly

14   here at the pleading stage.

15          **C.      The TAC Validly Alleges Fraudulent Concealment for 2013 to 2016**

16          Despite the Court's Order finding that Plaintiffs have adequately alleged that "Defendants'

17   fraudulent concealment of their misconduct tolled the statutes of limitations as to claims arising out

18   of conduct in 2013 or later" (ECF No. 173 at 14:2-4), Defendants renew their argument, contending

19   that the TAC's claims since 2013 are barred because Ms. Huang's email address should have put

20   Plaintiffs on notice that Defendants were orchestrating a conspiracy to fix prices and divide the

21   market (Mot. at 14:16-23). This fact-based theory also fails. First, Plaintiffs alleged that

22   Defendants' "misconduct was occurring ***pre***-2013" during the last round of briefing on the motion

23   to dismiss, and Defendants' argument that this is a new position (Mot. at 14:17-19) is disingenuous.

24   Second, as described above, nothing about the email address would have put anyone on notice of

25   any misconduct since, as Defendants contend, "use of a trading company, even one affiliated with a

26   manufacturer, is not wrongful, but rather standard in the industry." (Mot. at 4:2-4.) Nor is the email

27   address a "Synta" domain name, unlike other Synta employees' email addresses. (*See, e.g.*, TAC

28   Ex. 14 at 3 (Synta sales department employee with "fanfang.liu@synta-cn.com" email address).)

Even if the email address alone could somehow put recipients of her emails on notice of Defendants' wrongdoing, the TAC does not allege that the email address that Ms. Huang used to conspire with Ningbo Sunny (Ex. 14) is the only email address she used or that it was the one that she used with any of the class members in this action. Finally, the facts on which the Court relied to conclude that Plaintiffs had adequately alleged that Defendants engaged in fraudulent concealment from 2013 onward involve misrepresentations to the FTC, Celestron's secretly taking equity in its competitor Meade (reflected only in "shadow books"), and Celestron's structuring payments to Ningbo Sunny in a manner to avoid regulatory scrutiny (ECF No. 173 at 12:4-13), all of which are independent of Defendants' baseless argument that one of Ms. Huang's email addresses should have revealed that she was participating in an antitrust conspiracy behind the cloak of the "Good Advance" company.

*          *          *

In sum, the TAC validly alleges fraudulent concealment, and the Motion should be denied.

## IV.   THE ARGUMENTS THAT THE COURT REJECTED IN PRIOR BRIEFING ON MOTIONS TO DISMISS REMAIN MERITLESS

Defendants improperly seek to re-incorporate the arguments that the Court previously rejected in prior briefing on Defendants' motions to dismiss. (Mot. at 21:12-20.) The Court need not address these unbriefed arguments. *Raifman v. Wachovia Sec.*, *LLC*, No. C 11-02885 SBA, 2012 WL 1611030, at *3 (N.D. Cal. May 8, 2012) ("It [is] wholly improper for a party to incorporate by reference legal arguments made in briefs filed in connection with a motion that is not before the Court.").

To the extent that the Court is inclined to consider unbriefed arguments that are incorporated by reference, Plaintiffs respectfully incorporate by reference their arguments in opposition to the prior motions to dismiss.

__CONCLUSION__

For the foregoing reasons, Plaintiff respectfully requests that the Motion be denied in its entirety, or in the alternative, that leave to amend be granted.

1   Dated:  December 6, 2021

2                                                          Respectfully Submitted,

3                                                          BRAUNHAGEY & BORDEN LLP

4                                                          By:    /s/ Matthew Borden
                                                                     Matthew Borden

5                                                          Attorneys for Representative Plaintiff
                                                           Radio City, Inc.
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THIRD AMENDED COMPLAINT