Pages 1 - 40

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Virginia K. DeMarchi, Magistrate Judge

DANIEL HIGHTOWER, et al.,          )
                                   )
          Plaintiffs,              )
                                   )
  VS.                              )   NO. C 20-03639 EJD (VKD)
                                   )
CELESTRON ACQUISITION, LLC,        )
et al.,                            )
                                   )
          Defendants.              )
_____)
                                   )
SPECTRUM SCIENTIFICS, LLC,         )
et al.,                            )
                                   )
          Plaintiffs,              )
                                   )
  VS.                              )   NO. C 20-03642 EJD (VKD)
                                   )
CELESTRON ACQUISITION, LLC,        )
et al.,                            )
                                   )
          Defendants.              )
_____)

                            San Jose, California
                            Tuesday, October 5, 2021

        __TRANSCRIPT OF OFFICIAL ELECTRONIC SOUND RECORDING__

        __OF REMOTE ZOOM VIDEO CONFERENCE PROCEEDINGS__

        __TIME: 12:10 P.M.  -  1:00 P.M.  = 50 MINUTES__


                (APPEARANCES ON FOLLOWING PAGE)


Transcribed By:  Ana Dub, RDR, RMR, CRR, CCRR, CRG, CCG
                 CSR No. 7445, Official U.S. Reporter

**APPEARANCES VIA ZOOM:**

For the Direct Purchaser Plaintiffs:
                        BRAUNHAGEY & BORDEN, LLP
                        351 California Street, Tenth Floor
                        San Francisco, California 94104
                BY:  **MATTHEW B. BORDEN, ATTORNEY AT LAW**


For the Indirect Purchaser Plaintiffs:
                        LIEFF, CABRASER, HEIMANN & BERNSTEIN LLP
                        275 Battery Street, 29th Floor
                        San Francisco, California 94111
                BY:  **LIN YEE CHAN, ATTORNEY AT LAW**

                        SUSMAN GODFREY LLP
                        1000 Louisiana Street, Suite 5100
                        Houston, Texas  77002
                BY:  **ALEJANDRA C. SALINAS, ATTORNEY AT LAW**


For Defendants:
                        EISNER LLP
                        9601 Wilshire Boulevard, Seventh Floor
                        Beverly Hills, California 90210
                BY:  **ASHLEE N. LIN, ATTORNEY AT LAW**

                        WEINBERG GONSER
                        10866 Wilshire Boulevard, Suite 1650
                        Los Angeles, California 90024
                BY:  **CHRISTOPHER L. FROST, ATTORNEY AT LAW**

<u>**Tuesday - October 5, 2021**</u>                                    <u>**12:10 p.m.**</u>

P R O C E E D I N G S

---o0o---

**THE CLERK:**  Calling the matter of Hightower versus

Celestron Acquisition, Case Number 5:20-cv-3639, and

Spectrum Scientifics versus Celestron Acquisition,

Case Number 5:20-cv-3642.

**THE COURT:**  Thank you.

And good afternoon.  Who is appearing for the direct

purchaser plaintiffs?

**MR. BORDEN:**  Good afternoon, Your Honor.  This is Matt

Borden on behalf of the direct purchaser plaintiffs.

**THE COURT:**  Good afternoon.

And who is for the indirect purchaser plaintiffs?

**MS. CHAN:**  Good afternoon, Your Honor.  This is Lin Chan

for indirect purchaser plaintiffs.  I have my co-counsel here,

Alejandra Salinas, appearing for indirect purchaser plaintiffs

as well.

**THE COURT:**  Okay.  Thank you.  Good afternoon.

And who appears for the defendants?

**MS. LIN:**  Good morning.  Ashlee Lin on behalf of

defendants.  And also --

Go ahead.

**MR. FROST:**  Sorry to interrupt.

Good afternoon, Your Honor.  Christopher Frost of Weinberg

1    Gonser, also on behalf of defendants.

2        **THE COURT:**  Okay.  Good afternoon.

3        Thank you all for your patience.  It was a long calendar

4    this morning and you are last.

5        This is a discovery dispute.  And I believe I have the

6    same discovery dispute in both cases.  Correct?

7                        (No audible response.)

8        **THE COURT:**  Okay.  Good.

9        This is a discovery dispute about the defendants' review

10   and production of ESI and, in particular, the defendants'

11   proposed use of technology assisted review techniques.

12       So I do have a couple of questions just about the status

13   of your discussions and the dispute.  Let me -- let me just

14   start with those, if I may.

15       So as I understand it, the parties have for many months

16   been discussing the use of search terms.  And I don't think

17   anybody disputes that; that there -- I don't understand the

18   defendants as disputing that.  The search has been -- sorry.

19   The discussion has been around search terms to use.

20       And, you know, the difficulty that may come up with search

21   terms is that they're either overinclusive or underinclusive.

22   And as I understand it right now, the set of search terms that

23   are out there -- well, what I don't understand is whether the

24   set of search terms that have been discussed between the

25   parties are sort of done, or whether there is a dispute about

1    the scope of the search terms.

2        So let me put it this way:  If we were only to rely on

3    search terms, are the parties in agreement about what those

4    search terms are, or is there a lingering disagreement about

5    search terms?

6        And let me -- let me ask Mr. Borden to answer that first.

7        **MR. BORDEN:**  Thank you, Your Honor.

8        Yeah.  So there is a lingering dispute about search terms,

9    and I think they're identified somewhere in the -- in the

10   papers.

11       **THE COURT:**  I do have a big list of search terms, and I

12   have them in both places.  So I have a list of search terms

13   in -- well, it's not really a list.  It's the direct purchaser

14   plaintiffs' Exhibit A.  Looks like there's -- there was some

15   discussion -- this is a couple of months ago -- about search

16   terms.  And then I have a big, long list in Exhibit E and then

17   the IPP's Exhibit 2 that includes columns for -- that look like

18   different commentary about it.

19       But what I wasn't sure about was if those disputes had

20   been resolved.  You know, the disputes raised in the July

21   e-mail that's Exhibit A, had that been -- had those been

22   resolved, or had there been an impasse reached?

23       So, Mr. Borden, does that help you answer the question?

24       **MR. BORDEN:**  I think that there's still three categories

25   of objections that -- or search terms that remain outstanding.

