J. Noah Hagey, Esq. (SBN: 262331)
    hagey@braunhagey.com
Matthew Borden, Esq. (SBN: 214323)
    borden@braunhagey.com
Ellen V. Leonida, Esq. (SBN: 184194)
    leonida@braunhagey.com
Ronald J. Fisher, Esq. (SBN: 298660)
    fisher@braunhagey.com
Hunter B. Thomson, Esq. (SBN: 330533)
    thomson@braunhagey.com
BRAUNHAGEY & BORDEN LLP
351 California Street, 10th Floor
San Francisco, CA 94104
Telephone: (415) 599-0210
Facsimile: (415) 599-0210

ATTORNEYS FOR REPRESENTATIVE
PLAINTIFF RADIO CITY, INC.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE TELESCOPES ANTITRUST LITIGATION | Case No. 5:20-cv-03639-EJD |
| This Document Relates to: | Case No. 5:20-cv-03642-EJD |
| SPECTRUM SCIENTICS LLC, RADIO CITY, INC., and those similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>CELESTRON ACQUISITION, LLC, SUZHOU SYNTA OPTICAL TECHNOLOGY CO., LTD., SYNTA CANADA INT'L ENTERPRISES LTD., SW TECHNOLOGY CORP., OLIVON MANUFACTURING CO. LTD., OLIVON USA, LLC, NANTONG SCHMIDT OPTO-ELECTRICAL TECHNOLOGY CO. LTD., NINGBO SUNNY ELECTRONIC CO., LTD., PACIFIC TELESCOPE CORP., COREY LEE, DAVID SHEN, SYLVIA SHEN, JACK CHEN, JEAN SHEN, JOSEPH LUPICA, DAVE ANDERSON, LAURENCE HUEN, and DOES 1-50,<br><br>Defendants. | **PLAINTIFF RADIO CITY, INC.'S NOTICE OF MOTION AND MOTION TO ENFORCE DISCOVERY ORDER AND FOR ORDER TO SHOW CAUSE AS TO WHY DEFENDANTS SHOULD NOT BE SANCTIONED FOR VIOLATING THE COURT'S ORDER**<br><br>**Date:** August 9, 2022<br>**Time:** 10:00 a.m.<br>**Judge:** Hon. Virginia K. DeMarchi<br>**Location:** Courtroom 2 – 5th Fl.<br><br>**Compl. Filed:** June 1, 2020<br>**Third Am. Compl. Filed:** August 31, 2021<br>**Trial Date:** None Set |

## NOTICE OF MOTION AND MOTION

TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE that on August 9, 2022, at 10:00 a.m. or as soon thereafter as the matter may be heard before the Honorable Virginia K. DeMarchi, in the United States District Court for the Northern District of California at the San Jose Courthouse, 280 South 1st Street, Courtroom 2, 5th Floor, San Jose, CA 95113, Plaintiff Radio City will move this Court to compel Defendants to (1) certify that they are in compliance with the Court's Order, (2) identify all documents that hit on the Court-ordered search terms that they are withholding on grounds other than attorney-client or work-product privilege, and (3) explain what criteria they are using to make their relevance determinations, and why it would enable them to withhold obviously relevant materials, and to show cause as to why they should not be sanctioned for violating the Court's Order pursuant to Federal Rule of Civil Procedure 37 and the Court's inherent powers.

This Motion is based on this Notice of Motion and Motion, the accompanying Memorandum, the Declaration of Matthew Borden, the Declaration of Thomas Shou, the files and records in this action, and on such other written and oral argument as may be presented to the Court.

Dated: July 5, 2022

Respectfully submitted,

BRAUNHAGEY & BORDEN LLP

By: ___/s/ *Matthew Borden*___
Matthew Borden

Attorneys for Plaintiffs

# **TABLE OF CONTENTS**

Page(s)

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................. 3

     A.     DPPs' Claims ...................................................................................... 3

     B.     Defendants Reveal that They Have Been Withholding Critical Documents ......... 4

     C.     Defendants' Initial Efforts to Destroy Relevant Documents ................................ 8

     D.     Defendants' Continuing Efforts to Prevent the Review of Highly-Inculpatory Documents ........................................................................................... 9

     E.     DPPs' Further Efforts to Avoid Bringing this Motion ......................................... 11

     F.     The 4,270 Documents Defendants Sought to Suppress Contain Relevant and Inculpatory Documents ...................................................................... 12

ARGUMENT ...................................................................................................................... 14

I.     SIGNIFICANT DOUBTS EXIST AS TO WHETHER DEFENDANTS ARE IN VIOLATION OF THE COURT'S ORDER ................................................................ 15

II.     DEFENDANTS SHOULD BE REQUIRED TO EXPLAIN THEIR PRODUCTION PROCESS AND SHOW CAUSE WHY THEY SHOULD NOT BE SANCTIONED ....................................................................................... 17

CONCLUSION ................................................................................................................... 17

1

# <u>TABLE OF AUTHORITIES</u>

2

Page(s)

