1                    UNITED STATES DISTRICT COURT

2                    NORTHERN DISTRICT OF CALIFORNIA

3     Before The Honorable Virginia K. DeMarchi, Magistrate Judge

4

5    HIGHTOWER,                      )
                                     )
6             Plaintiff,             )
                                     )
7    vs.                             )   No. C 20-03639-VKD
                                     )   Related Case C 20-03642-VKD
8    CELESTRON ACQUISITION, LLC      )
     et al.,                         )
9                                    )
              Defendants.            )
10   _____ )

11                                       San Jose, California
                                         Tuesday, August 1, 2023
12

13     TRANSCRIPT OF PROCEEDINGS OF THE OFFICIAL ELECTRONIC SOUND
              RECORDING 10:20 - 12:02 = 1 HOUR, 42 MINUTES
14

15   APPEARANCES:

     For Plaintiff:
16                                   BraunHagey & Borden, LLP
                                     351 California Street
17                                   Floor 10
                                     San Francisco, California
18                                     94104
                                BY:  MATTHEW B. BORDEN, ESQ.
19                                   RONALD J. FISHER, ESQ.

20                                   Cotchett Pitre & McCarthy, LLP
                                     840 Malcolm road
21                                   Suite 200
                                     Burlingame, California 94010
22                                   JAMES G. DALLAL, ESQ.

23

24
                     (APPEARANCES CONTINUED ON NEXT PAGE)
25

*Echo Reporting, Inc.*

2

For Defendants:
                            Frost,LLP
                            10960 Wilshire Boulevard
                            Suite 1260
                            Los Angeles, California 90024
                    BY:     CHRISTOPHER L. FROST, ESQ.
                            JOHN D. MATTA, JR., ESQ.

Transcribed by:             Echo Reporting, Inc.
                            Contracted Court Reporter/
                            Transcriber
                            echoreporting@yahoo.com

3

1  Tuesday, August 1, 2023                                    10:20 a.m.

2                      P-R-O-C-E-E-D-I-N-G-S

3                          --oOo--

4          THE COURT:  Calling cases 20-CV-3639, Hightower

5  versus Celestron Acquisition, LLC et al, on for discovery

6  hearing, and case 20-CV --

7          THE CLERK:  Sorry, I'm just telling them they can

8  sit down.

9          THE COURT:  Case 20-CV-3642, Spectrum Scientifics,

10 LLC et al versus Celestron Acquisition, LLC et al, on for

11 discovery hearing.

12     If the parties could state their appearances, please,

13 beginning with plaintiffs' counsel.

14         MR. BORDEN:  Good morning, your Honor.  Matt

15 Borden on behalf of direct purchaser plaintiffs.

16         THE COURT:  Good morning.

17         MR. FISHER:  And Ronald Fisher, also on behalf of

18 the direct purchaser plaintiffs, your Honor.

19         THE COURT:  Good morning.

20         MR. DALLAL:  Good morning, your Honor.  James

21 Dallal, Cotchett, Pitre, and McCarthy, on behalf of the

22 indirect purchaser plaintiffs.

23         THE COURT:  Okay.  Good morning.

24         MR. FROST:  Good morning, your Honor.  Christopher

25 Frost and John Matta from Frost LLP, on behalf of the

4

1  defendants.

2        THE COURT:  Okay.  Good morning.  All right.  We

3  have a full agenda this morning.  On my list are to discuss

4  what remains of the dispute about transactional data.  Then

5  we'll talk about the deposition of Mr. Cannon (phonetic),

6  and then finally discuss deposition scheduling more broadly.

7  And I plan to take the items in that order.

8        So, first, with respect to the defendants' production

9  of transactional data, I have the status report that you

10  shared with me.  And I just wanted to sort of share what I

11  understand the issue is and then get your updates, if there

12  are any, about where things stand.

13        So on the Nantong Schmidt data, when we were at the

14  hearing on July 18th, the defendants shared with the Court

15  and with the plaintiffs that Nantong Schmidt doesn't

16  maintain cost data on a product-specific basis or a

17  transaction basis and didn't maintain the data on a weekly

18  or monthly basis but only on an annual basis, and that there

19  was some effort being undertaken by the client directly to

20  summarize the information that was available, and that

21  potentially a witness with knowledge, Mr. Son (phonetic),

22  could testify about that.

23        So I understand from the report that Nantong Schmidt

24  has produced a spreadsheet that summarizes some costs on an

25  annual basis for the period of 2016 to 2022.  And I'm not

5

1 sure about those dates, but that there was a spreadsheet

2 produced.  So I would like to understand from the defendants

3 what exactly was produced on July 21st.

4          MR. FROST:  That is correct.  It was exactly the

5 report as you've mentioned it.  2016 is when the company

6 started.  And so we've given them the information we have up

7 to current.

8          THE COURT:  Okay.  And do the plaintiffs agree

9 with the characterization that that's what's been produced?

10 Who's going to speak first on behalf of -- I'll turn to Mr.

11 Dallal.  He looks like he's on deck here.

12          MR. DALLAL:  We can agree that there was a

13 spreadsheet produced that covers that period.

14          THE COURT:  And it covered what you expected from

15 the hearing to be produced?  I mean, I took notes about what

16 -- and I have the transcript -- about what was represented

17 would be produced, and it seems like that was what was

18 produced.

19          MR. DALLAL:  We expected there to be a summary

20 information produced and for the underlying data to be made

21 available.  So we're waiting on that second piece.

22          THE COURT:  Okay.  So we're going to talk about

23 the underlying data.  Let me ask the DPPs if they agree that

24 the summary was produced.

25          MR. BORDEN:  We agree, your Honor, that a summary

1 was produced, yes.

2       THE COURT:  Okay.  As expected.  Okay.  So now the

3 issue is the underlying data.  And I understand that the

4 plaintiffs want access to the source material.

5       MR. DALLAL:  That is correct, your Honor.

6       THE COURT:  And have asked that to be produced or

7 made available by August 11th.  Okay.  So where do we stand,

8 from the defendants' perspective, on making the underlying

9 data available?

10       MR. FROST:  We're working on it right now.  It's

11 actually going to take weeks.  It's not an issue that we can

12 just produce that quickly, because the source information is

13 spread over a number of locations, and we're trying to have

14 the client track that down now.

15       THE COURT:  But this was the source material that

16 your client just used to prepare the summary.  So why does

17 it need to be tracked down?  Why is it not -- when I had

18 your colleague in front of me, I said, "Your client is

19 looking at it now.  Keep track of it, so that if somebody

20 wants to go look at an invoice by invoice collection of

21 material to satisfy themselves that the summary is accurate,

22 they can."  So I'm a little bit surprised to hear that it

23 needs to be tracked down.

24       MR. FROST:  Well, let's be clear.  If we're

25 talking about specifically the information that he looked at

7

1  in preparing that summary, yes, we can make that available,

2  whatever that may be.  But I understand there's -- that the

3  reach of what they were asking for was greater than that.

4  But if that's all we're talking about, then whatever he

5  looked at in preparing the summary, whatever he has, we can

6  make available.

7          THE COURT:  I'm not sure what the other

8  information is, because I understand the plaintiffs to be

9  asking for -- what's the source material for the summary?

10  So what else is there?

11          MR. FROST:  In terms of what he specifically

12  looked at to prepare the summary, that -- we can make that

13  available.

14          THE COURT:  What else would need to be tracked

15  down?  What do you -- what do you have in mind when you

16  remarked that material would need to be tracked down?  I'm

17  trying to figure out what's the delta between what's

18  available now and what you imagined the plaintiffs wanted,

19  which -- I'm trying to figure out if they do want it.

20          MR. FROST:  So I'm probably overthinking in

21  response to your question.

22          THE COURT:  Okay.

23          MR. FROST:  If the question is that the plaintiffs

24  want to see the information that actually went into this

25  spreadsheet, we can make that available.

8

1          THE COURT:  Okay.  And is it -- can it be made

2  available electronically?  Like, put it in a secure share

3  room, people can look at it, or is it paper?

4          MR. FROST:  Yeah.  We're trying to find out now.

5  I don't have an answer to that question.  And one of the

6  problems that we're struggling with is the fact that we're

7  trying to decipher and determine what actually is considered

8  state secret by the Chinese government, and so we don't

9  cross -- you know, create criminal activity for our client.

10  And that's a complicated issue that we're working on now.

11  So I don't know exactly the parameters of how we can produce

12  it, but I'm working on it.

13          THE COURT:  Okay.  So the plaintiffs have asked

14  for access to the source material by August 11th.  So

15  that's, you know, a little less than two weeks from now.  So

16  when do the defendants expect to be ready to provide access

17  to the material that can be accessed legally?

18          MR. FROST:  I think if we can say August 25th and

19  just -- for two more weeks.  The Taiwanese depositions are

20  not going to start until mid-September.  And so I think that

21  should give us plenty of time to sort out the issue.  If I

22  tell you August 11th, I'm going to fail, and we're going to

23  have a problem, and I don't want to walk into that mess.

24          THE COURT:  Well, here's what I don't want to have

25  happen.  I don't want to have a communication on August 25th

9

1  that says we can't provide any of it because it's illegal

2  under Chinese law.

3          MR. FROST:  No, no, no.

4          THE COURT:  So if that issue can be prior -- if

5  you can figure out if that's a problem and address it with

6  the plaintiffs and see if you can work it out.  If there is

7  an issue of legality, maybe there's some workaround to it.

8  But I don't want it to wait until August 25th, so -- okay.

9          MR. FROST:  I agree with that, your Honor.  I

10 don't, either.

11         THE COURT:  Okay.  So let me hear from the

12 plaintiffs about the suggestion that by August 25th the

13 defendants expect to be able to make the source material

14 available for inspection.

15         MR. DALLAL:  So we're surprised to learn of the

16 issue of the potential sensitivity according to these

17 unidentified regulations of the Chinese government.  We're

18 not saying that we have any particular insight into whether

19 or not that will be a factor.  We do think if that's going

20 to be a factor, that issue should be front-loaded and that

21 the defendants should substantiate what they mean and why

22 exactly that means they can't produce things.

23     We would prefer, of course, to have the material

24 earlier.  We think August 11th is reasonable.  If they say

25 they can't do it by August 25th, you know, our concern is

1  the same as the Court's that that date is going to slip as

2  well.  So I think perhaps there could be some structure put

3  in place in advance of that date to let us know if there's

4  going to be an issue involving Chinese regulations, a

5  deadline to state any issues in that vein that exist.

6      But if we're reliably going to get it by August 25th

7  and we can't reliably get it by August 11th, then we're not

8  in a position to object to August 25th, if that's the date

9  when it's actually possible.

10     The other aspect of this is that there's additional

11 transparency we're looking for in the bucket of the

12 interrogatory response --

13          THE COURT:  I'll get to that.

14          MR. DALLAL:  -- so we can get to that, yeah.

15          THE COURT:  I asked for that, because I knew this

16 question was coming, so -- okay.  Do the DPPs have anything

17 they would like to add on the question of production of

18 underlying source material and surfacing -- the issue of

19 Chinese regulations prohibiting its disclosure?

20          MR. BORDEN:  Yeah, maybe just a couple of points,

21 your Honor.  The first point being -- is when we were here

22 last time, I think the Court was pretty vehement about

23 asking, you know, what are the underlying documents that

24 they're compiling them from?  And that's something we would

25 still like to know and something that they can tell us what

1  it is right now, because I think that would be, you know,

2  really helpful in terms of us trying to understand if the

3  production is complete or not or whether we have objections

4  to it or what they're doing exactly.  So I think that would

5  be particularly useful.  This is, you know, probably the

6  largest telescope manufacturer in the world for these kind

7  of consumer telescopes.  So the idea that they don't have

8  any of this information readily available is somewhat

9  mysterious to us.

10      The second thing on this whole state secrets, you know,

11  Chinese law thing, we concur with the IPPs.  We also note

12  that this was never raised as an objection, and it's

13  probably waived, and, you know, we've been asking for this

14  information for a couple of years, and to hear this sort of

15  come up for the first time is a little bit troubling to us.

16  I think that it -- I don't know how the cost of a telescope

17  could somehow be a state secret, but -- those are the two

18  observations I have about it.

19          THE COURT:  Okay.  Thank you.  So here's my

20  suggestion for how we should proceed here.  August 11th is a

21  Friday.  It's a week from this Friday.  And what I would

22  like to have by August 11th is a joint discovery letter on

23  the question of what categories of documents are not able to

24  be shared in any way by the defendants because of some

25  Chinese state secret or regulation or something or other,

12

1 whatever it is that's the barrier.

2     I would like to have that letter filed on that day,

3 which means that you have to work backwards and confer, and

4 there has to be a communication from the defendants about

5 what the categories of information are that are of concern

6 and that might be subject to these regulations.  So that has

7 to be done, I would imagine, by -- well, I -- by this

8 Friday, at the latest, so that you have the time to confer

9 and then prepare something.  I do not want a unilateral

10 discovery brief from anybody.  I want a joint discovery

11 dispute submission.

