1  J. Noah Hagey, Esq. (SBN: 262331)
        hagey@braunhagey.com
2  Matthew Borden, Esq. (SBN: 214323)
        borden@braunhagey.com
3  Andrew Levine, Esq. (SBN: 278246)
        levine@braunhagey.com
4  Ellen V. Leonida, Esq. (SBN: 184194)
        leonida@braunhagey.com
5  Ronald J. Fisher, Esq. (SBN: 298660)
        fisher@braunhagey.com
6  Ellis E. Herington, Esq. (SBN: 343085)
        herington@braunhagey.com
7  BRAUNHAGEY & BORDEN LLP
   351 California Street, 10th Floor
8  San Francisco, CA 94104
   Telephone: (415) 599-0210
9  Facsimile: (415) 276-1808

10 Garrett Biedermann, Esq. (admitted *pro hac vice*)
        biedermann@braunhagey.com
11 BRAUNHAGEY & BORDEN LLP
   118 W 22nd Street, 12th Floor
12 New York, NY 10011
   Telephone: (646) 829-9403
13 Facsimile: (646) 403-4089

14 ATTORNEYS FOR DIRECT PURCHASER PLAINTIFFS

15                 **UNITED STATES DISTRICT COURT**

16                **NORTHERN DISTRICT OF CALIFORNIA**

17

| | |
|---|---|
| 18  IN RE TELESCOPES ANTITRUST LITIGATION | Case No. 5:20-cv-03639-EJD |
| 19 | |
| 20  This Document Relates to: | Case No. 5:20-cv-03642-EJD |
| 21  AURORA ASTRO PRODUCTS LLC, PIONEER CYCLING & FITNESS, LLP, JASON STEELE, and those similarly situated, | **FOURTH AMENDED COMPLAINT FOR VIOLATIONS OF SHERMAN ACT; CARTWRIGHT ACT; AND UNFAIR COMPETITION LAW** |
| 22 | |
| 23          Plaintiffs, | **CLASS ACTION** |
| 24      v. | **JURY TRIAL DEMANDED** |
| 25  CELESTRON ACQUISITION, LLC, SUZHOU SYNTA OPTICAL TECHNOLOGY CO., LTD., SYNTA CANADA INT'L ENTERPRISES | **Judge:**     Hon. Edward J. Davila **Location:**  Courtroom 4 – 5th Fl. |
| 26  LTD., SW TECHNOLOGY CORP., OLIVON MANUFACTURING CO. LTD., OLIVON USA, | **Compl. Filed:**  June 1, 2020 |
| 27  LLC, NANTONG SCHMIDT OPTO-ELECTRICAL TECHNOLOGY CO. LTD., | **First Am. Compl. Filed:**  July 17, 2020 |
| 28  NINGBO SUNNY ELECTRONIC CO., LTD., | **Trial Date:**  None Set |

PACIFIC TELESCOPE CORP., COREY LEE,
DAVID SHEN, SYLVIA SHEN, JACK CHEN,
JEAN SHEN, JOSEPH LUPICA, DAVE
ANDERSON, LAURENCE HUEN, and DOES
1-50,

        Defendants.

Plaintiffs Aurora Astro Products LLC, Pioneer Cycling & Fitness, LLP, and Jason Steele, on behalf of themselves and those similarly situated, allege as follows:

**<u>INTRODUCTION</u>**

1.      Since the beginning of time, humans have looked beyond their world into the night sky.  But if you love astronomy and want to share your joy with others, you must pay a price – hundreds of millions of dollars in illegal overcharges.

2.      Plaintiffs are all either small telescope distributors or individual astronomy enthusiasts.  They bring this antitrust class action against the dominant U.S. telescope distributor Defendant Celestron Acquisition, LLC ("Celestron") and its syndicate of co-conspirators. Specifically, Celestron and its parent company in China, Synta,[1] conspired with their competitor Ningbo Sunny Electronic Co., Ltd. ("Ningbo Sunny") to fix prices, divide the market, retaliate against competitors, mislead U.S. authorities, illegally acquire assets and dominate the U.S. market so that they could rip off American purchasers.  For the last decade, Defendants and their cohorts have massively and illegally overcharged U.S. telescope distributors.

3.      Synta and Ningbo Sunny together manufacture over 80% of all consumer telescopes imported into the U.S.  Instead of competing, Synta and Ningbo Sunny agree on what prices to charge and which products their companies will produce.  They have used their unlawful cooperation and dominance over telescope supply to enable their subsidiaries to take over the U.S. distribution market.  As a result of this unlawful conspiracy, Celestron controls at least 70% of all U.S. consumer telescope sales, including sales to small distributors or individuals like Plaintiffs and their fellow class members, who are forced to pay supracompetitive prices.

4.      In addition to colluding on pricing, Defendants and their co-conspirators – who should have been competing against one another – operated their businesses as a conglomerate for the mutual benefit of one another.  For example, when the Federal Trade Commission blocked Celestron from acquiring its competitor Meade Instruments Corp., Celestron made a deal where it

---

[1] As detailed below Synta is a conglomerate of entities owned and controlled by Dar-Tson "David" Shen and his close family members that include Synta Technology Corporation, Suzhou Synta, and a shadowy network of other factories and distributors.

agreed to help Defendant Ningbo Sunny acquire Meade.  In exchange, Ningbo Sunny lied to the FTC about Celestron's involvement, secretly gave Celestron equity in Meade, provided Celestron and Synta access to Meade's IP and manufacturing techniques and ensured that Meade – which previously was an independent brand – no longer competed against Celestron.  At the same time, Ningbo Sunny funneled its customers' trade secrets to Celestron and Synta to help Celestron adjust its pricing and marketing strategies.

5.      Defendants' concealment of their conspiracy from consumers ended no earlier than September 2019, when documents were unsealed in an antitrust proceeding brought by Optronic Technologies, Inc. d/b/a Orion Telescopes & Binoculars® (the "Orion Litigation"), where a jury awarded over $52,000,000 in damages against Defendants' co-conspirators. Some of the documents that the jury relied on in that litigation are attached to this complaint as **Exhibits 1-18**.[2]

6.      Defendants and their agents have continued to conceal their conspiracy by intentionally destroying all of their emails and documents to, in their own words, avoid "a potential lawsuit in the United States." Further, to date, Defendants have not produced a single email in this case.

7.      To remedy Defendants' conspiracy and injury to the U.S. telescope market, Plaintiffs and their fellow class members seek compensatory damages to be trebled in accordance with the antitrust laws, injunctive relief, and attorneys' fees.

### JURISDICTION AND VENUE

8.      The Court has subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337, as well as 15 U.S.C. § 15.  The Court has supplemental jurisdiction over Plaintiffs' state-law claims pursuant to 28 U.S.C. § 1367.

9.      The Court has personal jurisdiction over the Defendants because they directed their tortious conduct at persons and activities within the State of California.  The Court further has jurisdiction over Defendant Celestron because its headquarters are in California.

---

[2] Pursuant to the Court's Standing Order, a redline showing changes made to the Third Amended Complaint is attached as **Exhibit 19**.

10.     Venue is proper in this district under 28 U.S.C. § 1391(b)(2) and 15 U.S.C. § 22, because a "substantial part of the events or omissions" on which the claims are based occurred in this district.

11.     Venue is further proper in this district under 28 U.S.C. § 1391(d) because California has more than one judicial district, Defendant Celestron is a California limited liability company subject to the personal jurisdiction of California courts, and Defendant Celestron has sufficient contacts with this District that it would be subject to personal jurisdiction if this District were a separate state.

## THE PARTIES

**A.     Plaintiffs**

12.     Aurora Astro Products LLC is a Washington limited liability company. Aurora Astro sold telescopes in a retail store, online, and at trade shows. Aurora Astro suffered from low margins on telescope sales because of supracompetitive prices set by Defendants. During the Class Period, Aurora Astro bought telescopes that were manufactured by Defendants.

13.     Pioneer Cycling & Fitness, LLP is a Minnesota limited liability partnership. Pioneer Cycle sells a small collection of telescopes in a retail store in Minnesota. Pioneer Cycle suffers from low margins on telescope sales because of supracompetitive prices set by Defendants. During the Class Period, Pioneer Cycle bought telescopes that were manufactured by Defendants.

14.     Jason Steele is an individual resident of Texas. Mr. Steele is an astronomy enthusiast, and purchased a telescope from Defendant Celestron for his own personal use. Mr. Steele paid supracompetitive prices for the telescope he purchased during the Class Period.

**B.     Defendants and the Synta Co-Conspirators**

15.     Defendants are a group of related entities, holding companies, and shell corporations controlled by an individual named David Shen, and his henchmen.

FOURTH AMENDED COMPLAINT

16.    Defendant Dar-Tson "David" Shen owns and/or controls various telescope manufacturing and distribution companies discussed below (collectively "Synta").  Chairman Shen regularly comes to this District and other places in the U.S. to meet with U.S. distributors of Synta products.  Chairman Shen directly or indirectly owns and/or controls each of the Synta entities, as detailed below. Chairman Shen is one of the primary architects of Defendants' anticompetitive conspiracy.  He regularly travels to the United States for meetings and other activities in furtherance of this conspiracy.



**David (Dar Tson) Shen**
Founder/Owner/Chairman
of Synta & Celestron

17.    Even though he founded Synta and has run it since its inception, from 2001 to 2005, Chairman Shen was also concurrently an officer of Synta's supposed horizontal competitor, Ningbo Sunny.  As Chairman Shen's fixer, Defendant Laurence Huen, explained in an email, "David Shen was appointed as the Vice Chairman of Ningbo Sunny Electronic Co. Ltd. . . . on November 23 2001. . . . David resigned this position on July 2005, in order to avoid any conflict of interest after he acquired Celestron on April 2005." A true and correct copy of Mr. Huen's email is attached as **Exhibit 1**.

18.    Until 2005, Chairman Shen also held a 26 percent ownership stake in Synta's horizontal competitor Ningbo Sunny.  At that time, he transferred his shares to his sister-in-law, Dong Yun Xue.  Ms. Dong continues to hold that interest.

