United States District Court
Northern District of California

1
2
3
4

UNITED STATES DISTRICT COURT

5

NORTHERN DISTRICT OF CALIFORNIA

6

SAN JOSE DIVISION

7

| | |
|---|---|
| AURORA ASTRO PRODUCTS LLC, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>CELESTRON ACQUISITION, LLC, et al.,<br><br>Defendants. | Case No.  5:20-cv-03642-EJD<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS WITH LEAVE TO AMEND; DENYING MOTION TO STRIKE**<br><br>Re: ECF Nos. 206, 207 |

Pending before this Court is Defendants' motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) at ECF No. 206 and Defendants' motion to strike allegations in the complaint at ECF No. 207.  The Court took both motions under submission for decision without oral argument pursuant to Civil Local Rule 7-1(b).

For the reasons stated below, the Court **GRANTS IN PART AND DENIES IN PART** Defendants' motion to dismiss with leave to amend and **DENIES** Defendants' motion to strike.

## I.      BACKGROUND

### A.      Factual Background

This celestial antitrust action arises from the alleged inflation of telescope prices sold to U.S. telescope distributors and domination of the telescope market.

Plaintiffs Aurora Astro Products LLC ("Aurora") and Pioneer Cycling & Fitness, LLP ("Pioneer") are Washington and Minnesota independent distributors that sold telescopes in their retail stores.  Fourth Am. Compl. ("FAC"), ECF No. 495 ¶¶ 12–13.  Plaintiff Jason Steele is a resident of Texas who directly purchased a telescope from Defendant Celestron (collectively,

"Plaintiffs"). *Id.* ¶ 13. Plaintiffs bring this putative class action on behalf of themselves and a proposed class of direct purchaser plaintiffs ("DPPs") who purchased telescopes manufactured or sold by Defendants during the time period beginning in 2005 through such time as class notice is given. *Id.* ¶ 143. DPPs allege antitrust violations arising out of a conspiracy to unlawfully monopolize and fix prices in the telescope market against the following Defendant entities and individuals: (1) Synta Technology Corp. ("Synta"), (2) Suzhou Syntax Optical Technology Co., Ltd. ("Suzhou Synta"), (3) Nantong Schmidt Opto-Electrical Technology Co. Ltd. ("Nantong Schmidt"), (4) Synta Canada International Enterprises Ltd. ("Synta Canada"), (5) Pacific Telescope Corp. ("Pacific Telescope"), (6) Olivon Manufacturing Group Ltd. ("Olivon Manufacturing"), (7) SW Technology Corp. ("SW Technology"), (8) Celestron Acquisition, LLC ("Celestron"), (9) Olivon USA LLC ("Olivon USA"), (10) Dar Tson "David" Shen, (11) Joseph Lupica, (12) David Anderson, (13) Corey Lee, (14) Jean Shen, (15) Sylvia Shen, (16) Jack Chen, (17) Laurence Huen, and (18) Ningbo Sunny Electronic Co. Ltd., ("Ningbo Sunny") (collectively, "Defendants").[1]

The allegations concern two relevant markets in the telescope industry: manufacturers and distributors. *Id.* ¶¶ 73, 77. The geographic scope of the manufacturing market is global, and the geographic scope of the distribution market is the United States. *Id.* Celestron and Meade Instruments Corp. ("Meade") are U.S. telescope manufacturers and distributors. *Id.* ¶¶ 25, 39. Historically, Meade was the leading U.S. telescope brand. *Id.* ¶ 94. Celestron unsuccessfully attempted to merge with Meade in 1991 and, again, in 2002. *Id.* ¶ 95. The acquisitions were blocked by the FTC on antitrust grounds. *Id.* ¶¶ 95, 98–99. Then, in 2005, Synta acquired Celestron. *Id.* ¶ 78.

When Meade went up for sale in 2013, Synta recognized that it could not lawfully acquire Meade because it owed Meade's direct competitor Celestron. *Id.* ¶ 98. Instead, Ningbo Sunny's CEO, Peter Ni, and Synta's CEO, David Shen, agreed that Ningbo Sunny would purchase Meade

---

[1] Ningbo Sunny has not appeared in this action.

United States District Court
Northern District of California

with financial and other assistance from Synta.[2]  *Id.* ¶¶ 98–101, 104–05. This agreement prevented a small telescope manufacturer, Jinghua Optical, from purchasing Meade and competing with Synta and Ningbo Sunny.  *Id.* ¶¶ 96–97.  After the Meade acquisition, Celestron loaned substantial sums to horizontal competitor Ningbo Sunny.  *Id.* ¶¶ 101, 109.  In exchange for these capital contributions, Celestron took ownership interest in Meade, which was memorialized in Celestron's "shadow books."  *Id.* ¶ 110.

The Synta Entities and Ningbo Sunny Entities effectively divided the telescope market by agreeing that Synta would manufacture and supply higher-end telescopes, that Ningbo Sunny would manufacture and supply lower-end telescopes, and that they would not compete.  *Id.* ¶¶ 74–76.  Ningbo Sunny also provided Celestron with Meade's trade secrets and pricing information, allowed Celestron engineers to tour Meade's factory, and continued to coordinate business activities with Mr. Shen and his trusted counselor and Celestron Executive Committee member Laurence Huen.  *Id.* ¶¶ 106, 108, 117, 120–27.  As a result, Synta and Ningbo Sunny became the two key telescope manufacturers—both of which are vertically integrated with the largest telescope distributors and allegedly act as single enterprises exercising control over their U.S. subsidiaries and affiliates.  *Id.* ¶¶ 51–60, 84.

DPPs allege that Synta and Ningbo Sunny "transformed the [distribution] market through their stranglehold over the Manufacturing Market."  *Id.* ¶¶ 79.  According to DPPs, no new manufacturing competitors have entered the market within the last 10 years and independent distributors have been forced to pay higher prices for Synta and Ningbo Sunny's manufacturing services.  *Id.* ¶¶ 86–87.  Together, Synta and Ningbo Sunny eclipse all other telescope manufacturers, accounting for the production of approximately 80% of all consumer telescopes in the U.S.  *Id.* ¶¶ 3, 71.

Defendant David Shen, who owns and controls multiple telescope manufacturing and

---

[2] Meade is no longer a member of the conspiracy by virtue of its bankruptcy and subsequent sale of the majority of its assets.  FAC ¶ 39.

1    distribution companies, is at the center of the alleged conspiratorial universe. *Id.* ¶ 16.  Mr. Shen

2    founded and controlled Synta from 2001 to 2005, during which time he was also chairman of

3    Synta's horizontal competitor, Ningbo Sunny. *Id.* ¶¶ 17–18.  The Synta entities and the Ningbo

4    Sunny entities are vertically integrated corporate families that manufacture telescopes in China

5    and distribute, market, and sell those telescopes around the world, including in the U.S. *Id.* ¶ 52.

6    DPPs alleges that with their combined market power, these two corporate families have been able

7    to work together to dominate the telescope industry. *Id.* ¶ 72.

8            Mr. Shen allegedly exerts his control of the telescope industry through family and relatives

9    who own or control Synta entities and other market participants, including: Mr. Shen's sister,

10   Sylvia Shen, who owns Pacific Telescope, and her husband, Jack Chen, who are both members of

11   telescope manufacturer Celestron's executive committee; Jean Shen, Mr. Shen's sister, who

12   exercises control over Olivon Manufacturing, a Canadian telescope company with U.S.

13   subsidiaries; Suzhou Synta and Nantong Synta, telescope manufacturing companies in China

14   owned and controlled by Mr. Shen and his family; Synta Canada, which has 20% ownership of

15   Suzhou Synta and is controlled by the Shen family; and SW Technology, an affiliate of Synta that

16   is also owned and controlled by the Shen family and which acquired Celestron in 2005. *Id.* ¶¶ 19–

17   24, 26–28, 31.  According to DPPs, this constellation of family-controlled telescope manufacturers

18   enables Mr. Shen to market and sell telescopes at unlawfully inflated prices in the U.S. to

19   telescope distributors who are not participants in the conspiracy while offering co-conspirator

20   distributors preferential pricing.

