1  J. Noah Hagey, Esq. (SBN: 262331)
       hagey@braunhagey.com
2  Matthew Borden, Esq. (SBN: 214323)
       borden@braunhagey.com
3  Ellen V. Leonida, Esq. (SBN: 184194)
       leonida@braunhagey.com
4  Andrew Levine, Esq. (SBN: 278246)
       levine@braunhagey.com
5  Yekaterina Kushnir, Esq. (SBN: 350843)
       kushnir@braunhagey.com
6  BRAUNHAGEY & BORDEN LLP
   351 California Street, 10th Floor
7  San Francisco, CA 94104
   Telephone: (415) 599-0210
8  Facsimile: (415) 276-1808

9  Garrett Biedermann, Esq. *(pro hac vice)*
       biedermann@braunhagey.com
10 Eric Schlabs, Esq. *(pro hac vice)*
       schlabs@braunhagey.com
11 BRAUNHAGEY & BORDEN LLP
   118 W. 22nd St., 12th Floor
12 New York, NY 10011
   Telephone:  (646) 829-9403
13 Fax:  (646) 403-4089

14 ATTORNEYS FOR DIRECT PURCHASER PLAINTIFFS

15

16                    **UNITED STATES DISTRICT COURT**

17                   **NORTHERN DISTRICT OF CALIFORNIA**

18

| | |
|---|---|
| 19  IN RE TELESCOPES ANTITRUST LITIGATION | Case No. 5:20-cv-03639-EJD |
| 20  This Document Relates to: | Case No. 5:20-cv-03642-EJD |
| 21  AURORA ASTRO PRODUCTS LLC, PIONEER CYCLING & FITNESS, LLP and | **DIRECT PURCHASER PLAINTIFFS' NOTICE OF MOTION AND MOTION** |
| 22  those similarly situated, | **FOR CLASS CERTIFICATION** |
| 23            Plaintiffs, | **Date:**      July 18, 2024 |
| 24            v. | **Time:**      9:00 a.m. <br> **Judge:**     Hon. Edward J. Davila <br> **Courtroom:** 4, 5th Floor |
| 25  CELESTRON ACQUISITION, LLC, SUZHOU SYNTA OPTICAL TECHNOLOGY CO., LTD., | |
| 26  SYNTA CANADA INT'L ENTERPRISES LTD., SW TECHNOLOGY CORP., OLIVON | **Compl. Filed:**   June 1, 2020 <br> **Fourth Am.**    September 1, 2023 |
| 27  MANUFACTURING CO. LTD., OLIVON USA, LLC, NANTONG SCHMIDT OPTO- | **Compl. Filed:** <br> **Trial Date:**   None Set |
| 28  ELECTRICAL TECHNOLOGY CO. LTD., | |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

NINGBO SUNNY ELECTRONIC CO., LTD.,
PACIFIC TELESCOPE CORP., COREY LEE,
DAVID SHEN, SYLVIA SHEN, JACK CHEN,
JEAN SHEN, JOSEPH LUPICA, DAVE
ANDERSON, LAURENCE HUEN, and DOES
1-50,

         Defendants.

DIRECT PURCHASER PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

## <u>NOTICE OF MOTION AND MOTION</u>

TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE that on July 18, 2024, at 9:00 a.m. or as soon thereafter as the matter may be heard before the Honorable Edward J. Davila, in the United States District Court for the Northern District of California at the San Jose Courthouse, 280 South 1st Street, Courtroom 4, 5th Floor San Jose, CA 95113, Plaintiffs Aurora Astro Products, LLC and Pioneer Cycling & Fitness, LLP will move this Court to certify a class under Federal Rule of Civil Procedure 23.

This Motion is based on this Notice of Motion and Motion, the accompanying Memorandum, Declaration of Matthew Borden, Expert Report of J. Douglas Zona, Ph. D., the files and records in this action, and on such other written and oral argument as may be presented to the Court.

Dated:  May 20, 2024

Respectfully submitted,

BRAUNHAGEY & BORDEN LLP

By:   /s/ *Matthew Borden*
Matthew Borden

Attorneys for Plaintiffs

# **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................... 3

    A.    Parties ...................................................................................................... 3

        1.    The Class Plaintiffs and the Class of Direct Purchaser Plaintiffs.............. 3

        2.    Defendants ............................................................................................ 4

    B.    The Relevant Market ................................................................................ 6

    C.    Defendants' Anticompetitive Conduct ....................................................... 7

        1.    Price Fixing........................................................................................... 7

        2.    Market Allocation................................................................................. 8

        3.    The Meade Acquisition.......................................................................... 9

        4.    Attempted Monopolization.................................................................... 11

    D.    DPPs Were Commonly Overcharged as a Result of Defendants' Conduct ......... 12

ARGUMENT...................................................................................................................... 12

I.    THE CLASS SATISFIES RULE 23(A)............................................................... 13

    A.    The Class Is Ascertainable........................................................................ 13

    B.    The Class Is Sufficiently Numerous ........................................................... 13

    C.    Questions of Law and Fact Are Common to the Class................................. 14

    D.    Plaintiffs' Claims Are Typical of the Class ................................................ 14

    E.    Plaintiffs and Their Counsel Will Adequately Represent the Class .................... 15

II.    THE CLASS SATISFIES RULE 23(B)(3) ........................................................... 15

    A.    Common Issues Predominate .................................................................... 15

        1.    Common Issues Predominate as to Defendants' Antitrust Violations...... 16

        2.    Common Issues Predominate as to Antitrust Injury ................................ 17

        3.    Common Issues Predominate as to Fraudulent Concealment.................... 21

    B.    Damages Can Be Proven by a Common Methodology ....................................... 22

DIRECT PURCHASER PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

     C.     A Class Action is Superior to Individualized Determinations .............................. 23

III.     BHB SHOULD BE APPOINTED CLASS COUNSEL ..................................................... 24

CONCLUSION ...................................................................................................................... 25

DIRECT PURCHASER PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

# **TABLE OF AUTHORITIES**

**Page(s)**

## **Cases**

*Abdullah v. U.S. Sec. Assoc., Inc.*,
   731 F.3d 952 (9th Cir. 2013) ............................................................... 14

*Gilbert v. MoneyMutual, LLC*,
   318 F.R.D. 614 (N.D. Cal. 2016) ......................................................... 13

*Giuliano v. Sandisk Corp.*,
   No. C 10-2787 SBA, 2015 WL 10890654 (N.D. Cal. May 14, 2015) ........................................ 16

*Herrera v. LCS Fin. Servs. Corp.*,
   274 F.R.D. 666 (N.D. Cal. 2011) ......................................................... 23

*Hexcel Corp. v. Ineos Polymers, Inc.*,
   681 F.3d 1055 (9th Cir. 2012) ............................................................. 21

*Hofstetter v. Chase Home Fin., LLC*,
   No. C 10-1313 WHA, 2011 WL 1225900 (N.D. Cal. Mar. 31, 2011) ................................. 12, 13

*In re Capacitors Antitrust Litig. (No. III)*,
   3:14-CV-03264-JD, 2018 WL 5980139 (N.D. Cal. Nov. 14, 2018) ....................................... 18

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
   308 F.R.D. 606 (N.D. Cal. 2015) ......................................................... 13

*In re Comm. Tissue Prods.*,
   183 F.R.D. 589 (N.D. Fla. 1998) ......................................................... 18

*In re Google Play Store Antitrust Litigation*,
   No. 3:20-CV-5761-JD, 2022 WL 17252587 (N.D. Cal. Nov. 28, 2022) .................................. 18

*In re Online DVD Rental Antitrust Litig.*,
   No. M 09-2029 PJH, 2010 WL 5396064 (N.D. Cal. Dec. 23, 2010) ..................................... 13

*In re Rubber Chem. Antitrust Litig.*,
   232 F.R.D. 346 (N.D. Cal. 2005) ......................................................... 13