1    **THE COURT:**  Okay.  And if I were to look at your

2    Exhibit E, does that capture what you believe is the dispute as

3    far as the DPPs are concerned?

4    **MR. BORDEN:**  I think we've -- we've cited IPPs'

5    Declaration Number 2.

6    **THE COURT:**  Okay.

7    **MR. BORDEN:**  So I think that that's the -- that's the

8    correct explanation of what remains.

9    **THE COURT:**  Okay.  Ms. Chan, what is the IPPs' view

10   about -- what's the status of search terms right now?

11   **MS. SALINAS:**  Your Honor --

12   **THE COURT:**  Oh, I'm sorry.

13   **MS. SALINAS:**  -- if I may address --

14   **THE COURT:**  Ms. Salinas?  Okay.  Go ahead.

15   **MS. SALINAS:**  That's okay.

16   If I may, so just to give a little bit more context, on

17   July 30th the parties had a tentative agreement about a list of

18   search terms that was roughly 378 unique terms and roughly

19   3 million responses for one defendant, and then there was

20   another half a million that the parties have agreed to as to

21   all the other defendants and with respect to the Chinese terms.

22   After that, the defendants began to indicate to plaintiffs

23   that no matter what the number of documents that the terms hit

24   on, they would not be willing to proceed with a

25   search-term-only review.  And so at that point, sort of the

1  parties agreed that further discussions about search terms were

2  no longer --

3      **THE COURT:**  Right.

4      **MS. SALINAS:**  -- going to be effective.

5      But there is -- there was an agreement on July 30th.

6      Since then, the defendants served objections to about 270

7  terms that would effectively gut the list.  We don't agree to

8  those objections.

9      But I do think there is an agreement the Court could turn

10  to, and that's the July 30 search terms.

11      **THE COURT:**  Okay.  So the July 30th e-mail -- and that's

12  the exhibit -- none of your exhibits are -- like, have the same

13  numbering.  Next time, maybe you can number them like 1 through

14  whatever or A through whatever.

15      But I guess what I'm calling DPPs' Exhibit A is the one

16  that I'm looking at, which is this e-mail exchange.  And the

17  e-mail exchange doesn't look like it reflects an agreement.  It

18  looks like it reflects a dispute as to 25 terms.  So I'm not

19  sure if I'm looking at the same document you're referring to,

20  Ms. Salinas.

21      **MS. SALINAS:**  So I -- the document -- if you look at the

22  second part of the e-mail -- oh, I'm sorry.  So, yes, this

23  e-mail doesn't -- reflects what -- what the defendants had sent

24  to me.  I responded to that e-mail a few hours later and

25  indicated that we were in agreement.  And then a search term

1    list was hit -- was run.

2         I'd be happy to provide that -- that e-mail to the Court.

3         **THE COURT:**  Okay.  So did you accept the defendants'

4    proposal?

5         **MS. SALINAS:**  We did with some -- I'm sorry, Your Honor.

6         **THE COURT:**  No.  So I'm looking at the column that says

7    "Defendants' Proposal," which is a modification to several -- I

8    don't know exactly how many -- of these terms.

9         So are you saying that the IPPs accepted the defendants'

10   proposal as reflected in this Exhibit A?

11        **MS. SALINAS:**  So, no.  We made some small modifications,

12   and that would have been reflected in my response to Ashlee on

13   July 30th.

14        **THE COURT:**  Okay.  The text response?

15        **MS. SALINAS:**  Yes, Your Honor.

16        **THE COURT:**  Okay.  So as of that time, at least as between

17   the IPPs and the defendants, there was agreement?

18        **MS. SALINAS:**  Yes, Your Honor.

19        **THE COURT:**  Okay.  All right.  Okay.  Now I'm coming to

20   the defendants.

21        What is -- what was your understanding of the status of

22   the negotiation over search terms?

23        **MS. LIN:**  So, Your Honor, thank you.

24        So the way we've been going through this process since --

25   since plaintiffs initially proposed search terms is, they

1   proposed search terms; we run the hit counts; we provide the

2   hit counts; we would make modi- -- we would propose

3   modifications; they would propose modifications; we'd run them;

4   we'd provide the new hit counts.

5        And so on July 30th we had provided proposed

6   modifications.  We ran those -- which some, they did agree to

7   with, you know, slight modifications.  We ran those hit counts

8   again, and we still had, you know, over 3 1/2 million

9   documents.

10       So -- so there was some tentative agreement to those

11  modifications, but we were not -- we never agreed to run that

12  full set of search terms across --

13       **THE COURT:**  Okay.

14       **MS. LIN:**  -- the entire universe of documents.

15       **THE COURT:**  So now -- so now let me ask you.

16       **MS. LIN:**  Sure.

17       **THE COURT:**  In the submission that's before me, I have

18  these tables.

19       **MS. LIN:**  Yes.

20       **THE COURT:**  I have DPPs' Exhibit E and IPPs' Exhibit 2.

21  I think it's Exhibit 2.  That may not be the right one.

22       Anyway, there are these tables that reflect what I

23  understand to be at least objections that the defendants have

24  to various search terms.  They're categorized as "Too Few

25  Hits," "Irrelevant," and -- sorry -- one other category,

1    "Time Period."

2        **MS. LIN:**  Sure.

3        **THE COURT:**  How -- those were prepared for purposes of

4    this discussion?

5        **MS. LIN:**  So when we -- after the July 30th conversation,

6    when it became clear that it was still too many documents for

7    us to conduct a manual review, we proposed running predictive

8    coding across the documents that had hit on search terms; and

9    as part of that meet-and-confer process -- so I do agree with

10   Ms. Salinas -- we had a discussion as to whether there was

11   going to be any set of search terms where we would feel

12   comfortable doing a manual review.

13       I said, you know, given we had been at this for months,

14   I think it unlikely.  But she suggested that we make proposed

15   modifications, you know, come up -- send another proposal and

16   they'll consider it.  And so that's what -- our proposal was

17   borne out of that conversation.

18       **THE COURT:**  Okay.  So to understand the defendants'

19   position, if I were just to look at the proposed modifications

20   in these three buckets, you're essentially -- well, let's

21   forget the low search term hit -- low hits issue; just the

22   "Time Period" and the things that you're calling "Irrelevant."

23       And you have "Defendants' Notes."  I'm focusing on that

24   column.