3

## <u>CASES</u>

4

*California Earthquake Auth. v. Metro. W. Sec., LLC,*
5    No. 2:10-CV-0291 MCE GGH, 2012 WL 6651152 (E.D. Cal. Dec. 20, 2012)........................... 17

*Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.,*
6    20 F.4th 466 (9th Cir. 2021) ...................................................................................................... 2, 4

*Stone Brewing Co., LLC v. MillerCoors LLC,*
7    No. 18CV331-BEN-LL, 2019 WL 5677844 (S.D. Cal. Oct. 31, 2019) ...................................... 17

8

*Stone Brewing Co., LLC v. MillerCoors LLC,*
    No. 3:18-CV-0331-BEN-LL, 2020 WL 6112188 (S.D. Cal. Oct. 16, 2020) .............................. 17

9

## <u>RULES</u>

10

Fed. R. Civ. P. 37........................................................................................................................... 1
11

Fed. R. Civ. P. 37(b)(2)(A) .......................................................................................................... 14

Fed. R. Civ. P. 37(b)(2)(C) .......................................................................................................... 17
12

Fed. R. Civ. P. 37(c)(1).................................................................................................................. 14

Fed. R. Civ. P. 26............................................................................................................................ 8
13

Fed. R. Civ. P. 26(f)........................................................................................................................ 4

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DPPs' MOTION TO ENFORCE DISCOVERY ORDER

Plaintiff Radio City on behalf of the Direct Purchaser Plaintiffs (DPPs) respectfully submits this Memorandum in support of its Motion to Enforce the Court's Discovery Order.

## **INTRODUCTION**

DPPs recently learned that Defendants may be withholding evidence in violation of the Court's Order to produce documents and a privilege log by January 13, 2022. This conduct came to light when Defendants sought to "claw back" 51,500 documents, which they claimed they had intended to withhold for some type of "relevance" review, but their vendor accidentally produced. The documents that Defendants sought to claw back as "irrelevant"—and actually demanded that DPPs destroy—have turned out to be some of the most incriminating documents in the case. After the parties had negotiated search terms for several months, and Defendants had produced volumes of spam, DPPs were surprised to learn that Defendants were doing some sort of "relevance" review. The only reason DPPs learned that Defendants were culling documents was by accident.

When DPPs asked Defendants if they had withheld any other non-privileged documents that hit on the Court-ordered search terms, what they were, and what criteria Defendants were using to withhold them, Defendants refused to answer. If there are other documents, or troves of documents, that Defendants are improperly withholding based on "relevance," Defendants are in violation of the Court's Order. DPPs obviously would have preferred to simply learn the facts from Defendants, but absent their cooperation, Defendants should be compelled to explain their production process and show cause as to why they should not be sanctioned for violating the Court's Order.

Substantial evidence shows that Defendants have tried to suppress key documents via their "relevance" review. Documents Defendants demanded that DPPs destroy as "irrelevant" include:



- ███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████████

██████████████ (Declaration of Matthew Borden ("Borden Decl."), Ex. 1);

- █████████████████████████████████████

███████████████████████████████████

█████████████████████████████████████

1   ██████████████████████ (*Id.*, Ex. 2.) This document—████████████████

2   ██████—shows a conspiracy between horizontal competitors Synta and Ningbo Sunny.

3   • A 2009 email that shows Defendant Sylvia Shen ████████████████████████

4   ████████████████████████████████████ (Declaration of Thomas Shou ("Shou

5   Decl."), Exs. 11 & 12.) This email shows a pre-2013 conspiracy between Synta and

6   Ningbo Sunny and directly contradicts arguments that Defendants are pressing before

7   Judge Davila in their pending motion to dismiss.

8   • Bank records and investment documents relating to Good Advance, the entity that the

9   Ninth Circuit has noted was used by Synta and Ningbo Sunny to fix prices. *Optronic*

10   *Techs., Inc. v. Ningbo Sunny Elec. Co.*, 20 F.4th 466, 480 (9th Cir. 2021).

11   In sum, documents that hit on the Court-ordered search terms, which Defendants claim to

12   be non-responsive, are, in fact, smoking hot. Defendants' review has nothing to do with relevance

13   because they produced Halloween party invitations, Word-of-the-Day emails, and scores of other

14   non-responsive materials that any relevance reviewer easily would have spotted.

15   It is particularly troubling that the only reason that DPPs have these hot documents is that

16   according to Defendants, their vendor produced them in "error." To purportedly correct that error,

17   Defendants demanded that DPPs destroy the 51,500 documents and accept a substitute production

18   once Defendants had reviewed the 51,500 documents. Defendants repeatedly threatened to take

19   action against DPPs if they reviewed the supposedly irrelevant materials Defendants' vendor

20   produced. Defendants' substitute production omitted 4,270 documents that Defendants claimed to

21   be non-responsive. Because there is no legal basis for clawing back documents based on relevance,

22   DPPs reviewed those documents and found many critical pieces of evidence identified above and

23   below. Defendants are still withholding these materials from IPPs.