12     But, otherwise, the documents will be -- the documents

13 that can be made available will need to be made available by

14 August 25th.  And, hopefully, if there's some ruling

15 required by me, not sure how I'm going to do that if the

16 question is interpretation of Chinese law -- but I'll see

17 what you all say, and then I'll try to give you some kind of

18 guidance between August 11th and August 25th, so that by the

19 time August 25th comes around, you can have what you can

20 have.

21     But I think also plaintiffs should keep in mind, and

22 we'll get to the interrogatory in a moment, about whether

23 the juice is worth the squeeze.  If what we can obtain is --

24 this summary is what we're relying on, from the defendants'

25 perspective, and they're going to answer the rest of the

13

1  questions in the interrogatory number five, or we're going

2  to have a discussion about that, because I recall -- at

3  least the IPPs' position at the last hearing was, "We just

4  need to know what it is.  Somebody needs to be done, and the

5  ambiguity needs to be over."  So you may thus decide that

6  you're going to be done with the information that you have

7  in summary form.  But I'll leave that up to you after you've

8  conferred.  Okay.  So I'm going to put this in an order, but

9  August -- yeah.  Go ahead, Mr. Frost.

10         MR. FROST:  Your Honor, if I can -- I'm sorry to

11  interrupt.  Could I make a suggestion?  Can we just agree

12  that that's August 14th, so the Monday instead of the

13  Friday, so we have a couple of more days to actually work

14  through the process, the back and forth taking a full week

15  is going to eat up most of that time anyway.

16         THE COURT:  All right.  So August 14th is the

17  Monday.  I am contemplating doing this without a hearing, by

18  the way, because it would be pretty tight for me to have you

19  in on the 15th if I get something on the 14th.  That's just

20  not good for my preparation.  So I'm fine with the 14th.  As

21  I said, I would like to have the issue crystallized and not

22  people talking past each other.  So if the 14th allows you

23  to do that, fine.  Okay.  So I'll have it be the 14th then

24  for the joint submission.

25         MR. FROST:  Thank you, your Honor.

14

1          THE COURT:  All right.  So let's consider

2    interrogatory number five.

3       Now, this was important to our discussion last time

4    because at least the plaintiffs took the position -- I

5    believe it was -- Ms. Salinas (phonetic) explained that it's

6    -- it would be helpful to have the answers to this

7    interrogatory so that it could be clear what the defendants'

8    position was on what was and was not available.

9       Okay.  So as I read your joint report, what I

10   understand the problem with the defendants' supplemental

11   response to number -- interrogatory number five is that it

12   leaves unanswered -- clearly leaves unanswered the parts of

13   that interrogatory that ask for an explanation about how

14   each cost type is calculated for the product line, what the

15   overall cost percentage of each cost type is for the product

16   line, and what the English or Chinese names are that are

17   used to refer to the cost type.  Do I have that right, Mr.

18   Dallal?

19          MR. DALLAL:  That is correct, your Honor.

20          THE COURT:  Okay.  Those are the three things that

21   are missing.  I've looked at the interrogatory response.  I

22   think that's not clearly answered.  It seems to me the

23   simplest course is for defendants to just answer those

24   questions.  And, you know, if the answer is, "We don't

25   calculate cost type by product line," just say that.  But

15

1   let's not have a fight about whether you have or haven't

2   answered.  Because if they say it's not clear to them, and

3   I'm telling you it's not clear to me, this is the solution

4   to the problem, is to just supplement it and be absolutely

5   clear.  Any problem with that?

6               MR. FROST:  No, your Honor.

7               THE COURT:  Okay.  So --

8               MR. FROST:  And with the Court's permission, we

9   could do that by the same deadline of August 14th.

10              THE COURT:  Well, do you need until August 14th to

11  do that?

12              MR. FROST:  I don't know the answer to that, but I

13  don't want to have to come back asking for relief if it

14  takes us long -- that long to get the information.  We are

15  working through it.  If you tell me you want it earlier,

16  I'll make it earlier.  I'm just trying to give us enough

17  room, with everything else happening, to actually get that

18  done.

19              THE COURT:  Okay.  Well, it shouldn't be any later

20  than August 14th, and I would expect it to be not that hard

21  to do, given that you've already produced the underlying

22  summary, which presumably has names in it, English or

23  Chinese or both.  And based on the representations made to

24  me at the hearing on July 18th, I think I know the answers

25  to the first two questions, and they just need to be in a

16

1  verified interrogatory response.

2          MR. FROST:  That's fine.

3          THE COURT:  So I'll order that that interrogatory

4  answer be supplemented by August 14th.

5          MR. FROST:  And just so you understand from our

6  position, we will be doing so before August 14th.

7          THE COURT:  Okay.

8          MR. FROST:  I just don't want to walk myself into

9  violating a court order.

10         THE COURT:  All right.

11         MR. FROST:  But as soon as we can reasonably do

12 it, they will have it.

13         THE COURT:  Okay.  That's fine.  Now, does that

14 address the plaintiffs' concern about interrogatory number

15 five?

16         MR. DALLAL:  Yes, your Honor.

17         THE COURT:  Okay.  All right.  Celestron margin

18 data.  Okay.  So here's what I understand from your joint

19 report.  The plaintiffs say that the documents that the

20 defendants identified as price component reports are not

21 price component reports.

22     IPPs say they think they've identified the correct

23 Bates ranges for the reports but that those documents only

24 cover the period of time from 2015 to 2022, and they're

25 missing reports for the period 2005 to 2014.  And IPPs want

1  the missing data by August 11th.

2      DPP say they need an additional amount of time to

3  review the reports with their expert who's not available,

4  but, in any event, they want the general ledgers.

5      So defendants say they didn't realize that they had

6  identified the wrong reports.  And that just kind of blew my

7  mind, because -- I mean, it's like a keystone cop kind of a

8  situation, after all of this, like, effort and repeated

9  discovery conferences and briefing on this issue, to not

10  have checked, and then to say, "Well, we didn't even know

11  until we saw their half of the report," it just -- you got

12  to check.  I mean, this carelessness has got to stop.

13      So, anyway, I hope by now the defendants have had an

14  opportunity to check and figure out what happened.  And I

15  would like to get an update on what the price component

16  reports are, whether they -- they are available and have

17  been produced for the entire range.  And if not, why not?

18          MR. FROST:  So the issue with -- so the answer is,

19  with respect to 2015 to 2022, they have been produced.  The

20  problem that we have for the earlier time period is we used

21  a different system.  We used the SiteLine system -- a system

22  called SiteLine instead of SAP, and we did not track the

23  information in the same way.  And there are -- they do not

24  exist, any of the reports, in the manner in which they're

25  looking for them.  So we have given them what we have, and

18

1   we can -- have confirmed they have it.

2       Now, with respect to the issue.  And so I'm going to

3   make a suggestion.  First of all, the suggestion that we

4   have to give them all of the general ledgers seems to us to

5   be absurd.  It's not going to help them anyway in terms of

6   this regard.

7       My suggestion would be that on August 7 and 8, because

8   we're still trying to understand even what they're looking

9   for in terms of margin, because we don't calculate margin

10  the way that they think we do, and we keep trying to explain

11  that.  So on August 7 and 8, they're taking the deposition

12  of Paul Roth, who's the chief financial officer, who will be

13  able to answer any and all questions they have about any of

14  this, and we can do it in one setting.  And if they have any

15  follow up questions or any data they want us to track down

16  specifically, we'll be happy to do it.  But we think we have

17  given them everything based on what we understand them to be

18  asking for.  We just didn't keep it in the form they're

19  talking about or any comparable report prior to 2015.

20          THE COURT:  Okay.  So let's just start with the

21  2015 to 2022 period of time for which there are price

22  component reports.  Have defendants identified the correct

23  Bates numbers to the plaintiffs for those reports?

24          MR. FROST:  Yes.

25          THE COURT:  Okay.

19

1         MR. BORDEN:  Your Honor --

2         THE COURT:  Yes.

3         MR. BORDEN:  So we did -- we were able to talk to

4  our expert yesterday, and the -- these price component

5  reports don't have -- they have a generalized kind of

6  concept of margin, but they've baked in overhead costs and

7  other fudge factors that we could understand, you know, what

8  they were if we actually had the general ledger.  So that's

9  the first point is they should just produce --

10        THE COURT:  That's not the first point.  The first

11 question I'm trying to get an answer to is, do you have the

12 Bates ranges -- the correct Bates ranges for the price

13 component reports?

14        MR. BORDEN:  I don't know if these -- if what

15 they've produced is complete or not.  We have -- our expert

16 was able to go through the production and pulled out some,

17 but I'm not sure if they're complete or not.

18        THE COURT:  Okay.  Mr. Dallal, you're the one who

19 said you thought you had figured it out.  So do you have the

20 Bates ranges for the price component reports that cover 2015

21 to 2022?

22        MR. DALLAL:  We believe so.  Yes, your Honor.

23        THE COURT:  Okay.  And can you calculate profit

24 margin from those reports, which is what you suggested you

25 could do from the joint status report?

20

1          MR. DALLAL:  For the moment, yes, we -- our

2   experts -- as of the moment of this joint status report, and

3   I think that had only become the case a day or two before.

4   But our experts believe that based on their review, they

5   would be able to calculate margins for the later period,

6   yes.

7          THE COURT:  Okay.  Now, the point about the

8   adequacy of what's been produced so far with respect to what

9   your experts need and what you all need to establish your

10  case.

11     So, Mr. Borden, you were saying you think the general

12  ledgers are superior.  Why are they superior?

13         MR. BORDEN:  So -- well, I think that the

14  different discovery requests that we made -- asked for is

15  for, you know, documents sufficient to identify your actual

16  margins.  The price component reports have things like

17  overhead built into them.  And that might be sufficient for

18  the type of analysis that the IPPs might want to do, but

19  it's not sufficient for the analysis that we need to do, but

20  we need to understand the actual real margins without that

21  other information, which can be used to, you know, bring the

22  margins up or down.  That information is available in the

23  general ledger.  We -- when we talked to Mr. Ayers

24  (phonetic), he said that Celestron calculates its own

25  margins internally based on the general ledger, which is why

21

1   we've been insistent upon them producing it.  We have a

2   number of discovery requests that ask for it.  And that's

3   actually -- I mean, I -- just from a practical standpoint,

4   Occam's razor, give us the general ledger.  Mr. Frost says

5   it won't be useful to us.  Our expert disagrees.  He can

6   sift through it, and we can just have the data that we need

7   and put this issue to bed.

8          THE COURT:  All right.  Let me go back to Mr.

9   Frost.  And here's the concern I have about just sort of

10  having a deposition and just waiting to get information from

11  the witness.  Usually, you want to have the documents before

12  you have the witness' deposition, so the witness can explain

13  the items in the document to the questioning party.  So it

14  seems to me a little bit backwards to -- what you're

15  suggesting.  It seems like you should have the documents

16  first so that someone can be asked questions about them.

17     I don't understand the defendants' -- Celestron's

18  resistance to producing the general ledgers.  I just don't

19  understand it.  It does seem that IPPs are satisfied with

20  the kind of information that's in the price component

21  reports, but they don't have the information for the earlier

22  time period because it's not available.  If it is available

23  in the general ledger, I said at the last hearing I was

24  going to make defendants produce it, because the margin is

25  important information.

1    I understand that the DPPs have asked for various --

2  you know, different slices of margin, gross margin, net

3  margin, you know, all these different flavors of margin,

4  which they say they can't get from the price component

5  report.  So I just don't understand the resistance to

6  producing the general ledger if it's the only other document

7  that contains this information or information that will

8  allow the calculation of margin.

9         MR. FROST:  So the problem that we're having, to

10 be perfectly candid -- and if the Court ordered us to

11 produce it, we will do it.  I don't think they need it.  And

12 we would be happy to have a call -- an informal call, where

13 they could talk to Paul Roth ahead of his deposition to get

14 an answer to that question to understand why they're wrong.

15 We could even do something like that.

16    I can tell you it makes me really nervous, and it makes

17 the client really nervous to turn over their general ledger

18 -- the entire general ledger for our company to counsel who

19 also is currently representing our primary competitor,

20 Orion.  That's an issue we're going to get to when we talk

21 about the Amir (phonetic) Cannon situation.  It makes us

22 very nervous.  They're using depositions in this case to

23 garner information for that litigation.  And with that we

24 are very uncomfortable about the idea of giving our entire

25 general ledger to counsel for our competitor, even with the

1 protective order in place.

2          THE COURT:  But haven't you already given all

3 kinds of other sensitive information from your clients to

4 the lawyers for the DPPs in this case?  Like, how is a

5 general ledger, like, special?

6          MR. FROST:  Because it is literally a transaction

7 by transaction account of the firm -- the entire firm, the

8 way it operates, its business practices, all of that.  It's

9 the keys to the kingdom.  That's what the general ledger is.

10 And so when they have all the underlying transactional data,

11 this is the only thing --

12          THE COURT:  But they don't.  They don't have all

13 the underlying transactional data is the problem.  At least

14 that's what I'm being told is they don't have something from

15 which they can calculate, on their own, profit margin.

16          MR. FROST:  And we disagree with that.

17          THE COURT:  Okay.  What have you -- so last -- at

18 the last hearing -- well, you weren't here.  Your colleague

19 was here.  He told me the price component reports are the

20 documents from which margin can be calculated.