19.    Defendant Sylvia Shen is Chairman Shen's sister.  Chairman Shen exercises control over several Synta-related entities, including Celestron, through her.  Defendant Sylvia Shen is a member of Celestron's executive committee.  On information and belief, Defendant Sylvia Shen resides in British Columbia, Canada.  She participated in, planned, and carried out the conspiracy detailed below. As a member of Celestron's executive team, at all relevant times, Sylvia Shen, in collusion with David Shen, Jack Chen, and Laurence Huen controlled strategic business decisions for Defendant Celestron, including all of the anticompetitive activities, price fixing, market

allocation, retaliation, and conspiracy to monopolize alleged herein. For example, Defendant Sylvia Shen was aware of Ningbo Sunny's efforts to purchase Meade before Ningbo Sunny submitted a bid, a fact that was disclosed in a filing with federal securities regulators. Defendant Sylvia Shen authorized, approved, and ratified Celestron's involvement in the unlawful acquisition of Meade, and was on the email chain between Ningbo Sunny and Synta and Celestron personnel in which Peter Ni stated that "to prevent JOC to buy MEADE, we decided to purchase MEADE by sunny after discussion. But the premise of this case is CELESTRON/SYNTA should be provided the financial support to SUNNY." Defendant Sylvia Shen participated in numerous meetings after the acquisition of Meade in which Chairman Ni, Chairman Shen, and other Celestron and Meade executives jointly planned the companies' activities and strategies, including their price-fixing and market division. This plan included taking advantage of Meade's intellectual property in order to take over the U.S. telescope market through a new brand known as "SkyWatcher" for the benefit of Synta and Ningbo Sunny.

20.    Defendant Jack Chen is Chairman Shen's brother-in-law and Defendant Sylvia Shen's husband. Defendant Jack Chen is a member of Celestron's executive committee.  On information and belief, Defendant Jack Chen resides in British Columbia, Canada.  He participated in, planned, and carried out the conspiracy detailed below. As a member of Celestron's executive team, at all relevant times, Jack Chen, in collusion with David Shen, Sylvia Shen, and Laurence Huen controlled strategic business decisions for Defendant Celestron, including all of the anticompetitive activities, price fixing, market allocation, retaliation, and conspiracy to monopolize alleged herein. For example, Defendant Chen was aware of Ningbo Sunny's efforts to purchase Meade before Ningbo Sunny submitted a bid, a fact that was disclosed in a filing with federal securities regulators. Defendant Chen authorized, approved, and ratified Celestron's involvement in the unlawful acquisition of Meade, and was on the email between Ningbo Sunny and Synta and Celestron personnel in which Peter Ni stated that "to prevent JOC to buy MEADE, we decided to purchase MEADE by sunny after discussion. But the premise of this case is CELESTRON/SYNTA should be provided the financial support to SUNNY."  Defendant Chen participated in numerous meetings after the acquisition of Meade in which Chairman Ni, Chairman Shen, and other

1    Celestron and Meade executives jointly planned the companies' activities and strategies, including

2    their price-fixing and market division. Chairman Ni and his right-hand man Hank Qi continued to

3    exchange correspondence with Chairman Shen and Defendant Chen to develop a plan of

4    cooperation between Meade, Synta Canada, Celestron, and the rest of the Synta family of

5    businesses. This plan included taking advantage of Meade's intellectual property in order to take

6    over the U.S. telescope market through a new brand known as "SkyWatcher" for the benefit of

7    Synta and Ningbo Sunny.

8         21.    Defendant Jean Shen is Chairman Shen's sister. Chairman Shen exercises control

9    over Olivon Manufacturing Corp., a Canadian telescope company with United States subsidiaries,

10   and Olivon USA, LLC, through her. On information and belief, Defendant Jean Shen lives in

11   British Columbia, Canada. She participated in, planned, and carried out the conspiracy detailed

12   below. In specific, Jean Shen was aware of and took advantage of her brother Synta's price-fixing

13   and market division by using her influence with her brother to sell telescopes produced by Ningbo

14   Sunny through her own companies, Olivon USA, LLC and Olivon Manufacturing Co. Ltd., for her

15   own profit. These activities included representing to telescope distributors that Synta's horizontal

16   competitor and co-conspirator Ningbo Sunny Electronic Co., Ltd. was one of "my family's

17   companies" in an effort to obtain bids from these distributors. Jean's sales activities on behalf of

18   the conspirators were thus made with actual knowledge of the conspiracy and with the intent to

19   advance its ends. On information and belief, Jean Shen's and the Olivon Defendants' acts to

20   advance the conspiracy were also repaid through preferential pricing from Ningbo Sunny and Synta

21   beyond prices afforded to other telescope distributors who were not members of the conspiracy.

22        22.    Defendant Suzhou Synta Optical Technology Co., Ltd. ("Suzhou Synta") is a

23   telescope manufacturing company located in Suzhou, China. Suzhou Synta is owned and/or

24   controlled by David Shen and his family. Suzhou Synta is Synta's primary manufacturing

25   company. During the Class Period, Suzhou Synta—directly and/or through its subsidiaries, which

26   it wholly owned and/or controlled—manufactured, marketed, and/or sold telescopes at prices that

27   were unlawfully inflated as a result of the anticompetitive conspiracy alleged herein, and that were

28   sold and purchased throughout the United States, including in this District. Suzhou Synta claims

1   that it knowingly and intentionally destroyed all documents relating to its conduct during the Class

2   Period to conceal the antitrust conspiracy at issue in this suit from litigation such as this one.

3           23.     Defendant Nantong Schmidt Opto-Electrical Technology Co. Ltd. ("Nantong

4   Synta") is a telescope manufacturing company located in Nantong, China.  Nantong Synta is owned

5   and/or controlled by David Shen.  During the Class Period, Nantong Synta—directly and/or

6   through its subsidiaries, which it wholly owned and/or controlled—manufactured, marketed, and

7   sold telescopes at prices that were unlawfully inflated as a result of the anticompetitive conspiracy

8   alleged herein, and that were sold and purchased throughout the United States, including in this

9   District and to Defendant Celestron.

10          24.     Defendant Synta Technology Corp. ("Synta Technology") is a company

11  headquartered in Taiwan.  Together with its subsidiaries and affiliates, it has sold telescopes into

12  the U.S., Canada, and the European Union during the Class Period.  Synta Technology has sold

13  telescopes that were shipped into this District.  Its address in Taiwan is No. 89 Lane 4 Chia-An W.

14  Road Lung-Tan Taoyuan Taiwan R.O.C.  Synta Technology is a member of Defendants'

15  anticompetitive conspiracy. Good Advance and Synta Taiwan are other names used by Synta

16  Technology.  During the Class Period, Synta Technology—directly and/or through its subsidiaries,

17  which it wholly owned and/or controlled—manufactured, marketed, and/or sold telescopes at

18  prices that were unlawfully inflated as a result of the anticompetitive conspiracy alleged herein, and

19  that were sold and purchased throughout the United States, including in this District.  Synta

20  Technology claims that its employee Joyce Huang destroyed all evidence relating to her and Synta

21  Technology's role in the conspiracy in order to conceal the antitrust conspiracy at issue in this suit

22  from litigation such as this one. In specific, Synta Technology claims that it destroyed its

23  documents because "the aggravation of having to deal with a potential lawsuit was the straw that

24  broke the camel's back" and "the fact that they had faced a lawsuit in the United States, a potential

25  lawsuit in the United States over that very business which they finally said this is just not worth the

26  aggravation anymore."

27          25.     Defendant Celestron Acquisition, LLC ("Celestron") is the largest importer and

28  seller of telescopes in the U.S. and abroad.  It is headquartered in Torrance, California, and it

imports and sells telescopes in this District.  It is a wholly owned subsidiary of Synta Technology, and like all Synta entities, it is controlled by Chairman Shen.  During the Class Period, Celestron— directly and/or through its subsidiaries including Celestron Global, which it wholly owned and/or controlled—manufactured, marketed, and/or sold telescopes at prices that were unlawfully inflated as a result of the anticompetitive conspiracy alleged herein, and that were sold and purchased throughout the United States, including in this District.

26.     Defendant SW Technology Corporation ("SW Technology") is a Delaware corporation.  Upon information and belief, it is a wholly owned subsidiary of Synta Technology. Chairman Shen and his family members created it in 2005 to acquire Celestron, and they continue to operate it as a holding company.  During the Class Period, SW Technology—directly and/or through its subsidiaries, which it wholly owned and/or controlled—manufactured, marketed, and/or sold telescopes for which its parent company and beneficial ownership had fixed prices, divided the market, and undertaken the other anticompetitive acts alleged herein, and that were sold and purchased throughout the United States, including in this District, all in advancement of the anticompetitive conspiracy alleged herein.

27.     SW Technology acquired Celestron as a wholly owned subsidiary in 2005. Celestron issued a press release about the acquisition in which it stated that SW Technology is "an affiliate of Synta Technology Corporation" and referred by name to Chairman Shen.  Chairman Shen owns and controls Celestron through SW Technology.  Defendant Sylvia Shen is the CEO, CFO, and Secretary of SW Technology. Because SW Technology is owned and operated by Defendants Synta Technology, David Shen and Sylvia Shen, it is a member of the conspiracy and liable for its acts.  *Arandell Corp. v. Centerpoint Energy Servs., Inc.*, 900 F.3d 623, 631 (9th Cir. 2018) ("a subsidiary such as CES as a matter of law *cannot* innocently advance an anticompetitive scheme (here, by selling gas at prices rigged by Reliant and distributing the profits to Reliant) for a legitimate business purpose, while its parent and sister companies purposely advance the very same scheme (here, by rigging the prices upstream) for an illegal, anticompetitive purpose.").

28.     Defendant Synta Canada Int'l Enterprises Ltd. ("Synta Canada") is a Canadian company.  It is listed as a 20 percent owner of Suzhou Synta.  Upon information and belief, Synta

Canada is owned and/or controlled by Chairman Shen and his family members.  During the Class Period, Synta Canada—directly and/or through its subsidiaries, which it wholly owned and/or controlled—manufactured, marketed, and/or sold telescopes at prices that were unlawfully inflated as a result of the anticompetitive conspiracy alleged herein, and that were sold and purchased throughout the United States, including in this District. Because Synta Canada is owned and operated by Defendants Synta Technology, David Shen and Sylvia Shen, and owns Defendant Celestron Acquisition LLC, it is a member of the conspiracy and liable for its acts. *Arandell Corp. v. Centerpoint Energy Servs., Inc.*, 900 F.3d 623, 631 (9th Cir. 2018) ("a subsidiary such as CES as a matter of law *cannot* innocently advance an anticompetitive scheme (here, by selling gas at prices rigged by Reliant and distributing the profits to Reliant) for a legitimate business purpose, while its parent and sister companies purposely advance the very same scheme (here, by rigging the prices upstream) for an illegal, anticompetitive purpose."). Moreover, Synta Canada officers and owners Defendants Sylvia Shen and Jack Chen were aware of and approved Celestron's involvement in the unlawful acquisition of Meade, and participated in numerous meetings in California and at Meade's Mexico factory after the acquisition of Meade in which Chairman Ni, Chairman Shen, and other Celestron and Meade executives jointly planned the companies' activities and strategies, including their price-fixing and market division to develop a plan of cooperation between Meade, Synta Canada, Celestron, and the rest of the Synta family of businesses.  This plan included taking advantage of Meade's intellectual property in order to take over the U.S. telescope market through a new brand known as "SkyWatcher" for the benefit of Synta and Ningbo Sunny.