21           On June 1, 2020, Plaintiffs initiated this action alleging violations of §§ 1 and 2 of the

22   Sherman Act and Clayton Act § 7, as well as state law violations arising under the Cartwright Act

23   and UCL.  DPPs allege price-fixing, market allocation, product allocation, and other unlawful

24   collusion between competitors as well as monopolization, attempted monopolization, and

25   conspiracy to monopolize. *See generally* FAC.  DPPs allege that at both the manufacturing and

26   distributions levels, price competition and open competition have been restrained for products

27

28

Case No.: 5:20-cv-03642-EJD
ORDER GRANTING IN PART & DEN. IN PART DEFS.' MOT. TO DISMISS WITH LEAVE
TO AMEND; DEN. MOT. TO STRIKE

United States District Court
Northern District of California

where Synta and Ningbo Sunny have agreed to divide the market between them beginning in 2005. *Id.* ¶¶ 134, 136. DPPs also allege that price competition has been harmed at the distribution level by Defendants' agreement to fix price and credit terms so that DPPs pays more than Celestron. *Id.* ¶ 136.

### B.    Procedural Background

The Court previously granted in part and denied in part Defendants' motion to dismiss the Second Amended Complaint ("SAC"), finding in relevant part that Plaintiffs Radio City and Spectrum Scientifics[3] failed to sufficiently allege: (1) Defendants SW Technology, Jack Chen, Pacific Telescope, Nantong Schmidt, Olivon Manufacturing, Olivon USA, Suzhou Synta, Jean Shen, and Synta Canada joined or participated in the alleged conspiracy; (2) Violation of the Sherman Act §§ 1and 2 prior to 2013; and (3) Violation of the Clayton Act § 7 prior to 2013. *See* Order Granting in Part and Den. In Part Defs.' Mot. to Dismiss; Granting in Part and Den. in Part Defs.' Mot. to Strike ("First Order"), ECF No. 173. DPPs were granted leave to amend to allege facts, if any, to support the alleged class period between 2005 and 2012, and to support a finding of liability as to the dismissed defendants. *See id.*

DPPs filed the Third Amended Complaint ("TAC") on August 31, 2021. Defendants moved to dismiss the TAC and strike certain allegations therein. ECF Nos. 206, 207. DPPs oppose the motion. *See* Mot. to Dismiss Third Am. Compl. ("Opp'n to Mot. to Dismiss"), ECF No. 217. While the motion was pending, DPPs moved for leave to file a Fourth Amended Complaint ("FAC") to add three proposed class representatives. ECF No. 402. DPPs and the new proposed class representatives agreed to allow Defendants' pending motions attacking the pleadings to apply to their claims to prevent any additional work or re-filing. The Court granted leave to amend (*see* ECF No. 486) and DPPs filed the FAC on September 1, 2023. *See* FAC, ECF No. 495. The Court construes Defendants' motion to dismiss the TAC at ECF No. 206 as attacking the FAC filed at ECF No. 495.

---

[3] Spectrum Scientifics LLC and Radio City LLC are no longer class representatives in the FAC.

United States District Court
Northern District of California

United States District Court
Northern District of California

## II.     LEGAL STANDARD

Rule 8(a)(2) of the Federal Rules of Civil Procedure requires a complaint to include "a short and plain statement of the claim showing that the pleader is entitled to relief."  A complaint that fails to meet this standard may be dismissed pursuant to Rule 12(b)(6).  Rule 8(a) requires a plaintiff to plead "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  While a plaintiff must allege "more than a sheer possibility that a defendant has acted unlawfully," the plausibility standard "is not akin to a probability requirement."  *Id.*

For purposes of ruling on a Rule 12(b)(6) motion, the Court generally "accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving party."  *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).  The Court need not, however, "assume the truth of legal conclusions merely because they are cast in the form of factual allegations."  *Fayer v. Vaughn*, 649 F.3d 1061, 1064 (9th Cir. 2011) (per curiam).  Mere "conclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss."  *Adams v. Johnson*, 355 F.3d 1179, 1183 (9th Cir. 2004).  The Court may also "look beyond the plaintiff's complaint to matters of public record" without converting the Rule 12(b)(6) motion into a motion for summary judgment.  *Shaw v. Hahn*, 56 F.3d 1128, 1129 n.1 (9th Cir. 1995).

## III.     MOTION TO DISMISS

Defendants seek to dismiss the Complaint on three grounds: (1) DPPs fail to state claims under §§ 1 and 2 of the Sherman Act and § 7 of the Clayton Act for Defendants' conduct prior to 2013; (2) DPPs' claims are barred under the applicable statutes of limitations; and (3) DPPs fail to raise adequate allegations as to specific named Defendants.[4]

---

[4] Defendants also reincorporate their rejected arguments from their motion to dismiss DPPs' SAC. *See* ECF No. 173.  Defendants fail to raise any new basis for reaching a different decision

**A.      Sherman Act Claims**

**1.      Sherman Act § 1**

Section 1 of the Sherman Act provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal."  15 U.S.C. § 1.  A plaintiff asserting a claim under § 1 must plead: "(1) a contract, combination or conspiracy among two or more persons or distinct business entities; (2) which is intended to restrain or harm trade; (3) which actually injures competition; and (4) harm to the DPPs from the anticompetitive conduct."  *Name.Space, Inc. v. Internet Corp. for Assigned Names & Numbers*, 795 F.3d 1124, 1129 (9th Cir. 2015) (quotations omitted).  Because § 1 does not forbid all unreasonable restraints of trade, "the crucial question is whether the challenged anticompetitive conduct stems from independent decision or from an agreement, tacit or express."  *Twombly*, 550 U.S. at 553.

For the purposes of this motion, DPPs' allegations can be reasonably understood as encompassing two distinct time periods: (1) the 2005 acquisition of Celestron until 2012 and (2) the acquisition of Meade—Celestron's horizontal competitor—in 2013 through the end of the class period.  *See* FAC ¶ 143.  The main issue is whether DPPs adequately allege an antitrust conspiracy prior to the acquisition of Meade in 2013.  The First Order found that DPPs adequately alleged violation of § 1 in the period following the Meade acquisition in 2013 but failed to do so for the preceding period.

Defendants maintain that DPPs have not cured the deficiencies that led the Court to dismiss the SAC.  The Court disagrees.  Viewing the allegations in the light most favorable to DPPs, the Court finds that the allegations adequately allege that Defendants conspired to fix prices beginning in 2005.

The FAC alleges in relevant part that, after acquiring telescope distributor Celestron in 2005, the Synta entities began colluding with Ningbo Sunny to fix prices.  *Id.* ¶ 91; *see also id.*

---

therefore the Court will not reconsider them.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    121–124.  To carry out this conspiracy, "Ningbo Sunny forced customers (other than Celestron) to

2    purchase Ningbo Sunny goods through Ms. Huang—an employee of Ningbo Sunny's horizontal

3    competitor Synta []" who allegedly answered to David Shen and was under his control.  *Id.*

4    According to DPPs, Synta and Ningbo Sunny concealed the fact that Joyce Huang worked for

5    David Shen and Synta by referring to the company as "A Good Advance," which was "just a

6    trading company with no connection with Synta rather than a company controlled by Chairman

7    Shen and Synta."  *Id.* ¶ 92.  DPPs alleges that this price fixing conspiracy extended to the other

8    companies directly or indirectly owned and/or controlled by David Shen, including Synta Canada,

9    Pacific Telescope Corp, Olivon Canada, and Olivon USA.  *Id.* ¶ 93.

10        In support of the allegations, DPPs attach contemporaneous email communications

11   between Joyce Huang of Synta and James-Junwen ("James") Chiu of Ningbo Sunny suggesting

12   coordinated price-fixing on at least one occasion between the entities.  *See* ECF Nos. 495-13, 495-

13   14.  The correspondence reveals that independent distributor-customer Orion reached out to James

14   Chiu seeking product pricing information.  ECF No. 495-13, Ex. 13.  Instead of receiving a quote

15   from James Chiu, James forwards the request to Joyce Huang who then quoted prices to Orion.  In

16   one of the emails discussing pricing and payment terms, James informed Joyce that Orion's

17   "target price is too low" and the "price USD88.00 offered by customer is too low."  *Id.*  James

18   instructed Joyce to increase the price to "USD90.00" in order for Ningbo Sunny to "take the

19   project."  *Id.*  Other correspondence reveals invoices sent from Joyce to Orion under the name

20   "Good Advance Industries Limited," which DPPs contends is an alias used by Synta and operating

21   under David Shen's control.[5]  FAC ¶¶ 24, 92; *see* ECF No. 495-14.  In another email Joyce

22   instructed James that Ningbo Sunny's "payment terms should be the same with Suzhou [Synta]."