*In re Static Random Access Memory (SRAM) Antitrust Litig.*,
   No. C 07-01819 CW, 2008 WL 4447592 (N.D. Cal. Sept. 29, 2008) .................................... 13

*In re Static Random Access Memory (SRAM) Antitrust Litig.*,
   264 F.R.D. 603 (N.D. Cal. 2009) ......................................................... 16

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
  267 F.R.D. 291 (N.D. Cal. 2010) ................................................................. 16, 18

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
  267 F.R.D. 583 (N.D. Cal. 2010) ....................................................................... 13

*In re Urethane Antitrust Litig.*,
  768 F.3d 1245 (10th Cir. 2014) ........................................................................ 18

*Just Film, Inc. v. Buono*,
  847 F.3d 1108 (9th Cir. 2017) .......................................................................... 14

*Lozano v. AT & T Wireless Servs., Inc.*,
  504 F.3d 718 (9th Cir. 2007) ............................................................................ 14

*Markson v. CRST Int'l, Inc.*,
  No. 5:17-CV-01261-SB-SP, 2022 WL 805615 (C.D. Cal. Feb. 24, 2022) ................. 25

*Moore v. Ulta Salon, Cosmetics & Fragrance, Inc.*,
  311 F.R.D. 590 (C.D. Cal. 2015) ....................................................................... 24

*Nitsch v. Dreamworks Animation SKG Inc.*,
  315 F.R.D. 270 (N.D. Cal. 2016) ....................................................................... 13

*Olean Wholesale Grocery Cooperative, Inc. v. Bumble Bee Foods, LLC*,
  31 F.4th 651 (9th Cir. 2022) ........................................................................ passim

*Optronic Techs., Inc. v. Ningbo Sunny Electronic Co., Ltd.*,
  20 F.4th 466 (9th Cir. 2021) ......................................................................... 1, 21

*Pecover v. Elec. Arts Inc.*,
  No. C, 08-2820 VRW, 2010 WL 8742757 (N.D. Cal. Dec. 21, 2010) ................... 13, 14

*Ries v. Ariz. Beverages USA LLC*,
  287 F.R.D. 523 (N.D. Cal. 2012) ....................................................................... 14

*Schramm v. JPMorgan Chase Bank, N.A.*,
  No. 2:09-cv-09442-JAK-FFM, 2011 WL 5034663 (C.D. Cal. Oct. 19, 2011) ............. 21

*Stewart v. Quest Diagnostics Clinical Lab'ys, Inc.*,
  No. 3:19-cv-02043-AGS-DDL, 2022 WL 5236821 (S.D. Cal. Oct. 5, 2022) ............... 24

*Tait v. BSH Home Appliances Corp.*,
  289 F.R.D. 466 (C.D. Cal. 2012) ....................................................................... 21

*Tyson Foods v. Bouaphakeo*,
  577 U.S. 442 (2016) ................................................................................... 15, 16

*Wal-Mart Stores, Inc. v. Dukes*,
   564 U.S. 338 (2011)................................................................................................ 14

*Zinser v. Accufix Research Institute, Inc.*,
   253 F.3d 1180 (9th Cir. 2001) ............................................................................... 23

**Rules**

Fed. R. Civ. P. Rule 23(a)............................................................................... 13, 14, 24
Fed. R. Civ. P. Rule 23(b) ..................................................................... 14, 15, 16, 23, 24
Fed. R. Civ. P. Rule 23(g) .............................................................................. 24, 25

**Other Authorities**

6 NEWBERG ON CLASS ACTIONS, § 18.25 (4th ed. 2002) ...................................... 16

DIRECT PURCHASER PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

Plaintiffs Aurora Astro Products, LLC ("Aurora") and Pioneer Cycling & Fitness, LLP ("Pioneer") respectfully submit this Motion for Class Certification.

## **INTRODUCTION**

For almost two decades, Defendants have colluded to fix prices, and allocate and monopolize the market for consumer telescopes in the United States. As direct purchasers of telescopes made and sold by Defendants, Plaintiffs Pioneer and Aurora were overcharged for their purchases. They were not alone. Because Defendants unlawfully inflated the price of telescopes, everyone who bought a telescope directly from Defendants paid too much.

The evidence against Defendants is vast. At the beginning of the class period, David Shen, the head of telescope manufacturer Synta, owned 26% of his horizontal competitor, Ningbo Sunny Electronic Co., Ltd., and was an officer there. ██████████████████████████ ████████████████████████████████████████████████ In November 2019, a jury found that Defendants Ningbo Sunny, Synta and Celestron fixed prices, allocated the market, conspired to monopolize the market and colluded to unlawfully acquire Meade. The Ninth Circuit affirmed, finding, for example, that "the jury could infer from the evidence that Synta controls an entity called Good Advance, and that Sunny and Synta conspired to fix the prices that they charged Orion and Synta's subsidiary Celestron using Good Advance . . . .  Also, the evidence showed that Huang worked for Synta owner David Shen, who gave direction to Good Advance." *Optronic Techs., Inc. v. Ningbo Sunny Electronic Co., Ltd.*, 20 F.4th 466, 480 (9th Cir. 2021).

While Synta and Celestron were not parties in the *Orion* litigation, the universe of evidence against them has only expanded. Although they claim that Ms. Huang mysteriously disappeared while destroying all of Synta Tech's documents (and Suzhou Synta separately destroyed all of its documents), the materials Defendants failed to get rid of ██████████████████ ████████████████████████████████████████████████ ███████████████ █████████████████████████████████████ ██████████████████████████████████████ █████████████████████████████

DIRECT PURCHASER PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

1   ███████████████████████████████████████ (Declaration of

2   Matthew Borden ("Borden Decl."), Ex.[1] 1.)

3   ████████████████████████████████████

4   ████████████████████████████████████████████

5   ████████████████████████████████████████

6   ████████████████████████ (Ex. 2.)

7   ████████████████████████████████████

8   ████████████████████████████████████████████

9   ████████████████████ (Ex. 3.) ████████████████

10  ██████████████████████████████████

11  ████████████████████████████████████████████

12  ████████████████████ (Ex. 4.) ████████████████

13  ████████████████████████████████████████████

14  ███████████████████████████████████

15  ████████████████████████████████████████████

16  ████████████████████ (Ex. 5.)

17  ████████████████████████████████████████████

18  ████████████████████████████████████████

19  ██████████████████████ (Ex. 6.)

20          Defendants' testimony was evasive and, at best, inconsistent with the deluge of inculpatory

21  documents. ████████████████████████████████████

22  ████████████████████████████████████████

23  ████████████████████████████████████████████

24  ████████████████████████████████████████████

25  ████████████████████████████████████████

26  ██████████████████████████████████

27  _____

28  [1] References to "Ex." In this Memorandum refer to exhibits to the Borden Declaration unless otherwise noted.

Defendants' antitrust violations are the core issue in this case, and their effect on the prices that direct purchasers paid for telescopes is common to all the class members' claims. As the accompanying expert analysis of Douglas Zona, Ph. D. shows, the economic effect of Defendants' conduct is like dropping a rock into a glass of water: all the water rises. In a functional market, different direct purchasers will pay different prices based on volume. This remains true in a dysfunctional market, only everyone pays an unlawful premium to Defendants because the price that serves as the baseline for pricing negotiations is higher—an issue common to the class.

For the foregoing reasons, the Court should certify the Class and appoint BraunHagey & Borden LLP ("BHB") as Class Counsel.

## BACKGROUND

### A.      Parties

#### 1.      The Class Plaintiffs and the Class of Direct Purchaser Plaintiffs

The Class Plaintiffs are two businesses that purchased telescopes from Celestron and sold them to consumers in retail stores.