25       **MS. LIN:**  Mm-hmm.

1      **THE COURT:**  Are the defendants saying that with those

2    modifications, happy to run search terms and proceed as before

3    per the stipulation?

4      **MS. LIN:**  So -- I -- I -- that was our goal in proposing

5    that.  We didn't -- because we didn't reach any agreement, we

6    didn't run search terms based on this modification.  The

7    parties decided to brief the issue instead.

8      So that is the goal with this proposal, with the caveat

9    that, you know, we don't have final hit counts for any of

10    the -- for this proposal because it was not agreed to.

11      **THE COURT:**  Okay.  Well, so we have a problem here, guys,

12    because I'm -- I'm -- I am concerned that you all have spent

13    many, many months engaging on search terms per your

14    stipulation, and I'm worried that there's now been a disruption

15    of the apple cart on that whole effort.

16      So, you know, ordinarily, a party that's producing

17    documents in response to document requests controls how it

18    complies with its discovery obligations.  But here, the parties

19    kind of stipulated out of that ordinary course, which is a good

20    thing.  You know, you need to have some kind of order and

21    process governing ESI.  And so this is -- you know, this is

22    very similar to some of the matters that have been briefed to

23    me where the parties have done that; and then, kind of at

24    the -- you know, late in the game, there's a sort of disruption

25    and everybody understanding about how things will proceed.  And

1    I know enough about TAR to understand the arguments that are

2    being made to me, that it sort of changes the analytics

3    depending on what your starting point is.

4        So let me just -- that's, like, my general observation and

5    my approach to this, is that we have a problem that we need to

6    solve, because it's not necessarily acceptable to say:  Having

7    narrowed the universe of documents based on search terms, we're

8    now going to do a TAR process.  That is not just sort of an

9    obvious solution to the problem, unless what you all are

10   proposing or contemplating is that TAR will be used to

11   prioritize production as opposed to TAR will be used to cut off

12   at some point the -- the point at which defendants have to

13   review.

14       And I want to make sure I understand what's being

15   suggested and discussed and debated amongst you all before we

16   go down this path too far.  So I'm going to ask the defendants

17   the question first, because it's not really clear from your

18   papers exactly, you know, how you intend to use the TAR, what

19   the precise proposal is.

20       Exhibit B, Defendant- -- DPPs' Exhibit B, which is what I

21   understand is a text of the TAR proposal, is pretty cursory and

22   high level.  I know you had subsequent e-mail discussions about

23   it.  But let me understand from the defendants how TAR is going

24   to be implemented and how it will be used.

25       So is that Ms. Lin?

1     **MS. LIN:**  Yes, Your Honor.

2     **THE COURT:**  Okay.

3     **MS. LIN:**  Thank you.

4     So we are proposing that we run predictive coding, a TAR

5  protocol, over some limited set of documents that's been

6  narrowed.  You know, we've collected now over 13 million

7  documents.  And so all we're saying is, we need to -- in order

8  to host that much data, it's going to cost us $100,000 a month

9  in just hosting fees.

10    So all we're proposing is limiting that universe of

11 documents with some search terms.  It doesn't have to be --

12 and, you know, I've made this clear to plaintiffs multiple

13 times.  It doesn't have to be the narrowed set of search terms

14 we've, you know -- we had as of July 30th.  If there's

15 additional terms in light of the TAR protocol we want to run,

16 they want to add to expand that number, we're happy to have

17 that discussion.  But, yes, running the TAR protocol over some

18 limited set of documents that has been refined by search terms

19 is our proposal.

20    We've -- but in connection with that, we've agreed to run,

21 you know, a null set on the set of documents that is not

22 captured by the search terms.  We're happy to run, you know,

23 additional analyses on that universe of 9 million documents

24 that was not captured by the search terms to make sure that

25 we're not missing, you know, huge chunks of responsive

1    documents.

2        You know, we're not trying to be obstructionist or hide

3    documents here.  We're just trying to --

4        **THE COURT:**  Yeah.  If I understand correctly, you're

5    proposing to use TAR in its traditional sense, which is scrap

6    the search terms as a methodology for finding potentially

7    responsive documents; use TAR instead.  That's really what

8    you're trying to do, as opposed to what I suggested, which is,

9    you've got a universe of potentially responsive documents

10   defined by search terms that have already been agreed on --

11   asterisk on the "agreed on" part -- and what you're going to do

12   is use TAR to prioritize the production of those so that you

13   can get the things that are most likely responsive out first

14   from your 3.5 million document collection.

15       That's not what you're proposing.  Right?

16       **MS. LIN:**  No.  I guess -- I guess -- if I'm understanding

17   Your Honor correctly, versus running TAR over everything, but

18   first running it over the 3 1/2 million documents and then

19   running TAR over the remaining 9 million documents?

20       **THE COURT:**  Yeah.  I mean, so I do think that the

21   *In Re Valsartan* and *Progressive* cases are pretty analogous to

22   your circumstances, I have to say.  And, you know, those are

23   just, you know, other courts that have faced the same issue.

24   But the one thing that the *In Re Valsartan* court contemplated

25   is -- I'm just reading the remark.

1          (Reading):

2              "If Teva had planned to only use CMML to

3          prioritize documents for production, perhaps

4          plaintiffs would not have objected."

5          That's not what you're planning to do.  Right?  You're not

6     planning to simply use TAR to prioritize the production of

7     documents.  Right?

8          **MS. LIN:**  That's correct.

9          **THE COURT:**  Okay.  All right.  Just, I just wanted to be

10    clear.  Again, I'm hoping to approach this with a

11    problem-solving mind-set here because I really would like for

12    you all to get on with it in a -- in a way that can actually be

13    done.

14         On the -- from the plaintiffs' perspective, I understand

15    what you're saying to the Court.  I appreciate what you're

16    saying to the Court.  I can understand how, you know, there's a

17    risk that the integrity of the process to identify relevant and

18    responsive documents is compromised by this maneuver, not to

19    mention the investment of time, effort, and energy that all

20    parties have engaged in.

21         What I understand the IPPs to say and, in particular --

22    and maybe the DPPs share this perspective as well -- is that

23    the use of TAR that the defendants are proposing threatens to

24    suppress relevant information from production.