24   In light of Defendants' refusal to explain any of the above, DPPs respectfully ask the Court

25   to compel Defendants to (1) certify that they are in compliance with the Court's Order, (2) identify

26   all documents that hit on the Court-ordered search terms that they are withholding, and (3) explain

27   what criteria they are using to make their relevance determinations, and (4) show cause as to why

28   they should not be sanctioned for violating the Court's Order.

## BACKGROUND

### A.    DPPs' Claims

On November 26, 2019, a jury found that Defendant Ningbo Sunny had conspired with Defendants Celestron and Synta to divide the market, fix prices, and engage in other antitrust violations regarding telescopes. This action seeks to recover the damages that Defendants have caused to all the direct purchasers of their products in the United States.

The Third Amended Complaint ("TAC") details that Dar-Tson "David" Shen, his family members and cohorts control a number of entities (collectively "Synta") that manufacture and sell telescopes, and own the largest telescope distributor in the U.S., Defendant Celestron. Synta and Celestron conspired with their horizontal competitor Defendant Ningbo Sunny to fix the prices of telescopes, and divide and dominate the market. (TAC ¶ 2.) Defendants are members or employees of Synta, a conglomerate of entities owned and controlled by Defendant David Shen and his family members, including Synta Technology Corp., Suzhou Synta Optical Technology Co., Ltd., and a shadowy network of factories and distributors.[1] (*Id.*) Synta wholly owns Defendant Celestron Acquisition, LLC ("Celestron") through its wholly owned subsidiary, Defendant SW Technology Corp. ("SW Tech."). (*Id.* ¶¶ 23-24.)

Even though he founded Synta and has run it since its inception, from 2001 to 2005, David Shen concurrently served as an officer of Synta's horizontal competitor, Ningbo Sunny, until he resigned the position in 2005 a few months after he acquired Celestron. (*Id.* ¶ 15.) He also held a 26% ownership stake in Synta's horizontal competitor Ningbo Sunny until 2005, when he transferred his shares to his sister-in-law, Dong Yun Xue, who continues to hold that interest. (*Id.* ¶ 16.) In the *Orion* litigation, Ningbo Sunny concealed in its discovery responses that Dong Yun Xue is David Shen's sister-in-law, admitting it only after Orion uncovered documentary evidence demonstrating the family connection, requiring amended discovery responses that the Court observed were "perhaps not as forthcoming as they should have been." (ECF No. 189 at 4 in 5:16-cv-06370-EJD. *See also* ECF No. 148 at 6-9 in 5:16-cv-06370-EJD (moving papers detailing evasive discovery responses).)

---

[1] Ningbo Sunny is also a Defendant in this action, but despite being served and having notice of this litigation, it has refused to appear. (ECF No. 174 at 7:19-20.)

Defendant Sylvia Shen is David Shen's sister. She is a member of Celestron's Executive Committee and was involved with planning the anticompetitive activities and strategies at issue in this suit, including the price-fixing and market division. (TAC ¶ 17.) Defendant Jean Shen is another of David Shen's sisters, who participated in the conspiracy, including through her companies, Defendants Olivon USA, LLC and Olivon Manufacturing Co. Ltd. (*Id.* ¶ 19.)

Defendant Synta Technology Corp. ("Synta Technology") was a key piece of the anticompetitive conspiracy. (*Id.* ¶ 22, 89.) Beginning in 2005, Ningbo Sunny and the Synta companies conspired to fix prices and unlawfully coordinate their activities by having Ningbo Sunny's customers purchase Ningbo Sunny goods through Synta Technology—calling it "Good Advance" to conceal that it was controlled by Ningbo Sunny's horizontal competitor, Synta. (*Id.* ¶¶ 89-90.) Good Advance employee Joyce Huang enforced the price-fixing conspiracy from her perch at Good Advance, in one documented instance directing James Chiu of Ningbo Sunny to raise prices offered to a customer because Suzhou Synta (a Synta company and horizontal competitor of Ningbo Sunny's) charged higher prices. (*Id.* ¶ 89.) In the *Orion* action, the Ningbo Sunny defendants repeatedly denied that Good Advance was controlled by David Shen and that Joyce Huang answered to David Shen—before finally admitting the truth at trial. (*Id.* ¶ 90.) Joyce Huang has subsequently destroyed evidence relating to her and Synta Technology's role in the conspiracy. (*Id.* ¶ 22.)