21          MR. FROST:  That is correct.

22          THE COURT:  And now you're telling me that those

23 don't exist for this earlier time period?

24          MR. FROST:  Correct.

25          THE COURT:  So what exists for the earlier time

24

1  period, apart from the general ledger?

2          MR. FROST:  The transactional data we have already

3  provided them.

4          THE COURT:  When you say "the transactional data,"

5  what are you referring to?

6          MR. FROST:  All of the reports from the SiteLine

7  system that have the entire breakdown of every single

8  transaction.

9          THE COURT:  And those include a way to distinguish

10  overhead from materials' costs, from labor, from whatever

11  else might be there in the mix?

12          MR. FROST:  I believe that is correct.

13          THE COURT:  You believe that's correct?

14          MR. FROST:  Yes.

15          THE COURT:  Okay.

16          MR. FROST:  Look, if it will make the Court feel

17  better, we'll produce the general ledgers.

18          THE COURT:  It's not about making me feel better.

19  It's about actually providing the information that they need

20  and that we've been debating for months on this issue.  So

21  what I think -- what I think you need to do, at a minimum,

22  if you want to not produce the general ledger, and I

23  understand why it's a sensitive thing, it's a sensitive

24  document, very comprehensive, the general ledger would be --

25  you have to do more by way of supporting your position that

25

they don't need it, meaning you have to be able to say,
"Here are the Bates numbers for the documents that have the
information from which you can make these calculations."
And when I -- and I want to be very precise because I'm --
do not have the underlying material, but I'm looking at the
summary that was included that references the request for
production.  This is in the joint report at docket -- let's
see, which one is this?  This is docket 355 in case number
20-3639.  But DPPs' position identifies RFP-19 and RFP-109
to Celestron.  And it sounds to me that Celestron has
committed to producing documents sufficient to show the
information.  And, for example, 109 is gross profits,
operating profits, net profits, cashflow reports, EBITDA
reports, and profit and loss statements.

So, you know, if you've committed to produce documents
sufficient to show those profit margins for U.S. sales 2005
forward, then you need to do that.  And I think the way to
resolve this problem, when they say they don't have it and
you say that they do, is to identify the documents for them.
Now -- you know, so it's a -- you're between a rock and a
hard place, because, ordinarily, I don't require a party to
curate its own production for the other side, but I can't
resolve the dispute without, you know, actually having you
tell me that the documents already exist and have been
produced and that all this information can be gleaned from

26

1 them.

2    So that's the difficulty that I have, because they tell

3 me they don't have it.  They can't figure it out from the

4 documents that they have from you already, and they need the

5 general ledger.  So, you know, one possibility here also is

6 produce, you know, an example of the general ledger.  If you

7 think they don't need it and don't want it and it would not

8 be useful for them, you could produce a page or a month's

9 worth or what -- I don't know how it's organized, but

10 whatever an example -- a sample might be, you could produce

11 it, and then you could have a conversation about it, and

12 perhaps you -- and maybe you put your witness on an informal

13 phone call not to be recorded and not to be treated as a

14 deposition, and you talk about it.  But I'm not confident

15 that's really going to get you there.  So those are my

16 suggestions.

17       MR. FROST:  So we -- what we will do is, we will

18 produce --what's today?

19       THE COURT:  The 1st.

20       MR. FROST:  We'll get them by this Friday an

21 example of the general ledger for a three-month period of

22 time, and we will plan on having a phone call with them no

23 later than Friday of this week so we can talk through what

24 it is that they've seen.  That way, we can accomplish all of

25 this in the period of time before Paul Roth's depo starts

27

 1  next Monday.

 2          THE COURT:  Okay.  And let me just -- just to be

 3  clear about your concerns about sharing the general ledger

 4  information with DPPs' counsel -- and I'm just -- I'm

 5  acknowledging that you have the concern.  I'm not saying

 6  that it's meritorious, but I'm just acknowledging that you

 7  have it.  Is there a way to produce the general ledger that

 8  is specific to the product lines at issue, the time periods

 9  at issue, and U.S. sales, and the information that will be

10  necessary to calculate the profit margins that are asked for

11  without revealing other things that your client finds

12  particularly sensitive?

13          MR. FROST:  It will, as I understand it, be a

14  remarkably cumbersome effort in redaction.

15          THE COURT:  I see.

16          MR. FROST:  But I will look into it.

17          THE COURT:  Well, it -- it's just an option that

18  you may consider, but, you know, it can't be done in such a

19  way that it makes the document unusable, so --

20          MR. FROST:  I agree with that.

21          THE COURT:  Okay.  Let me hear from the plaintiffs

22  on Mr. Frost's suggestion for how to proceed.

23          MR. BORDEN:  Sure, your Honor.  I think it

24  wouldn't take them very long to produce the general ledger

25  because they already have the general ledger.  They use it

28

1 as part of their operations, so -- but what I think would be
2 helpful is maybe for like a couple of year period, maybe
3 2019 and 2020.  I think those would be good years for the
4 general ledger.  I think -- you know, we're happy to get on
5 the phone with Mr. Roth.  I -- you know, I would like to get
6 the general ledger information a little bit sooner, like
7 those couple of years.  Those shouldn't be very commercially
8 sensitive because that's already, you know, a couple of
9 years old.  Like, I would think that the most commercially
10 sensitive stuff would be the things that are going on with
11 their business right now.

12     And that said, you know, just -- I'm sure you have lots
13 of trade secret and patent litigation that's before you all
14 the time, where they have, like, really legitimate concerns
15 about competition.  People produce stuff under protective
16 orders in this case.  Lawyers follow protective orders.
17 I've never violated any protective order or nothing like
18 that in this case or any other case.  And so, you know, I
19 think that that's sufficient.  And, certainly, we negotiated
20 the protective order for, like, three months in this case to
21 protect anything that would be of legitimate concern to the
22 defendants.

23         MR. FROST:  Well, here's my -- I'm sorry.  If I
24 may, here's my concern.  As I understood it -- and I think
25 it's telling that the IPPs are telling you they have what

1  you need.  They do this all the time.  This is their -- this

2  is their work.  But as I understood it, the concern was 2005

3  to 2014.  There shouldn't be an issue with respect to 2015

4  to 2022.  We've already given them all those reports.  So if

5  the issue is 2005 to 2014, it does cause me concern if

6  they're saying they want two of the most recent years.  That

7  troubling.

8          THE COURT:  Yeah.  I noticed that as well.  What

9  are -- what three-month period were you proposing to share?

10         MR. FROST:  Something like -- to the extent that

11 we have it, and I think that we should, something like a

12 two-month period or give them a six-month period from Q3

13 2013 through Q1 2014.

14         THE COURT:  Uh-huh.  It does make more sense to

15 provide the information from the period for which price

16 component reports are missing, even though I acknowledge

17 that the DPPs are taking the position that they need more

18 detailed information that can only be found in the general

19 ledger, because the price component reports don't

20 sufficiently break out the different cost components like

21 overhead.  So let's --

22         MR. FROST:  Okay.  I don't agree, but I hear that.

23         THE COURT:  Okay.  Let's start with the sharing of

24 the six-month sample.  I will hear from you after that's

25 been provided.  I think you said you would provide it -- how

1  quickly can you provide the six-month sample, Mr. Frost?

2  MR. FROST:  I have to talk to the client before I

3  fully commit, but I'm working on trying to get it to them by

4  -- well, Wednesday is tomorrow .  So I would try to do it --

5  I could do it as best I could -- if I can, I'll do it by

6  Friday.

7  THE COURT:  All right.  And then you're going to

8  evaluate -- and I think it should be produced to both IPPs

9  and DPPs.

10  MR. FROST:  Agreed.

11  THE COURT:  And then you should all talk about it,

12  and I'll get another status report from you all.  I want

13  another status report, though, by -- let's see.  Well, can I

14  get another status report by the 11th?  So that'll be a week

15  after your call.

16  MR. FROST:  Sure.

17  MR. BORDEN:  Two suggestions.

18  THE COURT:  Yes.

19  MR. BORDEN:  One is I'm not sure if this involve

20  getting Mr. Roth on the phone as defendants offered because

21  that may be useful to this process.  I don't know if it will

22  be or not.

23  THE COURT:  He gets deposed on Monday.

24  MR. BORDEN:  He gets deposed on Monday, which is

25  why we're trying to get this front-loaded.

1           THE COURT:  Well, why don't we do this?  How about

2  this?  You produce the six-month period for the general

3  ledger.  You get to examine -- plaintiffs get to examine Mr.

4  Roth about it during his deposition on Monday.  And then

5  you'll have a record that you can present to me about why it

6  is or is not something that you need for the period of time

7  that is not covered by the price component reports or for

8  the entire period of time.  You'll have the basis to do

9  that.  And we can just kind of short circuit this.

10          MR. BORDEN:  So can I make one more suggestion --

11          THE COURT:  Sure.

12          MR. BORDEN:  -- or request?  Which is that if it's

13  going to be a six-month period of data, let's do three

14  months in 2020 and three months in the before period,

15  because part of it is we want to, you know, see if it has

16  the information in --

17          THE COURT:  You want to compare.

18          MR. BORDEN:  Yeah.

19          THE COURT:  Okay.

20          MR. BORDEN:  We want to compare, and we want to --

21  we want to be able to look at the price component reports

22  and be able to say, here's what we glean from the general

23  ledger.  Here's what's not in the price component reports.

24          THE COURT:  So let's do this.  Why don't we pick

25  -- that's a useful suggestion, I think.  Why don't we pick a

32

1  three-month period that overlaps with a price component
2  report production that's already been made?  I'm not going
3  to dictate what period it is.  But three-month overlap with
4  the price component reports, and then a three-month --
5  another three-month chunk that doesn't overlap with the
6  price component reports from an earlier period, so that we
7  can see what the older documents have available.  And then
8  you can compare, and then you can show me, hopefully, why --
9  if you believe -- the plaintiff believes that the general
10  ledger information is superior and essential, that you need
11  to have it.  And I can hear from the defendants whatever
12  their contrary view is, if that's their view.  And IPPs can
13  weigh in as a voice of reason as they usually do, if they
14  wish.  So how does that sound to everyone?

15           MR. FROST:  We're fine with that, your Honor.

16           MR. BORDEN:  Thank you, your Honor.  That's a good
17  idea.

18           THE COURT:  Okay.  And I don't mean to dictate
19  IPPs' position.  That was a joke.

20      Okay.  So I think that's where we stand.  And if the
21  deposition are on Monday and I ask for the status report on
22  the Celestron margin data by August 11th, that will be
23  sufficient for everyone in terms of timing?  Yes.  Okay.

24           MR. FROST:  We'll have to work quickly on the
25  report, because that actually gives us less than five days,

1 but we'll figure out how to make it work.

2        THE COURT:  Right.  I mean, I want something

3 useful.  So if you need more time, take more time.  That's

4 fine.  Just let me know that you need until whenever, but I

5 want something useful, okay?  It's not going to help me if

6 it's not useful.  So if you don't have the transcript yet,

7 for example, and you need time to get that, I can look at a

8 rough.  That's fine.  I don't care if it's perfect.  But,

9 you know, if I do need to look at a transcript, make sure

10 you have that and can submit it, okay?

11        MR. FROST:  Thank you, your Honor.

12        THE COURT:  Okay.  All right.  Now, we're going to

13 move on to the Cannon deposition.

14     All right.  So let me tell you how I prepared for this

15 one.  I read the papers, of course.  I looked at the

16 transcript of Judge Davila's hearing in the Orion litigation

17 in matter 16-6370.  I looked at the excerpts of the Cannon

18 deposition transcript in this case, and I do have some

19 questions.

20     So in Judge Davila's Orion vs. Ningbo Sunny case

21 16-6370, I understand that the plaintiff, Orion, represented

22 by counsel for DPPs here, they were permitted to depose Mr.

23 Cannon for four hours to investigate the question of whether

24 Celestron was buying telescopes directly or indirectly from

25 Ningbo Sunny after the date of the judgment.  So did that

34

1  deposition take place?

2          MR. BORDEN:  Yes, your Honor.

3          MR. FROST:  It did.

4          THE COURT:  And it was for four hours.

5          MR. FROST:  It was.

6          THE COURT:  Okay.  So in Mr. Cannon's June 21st,

7  2023, deposition in this case, my understanding from the

8  papers is that there were two questions essentially that the

9  witness was instructed not to answer.  The first was a

10 question asking him if his prior testimony, which involved a

11 series of questions and answers from his deposition in the

12 Orion, Ningbo Sunny case about a conversation the witness

13 had with Corey Lee about sourcing telescopes following

14 judgment in that case, whether that testimony was truthful.

15 And the question was essentially asked twice.  And the

16 witness was instructed not to answer twice.  That's at the

17 Cannon deposition transcript, pages 221 to 223.

18     The second question was counsel for DPPs asked the

19 witness whether once there was a judgment in the case, the

20 case presumably meaning the Orion litigation, the witness

21 was told to go to China, find a new source of telescopes by

22 Corey Lee and that Celestron decided that it was going to

23 continue buying telescopes from Ningbo Sunny.  It was just

24 going to do it via ViewWay as an intermediary.  And that's

25 the Cannon deposition transcript, at 275, lines 12 to 17.