29.     Upon information and belief, Defendant Olivon Manufacturing Co. Ltd. ("Olivon Canada") is a company registered in British Columbia, Canada and headquartered in Richmond, British Columbia, Canada.  Defendant Jean Shen is its principal.  During the Class Period, Olivon Canada—directly and/or through its subsidiaries, which it wholly owned and/or controlled— manufactured, marketed, and/or sold telescopes at prices that were unlawfully inflated as a result of the anticompetitive conspiracy alleged herein, and that were sold and purchased throughout the United States, including in this District.  In specific, Jean Shen was aware of and took advantage of her brother Synta's price-fixing and market division by using her influence with her brother to sell

telescopes produced by Ningbo Sunny through her own companies, Olivon Canada and Olivon USA, LLC, for her own profit.  These activities included representing to telescope distributors that Synta's horizontal competitor and co-conspirator Ningbo Sunny Electronic Co., Ltd. was one of "my family's companies" in an effort to obtain bids from these distributors.  Jean Shen's sales activities on behalf of the conspirators were thus made with actual knowledge of the conspiracy and with the intent to advance its ends.  On information and belief, Jean Shen's and the Olivon Defendants' acts to advance the conspiracy were also repaid through preferential pricing from Ningbo Sunny and Synta beyond that afforded to other telescope distributors who were not members of the conspiracy.

30.     Defendant Olivon USA, LLC ("Olivon USA") is a company registered in Nevada and headquartered in Las Vegas, Nevada.  Defendant Jean Shen is its principal.  During the Class Period, Olivon USA, LLC—directly and/or through its subsidiaries, which it wholly owned and/or controlled—manufactured, marketed, and/or sold telescopes at prices that were unlawfully inflated as a result of the anticompetitive conspiracy alleged herein, and that were sold and purchased throughout the United States, including in this District.  In specific, Jean Shen was aware of and took advantage of her brother Synta's price-fixing and market division by using her influence with her brother to sell telescopes produced by Ningbo Sunny through her own companies, Olivon Canada and Olivon USA, for her own profit. These activities included representing to telescope distributors that Synta's horizontal competitor and co-conspirator Ningbo Sunny Electronic Co., Ltd. was one of "my family's companies" in an effort to obtain bids from these distributors.  Jean Shen's sales activities on behalf of the conspirators were thus made with actual knowledge of the conspiracy and with the intent to advance its ends.  On information and belief, Jean Shen's and the Olivon Defendants' acts to advance the conspiracy were also repaid through preferential pricing from Ningbo Sunny and Synta beyond that afforded to other telescope distributors who were not members of the conspiracy.

31.     Defendant Pacific Telescope Corp. ("Pacific Telescope") is a company registered in British Columbia, Canada.  Defendant Sylvia Shen is its principal.  During the Class Period, Pacific Telescope—directly and/or through its subsidiaries, which it wholly owned and/or controlled—

manufactured, marketed, and/or sold telescopes at prices that were unlawfully inflated as a result of the anticompetitive conspiracy alleged herein, and that were sold and purchased throughout the United States, including in this District. Moreover, Pacific Telescope officers and owners Defendants Sylvia Shen and Jack Chen were aware of and approved Celestron's involvement in the unlawful acquisition of Meade, and participated in numerous meetings after the acquisition of Meade in which Chairman Ni, Chairman Shen, and other Celestron and Meade executives jointly planned the companies' activities and strategies, including their price-fixing and market division. Chairman Ni and his right-hand man Hank Qi continued to exchange correspondence with Chairman Shen and Defendant Chen to develop a plan of cooperation between Meade, Synta Canada, Celestron, and the rest of the Synta family of businesses. This plan included taking advantage of Meade's intellectual property in order to take over the U.S. telescope market through a new brand known as "SkyWatcher" for the benefit of Synta and Ningbo Sunny. Pacific Telescope personnel, including Defendant Jack Chen, Defendant Sylvia Shen, and Frank Liu, all conspired with their ostensibly horizontal competitor Meade regarding SkyWatcher products.

32.     Defendant Joseph Lupica is the former CEO of Celestron. He subsequently became the CEO of Celestron's horizontal competitor Meade as the result of a conspiracy engineered by Chairman Shen and Defendants' co-conspirators. Defendant Lupica lives in Palm Springs, California. Defendant Lupica participated in, planned, and carried out the conspiracy detailed below. For example, Defendant Huen was aware of Ningbo Sunny's efforts to purchase Meade before Ningbo Sunny submitted a bid, a fact that was disclosed in a filing with federal securities regulators.



**Joe Lupica**
- Ex-CEO of Meade
- Ex-CEO Celestron

33.    Defendant Dave Anderson is the former CEO of Celestron.  Defendant Anderson lives in or near Minneapolis, Minnesota.  Defendant Anderson participated in, planned, and carried out the conspiracy detailed below.

34.    Defendant Corey Lee is the CEO of Celestron, and lives in California.  Defendant Lee participated in, planned, and carried out the conspiracy detailed below.

35.    Defendant Laurence Huen is a board member of Celestron and a close advisor and confidante to Defendant Shen.  On information and belief, Defendant Huen resides in British Columbia, Canada.  Defendant Huen participated in, planned, and carried out the conspiracy detailed below.  As a member of Celestron's executive team, at all relevant times, Laurence Huen, in collusion with David Shen, Sylvia Shen, and Jack Chen, controlled strategic business decisions for Defendant Celestron, including all of the anticompetitive activities, price fixing, market allocation, retaliation,



**Dave Anderson**
Ex-CEO of Celestron



**Laurence Huen**
Advisor to David Shen /
Synta

and conspiracy to monopolize alleged herein.  For example, Defendant Huen was aware of Ningbo Sunny's efforts to purchase Meade before Ningbo Sunny submitted a bid, a fact that was disclosed in a filing with federal securities regulators.  Defendant Huen authorized, approved, and ratified Celestron's involvement in the unlawful acquisition of Meade, and was on the email chain between Ningbo Sunny and Synta and Celestron personnel in which Peter Ni stated that "to prevent JOC to buy MEADE, we decided to purchase MEADE by sunny after discussion. But the premise of this case is CELESTRON/SYNTA should be provided the financial support to SUNNY." Defendant Huen participated in numerous meetings after the acquisition of Meade in which Chairman Ni, Chairman Shen, and other Celestron and Meade executives jointly planned the companies' activities and strategies, including their price-fixing and market division. This plan included taking advantage of Meade's intellectual property in order to take over the U.S. telescope market through a new brand known as "SkyWatcher" for the benefit of Synta and Ningbo Sunny.

36.     Upon information and belief, Defendants SW Technology, Synta Canada, Olivon Canada, Olivon USA, Celestron, and Synta Technology Corp., are part of a network of Synta entities directly and indirectly owned and controlled by Chairman Shen and his family members. They are operated and run for the common benefit of one another and Chairman Shen and have aided, encouraged, and cooperated with Defendants and their co-conspirators to fix the prices of telescopes, and dominate and allocate the markets for telescope manufacturing and distribution. Upon information and belief, there is no reasonable or legitimate business purpose for the proliferation of Synta-related holding companies and shell corporations.  Upon information and belief, they are designed to hide assets, obscure ownership, and divert assets and shift capital away from the People's Republic of China on behalf of their co-conspirators who are based in China. Because these Defendants are owned and/or controlled by Defendants Synta Technology, David Shen and Sylvia Shen, they are members of the conspiracy and liable for its acts.  *Arandell Corp. v. Centerpoint Energy Servs., Inc.*, 900 F.3d 623, 631 (9th Cir. 2018) ("a subsidiary such as CES as a matter of law *cannot* innocently advance an anticompetitive scheme (here, by selling gas at prices rigged by Reliant and distributing the profits to Reliant) for a legitimate business purpose, while its parent and sister companies purposely advance the very same scheme (here, by rigging the prices upstream) for an illegal, anticompetitive purpose.").

## C.    The Ningbo Sunny/Meade Co-Conspirators

37.     The Ningbo Sunny/Meade Co-Conspirators are a group of related entities controlled by Wenjun ("Peter") Ni.

38.     Defendant Ningbo Sunny Electronic Co., Ltd. is a company located in Yuyao, Zhejiang, China.  During the Class Period, Ningbo Sunny has exported and sold telescopes into this District through its U.S. subsidiary, Meade Instruments Corp. ("Meade"), through Celestron, and through other U.S. distributors.

39.     Meade Instruments Corporation is a wholly-owned U.S. subsidiary of Ningbo Sunny.  Meade is located in Irvine, California, and has sold telescopes in this District during the relevant time period, when it was owned and controlled by Ningbo Sunny. Meade is no longer a

1   member of the conspiracy by virtue of its bankruptcy and subsequent sale of substantially all of its

2   assets.

3       40.    Peter ("Wenjun") Ni is the founder, owner,

4   and chief executive of Ningbo Sunny.  On information and

5   belief, Mr. Ni directly or indirectly owns and/or controls

6   each of the Ningbo Sunny entities detailed below.  Mr. Ni

7   coordinated, led, entered, and/or authorized the collusive

8   agreements at issue between Defendants and the Synta co-

9   conspirators and Ningbo Sunny, described herein, including

10  without limitation:  to jointly fix prices offered to

11  distributors, to jointly restrict and set distributors' trade and

12  credit terms, and to block competitors from purchasing



Peter (Wenjun) Ni
Founder/Owner/CEO of
Ningbo Sunny & Meade

13  Meade by orchestrating the acquisition of Meade using the Synta Defendants' support and

14  assistance to coordinate its pricing, sales, and manufacturing practices with Synta and Celestron to

15  effectively monopolize the U.S. market.