23   ECF No. 495-14, Ex. 14.

24

25   [5] Defendant argues that Good Advance is a legitimate trading company created to facilitate
     inventory sales for Orion.  MTD at 4 n.2.  To the extent that Defendants dispute the
26   characterization of factual allegations in the FAC it is not for the Court to decide at the pleading
     stage.  The Court must "take as true the material facts alleged" in the FAC.  *Hosp. Bldg. Co. v.*
27   *Trustees of Rex Hosp.*, 425 U.S. 738, 740 (1976).

     Case No.: 5:20-cv-03642-EJD
28   ORDER GRANTING IN PART & DEN. IN PART DEFS.' MOT. TO DISMISS WITH LEAVE
     TO AMEND; DEN. MOT. TO STRIKE

1       ***First***, Defendants accuse DPPs of inserting "baseless allegations relating to the 2005 to

2       2012 time period in an attempt to artificially expand their class" but the attached email chain

3       between Orion, James, and Joyce provides a basis for DPPs' price-fixing allegation.  Mot. to

4       Dismiss at 7–8; *Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*, 414 F. Supp. 3d 1256, 1266

5       (N.D. Cal. 2019), *aff'd*, 20 F.4th 466 (9th Cir. 2021) ("When competitors share sensitive

6       information, such as pricing information, it can support a finding that the competitors are part of a

7       conspiracy.").

8               ***Second***, Defendants contend that these emails post-date 2013 and therefore cannot support

9       DPPs' allegations of a conspiracy beginning in 2005.  Although Defendants may lack proof that

10      the alleged conspiracy began in 2005, the Ninth Circuit disfavors summary dismissals of antitrust

11      actions for this very reason: "because the proof lies largely in the hands of the defendants."[6]

12      *Ernest W. Hahn, Inc. v. Codding*, 615 F.2d 830, 835 (9th Cir. 1980).  At the pleading stage, DPPs

13      need only make allegations containing enough factual matter to "plausibly" suggest a conspiracy

14      to fix prices prior to 2013.  *Id.* at 545 ("Asking for plausible grounds to infer an agreement . . .

15      simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence

16      of illegal agreement.").  The emails between Joyce Huang and James Chiu lend support to DPPs'

17      allegations of collusive conduct between competitors Ningbo Sunny and Synta, which reasonably

18      could have begun after the Celestron acquisition in 2005 as pled.  It is plausible that discovery will

19      reveal evidence of the price-fixing conspiracy prior to the acquisition of Meade in 2013.  *In re*

20      *TFT-LCD (Flat Panel) Antitrust Litig.*, 586 F. Supp. 2d 1109, 1117 (N.D. Cal. 2008).  Should

21      discovery fail to support DPPs' allegations regarding this time period, Defendants may renew their

22      challenges to the pre-2013 claims.  *See In re TFT-LCD (Flat Panel) Antitrust Litig.*, 599 F. Supp.

23

24      _____

        [6] The FAC addresses the fact that the attached emails post-date 2013 by alleging that "employee
25      Joyce Huang destroyed all evidence relating to her and Synta's role in the conspiracy in order to
        conceal the antitrust conspiracy at issue in this suit from litigation such as this one" based on an
26      admission by Synta's counsel that Synta destroyed documents after being faced with a lawsuit in
        the U.S.  FAC ¶¶ 24, 93.  DPPs believe the destroyed records contain evidence of the full extent of
27      Defendants' price-fixing and collusion.  *Id.* ¶ 93.

28      ORDER GRANTING IN PART & DEN. IN PART DEFS.' MOT. TO DISMISS WITH LEAVE
        TO AMEND; DEN. MOT. TO STRIKE

United States District Court
Northern District of California

2d 1179, 1185 (N.D. Cal. 2009).

*Finally*, Defendants argue that the allegation Synta and Ningbo Sunny fixed prices by forcing customers to order inventory through Synta employee Joyce Huang is not unlawful anticompetitive conduct.  According to Defendants, "[the] use of a trading company, even one affiliated with a manufacturer . . . [is] standard in the industry."  Opp'n to Mot. to Dismiss at 4. However, Defendants ignore DPPs' allegations.  The FAC alleges that, beginning in 2005, horizontal competitors, Synta and Ningbo Sunny, colluded to fix prices and impose these prices on their distributor-customers.  FAC ¶ 91; *see also* ECF Nos. 495-13, 495-14.  This is the very definition of *per se* anticompetitive conduct.  *Optronic Techs., Inc.*, 20 F.4th at 479 ("Horizontal price fixing and market allocation are *per se* Section 1 violations.").[7]

Accordingly, the Court finds that the factual allegations give rise to a plausible conspiracy in violation of § 1 of the Sherman Act for the 2005 to 2012 period, and "will not limit the class period at this stage of the litigation."  *In re TFT-LCD*, 599 F. Supp. 2d at 1185.  The Court DENIES Defendants' motions as to the Sherman Act § 1 claim.

### 2.      Sherman Act § 2

Section 2 enumerates three antitrust violations: monopolization, attempt to monopolize, and conspiracy to monopolize.  15 U.S.C. § 2.  The FAC asserts all three theories of monopolization of the U.S. telescope distribution market beginning in 2005.  FAC ¶ 169.  The Court previously found that DPPs stated a § 2 claim for the period starting in 2013.

#### a.      Monopolization and Attempted Monopolization

"While [the Sherman Act] Section 1 'targets concerted anticompetitive conduct, Section 2

---

[7] The First Order found that the price-fixing and market allocation allegations with respect to post-2013 conduct sufficiently state a *per se* violation of Section 1.  First Order at 20–21.  To the extent Defendants challenge whether DPPs have sufficiently alleged "market power" under Section 1 with respect to the pre-2013 period, *see* Mot. to Dismiss at 5–7, this inquiry is not necessary.  *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1191 (9th Cir. 2015) ("[I]nherently anticompetitive horizontal agreements violate the Sherman Act per se. Once the agreement's existence is established, no further inquiry into the practice's actual effect on the market or the parties' intentions is necessary to establish a § 1 violation.").

targets independent anticompetitive conduct.'"  *Optronic Techs., Inc.*, 20 F.4th at 481 (quoting

*Qualcomm*, 969 F.3d at 989–90).  Section 2 makes it illegal to "monopolize . . . any part of the

trade or commerce among the several States."  15 U.S.C. § 2.  To plead a monopolization claim, a

plaintiff must allege that the defendant "(1) possessed monopoly power in the relevant market,

[and] (2) wil[l]fully acquired or maintained that power through exclusionary conduct . . . . "

*MetroNet Servs. Corp. v. U.S. W. Commc'ns*, 329 F.3d 986, 1002 (9th Cir. 2003), *cert. granted,*

*judgment vacated sub nom. Qwest Corp. v. MetroNet Servs. Corp.*, 540 U.S. 1147 (2004).

Attempted monopolization refers to "the employment of methods, means and practices which

would, if successful, accomplish monopolization, and which, though falling short, nevertheless

approach so close as to create a dangerous probability of it."  *Am. Tobacco Co. v. United States*,

328 U.S. 781, 785 (1946).  A plaintiff asserting an attempted monopolization claim under § 2 must

plead: "(1) a specific intent to control prices or destroy competition; (2) predatory or

anticompetitive conduct directed at accomplishing that purpose; (3) a dangerous probability of

achieving 'monopoly power,' and (4) causal antitrust injury."  *Rebel Oil*, 51 F.3d at 1434.