**Plaintiff Pioneer Cycling & Fitness, LLP** is a 41-year-old family business run by Denise Wolens and her husband, Troy. (Dkt. 558-1 (Wolens Decl.) ¶ 2.) Pioneer began selling telescopes in 2018 as a way to generate additional sales around the holidays, when telescopes are often purchased as Christmas presents. (*Id.* ¶¶ 2-3.) Pioneer bought telescopes and telescope accessories directly from Celestron, but was unable to make a satisfactory margin selling them. (*Id.*)

**Plaintiff Aurora Astro Products, LLC** sold telescopes in a retail store, online, and at trade shows. (Borden Decl., Ex. 91 (Bielaga Dep.) 80:20-81:4.) It purchased and sold telescopes made by multiple manufacturers, including Celestron. (*Id.* at 10:25-11:3.) Aurora lost profits as a result of Defendants' telescope pricing. (*Id.* at 11:11- 12:17; Dkt. 558-3 (Bielaga Decl.) ¶ 2.)

Together, Class Plaintiffs seek to represent a class of themselves and all similarly situated retailers, distributors, and individuals who purchased a telescope sold by Defendants from Synta's acquisition of Celestron in 2005 through such time as class notice is given (the "DPP Class").

2.      **Defendants**

Defendants are individuals and entities that make and sell telescopes that are affiliated with Synta and Ningbo Sunny. As set forth below, the ownership interests and affiliations between these two companies overlap substantially.

**Synta.** The term "Synta" comprises the various entities owned and/or controlled by Dar Tson (David) Shen and his family. These companies include at least (1) Synta Technology Corp. (also known as "Synta Taiwan"); (2) Suzhou Synta Optical Technology Co., Ltd. ("Suzhou Synta"); (3) Nantong Schmidt Opto-Electrical Technology Co. Ltd. ("Nantong Schmidt"); (4) SW Technology Corp.; (5) Synta Canada International Enterprises, Ltd. ("Synta Canada"); (6) Pacific Telescope Corp.; (7) Olivon Manufacturing Co., Ltd.; (8) Olivon USA LLC; and (9) various shell companies in multiple jurisdictions under the name "Good Advance," including at least Good Advance Hong Kong and Good Advance in the British Virgin Islands. ██████████████████ ███████████████████████████████████████████ (Ex. 90.) ████████████ █████████████████████████████████████████████████████████████████████ █████████████████████████████████████████████████████████████████████ ██████████████████████████ (Ex. 7; Ex. 8 (Dagong Dep.) 33:2-36:22.)

Synta purchased Celestron in 2005. (Borden Decl., Ex. 50.) ███████████████ █████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ (Ex. 9 (Lee 3/28 30(b)(6) Dep.) 12:5-13:3; Ex. 10 (Lupica Dep.) 23:3-24:3.) ███████████████████████ (*Id.* at 23:3-24:3.) █████████████████████████████████████████████████████████████████████ █████████████████████████████ (*Id.* at 22:14-17; Ex. 9 (Lee 3/28 30(b)(6) Dep.) 12:2-24; Ex. 11 (Anderson Dep.) 19:8-9; 28:14-29:14.)

██████████████████████████████████████████████ █████████████████████████████████████████████ █████████████████████████████████████████████ ██████████████████████████████████████████



1  ████████████████████████. (Ex. 13 ████████████████████████████████

2  ████████████████████████████████████████████████████████████

3  ███(Ex. 51 ████████████████████████████████████████████████████████

4  ████████████████████████████████████████████████████████████████

5  Ex. 52 ██████████████████████████████████████████████████ Ex. 53

6  ██████████████████████████████████████; Ex. 54 ███████████████████

7  ███████████████████████

8  ███████████████████████████████████████

9  ████████████████████████████ (*E.g.*, Ex. 14 ██████████████████████

10  ████████████████; Ex. 15 ██████████████████████████████████████

11  █████████; Ex. 16 ████████████████████████████████████████████

12  ████████; Ex. 17 █████████████████████████████████

13  ████████████████████████████████████████████████████

14  ██████████████████████████████████████████████████████

15  ███████████████████████████ (Ex. 18.)

16  **Ningbo Sunny.** Ningbo Sunny manufactures consumer telescopes in Yuyao, Zhejiang,

17  China and is run by Chairman Wenjun ("Peter") Ni. David Shen owned an interest in Ningbo

18  Sunny ███████████████████████████████████████████████████████████

19  ██████████████████████████████████████████████████████

20  ███████ (Ex. 8 (Dagong Dep. 22:9-28:1); Ex. 89.) ████████████████████████

21  ████████████████████████████████████████████████████ (Ex. 19

22  (Dong Dep.) 38:3-40:3; Ex. 56.) ██████████████████████████████████

23  ████████████████████████████████████████████████████████████████

24  ██████████████████████████████████████ (Ex. 19 (Dong Dep.) 25:2-14; Ex.

25  20 (SW Tech. 30(b)(6) Dep.) 43:3-44:11 (stating ownership of SW Technology).) David Shen ████

26  █████████████████████████████████ (Ex. 21), and worked as Vice Chairman

27  of Ningbo Sunny at the same time as he was running Synta. (Ex. 56.)

28

DIRECT PURCHASER PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

1    As detailed below, Ningbo Sunny purchased Meade Instruments Corp. in 2013 with the

2  help of Synta and Celestron. ███████████████████████████████████████████████

3  ██████████████████████████████. (Ex. 22 (Lupica Dep.) 15:1-16:8; Ex. 16.)

4  Ningbo Sunny put Meade into bankruptcy in 2019 as a result of the *Orion* litigation.

5    **B.    The Relevant Market**

6    The relevant antitrust market in this matter is the market for consumer-grade telescopes in

7  the United States. (Expert Report of J. Douglas Zona, Ph. D. ("Zona Rpt.") ¶ 24.) During the Class

8  Period, there were three significant manufacturers of telescopes sold in the United States:  Ningbo

9  Sunny, Synta[2] and Meade (which Ningbo Sunny purchased in 2013).[3] Distributors of telescopes

10 made the vast majority of their telescope purchases from these manufacturers. For example,

11 ██████████████████████████████████████████████████████████████████████

12 ██████████████████████████████████████████████████████████████████████,

13 when Ningbo Sunny's judgment avoidance efforts forced it to begin using intermediaries to sell

14 telescopes into the United States. (*Id.* ¶ 26; Ex. 92 (8/14/23 Lee Dep.) 76:4-82:20; Ex. 93 (8/15/23

15 Lee Dep.) 254:20-259:1; Ex. 94 at 32.)

16    The key distributors within the relevant market from 2005 through Meade's bankruptcy in

17 2019 were Celestron, Orion and Meade. (Zona Rpt. ¶ 42.) After Orion's acquisition of Meade, the

18 key distributors have been Celestron and Orion, with Celestron comprising, on average, 65% of all

19 U.S. consumer telescope sales (although its market share has been over 80% during the Class

20 Period). (*Id.*) Defendants sell telescopes within the relevant market through Celestron, which

21 operates as the distribution arm of their business. From 2013 to 2019, Defendants also sold their

22 telescopes within the relevant market through Meade, which was owned by Ningbo Sunny. The

23 members of the DPP Class, including Class Plaintiffs, all purchased their telescopes and telescope

24 accessories from Celestron or Meade (from 2013 to 2019) within the relevant market.

25 [2] █████████████████████████████████████████████████████████████████████

26 (Ex. 24 (Sun 30(b)(6) Dep.) 11:2-7.)

27 [3] Meade was a distributor that also had a manufacturing facility in Mexico. (Ex. 23.) ██████

28 ████████████████████████████████████████. (Exs. 92-93.)

Dr. Zona has calculated from publicly available customs data that Synta and Ningbo Sunny together comprised 70 percent of telescope imports into the United States from 2006 to 2022. (Zona Rpt. ¶ 44.) That is consistent with Nantong Schmidt's claim on its LinkedIn page that it is the largest telescope manufacturer in the world and "mak[es] up 70 percent of the industry market." (*Id.* ¶ 28.) This dominance of manufacturing has allowed Synta's and Ningbo Sunny's wholly owned distributors, Celestron and Meade, to dominate the relevant market. Dr. Zona's market share analysis likewise finds that Celestron and Meade together comprised over 70% of the relevant market. (*Id.* ¶ 44.)