25         But I would like to understand that a little bit more in

the context of this particular dispute.  Like, theoretically, yes, that's alway- -- that's true, because I understand how -- how the training might be impacted.

But you have a case where you have invested a lot of effort in search terms that are, you know, really tailored to your dispute.  And maybe it's the case that there are some terms that are still pretty broad and are yielding, like, not very many responsive documents.  I know that's not an agreed point.

But in this particular case, what are you concerned about, for lack of a better word, missing, suppressing relevant documents from production, if you layer the TAR over the universe of documents that have been grabbed by the search terms from this $13 million -- 13 million document collection?

Let me ask Ms. Chan to respond first, since that's a remark that the IPPs made.  And then I'll let Mr. Borden also weigh in.

**MS. CHAN:**  Thank you, Your Honor.

I think here, it's obviously difficult for us to predict what we will miss.  But we are dealing with a multinational case with multinational companies who write e-mails, for instance, in English and Chinese; and within Chinese, they're writing it in simplified and traditional characters, given the location of the custodians in both Mainland China and Taiwan. So we are really very concerned that in this context where

1    we're dealing with multiple languages, multiple texts, we're

2    going to be particularly underinclusive.

3        And I'd note that we don't have any information at this

4    time about how well defendants' proposed TAR platform does with

5    Chinese language documents.

6        Our experience has been that East Asian languages are very

7    different in how they're written and how computers process

8    them, and so a platform that will work very well for English

9    may not work very well for East Asian languages.  So that --

10   that is a big concern of ours.

11       **THE COURT:**  So are the documents -- like, is a single

12   document in both English and Chinese language; or is it we have

13   some documents in English, some other set of documents in

14   Chinese?

15       **MS. CHAN:**  My -- my recollection is that they are not

16   always readily segregable and there are many documents where

17   both languages are used.

18       **THE COURT:**  Because one thought I had when I was reading

19   the papers, and then hearing your remarks causes me to think

20   about this is, is it possible that we could segregate out

21   Chinese language issues for different attention?

22       So, you know, is there a possibility that there could be a

23   process that takes the search word -- search-term-selected set

24   of documents, applies a TAR process to prioritize the review,

25   but doesn't -- doesn't use TAR at all on any that's Chinese

1  language?  So, for example, that would require separate

2  handling.  Is that a -- is that a possibility in this case?

3       And let me just ask Ms. Chan to follow up.

4       And then, Mr. Borden, it sounds like you want to weigh in

5  as well.

6       **MS. CHAN:**  That -- that's an option.  I think our concern

7  there is that there will be just additional delay in getting

8  the English language documents.

9       **THE COURT:**  Well, you're already going to have -- you

10 already have delay.  I mean, you all have delayed.  You're

11 delayed, period.  So it doesn't -- if I rule completely in the

12 plaintiffs' favor on this point, on this -- on this dispute,

13 you're still not getting your documents out.  I mean, there's

14 just no way it's going to happen.

15      And, I mean, the plaintiffs may say, "Well, then just

16 sanction the defendants and we're done with it"; but that still

17 doesn't solve the problem.  It's just not going to solve the

18 problem.

19      So, again, I may be prejudging what -- what I'm going to

20 hear from the plaintiffs; but -- but, nevertheless, we have a

21 problem we have to solve and I'm trying to find a solution.

22      So, Mr. Borden, can you address the question about whether

23 it would be possible to do special treatment for Chinese

24 language stuff?  Might be take it out of the TAR process

25 altogether.  Is that possible?

1      **MR. BORDEN:**  So, yes, Your Honor.

2      I'm just -- I have a little bit of experience with this

3  because we went through it in the *Orion* case.

4      **THE COURT:**  Right.

5      **MR. BORDEN:**  And -- and the documents are intermingled in

6  English and Chinese.

7      **THE COURT:**  Okay.

8      **MR. BORDEN:**  And there's a bunch of that.  And I don't see

9  how a TAR process is really going to work on that.

10      And just to go back to what the Court had, you know,

11  counseled, you know, one of the people earlier.  You said make

12  a commitment and follow --

13      **THE COURT:**  Everybody likes that.

14      **MR. BORDEN:**  -- up on that.

15      Well, I mean, it's not only that we made a commitment

16  and -- it's that we actually worked for a long time together to

17  stipulate to this ESI protocol.  And it says in the ESI

18  protocol, which was ordered by Your Honor --

19      **THE COURT:**  I read it.

20      **MR. BORDEN:**  -- that (reading):

21          "A Producing Party electing to use search terms

22      shall not use them in combination with technology

23      assisted review . . . ."

24      **THE COURT:**  No.  I got it.

25      **MR. BORDEN:**  And the reason why we came up with this is

```
 1   the exact concerns that the Court is coming up with now, which
 2   is that you can't -- you can't do TAR with -- with this kind of
 3   intermingled documents.
 4        THE COURT:  Okay.
 5        MR. BORDEN:  And there's --
 6        THE COURT:  So that's the -- that's the issue --
 7        MR. BORDEN:  Yes.
 8        THE COURT:  -- that you can't really apply -- I was trying
 9   to focus on, which is, it's not really possible to say this is
10   the Chinese language universe of documents separate from the
11   English language universe of documents.
12        There may be some that are only in one language or the
13   other.  There's a lot that are intermingled.  That's the point?
14        MR. BORDEN:  That's correct, Your Honor, because they have
15   communications going from China to the U.S. and people are
16   translating them, and so there's some of each.
17        Another point that I would just raise really quickly is
18   that in the *Orion* case itself, they produced over 6 million
19   documents, and we did it in the course of a month.
20        So this is not a situation where the defendants have to
21   miss their deadline of November 1st, and which we told them,
22   you know, that this is the court-ordered deadline and they need
23   to comply with it because we propounded these document requests
24   back in August of 2020.  And this is -- we don't have a single
25   e-mail at this point, and it's too long.
```

 1          And it's not been the plaintiffs in this case that have

 2     been delaying.  We have met and conferred with them in good

 3     faith for four months to try to develop these search terms.

 4          **THE COURT:**  Yes.

 5          **MR. BORDEN:**  So --

 6          **THE COURT:**  Okay.  All right.  So, Mr. Borden, I don't

 7     want to cut you off.  But I have been your discovery magistrate

 8     judge for this whole case; so you don't need to tell me too

 9     much about what's happened over the course of discovery.  And

10     thank you for not sharing all of it with me because I

11     appreciate, I've only seen the disputes and not everything else

12     that's gone on.