## B.   Defendants Reveal that They Have Been Withholding Critical Documents

DPPs served their initial document requests on Defendants in August 2020. The parties thereafter engaged in multiple conferences pursuant to Federal Rule of Civil Procedure 26(f) to agree to a discovery plan, custodians, and search terms. (ECF No. 169 at 2:10-11.) The Court ordered the parties to reach agreement on search terms and custodians by June 7, 2021, and ordered a substantial completion deadline for document production by November 1, 2021. (*Id.* at 2:1-3:2.) Defendants refused to reach agreement on custodians and search terms by June 7. Defendants continued what turned out to be 21 weeks of negotiations over search terms, before they disclosed their intent to use technology-assisted review ("TAR") after running search terms, contrary to the terms of the Court-ordered discovery plan. (ECF No. 193 at 3-4.) This led to further delay, with

weeks of negotiations before briefing the issue to the Court, which on October 7, 2021, issued an order rejecting Defendants' proposal to use TAR. (ECF No. 201 at 2 ("Defendants' TAR proposal now threatens to disrupt and further delay the production of responsive ESI.").)

Because of Defendants' delays, Defendants failed to complete their production by the Court-ordered deadline of November 1, 2021. The Court, however, entered a new schedule in late October that provided that Defendants begin making substantial productions on November 15, 2021, substantially complete the production of documents for which David Shen, Sylvia Shen, Jean Shen, and Jack Chen are custodians by January 3, 2022, and substantially complete the entire production by February 15, 2022. (ECF No. 212.)

A month after that Court-ordered production deadline had passed, on March 15, 2022, Indirect Purchaser Plaintiffs ("IPPs") filed a Motion for Leave to File a Third Consolidated Class Action Complaint, quoting numerous inculpatory documents from Defendants' recent productions, which rebutted arguments Defendants had made in their then-pending Motion to Dismiss about a lack of evidence of pre-2013 anticompetitive conduct. (ECF No. 244 at 2-3, in 5:20-cv-03639.) Among the inculpatory documents cited in IPPs' motion were documents produced in late January 2022 showing:

- "David decided to move all the production for 114mm or smaller items to Sunny … Synta will concentrate on bigger and higher end products[.]" (David Shen Email, May 2006).[2]

- "[T]he production for these models will be transferred to Sunny. … we don't want to order from Bosma any more, unless otherwise you have urgent demand in the near future before Sunny can catch up the production." (Sylvia Shen Email, May 2005).

- "Please be sure that Sunny will never directly work with or supply to any of Celestron's dealers and distributors. … And we assure you that we will never sell any big diameter telescopes to any third parties." (Peter Ni Email, Nov. 2005).

---

[2] Though identified in the motion as a 2006 email, it appears to be an email from May 2005 sent by Sylvia Shen.

- "David, Mr. Ni and I discussed the Powerseekers and Firstscope lines since we intend to discontinue both lines this year …." (Joe Lupica Email, Jan. 2006).

- "Take Sales from Suppliers that Compete with Synta and Sunny: The additional 40,000 to 50,000 telescopes purchased from Synta/Sunny will not only provide additional work for these two factories but it will also take business away from the competitors of Synta/Sunny such as Jinghua and others." (Joe Lupica, Feb. 2007).

- "Sunny will try its best to work with Celestron and Synta to turn these 3 companies into the best and strongest Telescope & sport optics manufacturing and marketing group in the world. … I appreciate your confidence about our future through cooperation. And I am expecting greater success to be made by our common efforts." (Peter Ni Email, Nov. 2005).

- "I look forward to working together for the benefit of all three companies. … I think it is important for the three of our companies to look to the world as one strong group of companies." (Joe Lupica Email, Nov. 2005).

- "The facts supporting the movement were well received by David" in "knowing that he has got certain 'strategic alignment' with Sunny. So shifting to Sunny, if suggested by him, will never be a problem." (Laurence Huen, February 2007).

- "I know we will be working closer with Synta and Sunny to develop the strongest group of telescope companies in the world." (Joe Lupica Email, Mar. 2011).

- "The relationship between Celestron, Synta and Sunny has never been stronger. … It is also well understood that each is dependent upon the other for continued growth." (Celestron's Monthly Management Presentation, Dec. 2011).

- Defendants concealed their intent to expand into the lower-end telescope market through their acquisition of Celestron. In an April 2005 email to Bushnell Telescopes, for example, David Shen stated: "I have no interest to compete the volume low price products with Bushnell, Meade or others. … Once again, I would like to address, I have no intention to compete with you. We are looking forward to exploring more opportunities to serve you."

- Defendants further concealed their broader agreement to cooperate as horizontal competitors. Among other things, in August 2006, Joe Lupica was admonished for representing Synta and Ningbo Sunny as "sister companies" and instructed "not refer to Sunny as an affiliated company again." However, as a subsequent Celestron sales presentation acknowledged, Synta and Ningbo Sunny were and would remain "sister companies."

- Defendants also concealed that Mr. Shen would remain in control of Ningbo Sunny after the Celestron acquisition. Among other things, Defendants represented that Mr. Shen resigned from his position as Vice Chairman of Ningbo Sunny in July 2005 and held no other position in Ningbo Sunny "in order to avoid any concern of conflict of interest after he acquired Celestron." However, as the documents unequivocally demonstrate, Mr. Shen remained in control of Ningbo Sunny after the Celestron acquisition.

(ECF No. 244 at 2-3, in 5:20-cv-03639-EJD.)