1 So Celestron's counsel objected to the question as --

2 questions as improper.  And I understand that the argument

3 that the defendants are making and did make in the

4 deposition was that DPPs' counsel had asked those questions

5 or had asked those two questions for which instruction was

6 given on behalf of a different client in the Orion matter

7 pursuant to a court order permitting a four-hour deposition

8 on that subject, and it was not appropriate to ask those

9 same questions in this case or to ask questions about those

10 matters in this case.

11     So the parties frame the issue differently.  I

12 understand DPPs to say it's never proper to instruct a

13 witness not to answer on grounds of relevance.  And

14 defendants say, citing Rule 30(c)(2), that the instruction

15 not to answer was because defendants believed the DPPs were

16 attempting an end run around Judge Davila's order in the

17 Orion litigation that limited deposition testimony of this

18 witness on those topics to four hours in that case.

19     Defendants also invoke Rule 30(d)(3), which permits an

20 instruction not to answer so that a party can apply for a

21 protective order or some other relief and can terminate the

22 deposition for that purpose.  But I don't understand

23 defendants to have done that in this case.  I understand the

24 state of play is the objection was made, the instruction was

25 given, and the DPPs moved.  So I'm not sure how Rule

36

1  30(d)(3) comes into play here.

2      So that's how I understand the parties' arguments to

3  sort of shake out.  And I would like to hear from you both.

4  So let me start with DPPs.

5          MR. BORDEN:  Sure.  Thank you, your Honor.  So

6  this is a different client.  This is a different case.  And

7  the issue of where defendants are sourcing telescopes, what

8  they understand the source of telescopes to be, what types

9  of agreements they've made with other defendants in this

10 case, namely Ningbo Sunny, are all relevant to an antitrust

11 conspiracy that's alleged in this case.  And so we're

12 allowed to ask questions about that in this case.

13         THE COURT:  And didn't you ask those in the

14 deposition?  I read a lot of deposition transcript on that

15 subject.

16         MR. BORDEN:  Well, they didn't answer specific

17 questions, and what Mr. Frost said on -- I don't know if

18 this is in the transcript.  He said, "We will have -- we

19 will agree that your record is perfected without having to

20 ask each and every one of those questions."  I didn't want

21 to sit there and try to bludgeon the witness with a bunch of

22 questions on similar topics.  I tried to ask them in several

23 ways, like, "Will you just agree to let this gentleman

24 answer the questions so that we can finish the deposition?

25 And we don't have to be here."  But there were a lot of

1  questions that we were trying to ask Mr. Cannon about these

2  topics, and the topics are plainly relevant to the case.

3         THE COURT:  Okay.  Let me hear from the defendant.

4         MR. FROST:  Yes, your Honor.  So we tried to be

5  very judicious about the questions that we instructed him

6  not to answer.  Anything that had to do with where we were

7  sourcing product and who we were getting it from, we allowed

8  him to answer the question.  And that's clear in the

9  transcript.  Our objections were very narrow.  Most of the

10  time, literally, all we said is the objection and the basis

11  for it.  And then the only time I even spoke is to help Mr.

12  Borden understand the line that we were drawing.  And the

13  line that we were drawing was where it was clearly only

14  indicated to try to get some more information concerning

15  whether or not we were still purchasing from Ningbo Sunny so

16  they could use that for a further request for a TRO in the

17  Orion case.  We shut it down.  The -- one of the two

18  questions that you talked about was he -- Mr. Borden

19  actually literally read -- without showing the witness the

20  transcript, literally read pages from the other deposition

21  and said, "Is all that correct?"  How is that productive to

22  anything, let alone miraculously compound?

23      So all we were trying to do is, literally, where it

24  clearly had no purpose but to walk into the same areas that

25  Judge Davila had limited the time, those are the very few

38

1  questions that we said no.  That was it.

2      Now, there were 40-something minutes left in the

3  deposition when they terminated it, and now they're coming

4  to you asking for two hours.  We think we understand what's

5  really happening here.  We think they're still trying to use

6  this for the Orion case.  We don't think that's appropriate.

7  They did the same thing in the four hours they had with Amir

8  Cannon in the other depo is they tried to use it, without

9  the IPPs present, to start asking questions about this

10 litigation.  And I -- you know, when I would ask the court

11 reporter to read a question back, Mr. Borden would object

12 and say that's inappropriate.  I don't get the reporter -- I

13 don't have the right to ask the reporter to simply read a

14 question back.  We tried to have a productive conversation.

15 It wasn't going anywhere.

16     So we let them ask everything they could possibly need

17 on the subject of who we're buying from and where and how,

18 with respect to this litigation.  But where it was clearly,

19 transparently even referring to the Orion case, we said no.

20 That was all.

21         THE COURT:  Okay.  Let me just ask -- I was

22 looking through the transcript -- because I thought there

23 was some colloquy between the parties during the deposition,

24 that, Mr. Borden, you were going to ask the questions that

25 you wanted to ask and elicit an objection if there was one,

39

1  so that you would have a clear record of what the

2  instruction not to answer was about.  Now, you're telling me

3  that you didn't do that.

4        MR. BORDEN:  We did some of that.  I mean, I tried

5  to circle back with him a couple of times to get the answers

6  and -- the point is that the intent of Celestron in making a

7  deal with its co-conspirator is important.  And if they're

8  still sourcing telescopes from Ningbo Sunny, that's

9  important to this case.  And Mr. Frost just said he wouldn't

10 let him answer questions on that topic.  Judge Davila hasn't

11 precluded us from asking any questions in this case.  And

12 those are relevant to the antitrust conspiracy that's a

13 broad conspiracy that we think is ongoing in this case.

14        MR. FROST:  If I may, your Honor --

15        THE COURT:  Just a moment.

16        MR. FROST:  Of course.

17        THE COURT:  Let me just ask, do DPPs have any

18 further questions to ask Mr. Cannon besides the questions

19 that he was instructed not to answer?  So I'm told that you

20 have 40 minutes left in your deposition.

21        MR. BORDEN:  I think that, you know, topically, we

22 have a lot of questions on topics, you know, around that.

23 And, you know, who knows what kind of follow up questions we

24 would have.  But the deposition was substantially interfered

25 with and -- including what Mr. Frost is just describing, you

40

1  know, when there's a question pending to a witness, like

2  asking to have the question read back when the witness is

3  capable of answering the question.

4          THE COURT:  I saw one example of that where Mr.

5  Frost was asking to have a question read back because he

6  didn't hear it clearly and wanted to understand it.  So I

7  saw -- if that -- if you're suggesting that I should take

8  that one example as evidence of, you know, interference with

9  the deposition generally, I don't have a record for that.

10 I'm just going to put it out there.  That's just one

11 question to -- asking to read back.

12         MR. BORDEN:  We could make a record of that if you

13 want, but I don't think that's what you want.  I think --

14         THE COURT:  I don't think that's what your -- the

15 point is.  I'm trying to understand, are there other subject

16 matters that you would use your 40 minutes for besides the

17 questions that you -- that there was an instruction not to

18 answer given or stuff directly related to those questions?

19         MR. BORDEN:  It's on that topic and --

20         THE COURT:  Okay.  So there's no -- otherwise

21 you're done with Mr. Cannon's deposition?

22         MR. BORDEN:  I mean, it depends what -- I mean,

23 again, like, it depends what he says.  We'll be done with

24 the deposition if we can go back and finish on this topic

25 and exhaust all the questions that we want to ask the

41

1  witness.  I do think, to your point, in the Orion case, you

2  issued a very helpful order about conduct during

3  depositions.  And since this is really the first deposition

4  of the defendants' witness in this case, it seems like this

5  could be an appropriate opportunity to issue another order

6  that says defendants' lawyers are not to, you know, make

7  objections that are speaking objections and to limit their

8  conduct to objections that are allowed under the Rules of

9  Civil Procedure.  I think that would be particularly helpful

10  and sort of grease the skids for the rest of these

11  depositions that we have.

12        THE COURT:  You know, I don't need to issue such

13  an order because that's the law already that you can't make

14  speaking objections.  Everybody knows that, so --

15     All right.  Putting that issue to the side, I

16  understand that there are no other categories of subject

17  matter that were left not questioned about in Mr. Cannon's

18  deposition.  Is that fair?

19        MR. BORDEN:  That's fair, your Honor.

20        THE COURT:  Okay.  All right.  Mr. Frost, you

21  wanted to respond to something.  I'm not sure what it was.

22        MR. FROST:  I actually think you've covered the

23  topic that we -- I don't want to belabor the point, but

24  since we are on the record, nobody did anything

25  inappropriate in terms of the objections.  I think the

42

1  record is clear on that.

2      But with respect to the issue of the subject matter --

3  oh, I do remember the point I was going to make.  They have,

4  and I think it's clear in the transcript -- clearly had an

5  opportunity to ask the question and get answers as to

6  whether they're still buying from Ningbo Sunny.  I mean

7  that's answered 100 different ways in the transcript.  That

8  was not the point of the objection, not the point of the

9  instruction.  It was very limited to questions that

10 specifically hearken back to the actual Orion litigation and

11 what they're trying to accomplish there.  And if this depo

12 is allowed to go forward on that topic, I'll bet you five

13 dollars, a month from now, we're going to have a motion in

14 the Orion case citing back to this transcript talking about

15 Ningbo Sunny.  That's where we're heading.

16         THE COURT:  Well, okay.  I'm not sure what to make

17 of that, because if it really is true that your client is

18 surreptitiously buying stuff through an intermediary, then

19 okay.  But I do agree that the question has already been

20 asked and answered.

21     And let me just tell you my take on this.  I'm going to

22 -- this is how I'm going to decide this issue so we can move

23 on to the depo scheduling.  So I agree that an instruction

24 not to answer solely because a question concerns subject

25 matter that is not relevant is improper under the rules.

43

But I don't think that the -- that is actually a fair characterization of what happened in this deposition, at least not by the time we got to the end of it.  I understand, rather, that the defendants' instruction not to answer was for the purpose of enforcing what they believed was a limitation that Judge Davila had set by court order in the Orion litigation.

So it's not per se improper in the manner that DPPs argue in their motion.  I don't think I need to resolve whether in fact it was or was not a violation of Judge Davila's order regarding Mr. Cannon's deposition in the Orion litigation, because the deposition of Mr. Cannon in this case was, of course, appropriate to take.

And in terms of the questions that he was asked that he did not answer, I'm not inclined to order a witness to sit for further deposition to be asked whether testimony he gave in a prior case was or was not truthful.  There's just no point for that.  That's not a proper use of a deposition in this case.

But, more importantly, Mr. Cannon has already testified at some length about the matters that DPPs say they are most interested in learning about.  And that is specifically the subject of Celestron's efforts to identify substitute manufacturers for Ningbo Sunny and its interactions -- Celestron's interactions with ViewWay.

44

1      And also, the question of whether they're still using

2  Ningbo Sunny, in that deposition testimony, at least the

3  part that's presented to me is at Cannon deposition

4  transcript 215, 19 to 24, 216, seven to 12, 217, 20 to 218,

5  17, and the extended discussion at 272, five to 275, eight.

6  And there may be more discussion in there that wasn't

7  presented to me.  But I think you've had your opportunity to

8  ask this witness the questions about what Celestron is doing

9  to procure telescopes in lieu of its ability to obtain

10 telescopes from Ningbo Sunny and its interactions with

11 ViewWay.  The witness has answered those questions.  And I

12 just don't see any basis for having to come back to answer

13 more questions asked in a different way about whether he was

14 or was not lying in his prior deposition.  It's just a waste

15 of time.

16      So the answer is no.  DPPs' request for further

17 deposition time with Mr. Cannon is denied.  And, obviously,

18 the request for an opportunity to seek sanctions for

19 improper instructions not to answer is also denied.  All

20 right.

21           MR. BORDEN:  So, your Honor, can I --

22           THE COURT:  Yes, I will put that in writing if you

23 need it, but that's my conclusion.

24           MR. BORDEN:  Can I make one response to that,

25 which is that the deposition was taken of Mr. Cannon like a

45

 1  year ago, maybe more than a year ago.  We're still entitled

 2  to understand what they're doing now on the same topic.

 3          THE COURT:  Of course.  And that's why you asked

 4  those questions and got those answers at page 272, line five

 5  to 275, line eight.  You've already asked the questions and

 6  gotten the answers.  I don't know what else to tell you.  If

 7  you hadn't gotten the answers and hadn't asked the

 8  questions, well then maybe he could come back for 40 minutes

 9  to have you do that, but that's not what the record shows

10  me.  And that's not the basis for your motion, so -- and I'm

11  certainly not going to have him come back and answer

12  questions about whether his prior testimony was or was not a

13  lie.

14          MR. BORDEN:  Well, the purpose of --

15          THE COURT:  So it's just not -- I've made my

16  ruling, okay?

17          MR. BORDEN:  Okay.

18          THE COURT:  So we're done.  We're going to move on

19  to depo scheduling.