16      41.    Defendant Ningbo Sunny is an affiliate of a publicly traded company on the Hong

17  Kong stock exchange, Sunny Optical Technology Group Co., Ltd. ("Sunny Optical Group").

18  Sunny Optical Group's director and ultimate controlling shareholder Wang Wenjian is the uncle of

19  Chairman Ni.

20      42.    Chairman Ni helped fund the Meade acquisition and executed the acquisition

21  agreement under U.S. law.

22      43.    The Ningbo Sunny/Meade Co-Conspirators are controlled by Chairman Ni.

23  Through Chairman Ni and other agents, the Ningbo Sunny/Meade Co-Conspirators conspired with

24  one another and with their competitors, the Synta/Celestron Defendants and co-conspirators, to

25  engage in the acts and omissions alleged herein.  Each Defendant acted with knowledge of the

26  conspiracy and worked with each other and unknown third parties to accomplish their objective.

27  Each Defendant acted as the principal, agent, and/or joint venturer of, and on behalf of the other

28  Defendants, regarding the acts, violations, and common course of conduct alleged herein.

44.     DOES 1-25 participated as co-conspirators in the violations alleged herein and performed acts and made statements in furtherance thereof.  Each of the Defendants actively conspired with one another and are liable for each other's acts and omissions alleged herein.  Each Defendant acted with knowledge of the conspiracy to monopolize the market for telescopes and worked with each other and unknown third parties to accomplish their objective.  Each Defendant acted as the principal, agent, and/or joint venturer of, and on behalf of, the other Defendants, regarding the acts, violations, and common course of conduct alleged herein.

45.     DOES 26-50 worked with Defendant Shen, Defendant Huen, Defendant Lupica and Defendant Anderson, and aided and abetted the unlawful Meade acquisition and other unlawful and anticompetitive conduct set forth herein.

46.     Each Defendant headquartered outside the United States relied upon its domestic agents, employees, and affiliates, and co-conspirators including without limitation Celestron, SW Technology, Sunny Optics, and Meade to help implement and conceal the anticompetitive activities alleged herein, including the conspiracy to fix prices, divide, and dominate the market discussed below.

47.     The agency relationships formed among the Defendants with respect to the acts, violations, and common course of conduct alleged herein were consensually formed.  Defendants' agents acted in the United States and abroad within the scope of their agency relationship with their own principals, under the control and explicit authority, implied authority, or apparent authority of their principals.  Accordingly, the Defendant principals are liable for the acts of their agents.  Likewise, the Defendant agents are liable for the acts of their principals conducted by the agents within the scope of their explicit, implied, or apparent authority.

48.     On information and belief, Defendants, and each of their co-conspirators identified above, conspired together to commit the antitrust violations set forth in this complaint, aided and abetted one another, and acted in concert with one another.  Defendants conspired with one another and their co-conspirators to engage in the acts and omissions alleged herein.  Each Defendant acted with knowledge of the conspiracy and worked with each other and unknown third parties to accomplish their objective.  Each Defendant acted as the principal, agent or joint venturer of, and

FOURTH AMENDED COMPLAINT

on behalf of the other Defendants, regarding the acts, violations, and common course of conduct alleged herein.

49.     Various persons, partnerships, sole proprietors, firms, corporations, companies, and individuals not named as defendants in this lawsuit, and individuals, the identities of which are presently unknown have participated as co-conspirators with Defendants in the offenses alleged in this Complaint and have performed acts and made statements in furtherance of the conspiracy or the anticompetitive conduct.  The co-conspirators committed overt acts and communicated with others in the conspiracy to restrain, restrict, exclude, and foreclose competition in the telescope market (*see infra*) in every state and territory of the United States.  Celestron is headquartered in California.  Ningbo Sunny's and Synta's conduct in California, and related conduct occurring in every other state and territory, substantially affected and continues to affect a substantial amount of trade and commerce and has injured consumers in every state and territory of the United States.

50.     Whenever in this Complaint reference is made to any act, deed, or transaction of any corporation, limited liability entity, or company, the allegation means that the corporation, limited liability entity, or company engaged in the act, deed, or transaction by or through its officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of the business or affairs of the corporation, limited liability entity, or company.

**D.     Defendants' Corporate Families Acted as Single Enterprises, and Defendant Parent Companies Exercised Substantial Control over Their U.S. Affiliates**

51.     When Defendants reached agreement on fixing or stabilizing prices, rigging bids, or allocating the market of telescopes—whether as a result of formal or informal meetings or discussions arranged to implement or enforce cartel purposes and agreements—Defendants and Co-Conspirators meant for their collusive agreements to impact the pricing for all telescopes subject to the cartel's anticompetitive efforts regardless of where they were sold.

52.     As part of a single, integrated, global enterprise, Defendants and Co-Conspirators manufacture, market, and/or sell telescopes.  They sell their telescopes around the world, including in the United States.  Accordingly, to achieve the cartel's anticompetitive aims, Defendants and

1   Co-Conspirators effectuated the cartel by establishing pricing and allocating the market in which

2   they compete.

3       53.     Foreign-based Defendants and Co-Conspirators established United States (and other

4   North American) subsidiaries not only to market and sell their telescopes in the United States but

5   also to effectuate and achieve the cartel's aims and purposes.  Without doing so, these corporate

6   entities would have had to perform such functions themselves.  These corporate entities chose not

7   to do so and instead established corporate subsidiaries and affiliates that perform functions at the

8   direction of and are controlled by their officers in China.

9       54.     These United States (and other North American) subsidiaries have no authority to

10  set prices below the prices for telescopes agreed to among the cartel's members.  For these

11  subsidiaries, pricing authority largely was held by their Chinese corporate parent or affiliate.

12      55.     Because their foreign-based corporate parent or affiliate had significant control over

13  all aspects of their business (e.g., type of telescopes, prices, supply, business strategy, customer

14  development and relations, sales, personnel decisions), the United States (and other North

15  American) subsidiaries operated as little more than distribution and sales units of their foreign-

16  based corporate parents or affiliates.  Indeed, the foreign-based corporate parent and affiliates

17  named their own family members as employees and officers of their United States subsidiaries.  As

18  a result, the United States (and other North American) subsidiaries were—as intended—able to

19  advance the cartel aims in the United States.

20      **E.     Defendants' High-Level Employees Organized the Conspiracy, and Their
         Subordinate Employees—Including Those of Their U.S. Subsidiaries—
21       Executed the Conspiracy**

22      56.     Defendants and Co-Conspirators organized the telescope conspiracy at a high-level

23  within their respective corporate families.  Both executives and subordinate employees carried out

24  the conspiracy.  Additionally, given the nature of the industry, the subsidiaries and affiliates

25  implemented the conspiratorial agreements within their respective corporate families.

26      57.     Each of the corporate families alleged herein (i.e., Synta and Ningbo Sunny)

27  operates not as separate corporate entities but as a single enterprise.  Each corporate family holds

28  itself out to the public as a single, integrated enterprise.  Each of the parent and/or foreign entities

named in this case operate a hierarchical corporate structure wherein it treats subsidiaries not as separate corporate entities under their own control but as mere divisions of the corporate parent.

58.    Each corporate parent alleged herein also coordinates and manages the finances and meetings among officers from each of the different subsidiaries to facilitate an integrated enterprise to link the various supply chains to the corporate families' clients.  The parent defendants dominate and control the finances, policies, and business practices of their various subsidiaries, including the United States subsidiaries.

59.    In light of the fact that the United States subsidiaries named in this Complaint were treated as mere distribution and sales units of the Chinese parent or foreign affiliate, they were generally kept informed about the competitor meetings and discussions occurring abroad and were not permitted to undercut the pricing and market allocation agreements reached during those meetings and discussions.

60.    By virtue of their integrated enterprises, and by virtue of the other allegations in this complaint, each Defendant and Co-Conspirator entered into the conspiracy alleged herein on behalf of, and reported these meetings and discussions to, its respective corporate family and United States subsidiaries.  In fact, Chinese-based parents and affiliates often provided pricing instructions to their United States subsidiaries, which acted as their distribution and sales arms in the United States.

**F.    Defendants and Co-Conspirators Who Engaged in Collusive Conduct Participated in Discussions on Behalf of Entire Corporate Families and Failed to Distinguish Between Corporate Entities in the Same Corporate Family**

61.    In meetings and discussions between Defendants and Co-Conspirators in furtherance of the telescope conspiracy (*see infra*), Plaintiffs allege generally which corporate family was represented in a particular meeting or communications.  The individual participants in the conspiratorial meetings and discussions did not distinguish among entities within a particular corporate family, referring to themselves or others, for example, merely as "Synta," "Celestron," or "Sunny."  Indeed, the officers from Defendants appear to have attended the conspiratorial meetings on behalf of their entire corporate families, including their respective United States' subsidiaries.  Further, because of their generic uses of Defendants and Co-Conspirators' names, individual

participants in the conspiratorial meetings and discussions did not always know the specific corporate affiliation of their counterparts nor did they distinguish among entities within the respective corporate families.  Participants in the conspiratorial meetings entered into agreements on behalf of, and reported these meetings and discussions to their respective corporate families and United States affiliates.  As a result, the entire corporate family was represented in meetings and discussions by its agents and was party to the agreements reached in those meetings.

62.     For example, in an email from Peter Ni to Celestron's former CEO, Dave Anderson, and Celestron's board members, Laurence Huen, Mr. Chen and Ms. Sylvia Shen, Mr. Ni wrote "But the premise of this case is CELESTRON/SYNTA should be provided the financial support to SUNNY" and "[a]t present, Meade has already started to borrow money from East West Bank by offering guarantees from sunny."  *See infra.*

63.     Similarly, Meade's then Vice-President of Sales Victor Aniceto wrote to then-Meade CEO Joe Lupica, "Mr. Ni. . . . doesn't want to disrupt Synta business.  However, this promo will not be disruptive to Celestron business."  *See infra.*

64.     Additionally, former CEO of Celestron and Meade, Joe Lupica, wrote in an email to Sunny Optics and Meade, "On the other hand if we take advantage of the strong relationships among Ningbo Sunny, Synta, Celestron and Meade (under Peter's ownership) ***we can quickly turn the company around and the four companies can dominate the telescope industry***" (emphasis supplied).  Further revealing the interrelatedness of Ningbo Sunny and its affiliates is the manner in which invoices were paid.  For example, Sunny Optical's financial statements reflect Meade paying invoices issued by the law firm which represented Ningbo Sunny in the acquisition of Meade.

65.     Further, Defendants and Co-Conspirators knew the individuals at the conspiratorial meetings represented their entire respective corporate family; otherwise, Defendants and Co-Conspirators would not have entered into the agreements if affiliates could simply undercut the agreements reached.