    ***First***, Defendants argue that DPPs fails to adequately allege monopoly power prior to

2013.  Mot. to Dismiss at 4–5.  Monopoly power refers to a monopolist's ability to increase prices

by restricting output.  *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2288 (2018) (quotations and

citations omitted).  A court may infer monopoly power from a defendant's predominant share in

the relevant market.  *United States v. Grinnell Corp.*, 384 U.S. 563, 571 (1966).  "Monopoly

power differs in degree from market power, requiring something greater."  *Epic Games, Inc. v.*

*Apple, Inc.*, 67 F.4th 946, 998 (9th Cir. 2023) (quotations and citations omitted).  Direct evidence

of monopoly power includes a showing of restricted output and supracompetitive prices.  *Theme*

*Promotions, Inc. v. News Am. Mktg. FSI*, 546 F.3d 991, 1001 (9th Cir. 2008).  To establish

monopoly power using circumstantial evidence, a plaintiff must "(1) define the relevant market,

(2) show that the defendant owns a dominant share of that market, and (3) show that there are

significant barriers to entry and . . . that existing competitors lack the capacity to increase their

United States District Court
Northern District of California

1   output in the short run." *MetroNet Servs. Corp.*, 329 F.3d at 1003 (quoting *Rebel Oil*, 51 F.3d at

2   1434).

3       There are two relevant markets: the global manufacturing market and the downstream U.S.

4   distribution market. FAC ¶¶ 73, 77. DPPs allege that Celestron monopolized the U.S. telescope

5   distribution market. *Id.* ¶ 137. "Courts generally require a 65% market share to establish a prima

6   facie case of market power." *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195,

7   1206 (9th Cir. 1997). Here, the FAC lacks any specific allegation that Celestron "owned a

8   dominant share of the market" prior to the Meade acquisition. *Image Tech. Servs., Inc. v. Eastman

9   Kodak Co.*, 125 F.3d 1195, 1206 (9th Cir. 1997) (quotations and citation omitted).

10      DPPs allege Celestron became the dominate U.S. distributor with approximately 70%

11  market share because of the conspiratorial conduct. *See, e.g.*, FAC ¶ 3 ("As a result of this

12  unlawful conspiracy, Celestron controls at least 70% of all U.S. consumer telescope sales."); *id.* ¶

13  78 ("Through Defendants' and their co-conspirators' efforts, Celestron became the dominant U.S.

14  telescope distributor."); *id.* ¶ 119 ("[T]he goal of the co-conspirators' conduct was to ensure that

15  Celestron was able to dominate the U.S. market and keep their ill-gotten gains outside of mainland

16  China."). However, the Court cannot reasonably infer from these allegations that Celestron

17  possessed monopoly power at or around the time it was acquired in 2005. Indeed, DPPs allege

18  that another formidable competitor, Meade, existed as a "leading" telescope brand in the market

19  during this time period and that it stopped competing with Celestron only after it was acquired in

20  2013. *Id.* ¶¶ 4, 80, 94; *see Stanislaus Food Prod. Co. v. USS-POSCO Indus.*, 782 F. Supp. 2d

21  1059, 1079 (E.D. Cal. 2011) (finding plaintiffs failed to allege "specific intent" where plaintiff

22  alleged that defendants intended to eliminate competition and monopolize the market but also

23  alleged the presence of other competitors in the market). Because the class period encompasses

24  both acquisitions, allegations of market power during the class period sum up the combined

25  market power of Synta and Ningbo Sunny *after* the Meade acquisition.

26      Before 2013, however, Meade was Celestron's direct, "leading" competitor in the market,

27

28  Case No.: 5:20-cv-03642-EJD
ORDER GRANTING IN PART & DEN. IN PART DEFS.' MOT. TO DISMISS WITH LEAVE
TO AMEND; DEN. MOT. TO STRIKE

*United States District Court*
*Northern District of California*

and the allegations suggest Meade controlled a substantial market share such that its acquisition harmed competition.  For example, DPPs allege:

- "Together, Celestron and Meade account for the vast majority of consumer telescopes sold in the United States."  FAC ¶ 78.

- "The Federal Trade Commission blocked attempts by Celestron and Meade to merge in 1991 and 2002 because the mergers would have created monopolies and reduced competition."  *Id.* ¶ 95.

- "Because JOC's acquisition of Meade would have diversified manufacturing, preserved an independent distributor, and increased competition in the telescope industry, both Synta and Ningbo Sunny wanted to acquire Meade to keep it out of JOC's hands."  *Id.* ¶ 97.

- "Competition, innovation, and consumer choice have also been restrained due to Ningbo Sunny's acquisition of Meade."  *Id.* ¶ 138.

The FAC further alleges that Synta and Ningbo Sunny "leveraged their market power in the Manufacturing Market to control the Distribution Market" which resulted in Celestron's rise to "prominence" in the distribution market.  *Id.* ¶ 80.  This was achieved by offering products to Celestron at lower prices and with better credit terms than those offered to other distributors, and it was successful because Synta and Ningbo Sunny had eliminated "other meaningful sources of supply" leaving independent distributors with no better choice "but to pay the elevated prices."  *Id.* ¶ 81.  Plaintiffs specifically allege that, after Ningbo Sunny's acquisition, "there are few or no substitutes for Defendants' manufacturing services and products . . . . "  *Id.* ¶ 87.  It is therefore possible that Celestron did not possess market power prior to 2013; it only did so after Ningbo Sunny acquired Meade and effectively dismantled its manufacturing capabilities thereby reducing Celestron's competition.  FAC ¶ 80 ("Meade has not seriously competed with Celestron since the Ningbo Sunny acquisition and has not used its manufacturing capabilities to diversify the supply of telescopes."); *id.* ¶ 135 ("Ningbo Sunny[] . . . dismantle[d] Meade's manufacturing capabilities.").  Indeed, DPPs allege that "[w]ith Ningbo Sunny's acquisition of Meade, which also had manufacturing capabilities, the number of sources of supply essentially diminished to two: Synta and Ningbo Sunny."  FAC ¶ 86.  Thus, pursuant to DPPs' own theory, Celestron would not have possessed monopoly until 2013 or later.

United States District Court
Northern District of California

Here, by failing to allege Celestron's market share prior to the Mead acquisition, the DPPs have not adequately pled Celestron had the power to control prices or exclude competition from the 2005 to 2012 time period.

*Second*, Defendants argue that DPPs fail to allege any threat or dangerous probability of monopolization arising from the Celestron acquisition.  Mot. to Dismiss at 5.  Defendants likewise contend the monopoly allegations are predicated on the Meade acquisition in 2013 and the effects alleged to have occurred thereafter.  *Id.* at 7; *see* FAC ¶¶ 135–38.

DPPs allege that Defendants have "a dangerous probability of success in accomplishing its unlawful purpose of obtaining monopoly power."  FAC ¶ 171; *Paladin Assocs., Inc.*, 328 F.3d at 1163 n.22.  In the Ninth Circuit, "a dangerous probability of success may be inferred either (1) from direct evidence of specific intent plus proof of conduct directed to accomplishing the unlawful design, or (2) from evidence of conduct alone, provided the conduct is also the sort from which specific intent can be inferred."  *William Inglis & Sons Baking Co. v. ITT Cont'l Baking Co.*, 668 F.2d 1014, 1029 (9th Cir. 1981).  While the Court held in the First Order that DPPs adequately alleged a "dangerous probability" that Defendants will achieve monopoly power for the period starting in 2013, DPPs have not amended the complaint to include any new allegations with respect to Celestron's market share during the 2005 to 2012 period.