### C.   Defendants' Anticompetitive Conduct

As the jury found in the *Orion* litigation, and the Ninth Circuit affirmed, Ningbo Sunny conspired with Synta and Celestron to (1) fix prices; (2) allocate the market; (3) attempt to monopolize the market; and (4) buy Meade to prevent competition and unlawfully over-consolidate the market.

### 1.   Price Fixing

Substantial evidence of price fixing exists. First, Synta's employee Joyce Huang was responsible for selling all of Ningbo Sunny's telescopes and thus controlled how much Ningbo Sunny charged. (Ex. 57.) She asked Ningbo Sunny to raise its prices. (Ex. 58.) Through Ms. Huang, Synta told Ningbo Sunny to cut off Orion's credit (Exs. 59-61) to ensure that Ningbo Sunny's credit terms to Orion were "the same as Suzhou [Synta]." (Ex. 59.) In an email, ███████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████" (Ex. 1.)

Second, Messrs. Shen and Ni cooperated on all their business strategies, including how much to charge. In addition to sharing price information through Ms. Huang, they exchanged this information at other times. For example, after buying Meade (with Synta's help), Mr. Ni sent Synta all of Meade's cost information, vendor lists, pricing, and other trade secrets and intellectual property so that Synta could "help" with the business. (Exs. 62-66.)

1  Third, ███████████████████████████████████████████████████

2  ████████████████████████████████████████████. (Ex. 25.) ████████

3  ███████████████████████████████████████████

4  ██████████████████████████████████████████████

5  █████████████████████████████████████████████

6  ████████████████████████████████

7  ███████████████████████████████████████████████████

8  ████████████ (Ex. 26; Ex. 27 (David Shen Dep.) 40:12-42:4.) Ningbo Sunny's price lists show

9  that for some of the most popular telescopes, it charged Orion over 50% more than what it charged

10  Celestron for identical products. (Ex. 67; Ex. 68.)

11          **2.      Market Allocation**

12          Ningbo Sunny and Synta divided the market between themselves, which is also a *per se*

13  antitrust violation. Ningbo Sunny and Synta are able to make competing lines of telescopes. (Exs.

14  68-70 (describing Ningbo Sunny factory capabilities); Ex. 71 (same).) They never did so. (*E.g.*, Ex.

15  68.) ████████████████████████████████████████████████████

16  ████████████████████████████████████████████████████

17  ████████████████████████████████████████████ (Ex. 24 (Sun Dep.)

18  51:2-11.)

19          Emails between David Shen and Peter Ni confirm that Synta's and Ningbo Sunny's market

20  allocation was intentional and planned. For example:

21      •  "Bidding with Costco between May and June (compete with Celestron for the price).
           This is a very important issue. This needs Director Ni to communicate face-to-face with

22         DAVE [Anderson] when he goes to the United States. Don't bid. If you let the thing go
           by doing this, how would you deal with everything in the future? . . . Following a

23         conflict, celestron would not trust sunny any longer." (Ex. 72.)

24      •  "[W]e need to consider how to avoid conflict with Celestron products. If the customer
           visits our factory and confirms their intention to cooperate with us, we will consider the

25         strategy of separation from Celestron products or adopt different product prices to
           protect Celestron." (Ex. 73.)

26

27      •  David Shen sent an email to Messrs. Ni, Chiu, Anderson, Huen, and Sylvia Shen: "The
           best way in the future is to divide the products and sell them into different markets to

28         reduce conflicts . . . . No company can replace CELESTRON … SKYWATCHER …
           MEADE." (Ex. 74.)

### 3.   The Meade Acquisition

David Shen decided that Ningbo Sunny would purchase Meade because the FTC had twice blocked Celestron and Meade from merging. For example,



(Ex. 28.)

(Ex. 29.)

(Ex. 30.)

In 2013, David Shen learned that JOC was actively pursuing an acquisition of Meade.

." (Ex. 31.)

. (*See* Ex. 32.)

(Ex. 33.)

(Ex. 34.)



(Ex. 3.)

Celestron's then-CFO (and later CEO), Defendant Anderson, found deal counsel for Ningbo Sunny, met with Ningbo Sunny's lawyers, David Shen and Peter Ni to help set up the acquisition. The engagement letter provided that Ningbo Sunny's attorneys would take instruction from Messrs. Shen, Anderson, and Lupica, Celestron's then-CEO. (Ex. 75.) Thereafter, Mr. Anderson prepared the basic deal structure and worked closely with the acquisition team to help secure the purchase. (*E.g.*, Ex. 76; Ex. 77 (providing direction to deal counsel re price, structure, timing, and strategy of acquisition).) At the same time, Celestron Board member, Mr. Huen, began "consulting" for Ningbo Sunny on the acquisition, and Mr. Lupica "retired" from his post as Celestron's CEO, became a "consultant" for Ningbo Sunny, and became Meade's CEO after the acquisition—a plan documented in emails exchanged between Defendants. (Ex. 78.) The acquisition was ultimately funded through Sky Rainbow, a company jointly owned by Messrs. Shen and Ni. (Exs. 79-81.)

(Exs. 35-36.)

(Ex. 37.)

(Exs. 38-39.) All the while, Synta and Celestron told the FTC that "David Shen has no role in the proposed acquisition of Meade by Sunny." (Ex. 82.)



(Ex. 40.)

(Ex. 41.) David Shen and Peter Ni continued to meet to discuss Meade's operations. (Ex. 42; Ex. 83 (2013 Messrs. Ni, Shen, Lupica meeting agenda re Meade strategy); Ex. 84; Ex. 85 (2013 visit); Ex. 86 (2014 visit); Ex. 87 (2016 visit).)

. (*Compare* Ex. 55

; *with* Ex. 88 ("the FTC is concerned that there will be ongoing coordination between Celestron and Meade after the acquisition"); Ex. 89 ("[a]ny tie up between Celestron and Meade post closing would raise the same antitrust issues that exist today").)

### 4.    Attempted Monopolization

Defendants attempted to monopolize the telescope market.

(Ex. 43.)

(Ex. 44.)

(Ex. 45.)

(Ex. 46.)

(Ex. 47.)

DIRECT PURCHASER PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

1

2 ." (Ex. 48.)

3

4

5

6 (Ex. 2.)

7

8 " (Ex. 49.)

9      When Ningbo Sunny faced the prospect of having its assets seized to satisfy the jury verdict

10 in the *Orion* litigation, Celestron came to its aid and pre-paid Sunny invoices totaling $4.2 million,

11 thereby allowing Sunny to evade the judgment. (5:16-cv-06370-EJD, Dkts. 598, 803, 823, 844-1.)

12      **D.**     **DPPs Were Commonly Overcharged as a Result of Defendants' Conduct**

13      The conduct described above has harmed Class Plaintiffs and the Class by eliminating

14 competition in the relevant market for consumer telescopes and artificially inflating the prices of

15 telescopes and telescope accessories. Dr. Zona, whose opinion in the *Orion* litigation was affirmed

16 by the Ninth Circuit, has performed a regression analysis showing that, after controlling for cost,

17 seasonality and product specific factors affecting supply and demand, all or substantially all

18 members of the Class incurred an overcharge. (Zona Rpt. ¶ 124.)

19

20 . (Zona Rpt. ¶ 117.)