13          But I -- I appreciate what's happened in the past.  I've

14     already acknowledged that it's an enormous -- I think it's an

15     enormous burden on all parties, but particularly the plaintiffs

16     in this situation, to say that all of the work that has been

17     done negotiating search terms is now out the window and we're

18     going to start all over with a TAR process.  That's -- that's

19     not -- that's not right here.

20          But at the same time, I don't see how it's really

21     possible.  I don't know what your adversaries did in the *Orion*

22     case to produce $6 million in a month -- 6 million documents in

23     a month, but I'm not necessarily sure that that is possible

24     here.  It may be.

25          That's an option I want to explore, because there is the

 1  possibility of just running your privilege screen and making

 2  the stuff available.  And that is not ridiculous because it's

 3  in one of the cases that somebody cited to me where that was a

 4  possibility.  You can always make that call.  I'm not going to

 5  order you to make that call at this point because we're kind of

 6  getting ahead of ourselves.

 7          But let me tell you all, I am interested in Mr. Johnson's

 8  declaration.  So this is -- Mr. Johnson is at -- he's the IPPs'

 9  ESI declarant.  And so his declaration appears -- I don't even

10  know what you all are calling this tab.  But anyway, his

11  declaration, I'm interested in what he has to say about this

12  process and, in particular, paragraph 14, which says (reading):

13              "Instead of their proposal," meaning defendants'

14          proposal, "defendants should consider the TAR

15          prioritized document review until 10 percent or fewer

16          of the last 1,000 documents are found responsive by

17          human reviewers and the documents being identified as

18          responsive are not (a) novel and/or (b) more than

19          marginally relevant."

20      I'm not sure I understand exactly what that means, but it

21  seemed like someone was suggesting an option, and I wanted to

22  understand what that option was.

23      So let me ask Ms. Chan, since it's your declarant.  What

24  is Mr. Johnson talking about in paragraph 14?

25      **MS. CHAN:**  What -- Mr. Johnson isn't saying that there

1     should be TAR instead of search terms or TAR on top of search

2     terms.  But in an optimal -- optimal TAR procedure, there

3     should be a less arbitrary and better threshold for

4     discontinuing review of a production.

5         So this is in response to defendants' proposal that they

6     stop reviewing documents when the prevalence rate, or the rate

7     of documents that have been found responsive, is less than

8     10 percent, which is potentially an arbitrary stopping point

9     and relates back to our issue of error and underinclusiveness.

10    So this is one way to guard against an arbitrarily low

11    threshold for discontinuing -- discontinuing review.

12         **THE COURT:**  But in the context of a TAR-only review

13    process, or -- I read his remark as suggesting that you could

14    use TAR to prioritize the ESI review because --

15         **MS. CHAN:**  That -- that is -- yes, that is one way to

16    handle TAR, correct.

17         **THE COURT:**  Okay.  All right.  And are the IPPs suggesting

18    that as an option?

19         **MS. CHAN:**  We are open to TAR-prioritized review.  Our

20    concern is delay, which we already discussed, and

21    underinclusiveness.  And so this -- this part of his proposal

22    goes to that issue.

23         **THE COURT:**  All right.  And, Mr. Borden, do you have -- I

24    don't know if you agree with that suggestion as an option, but

25    let me ask what the DPPs' position is on that particular point.

1      **MR. BORDEN:**  No.  I mean, the DPPs want to, you know,

2   continue with what you ordered, which is that there will be no

3   TAR and that they're going to produce their documents on

4   November 1st and they're going to use the search terms that we

5   spent four months negotiating.  And -- and like you said, it's

6   very easy to do it.  All you do is you run the search terms

7   that we've agreed on, and then you're done.  You run the

8   privilege screens.

9      And they've -- they've -- they have known about their

10   obligation to produce documents for a long time.  They've had

11   these requests for a long time.  They've had the materials

12   pulled.  So all they have to do, literally, is run the search

13   terms.  They've already run it.

14      You have literally half the documents that they produced

15   in the *Orion* litigation.  There's been way too much muss and

16   fuss about this.  It's really not very difficult.  You know,

17   I've defended a lot of cases, and it's the same thing we do.

18      **THE COURT:**  Right.  I did see -- and I'm going to give the

19   plaintiffs -- or the defendants an opportunity to respond for a

20   moment.  But, you know, I did see the transcript excerpt that

21   you all included, and you left out the part where I said

22   normally -- "normally" -- you don't use the search terms as

23   your basis for production.  You use them to cull the universe

24   of documents, and then you do a review for responsiveness.

25      And that's still my understanding of what you all agreed

1    to in your ESI stip, is that that's what will happen.

2        And now we have a situation where there are too many

3    documents, according to the defendants, to actually do that.

4    That's their argument anyway.

5        So, again, trying to find a path forward here.  Let me ask

6    the defendants.

7        It does seem to me like the option is open to you all to,

8    at least for certain custodians who maybe aren't, you know,

9    particularly risky for privilege, to just go ahead and use your

10   search terms and produce the material and dispense with a

11   manual review of every piece of paper that hits on a search

12   term.

13       **MR. FROST:**  We --

14       **THE COURT:**  Why not?

15       **MR. FROST:**  We can take a look at particular custodians,

16   but context is important.  Given the fact that the retailer

17   class are our customers and the type of information they have

18   requested includes business plans, forecasts, strategic

19   meetings, competitively sensitive information, the fly in that

20   ointment is, even if that were appropriate -- and I'll get back

21   to the issue of the purported delay in a second -- the problem

22   is, even if we viewed that as otherwise appropriate, we have to

23   have the ability to designate the confidentiality of the

24   documents on a document-by-document basis.  Otherwise, we have

25   to designate everything as "Attorneys' Eyes Only," which is

1    clearly not a workable solution.  With -- so there may be some

2    particular custodians we can look at to help prioritize that

3    issue, but that's the real sensitive issue.

4        I will also note that this idea -- and I don't want to

5    belabor this point too much, but this idea of we've been

6    delaying and we have to produce everything by November 1st is

7    clearly not workable.  I don't want to belabor everything we've

8    done, but the search term conversation has gone on for months.