The next day, on March 16, 2022, Defendants sent an email to DPPs and IPPs claiming that "a folder of sensitive and privileged documents that had been segregated for secondary review was inadvertently produced due to a vendor error" and demanding that "you delete all versions and copies of the documents." (Borden Decl., Ex. 3.) The documents cited by IPPs were among the 51,500 documents that Defendants claimed that they had intended to continue withholding, and that their vendor had mistakenly produced.

In addition to the documents cited by IPPs, the 51,500 documents that Defendants demanded that Plaintiffs destroy included other inculpatory documents. For example, the documents included a ███████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████

[REDACTED]

(Borden Decl., Ex. 4 at '469.) In another document, Defendant Sylvia Shen reported to other officers at Celestron [REDACTED]

[REDACTED]

[REDACTED]

[REDACTED] (Borden Decl., Ex. 5.)

**C.     Defendants' Initial Efforts to Destroy Relevant Documents**

In response to Defendants' demand that they destroy 51,500 documents, DPPs asked for further information. On March 18, 2022, DPPs wrote:

> We understand defendants' position that they have inadvertently produced over 50,000 documents. DPPs have quarantined them pursuant to your request. However, from your email below, it appears that Defendants are trying to "claw back" non-privileged materials, which, of course, they cannot do under the Protective Order (or Rule 26).
>
> From your email, it also appears that Defendants are not producing all the documents that hit on the keywords that the Court ordered. If that is so, please let us know.
>
> To the extent that Defendants wish to claw back any documents on a legitimate basis, please provide a log for listing each document over which defendants claim privilege that provides (i) the Bates number (ii) whether Defendants are claiming attorney-client privilege or work product protection, (iii) the sender and recipient, (iv) the subject matter, and (v) facts sufficient for us to evaluate whether the claim of privilege has any merit, by no later than 3/30/22. We note that the Court-ordered time for Defendants to complete privilege review has passed. (ECF 211.) Please also explain how it came to be that an entire folder of 50,000+ allegedly privileged documents was produced, and all the steps that Defendants took to protect against it.

(Borden Decl., Ex. 6.)

Defendants refused to answer any of these questions, and instead maintained their demand that DPPs destroy all 51,500 documents. (Borden Decl., Exs. 7 & 8.)

The same day, IPPs wrote to Defendants and pointed out that the 51,500 documents that Defendants were attempting to claw back included obviously non-privileged materials that were identified in IPPs' Motion for Leave to File a Third Consolidated Class Action Complaint. (Borden Decl., Ex. 9 at 2.) IPPs explained that those documents showed that Celestron, Synta, and Ningbo Sunny had conspired to divide markets and illegally collude going back more than a decade. For example, one of the documents stated:

> Sunny will try its best to work with Celestron and Synta to turn these 3 companies into the best and strongest Telescope & sport optics manufacturing and marketing group in the world. … I appreciate your confidence about our future through cooperation. And I am expecting greater success to be made by our common efforts.

(Borden Decl. Ex. 10)

In response to the IPPs, Defendants withdrew their demand for the destruction of the documents identified by IPPs, and admitted that those documents were "relevant and responsive." (Borden Decl., Ex. 7.) Defendants, however, maintained that they still wanted Plaintiffs to segregate the remainder of the 51,500 documents while Defendants reviewed them. (*Id.*)

**D.     Defendants' Continuing Efforts to Prevent the Review of Highly-Inculpatory Documents**

By March 31, 2022, Defendants still had not identified any privileged documents in the batch of 51,500 they were demanding that Plaintiffs destroy. DPPs again wrote Defendants, stating:

> To date, Defendants have not identified any of the 51,000 documents as privileged, or provided any information from which we could ascertain whether any of the 51,000 documents arguably could be privileged. As noted in our email of March 18, 2022, the Court-ordered cut-off for completing privilege review was February 25, 2022. (Dkt. 211.) In addition to failing to provide a privilege log, Defendants have not offered any explanation for why they apparently violated the Court's Order. Nor have Defendants explained how the 51,000 documents, which apparently hit on the Court-ordered search terms, ended up in a segregated folder.

(*Id.*, Ex. 11.)

DPPs also explained that when using the names of every single lawyer identified by Defendants in their supposedly-completed privilege log as search terms, the 51,500 documents contained only 12 potentially privileged communications. (*Id.*) DPPs further explained that

1   Defendants' efforts to "claw back" non-privileged documents was particularly troubling. They

2   explained:

> Defendants' clawback demand raises substantial questions about
> Defendants' document production. Defendants plainly have not been
> reviewing their production for responsiveness and relevance because
> it contains tens of thousands of documents (if not more) that have
> nothing to do with any of the claims and defenses in this case, e.g.,
> DEFS002919064   (█████████████████████████████████),
> DEFS002998906   (█████████████████████████████████████
> ████████, DEFS002920752 █████████████████████, DEFS002920776
> ████████████ It is thus highly concerning to learn that
> Defendants have segregated at least one folder of documents—which
> contains at least some highly inculpatory materials—to apparently
> review for reasons other than privilege. Moreover, Defendants'
> attempt to withhold evidence on non-privileged grounds never would
> have come to light but for these materials, which admittedly include
> relevant and responsive documents that should have been produced
> long ago, being supposedly "inadvertently produced due to a vendor
> error."