20      All right.  Let me look at -- the party status report

21  that was filed yesterday indicates that there are a number

22  of depositions that are -- well, that are the subject of

23  this conference today.  Let me just understand, are there

24  any objections to the taking of the depositions on the

25  merits of any particular witness?  Or is the problem just

46

1  scheduling?

2          MR. FROST:  Simply scheduling.

3          THE COURT:  Is that the plaintiffs' view as well?

4  There's not an objection to a particular witness?

5          MR. DALLAL:  I think that's right, your Honor,

6  although there is the question of seven versus 11 hours for

7  some of them.

8          THE COURT:  Okay.  Okay.  Got that.  But apart

9  from the length of time, it's not whether the witness should

10 or should not be deposed.  Okay.

11         MR. FROST:  I'm going to give a -- I'm going to

12 state a caveat to that as well, which maybe the DPPs can

13 answer.  There is one witness who is a potential new class

14 -- potential new putative class representative who is part

15 of their motion to amend that we had asked to go ahead and

16 depose because we're concerned that she may be overlapping

17 with the issue of Radio City and Maline Fish, who is her

18 mother, and that they had said -- DPP said they would make

19 her available, but then they have objected in the papers

20 that they don't have to make her available because she's not

21 a putative class rep.

22         THE COURT:  Is this Ms. Wollens (phonetic)?

23         MR. FROST:  There you go.

24         THE COURT:  Okay.  But this is -- this deposition

25 -- Ms. Wollens' deposition is on the list.  And if there's

47

1  no objection on the merits to her being deposed, I don't

2  understand that to be an issue.

3          MR. FROST:  Okay.  Then great.  Because they had

4  just put that in the papers that they didn't think we would

5  have the right, and so I didn't understand.

6          THE COURT:  Well, they said, "We don't have to.

7  She's a non-party," but we're going to make her available

8  anyway.  That's what I understood them to say.  Is that not

9  correct?

10          MR. BORDEN:  That's correct, your Honor.

11          MR. FROST:  Okay.  Very good.

12          THE COURT:  Okay.  Fine.  So let's not make more

13  hassle where there's not hassle.  Okay.

14      So why have the parties been unable to schedule these

15  depositions?

16          MR. FROST:  If I may, your Honor?

17          THE COURT:  Sure. Go ahead.

18          MR. FROST:  We had -- scheduling these depositions

19  has been a remarkable effort.  In order to get this done

20  with the coordination that we need to, we had proposed dates

21  for almost all the witnesses, and then there were a couple

22  of stragglers.  After we did that and after we had said --

23  we said we need to know who you want to depose, give us your

24  full list.  And they did.  It did not include 30(b)(6)s.

25  And we said we need to understand everybody, because

48

1  coordinating these is going to be virtually impossible.

2  They said, "Fine."

3       After they gave us the list and after we had worked

4  through most of them and had set dates for most of them,

5  they said -- came back and said, oh wait, these are the ones

6  that we want 11 hours for and went back and said -- for

7  almost every witness.  So we had to start over.  And then

8  for -- you have to understand, for the 11-hour witnesses,

9  many of them are native Mandarin --native Mandarin or native

10 Cantonese, which means that we double the time because of

11 the translator.  And now we're talking three days for each

12 of them.

13      And so when we finally got in a place where we

14 understood -- and all this happened very recently, within

15 the past couple of weeks.  So when we finally got in a place

16 where we had a meet and confer, and we said, "All right.  Do

17 we have everybody on your list?"  And they said, "Yes, this

18 is the list," and it did not include 30(b)(6) witnesses.  So

19 we said, "Fine, no problem."  And I said, "I will get you --

20 I cannot get you three alternative dates for every witness

21 that requires three days of testimony."  I cannot physically

22 make Taiwan work that way.  And so IPP said, "Great, get us

23 the dates that they're available," and DPP said, "No, we

24 need three alternatives."  And I said, "I can't give you

25 three alternatives."  So when we all came to a resolution

49

1  that we can -- and I know it's mind numbing, I apologize,

2  but I need you to understand the process.  When we finally

3  came to a resolution and I said, "Okay.  I'll get you the

4  dates."  And I got all the dates except for two witnesses

5  and then two more that they just brought up that day.

6      And so we gave them all the dates.  Everybody confirmed

7  the dates.  And then all of a sudden when we bring the issue

8  toward you -- and I told them once I confirmed those, I can

9  get you Joe Lupica and one other witness, the one who was

10 remaining, and -- I can't remember the name.  But -- and

11 after we did that, we said, "Great.  IPP is confirmed.  DPP

12 is confirmed."  And right before we came in to you, they

13 said, "Wait, we don't have 30(b)(6)" --

14          THE COURT:  Are you talking about today or last --

15 on the 18th?

16          MR. FROST:  In the -- this time.

17          THE COURT:  Okay.

18          MR. FROST:  Today.  Like, in preparing the status

19 report for today --

20          THE COURT:  Yeah.

21          MR. FROST:  -- they brought up the issue first

22 again of the 30(b)(6) witnesses.  And if those have to be

23 separate days -- they're going to be the same witnesses.

24          THE COURT:  Okay.

25          MR. FROST:  But if those have to be separate days,

50

1   we have to start over.  I told them we have to have the full

2   list, because this is really complicated.  And that's how we

3   ended up here.

4           THE COURT:  Okay.

5           MR. FROST:  We had given them dates for almost

6   everybody.

7           THE COURT:  Okay.  Let me hear from the

8   plaintiffs.  Who's speaking on the deposition scheduling

9   issue?

10          MR. FISHER:  I'll speak on behalf of DPP.  This is

11  Mr. Fisher.

12          THE COURT:  Okay.  So -- and the question, just

13  keep in mind, is, why have the parties been unable to

14  schedule the witnesses listed in the reports?

15          MR. FISHER:  The reason that the parties have been

16  unable to schedule the depositions listed here, your Honor,

17  is because defendants have refused repeatedly to comply with

18  this Court's order and the stipulated orders regarding

19  deposition scheduling in this case.  We've been seeking to

20  schedule these depositions for a long, long, long time.

21          THE COURT:  Can I have, like, a more recent

22  explanation?  Because -- and the reason I pause you there is

23  because when we last were here and we had this conversation

24  about the utility of a discovery conference, you all were

25  going to meet and confer.  And then we were going to have

1  something like the agenda right before Monday so that I

2  could prepare to assist you.  So I really just need, like,

3  what happened, not six months ago, but what -- why can't

4  these be scheduled, given your efforts over the last, you

5  know, week or so?

6         MR. FISHER:  Understand, your Honor.  Now I

7  understand your question.  The answer is that defendants --

8  we've been asking for the dates that are listed here, and

9  defendants weren't providing them.  We were taking the

10  deposition dates that they were willing to give us.  I asked

11  in no less than three separate e-mails before our scheduled

12  conference for defendants to provide the dates that they

13  were proposing so that we could say, "Yes, those are good.

14  No, they're not," so we could have a productive

15  conversation.  Defendants did not do so.  They came to the

16  conference with a list of -- an incomplete list of dates.

17  At the first conference --

18         THE COURT:  Meaning they had two dates per witness

19  instead of three?

20         MR. FISHER:  No, your Honor.  That's not what I

21  mean.  I mean, for only a handful of witnesses at the first

22  conference, which was last Tuesday, they had dates for only

23  two witnesses, Mr. Roth and Mr. Lee.  Those are the only

24  witnesses they had dates for.

25         THE COURT:  And those witnesses have been

52

1  scheduled?

2          MR. FISHER:  And we scheduled those.

3          THE COURT:  Okay.

4          MR. FISHER:  They came to the Thursday conference,

5  and they had deposition dates for the Taiwan witnesses in

6  their individual capacity, and they had deposition dates for

7  essentially the folks who weren't here.  And of the folks

8  that they proposed, we accepted the dates, and they're

9  scheduled.

10          THE COURT:  Okay.

11          MR. FISHER:  We told them we aren't -- do you have

12  30(b)(6) dates for us today during that call, and they said

13  no.  There can be no surprise that we're here saying --

14          THE COURT:  So let me just ask a question about

15  the -- who are the Taiwan witnesses?  You're both referring

16  to Taiwan -- who are they?

17          MR. FISHER:  They are the -- there's a number of

18  individuals, but I believe I can give you --

19          THE COURT:  Can you tell me their -- are they on

20  this list?

21          MR. FISHER:  They are not your Honor, but I can

22  give you -- Michael Son will be a Taiwan witness, so he's

23  the exception here.

24          THE COURT:  Okay.  So this is Taiwan.  And that

25  means they're being deposed in Taiwan.  They have to come

53

1  from China to Taiwan.

2          MR. FISHER:  I believe there's some questions of

3  whether Mr. Son can be deposed in Taiwan or Hong Kong,

4  but --

5          THE COURT:  I see.  Okay.

6          MR. FISHER:  Over there, if you will, your Honor,

7  there is Mr. David Shen.

8          THE COURT:  David Shen.  I don't see him on the

9  status report.

10          MR. FISHER:  Because he's been scheduled, your

11  Honor.

12          THE COURT:  Oh, I see.  You're telling me people

13  who have already been scheduled.

14          MR. FISHER:  These are the people -- Yes.  The

15  individuals other than Mr. Son in Asia --

16          THE COURT:  Got it.  Okay.

17          MR. FISHER:  -- those have been scheduled.

18          THE COURT:  Okay.  So that's David Shen.

19          MR. FISHER:  David Shen and his sister-in-law,

20  Dong Yun Xue.

21          THE COURT:  Okay.

22          MR. FISHER:  His brother-in-law Dar Gon Shen

23  (phonetic).

24          THE COURT:  Okay.

25          MR. BORDEN:  Sylvia Shen.

54

1          MR. FISHER:  No.  Sylvia Shen is -- lives in San

2  Francisco.

3          THE COURT:  I'm sorry.  Sylvia Shen?

4          MR. DALLAL:  There had been six witnesses

5  originally, your Honor.  So, at this point, those three are

6  the only ones.  So it's actually David Shen, and Dar Gon

7  Shen is David Shen's brother, and then Dong Yun Xue is David

8  Shen's sister-in-law.

9          THE COURT:  So not Sylvia Shen?

10          MR. DALLAL:  And no -- Sylvia Shen and Jack Chen,

11  C-H-E-N, had originally been among the group of six, but

12  defendants are now presenting them on agreed dates in San

13  Francisco.

14          THE COURT:  Okay.

15          MR. DALLAL:  And then there's -- the sixth one is

16  Michael Son who had originally been proposed for Taiwan.

17  And now we understand that there is a question as to whether

18  he can lawfully travel to Taiwan.  And so we're trying to

19  make alternative arrangements for that, perhaps involving

20  Hong Kong.

21          THE COURT:  Oh, I see.  Okay.  Okay.  So is the --

22  is part of the problem that some of the witnesses who are --

23  you've described as the Taiwan witnesses also going to be

24  defendants' 30(b)(6) designees?

25          MR. FROST:  So the issue, your Honor, is all of

1 the witnesses will be 30(b)(6).  Not that -- let me take

2 that back.  All of the 30(b)(6) witnesses will be among the

3 witnesses who have already been identified for dates.

4             THE COURT:  Okay.

5             MR. FROST:  And if we can do those in overlapping

6 to where they're taking the 30(b)(6) deposition at the same

7 time they're taking the individual, then that solves the

8 problem.  And we can identify who will --

9             THE COURT:  Okay.  So it's not just a -- it's not

10 just a Taiwan witness problem.  It's like an all defendant

11 witness problem?

12            MR. FROST:  Correct.

13            THE COURT:  Okay.  So can I just ask a question

14 about that?  Because there are a number of Rule 30(b)(6)

15 depositions that the plaintiffs want.  Have notices been

16 served for those?

17            MR. FISHER:  No, your Honor.  We've been trying to

18 schedule -- we've been told who -- at a high level who the

19 witnesses are going to be.  For example, we've been told for

20 Pacific Telescope that that's going to be Sylvia Shen.

21 We've been told for the Olivon Manufacturing defendants that

22 that's going to be Jean Shen, who she's the principal of.

23 We've been told that Mr. David Shen will be the witness for

24 Suzhou Synta and -- excuse me, or Suzhou Synta.

25      And so there's been names that have been associated

56

 1  with this, and we've been trying to just get the dates that

 2  make sense.  And it -- actually, we negotiated a discovery

 3  order at the outset of this case in which we agreed that the

 4  30(b)(6) dates would be conjoined and adjacent, to the

 5  extent possible, to the individual dates.  You know, so if

 6  there was --

 7          THE COURT:  Right.  Now that -- and that makes

 8  complete sense.

 9          MR. FISHER:  We agree.

10          THE COURT:  But, ordinarily, a corporate entity

11  needs to see what the topics are in order to understand who

12  the designees will be.  So I'm a little bit puzzled by why

13  you all are trying to do this without actually having -- and

14  this goes for defendants too -- having exchanged your

15  30(b)(6) notices so that you can actually figure out who the

16  witnesses are who need to testify as to the topics.

17          MR. FISHER:  Right.  Well --

18          MR. FROST:  If I may, your Honor.

19          THE COURT:  Let me just hear from Mr. Fisher

20  first, and I'll come back to you, Mr. Frost.