**G. The Nature of the Telescope Industry Required Foreign Companies Named As Defendants and Co-Conspirators Herein to Use Their United States Subsidiaries and Affiliates As Distribution and Sales Arms**

66. Defendants and Co-Conspirators' United States subsidiaries are wholly owned and/or controlled by their foreign parents or affiliates. As part of each Defendant's global enterprise, its United States subsidiary or affiliate assists the foreign parent or affiliate with the distribution and/or sale of telescopes to consumers in the United States. In most cases, the United States subsidiaries carry out the distribution and/or sales of telescopes to customers in the United States after obtaining telescopes manufactured at the foreign parent or affiliate's factories located abroad. Generally, United States' subsidiaries facilitate direct purchaser orders for telescopes with parents or affiliates overseas. That is, the foreign parent or affiliate manufactures telescopes abroad and sends the telescopes directly to the United States, often through its United States (or other North American) subsidiaries or affiliates. Indeed, the foreign parents and affiliates make millions—if not, billions—of dollars of "sales" annually to their United States' (and other North American) subsidiaries and affiliates as part of their global business.

67. In sum, the foreign-based Defendants and Co-Conspirators sell directly to the United States and operates their telescope business as a single global enterprise with their subsidiaries and affiliates in the United States and North America generally.

## FACTS

**A. Consumer Telescopes**

68. Astronomy is a popular hobby for many Americans. The worldwide market for consumer astronomical telescopes (as opposed to the advanced telescopes used at universities and observatories) generates approximately $250–$500 million in telescope sales annually. The U.S. is one of the largest markets for consumer telescopes in the world, if not the largest.

69. Telescopes have two main optical components: the *objective*, the primary lens or mirror that collects and focuses the light into an image, and the *eye lens*, which is placed near the focal point of the objective to magnify its image. In a *refracting* telescope, the objective is composed of concave lenses; in a *reflecting* telescope, it is one or more concave mirrors.

FOURTH AMENDED COMPLAINT

70.     In addition to optical components, telescopes have mounts that enable the user to move the telescope.  Some telescopes employ motorized mounts and software that can automatically move the telescope to point at objects in the sky.

71.     Over 80% of all recreational telescopes sold in the U.S. market are made by either Ningbo Sunny or Synta.

72.     By working in concert with their competitors, Defendants have dominated telescope sales in the U.S.

**B.    The Telescope Market**

73.     There are two relevant markets in this action.  The first is for consumer telescope and telescope accessory manufacturing for import into the United States (the "Manufacturing Market").  The geographic scope of this market is global.  The Synta/Celestron Defendants and co-conspirators and the Ningbo Sunny/Meade Co-Conspirators together control over 80 percent of that market.

74.     Synta and Ningbo Sunny are each capable of manufacturing all types of consumer telescopes.  Generally, however, Synta manufactures only higher-end products, while Ningbo Sunny manufactures only lower-end models.  Synta will not manufacture or offer to quote a competitive price on products offered by Ningbo Sunny, and vice versa.

75.     This arrangement is no accident:  It is the result of a long-standing agreement between the two, memorialized in dozens of emails.

76.     As a result of their unlawful agreement not to compete, both Synta and Ningbo Sunny can, and do, charge supracompetitive prices, restrict supply, and engage in other unlawful, monopolistic conduct.

77.     The second relevant market in this action is a downstream market from the Manufacturing Market.  It is the market for consumer telescope distribution (the "Distribution Market").  The geographic scope of this market is the United States.

78.     In 2005, Synta acquired Celestron.  Through Defendants' and their co-conspirators' efforts, Celestron became the dominant U.S. telescope distributor.  Then, as detailed below, Ningbo Sunny acquired Meade with Celestron's and Synta's help.  Synta and Ningbo Sunny sell their

telescopes to distributors through distributor brands, including their wholly owned subsidiaries Celestron and Meade, which then sell the telescopes through stores, dealers, and the internet to astronomy enthusiasts in the U.S.  Together, Celestron and Meade account for the vast majority of consumer telescopes sold in the United States.

79.    Telescope distribution was not historically this concentrated.  But Synta and Ningbo Sunny transformed the market through their stranglehold over the Manufacturing Market.  Working together, they have prevented competitors from entering the market and have thereby ensured that they are the only meaningful sources of telescopes for U.S. telescope distributors – and, ultimately, for consumers.

80.    Synta and Ningbo Sunny conspired and leveraged their market power in the Manufacturing Market to control the Distribution Market.  As a result, Celestron rose to prominence over other distributors.  When Ningbo Sunny, aided by Celestron and Synta, acquired Meade, they took an independent supplier/distributor/competitor out of the market.  Meade has not seriously competed with Celestron since the Ningbo Sunny acquisition and has not used its manufacturing capabilities to diversify the supply of telescopes.

81.    Synta and Ningbo Sunny consolidated their subsidiaries' control of the Distribution Market by fixing prices and engaging in anticompetitive conduct.  In specific, Synta and Ningbo Sunny would offer supply to Celestron at prices far below those offered to independent distributors and with far better credit terms, thereby raising telescope prices throughout the Distribution Market.  With no other meaningful sources of supply, Plaintiffs and the Class had no choice but to pay the elevated prices caused by Defendants and their co-conspirators' unlawful collusion.

82.    Because of their respective market shares, agreements not to compete, and significant barriers to entry, Synta and Ningbo Sunny have an effective monopoly over the respective products each sells to distributors.

83.    Defendants' ability to control prices, influence output, and charge supracompetitive rates is likely to last for years because significant barriers to entry exist.  These barriers to entry arise from unique market conditions, including the history of collusion among Defendants.

84.     First, telescope manufacturing has high capital investment costs, and the two key manufacturers (Synta and Ningbo Sunny) are vertically integrated with the largest distributors. Given the size of the market, there are not enough independent distributors to make building an independent manufacturing facility profitable.

85.     Second, telescope manufacturing requires key intellectual property rights. One important example is a portfolio of patents on software to automatically find celestial objects, which beginning users demand. Meade invented that software and originally owned the patents on it. But Defendants and Ningbo Sunny colluded to acquire Meade, specifically to block a small manufacturer that might have been a competitor from acquiring this vital IP.

86.     No new manufacturers of any significance have entered the market in at least the last 10 years. With Ningbo Sunny's acquisition of Meade, which also had manufacturing capabilities, the number of sources of supply essentially diminished to two: Synta and Ningbo Sunny.

87.     Synta and Ningbo Sunny have, on information and belief, restricted supply and charged monopoly prices because they have agreed to divide the supply market between themselves to eliminate any competition. Moreover, demand is inelastic for telescopes and telescope manufacturing. Because there are few or no substitutes for Defendants' manufacturing services and products, distributors and consumers have little choice but to pay higher prices.

**H.     Defendants' Anticompetitive Conduct**

88.     Defendants conspired with their co-conspirators to fix the prices of telescopes, to allocate the manufacturing and sales of telescopes, to unlawfully acquire assets, and to dominate and monopolize telescope supply and distribution.

89.     The anticompetitive acts include, without limitation:

a.     Fixing the prices of telescopes and dividing the market;

b.     Helping Ningbo Sunny acquire and operate Celestron's horizontal competitor, Meade;

c.     Obtaining and sharing non-public, sensitive information with their co-conspirators, including information about Meade's intellectual property, business plans, and product pricing;

d.     Obtaining and sharing non-public, sensitive information about its competitors' businesses, including intellectual property, business plans, and product pricing with their co-conspirators; and

e.     Aiding and abetting their co-conspirators' coordinated action to maintain power.

90.     Through such activities, Synta and Ningbo Sunny – the only two major manufacturers of consumer telescopes – illegally combined and conspired with one another instead of competing against each other, and illegally helped Celestron dominate the Distribution Market. Each such activity, taken alone, represents an independent antitrust conspiracy. Together, they are overwhelming. *See Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*, No. 5:16-CV-06370-EJD, 2019 WL 1429631, at *3 (N.D. Cal. Mar. 29, 2019) ("[I]n cases such as this, plaintiffs should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each.") (quoting *Russell v. Nat'l Collegiate Athletic Ass'n*, 2012 WL 1747496, at *3 (N.D. Cal. May 16, 2012); *see also Church & Dwight Co. v. Mayer Labs.*, Inc., 2011 WL 1225912, at *16 (N.D. Cal. Apr. 1, 2011) (collecting cases and stating, "the Court considers the effects of [the defendant's] conduct in the aggregate, including, as appropriate, cumulative or synergistic effects."); *see also, e.g.*, *United States v. Container Corp.*, 393 U.S. 333, 337 (1969) ("The inferences are irresistible that the exchange of price information has had an anticompetitive effect in the industry, chilling the vigor of price competition."); *In re Static Random Access Memory (SRAM) Antitrust Litig.*, 580 F. Supp. 2d 896, 902 (N.D. Cal. 2008) ("The exchange of pricing information alone can be sufficient to establish the combination or conspiracy, the initial ingredient of a violation of § 1 of the Sherman Act") (quoting *Container Corp.*, 393 U.S. at 335); *In re Capacitors Antitrust Litig.*, 106 F. Supp. 3d 1051, 1067 (N.D. Cal. 2015) (allegations that two parties "conducted an exchange of competitively sensitive information" and agreed to exchange in the future is "enough to meet the *Twombly* pleading standard").

### 1.    The Conspiracy Begins in 2005

91.    At the time Chairman Shen acquired Celestron in 2005, he was an owner and officer of Synta's horizontal competitor Ningbo Sunny. Suzhou Synta and the other Synta companies began colluding with Ningbo Sunny to fix prices and unlawfully coordinate their anticompetitive activities. Synta employee Joyce Huang coordinated with David Shen, James Chiu, Ningbo Sunny and Synta personnel to ensure that the fixed prices were imposed by the respective conspirators on their customers.  In specific, from 2005 and forward Ningbo Sunny forced customers (other than Celestron) to purchase Ningbo Sunny goods through Ms. Huang—an employee of Ningbo Sunny's horizontal competitor Synta Tech., and who Chairman Ni testified answered to and was controlled by Chairman Shen.  This paradigm was a primary means by which Synta and Ningbo Sunny implemented their price-fixing regime.  For example, Ms. Huang directed Mr. Chiu of Ningbo Sunny to raise prices offered to a customer because "Suzhou[ Synta]'s price" was higher; Mr. Chiu then complied.