DPPs rely on the aggregated market share of Synta and Ningbo Sunny, who together controlled "over 65% of the Manufacturing Market since 2012", to plead monopoly power.  Opp'n to Mot. to Dismiss at 13–14 (citing *Rebel Oil*, 51 F.3d at 1437–38).  As discussed, DPPs allege that "Synta and Ningbo Sunny conspired and leveraged their market power in the Manufacturing Market to control the Distribution Market," which resulted in Celestron gaining monopoly power in the U.S. distribution market.  FAC ¶¶ 80–81.  The alleged conspiracy between manufacturers Synta and Ningbo Sunny at the global level is what brought about Celestron's market power in the downstream U.S. distribution market.  *Id.* ¶¶ 135, 137.

When assessing a § 2 attempted monopoly claim, "[t]he aggregation of market shares of

United States District Court
Northern District of California

several rivals is justified if the rivals are alleged to have conspired to monopolize." *Rebel Oil Co.*, 51 F.3d at 1437.  Here, DPPs allege that Synta and Ningbo Sunny conspired to monopolize and seek to aggregate Synta and Ningbo Sunny's shares in the *manufacturing* market, however, the FAC alleges Celestron's actual or attempted monopolization in the downstream *distribution* market.  FAC ¶¶ 88, 137, 164, 169.  "Even in the two-market situation, a plaintiff cannot establish a violation of Section 2 without proving that the defendant used its monopoly power in one market to obtain, or attempt to attain, a monopoly in the downstream, or leveraged, market." *Alaska Airlines, Inc. v. United Airlines, Inc.*, 948 F.2d 536, 547 (9th Cir. 1991).  It is insufficient to allege that a defendant "merely [] obtain[ed] a competitive advantage in the second market." *Id.*  There can be no legally cognizable claim that Celestron monopolized or attempted to monopolize the distribution market using Synta and Ningbo Sunny's dominant share in the manufacturing market without adequately alleging that Celestron had monopoly power or a "dangerous probability" of attaining actual market power in the U.S. distribution market during the 2005 to 2012 period.  Furthermore, DPPs' allegations with respect to Sytna and Ningbo Sunny's manufacturing market shares refer only to the 2012 to 2018 time period.

Accordingly, the Court finds that DPPs have not adequately stated a § 2 claim for the period starting in 2005 to 2012.

\* \* \*

In sum, the Court GRANTS Defendants' motion to dismiss to the extent that Defendants assert the FAC fails to state a claim for Sherman Act § 2 from the 2005 to 2012 class period.

### B.    Clayton Act § 7 Claim

"Section 7 of the Clayton Act generally prohibits business acquisitions whose effect 'may be substantially to lessen competition, or tend to create a monopoly' in a relevant market." *Dehoog v. Anheuser-Busch InBev SA/NV*, 899 F.3d 758, 762 (9th Cir. 2018) (quoting 15 U.S.C. § 18).  "[It] requires Consumers to first establish a prima facie case that a merger is anticompetitive." *St Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*, 778 F.3d

Case No.: 5:20-cv-03642-EJD
ORDER GRANTING IN PART & DEN. IN PART DEFS.' MOT. TO DISMISS WITH LEAVE TO AMEND; DEN. MOT. TO STRIKE

United States District Court
Northern District of California

775, 783 (9th Cir. 2015).  "In practical terms, this means adequately alleging facts that an acquisition creates 'an appreciable danger' or a 'reasonable probability' of anticompetitive effects in the relevant market."  *DeHoog*, 899 F.3d at 763.  In other words, the merger must create an appreciable danger of higher prices in the relevant market in the future.  *St. Alphonsus Med. Ctr.- Nampa*, 778 F.3d at 788.  "The relevant market consists of two components, the 'product market,' and the 'geographic market'."  *California v. Sutter Health Sys.*, 130 F. Supp. 2d 1109, 1118 (N.D. Cal. 2001).

The Court previously found that DPPs stated a claim under § 7 arising out of Ningbo Sunny's acquisition of Meade.  Defendants contend that DPPs do not state a plausible Clayton Act claim for the class period following the acquisition of Celestron in 2005.  Mot. to Dismiss at 2.  DPPs allege that the acquisition of Celestron "and removal of it from the Manufacturing Market was the blueprint for the subsequent unlawful Meade acquisition."  Opp'n to Mot. to Dismiss at 15.  However, DPPs fail to allege a § 7 claim beginning in 2005 because DPPs fail to allege a monopoly or attempted monopoly arising from the Celestron acquisition, and "[m]erely alleging the elimination of a rival does not plausibly support an inference of an appreciable danger of anticompetitive effects in a relevant market."  *Demartini v. Microsoft Corp.*, No. 22-CV-08991- JSC, 2023 WL 2588173, at *6 (N.D. Cal. Mar. 20, 2023).

Therefore, the Court finds that DPPs fail to allege any conduct giving rise to a § 7 claim with respect to the Celestron acquisition in 2005.

### C.    Cartwright Act Claim

DPPs' fourth cause of action alleges that Defendants' price-fixing and other collusive conduct restrains trade in violation of California's Cartwright Act.  FAC ¶¶ 177–80.  Defendants argue that DPPs fail to sufficiently allege a Cartwright Act claim because DPPs' federal antitrust claims fail.  Mot. to Dismiss at 8.  Indeed, "[t]he analysis under California's antitrust law mirrors the analysis under federal law because the Cartwright Act, Cal. Bus. & Prof. Code § 16700 *et seq.*, was modeled after the Sherman Act."  *Cnty. of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148,

United States District Court
Northern District of California

1160 (9th Cir. 2001).  Given the Court's analysis and findings as to DPPs' Sherman Act § 1 claim, the Court finds that DPPs' Cartwright Act claim is likewise adequately pled.

### D.  Statute of Limitations

Defendants seeks to revisit its argument that DPPs' Sherman Act §§ 1 and 2, Clayton Act § 7, and Cartwright Act claims fail because they are all barred by the four-year statute of limitations. Mot. to Dismiss at 8–9; *see* 15 U.S.C. § 15b (Sherman Act); Cal. Bus. & Prof. Code § 16750.1 (Cartwright Act); Cal. Bus. & Prof. Code § 17208 (UCL); Cal. Civ. Proc. Code § 343 (limitations applicable to § 16600).  "[A]bsent an exception, a Sherman Act claim accrues at the time of the anticompetitive conduct."  *Garrison v. Oracle Corp.*, 159 F. Supp. 3d 1044, 1066 (N.D. Cal. 2016).  "The statute of limitations is tolled, however, if the plaintiff can prove the defendant fraudulently concealed the existence of the conspiracy."  *In re Cathode Ray Tube (CRT) Antitrust Litig.*, No. 07-CV-5944 JST, 2016 WL 8669891, at *4 (N.D. Cal. Aug. 22, 2016)

The First Order considered whether the "continuing violation" doctrine or the fraudulent concealment doctrine tolled the state of limitations on DPPs' claims.  The Court held that "Plaintiffs have plausibly alleged that Defendants' fraudulent concealment of their misconduct tolled the statutes of limitations as to claims arising out of conduct in 2013 or later."  First Order at 14.  In determining when the statute of limitations accrued, the Undersigned found that "each new price-fixed sale triggers a new limitations period for Plaintiffs to recover 'the damages caused by that act'" but concluded that, pursuant to *Oliver v. SD-3C LLC*, 751 F.3d 1081, 1086 (9th Cir. 2014), "Plaintiffs may recover damages for alleged price-fixed sales throughout the last four years."  First Order at 9 (quoting *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 401 U.S. 321, 338–39 (1971)).

Defendants now argue that DPPs' amended allegations regarding Joyce Huang's role in the price-fixing conspiracy beginning in 2005 prevent DPPs from claiming fraudulent concealment. Mot. to Dismiss at 9; *see* FAC ¶¶ 91–93.  A plaintiff asserting fraudulent concealment must allege that: (1) the defendant took affirmative acts to mislead the plaintiff; (2) the plaintiff did not have

1    actual or constructive knowledge of the facts giving rise to its claim; and (3) the plaintiff acted

2    diligently in trying to uncover the facts giving rise to its claim. *In re Animation Workers Antitrust*

3    *Litig.*, 123 F. Supp. 3d 1175, 1194 (N.D. Cal. 2015) (quoting *Hexcel Corp. v. Ineos Polymers,*

4    *Inc.*, 681 F.3d 1055, 1060 (9th Cir. 2012)).  "Passive concealment of information is not enough" to

5    establish an affirmative act but "[a]n affirmative act of denial . . . is enough if the circumstances

6    make plaintiff's reliance on the denial reasonable." *Reveal Chat Holdco, LLC v. Facebook, Inc.*,

7    471 F. Supp. 3d 981, 992 (N.D. Cal. 2020).