21                              **<u>ARGUMENT</u>**

22      To certify a class, a plaintiff must show that each of the elements of Rule 23(a) and at least

23 one of the requirements in Rule 23(b) is met. *Olean Wholesale Grocery Cooperative, Inc. v.*

24 *Bumble Bee Foods, LLC*, 31 F.4th 651, 653-54 (9th Cir. 2022) (en banc). Rule 23 also contains "an

25 implied prerequisite" that "the class must be sufficiently definite," or ascertainable. *Hofstetter v.*

26 *Chase Home Fin., LLC*, No. C 10-1313 WHA, 2011 WL 1225900, at *12 (N.D. Cal. Mar. 31,

27 2011). All these elements must be shown by a preponderance of the evidence. *Olean*, 31 F.4th at

28 665. Because "[c]lass actions play an important role in the private enforcement of antitrust actions

1  . . . courts resolve doubts in these actions in favor of certifying the class." *In re Rubber Chem.*

2  *Antitrust Litig.*, 232 F.R.D. 346, 350 (N.D. Cal. 2005) (citations omitted). Actions resulting from

3  horizontal price-fixing—as well as other per se antitrust violations—are routinely certified.[4]

4  **I.       THE CLASS SATISFIES RULE 23(a)**

5         The ascertainability, numerosity, commonality, typicality and adequacy elements of Rule

6  23(a) are easily satisfied here.

7         **A.       The Class Is Ascertainable**

8         A class is sufficiently ascertainable if "all of the parameters for membership in [the] class

9  are objective criteria." *Hofstetter*, 2011 WL 1225900, at *12; *see also Gilbert v. MoneyMutual,*

10  *LLC*, 318 F.R.D. 614, 623 (N.D. Cal. 2016) (same). Here, class membership is determined by

11  objective criteria: having purchased telescopes or telescope accessories from either Celestron

12  during the Class Period or from Meade from 2013 to 2019. Celestron purchases are also recorded

13  in its business records, which show all direct purchases from Celestron throughout the class period.

14  (*See* Zona Rpt. ¶ 124.); *see also Hofstetter*, 2011 WL 1225900, at *12 (class ascertainable where

15  defendants' business records were sufficient to determine class membership of any person).

16        **B.       The Class Is Sufficiently Numerous**

17        "Numerosity" requires that "the class is so numerous that joinder of all members is

18  impracticable." Fed. R. Civ. P. 23(a)(1). "While there is no fixed number that satisfies the

19  numerosity requirement, as a general matter, a class greater than forty often satisfies the

20

---

21  [4] *See, e.g.*, *Nitsch v. Dreamworks Animation SKG Inc.*, 315 F.R.D. 270, 317 (N.D. Cal. 2016) (class
    certified in action alleging anticompetitive conspiracy to fix employee compensation); *In re*
22  *Cathode Ray Tube (CRT) Antitrust Litig.*, 308 F.R.D. 606, 630 (N.D. Cal. 2015) (DPP class
    certified in action alleging price fixing in cathode ray tube market); *In re TFT-LCD (Flat Panel)*
23  *Antitrust Litig.*, 267 F.R.D. 583, 608 (N.D. Cal. 2010) (IPP class certified in action alleging price
    fixing of LCD panels); *In re Apple iPod iTunes Antitrust Litig.*, No. C 05-00037 JW, 2011WL
24  5864036 at *4 (N.D. Cal. Nov. 22, 2011) (class certified in action alleging supracompetive pricing
    for iPods); *In re Online DVD Rental Antitrust Litig.*, No. M 09-2029 PJH, 2010 WL 5396064 at
25  *12 (N.D. Cal. Dec. 23, 2010) (class certified in action alleging market allocation in online rental
    DVD market); *Pecover v. Elec. Arts Inc.*, No. C 08-2820 VRW, 2010 WL 8742757, at *26 (N.D.
26  Cal. Dec. 21, 2010) (class certified in action alleging defendants "foreclose[ed] competition in a
    market for football-based interactive video games"); *In re Static Random Access Memory (SRAM)*
27  *Antitrust Litig.*, No. C 07-01819 CW, 2008 WL 4447592, at *7 (N.D. Cal. Sept. 29, 2008) (class
    certified in action alleging pricing fixing in static random access memory market).

28

1   requirement, while one less than twenty-one does not." *Ries v. Ariz. Beverages USA LLC*, 287

2   F.R.D. 523, 536 (N.D. Cal. 2012). Here, the proposed Class includes nearly ▮▮▮ members,

3   joining all of whom would be impracticable. (Zona Rpt. ¶ 124.)

**C.  Questions of Law and Fact Are Common to the Class**

5   Commonality requires only a single significant issue of law or fact common to a class. *Wal-*

6   *Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 359 (2011) ("[F]or purposes of Rule 23(a)(2) [e]ven a

7   single [common] question will do." (quotation marks and citation omitted)); *Abdullah v. U.S. Sec.*

8   *Assoc., Inc.*, 731 F.3d 952, 957 (9th Cir. 2013) ("[A]ll that Rule 23(a)(2) requires is 'a single

9   significant question of law or fact.'" Commonality under Rule 23(a) and predominance under Rule

10  23(b) are often addressed together because "the plaintiffs must prove that there are questions of law

11  or fact common to class members" that can be determined in one stroke . . . in order to prove that

12  such common questions predominate over individualized ones." *Olean*, 31 F.4th at 664. As detailed

13  in Part II.A below (concerning predominance), common questions here include (1) whether

14  Defendants conspired to fix prices, divide the market and engage in unlawful acquisitions; (2) the

15  identity of the conspirators; and (3) whether Defendants' conduct violated Sections 1 and 2 of the

16  Sherman Act and Section 7 of the Clayton Act.

**D.  Plaintiffs' Claims Are Typical of the Class**

18  Under Rule 23(a)(3), "the claims or defenses of the representative parties" must be "typical

19  of the claims or defenses of the class." Typicality is a "permissive" standard; "representative claims

20  are 'typical' if they are reasonably coextensive with those of absent class members; they need not

21  be substantially identical." *Just Film, Inc. v. Buono*, 847 F.3d 1108, 1116 (9th Cir. 2017) (citation

22  omitted); *Lozano v. AT & T Wireless Servs., Inc.*, 504 F.3d 718, 734 (9th Cir. 2007) (same). Here, all

23  Plaintiffs' claims concern Defendants' antitrust violations. The Class Plaintiffs each purchased

24  consumer telescopes from Defendant Celestron. They were injured by Defendants' conspiracy

25  because they overpaid for the telescopes they purchased. All class members suffered the same

26  injury because all overpaid for their telescopes directly purchased from Celestron. This satisfies

27  typicality. *See, e.g.*, *Pecover*, 2010 WL 8742757, at *11-12 (N.D. Cal. Dec. 21, 2010) ("[B]oth

28

1    named plaintiffs and the purported class, to succeed on the merits, must show that the exclusive

2    licenses at issue had an anticompetitive effect on the market and that they suffered damages.").

3        **E.    Plaintiffs and Their Counsel Will Adequately Represent the Class**

4        The Court has already considered and rejected Defendants' adequacy challenges regarding

5    Plaintiffs and their counsel in its Order Denying Defendants' Motion to Deny Class Certification,

6    and Defendants are not permitted to re-raise their adequacy arguments here. (Dkt. 596.) As the

7    Court already found, Class Plaintiffs are adequate because they do not have interests in conflict

8    with those of the Class. Both Class Representatives and Class Counsel submitted declarations

9    showing that they lacked any conflict of interest, were following developments in the case, and

10   intended to vigorously prosecute this action on behalf of the class. (Dkts. 558-01, 558-03, 558-06.)

11   **II.    THE CLASS SATISFIES RULE 23(b)(3)**

12       To satisfy Rule 23(b)(3), a plaintiff must show that "the questions of law or fact common to

13   class members predominate over any questions affecting only individual members, and that a class

14   action is superior to other available methods for fairly and efficiently adjudicating the controversy."

15   "The predominance inquiry asks whether the common, aggregation-enabling, issues in the case are

16   more prevalent or important than the non-common, aggregation-defeating, individual issues."

17   *Olean*, 31 F.4th at 664 (quoting *Tyson Foods v. Bouaphakeo*, 577 U.S. 442, 453 (2016)).