9    We've been actively involved.  That followed meeting and

10   conferring for months concerning the different requests, some

11   of the delays in that process created by months over December

12   and January when DPP counsel wasn't available.

13       So everybody is working in good faith and doing the best

14   we can.  But this is a lot of documents and there's been a lot

15   of process involved.

16       So the suggestion that we should just document dump

17   4 million documents next week is just -- it doesn't make any

18   sense.  We'll continue to work in good faith.

19       But to answer your direct question, that's the reason it

20   really doesn't work to just produce everything, is because

21   there's a bigger issue than privilege, because confidentiality

22   and trade secret information is incredibly important, given the

23   class of people that we're talking about producing these

24   documents to.

25       **THE COURT:**  Well, let me ask Mr. Borden this question.

1     Since you're representing the class of folks that I think

2     that Mr. Frost is principally worried about, what if there were

3     a mass production that was outside counsel's eyes only?

4         **MR. BORDEN:**  Your Honor, that's fine with us.  If they

5     want to mass designate things "Attorneys' Eyes Only," we're

6     happy to do that, provided that Mr. Frost will work with us in

7     good faith.  If we end up, you know, reviewing some of these

8     materials and figure out that they're not really attorneys'

9     eyes only, then we can go back to him and have a reasonable

10    discussion.

11        But that's a perfectly reasonable way to deal with that

12    problem.

13        **THE COURT:**  Okay.  All right.

14        **MR. FROST:**  But the problem is, all that does -- I'm

15    sorry.  I didn't mean to interrupt.

16        The problem is, all that does is push to the back end the

17    conversation about reviewing every single document.

18        **THE COURT:**  Yeah.  Well, that would have to not be, like,

19    just:  Okay, you've massively produced all this; now you have

20    to do it all over.

21        I mean, there'd have to be some understanding that that

22    was not going to happen.

23        It was "I'm going to use this in a summary judgment

24    motion" or "I'm going to use this in a deposition and it needs

25    to not be attorneys' eyes only," you know, like that kind of

1   thing.  Something specific.

2       So I'm not -- I'm not saying I'm ordering this.  I'm just

3   exploring the options here.

4       So if Mr. Borden is on board with what the Court just said

5   about how I would understand this deal would work, then that's

6   at least a possibility.

7       Mr. Borden?

8       **MR. BORDEN:**  Absolutely.  That makes total sense.

9       **THE COURT:**  All right.  So here's the -- here's the other

10  thought I had about this, which I'll return to, which is, at

11  least for some of these documents, it seems to me pretty

12  uncontroversial to say:  Okay to use TAR to prioritize

13  production.  I mean, it's not November 1st yet.  So you could

14  get to it and prioritize your documents for production.

15      And, you know, I'm going to suggest to you all that you've

16  extended other deadlines; you may need to extend this one as

17  well.  We can talk about that.  It's probably not my call to

18  extend it.  It'd be Judge Freeman's call.  But you've asked to

19  extend some other things.

20      Maybe it is my call because it's been in a discovery

21  stipulation.  It's not something ordered by Judge Freeman.  I

22  can't remember.

23      But putting that aside, I mean, what about using --

24      **MR. FROST:**  Sorry to interrupt, Your Honor, but you are

25  correct.  It was before you, not Judge Davila.

1          **THE COURT:**  Right.  But it was by Judge -- sorry.  Not

2    Judge Freeman.  Judge Davila.

3          **MR. FROST:**  Right.

4          **THE COURT:**  Too many judges today.

5          But I think it was by stipulation.  And I signed your

6    stipulation.  I didn't sort of magically pick out of the air

7    November 1st as the date.  You all proposed it to me.  Right?

8                          (No audible response.)

9          **THE COURT:**  Okay.  All right.  Good.  And I don't think

10   that Judge Davila has set any case deadlines that are bearing

11   down on you right now.  Is that correct?

12         **MR. FROST:**  That is also correct.

13         **THE COURT:**  Okay.

14         **MR. FROST:**  And -- and the only point I would add to that

15   is, at the time we entered into that stipulation, we clearly

16   had no understanding that we were going to be dealing with

17   nearly a thousand search terms.

18         **THE COURT:**  Okay.  Maybe that's true, but you all knew --

19   and I believe that this is a true statement -- you all knew

20   that this was going to be a case with massive amounts of

21   documents in it.

22         Mr. Frost, you told me that from the beginning when you

23   were trying to get the -- the documents out of the *Orion*

24   litigation.

25         Massive amounts of documents that people have.  So this

1    has always been a massive document case, and everybody knew it.

2         So here's another thought I had.  I -- I am thinking that

3    at a minimum, we need to deal with the search terms and get

4    them finalized.  And they're not finalized.  There seem to be

5    some legitimate reasons why some search terms should be

6    modified.

7         Now, maybe those things are finalized.  Like, for example,

8    there was the remark that's made in the July 30th letter that

9    says:  This search term keeps coming up with some person's name

10   that is not intended because of how his e-mail address works.

11   I mean, those seem to -- this Chen, Ryan Chen, who -- or who is

12   the person that I think you're not trying to get information

13   out of.  Sorry.  You're trying to get a different Chen, and

14   you're coming up with someone named Chris Hendrin, whose e-mail

15   address happens to have "chen" as part of it.  Okay.

16        Those are problems you all should solve.  That seems to be

17   easy.  And maybe what I was being told before is that those

18   problems were solved, at least as between the IPPs and the

19   plaintiffs.

20        But when I see this --

21        **MS. SALINAS:**  Yes, Your Honor.

22        **THE COURT:**  -- this big chart and I see these three

23   categories of things in dispute -- I mean, one possibility is,

24   we resolve the search terms.

25        You apply those search terms.  Whatever it is is whatever

1    it is.  I give you a deadline to do it.  If I have to resolve

2    the search term dispute, I will.  I will just decide, and those

3    will be the search terms.

4        TAR will be used to prioritize the production so that the

5    plaintiff get the best documents, meaning the most responsive

6    documents, first rather than later.  And then we will figure

7    out what to do with the remainder.  But not to be using TAR as

8    a way to cut it off.

9        It may be that I'll say:  Okay, for the remainder, you're

10   just going to have to produce whatever is -- whatever hits.  I

11   mean, that may be the solution to the problem.