13  (*Id.*)

14      DPPs further noted that the documents Defendants were seeking to withhold directly

15  contradicted their representations to Judge Davila in their pending motions to dismiss, in which

16  they claimed that there was no evidence that Defendants conspired before 2013. (*Id.*) Indeed, one

17  of the documents that they had demanded that DPPs destroy was a May 2007 correspondence from

18  Celestron's former CEO discussing Defendants' plan ██████████████████████████████████

19  █████████████ DPPs again requested that in light of Defendants' "relevance" review, they

20  provide an explanation for what else they were withholding, and why they had not complied with

21  the Court's Orders. (*Id.*) The letter further explained that in light of Defendants' refusal to identify

22  any privileged documents, DPPs would segregate the 12 possibly privileged documents and review

23  the remainder of the 51,500 documents, subject to their ethical obligations related to privileged

24  documents that may have inadvertently been produced. (*Id.*)

25      In response, Defendants refused to identify any privileged documents, but renewed their

26  demand that "you immediately stop reviewing those documents pending our further review." (*Id.*,

27  Ex. 12.) Defendants further threatened to seek disqualification of DPPs' counsel for reviewing the

28  51,500 documents. (*Id.*) Nine minutes later, Defendants wrote, "your list of attorneys is incomplete.

1   If you continue reviewing, it will be at your own peril." (*Id.*, Ex. 13.) But Defendants did not

2   explain who these additional attorneys supposedly were. (Borden Decl. ¶ 28.)

3        **E.    DPPs' Further Efforts to Avoid Bringing this Motion**

4        The parties met and conferred on April 11, 2022. (Borden Decl. ¶ 27.) During that call,

5   Defendants admitted that instead of producing the documents that hit on the Court-ordered search

6   terms, they were conducting an additional level of "relevance" review. They claimed that they ran

7   unspecified "targeted searches" to identify private, non-business documents, which represented the

8   51,500 documents that they demanded that Plaintiffs destroy. (*Id.*) They stated that they wanted

9   DPPs to destroy all 51,500 documents, and that they would review the 51,500 documents and make

10  a substitute production comprising all documents having anything to do with the case. (*Id.*)

11  Defendants declined to disclose the search terms they used or other details about the search

12  process. (*Id.*)

13       On April 26, 2022, Defendants sent: (1) a spreadsheet of 64 "preliminary list of privileged

14  documents" and (2) a spreadsheet of 4,270 "non-responsive documents." (Borden Decl., Ex. 8.)

15  The spreadsheet of documents supposedly containing "non-responsive" documents included

16  descriptive entries such as:

17       • "Financial; Sensitive Non-Responsive";

18       • "Sensitive Non-Responsive; Other"; and

19       • "Sensitive Non-Responsive; Family-related."

20  (Borden Decl., Ex. 14.) Twenty-seven entries are labelled simply "Potentially Relevant," with no

21  further description. (*Id.*) Hundreds have no explanation whatsoever, even while also indicating that

22  the secondary review of these documents is complete. (*Id.*)

23       On April 26, 2022, Defendants also provided a log identifying the 55 "potentially

24  privileged" documents and reproduced certain of those documents with redactions. (Borden Decl.,

25  Ex. 15.) Defendants made their "substitute" production on May 2, 2022. It comprised the

26  previously produced documents, but excluded the 65 documents they claimed were "potentially

27  privileged" and the 4,270 documents they claimed were irrelevant. (Borden Decl., Ex. 16.)

28

**F.     The 4,270 Documents Defendants Sought to Suppress Contain Relevant and Inculpatory Documents**

The 4,270 non-privileged documents that Defendants sought to claw back on the basis of relevance are in fact highly relevant and inculpatory.

The TAC alleges that "Good Advance" was an alias for Defendant Synta Technology and a key component of Defendants' anticompetitive conspiracy, as the agent through which Ningbo Sunny and Synta customers ordered telescopes to ensure that the co-conspirators' price agreements were enforced. (TAC, ECF No. 188 ¶¶ 22, 90. *See also* ECF No. 464 at 13:19-14:8 in *Orion* action, 5:16-cv-06370 (Ningbo Sunny's motion for judgment as a matter of law, contending that Good Advance was independent of the Synta companies and that evidence at trial was consistent with the explanation "that Good Advance is a trading company that operates as a middleman that connects manufacturers with customers for a commission").) Good Advance's operations—including whether employee Joyce Huang was an employee of and controlled by David Shen—was a contested issue in the *Orion* action until the defendants finally admitted at trial that the company through which they directed customers to purchase their products was secretly controlled by their horizontal competitor. (TAC ¶ 90.) Joyce Huang has now destroyed Good Advance documents. (*Id.* ¶ 22.)