21          MR. FISHER:  Well, there are certain instances in

22  which that, in fact, has happened, your Honor.  For example,

23  your Honor ordered a special 30(b)(6) deposition regarding

24  document destruction.  And we served that notice.

25          THE COURT:  Yeah.

1          MR. FISHER:  That notice obviously went through a

2   court order.  You approved --

3          THE COURT:  Right.

4          MR. FISHER:  -- you limited it in some respects.

5   We still have been unable to schedule that deposition as

6   well.

7          THE COURT:  Okay.  But that's not answering my

8   question.  So, like -- it seems to me -- it's like you're

9   making it harder on yourselves by not actually exchanging

10  the notices when you're trying to negotiate the scheduling

11  of individual depositions for people who are also going to

12  be designees.  Like, why not just -- why not do that?

13         MR. FISHER:  That's a sensible suggestion, your

14  Honor.  I would say that's not something the defendants have

15  raised with us.  We would have been willing to do that.

16  That's fine.  We'll do that.

17         THE COURT:  Okay.  But that's like -- nobody has

18  to raise it with anybody.  This is like -- I'm sorry, but

19  this is normal to kind of think -- and maybe you negotiated

20  your way out of doing it this way in your stipulation, but I

21  don't think the stipulated discovery order precludes this.

22  And why not do it?

23         MR. FISHER:  No, my point --

24         THE COURT:  I mean -- because you want prepared

25  witnesses.  You want prepared witnesses.  Like, why not?

58

1          MR. FISHER:  We're completely happy to do that,

2 your Honor.

3          THE COURT:  Okay.

4          MR. FISHER:  That wasn't the point that I was

5 making.  The point I was making is that as we were in these

6 discussions with defendants, you know, the lack of topics

7 has not been an impediment to scheduling these.  So it's not

8 something that have been articulated to us.

9          THE COURT:  Okay.  Well, if it hasn't been an

10 impediment, fine.  But Mr. Frost seems to think it's a

11 problem.

12          MR. FROST:  I wholeheartedly disagree.  We have

13 put it in writing numerous times for your 30(b)(6)

14 witnesses, we need to know what the topics are.  I did not

15 give those witnesses those designations.  We've told them

16 that, and we haven't seen it, and that's the problem.

17          THE COURT:  Okay.  But, Mr. Frost, is there really

18 any question for a given defendant who the designees will

19 be?

20          MR. FROST:  Yes.  Yes.

21          THE COURT:  Okay.

22          MR. FROST:  For some of them, it's easy.  For

23 Olivon, it will be Jean Shen.  For --

24          THE COURT:  Okay.  So for whom is it not easy?

25          MR. FROST:  Synta Taiwan.  Potentially Suzhou

59

1   Synta.  Potentially Nantong Schmidt.  Potentially Celestron,

2   because it may be multiple witnesses.

3          THE COURT:  Okay.

4          MR. FROST:  Now, if we can get the notices and we

5   can see what the topics are, we can designate them.  But the

6   problem we're having now is -- and maybe this is something

7   we can get clarity from the Court -- and just so we're

8   clear, for the one 30(b)(6) that we noticed, they have the

9   topics.  We gave them the topics.  They had the notice,

10  so --

11          THE COURT:  For your 30(b)(6) depo of Radio City?

12          MR. FROST:  Radio City, correct.  And that's the

13  one we terminated after we figured out the other problems in

14  the documents that we're going to pick up again.  So the

15  problem that we're having is we're coming up on Paul Roth

16  and Corey Lee's depos next week and the following week, and

17  they may be two of Celestron's 30(b)(6) witnesses, but I

18  don't know the topic, so I can't know it.

19      Now, if the -- what I would suggest is, if the Court

20  says that the days that we have for these witnesses will

21  include the 30(b)(6) depo dates and they would just run

22  concurrently, that solves the problem, because once we get

23  the topics --

24          THE COURT:  What do you mean "run concurrently"?

25          MR. FROST:  So --

60

1          THE COURT:  Meaning that you're taking the

2  individual deposition on the same day or --

3          MR. FROST:  Correct.  That they are -- they will

4  be testifying in their individual and their 30(b)(6)

5  capacity.

6          THE COURT:  Okay.  How does that work with the

7  timing, though?  Because if a witness is testifying in

8  Chinese or Mandarin, let's say, and is going to be on the --

9  you know, for his or her individual deposition subject to 22

10 hours or 14 hours of deposition -- I mean, we're talking

11 about days if they're also going to be a 30(b)(6) designee,

12 right?

13         MR. FROST:  And that's -- but that's what I'm

14 saying is if we had known this issue earlier -- if we have

15 to do more days, the whole schedule goes out the window

16 because Taiwan is now full, San Francisco is now full, and

17 we are running out of days.

18         THE COURT:  When you say those locations are full,

19 what does that mean?

20         MR. FROST:  It means that we have almost

21 back-to-back days every day for the entire period that we're

22 in Taiwan, which, as everybody agreed, two weeks.  And then

23 we have almost four weeks in San Francisco, the entire month

24 of October, to cover those depositions.  So if we have to

25 start adding days to these multiple witnesses, we have to

61

1 start over on the scheduling.

2        THE COURT:  I don't know why we would have to

3 start over.

4        MR. FROST:  Because they're back-to-back.  And so

5 when David Shen is done, the next witness starts.  There are

6 no more days in there to make that work.

7        THE COURT:  Okay.  But is there a defined -- do --

8 have you set aside defined days for each witness?  Or is it

9 just, once we get done with witness A, we start up with

10 witness B, and they're just in the queue.

11        MR. FROST:  We have defined -- we have defined

12 days.

13        MR. FISHER:  The parties have agreed to define

14 days, your Honor, but there's days built into there that

15 could easily be used for the 30(b)(6) depositions.  For

16 example, Mr. Shen's deposition is scheduled on three days,

17 but they're not consecutive.  There's gap days between each

18 day of testimony.  And it would be very easy to rejigger

19 those days so that that period is taken by 30(b)(6)

20 testimony.  In other words, your Honor --

21        THE COURT:  His 30(b)(6) testimony, or some --

22        MR. FISHER:  If I may just give an example.

23        THE COURT:  Yeah.

24        MR. FISHER:  These aren't the exact dates, but

25 it's as if it's like this, Mr. Shen testifies on a Monday

62

1  and a Wednesday and a Friday.  That's the way it's currently

2  scheduled at defendants' request.  It would be no problem to

3  make Mr. Shen's testimony Monday, Tuesday, Wednesday, and

4  have the 30(b)(6) one on Thursday and Friday, for example.

5  We think it's quite workable.

6          THE COURT:  Okay.  So then the witness is

7  potentially in deposition for five straight days.

8          MR. FISHER:  Your Honor, that is not what I would

9  choose to do with my witnesses and my client, but we're

10 being told that it's very important to defendants that these

11 are all done at the same time.  We personally are taking

12 these remotely.  So we're fine doing the Taiwan depositions

13 separating the 30(b)(6) from the individuals, but --

14         THE COURT:  Okay.  So the witness will be in

15 Taiwan, and the lawyers will be where?

16         MR. FISHER:  DPP lawyers will be in San Francisco,

17 your Honor.

18         THE COURT:  Okay.  And where will defense lawyers

19 be?

20         MR. FROST:  Defendants and, I understand, IPPs

21 will be in Taiwan.

22         THE COURT:  Okay.

23         MR. FISHER:  That's correct.

24         THE COURT:  All right.  So, I mean, it doesn't

25 make sense to have an individual witness, who's also a

63

1  designee, appear multiple times, but I'm also a little bit

2  wondering about whether if you have a witness testifying

3  both in his or her individual capacity and as a designee,

4  whether you really need the full, you know, individual time

5  and the full 30(b)(6) time.  I mean -- and maybe at this

6  point you have some sense of how this will go, but just

7  because you can doesn't mean you have to.  And I'm just

8  wondering if you -- if there can be some flexibility in the

9  schedule where you can be more efficient than you -- yeah.

10 Okay.  Go ahead.

11         MR. FISHER:  So I can just speak to experience on

12 this because we went through this in the Orion case.

13         THE COURT:  It takes a long time when you have to

14 have translation.  I get it.

15         MR. FISHER:  It's less than half time because of

16 -- you know, you ask a question, you get an answer that's a

17 non-sequitur.  Then you got to figure out if the witness

18 understood or if -- anyway, it's very slow going.  And so I

19 would be -- I would be reticent to sacrifice any time,

20 especially on the 30(b)(6) aspect of things, because that's

21 how you bind the company.

22         THE COURT:  Right.  Okay.  So, Mr. Frost, what do

23 you think about the idea of -- or the suggestion that there

24 is some room in the schedule and that there is room to

25 actually -- you don't have to start over.  You can actually

64

1 update the schedule to include 30(b)(6) testimony in there.

2          MR. FROST:  Because it doesn't work for two

3 reasons.  Number one, because it does not give me time to

4 prepare my witnesses in advance of their depositions, and

5 all three of these witnesses are elderly, which is going to

6 make it incredibly hard on them to sit for

7 back-to-back-to-back days of a deposition.  It would be --

8          THE COURT:  When are you doing the Taiwan

9 depositions?

10          MR. FROST:  September 11 through 25.

11          THE COURT:  And when are you doing the San

12 Francisco depositions?

13          MR. FROST:  October, I believe, 2nd through the

14 23rd or 24th.

15          THE COURT:  So why don't you have -- if you got --

16 if you got the notices for deposition, you know, by the end

17 of this week, why would that not give you enough time?

18          MR. FROST:  To do what?

19          THE COURT:  To prepare your witnesses?

20          MR. FROST:  We will be preparing our witnesses,

21 but I -- we will be preparing our witnesses in advance, but

22 there are a lot of witnesses to prepare.  And I -- and -- we

23 know how this works.  I need to be able to meet with my

24 witness at least the day before the depo.  And I can't -- it

25 does not solve the issue that they are elderly and they are

1 frail, and I am afraid to put them up for multiple

2 back-to-back days, a five straight day depo.

3          THE COURT:  Oh, I see.  So you can't -- so you're

4 saying the witness just can't sit in a deposition for

5 consecutive days.  They need a rest day?

6          MR. FROST:  Correct.  Correct.

7          THE COURT:  All right.  Because the prep thing,

8 I'm not too sympathetic about, because if you have the

9 notice more than a month in -- before the deposition starts

10 -- if you have to go out to Taiwan earlier, okay, or some of

11 your team -- you know, or you do it by video or whatever it

12 is.  You have an opportunity to prep.  I realize it's

13 difficult, but it seems like that's doable.  Yes.

14          MR. DALLAL:  Your Honor.

15          THE COURT:  Yes.  Go ahead, Mr. Dallal.

16          MR. DALLAL:  So I believe the only witness in

17 Taiwan that is potentially at issue for 30(b)(6) testimony

18 is David Shen.  The two others Dar Gon Shen and Dong Yun

19 Xue, I believe Mr. Frost said that they weren't going to

20 know anything.  I think that was how he characterized it on

21 the meet and confer call.  So we hope that somebody that

22 doesn't know anything wouldn't be put up as a 30(b)(6).  I

23 mean, they are valid 30(b)(1) deponents.  They are witnesses

24 to some of what went down in this case.  But I think David

25 Shen is the only one that would be a 30(b)(6) witness.

66

1     And so our concern is that, you know, we've been trying

2 for, I think, around a year to schedule these depositions.

3 We've been told, you know, many things were reasons to throw

4 the whole schedule "out the window."  When we asked for --

5 when we discovered there was a limited number of

6 knowledgeable individuals, we wanted to depose those people

7 for 11 hours rather than seven, as is our right under the

8 discovery plan, if that upended all of the dates that we had

9 been contemplating prior to that.

10     Now, we're told that -- you know, needing to add

11 30(b)(6) testimony is going to, you know, throw it out

12 again.  We just don't think the notion that wholesale

13 destruction of, you know, laboriously negotiated dates is

14 the right way, and especially given that David Shen is very

15 likely the only 30(b)(6) witness in Taiwan.  We think that

16 we can hold the dates we have now and just add a date on the

17 front or the back of his testimony and find a way to get the

18 30(b)(6) done.  But we really don't want to see the whole

19 schedule get upended.

20         THE COURT:  Yeah.  It doesn't make sense.  So

21 what --

22         MR. FROST:  If I can make --

23         THE COURT:  -- is David Shen elderly?

24         MR. FROST:  He is.

25         THE COURT:  And is he the only 30(b)(6) witness in

1  Taiwan, or are there others?

2         MR. FROST:  He is.  And it -- what would it --

3  what it would be helpful for me to understand is, what is

4  the expectation with respect to the 30(b)(6) witnesses in

5  terms of how long they need?  Are they going to want two

6  full days for a 30(b)(6) because it requires a translator.

7  Because if we do, we're talking five days.  And I literally

8  cannot ask him to sit for five straight days.  He will not

9  be able to handle it.

10         THE COURT:  So is there a room in the schedule for

11  him to -- if he's already testifying on Monday, Wednesday,

12  and Friday, for him to then come back the next week for two

13  days?