92.    Ms. Huang, Synta, and Ningbo Sunny concealed this portion of their conspiracy by concealing the fact that Ms. Huang was controlled by the broader Synta enterprise.  For example, Ms. Huang, Synta, and Ningbo Sunny publicly referred to Synta Tech. as "Good Advance," and would pretend that Good Advance was just a trading company with no connection with Synta rather than a company controlled by Chairman Shen and Synta.  Chairman Ni and Ningbo Sunny kept up this charade until trial in the *Orion* Action, when Chairman Ni finally admitted that Good Advance was controlled by David Shen and that Ms. Huang answered to Chairman Shen.

93.    Celestron claims that Ms. Huang destroyed all evidence relating to her and Synta Technology's role in the conspiracy in order to conceal the antitrust conspiracy at issue in this suit from litigation such as this one.  In specific, Synta Technology's counsel admitted that Synta Technology destroyed its documents because "the aggravation of having to deal with a potential lawsuit was the straw that broke the camel[']s back" and "the fact that they had faced a lawsuit in the United States, a potential lawsuit in the United States over that very business which they finally said this is just not worth the aggravation anymore."  On information and belief, these destroyed records evidenced the full extent of the price fixing and collusion among Chairmen David Shen's

companies, along with the companies run by his sisters Sylvia Shen and Jean Shen and Sylvia's husband Jack Chen (including Defendants Synta Canada, Pacific Telescope Corp, Olivon Canada, and Olivon USA.).

## 2. Defendants' Collusion to Acquire Meade

94.    For many years, Meade was the leading U.S. telescope brand.  It had a manufacturing facility in Mexico, where it had the ability to manufacture high- and low-end products.  It also owned significant patents, including patents for Goto technology, which uses computers and GPS to allow users to automatically direct their telescopes to celestial objects.  That capability is highly valued by hobbyists and amateur astronomers, especially beginners.  It was also the subject of substantial litigation between Defendant Celestron and Meade.

95.    The Federal Trade Commission blocked attempts by Celestron and Meade to merge in 1991 and 2002 because the mergers would have created monopolies and reduced competition.

96.    When Meade went up for sale in 2013, a small telescope manufacturer named Jinghua Optical ("JOC") submitted a bid to purchase it.  Although JOC was much smaller than Synta and Ningbo Sunny, it was a competitor of Synta and Ningbo Sunny.  If JOC had been able to complete the purchase, it would have gained key knowledge about how to make high-end products, as well as a patent portfolio with which to compete against Synta and Ningbo Sunny.  It also would have gained a brand to compete against Celestron in the Distribution Market.

97.    Because JOC's acquisition of Meade would have diversified manufacturing, preserved an independent distributor, and increased competition in the telescope industry, both Synta and Ningbo Sunny wanted to acquire Meade to keep it out of JOC's hands.

98.    However, the FTC had earlier blocked Celestron and Meade from merging. Because Synta owned Celestron, Synta too could not acquire Meade directly.  Instead, Chairman Shen made an agreement with Chairman Ni that if Ningbo Sunny would acquire Meade, Celestron and Synta would provide financial and other assistance to complete the purchase.

99.     Chairman Ni explained this plan in an email to Defendant Anderson (Celestron's then-CEO), and Celestron's Board members, Defendants Huen, Chen and Sylvia Shen, asking Celestron and Synta to continue providing financial support pursuant to their illegal agreement:

| | |
|---|---|
| **From:** | nbsunny <nbsunny@vip.sina.com> |
| **Sent:** | Friday, December 13, 2013 12:43 AM |
| **To:** | DAVE ANDERSON |
| **Cc:** | david shen; Laurence Huen; Jack chen; shentakuo1 |
| **Subject:** | Fw: Fw: Celestron Payments星特朗付款 |

Dear Dave,

Thanks for your email and supports!

At the end of June or beginning of July, I discussed with you about the case of purchasing meade in USA. To prevent JOC to buy MEADE, we decided to purchase MEADE by sunny after discussion. But the premise of this case is CELESTRON / SYNTA should be provided the financial support to SUNNY.

A copy of the email is attached as **Exhibit 2**.

100.     Before the acquisition took place, the Financial Industry Regulatory Authority (FINRA) opened an investigation into Ningbo Sunny.  Ningbo Sunny's disclosures to FINRA reveal the following timeline:

    a.     On May 17, 2013, JOC announced its plan to acquire Meade.

    b.     On May 23, 2013, Chairman Ni and Chairman Shen, along with Defendants Sylvia Shen, Joseph Lupica, and Dave Anderson, discussed Ningbo Sunny's possible purchase of Meade.

    c.     On June 11, 2013, Ningbo Sunny submitted its bid to purchase Meade.

    d.     Five days later, Chairman Ni emailed Celestron Board member Defendant Huen, asking Celestron to pay $2,000,000 for the transaction, a copy of which is attached as **Exhibit 3**.

101.     Celestron sent Ningbo Sunny the requested amount, as well as other sums, to fund its purchase of Meade.

102.     Documents and testimony from the Orion Litigation reveal that in addition to financially supporting the transaction, Synta and Celestron, with the help of Defendants Anderson

FOURTH AMENDED COMPLAINT

1  and Lupica (who were working for Celestron at the time) were actively involved in setting up the

2  deal structure, assisting with due diligence, and negotiations.

3       103.    Ningbo Sunny was represented in the Meade transaction by the law firm Sheppard,

4  Mullin, Richter & Hampton, LLP.  According to the terms of the engagement letter, however,

5  Sheppard Mullin was required to take instructions from Ningbo Sunny's horizontal competitor

6  Chairman Shen and his employees, including Celestron executives Defendants Lupica and

7  Anderson.  Defendants Lupica and Anderson worked with Sheppard Mullin to help structure and

8  negotiate the transaction and to keep Chairmen Shen and Ni informed about its progress.  As stated

9  in Sheppard Mullin's engagement letter, a copy of which is attached as **Exhibit 4**:

---

SHEPPARD MULLIN RICHTER & HAMPTON LLP

Junef 6, 2013
Page 2

engagements for the Client that we may undertake.  You have advised us that you will obtain tax
advice regarding the Matter from a third party; accordingly, our firm will not be providing any
tax advice in connection with the Matter, including, without limitation, tax structuring or tax
consequences arising out of the Matter.  You have instructed us to take direction from and
communicate directly with your advisors, Dave Anderson (President of Celestron), Laurence
Huen, David Shen (head of Synta) and Joe Lupica.

---

17      104.    Chairmen Shen and Ni also agreed that Defendant Lupica, who was then CEO of

18  Celestron, would be transferred to Ningbo Sunny and that, once Ningbo Sunny had acquired

19  Meade, Defendant Lupica would become Meade's CEO.

20      105.    After the acquisition, Defendant Lupica became Meade's CEO.  He began replacing

21  Meade's management with officers from Celestron, including Celestron's Vice President of Sales,

22  co-conspirator Victor Aniceto, who was hired as the Vice President of Sales for Meade.  Later,

23  when Defendant Lupica retired, co-conspirator Aniceto was promoted to President of Meade.

24      106.    Celestron Board member Defendant Huen also assisted Defendant Lupica and acted

25  as a conduit of information between horizontal competitors Ningbo Sunny and Synta.

26      107.    Defendant Lupica has admitted that Ningbo Sunny could not have acquired Meade

27  but for the collusive assistance it received from its horizontal competitor Synta.

28

108.    After the Meade acquisition, Defendant Huen and Chairman Shen continued to provide advice and assistance to horizontal competitors Ningbo Sunny and Meade, met with Chairman Peter Ni about these issues, and toured Meade's facilities.  A copy of an email in which Defendant Huen instructs Ningbo Sunny to remove Meade's CEO and to replace him with Celestron's former CEO, Defendant Lupica, is attached as **Exhibit 5** at TX1303.002.

109.    Synta/Celestron made substantial payments and loans to Ningbo Sunny to facilitate the Meade acquisition.  These payments were documented, for example, in an accounting provided by Celestron's CFO, Paul Roth, a copy of which is attached as **Exhibit 6**.

110.    As part of their unlawful arrangement, Defendant Celestron took equity in its horizontal competitor Meade – which is memorialized in shadow books kept by Defendants' co-conspirators, a copy of which is attached as **Exhibit 7**.

111.    On November 26, 2019, a jury found that this acquisition, which was orchestrated and aided and abetted by Defendants, their co-conspirators and their agents, violated the antitrust laws.

### 3.    Defendants' Misrepresentation to the FTC

112.    The FTC began inquiring into whether Chairman Shen and Celestron were involved with the Meade acquisition.  In response, on August 22, 2013, Sheppard Mullin partner Robert Magelnicki represented to the FTC that "except for the limited advice to Peter Ni regarding how to acquire a U.S. company . . . , David Shen has no role in the proposed acquisition of Meade."  This email chain is attached as **Exhibit 8**.

113.    Mr. Magelnicki's statement to the government was false. As Peter Ni explained in **Exhibit 2**, prior to August 22, 2013, Chairman Ni and Chairman Shen had agreed that Chairman Shen and his companies – including Celestron – would provide financial support to Ningbo Sunny to assist in the acquisition, which they did:

| From: | nbsunny <nbsunny@vip.sina.com> |
|---|---|
| Sent: | Friday, December 13, 2013 12:43 AM |
| To: | DAVE ANDERSON |
| Cc: | david shen; Laurence Huen; Jack chen; shentakuo1 |
| Subject: | Fw: Fw: Celestron Payments星特朗付款 |

Dear Dave,

Thanks for your email and supports!

At the end of June or beginning of July, I discussed with you about the case of purchasing meade in USA. To prevent JOC to buy MEADE, we decided to purchase MEADE by sunny after discussion. But the premise of this case is CELESTRON / SYNTA should be provided the financial support to SUNNY.

114.    Moreover, as seen in **Exhibit 4**, Sheppard Mullin had been ordered to take instructions from Chairmen Shen and Synta/Celestron personnel regarding the Meade acquisition.

115.    The FTC was also concerned that Chairman Shen was previously a Ningbo Sunny shareholder.  To allay the FTC's concerns, Chairman Ni formed Sunny Optics, Inc., the entity used to acquire Meade, and became its sole shareholder.  Sheppard Mullin then represented to the FTC that Ningbo Sunny had nothing to do with the Meade acquisition.  Then, after the acquisition closed, Chairman Ni transferred his interest in Sunny Optics to Ningbo Sunny, for $1.