8         ***First***, Defendants contend that the only alleged fraudulent concealment with respect to the

9    2005 to 2012 period—that the price-fixing conspiracy was carried out by Joyce Huang who was

10   controlled by the Synta enterprise—does not rise to the level of affirmative misrepresentation

11   necessary to satisfy the first element of fraudulent concealment.  Mot. to Dismiss at 10–11.  The

12   Court addressed the "affirmative act" element extensively in the First Order, finding that DPPs

13   adequately alleged affirmative acts as to the alleged conduct that occurred in 2013 or later.  Mot.

14   to Dismiss at 10–12.  For example, the Court found that DPPs alleged the following affirmative

15   acts: (i) that Ningbo Sunny made affirmative misrepresentations to the FTC regarding Mr. Shen's

16   involvement in the Meade acquisition; (ii) the fact that Celestron took equity in its competitor

17   Meade and only recorded the transaction in "shadow books"; and (iii) that Celestron structured

18   payments to Ningbo Sunny to avoid raising red flags.  First Order at 12.  With respect to Joyce

19   Huang's alleged conduct at the beginning of the proposed class period in 2005, the Court finds

20   that this allegation, considered in combination with Defendants' affirmatively misleading conduct

21   after the 2013 time period, adequately alleges an affirmative act to mislead DPPs.  *See Animation*

22   *Workers*, 123 F. Supp. 3d at 1200 (finding that the allegations of pretextual statements "taken as a

23   whole" with other allegations of active concealment plausibly stated a claim that Defendants took

24   "affirmative acts" to mislead the plaintiffs); *see also In re Korean Ramen Antitrust Litig.*, 281 F.

25   Supp. 3d 892, 906 (N.D. Cal. 2017) (considering affirmative acts in their totality).

26        ***Second***, Defendants argue that DPPs had actual or constructive knowledge of where Joyce

27   Case No.: 5:20-cv-03642-EJD

28   ORDER GRANTING IN PART & DEN. IN PART DEFS.' MOT. TO DISMISS WITH LEAVE
     TO AMEND; DEN. MOT. TO STRIKE

18

United States District Court
Northern District of California

1    Huang worked.  Mot. to Dismiss at 11.  Under the theory of constructive notice, "[o]nce the

2    plaintiff has knowledge or constructive knowledge of all the operative facts underlying its claim,

3    the statute begins to run, even the plaintiff does not believe the information it received or is not

4    convinced of the defendant's culpability."  *In re Cathode Ray Tube*, 2016 WL 8669891, at *5.  A

5    plaintiff is deemed to have constructive knowledge of their claim "if it has enough information to

6    warrant an investigation which, if reasonably diligent, would [lead] to the discovery of the facts

7    underlying its claims."  *Id.* (alteration in original) (citation omitted).

8          Defendants raise this argument because Joyce Huang's email address

9    ("hcsynta@sysnix.com.tw") in the email chain with Orion and James Chiu references Synta.  *Id.*;

10   *see* ECF Nos. 495-13, 495-14.  Defendants contend, therefore, that any purchaser who transacted

11   with Ningbo Sunny would have seen Joyce's "Synta" email and been put on notice.  However, the

12   FAC alleges that Defendants held out Joyce as an employee of Good Advance, "a trading

13   company with no connection with Synta" or other co-conspirators and that DPPs did not learn of

14   Joyce's employment with Synta until it was revealed in the *Optronic Techs. Inc. v. Ningbo Sunny

15   et al.* litigation in September 2019.[8]  FAC ¶ 92 ("Chairman Ni and Ningbo Sunny kept up this

16   charade until trial in the Orion Action, when Chairman Ni finally admitted that Good Advance

17   was controlled by David Shen and that Ms. Huang answered to Chairman Shen.");  Opp'n to Mot.

18   to Dismiss at 22, 25.  DPPs timely initiated this action approximately six months later.  The Court

19   agrees with DPPs that the question of constructive knowledge or inquiry notice raised by

20   Defendants is more appropriately determined by the trier of fact.  Opp'n to Mot. to Dismiss at 24–

21   25; *see, e.g.*, *In re Animation Workers*, 123 F. Supp. 3d at 1205; *In re Rubber Chemicals Antitrust

22

23   _____

24   [8] On November 1, 2016, independent telescope distributor Optronic Technologies Co.
     ("Orion") filed suit in this District against its competitors Ningbo Sunny, Meade, and affiliate
     Sunny Optics, Inc. (the "*Orion* Action").  *See Optronic Techs. Inc. v. Ningbo Sunny et al.*, No.
25   5:16-cv-06370-EJD (N.D. Cal.).  The *Orion* Action involved largely the same causes of action and
     factual allegations as described in this action.  Orion was also represented by counsel for Plaintiffs
26   in this case.  After a six-week trial in the *Orion* Action, a jury found Ningbo Sunny liable for
     violations of the Sherman Act and Clayton Act.  *Optronic Techs. Inc. v. Ningbo Sunny et al.*, No.
27   5:16-cv-06370-EJD, ECF No. 501 (N.D. Cal. Nov. 26, 2019).

     Case No.: 5:20-cv-03642-EJD
28   ORDER GRANTING IN PART & DEN. IN PART DEFS.' MOT. TO DISMISS WITH LEAVE
     TO AMEND; DEN. MOT. TO STRIKE

United States District Court
Northern District of California

1   *Litig.*, 504 F.Supp.2d 777, 789 (N.D.  Cal.2007) ("[I]t is generally inappropriate to resolve the

2   fact-intensive allegations of fraudulent concealment at the motion to dismiss stage[.]"); *In re*

3   *Rubber Chemicals Antitrust Litig.*, 504 F. Supp. 2d 777, 789 (N.D. Cal. 2007).  "[C]ourts have

4   been hesitant to dismiss an otherwise fraudulently concealed antitrust claim for failure to

5   sufficiently allege due diligence, because questions of inquiry notice are necessarily bound up with

6   the facts of the case."  *In re Animation Workers*, 123 F. Supp. 3d at 1205 (quotations and citation

7   omitted).  Thus, the Court finds that that DPPs have adequately alleged that they did not have

8   actual or constructive knowledge of their claims.

9        Accordingly, DPPs' allegations with respect to the conduct in 2005 suffice for the

10  purposes of the pleading stage such that the Court will not dismiss any claims as time barred.

11       **E.      Sufficiency of Allegations as to Specific Defendants**

12       "Courts in this district do not require plaintiffs in complex, multinational, antitrust cases to

13  plead detailed, defendant-by-defendant allegations; instead they require plaintiffs 'to make

14  allegations that plausibly suggest that each Defendant participated in the alleged conspiracy.'"  *In*

15  *re Cathode Ray Tube (CRT) Antitrust Litig.*, 738 F. Supp. 2d 1011, 1019 (N.D. Cal. 2010)

16  (quoting *In re TFT–LCD*, 599 F.Supp.2d 1179, 1185 (N.D. Cal. 2009)).  An antitrust complaint

17  "must allege that each individual defendant joined the conspiracy and played some role in it

18  because, at the heart of an antitrust conspiracy is an agreement and a conscious decision by each

19  defendant to join it."  *In re TFT–LCD*, 586 F. Supp. 2d 1109, 1117 (N.D. Cal. 2008).  "Although

20  Plaintiffs will need to provide evidence of each Defendants' participation in any conspiracy, they

21  now only need to make allegations that plausibly suggest that each Defendant participated in the

22  alleged conspiracy."  *In re Static Random Access Memory (SRAM) Antitrust Litig.*, 580 F.Supp.2d

23  896, 904 (N.D. Cal. 2008).