18       **A.    Common Issues Predominate**

19       In *Olean*, the *en banc* Ninth Circuit upheld certification of three nationwide classes of direct

20   and indirect purchasers of tuna. 31 F.4th at 661. Plaintiffs alleged that the three main tuna suppliers

21   conspired to fix tuna prices and thereby caused purchasers to pay supracompetitive prices. *Id.* The

22   Court looked at what an antitrust plaintiff ultimately must prove: (1) an antitrust violation,

23   (2) antitrust injury and (3) damages, *id.* at 670, examined whether the common issues in

24   establishing those elements would predominate the case, and found that they would. *Id.* at 670-82.

25       In its analysis, the Court clarified the predominance standard. It held that a plaintiff needs

26   only to "show that the common question relates to a central issue in the plaintiffs' claim." *Olean*,

27   31 F.4th at 665. It further explained that "'[w]hen one or more of the central issues in the action are

28   common to the class and can be said to predominate, the action may be considered proper under

1    Rule 23(b)(3) even though other important matters will have to be tried separately, such as

2    damages or some affirmative defenses peculiar to some individual class members.'" *Id.* at 668

3    (quoting *Tyson Foods*, 577 U.S. at 453 (2016)). This standard is easily met here because all the

4    elements can be proven on a class-wide basis.

5           **1.     Common Issues Predominate as to Defendants' Antitrust Violations**

6           Whether an antitrust violation exists is a common question that predominates over other

7    issues "because proof of an alleged conspiracy will focus on defendants' conduct and not on the

8    conduct of individual class members." *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 267 F.R.D.

9    291, 310 (N.D. Cal. 2010) (citing cases); *Giuliano v. Sandisk Corp.*, No. C 10-2787 SBA, 2015

10   WL 10890654, at *17 (N.D. Cal. May 14, 2015) ("[W]hether there has been an antitrust violation is

11   a common issue rather than an individual one. In no event will the individual circumstances of

12   particular class members be relevant to the inquiry of whether such a violation has occurred."); 6

13   NEWBERG ON CLASS ACTIONS, § 18.25 (4th ed. 2002) ("[C]ommon liability issues such as

14   conspiracy or monopolization have, almost invariably, been held to predominate over individual

15   issues."). "Plaintiffs need not show that there will be common proof on each element of the claim

16   especially where proof of the violation is the predominant issue." *In re Static Random Access

17   Memory (SRAM) Antitrust Litig.*, 264 F.R.D. 603, 611 (N.D. Cal. 2009) (cleaned up).

18          Here, regardless of the identity or characteristics of any of the individual class members, the

19   common issues that must be proven as to Defendant's liability for conspiring to violate the antitrust

20   laws include (1) whether Defendants conspired to fix prices, divide the market and engage in

21   unlawful acquisitions; (2) the identity of the conspirators; and (3) whether Defendants' conduct

22   violated Sections 1 and 2 of the Sherman Act and Section 7 of the Clayton Act. As in *Olean* and all

23   the cases cited above, all these questions concern Defendants' conduct rather than the conduct of

24   any individual class member, so common issues necessarily predominate over individual issues as

25   to Defendants' liability. The evidence supporting Plaintiffs' allegations will likewise be common to

26   all members of the class and will include (a) the extensive factual record cited above and in the

27   Ninth Circuit's decision in the *Orion* litigation; (b) Dr. Zona's conclusions about the relevant

28

1   antitrust markets and Defendants' market share and market power within those markets; and (c) Dr.

2   Zona's method and conclusions regarding classwide damages.

### 2.    Common Issues Predominate as to Antitrust Injury

4       Common issues predominate as to the antitrust injury each class member suffered because

5   Defendants' price fixing, market allocation, attempted monopolization and unlawful consolidation

6   enabled them to raise the baseline prices direct purchasers paid for telescopes and telescope

7   accessories to supracompetitive levels. That is exactly what happened in *Olean*. 31 F.4th at 679.

8       In *Olean*, defendants argued that the District Court erred in concluding that antitrust injury

9   could be determined on a class-wide basis. *Id*. at 661 ("The main issue on appeal is whether the

10  purchasers' statistical regression model, along with other expert evidence, is capable of showing

11  that a price-fixing conspiracy caused class-wide antitrust impact"). In affirming the District Court,

12  the Ninth Circuit held that plaintiff's expert's findings that "the packaged tuna market was

13  conducive to price-fixing, given the Tuna Suppliers' dominance in the market, the attendant

14  barriers to entry for competitors" and other factors, "supported a baseline economic theory that the

15  Tuna Suppliers' collusive behavior would affect the DPPs on a class-wide basis." *Id*. at 670.

16      The same baseline exists here. Like the tuna market, the telescope market here is

17  structurally conducive to supracompetitive pricing. (Zona Rpt. ¶ 63.) First, Synta and Ningbo

18  Sunny comprised at least 70% of telescope imports during the Class Period and Celestron's market

19  share was consistently over 70%. (*Id*. ¶¶ 42, 44.) Like the three suppliers in *Olean*, Defendants'

20  high combined market share gave them the ability to raise the baseline price paid by the entire

21  market. (*Id*. ¶¶ 63, 80-111.) Second, the market has high barriers to entry in the form of (1) the

22  factory and equipment resources necessary to produce telescopes, including economics of scale (*Id*.

23  ¶¶ 56-59); (2) the intellectual property owned by Synta and Ningbo Sunny (*Id*. ¶¶ 52-55); and

24  (3) the fact that the largest U.S. distributor (Celestron) is a member of the conspiracy, thereby

25  foreclosing it as a potential customer (*Id*. ¶ 59). Further, as shown above, there is ample evidence

26  that Defendants colluded to prevent others from entering the market. (*Id*. ¶¶ 61-79.)

27      Under these circumstances, "the prevailing economic view [is] that price-fixing affects all

28  market participants, creating an inference of class-wide impact even when prices are individually

1   negotiated." *Olean*, 31 F.4th at 671 (quoting *In re Urethane Antitrust Litig.*, 768 F.3d 1245, 1254

2   (10th Cir. 2014), cleaned up). Thus, even though defendant tuna suppliers individually negotiated

3   prices with large and small retailers, and the prices offered to those retailers differed, an expert

4   regression model showed that all customer types experienced overcharges, which was "evidence

5   that the conspiracy artificially inflated the baseline for price negotiations." *Id.* at 677-78 (quoting *In*

6   *re Urethane*, 768 F.3d at 1254). For this reason, the en banc Ninth Circuit in *Olean* rejected the

7   argument that a class should not be certified because "large retailers like Walmart likely would

8   have used their bargaining power to negotiate lower prices," explaining that "the regression model

9   controlled for the variables identified" by defendants. *Id.* at 678.

10      Judge Donato applied these same principles in *In re Google Play Store Antitrust Litigation*,

11   and certified the class where plaintiffs' "case [was] that Google's monopolistic practices inflated

12   the 'headline rate' that was used at the basis for all developers' negotiations with Google, which

13   affected all of the prices set by the developers and paid by consumers to Google." No. 3:20-CV-

14   5761-JD, 2022 WL 17252587, at *12 (N.D. Cal. Nov. 28, 2022); *see also In re Capacitors*

15   *Antitrust Litig. (No. III)*, No. 3:14-CV-03264-JD, 2018 WL 5980139, at *5 (N.D. Cal. Nov. 14,

16   2018) ("[A]s many courts have noted, the claim of a conspiracy to fix prices inherently lends itself

17   to a finding of commonality and predominance, even when the market involves different products

18   and prices."); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 267 F.R.D. 291, 313 (N.D. Cal. 2010),

19   (noting that "even if there is considerable individual variety in pricing because of individual price

20   negotiations, class plaintiffs may succeed in proving classwide impact by showing that the

21   minimum baseline for beginning negotiations, or the range of prices which resulted from

22   negotiation, was artificially raised (or slowed in its descent) by the collusive actions of defendants."

23   (quoting *In re Comm. Tissue Prods.*, 183 F.R.D. 589, 595 (N.D. Fla. 1998) (collecting cases))).