12       But I'll allow you to use TAR to prioritize the material

13   first.  I mean, that's -- that's one thing I'm exploring.  Is

14   that a possibility from -- let me just ask the plaintiffs'

15   perspective; then I'll get the defendants.

16       So, Ms. Chan, you first.

17       **MS. CHAN:**  Yes.

18       **THE COURT:**  Okay.  Mr. Borden, what's your thought?

19       **MR. BORDEN:**  I mean, as long as the production is complete

20   by November 1st.  I mean, we don't really care what order we

21   get the documents in, but that date should stick firm.

22       They have not produced a single document in the entire

23   case -- I mean, a single e-mail.  They also haven't produced

24   their full transactional data.

25       **THE COURT:**  What do you mean by "transactional data"?

1    **MR. BORDEN:**  By the -- the sort of business guts of --

2    that you use to bring these kind of antitrust cases.

3    **THE COURT:**  Like financial information?

4    **MR. BORDEN:**  Yes.

5    **THE COURT:**  Like sales?

6    **MR. BORDEN:**  Yes.

7    **THE COURT:**  To whom -- okay.  Which I don't think this has

8    to do anything with search terms.  Right?

9    **MR. BORDEN:**  It does not.  But it goes to our underlying

10   point, which is that, you know, there is foot-dragging.

11   And I would -- I would say that, you know, in contrast,

12   our client has produced everything.  They're -- they've gone

13   and -- like, literally, we had to reconstruct some fire-damaged

14   drives and materials.  We have actually complied with our

15   obligations.

16   And our point is, like, if you don't enforce the deadlines

17   and enforce the rules, they just simply become a mechanism to

18   punish the people that are trying to adhere to them and do what

19   the Court actually wants us to do.

20   **THE COURT:**  There is always a risk for that.  I

21   acknowledge that.

22   But it does seem to me that both parties have asked me to

23   extend deadlines already by stipulation, and you've agreed to

24   do that.  So it seems to me that there may be some benefit to

25   some flexibility here with the completion date.

1        **MR. BORDEN:**  If -- sorry, Your Honor.

2        **THE COURT:**  No.  Just to make sure that we -- that this,

3    you know, isn't a complete train wreck, because otherwise, I

4    give a date.  You have a date.  The defendants won't make it.

5    You're going to make a motion for sanctions.  And then what am

6    I going to do?  Order them to produce the documents.  Right?

7    Right?  Or they just forfeit?  Maybe you're going to ask for

8    termina- -- go to Judge Davila and he'll get a motion for

9    terminating sanctions?

10        I mean, I don't know.  I just -- I feel like this is

11   not --

12        **MS. SALINAS:**  Your Honor, if I may make a suggestion.

13        I have found it to be helpful in the search term process

14   when we set successive deadlines.  And so we won't just have a

15   new substantial completion deadline, but first production,

16   second production, third production.  Defer- -- you know, happy

17   to work it out, but that that be a part of the instruction.

18        **THE COURT:**  Let me just give Mr. Borden an opportunity to

19   respond to my predictions of what's going to happen --

20        **MR. BORDEN:**  Yeah.

21        **THE COURT:**  -- if we don't make some adjustments here.

22        **MR. BORDEN:**  So we don't -- we don't want to bring

23   sanctions motions.  We don't want to bring any motions.  We

24   just want our documents.

25        And, you know, given experience in a case with a document

1    production that was twice this size that happened within

2    a month, I know that they can do it if they want to.  I know

3    that they could do it if producing the documents was their

4    priority.

5         It was our priority to comply with our discovery

6    obligations, and it should be their priority to comply with

7    theirs.  I mean, fair is fair.  And when you make a commitment,

8    you should live up to it.

9         And their commitment was to run these search terms and

10   produce the documents by November 1st.  We extended out the

11   deadlines many times.  Many times.  And each time we extended

12   out the deadlines for them to come up with reasonable search

13   terms, we told them that this November 1st deadline is going to

14   stick firm.  And it's an important -- we have literally

15   propounded these discovery request 60 weeks ago.

16        **THE COURT:**  Okay.  Mr. Borden, I appreciate that.

17        I do recall having to resolve a number of discovery

18   disputes where you were asked to produce documents on behalf of

19   your clients or on behalf of clients that you previously

20   represented, and I had to resolve those before things actually

21   happened.  So I just -- I don't want to rehash the whole

22   history of discovery in this case.

23        And it would be one thing if what we do here had direct

24   implications on a schedule that was already set before the

25   district judge.

```
 1        I don't know why Judge Davila hasn't set a case management

 2   schedule in this case, but he has not.  So my only point to the

 3   parties is, is we have some flexibility here to solve this

 4   problem in a way that makes sense, and that's what I'm trying

 5   to do.

 6        So I haven't decided yet what I'm going to do, but

 7   that's -- that's the focus of my questions to you all.  Okay?

 8        I want to understand how privileged issues are going to be

 9   handled from the defendants' perspective.  Do you have the

10   ability to run a privilege screen, extract potentially

11   privileged documents, and deal with the claw- -- use a clawback

12   process, if necessary?  Is that the plan?

13        MS. LIN:  Exactly, Your Honor.

14        THE COURT:  Okay.  So that's not going to hold anything

15   up.  Right?

16                          (No audible response.)

17        THE COURT:  Okay.  Is the answer "yes"?

18        Sorry.  Mr. Frost was shaking his head.

19        MS. LIN:  Yes.

20        THE COURT:  But I should get a "yes" or a "no."

21        MR. FROST:  Sorry.  The way you asked, that's not going to

22   hold anything up, the answer is:  No, it's not.  Forgive me for

23   being --

24        THE COURT:  Okay.

25        MR. FROST:  -- ambiguous.
```

1      **THE COURT:**  All right.  Here is what I'm inclined to do.

2    I'm inclined to give you all a deadline to resolve the

3    remaining disputes, and I think there probably are some about

4    search terms.

5      I'm going to tell you right away, if the dispute comes

6    before me that the problem is that these search terms hit too

7    few documents, I will not be persuaded by that.  So just, like,

8    ignore that part because I'm going to rule against you on that

9    issue for the defendants.  It's great that they hit very few

10   documents.  That's -- that's wonderful.  You should be

11   delighted.  So those terms are not going to be modified because

12   they hit too few documents.