Many of the documents that Defendants attempted to claw back consist of financial and other documents shedding light on Good Advance's structure and operations. For instance, Defendants demanded that DPPs destroy ████████████████████████████████ (Borden Decl., Ex. 17.) That document shows, among other things, that:

- ████████████████████████████████████
- ███████████████████████████████
- ████████████████████████

(*Id.* at '5808, '5814 & '5818.)

Even though this document hits on the Court-ordered search terms, Defendants seek to claw back this document on the grounds that it is "Financial; Sensitive Non-Responsive."

Other of the 4,270 documents also show the flow of money among co-conspirators, including a ████████████████████████████████████████



(Borden Decl., Ex. 18.) Defendants claim that this document is "Non-Responsive." (Borden Decl., Ex. 8.)

Other highly inculpatory documents go to the conspiracy between the Synta conspirators and Ningbo Sunny through Synta Technology/Good Advance. For instance,

(Borden Decl., Ex. 2.)

(*Id.*, Ex. 19.) This highly inculpatory document demonstrates not only that

(*Id.*) Defendants have asserted that this document should be clawed back as irrelevant. On the same basis, Defendants attempted to avoid producing

(Borden Decl., Exs. 20, 21 & 22.)

(Shou Decl., Exs. 11 & 12.)

Defendants have also attempted to claw back other documents showing the flow of money between and among the various Synta conspirators. Among other relevant documents, Defendants have demanded the clawback of documents showing:

- (*Id.*, Ex. 23.)
- (*Id.*, Ex. 24.)
- (*Id.*, Ex. 25.)
- (Shou Decl., Exs. 5 & 6.)

1    • ████████████████████████████████████████████

2    ████  (Shou Decl., Exs. 1 & 2.)

3    • ██████████████████████████████████████

4    ██████████████████████████████████████

5    ██████████  (Shou Decl., Exs. 7-10.)

6    • ████████████████████████████████████████████

7    ██████████████████████  (Shou Decl., Exs. 3 & 4.)

8    Though the documents show, for instance, ██████████████████████

9    ████████████████████████████████  Defendants claim that these

10   documents are all "non-responsive." (Borden Decl., Ex. 8.) These and other documents all go to the

11   conspiracy at issue in this matter and ████████████████████████████████

12   ████████████████████████████████

13   ████████████████████  but Defendants demanded that Plaintiffs

14   destroy these materials as non-responsive and have refused to provide details about how they

15   reached this determination or what other materials they are withholding.

16                                  **ARGUMENT**

17          When a party violates a Court Order, Rule 37(b)(2)(A) permits the court to issue "further

18   just orders" in its discretion and specifically lists an array of potential sanctions, including

19   "directing that the matters embraced in the order or other designated facts be taken as established

20   for purposes of the action, as the prevailing party claims"; "prohibiting the disobedient party from

21   supporting or opposing designated claims or defenses, or from introducing designated matters in

22   evidence"; "staying further proceedings until the order is obeyed"; or "rendering a default judgment

23   against the disobedient party." Fed. R. Civ. P. 37(b)(2)(A). A party's failure to disclose relevant

24   information as required by Rule 26 also empowers the Court with discretion to impose sanctions,

25   including the payment of the opposing party's attorneys' fees, informing the jury of the party's

26   failure, or "other appropriate sanctions." Fed. R. Civ. P. 37(c)(1).

27

28

## I.     SIGNIFICANT DOUBTS EXIST AS TO WHETHER DEFENDANTS ARE IN VIOLATION OF THE COURT'S ORDER

Defendants' deadline to substantially complete production of documents from the individual Shen Defendants was January 3, 2022, the deadline to provide a privilege log relating to that production was January 13, 2022, and the deadline to substantially complete the entire production was February 15, 2022. (ECF No. 212.) In their email of March 16, 2022, Defendants admitted that they had withheld 51,500 documents that they had not even reviewed yet. That conduct, alone, arguably shows that Defendants were not (and still are not) in substantial compliance with the Court's Order.[3]

More significant to DPPs, however, are Defendants' revelation that they are conducting some form of "relevancy" review to try to avoid producing inculpatory materials and lack of transparency about what they have done to comply with the Court's Order. After negotiating—literally for 21 weeks—over search terms, it was shocking to learn that Defendants had some undisclosed methodology for reviewing and withholding document that hit on the Court-ordered search terms. This was especially true given the volume of obviously non-responsive materials that Defendants produced.

Defendants have exacerbated these problems by refusing to provide any information or meaningfully meet and confer. When DPPs asked if there were other documents that hit on the Court-ordered search terms that Defendants had not reviewed, Defendants refused to respond. (Borden Decl. ¶ 27.) When DPPs asked whether Defendants were withholding documents other than the 4,270 based on "non-responsiveness," Defendants refused to answer. (*Id*.) Given the course of Defendants' conduct to date, these are not idle concerns; indeed, Defendants' conduct in trying to suppress some of the most inculpatory documents in the case based on its secret "non-responsiveness" review has cast the integrity of their entire production in question.