14         MR. FROST:  I can see how we can adjust the

15  schedule to make that work, but --

16         THE COURT:  Yeah.  I mean, if he's the only

17  30(b)(6) witness in Taiwan, doesn't that help you?  Because

18  that's the only person that you would need to accommodate in

19  Taiwan.

20         MR. FROST:  So let me ask a question is, can we

21  agree that for a witness who is a 30(b)(6) witness and a

22  Chinese speaker, that we add one additional day.  That's

23  four full days.  And then if we need to discuss the issue,

24  we can, but that's a lot of time.  And we -- I could make an

25  additional day work.

68

1          THE COURT:  well, yeah.  So here's the thing about
2  this.  It -- I mean, you all are experienced in doing this
3  with the need for translation, and it can make it take a
4  really long time.  I appreciate that.  I know that there was
5  a reservation, I think it was by DPPs, that the time limits
6  that were in here were subject to proportionality objections
7  if there were any.
8      Now, I don't -- it's hard for me to decide whether
9  there's any proportionality objection to request for a
10  two-day 30(b)(6) deposition after a witness has sat for an
11  individual deposition for three days, because I don't have a
12  notice.  So what I'm going to ask you all to do is, to the
13  extent you have not exchanged 30(b)(6) deposition notices,
14  you should do that immediately, and you should prioritize
15  the ones for witnesses in Taiwan or who the designees are
16  likely to be people in Taiwan.
17      So how quickly can the -- I think defendants have
18  already served their notice.  So how quickly can the DPPs
19  and IPPs provide their deposition notices for 30(b)(6)?
20          MR. FISHER:  I believe we could have that out
21  tomorrow, but I'll -- I won't speak for IPPs.
22          MR. DALLAL:  I think we're close.  We do need to
23  consult with our experts who have certain obligations on
24  other matters.  So I would say by the end of the week or
25  ideally -- well, what's today?  Today is the 1st.  Maybe by

69

1  Monday, the 7th.

2         THE COURT:  Okay.  I mean, I think you should do
3  it as soon as you can and prioritize the ones for Taiwan for
4  planning purposes.  But I also think that you should really
5  -- you should really keep in mind how much time do you
6  really need, right?  I mean, if we limit it to four days as
7  you suggest, Mr. Frost, if there's something -- if I get a
8  transcript that says, you know, the plaintiffs have very
9  efficiently asked questions and it just took as long as it
10 took, but there are still important topics to be examined
11 that were not examined, you know, I'll order another day,
12 and then you have to go back to Taiwan.  I mean, nobody
13 wants to do that, right?

14    So I think it's in everyone's interest to make sure
15 these depositions are focused, the witnesses are prepared,
16 and that you can be as efficient as possible.  I'm not
17 inclined to make someone who's elderly endure five
18 consecutive days of deposition, and I won't do that if I'm
19 -- there's a representation that that person just can't
20 tolerate that kind of a sustained interrogation.  It's just
21 not going to happen, so --

22         MR. FISHER:  And we wouldn't ask the Court to do
23 that, your Honor.  This is Mr. Fisher on behalf of IPPs
24 (sic.).  But, you know, candidly, one thing that's difficult
25 here is that we've been trying to make progress on

70

1  scheduling these depositions for so long.  And the fact that

2  there's a manufactured crisis now, because the IPP defendant

3  discovery deadline is coming up, it's difficult for us to

4  agree.

5          THE COURT:  Wait, what's the manufactured crisis?

6          MR. FISHER:  Oh, my understanding is that in the

7  -- one reason why this is now highly compressed is because

8  we haven't been able to schedule any defendant depositions

9  except for Mr. Cannon's to date in this case and because the

10 IPP defendants' discovery cutoff is in, I believe, early or

11 mid-October.  We do not have a discovery cutoff in the DPP

12 case.  And we would like for this to be an orderly process,

13 but a little bit -- that's creating a crisis here.  And it's

14 the combination of the inability of defendants to produce

15 their witnesses prior and this -- the discovery cutoff

16 that's moving in the other case.

17         THE COURT:  All right.

18         MR. FROST:  With all due respect --

19         MR. BORDEN:  Can I make one suggestion, your

20 Honor, which is that if Mr. Shen is sick and --

21         THE COURT:  He's not -- he's elderly.

22         MR. BORDEN:  -- elderly, and it's difficult for

23 him to sit consecutively, then -- I think your suggestion

24 to, you know, put him up at the beginning of the -- you

25 know, before this, put him up -- you know, at the end.

1  Like, there's no magical reason why he should have to -- I

2  mean, he lives in -- I believe he lives in Taiwan.  And so

3  -- you know, he could come get deposed at any point along

4  the course of those two weeks or two weeks and two days, add

5  two days at the end, add two days at the beginning, but let

6  us take the full deposition.  That way we -- I think that

7  will eliminate the possibility that we have to come back

8  here if we actually have sufficient time, because I don't

9  want to be in the position where we're having to file

10  motions and, you know, argue about, you know, whether we

11  were efficient in our depositions or not and whether --

12          THE COURT:  Yeah, I don't want to hear anything

13  about that either.  I'm just hoping that you will be.

14          MR. BORDEN:  Yeah, well, we'll try to be.

15          THE COURT:  Okay.  Yeah.

16      All right.  Mr. Frost, what about -- we're trying to

17  figure out ways to accommodate the witness -- your witnesses

18  who are elderly and can't sit for consecutive days but who

19  also need to be prepared.  So I'm going to order that the

20  notices be served by the plaintiffs at the latest by August

21  7th, so that you have full information about what the topics

22  are.

23          MR. FROST:  The only caveat to that --

24          THE COURT:  Yeah.

25          MR. FROST:  And what I think we can do is, we can

72

1  meet and confer -- meet and confer with the IPPs and that

2  maybe that we can extend the deadline a little bit so that

3  we actually build in more days to create the opportunity we

4  need, which may solve the problem in and of itself.

5       I will tell you my biggest concern is Celestron,

6  because I've got Paul Roth next week.  I've got Paul Roth

7  starting on August 7th, and he may be a witness -- a

8  30(b)(6) witness, depending on what the financial topics

9  are.  And I've got Corey Lee on August 14 and 15.  And so if

10 I --

11              THE COURT:  Who may also be a 30(b)(6) witness.

12              MR. FROST:  And I guarantee they will be witnesses

13 on -- they will have to be 30(b)(6) witnesses.  And so if I

14 don't get that notice, and I can't know that now, then we're

15 going to have to bring them back, and that's going to put us

16 in the position that we -- nobody wanted to be in.  But we

17 have never seen a notice to know what to do with that.

18              THE COURT:  All right.  Okay.  So who's taking Mr.

19 Lee's deposition?  Both of you?  Both sets of plaintiffs?

20              MR. DALLAL:  We're both taking Mr. Roth and Mr.

21 Lee.

22              THE COURT:  Yeah.

23              MR. DALLAL:  On the other hand, these are folks

24 that are in L.A.  If -- I mean, we're talking about one

25 30(b)(6) notice to Celestron.  So -- well, we can get it out

73

1    expeditiously.  But to the extent that one of these

2    individuals who's not elderly and who is located in the

3    United States has to appear twice, I mean that happens in

4    most cases --

5                THE COURT:  Yeah.

6                MR. DALLAL:  -- that someone has to be the

7    30(b)(6) witness.  And that's usually, you know, what the

8    defendants prefer, because then they can choose, you know,

9    who they want to represent the company.

10                THE COURT:  Yeah.  I mean, sometimes it happens,

11    sometimes it doesn't, if people kind of get things together.

12    So I -- you know, I appreciate you all are trying to

13    organize this in a global way, and the most sensitive issues

14    are the people who are grouped for San Francisco and Taiwan.

15    So I think trying to prioritize your discussions so that you

16    can do those efficiently and not have people come back is

17    the best thing.

18        So, sure, ask Judge Davila for extra time if he can

19    agree to that so that you can accommodate maybe an extension

20    of the Taiwan schedule.  I think that's what Mr. Frost was

21    proposing.  That's the one that happens in October?

22                MR. FROST:  September.

23                THE COURT:  September.  Okay.  Maybe that'll work,

24    maybe it won't.  But I -- I just -- I think you need to

25    exchange your notices as I've already said.  So that'll be

74

1 due on August 7th.

2      I was a little bit surprised to see some of the

3 individuals in this list show up as people for whom there's

4 not a confirmed date, because in the July 18th letter that

5 the -- let's see.  Yes.  I think it was submitted by both

6 parties.  It was jointly submitted on July 18th.  At least,

7 the DPPs tell me that Joe Lupica was confirmed for August

8 17th, and now he's showing up on the list as an outstanding

9 deposition date.  So what happened?

10           MR. FROST:  The reason that happened is because

11 when we were meeting and conferring, DPP counsel told us

12 that there was a six-week period of time that they could not

13 be available for depositions, so -- and that included that

14 date.  So we released it, and now we're working on getting a

15 different date.  We have filled that date in with a

16 different witness who will be testifying on August 17 and

17 August 18.

18           THE COURT:  Okay.  And I was --

19           MR. FISHER:  And that's actually -- if I may, your

20 Honor, with respect, that's actually not accurate.  What

21 happened was that Mr. Lupica was identified as a witness who

22 the parties jointly -- the plaintiffs jointly agree needs to

23 be deposed for 11 hours.  And we were told that as a result

24 of that, Mr. Lupica's deposition needed to be moved.

25           MR. FROST:  To which there was no objection and to

75

1  which we put a different witness in --

2         THE COURT:  Okay.  All right.  This is -- you

3  know, so here's what we're going to do.  You're going to

4  exchange your notices on August 7th.  If these depositions

5  are still not nailed down, you will come to court and you

6  will enjoy my windowless jury deliberation room, where you

7  will hammer out a schedule, okay?  And I won't let you leave

8  until you do.

9      So August 7th is the date when you have to exchange the

10 notices, and you can -- how long will you need to -- I mean,

11 the earlier you do the notices, the better.  But if I have

12 you come in on August 8th, will that be enough time for you

13 to think about it?  You can come in on August 8th and talk

14 about it in person.  That's what I'm suggesting that you do

15 if you can't manage to do it on your own, because I don't

16 know your complete schedule, and it's very hard for me to

17 micromanage it for you.  The purpose of today was to figure

18 out what the roadblocks were.  I think we've gotten rid of

19 one of the roadblocks, which is give the notices and then

20 maybe seek an accommodation of the schedule and the IPP case

21 so that you can extend the period of time for the Taiwan

22 depositions if you need to.  But, otherwise, you all just

23 have to coordinate it.

24         MR. FROST:  One other issue, your Honor.  And I

25 think we should probably -- if we're going to have to do

1  that, I think we're probably going to figure this out.  So

2  we don't -- we actually do have Paul Roth on August 8th, so

3  if we can do August 9th, if we have to.

4          THE COURT:  Oh, okay.

5          MR. FROST:  And then the other issue that we're

6  having and the concern that we're having is, we've asked

7  DPPs --

8          THE COURT:  Yeah.  Okay.

9          MR. FROST:  -- for their witnesses, that they be

10 11 hours.  And we've been told they're not going to do that.

11         THE COURT:  Yeah.  The 11 hour thing matters,

12 right?  Okay.  So both sides have asked each other for

13 depositions that are 11 hours/22 hours, right?

14         MR. FROST:  Correct.

15         THE COURT:  That's the situation.  Is there a

16 problem with that, with the -- putting up a witness for --

17 apart from scheduling, is there a merits problem with

18 putting up a witness for 11 hours or 22 hours?

19         MR. FISHER:  There is, with respect to the class

20 representatives for DPPs, your Honor.

21         THE COURT:  Okay.  Why?  What's the problem?

22         MR. FISHER:  So, unlike the defendants in the

23 discovery order, DPPs reserved a proportionality objection

24 here.  And then, candidly, the issue is that we just fail to

25 see how having all three Radio City witnesses for 11 hours

1  when they are a class rep, and their testimony is about, did

2  they buy -- did they purchase telescopes from Celestron or

3  not, and they can't speak to the antitrust conspiracy, or

4  anything along those lines, what the purpose is of 33 hours

5  that these witnesses are, who are in their 80s.

6          THE COURT:  So do you need them for 11 hours or --

7          MR. FROST:  We don't know.  We may.  But we agreed

8  at the time.  That was the reason we said everybody will

9  have the right to seek 11-hour depositions.  And there was

10 no objection at the time.  We showed up to Maline Fish's

11 deposition.  She admitted to destroying years' worth of

12 records.  We shut it down at the time because Mr. Fisher

13 represented he was going to drop that class rep.  Now, he

14 hasn't.  We haven't even scratched the surface.

15     And just so we're clear, this is a DPP rep, which makes

16 their entire business model and their history of

17 transactions relevant to the issue of whether or not we

18 caused them damage.  So it's not an issue of just what they

19 know about our business model.  So, yes, we may need that

20 time.

21         MR. FISHER:  So, your Honor, if I may.

22         THE COURT:  So -- well, I'm just going to say,

23 nobody needs to reserve the ability to object on grounds of

24 proportionality.  You don't need to reserve it, you don't

25 need to reserve it, and IPPs don't need to reserve it.  If

78

1  you take a deposition for longer than is reasonably

2  necessary, that's a problem.  It goes both ways.  But

3  plaintiffs are telling me they don't know how long they need

4  with a particular witness.  These are important witnesses on

5  the defense side.  The defendant is telling me the same

6  thing.  I can't tell.  So, presumptively, it's 11 hours.  So

7  schedule it.  If they don't need it, then fine.