116.    The money used to fund the Meade acquisition came from a Hong Kong company jointly owned by Chairman Shen and Chairman Ni, named "Sky Rainbow."  This is another way that the conspirators' representations to the FTC that Chairman Shen was uninvolved in the Meade acquisition were false.

> **4.    Defendants' Sharing of Trade Secrets, Price Fixing, and Market Allocation**

117.    After the acquisition, Synta, Celestron, Ningbo Sunny, and Meade colluded not to compete with one another.  This conspiracy is revealed in numerous emails.  For example, an email

between the principals of Synta and Ningbo Sunny shows Chairman Shen asking Ningbo Sunny's

Chairman Peter Ni to work out what he calls a "tacit understanding" with Defendant Anderson

(Celestron's then-CEO) about not competing against Celestron for sales to Costco:



A full, translated copy of this email is attached as **Exhibit 9** at TX1769.003.

118.    As Chairman Shen explained in another email to Chairman Ni and Defendant

Anderson: "The best way in the future is to divide the products and sell them into different markets

to reduce conflicts."  A copy of that email is attached as **Exhibit 10**.

119.    At all relevant times, the goal of the co-conspirators' conduct was to ensure that

Celestron was able to dominate the U.S. market and keep their ill-gotten gains outside of mainland

China.  To do so, the co-conspirators agreed not to compete against Celestron.  As Meade's then

Vice-President of Sales Victor Aniceto explained the strategy to then-Meade CEO Defendant

Lupica, "Mr. Ni. . . . doesn't want to disrupt Synta business. However, this promo will not be

disruptive to Celestron business." A copy of this email is attached as **Exhibit 11**.

120.    As part of their pricing coordination efforts, Celestron's current CEO, Defendant

Corey Lee, worked with co-conspirators Synta and Ningbo Sunny to steal competitors' trade secret

sales and pricing information.

FOURTH AMENDED COMPLAINT

121.   Ningbo Sunny sells products to Celestron's competitors.  To assist Celestron, Ningbo Sunny provides Celestron with key business information on such customers' purchasing, such as information about the pricing of products, credit arrangement and order forecasts.  For example, in May 2015, James Chiu (Ningbo Sunny) provided detailed statistics for several recent years of Orion orders to Celestron's current CEO, Corey Lee:



A full, translated copy of this email chain is attached as **Exhibit 12**.

122.   In a deposition, Mr. Chiu admitted that the kind of information he shared with Celestron constituted trade secrets:

> Q. How about the volume of business that a customer does with Ningbo Sunny? Is that a trade secret, too?
>
> A. Certainly, that's also a trade secret.
>
> Q. How about even the fact that somebody is buying from Ningbo Sunny, is that a trade secret?
>
> A. I consider it a trade secret.

123.   Ningbo Sunny and Synta also share and fix prices.  In charging certain distributors, Synta and Ningbo Sunny negotiate together on how much to charge and then jointly fix the price.

FOURTH AMENDED COMPLAINT

For example, James Chiu of Ningbo Sunny and Joyce Huang of Synta discussed how Ningbo Sunny's prices should be higher.  This email is attached as **Exhibit 13**.

124.    Similarly, Ms. Huang of Synta wrote emails to Mr. Chiu of Ningbo Sunny informing him that Ningbo Sunny's "payment terms should be the same with Suzhou [Synta]," a direction with which Ningbo Sunny complied. This email is attached as **Exhibit 14**.

125.    Chairman Ni also has forwarded other Meade confidential information to Chairman Shen to assist with Synta's and Celestron's business.

126.    As a result of having no competition and by virtue of their unlawful agreements, Defendants have the ability to unilaterally set supracompetitive prices far above what they could command in a competitive market.

127.    Emails among Defendants and their co-conspirators show collusion on what products they will manufacture and distribute at both the manufacturing and distribution stage.  For example, emails written by Ningbo Sunny Vice Chairman James Chiu to Defendant Sylvia Shen discuss "how to avoid conflict with Celestron products" and state that "[i]f the customer visits our factory and confirms their intention to cooperate with us, we will consider the strategy of separation from Celestron products or adopt different product prices to protect Celestron." This email is attached as **Exhibit 15**.

128.    On other occasions, James Chiu of Ningbo Sunny explained to Chairman Shen of Synta that Ningbo Sunny "will take prompt action to avoid conflict in the astronomical market," including "abandoning the small OEM customers so as to protect big customers." This email is attached as **Exhibit 16**.

129.    In sum, as Defendant Shen explained in an email to Ningbo Sunny:  "Director Ni will not be a competitor and is trustworthy when it comes to business."  **Exhibit 9** at TX1769.001.

130.    Defendants coordinated and elevated their prices.  They sought to avoid conflict with each other's products and developed strategies to protect each other from competition.  As Defendant Lupica wrote, they did this to "dominate the telescope industry." A copy of this email is attached as **Exhibit 17**.

131.    Whenever any Defendants' and their co-conspirators' customers challenged the dominance of the conspiracy over the telescope market, Defendants used their market power to crush the opposition.  As Chairman Shen explained to Defendants and the Ningbo Sunny co-conspirators, "we do not need to wage a price war" because "[s]uspension of supply does not need any price wars.  We replace them."  A copy of this email is attached as **Exhibit 18**.

**I.      Defendants' Conduct Has Harmed Plaintiffs and Competition in the Relevant Market**

132.    As a result of Defendants' and their co-conspirators' conduct, the number of brands and consumer choices in telescopes has been reduced.

133.    Defendants' conduct has caused injury to both Plaintiffs and the relevant markets. Plaintiffs have been injured because they are paying supracompetitive, arbitrarily inflated prices for telescopes.  Additionally, as a direct result of such conduct, the distributor Plaintiffs are losing sales, goodwill, and market share.

134.    In telescope manufacturing, price competition has been restrained or eliminated, particularly, as alleged above, for products where Synta and Ningbo Sunny have agreed to divide the market between them.  As a result, output has been restricted, and the prices of telescopes have been fixed, raised, stabilized, or maintained at artificially inflated levels, and purchasers of telescopes, including Plaintiffs, have been deprived of free and open competition.  This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

135.    Ningbo Sunny's plan to similarly dismantle Meade's manufacturing capabilities, and the failure of any replacement suppliers to emerge, demonstrates that the barriers to entry into the supply market, combined with Defendants' anticompetitive conduct, have effectively foreclosed competition at the supply level.

136.    At the telescope-distribution level, price competition has been restrained or eliminated, particularly, as alleged above, for products where Defendants have agreed to divide the market between them.  Further, by fixing prices and credit terms so that distributor Plaintiffs always pay substantially more than Celestron, and by sharing distributor Plaintiffs' confidential

business information with Celestron, Defendants and their co-conspirators have prevented the distributor Plaintiffs from fairly competing against Celestron.

137.    Fueled by extremely high relative margins obtained through Defendants' and their co-conspirators' unlawful anticompetitive acts, Celestron now "dominates the telescope market"—just as Defendant Lupica foretold—and exercises monopoly power in the distribution market, particularly over distribution to major retailers such as Wal-Mart, Menards, and Costco.

138.    Competition, innovation, and consumer choice have also been restrained due to Ningbo Sunny's acquisition of Meade. Since Ningbo Sunny acquired Meade, Meade has not significantly competed with Celestron—to the contrary, Meade avoided doing so. Moreover, the acquisition of Meade prevented companies that are trying to compete against Defendants, such as JOC, from obtaining a potential manufacturing facility and important intellectual property that would have increased competition. The concentration of patents and other intellectual property within the conspiracy has made it impossible for new entrants to challenge the conspirators. And the conspiracy's dominance over both manufacturing and distribution makes the development of a new manufacturing facility unprofitable because there is insufficient demand to support a new factory without selling to Celestron.

139.    Ningbo Sunny and Synta have together controlled over 65% of the Manufacturing Market since 2012. In 2018, they controlled over 90%.

140.    As a result of the conduct alleged herein, Defendants have stifled competition, fixed, raised, stabilized, or maintained prices at artificially inflated levels, and deprived consumers of free and open competition. This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

141.    Through their domination of the supply chain and unlawful agreements, Defendants have effectively prevented new market entrants at the distribution level, and forced many distributors to go out of business, thereby continuing to inhibit and restrict competition.

**J.**   **Defendants' Conduct Has Substantially Impacted Commerce**

142.   Defendants' anticompetitive acts involved United States domestic commerce and import commerce, and have a direct, substantial, and foreseeable effect on interstate commerce by raising and fixing prices for telescopes and diminishing competition throughout the United States.

## CLASS ACTION ALLEGATIONS

143.   This action is brought on behalf of Plaintiffs and all similarly situated retailers, distributors, and individuals who purchased a telescope manufactured or sold by Defendants from Synta's acquisition of Celestron in 2005 through such time as class notice is given.

144.   **Numerosity**: The number of Class members is so large that the joinder of all its members is impracticable.  The exact number of Class members can be determined from information in the possession and control of the Defendants, but based on public records, the number of class members is in the thousands.

145.   **Typicality:** Plaintiffs' claims are typical of the claims of the members of the Class. Defendants artificially raised the prices and restrained trade, and thereby injured all members of the Class in substantially identical fashion.

146.   **Adequacy**:  Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs' interests are not antagonistic to or in conflict with the interests they seek to represent as Class representatives.

147.   Plaintiffs' counsel is experienced in prosecuting class actions, is committed to fair and robust competition, and intends to prosecute this action vigorously.

148.   **Existence of Predominance of Common Questions of Fact and Law:** Numerous common issues of law and fact exist and predominate over questions affecting only individual members.  These issues include, without limitation:

     a.     Whether Defendants combined and/or conspired to fix, raise, maintain, or stabilize prices of telescopes sold to purchasers in the United States at any time during the Class Period;

     b.     Whether Defendants concertedly fixed, raised, maintained, or stabilized prices of telescopes sold to purchasers in the United States at any time

1    during the Class Period, or committed other conduct in furtherance of the

2    conspiracy alleged herein;

3    c.    The duration and the extent of Defendants' conspiracy;

4    d.    Whether Defendants fraudulently concealed their conspiracy from telescope

5    distributors in the United States;

6    e.    Whether the actions of Defendants in so conspiring violated Section 1 of the

7    Sherman Act;

8    f.    Whether Defendants' conduct caused the prices of telescopes sold at any

9    time during the Class Period to purchasers in the United States to be

10    artificially fixed, raised, maintained, or stabilized at noncompetitive prices;

11    g.    Whether Plaintiffs and the other members of the Class were injured by

12    Defendants' conduct and, if so, the appropriate class-wide measure of

13    damages;

14    h.    Whether Plaintiffs and other members of the Class are entitled to, among

15    other things, injunctive relief, and, if so, the nature and extent of such relief;

16    i.    Whether further relief, including an independent monitor, is necessary to

17    prevent Defendants' ongoing violations of the laws detailed above; and

18    j.    Whether Defendants have acted or refused to act on grounds that apply

19    generally to the class, so that final injunctive relief is appropriate respecting

20    the class as a whole.