24       In the First Order, the Court found that the allegations with respect to Defendants SW

25  Technology, Jack Chen, Pacific Telescope, Nantong Schmidt, Olivon Manufacturing, Olivon

26  USA, Suzhou Synta, Jean Shen, and Synta Canada failed to state claims against them.  *See* First

27  Case No.: 5:20-cv-03642-EJD

28  ORDER GRANTING IN PART & DEN. IN PART DEFS.' MOT. TO DISMISS WITH LEAVE
    TO AMEND; DEN. MOT. TO STRIKE

United States District Court
Northern District of California

1   Order at 14–19.  Defendants assert that DPPs fail to plead specific facts establishing the

2   conspiratorial involvement of the following Defendants: SW Technology, Synta Canada, Pacific

3   Telescope, Nantong Schmidt, Suzhou Synta, Jean Shen, Olivon Manufacturing, Olivon USA, and

4   Jack Chen.  Mot. to Dismiss at 14–21.

5        The FAC alleges that Jean Shen is David Shen's sister who controls Olivon Manufacturing

6   and Olivon USA.  FAC ¶ 21.  The First Order found that DPPs' allegations with respect to Jean

7   Shen's participation in the conspiracy failed to specify what action, if any, Jean Shen may have

8   taken to join and participate in the conspiracy.  First Order at 19.  DPPs add allegations bolstering

9   their assertion that "Jean Shen was aware of and took advantage of her brother Synta's price-

10  fixing and market division by using her influence with her brother to sell telescopes produced by

11  Ningbo Sunny through her own companies, Olivon USA, LLC and Olivon Manufacturing Co.

12  Ltd., for her own profit."  FAC ¶ 21.  The new allegations specifically address how Jean Shen

13  participated in the conspiracy:

> These activities included representing to telescope distributors that
> Synta's horizontal competitor and co-conspirator Ningbo Sunny
> Electronic Co., Ltd. was one of "my family's companies" in an effort
> to obtain bids from these distributors.  Jean's sales activities on behalf
> of the conspirators were thus made with actual knowledge of the
> conspiracy and with the intent to advance its ends.  On information
> and belief, Jean Shen's and the Olivon Defendants' acts to advance
> the conspiracy were also repaid through preferential pricing from
> Ningbo Sunny and Synta beyond prices afforded to other telescope
> distributors who were not members of the conspiracy.

19  *Id.*  Thus, the Court finds that DPPs have cured the deficiencies with respect to allegations against

20  Jean Shen.

21        Jack Chen is Sylvia Shen's husband and David Shen's brother-in-law.  FAC ¶ 20.  He is

22  allegedly a member of Celestron's executive committee.  *Id.*  The First Order likewise dismissed

23  the claims against him for lacking sufficient detail as to his participation in the conspiracy.  First

24  Order at 18–19.  DPPs add allegations that Jack Chen controlled strategic business decisions for

25  Defendant Celestron alongside Sylvia Shen, David Shen, and Laurence Huen, with whom he

26  colluded to fix prices and engage in other anticompetitive activities.  *Id.*  For example, the FAC

United States District Court
Northern District of California

1  specifically alleges that:

2      For example, Defendant Chen was aware of Ningbo Sunny's efforts
       to purchase Meade before Ningbo Sunny submitted a bid, a fact that
3      was disclosed in a filing with federal securities regulators. Defendant
       Chen authorized, approved, and ratified Celestron's involvement in
4      the unlawful acquisition of Meade, and was on the email between
       Ningbo Sunny and Synta and Celestron personnel in which Peter Ni
5      stated that "to prevent JOC to buy MEADE, we decided to purchase
       MEADE by sunny after discussion. But the premise of this case is
6      CELESTRON/SYNTA should be provided the financial support to
       SUNNY."  Defendant Chen participated in numerous meetings after
7      the acquisition of Meade in which Chairman Ni, Chairman Shen, and
       other Celestron and Meade executives jointly planned the companies'
8      activities and strategies, including their price-fixing and market
       division.  Chairman Ni and his right-hand man Hank Qi continued to
9      exchange correspondence with Chairman Shen and Defendant
       Chen to develop a plan of cooperation between Meade, Synta Canada,
10     Celestron, and the rest of the Synta family of businesses.  This plan
       included taking advantage of Meade's intellectual property in order
11     to take over the U.S. telescope market through a new brand known as
       "SkyWatcher" for the benefit of Synta and Ningbo Sunny.

12 *Id.*; *see also id.* ¶ 31.  In reference to the internal emails from David Shen regarding the Meade

13 acquisition, Defendants argue that Jack Chen's "passive receipt of an email by an employee" does

14 not amount to a conscious commitment to conspire.  Mot. to Dismiss at 20–21.  At the pleading

15 stage, however, communications exchanging information can be "sufficient to raise a plausible

16 inference of antitrust conspiracy."  *In re SRAM*, 580 F. Supp. 2d at 904 (finding that internal

17 emails exchanging "price information" between defendants support an inference of an ongoing

18 conspiracy to fix prices).  Construed in light most favorable to DPPs, these communications

19 support an inference that Jack Chen participated in the conspiracy and unlawful Meade

20 acquisition.  The Court therefore finds that DPPs have also cured the deficiencies with respect to

21 allegations against Jack Chen.

22     Turning to the Synta affiliate Defendants, SW Technology is an affiliate of Synta that

23 wholly-owns Celestron.  FAC ¶ 27.  Sylvia Shen is the CEO, CFO, and Secretary of the company.

24 *Id.*  The FAC alleges that Mr. Shen "owns and controls Celestron through SW Technology."  *Id.*

25 In the First Order the Court found that the allegations with respect to SW Technology were "not

26 sufficient to raise a plausible inference that SW technology participated in the alleged conspiracy."

27 Case No.: 5:20-cv-03642-EJD
28 ORDER GRANTING IN PART & DEN. IN PART DEFS.' MOT. TO DISMISS WITH LEAVE
   TO AMEND; DEN. MOT. TO STRIKE

First Order at 16.  The Court noted that DPPs did not allege any wrongdoing with respect to SW Technology.  *Id.* at 16.  Instead, DPPs relied on the fact that SW Technology is a holding company created to acquire Celestron and allegedly lacks a legitimate business purpose.  *Id.*  The Court reasoned that "[i]t is common for companies to create special purpose entities or holding companies for the purpose of acquiring a target, and without more, there is nothing nefarious about the use of such a holding company to acquire Celestron."  *Id.* at 16–17.

DPPs add detailed allegations describing the relationships between the individual defendants and the corporate families to which they belong and how they operate, alleging that (i) each corporate family operated as a "single enterprise" where the conspiracy was organized at the highest level and Synta and Ningbo Sunny used their subsidiaries and affiliates to achieve their conspiratorial aim and purpose "as their distribution and sales arm in the United States."  FAC ¶¶ 51–55.  The FAC specifically alleges that: (i) "individual and participants in the conspiratorial meetings and discussions did not distinguish among entities within a particular corporate family" nor did they "know the specific corporate affiliation of their counterparts", *id.* ¶ 61; (ii) "[p]articipants in the conspiratorial meetings entered into agreements on behalf of, and reported these meetings and discussions to their respective corporate families and United States affiliates", *id.*; and (iii) "Defendants and Co-Conspirators knew the individuals at the conspiratorial meetings represented their entire respective corporate family", *id.*  Allegations that SW Technology is part of a corporate family operating as a single enterprise, and that the conspiracy was organized by executives and carried out by subsidiaries and affiliates (such as SW Technology), are sufficient to plead an individual entity's role in an alleged conspiracy.  *See, e.g.*, *Jones v. Micron Tech. Inc.*, 400 F. Supp. 3d 897, 923 (N.D. Cal. 2019); *In re Cathode Ray Tube I*, 738 F. Supp. 2d at 1019–22; *In re TFT-LCD*, 599 F. Supp. 2d at 1184–85.