24      Here, as in *Olean* and the cases above, Dr. Zona verifies that Defendants' anticompetitive

25   conduct "artificially inflated the baseline for price negotiations." *Olean*, 31 F.4th at 677-78. He

26   does so using a standard multiple regression analysis using Celestron's transactional data to

27   determine whether Defendants' anticompetitive conduct had a measurable class-wide impact on the

28   prices Celestron charged to class members for their purchase of telescopes and telescope

1    accessories. (Zona Rpt. ¶¶ 100-110.) This is the exact same technique that was used to establish the

2    existence of class-wide antitrust injury in *Olean*.

3         To perform his analysis, Dr. Zona uses the 2001 to 2005 period as a "benchmark" for the

4    but-for world that would exist absent Defendants' anticompetitive conduct, although he explains

5    that the "before" period in this case does not reflect a true but-for world with independent

6    competitors, because Synta and Ningbo Sunny were under common ownership even prior to the

7    Class Period. (*Id.* ¶¶ 102-103.) Even with that caveat, Dr. Zona's regression analysis shows that

8    prices Celestron charged to the Class were inflated throughout the class period as compared to the

9    pre-2005 period. (*Id.* ¶¶ 108-109.) Dr. Zona's model uses the natural logarithm of price as the

10   dependent variable, which is derived from Celestron's transactional data. (*Id.* ¶ 107.) To measure

11   differences in price between time periods, Dr. Zona uses (1) "two conspiracy indicator variables,

12   one for the period from April 2005 to August 2013, and another from September 2013 forward";

13   (2) "the (natural logarithm of) Celestron unit costs associated with each record"; (3) "indicator

14   variables for the month of the year to control for seasonal effects within each year"; (4) the quantity

15   of the sale (in natural log form); (5) the exchange rate; and (6) fixed effects for each customer and

16   product to control for customer or product-specific effects. (*Id.*) The regression shows that ████

17   ████████████████████████████████████████████████████████████████

18   ████████████████████████████████████████████████████████████████

19   ███████████████████████████████████████████████████████ (*Id.* ¶

20   108.) As in *Olean*, ████████████████████████████████████████

21   ████████████████████████████████████████████ (*Id.* ¶¶ 108-109,

22   124.) For example, ██████████████████████████████████████████

23   ███████████████████████████████████████████ (*Id.* ¶ 124.)

24        As Dr. Zona explains, although his regression model demonstrates the *fact* that all members

25   of the class were overcharged, using regression by itself understates the *magnitude* of the

26   overcharge because it does not include the overcharge that occurred at the manufacturing level.

27   Thus, Synta, Ningbo Sunny, Celestron and Meade (from 2013 to 2019) were able to realize

28   supracompetitive profits from their conspiracy that are not fully captured in Celestron's sales data.

(*Id.* ¶ 82.) Defendants have either destroyed the data that would contain the true margin information (Synta) or not produced it (Ningbo Sunny). Dr. Zona therefore uses structural economic theory and literature to (1) explain why Defendants' conspiracy was able to impact the entire class and (2) better calculate the magnitude of the class-wide overcharge. (*Id.*)

*First*, Dr. Zona uses a textbook Cournot Equilibrium model to show the extent of the overcharge customers experienced. (*Id.* ¶¶ 89-94.) As he explains, the Cournot Equilibrium model shows how a combination between telescope suppliers impacts telescope prices and raises them above the competitive benchmark for the entire class. (*Id.*) The Cournot model shows the magnitude of the classwide impact as follows: (a) a 6.9% overcharge prior to 2005 (when Synta acquired Celestron), which reflects the fact that there is evidence of overlapping ownership between Synta and Sunny prior to 2005; (b) a 17.4% overcharge from 2005 to 2013 (when Synta, Sunny and Celestron were conspiring together, but before Ningbo Sunny acquired Meade); (c) a 35.7% overcharge from 2013 to 2019 (the time period Ningbo Sunny owned Meade and brought it into the conspiracy); and (d) a 17.4% overcharge after 2019 (when Ningbo Sunny divested Meade to satisfy the *Orion* judgment). (*Id.*)

*Second*, Dr. Zona uses literature on measured cartel overcharges compiled by Purdue University—known as the "PIC" data—to calculate the extent of the overcharge to the class. (*Id.* ¶¶ 95-99.) Like the Cournot Equilibrium model, the PIC model shows how the combination of multiple cartel members impacts class-wide prices. (*Id.*) Dr. Zona analyzes a subset of the PIC data pertaining to the United States containing two, three or four cartel members. (*Id.* ¶ 96.) As a result of that analysis, he assumes a baseline market share for Sunny and Synta of 40% prior to 2005 (reflecting their overlapping ownership prior to 2005). (*Id.* ¶ 98.) From 2005 to 2013, Dr. Zona uses a market share of 70%, which represents Celestron's approximate market share before Meade joined the conspiracy. During that time period, Dr. Zona calculates an overcharge of 35% using a regression model. (*Id.*) From 2013 to 2019, when Ningbo Sunny, Synta, Celestron and Meade were all part of the conspiracy, Dr. Zona uses a market share of 80% and finds an overcharge of approximately 39.8%. (*Id.*) From 2019 on, Dr. Zona's PIC model estimates a market share of 70% following the divestment of Meade and calculates an overcharge of 35%. (*Id.*)

These two measures of classwide impact find substantially similar overcharges for the time periods measured and therefore are mutually reinforcing. (*Id.* ¶ 99.) Moreover, the Ninth Circuit previously endorsed Dr. Zona's application of *both* the Cournot model and PIC model to calculate damages Ningbo Sunny inflicted on Orion on substantially the same facts. *See Optronic*, 20 F.4th at 478 ("Th[e] Cournot Equilibrium model corroborated the results that Dr. Zona derived from his analysis of cartels operating in markets with compositions similar to the telescope market. . . . Dr. Zona's expert report and testimony were sufficiently tied to the facts of this case such that the district court properly admitted this evidence."). Dr. Zona's regression model and classwide impact models easily meet the requirements of *Olean*.

### 3.    Common Issues Predominate as to Fraudulent Concealment

DPPs intend to show at trial that Defendants fraudulently concealed their actions from the Class such that the statute of limitations was tolled. "A statute of limitations may be tolled if the defendant fraudulently concealed the existence of a cause of action in such a way that the plaintiff, acting as a reasonable person, did not know of its existence." *Hexcel Corp. v. Ineos Polymers, Inc.*, 681 F.3d 1055, 1060 (9th Cir. 2012) (citation omitted). "A fraudulent concealment defense requires a showing both that the defendant used fraudulent means to keep the plaintiff unaware of his cause of action, and also that the plaintiff was, in fact, ignorant of the existence of his cause of action." *Id.* (citation omitted). "[C]ourts have been nearly unanimous . . . in holding that possible differences in the application of a statute of limitations to individual class members, including the named plaintiffs, does not preclude certification of a class action." *Tait v. BSH Home Appliances Corp.*, 289 F.R.D. 466, 486 (C.D. Cal. 2012) (quoting *Schramm v. JPMorgan Chase Bank, N.A.*, No. 2:09-cv-09442-JAK-FFM, 2011 WL 5034663, at *11–12 (C.D. Cal. Oct. 19, 2011)). Courts likewise find that plaintiffs' rebuttals to Defendants' statute of limitations arguments are issues common to the class. *See id.* ("[T]he doctrines used by plaintiffs for tolling the statute of limitations, such as the doctrine of fraudulent concealment, involve proof common to the defendants, namely, the act of concealing defendant's wrong." (citation omitted)).

Here, Defendants' fraudulent concealment of the anticompetitive acts described above is common to each of the class members. *First*, Defendants affirmatively misled the Government

1  (and, by extension, the DPP Class) about the Meade transaction. They did not disclose that Mr.