13     Now, if you told me all of them were, like, hitting a

14   hundred percent non-responsive documents, that would be one

15   thing; but don't waste your time over things that hit fewer

16   than 500 documents.  Just, that doesn't make any sense.

17     For things that are causing problems that you can

18   identify, that you can fix, like the Chen issue, fix those.

19     And for things where there's really a dispute about the

20   scope of the -- you know, it's too few -- you know, too many

21   responsive docu- -- too many non-responsive documents, if you

22   don't have a good solution to the problem, you know, sometimes

23   you just have to live with it.

24     I mean, that's why -- you can't get perfect search terms

25   unless the defendants are willing to just hit produce for

1    everything that the search terms hit, which is an option which

2    I may order at the end of the day for at least some of this

3    production.  But you're not going to get perfect search terms.

4        So, you know, there's no magic line that says:  These

5    search terms are coming up with too many non-responsive hits

6    because it's X percentage.  There's just no magic number like

7    that.

8        So, you know, like I said, identify the problems, try to

9    fix the problems, see if you can agree on the fix to the

10   problems.  If not, let me know what they are.  I want a chart.

11   And whatever the disputes are, I want it in a chart so I can

12   just go through and say, yes, no, yes, no.  Okay?  And that's

13   how I'll take care of the search terms.  And we need to -- we

14   need to get finality on the search terms.

15       So -- so my inclination -- I will write you an order about

16   this, but this is my inclination, is to not allow the redo with

17   TAR.  Just not going to happen.  Okay?  No TAR redo.

18       TAR can be used to prioritize if the -- and I would

19   encourage the defendants to do that because there is going to

20   come a point where I am going to order that you get the

21   documents out.  And whatever you're going to do to get them

22   out, you're going to get them out.

23       I am contemplating extending your deadline from

24   November 1st to sometime later, despite Mr. Borden's objection

25   on his client's behalf.

1    And I didn't actually give the IPPs an opportunity to

2    weigh in specifically on that.

3    It would be great if you all could come up with a proposal

4    for me about that.  Otherwise, I will just -- I'll probably

5    consult with Judge Davila and then I'll pick a date.  That's

6    probably what I'll do, to be honest.

7    And Judge Davila may say, "No, I want it to be

8    November 1st," in which case I'll leave it at November 1st.

9    But I think from a case management perspective, you know,

10   I need to make sure that what we're doing here is not impacting

11   the case management schedule that Judge Davila has in mind if

12   he hasn't actually issued an order and whatever else is going

13   on in the case.  So I'm going to tell you candidly, I'm going

14   to consult with him about that issue before I set a deadline.

15   So there may come a point where the defendants will have

16   to do something besides manual review.  Right?  And you won't

17   be able to use TAR to cut off your -- you know, your production

18   obligations, having already engaged with the search terms.

19   That's my inclination right now.  I think that's the only way

20   it's going to be fair.  So you can use TAR to prioritize, but

21   not to limit what you do, because we're too far down the search

22   term road.

23   So -- so that's my -- what I'm -- what I'm leaning

24   towards.  And, you know, if anybody wants to have any last

25   remarks about that plan, I'll let you do it.  It's

1   almost 1 o'clock.  You all have waited very patiently to be

2   heard on this; so I don't want to cut off the discussion.  So

3   let me just go around the room.

4        Ms. Chan, from the IPPs' perspective, any final remarks?

5        **MS. CHAN:**  Your Honor, that sounds like a very practical

6   solution.  So we'll abide by whatever the Court orders.

7        **THE COURT:**  All right.  Mr. Borden, from the DPPs, any

8   further remarks?

9        **MR. BORDEN:**  No.  Thank you.  We appreciate -- we

10  appreciate you spending the time on this.

11       You had a very exciting morning, by the way.  It was -- it

12  was a pretty interesting calendar that I got to see.  So,

13  brought me back.

14       **THE COURT:**  "Interesting" is a word one could use, I

15  suppose.

16       All right.  Thank you.

17       Defendants, any further remarks on what I plan to order?

18       **MR. FROST:**  That all is workable for us, Your Honor.

19       We'll talk with opposing counsel concerning an extended

20  deadline.  I don't think we're talking anything more than 60 or

21  90 days to be able to get things accomplished.

22       The only other thing I'll note is, I expect the reason we

23  probably haven't had a CMC in front of Judge Davila is because

24  we're still working on pleadings and filing motions to dismiss

25  on the latest versions of the complaint.  So I don't see

1  anything coming up so urgently that 60 or 90 days would make a

2  substantial difference in, given that it's going to be that

3  long before the motions to dismiss, anticipated motions to

4  dismiss on the -- on the most recent versions of the complaints

5  are going to be heard.

6      **THE COURT:**  Okay.  Well, like I said, I will consult with

7  Judge Davila on that point, but thank you for the observation.

8      All right.  I will issue a written order so that you have

9  some concrete guidance.  And I know you all always like to

10  order the transcript anyway so you can quote back to me

11  whatever I might have said.  But I will issue an order so that

12  you know what to do.  All right.

13      All right.  Thank you all very much.

14      **MR. BORDEN:**  Thank you.

15      **MS. LIN:**  Thank you, Your Honor.

16      **THE COURT:**  This matter is concluded.

17      **THE CLERK:**  Court's adjourned.

18              (Proceedings adjourned at 1:00 p.m.)

19                     ---o0o---

20

21

22

23

24

25

1

2                    **CERTIFICATE OF TRANSCRIBER**

3

4        I, ANA DUB, CSR NO. 7445, RDR, RMR, CRR, CCRR, CRG, CCG,

5    certify that the foregoing is a true and correct transcript, to

6    the best of my ability, of the above pages of the official

7    electronic sound recording provided to me by the U.S. District

8    Court, Northern District of California, of the proceedings

9    taken on the date and time previously stated in the above

10   matter.

11       I further certify that I am neither counsel for, related

12   to, nor employed by any of the parties to the action in which

13   this hearing was taken; and, further, that I am not financially

14   nor otherwise interested in the outcome of the action.

15

16

17   DATE:  Monday, November 8, 2021

18

19

20   _____

21       Ana Dub, CSR No. 7445, RDR, RMR, CRR, CCRR, CRG, CCG

22

23

24

25