Moreover, while DPPs successfully resisted Defendants' efforts to "claw back" the 4,270 documents on non-privileged grounds, Defendants are in ongoing violation of the Court's Order to produce evidence to the IPPs, who complied with Defendants' improper demand that they not

---

[3] Defendants provided a privilege log for the 64 documents they withheld on April 26, 2022, 103 days after the Court-ordered cutoff of January 13.

1    review the 51,500 documents and instead accept Defendants' replacement production that omits the

2    4,270 documents. At least some of the documents Defendants are withholding from IPPs are some

3    of the most inculpatory documents in the case. They show, for instance:

4    •   ███████████████████████████████████████████████████████████

5        █████████████████████████████████████████████████████████████

6        ███████████████████████████████████████████████████████ (*Id.*,

7    Exs. 19 & 20.)

8    •   █████████████████████████████████████████████████████████████

9        ███████████████████████████████████ (Shou Decl., Exs. 11 & 12.)

10       The grounds that Defendants have given for withholding this evidence are specious. First,

11   Defendants argue that some of the withheld materials are "financially sensitive." They are not.

12   Many deal with transactions that are over a decade old. But even if the documents were trade

13   secrets, the parties are operating under a protective order that Defendants also prolonged

14   negotiations over for months. (ECF No. 137.) That eliminates any possible objection that the

15   documents should somehow not be produced because they are "sensitive."

16       Second, as shown above, Defendants have no grounds for withholding many of the

17   documents based on relevance. To the contrary, the documents that they have unilaterally decided

18   are irrelevant are conveniently some of the most material documents in the case.

19       Under these circumstances, Defendants are in violation of the Court's Order as to the IPPs,

20   and serious doubts as to their compliance with the Court's Order as to DPPs exist. Based on

21   Defendants' past and ongoing violations of the Court's Order and refusal to provide information

22   regarding what they have done to comply, the Court should order Defendants to disclose:

23   (1) whether they are still withholding documents that they have not reviewed, (2) whether

24   Defendants have withheld documents that hit on the Court-ordered search terms other than the

25   4,270 documents discussed above, and (3) what criteria they have applied to their review process,

26   which has resulted in the production of Halloween Party invitations, while excluding some of the

27   most incriminating documents in the case. The Court should also order Defendants to show cause

28   as to why they should not be sanctioned for violating the Court's Order.

## II.   DEFENDANTS SHOULD BE REQUIRED TO EXPLAIN THEIR PRODUCTION PROCESS AND SHOW CAUSE WHY THEY SHOULD NOT BE SANCTIONED

Courts are empowered with discretion to address discovery shortcomings like these, including by ordering parties to explain the process leading to their deficient responses. *See* ECF No. 595 at 5:1-4 in *Orion* action, 5:16-cv-06370 ("the Court requires Ningbo Sunny to submit a declaration from a person with knowledge describing with specificity how Ningbo Sunny conducted a search for documents responsive to Orion's post-judgment document requests"). *See also California Earthquake Auth. v. Metro. W. Sec., LLC*, No. 2:10-CV-0291 MCE GGH, 2012 WL 6651152, at *5 (E.D. Cal. Dec. 20, 2012) (ordering recipient of third-party subpoena to "'fully explicate the process it used to identify and produce' documents responsive to each of [the subpoena's] requests for production"); *Stone Brewing Co., LLC v. MillerCoors LLC*, No. 18CV331-BEN-LL, 2019 WL 5677844, at *4 (S.D. Cal. Oct. 31, 2019) (recommending the imposition of monetary sanctions for defendant's failure "to adequately explain why a thorough and extensive search and corresponding production of all remaining [responsive] materials was not made until this procedural posture"), *report and recommendation adopted in relevant part*, No. 3:18-CV-0331-BEN-LL, 2020 WL 6112188 (S.D. Cal. Oct. 16, 2020).

Rule 37(b)(2)(C) provides that when a party has violated a Court Order, "the court must order the disobedient party, the attorney advising that party, or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the failure was substantially justified or other circumstances make an award of expenses unjust."

Defendants' "relevance" determinations are obviously improper and cast a pall on Defendants' entire document production. Even then, DPPs likely would not have had to bring this motion if Defendants had simply explained what other evidence they are withholding and why so that the parties could have ventilated these issues. Defendants should thus be ordered to provide such information and show cause why sanctions should not issue.

## **CONCLUSION**

For the reasons set forth above, Defendants should be ordered to provide information about their document-review and -production process and to show cause as to why they should not be sanctioned for violating the Court's Order, as set forth in the accompanying [Proposed] Order.

1    Dated:  July 5, 2022                          Respectfully submitted,

2                                                  BRAUNHAGEY & BORDEN LLP

3
                                                   By:   /s/ Matthew Borden
4                                                        Matthew Borden

5                                                  Attorneys for Plaintiffs

DPPs' MOTION TO ENFORCE DISCOVERY ORDER