8        MR. FISHER:  If I may, your Honor.

9        THE COURT:  Yes.

10        MR. FISHER:  We have given them three straight

11  days for these witnesses for a long time, and we're -- we

12  can easily schedule them.  We've been asking them to

13  identify the specific dates.

14        THE COURT:  Great.  Good.

15        MR. FISHER:  So to the extent that's a concern --

16  and that's why we're surprised to see them here.

17        THE COURT:  So no 11-hour problem, then.

18        MR. FISHER:  There is an -- that may well be

19  briefed to the Court, your Honor.

20        THE COURT:  Well, I don't want -- I don't want to

21  -- it's going to work both ways.  So, I mean, if I get a

22  brief that says, I don't think this witness is important

23  enough to warrant 11 hours, and I get another brief from Mr.

24  Frost that says, I don't think that witness is important

25  enough for 11 hours, what am I supposed to do, right?

1          MR. FISHER:  Your Honor.

2          THE COURT:  I mean, I'm going to let you take your

3   depositions, and then -- you know, one thing I could do is

4   -- and this will totally screw up your schedule.  So I can

5   say, well, it's seven hours, and then let me know.  I'll

6   look at the transcript, I'll see who's, you know, asked

7   efficient questions or not efficient questions and what more

8   you didn't ask.  I mean, I don't want to have to do that.

9   So you all need to compromise on this, okay?  It's not about

10  -- it's not about winning.  It's a scheduling issue, okay?

11  So just figure it out.  And you may have to compromise, and

12  you may have to compromise in order to get it done.

13         MR. FISHER:  So, your Honor, if I may, this issue

14  was raised with us for the first time last night.  We -- I

15  think there's a way and a compromise that can be reached,

16  but we haven't had the opportunity to have that conversation

17  with Mr. Frost.  And I think it's here precisely so your

18  Honor could experience that level of frustration and want

19  throw up your hands.

20         THE COURT:  No.  No.  No.

21         MR. FISHER:  And if I may, I think the way to

22  answer the question that you just asked, which is how can I

23  decide which witnesses would warrant extended time or not,

24  is to consider the fact that David Shen, for example, is the

25  person at the heart of the antitrust conspiracy alleged in

80

 1   this case and the Orion case in here.  And my clients are

 2   people who bought telescopes.

 3          THE COURT:  You know, Mr. Fisher, it says in the

 4   stipulation at paragraph D, five, DPPs reserve the right to

 5   object to the number and length of depositions of DPPs'

 6   percipient witnesses on grounds of proportionality, which

 7   objection shall be resolved by the parties in accordance

 8   with paragraph four of my standing order.  I don't have a

 9   joint discovery dispute letter.  I don't want one.  I want

10   you all to work it out.  But just talking about it in this

11   hearing is not a particularly good use of anybody's time,

12   right?

13          MR. FISHER:  I understand.

14          THE COURT:  So I really -- I encourage you all.

15   You may have to give up something in order to get something

16   and make this all work.  Please keep that in mind, okay?

17   Try to accommodate elderly witnesses.  Try to accommodate

18   the notion that somebody may be more or less important than

19   somebody else for the merits of the case.  Prioritize the

20   people who really matter.  And just don't sweat the small

21   stuff that you don't really need.  That's not a very useful

22   guidance, I know, because everybody wants to prevail on

23   every last issue, but you can actually be reasonable.  I

24   know you can.  And is everyone available August 9th to come

25   in and talk about it if you haven't reached total agreement

81

1 on everything?

2          MR. DALLAL:  I mean, your Honor, a suggestion.

3          THE COURT:  Uh-huh.

4          MR. DALLAL:  Just, if we turn over -- we'll

5 endeavor to do it sooner than August 7th.  But if we do

6 supply topics for some of the defendants on August 7th, I am

7 not sure that that will give Mr. Frost enough time to say

8 which witness will be -- you know, the 30(b)(6) for each

9 defendant and for us to have any meaningful chance to talk

10 and -- you know, work out dates before we come in, you know,

11 August 9th.

12     So I was wondering maybe if the 15th, your ordinary

13 Tuesday calendar, makes more sense.  We also, by your order,

14 have a weekly Thursday meet and confer, where we do get on

15 the Zoom, you know, sometimes with Mr. Frost, sometimes with

16 his colleague, Ms. Addie (phonetic).  So we do speak.  And

17 maybe if we have a chance to do that after he receives the

18 topics and has the chance to designate witnesses, maybe we

19 can blast through a lot of it without the Court's

20 intervention.

21          THE COURT:  I'm happy to do whatever you all think

22 will be most efficient and not disrupt your productive

23 efforts already.  But I'm just kind of doubtful that it's

24 working so far.  So if you want to meet on the 15th, that's

25 fine.  You're going to be talking to each other by

82

1 yourselves.  So I have a full calendar on the 15th, and I

2 will be busy.  So I will welcome you into the courtroom and

3 invite you into my jury deliberation room.  If you tell Ms.

4 Kratzmann that you're -- you still got things to work out,

5 you're just -- and you're going to have to be fully prepared

6 to work on the calendar, call your witnesses, figure out

7 who's available.  That's what you're going to have to do if

8 you can't do it on your own.  And it's like, I don't want

9 you to have to come in and do that.

10          MR. FROST:  Mr. Lee's deposition is on the 9th --

11 on the 15th.  So that's probably not going to be a good

12 date.

13          MR. BORDEN:  I think the point is for us to figure

14 it out on our own, and I expect we probably can.

15          THE COURT:  Well, that is the point.  Yeah.  Very

16 astute.  It's your -- the point is that you -- okay.  But if

17 -- is there a deposition on the 9th?

18          MR. FISHER:  There's not, your Honor.  And DPP is

19 the least to be prepared to be here on the 9th.

20          THE COURT:  Is there a deposition on the 10th?

21          MR. FISHER:  There is.

22          MR. FROST:  Yes.  There are 10, 11, 14, and 15.

23          THE COURT:  Okay.

24          MR. FROST:  And the next available date would be

25 August 16.  I agree with Mr. Dallal that we probably do need

83

1   time to actually let the process work.  So if we can set it

2   for the 16th so we have something out there, I think that's

3   probably the most appropriate way to do it.

4          THE COURT:  The 16th.  So that'll be next

5   Wednesday.

6          MR. FROST:  Two Wednesdays.

7          THE COURT:  Sorry, two weeks.  Two weeks.  I just

8   don't want us to linger that long.  You have too much to do.

9          MR. FROST:  Well -- and it's not -- in the

10  meantime, we have depositions on August 7, 8, 14 -- 7, 8,

11  14, 15, 17, 18.  So we're moving.

12         THE COURT:  All right.  So let me just -- let me

13  just give you some instructions.  The notice is by August

14  7th.  The time required -- best estimates of time required

15  -- if you require the maximum, okay, but use some

16  discernment and judgment about the time required -- that you

17  really require.  And if you need to go over, okay.  But for

18  planning purposes, the time that you really need, not the

19  time that you could possibly conceivably have under the

20  stipulation.  You have to exchange that with each other by

21  August 9th.  So after you get the notices for any

22  outstanding depositions that have not been scheduled, you

23  have to exchange the time required, okay?

24      And then in terms of dates, each side has to supply the

25  other with dates.  You can't just not supply the dates.  And

84

1   I'm not sure what guidance to give you about, you know,

2   supplying the dates, but you need to supply dates on which

3   the witness is available within the time -- now, I'm a

4   little bit concerned about -- I guess, Mr. Fisher, you have

5   trial that is taking you out of commission for some -- are

6   you suggesting that depositions can't occur during that

7   time?  Your colleagues, they can take depositions and

8   defend?

9          MR. FISHER:  Quite the opposite, your Honor.  We

10  -- sorry, but this is Mr. Fisher.  Quite the opposite, your

11  Honor.  We have scheduled depositions during the period that

12  I'll be out on trial.

13         THE COURT:  Okay.  So that's not a problem.  Okay.

14         MR. FISHER:  That's correct.

15         THE COURT:  So, fine, because you all have big

16  firms, lots of people.  You can -- big enough firms.  You

17  can have other people doing work.  Okay.  So, you know, I

18  think it's helpful to have enough dates for -- you'll have

19  the time required by the other side.  So then you can

20  propose dates for the witnesses that correspond to the time

21  required.  And if you need to have an accommodation, like

22  this witness can't sit for consecutive days, they have to

23  sit for every other day or something like that, put that in

24  your proposal.

25      But I want you to be able to exchange dates by, let's

1  say -- where's August?  Can you do that by the 11th?  So if

2  you get the time requirements by the 9th, can you exchange

3  dates by the 11th?  You've already done a lot of this work.

4  So you already know a lot of the dates of the witnesses'

5  availability.  So this is just refinement.  So the

6  plaintiffs are nodding their head.

7          MR. FROST:  You just said -- you just said August

8  9 is when we get the estimates.  You meant August 7th?

9          THE COURT:  No.  So August 7th, you get the

10  notices.  You get some time to look at the notices.  Then by

11  August 9th, you get the requirements, unless you can provide

12  it up by August 7th.  But this goes both ways.  So

13  defendants will say, we need this amount of time with this

14  witness, right?  And the plaintiffs will say, we need this

15  amount of time with this witness.  I guess that depends on

16  who's designated though, right?

17          MR. FROST:  Right.

18          THE COURT:  How quickly can you make your

19  designation decisions if you have notices by the 7th?

20          MR. FROST:  By the 9th.

21          THE COURT:  Okay.

22          MR. FROST:  And the only reason it'll take that

23  long is because we've got people who are on the other side

24  of the world.

25          THE COURT:  I see.  All right.  So the

86

1  designations will be by the 9th.  That makes sense.  Okay.

2  And then it will go back to whoever is the requesting party

3  to say, okay, given that witness A is both an individual

4  deponent and a designee, we think we need this much time

5  with that person.  Is that how you would like to do it?

6  Does that make sense?

7         MR. FROST:  It does.

8         THE COURT:  Okay.  So then that would mean that

9  you would be doing that exchange by the 11th.  And then can

10  you exchange proposed dates by the 14th, dates of

11  availability for your respective witnesses who have been

12  noticed or designated?  Does that timing work?

13         MR. FROST:  I expect we'll -- I expect we'll be

14  able to make it work.

15         THE COURT:  Does that work for plaintiffs?

16         MR. FISHER:  That's for the date exchange, your

17  Honor.  August 14th?

18         THE COURT:  Yes.  For the proposed dates.

19         MR. FISHER:  Yes, your Honor.

20         THE COURT:  Okay.  So that's for any witnesses who

21  are -- and you don't have to wait until that date.  But if

22  the individual witness is likely to be a 30(b)(6) designee

23  for anything, then you'll need to -- you'll need to take

24  that into account.

25      Okay.  So let's have that schedule.  I'll put that in

87

1  an order.  So the 7th for the notices, the 9th for

2  designations, the 11th for time limits or time requirements

3  -- estimated time required, and the 14th for exchange of

4  available dates.  Okay.  But, you know, like I said, don't

5  wait.  If you can accomplish this sooner rather than later,

6  that's great.

7      I don't know that there's anything else that I can do

8  usefully to help you on this.  I think I should ask for a

9  status report on where things stand by the 16th, and then I

10  will figure out what to do.  So, instead of hauling you in,

11  I'll wait and hear your report, because maybe you won't need

12  my help or my coercion.  Okay.  Does that sound okay to

13  everyone?

14          MR. FROST:  Very good, your Honor.

15          THE COURT:  Okay.  Status report by the 16th.  All

16  right.  Anything else for today?  Mr. Borden?

17          MR. BORDEN:  Not from DPPs, your Honor.  We

18  appreciate your help and coercion.

19          THE COURT:  Okay.

20          MR. BORDEN:  And I appreciate the promotion to a

21  big firm.

22          THE COURT:  All right.  Maybe that wasn't quite

23  right, but bigger than some other firms.  Okay.

24          MR. DALLAL:  We'll just note the coercion is

25  helpful.

88

1        THE COURT:  Coercion is helpful.  Thank you.

2  Anything further from the defendants?

3        MR. FROST:  Nothing, your Honor.  Thank you for

4  your time.

5        THE COURT:  All right.  Thank you very much.  Have

6  a good day.  Court is concluded.

7     (Proceedings concluded at 12:02 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

89

CERTIFICATE OF TRANSCRIBER


1      I certify that the foregoing is a true and correct

2  transcript, to the best of my ability, of the above pages of

3  the official electronic sound recording provided to me by

4  the U.S. District Court, Northern District of California, of

5  the proceedings taken on the date and time previously stated

6  in the above matter.

7      I further certify that I am neither counsel for,

8  related to, nor employed by any of the parties to the action

9  in which this hearing was taken; and, further, that I am not

10  financially nor otherwise interested in the outcome of the

11  action.

16          Echo Reporting, Inc., Transcriber

17              Friday, August 4, 2023