21    149.    These and other questions of law and fact are common to the Class and predominate

22 over any questions affecting the Class members individually.

23    150.    Absent certification of a class, the equitable relief sought by Plaintiffs will create the

24 possibility of inconsistent judgments and/or obligations among Defendants.

25    151.    **Superiority**: A class action is also superior to other available methods for the fair

26 and efficient adjudication of this controversy.  Requiring Class members to pursue their claims

27 individually would invite a host of separate suits, with concomitant duplication of costs, attorneys'

28 fees, and demands on judicial resources.  Furthermore, as the damages suffered by the individual

1  members of the Class may be relatively small, the expense and burden of individual litigation make

2  it impracticable for the members of the Class individually to seek redress of the wrongs perpetrated

3  by Defendants.  Plaintiffs know of no difficulty that could be encountered in the management of

4  this litigation that would preclude its maintenance as a class action.

5     **K.**  **Fraudulent Concealment**

6     152.  Plaintiffs have neither actual nor constructive knowledge of the pertinent facts

7  constituting their claims for relief asserted herein, despite their diligence in trying to discover such

8  facts.  Plaintiffs and Class members could not have discovered through the exercise of reasonable

9  diligence the existence of the conspiracy alleged herein until September 2019, when some evidence

10  revealing Defendants' secret conspiracy was first made public in the summary briefing in the Orion

11  Litigation.

12     153.  The members of the conspiracy affirmative acted on numerous occasions to conceal

13  their conspiracy and avoid having their unlawful acts revealed.  The conspirators falsely told the

14  FTC that Celestron, Synta, and David Shen were uninvolved in Ningbo Sunny's anticompetitive

15  and illegal acquisition of Meade. In fact, Ningbo Sunny's counsel Sheppard Mullin was directed to

16  take instructions from Synta and Celestron personnel, including Defendant Lupica, Defendant

17  Anderson, Defendant Huen, and David Shen. These Celestron and Synta personnel orchestrated the

18  illegal Meade deal behind the scenes.

19     154.  Later, when the FTC learned that David Shen owned part of Ningbo Sunny, the

20  conspirators told the FTC that Ningbo Sunny's CEO Peter Ni was the true purchaser of Meade

21  rather than Ningbo Sunny.  But after the deal closed and the scrutiny of federal antitrust regulators

22  faded, Peter Ni sold Meade to Ningbo Sunny for $1.

23     155.  The conspirators lied to the FTC to conceal their ongoing conspiracy from the U.S.

24  Government and its citizens, including Plaintiffs.

25     156.  After the Meade acquisition closed, Synta and Celestron directed millions of dollars

26  to Ningbo Sunny to finance its consolidation and control over Meade. Defendant Anderson (who

27  was President of Celestron at the time) wrote his co-conspirators emails explaining that this

28  arrangement could not be disclosed to Celestron's banking partners.

157.   The co-conspirators also intentionally and fraudulently concealed their conspiracy from the public by filing disclosures with the SEC relating to the Meade transaction that failed to disclose Chairman Shen, Synta, and Celestron's involvement and role in the Meade acquisition.

158.   In the aftermath of the Meade acquisition, the conspirators concealed their price-fixing and market division from the public, including Plaintiffs. The conspirators did not disclose that they were attending joint meetings to discuss business strategies and future plans. They did not disclose that Celestron's Defendant Lee and Ningbo Sunny were sharing trade secrets of non-conspirators with each other. They did not disclose that they were dividing markets between themselves or seeking to jointly dominate the telescope market. And they did not disclose that they were fixing prices to favor members of the conspiracy.

159.   Defendants engaged in a self-concealing conspiracy that did not give rise to facts that would put Plaintiffs or the Class on inquiry notice that there was a conspiracy among Defendants to artificially fix, raise, maintain, or stabilize prices for telescopes.  Defendants had secret discussions about price, market allocation, and preventing competitors from acquiring assets, and in furtherance of the conspiracy, they agreed not to discuss publicly the nature of the scheme, and put forth pretextual explanations about their pricing.

## CAUSES OF ACTION

### First Cause of Action
**Against All Defendants**
**Price Fixing, Credit Term Fixing, Market Allocation, Product Allocation, and Other
Unlawful Collusion Between Competitors
(Violation of the Sherman Act Section 1, 15 U.S.C. § 1)**

160.   Plaintiffs repeat and reallege the allegations of the Paragraphs above as if fully set forth herein.

161.   Section 1 of the Sherman Antitrust Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce."

162.   By engaging in the conduct described above, Defendants have knowingly and intentionally combined and conspired with their co-conspirators with the specific intent to unreasonably restrain trade in the market for consumer telescopes in the U.S.

163.     Defendants entered into a continuing combination or conspiracy to unreasonably restrain trade and commerce in violation of § 1 of the Sherman Act by artificially reducing or eliminating competition for the pricing of telescopes directly sold to United States purchasers; combining and conspiring to raise, fix, maintain, or stabilize the prices of telescopes sold to United States purchasers; fixing credit prices and terms; agreeing to divide the market between themselves to eliminate competition; selling telescopes to distributors in the United States at noncompetitive and artificial prices; and combining and conspiring to eliminate competition and solidify their monopoly power.

164.     Defendants further combined and conspired to unreasonably restrain trade and commerce in violation of § 1 of the Sherman Act by dividing distribution so as to eliminate competition with their co-conspirators; and by completing the merger between Ningbo Sunny and Meade with the intent and effect to lessen competition, control potentially competitive manufacturing capability, and create a monopoly.  The effect of that merger has already lessened competition, raised barriers to entry, and tended to create a monopoly in the market for telescopes in the U.S.

165.     Defendants' conduct has harmed competition in the U.S. for recreational telescopes by increasing the prices paid by telescope distributors, increasing the prices paid by consumers, reducing consumer choice, increasing barriers to entry, and stifling innovation.  Plaintiffs were and continue to be injured in fact by the conspiracies of Defendants.

166.     Plaintiffs have suffered an antitrust injury as a direct and proximate result of the combination and conspiracy between Defendants, and Defendants therefore are liable for treble damages, costs, and attorneys' fees in an amount to be proven at trial under Section 15 of the Clayton Act, 15 U.S.C. § 15.

**<u>Second Cause of Action</u>**
**Against All Defendants**
**Monopolization, Attempted Monopolization, and Conspiracy to Monopolize**
**(Violation of Sherman Act § 2, 15 U.S.C. § 2**
**and Clayton Act § 7, 15 U.S.C. § 18)**

167.     Plaintiffs repeat and reallege the allegations of the Paragraphs above as if fully set forth herein.

168.　Section 2 of the Sherman Antitrust Act prohibits any efforts to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations."

169.　Defendants have monopolized, attempted to monopolize, and/or conspired to monopolize the markets for telescopes in the United States.  By engaging in the conduct above, Defendants are willfully maintained and abused their market power to control distribution and price, and to prevent other market participants from acquiring competitive manufacturing potential.

170.　Defendants' willful conduct as described above has given them the ability to control prices and exclude competition.

171.　Defendants' willful conduct as described above has a dangerous probability of success in accomplishing its unlawful purpose of obtaining monopoly power.

172.　Defendants' conduct described above has caused Plaintiffs antitrust injury.

173.　As a result of Defendants' actions in violation of 15 U.S.C. § 2, Plaintiffs have been injured and continue to be injured in their business and property in an amount to be determined at trial, which amount is to be trebled in accordance with 15 U.S.C. § 15.

**Third Cause of Action**
**Against All Defendants**
**Unfair Competition**
**(Violation of Cal. Bus. & Prof. Code §§ 17200 *et seq.*)**

174.　Plaintiffs repeat and reallege the allegations of the Paragraphs above as if fully set forth herein.

175.　Defendants' conduct violates state law as described above and constitutes unfair, unlawful, and fraudulent competition against Plaintiffs.

176.　As a result of Defendants' unfair, unlawful, and fraudulent competition, Plaintiffs have lost money and customers, and continue to do so.

1
2
3
4

**Fourth Cause of Action**
**Against All Defendants**
**Price Fixing, Credit Term Fixing, Market Allocation, Product Allocation, Other Unlawful**
**Collusion Between Competitors, Monopolization, Attempted Monopolization, and**
**Conspiracy to Monopolize**
**(Violation of the Cartwright Act, Cal. Bus. & Prof. Code §§ 16700 *et seq.*)**

177.     Plaintiffs repeat and reallege the allegations of the Paragraphs above as if fully set forth herein.

178.     California's Cartwright Act prohibits any "combination of capital, skill or acts by two or more persons for" the purpose of restraining trade, including price maintenance.

179.     The conduct alleged above violates the Cartwright Act.

180.     Plaintiffs have suffered an antitrust injury as a direct and proximate result of the conspiracy between Defendants, and Defendants are therefore liable for treble damages, costs, attorneys' fees and punitive damages in an amount to be proven at trial.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that the Court issue the following relief:

A.     Equitable relief, including without limitation an injunction prohibiting Defendants' illegal practices;

B.     Compensatory damages;

C.     Treble damages;

D.     Restitution;

E.     Disgorgement of ill-gotten assets and property;

F.     Punitive Damages;

G.     Attorneys' fees and costs; and

H.     All such other and further relief as the Court may deem just, proper, and equitable.

Dated:  September 1, 2023                    Respectfully submitted,

                                            BRAUNHAGEY & BORDEN LLP


                                            By:   _/s/ Matthew Borden_
                                                     Matthew Borden

                                            Attorneys for Direct Purchaser Plaintiffs

1

## <u>DEMAND FOR JURY TRIAL</u>

2        Plaintiffs hereby demand a jury trial of all claims and causes of action triable before a jury.

3

4   Dated:  September 1, 2023                    Respectfully submitted,

5                                                 BRAUNHAGEY & BORDEN LLP

6
                                                  By:   _/s/ *Matthew Borden*_____
7                                                         Matthew Borden

8                                                 Attorneys for Direct Purchaser Plaintiffs

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FOURTH AMENDED COMPLAINT