Alongside SW Technology, the FAC alleges that "Synta Canada, Olivon Canada, Olivon USA, Celestron, and Synta Technology Corp.[] are part of a network of Synta entities directly and indirectly owned and controlled by Chairman Shen and his family members."  FAC ¶ 36.  The

First Order found that the SAC's conclusory allegations with respect to Olivon Canada and Olivon USA merely stated that Defendants participated in the conspiracy without specifying sufficient factual details as to the role they played in the conspiracy.  First Order at 18.  The FAC raises the following amended allegations as to Synta Canada, Olivon Canada, and Olivon USA:

- Synta Canada is a Canadian company owned by Synta, i.e., Defendant David Shen and his family.  *Id.* ¶ 26.  It has 20% ownership of Suzhou Synta.  Synta Canada's officers and owners (Defendants Sylvia Shen and Jack Chen) "were aware of and approved Celestron's involvement in the unlawful acquisition of Meade, and participated in numerous meetings in California and at Meade's Mexico factory after the acquisition of Meade in which Chairman Ni, Chairman Shen, and other Celestron and Meade executives jointly planned the companies' activities and strategies, including their price-fixing and market division to develop a plan of cooperation between Meade, Synta Canada, Celestron, and the rest of the Synta family of businesses."  *Id.*

- Olivon Manufacturing is registered and headquartered in British Columbia, Canada, *id.* ¶ 27, and Olivon USA is registered and headquartered in Nevada, *id.* ¶ 28.  Defendant Jean Shen is the principal of both entities. *Id.* ¶¶ 27, 28.  "In specific, Jean Shen was aware of and took advantage of her brother Synta's price-fixing and market division by using her influence with her brother to sell telescopes produced by Ningbo Sunny through her own companies, Olivon Canada and Olivon USA, LLC, for her own profit.  These activities included representing to telescope distributors that Synta's horizontal competitor and co-conspirator Ningbo Sunny Electronic Co., Ltd. was one of 'my family's companies' in an effort to obtain bids from these distributors."  *Id.*

For the same reasons the Court finds that the allegations against SW Technology are sufficiently pled, the Court also finds that DPPs have cured their allegations with respect to Olivon Canada and Olivon USA.  The Court finds that the above-mentioned allegations are sufficient to state claims against all three entities as part of the "corporate family" and their roles in the alleged anticompetitive conspiracy.

The remaining entities—Pacific Telescope, Nantong Schmidt, and Suzhou Synta—are manufacturers allegedly owned or controlled by Sylvia and David Chen:

- Pacific Telescope is registered in British Columbia, Canada. *Id.* ¶ 29.  Sylvia Shen is its principal.  *Id.*  The FAC alleges that Pacific Telescope, either directly or through its subsidiaries, manufactured and sold telescopes in the U.S. at inflated prices as a result of the conspiracy.  *Id.*

- <u>Nantong Schmidt</u> is a telescope manufacturer located in Nontong, China that is owned and controlled by David Shen.  *Id.* ¶ 21.  The FAC alleges that Nantong Schmidt, either directly or through its subsidiaries, manufactured and sold telescopes in the U.S. at inflated prices as a result of the conspiracy, including to Defendant Celestron.  *Id.*

- <u>Suzhou Synta</u> is a telescope manufacturer located in Suzhou, China that is owned and controlled by David Shen and his family.  *Id.* ¶ 20.  It is Synta's primary manufacturing company.  *Id.*  The FAC alleges that Suzhou Synta, either directly or through its subsidiaries, manufactured and sold telescopes in the U.S. at inflated prices as a result of the conspiracy.  *Id.*

For the same reasons the Court finds that the allegations against SW Technology and other Synta affiliate Defendants are sufficiently pled, the Court also finds that DPPs have cured their allegations with respect to these entities.

For the foregoing reasons, the Court finds that the FAC adequately alleges the involvement of each Defendant.  The motion to dismiss is DENIED with respect to Defendants SW Technology, Synta Canada, Pacific Telescope, Nantong Schmidt, Suzhou Synta, Jean Shen, Olivon Manufacturing, Olivon USA, and Jack Chen.

## IV.    MOTION TO STRIKE

Defendants concurrently move to strike certain allegations in the FAC as immaterial and impertinent.  DPPs oppose the motion.  *See* Opp'n to Mot. to Strike, ECF No. 216.

Federal Rule of Civil Procedure 12(f) provides that a district court "may order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f).  "'Impertinent' matter consists of statements that do not pertain, and are not necessary, to the issues in question." *Fantasy, Inc. v. Fogerty*, 984 F.2d 1524, 1527 (9th Cir. 1993), *rev'd on other grounds*, 510 U.S. 517 (1994).  "'Redundant' allegations are those that are needlessly repetitive or wholly foreign to the issues involved in the action." *Cal. Dep't of Toxic Substances Control v. Alco Pac., Inc.*, 217 F. Supp. 2d 1028, 1033 (C.D. Cal. 2002).  "Scandalous matters are allegations that unnecessarily reflect on the moral character of an individual or state anything in repulsive language that detracts from the dignity of the court." *Consumer Sols. REO, LLC v. Hillery*, 658 F. Supp. 2d 1002, 1020 (N.D. Cal. 2009) (quotations

United States District Court
Northern District of California

1    and citations omitted).  Motions to strike are disfavored and "are generally not granted unless it is

2    clear that the matter to be stricken could have no possible bearing on the subject matter of the

3    litigation."  *LeDuc v. Ky. Cent. Life Ins. Co.*, 814 F.Supp. 820, 830 (N.D. Cal. 1992).

4         Defendants move to strike DPPs' allegations asserting the class period from 2005 to 2012

5    because DPPs fail to allege legally cognizable claims prior to 2013.  *See generally* Mot. to Strike.

6    Given the Court's finding that DPPs plausibly allege a Sherman Act § 1 claim for the 2005 to

7    2019 period, the Court disagrees that there is no legally cognizable claim alleged to have occurred

8    before 2013.  Defendants argue no other basis to strike these allegations.  Accordingly,

9    Defendants' motion to strike is DENIED.

10   **V.    LEAVE TO AMEND**

11        DPPs request leave to amend any pleading deficiencies.  "Requests for leave to amend

12   should be granted with 'extreme liberality.'"  *Brown v. Stored Value Cards, Inc.*, 953 F.3d 567,

13   574 (9th Cir. 2020).  A court should not grant leave to amend if "it determines that the pleading

14   could not possibly be cured by allegation of other facts."  *Cook, Perkiss and Liehe, Inc. v. N. Cal.*

15   *Collection Serv. Inc.*, 911 F.2d 242, 247 (9th Cir. 1990).  Because it may be possible for DPPs to

16   allege market power sufficient to establish a Sherman Act § 2 claim prior to 2013, the Court finds

17   that amendment would not be futile.  The Court therefore GRANTS leave to amend to cure

18   deficiencies identified in this order.

19   **VI.   CONCLUSION**

20        For the foregoing reasons, Defendants' motion to dismiss is GRANTED IN PART AND

21   DENIED IN PART with leave to amend and Defendants' motion to strike is DENIED.

22        DPPs may file a fifth amended complaint, if any, by no later than fourteen (14) days from

23   the date of this order.  If DPPs choose to file an amended complaint, Plaintiffs shall file a redlined

24   document showing the changes made to the previously filed complaint pursuant to Section III of

25   the Court's Standing Order.

26

27
     Case No.: 5:20-cv-03642-EJD

28   ORDER GRANTING IN PART & DEN. IN PART DEFS.' MOT. TO DISMISS WITH LEAVE
     TO AMEND; DEN. MOT. TO STRIKE

United States District Court
Northern District of California

1

**IT IS SO ORDERED.**

2

Dated: September 13, 2023

3

4

_____
EDWARD J. DAVILA
United States District Judge

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Case No.: 5:20-cv-03642-EJD
ORDER GRANTING IN PART & DEN. IN PART DEFS.' MOT. TO DISMISS WITH LEAVE
TO AMEND; DEN. MOT. TO STRIKE

United States District Court
Northern District of California