2  Shen and Synta were behind Ningbo Sunny's attempt to acquire Meade. When the FTC learned

3  that Mr. Shen owned a significant percentage of Ningbo Sunny, the co-conspirators falsely

4  represented to the FTC that Ningbo Sunny's CEO Peter Ni was the party acquiring Meade (rather

5  than Ningbo Sunny itself), and funneled the money to purchase Meade through a Hong Kong entity

6  jointly owned by Mr. Shen and Mr. Ni—only for Mr. Ni to subsequently transfer Meade to Ningbo

7  Sunny for $1 after the deal closed. (Exs. 79-81.) Additionally, ████████████████████

8  ████████████████████████████████████████████████████████

9  ████████████████████████████████████████████████████████

10  ████████████████████████████████████ Ex. 3.)

11       *Second*, Defendants did not discuss the relationship between Celestron, Synta and Ningbo

12  Sunny with any class member and thereby hid their conspiracy from the Class. ██████████

13  ████████████████████████████████████████████████████████

14  ████████████████████████████████████████████████████████

15  ████. (Ex. 10 (Lupica Dep. Tr.) 137:25-139:1.) ████████████████████

16  ████████████████████████████████████████████████████████

17  ████████████████████████████████████████████████████████

18  ████████████████████████████████. Defendants' affirmative concealment

19  of their anticompetitive scheme is common to all Class members.

20       **B.    Damages Can Be Proven by a Common Methodology**

21       Courts generally find that, upon a showing of class-wide impact, common issues

22  predominate as to class-wide damages because "there is no *per se* rule that a district court is

23  precluded from certifying a class if plaintiffs may have to prove individualized damages at trial."

24  *Olean*, 31 F.4th at 681–82. For example, in *Olean*, the court found that the damages expert's

25  method for calculating damages was "a straightforward process of applying the class-wide

26  overcharge to the Tuna Purchasers' net sales records," which "would not give rise to a concern

27  about individualized mini-trials to determine each class member's damage award." *Id.* at 682 n.31.

28

Like the expert in *Olean*, Dr. Zona applies the class-wide overcharge to Celestron's and Meade's U.S. telescope product sales during the Class Period. (Zona Rpt. ¶¶ 112-116.) He does this by reviewing Celestron's transactional data and totaling transaction revenues for records with a "ship to" or "billed-to" address in the United States, and by using available Meade sales data. (*Id.*)

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

(*See* Zona Rpt. ¶ 117.)[5]

### C.     A Class Action is Superior to Individualized Determinations

Rule 23(b)(3) requires that "a class action [be] superior to other available methods for fairly and efficiently adjudicating the controversy." "The superiority inquiry focuses 'on the efficiency and economy elements of the class action so that cases allowed under subdivision (b)(3) are those that can be adjudicated most profitably on a representative basis.'" *Herrera v. LCS Fin. Servs. Corp.*, 274 F.R.D. 666, 681 (N.D. Cal. 2011) (quoting *Zinser v. Accufix Research Institute, Inc.*, 253 F.3d 1180, 1190 (9th Cir. 2001)). Courts assessing superiority consider practical considerations regarding whether a class action is appropriate, including (A) "the class members' interests in individually controlling the prosecution or defense of separate actions"; (B) "the extent and nature of any litigation concerning the controversy already begun by or against class members"; (C) "the desirability or undesirability of concentrating the litigation of the claims in the particular forum"; and (D) "the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3).

---

[5] To calculate damages, Dr. Zona adjusted the output of his regression model based on Celestron's transactional data to add a "base overcharge" derived from the PIC dataset. (*See* Zona Rpt. ¶¶ 98, 117.) This compensates for the fact that the transactional data did not fully account for manufacturer-level supracompetitive profits, as explained above.

These requirements are met here. This is an action alleging a complex international antitrust conspiracy in which Defendants have produced millions of documents. Litigating it has required years of Class Plaintiffs' and Class Counsel's time and resources. The majority of the class members do not have sufficient individual telescope purchase volume to give them an incentive to prosecute such claims individually, particularly where the overcharge for which each class member individually may collect damages is only a portion of the overall purchase price. *See Stewart v. Quest Diagnostics Clinical Lab'ys, Inc.*, No. 3:19-cv-02043-AGS-DDL, 2022 WL 5236821, at *17 (S.D. Cal. Oct. 5, 2022) (finding class action superior where "the cost of litigating individual cases, compared with each class member's amount of damages, make one class action cost effective and will avoid burdening the court with duplicative cases"); *Moore v. Ulta Salon, Cosmetics & Fragrance, Inc.*, 311 F.R.D. 590, 622-23 (C.D. Cal. 2015) ("Where recovery on an individual basis would be dwarfed by the cost of litigating on an individual basis, this factor weighs in favor of class certification."). Aside from Orion, no class member has initiated separate litigation against Defendants, and Defendants have not initiated any litigation against class members. By contrast, there are no difficulties in managing this action as a class action given that (1) DPPs satisfy the prerequisites of Rules 23(a) and 23(b); and (2) Class Plaintiffs and Class Counsel have the resources and incentive to litigate DPPs' claims and have done so for more than three years.

## III.   BHB SHOULD BE APPOINTED CLASS COUNSEL

Pursuant to Rule 23(g), "a court that certifies a class must appoint class counsel." In appointing Class Counsel, Rule 23(g) requires the Court to consider, among other issues, (i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class.

BHB is a boutique with approximately 50 lawyers with offices in San Francisco and New York. The firm routinely handles high-profile litigation, including recent antitrust and competition trial verdicts and appeals in state and federal courts. (Dkt. 558-6, ¶ 2.) BHB has been lead counsel on numerous top 100 trial verdicts involving complex commercial and business tort disputes,

including the verdict and appeal in the *Orion* litigation. BHB also secured the fourth largest trademark infringement jury verdict ever in *Stone Brewing Co. v. Molson Coors Brewing Co.*, No. 3:18-cv-00331 (S.D. Cal.). (*Id.*) The firm is the only San Francisco litigation boutique ranked in Chambers for commercial litigation and has garnered numerous other accolades. (*See id.* ¶ 3.)

BHB is uniquely qualified to be appointed class counsel here. It unearthed nearly every fact germane to the claims in this action. BHB has devoted significant resources to prosecuting this case on behalf of the class, amounting to well over 6,000 hours of attorney time thus far. (*Id.* ¶ 4.) As the Court already found, "BHB has demonstrated that it is experienced in handling complex antitrust class actions, including cases concerning many of the same facts, issues, and evidence that will likely be at issue in this case. Additionally, BHB has demonstrated its extensive knowledge in the applicable law, and that it has the appropriate resources to represent the best interests of the Direct Purchaser Plaintiffs." (Dkt. 49.) BHB has also vigorously represented the class. It has secured several key litigation victories for the class, including defeating Defendants' motions to dismiss and motion to deny class certification (Dkt Nos. 173, 539, 596). Because of its work on the *Orion* litigation, which included reviewing millions of pages of documents (much of which was produced in Chinese), BHB came into this case with five years of institutional knowledge, which saved the class considerable fees. In this case, BHB has reviewed thousands of additional documents and taken and defended numerous depositions. (*See* Dkt. 558-6 ¶ 5.) This more than satisfies the requirements of Rule 23(g), because BHB has proven that it is committed to vigorously prosecuting this action against Defendants, and should be appointed Class Counsel. *See, e.g.*, *Markson v. CRST Int'l, Inc.*, No. 5:17-CV-01261-SB-SP, 2022 WL 805615, at *5 (C.D. Cal. Feb. 24, 2022) (appointing class counsel where counsel "have vigorously and capably represented Plaintiffs for several years since filing this suit" and "have demonstrated their knowledge of the applicable law in this suit").

## **CONCLUSION**

For the foregoing reasons, the Court should certify the Class and appoint BHB as Class Counsel.

1   Dated:  May 20, 2024                         Respectfully submitted,

2                                                  BRAUNHAGEY & BORDEN LLP

3

4                                                    By:   */s/ Matthew Borden*
                                                                Matthew Borden

5                                              *Attorneys for Direct Purchaser Plaintiffs*

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28