1  CHRISTOPHER FROST (SBN 200336)
   chris@frostllp.com
2  JOHN MAATTA (SBN 83683)
   john@frostllp.com
3  JOSHUA STAMBAUGH (SBN 233834)
   josh@frostllp.com
4  LAWRENCE J.H. LIU (SBN 312115)
   lawrence@frostllp.com
5  FROST LLP
   10960 Wilshire Boulevard, Suite 2100
6  Los Angeles, California 90024
   Telephone: (424) 254-0441
7
   SHAUNA A. IZADI (Admitted *Pro Hac Vice*)
8  sizadi@izadilegal.com
   IZADI LEGAL GROUP, PLLC
9  13155 Noel Road, Suite 900
   Dallas, Texas 75240
10
   Attorneys for Defendants Celestron Acquisition, LLC,
11 Suzhou Synta Optical Technology Co., Ltd., Synta
   Canada Int'l Enterprises Ltd., SW Technology Corp.,
12 Olivon Manufacturing Co. Ltd., Olivon USA, LLC,
   Nantong Schmidt Optoelectrical Technology Co. Ltd.,
13 Pacific Telescope Corp., Corey Lee, David Shen,
   Sylvia Shen, Jack Chen, Jean Shen, Joseph Lupica,
14 Dave Anderson, Laurence Huen

15              **UNITED STATES DISTRICT COURT**

16     **NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION**

| | |
|---|---|
| 17  IN RE TELESCOPES ANTITRUST LITIGATION | Case No. 5:20-cv-03642-EJD |
| 18  THIS DOCUMENT RELATES TO: | *Assigned to: Hon. Edward J. Davila* |
| 19  AURORA ASTRO PRODUCTS, LLC, PIONEER CYCLING & FITNESS, LLP; and those similarly situated, | **DEFENDANTS' OPPOSITION TO DIRECT PURCHASER PLAINTIFFS' MOTION REQUESTING FINANCIAL ASSURANCE AND ASSET INFORMATION** |
| 20                   Plaintiffs, | |
| 21        vs. | |
| 22  CELESTRON ACQUISITION, LLC, SUZHOU SYNTA OPTICAL TECHNOLOGY CO., LTD., | *[Filed concurrently with supporting Declaration of Christopher Frost]* |
| 23  SYNTA CANADA INT'L ENTERPRISES LTD., SW TECHNOLOGY CORP., OLIVON | |
| 24  MANUFACTURING CO. LTD., OLIVON USA, LLC, NANTONG SCHMIDT OPTOELECTRICAL | Hearing |
| 25  TECHNOLOGY CO. LTD., NINGBO SUNNY ELECTRONIC CO., LTD., PACIFIC TELESCOPE | Date:       January 23. 2025 Time:       9:00 a.m. Crtrm.:     4 (5th Floor) |
| 26  CORP., COREY LEE, DAVID SHEN, SYLVIA SHEN, JACK CHEN, JEAN SHEN, JOSEPH | |
| 27  LUPICA, DAVE ANDERSON, LAURENCE HUEN, and DOES 1-50, | |
| 28                 Defendants. | Compl. Filed:   June 1, 2020 Trial Date:     None Set |

Case No. 5:20-cv-03642-EJD

**<u>TABLE OF CONTENTS</u>**

I.    INTRODUCTION ...................................................................................................... 5

II.   DPPS ARE ATTEMPTING TO RELITIGATE ISSUES ALREADY DECIDED AGAINST
      THEM NUMEROUS TIMES. ................................................................................... 7

      A.    BHB's First Failed Attempt to Allege Celestron Committed Fraud on the Court. ................ 9

      B.    BHB's Second Failed Attempt to Allege Celestron Committed Fraud on the Court. ........... 10

      C.    BHB's Third Failed Attempt to Allege Celestron Committed Fraud on the Court. .............. 10

      D.    BHB's Fourth Failed Attempt to Allege Celestron Committed Fraud on the Court. ............ 11

III.  DPPs' MOTION IS A THINLY VEILED ATTEMPT TO IMPROPERLY SEEK DISCOVERY
      AFTER THE DISCOVERY CUT-OFF. ................................................................... 12

IV.   DPPs' MOTION IS PROCEDURALLY AND SUBSTANTIVELY IMPROPER AND
      PRESENTS NO GROUNDS FOR ANY RELIEF. ................................................... 14

      A.    DPPs' Disguised Request for a Preliminary Injunction Must Fail. ....................................... 14

            1.    DPPs Fail to Demonstrate a Likelihood of Success. ................................................ 15

            2.    There is No Risk of Irreparable Injury. ................................................................... 18

            3.    The Balance of Hardships Weighs in Defendants Favor. ......................................... 20

            4.    Public Interest Favors Denying DPPs' Requested Prejudgment Relief. ................... 20

      B.    Neither Rule 64 nor the Court's Inherent Equitable Powers Authorize an Asset Freeze or
            Accounting of Funds Here. .................................................................................................. 22

            1.    DPPs' Reliance on Trademark Counterfeiting Cases Does Not Support the
                  Provisional Remedies That They Seek. ................................................................... 23

            2.    DPPs Fail to Show a Strong Likelihood of Dissipation of Assets. ........................... 25

                  (a)   There Is Nothing Fraudulent About Defendants' Corporate Structure. ............ 26

                  (b)   Defendants Are Not "Expatriating Money" From the U.S. ............................... 27

                  (c)   DPPs Did Not Timely Oppose or Object to IPPs' Motion for Preliminary
                        Settlement and Cannot Do So Now. ................................................................. 27

      C.    To the Extent DPPs' Seek a Writ of Attachment, Their Request Must Fail. ......................... 28

V.    CONCLUSION ......................................................................................................... 29

DEFENDANTS' OPPOSITION TO DIRECT PURCHASER PLAINTIFFS'
MOTION REQUESTING FINANCIAL ASSURANCE AND ASSET INFORMATION

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Big County Foods, Inc. v. Board of Educ. of the Anchorage Sch. Dist.*,
  868 F.2d 1085 (9th Cir. 1989) ................................................................................................. 18

*Blocktree Properties, LLC v. Pub. Util. Dist. No. 2 of Grant Cnty. Washington*,
  783 F. App'x 769 (9th Cir. 2019) ........................................................................................... 19

*California v. Trump*,
  379 F. Supp. 3d 928 (N.D. Cal. 2019), *aff'd*, 963 F.3d 926 (9th Cir. 2020) .................................. 19

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
  No. 07-CV-05944-JST, 2020 WL 1873554 (N.D. Cal. 2020) ..................................................... 27

*Churchill Vill., L.L.C. v. Gen. Elec. Co.*,
  169 F. Supp. 2d 1119 (N.D. Cal. 2000), *aff'd sub nom. Churchill Vill., L.L.C. v. Gen. Elec.*, 361
  F.3d 566 (9th Cir. 2004) .......................................................................................................... 19

*Cisco Sys. Inc. v. Shenzhen Usource Tech. Co.*,
  No. 20-cv-4773-EJD, 2020 WL 5199434 (N.D. Cal. 2020) ................................................. *passim*

*De Beers Consol. Mines v. United States*,
  325 U.S. 212 (1945) ................................................................................... 20, 21, 24, 25

*Deckert v. Independence Shares Corp.*,
  311 U .S. 282 (1940) ................................................................................................................ 25

*Disney Enterprises, Inc. v. VidAngel, Inc.*,
  224 F. Supp. 3d 957, 966 (C.D. Cal. 2016), aff'd, 869 F.3d 848 (9th Cir. 2017) ........................... 20

*Elder v. Hilton Worldwide Holdings, Inc.*,
  No. 16-CV-00278-JST, 2020 WL 11762284, at *7 (N.D. Cal. 2020) .......................................... 28

*F.T.C. v. H. N. Singer, Inc.*,
  668 F.2d 1107 (9th Cir. 1982) ................................................................................................. 22

*Facebook, Inc. v. BrandTotal Ltd.*,
  499 F. Supp. 3d 720 (N.D. Cal. 2020) ..................................................................................... 19

*Fin. & Sec. Prod. Ass'n v. Diebold, Inc.*,
  No. C 04-04347 WHA, 2005 WL 1629813 (N.D. Cal. 2005) ..................................................... 19

*Garcia v. Google, Inc.*,
  786 F.3d 733 (9th Cir. 2015) ................................................................................................... 15

DEFENDANTS' OPPOSITION TO DIRECT PURCHASER PLAINTIFFS'
MOTION REQUESTING FINANCIAL ASSURANCE AND ASSET INFORMATION

*Grupo Mexicano de Desarollo, S.A. v. Alliance Bond Fund, Inc.*,
   527 U.S. 308 (1999) ..................................................................................................... 25

*Hall v. U.S. Dep't of Agric.*,
   467 F. Supp. 3d 838 (N.D. Cal.), *aff'd sub nom. Hall v. United States Dep't of Agric.*, 984 F.3d
   825 (9th Cir. 2020) ...................................................................................................... 15

*Innovation Ventures, LLC v. Pittsburg Wholesale Grocers*,
   No. C 12-5523 WHA, 2013 WL 3622016 (N.D. Cal. 2013) ......................................... 23, 24, 25, 26

*Jaiyeola v. AT&T Mobility, LLC*,
   No. 5:23-CV-05182-EJD, 2023 WL 9502956 (N.D. Cal. Dec. 6, 2023), *aff'd sub nom. Jaiyeola v.
   AT&T Inc.*, No. 23-4027, 2024 WL 1462921 (9th Cir. Apr. 4, 2024) ................................ 14, 18, 19

*Kokka & Backus, PC v. Bloch*,
   No. C 10-0110 RS, 2010 WL 331336 (N.D. Cal. 2010) ................................................. 22

*In re Novatel Wireless Sec. Litig.*,
   No. 08CV1689 AJB RBB, 2014 WL 2858518 (S.D. Cal. 2014), *amended in part,* No. 08CV1689
   AJB RBB, 2014 WL 3341049 (S.D. Cal. 2014) ........................................................... 28

*Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*,
   20 F.4th 466 (9th Cir. 2021) ......................................................................................... 15

*Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*,
   N.D. Cal. Case No. 5:16-cv-06370-EJD ........................................................................ 6

*Reebok Int'l, Ltd. v. Marnatech Enterprises, Inc.*,
   970 F.2d 552 (9th Cir. 1992) ...............................................................................*passim*

*Sweet v. Cardona*,
   No. 23-15049, 2024 WL 4675573 (9th Cir. Nov. 5, 2024) ............................................ 28

*TVBI Co. Ltd. v. Hong Thoa Thi Pham*,
   No. 17-CV-05858-SI, 2018 WL 4616283 (N.D. Cal. 2018) ........................................... 28

*UL, LLC v. Space Chariot, Inc.*,
   No. CV16–8172–CAS, 2017 WL 6271272 (C.D. Cal. 2017) .......................................... 23, 24

*Wells Fargo Bank, N.A. v. Stewart Homes, Inc.*,
   No. 8:23-CV-01800 DOC, 2024 WL 2178245 (C.D. Cal. May 2, 2024) .......................... 29

*Winter v. Nat. Res. De. Council, Inc.*,
   555 U.S. 7 (2008) .................................................................................................. 14, 15

**Federal Statutes**

Lanham Act ......................................................................................................................... 23

Sherman Act ....................................................................................................................... 21

3

**Federal Rules**

Federal Rule of Civil Procedure 23 ........................................................................... 5, 27

Federal Rule of Civil Procedure 24 ................................................................................. 28

Federal Rule of Civil Procedure 64 ................................................................. 14, 22, 23

Federal Rule of Evidence 401 ......................................................................................... 16

Federal Rule of Evidence 402 ......................................................................................... 16

Federal Rule of Evidence 408 ......................................................................................... 16

Federal Rule of Evidence 602 ......................................................................................... 16

Federal Rule of Evidence 701 ......................................................................................... 16

Federal Rule of Evidence 704 ......................................................................................... 16

Federal Rule of Evidence 801 ......................................................................................... 16

Federal Rule of Evidence 802 ......................................................................................... 16

**California Statutes**

Code of Civil Procedure
    § 483.010(a) ............................................................................................................ 29

**Local Rules**

Local Rule 37-3 ......................................................................................................... 7, 13

Local Rule 7-5 ................................................................................................................ 16

DEFENDANTS' OPPOSITION TO DIRECT PURCHASER PLAINTIFFS'
MOTION REQUESTING FINANCIAL ASSURANCE AND ASSET INFORMATION

## MEMORANDUM OF POINTS AND AUTHORITIES

Defendants Celestron Acquisition, LLC, Suzhou Synta Optical Technology Co., Ltd., Synta Canada Int'l Enterprises Ltd., SW Technology Corp., Olivon Manufacturing Co. Ltd., Olivon USA, LLC, Nantong Schmidt Optoelectrical Technology Co. Ltd., Pacific Telescope Corp., Corey Lee, David Shen, Sylvia Shen, Jack Chen, Jean Shen, Joseph Lupica, Dave Anderson, and Laurence Huen (collectively, "Defendants") respectfully submit this Opposition to Direct Purchaser Plaintiffs' ("DPPs") Motion Requesting Financial Assurance and Asset Information (the "Motion" or "Mot.").

## I.    INTRODUCTION

DPPs' Motion is exceptional, both for its procedural deficiencies as well as its substantive failures. It is a hodgepodge of mischaracterized facts, inapplicable law, and contradictory requests for relief. It is nearly incomprehensible to determine the specific relief DPPs seek or to decipher the legal basis for any such relief. As just a few examples of the countless notable features in the Motion:

- In their Notice of Motion, DPPs cite to Rule 23 as the grounds for the Motion—despite this Rule having nothing to do with the relief they request. (Mot. at p. (i), line 9);

- DPPs claim that Celestron committed a "fraud on the Court by transferring $4.2 million to China"—hoping that this Court has a short memory and has forgotten that this issue has already been litigated and decided against DPPs on *four prior occasions*, *three of which were by this Court*. (*Id.* at 1:20);

- DPPs violate the mediation privilege and use communications *during* the mediation (not after as they suggest) to support their Motion. (*Id.* at 2:6–7);

- DPPs apparently seek a preliminary injunction—without having filed a motion for a preliminary injunction. (*Id.* at 6:25–7:5);

- DPPs claim the existence of key "*evidence*" in this case—and then cite to their complaint. (*Id.* at 2:17–18);

- DPPs assert Defendants have engaged in the dissipation of assets—but cite to routine and legal transfers of funds in the normal course of business. (*Id.* at 3–4);

- DPPs complain that Celestron has improperly transferred funds to foreign entities (their parent companies)—yet not one of these transfers was in violation of a Court Order, judgment, or any judgment lien. (*Id.* at 4:10–5:2.)

- DPPs fault Defendants for not arguing the merits of the case during class certification—despite liability not being "at issue" on class certification. (*Id.* at 15:14–15);

- DPPs repeatedly assert that Defendants have engaged in "blatant" violations of the U.S. antitrust laws—without any trial, or even rulings on dispositive motions. (*Id.* at 8:11);

- The Motion seeks post-judgment remedies by claiming that Defendants have engaged in "judgment avoidance" and have been permitted to "defy the Court's judgment"—in the absence of any judgment whatsoever. (*Id.* at 12:6);

- DPPs claim there is new evidence justifying relief—yet rely upon documents that were produced **years ago**, and deposition testimony from **nine months ago**. (*See generally*, Exhibits to Declaration of Matthew Borden ["Borden Decl."]). Indeed, DPPs are forced to admit that evidence they rely on was available "a year ago" (Mot. at 12:19);

- DPPs suggest that somehow relief is warranted in light of the settlement with the Indirect Purchaser Plaintiffs ("IPPs") ostensibly attempt to object to preliminary approval of that settlement—but DPPs are not members of the IPP settlement class, did not object to preliminary approval and have no standing to do so; and

- DPPs disingenuously state they are seeking "modest and practical" remedies—then under the guise of a Motion for "miscellaneous relief," they request extraordinary and drastic pre-judgment relief that they are not entitled to on a spurious factual record.

Once the Court sifts through the morass of confusing legal principles and inaccurate factual allegations, it is clear that DPPs' counsel has brought this Motion for no other reason than to: 1) continue their judgment collection efforts in the *Orion* Litigation[1]; and 2) demean and defame Defendants in the public record. These efforts should be rejected outright by the Court for numerous independent reasons.

**First**, these issues have been previously litigated and adjudicated no less than four times. Three times by this Court and once again by the Los Angeles Superior Court. The last time this Court rejected DPPs' attempt to claim that Celestron committed a fraud on the Court, the Court noted at the hearing that the TRO and OSC proceedings were brought without any new evidence and on the eve of the Holiday season when such allegations and distractions would be most disruptive to Defendants' business. So too here. Once again, DPPs have brought another baseless attempt to disrupt Defendants' business, with no new evidence, a few weeks before Black Friday when Defendants' sales are at their peak. For this reason alone, the Motion should be denied. Moreover, this conduct, which is verging on sanctionable behavior, should be stopped once and for all.

**Second**, DPPs' Motion is procedurally defective to the point of being nonsensical. They ask for relief that is not available at this stage in the proceedings. They seek a preliminary injunction without following the appropriate steps for injunctive relief and addressing the relevant elements. And they seek inconsistent remedies. This is a further independent ground for denying the Motion based on the current

---

[1] *Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*, N.D. Cal. Case No. 5:16-cv-06370-EJD.

6

1  record.

2      ***Third***, the Motion is an improper attempt to thwart the discovery process and violate this Court's

3  Local Rules regarding discovery disputes. It appears that DPPs seek some type of financial information

4  through this Motion. However, DPPs previously attempted to serve discovery in this case seeking similar

5  financial information, but only days before the October 4, 2024 discovery cut-off. Thus, the requests

6  were late and DPPs waived their right to any substantive responses from the Defendants. If, for some

7  reason, DPPs believed they were entitled to substantive responses (and they were not given their

8  untimely requests), they were required to bring a motion to compel within 7 days after the discovery

9  cut-off pursuant to Civil L.R. 37-3. They failed to do so. This Motion is an attempt to end-run the Court's

10  rules and make up for DPPs' failure to serve discovery in a timely fashion.

11      ***Fourth***, even if the Court were inclined to indulge DPPs on this issue for a fifth time, and even

12  if the Court were to overlook the fact that the Motion is procedurally improper and nothing more than

13  an attempt to end-run the discovery rules, it is abundantly clear that the motion has no substantive merit.

14  DPPs fail to identify the appropriate standards for any pre-judgment relief. The evidence they cite does

15  not even come close to justifying any of those pre-judgment remedies. And the caselaw they cite does

16  not help their cause. It is either completely inapposite or actually supports Defendants' position.

17      For all of these reasons, the Motion should be denied.

18  **II.    DPPS ARE ATTEMPTING TO RELITIGATE ISSUES ALREADY DECIDED**

19  **AGAINST THEM NUMEROUS TIMES.**

20      This Court is very likely experiencing déjà vu. This is the fourth time DPPs have brought these

21  issues before the Court. And the fifth time overall within multiple forums. Although DPPs attempt to

22  hide their true motivations for bringing this Motion, their intentions are belied by their opening

23  comments in the Introduction that: "Celestron helped Defendant Ningbo Sunny commit a fraud on the

24  Court by transferring $4.2 million to China to frustrate judgment collection in the Orion litigation."

25  (Mot. at 1:19–21.) This baseless claim that has been refuted time and again is the true reason for

26  rehashing their request for pre-judgment relief. (*See also id.* at 12:13–14 ["Celestron aided and abetted

27  Ningbo Sunny in avoiding the judgment by wiring $4.2 million to Ningbo Sunny …"].) Defendants will

28  briefly summarize these prior failed campaigns.

As explained in great detail in Celestron's response to the last OSC attempt by BraunHagey & Borden ("BHB") in the separate *Orion* Litigation, on January 2, 2020, at the request of Ningbo Sunny, Celestron paid nearly $4.2 million to Ningbo Sunny for inventory Ningbo Sunny had already provided to Celestron. Ningbo Sunny had requested that Celestron pre-pay for additional inventory it had not yet received, but Celestron refused to do so, as that would be outside the ordinary course of business. (*See Orion* Litigation, ECF 817.) The $4.2 million payment was memorialized by a Remittance. (*See* concurrently filed Declaration of Chris Frost ["Frost Decl."] ¶ 3, Ex. A.) Celestron did not attempt to conceal the payment from Orion; rather, Celestron provided it to Orion during post-trial discovery on February 10, 2020. (*See Orion* Litigation, ECF No. 598 [Court Order dated Mar. 9, 2020, at 3:18–23].) At that time, there existed no judgment lien or other order precluding Celestron from making the payment. This is undisputed.

On February 13, 2020, Plaintiff in the *Orion* Litigation (represented by BHB) filed a motion for an Order to Show Cause as to why defendant Ningbo Sunny and its President, Peter Ni, should not be sanctioned for false representations to the Court by Ningbo Sunny's principal and counsel regarding the transfer of assets outside of the United States. These proceedings were against Ningbo Sunny, not Celestron. (*See Orion* Litigation, ECF No. 578 [Mot. OSC].) Orion's counsel even admitted in the motion papers that Celestron had complied with its obligations and provided evidence of the remittance. In fact, it was because of Celestron's transparency that Orion knew that Ningbo Sunny was not being forthright. (*Id.* at 7:6–21.) The OSC motion even admits that Orion discovered the transfer when Celestron produced evidence of the Remittance. (*Id.* at 7:12–13.)

In other words, contrary to what DPPs imply, this Court made no findings of any wrongdoing by Celestron, and any "fraud on the court" findings against Ningbo Sunny related to representations and conduct was not only independent of Celestron, but actually came to light because of Celestron's transparency.

After the Order to Show Cause was fully briefed, the Court issued its order on March 9, 2020, and found that Ningbo Sunny (not Celestron) made certain representations in bad faith and that sanctions were appropriate. (*Orion* Litigation, ECF No. 598 [March 9, 2020 Order, 5:23–6:1].) The Court then ordered Ningbo Sunny (not Celestron) to remit the approximate $4.2 million received to Orion no later

than March 23, 2020. (*Id.* at 6:5–6.) The Court even held Ningbo Sunny's Peter Ni personally responsible for the return of the same funds. On April 20, 2020 (four months after the subject transfer), Ningbo Sunny (not Celestron) was ordered to assign to Orion all of its accounts, accounts receivable, rights of payment of money, contingent rights, contract rights, deposits and deposit accounts, claims against third parties, and monies due from various third parties including Celestron. (*Orion* Litigation, ECF No. 643 [Order Granting Celestron's Motion for Clarification].) In short, Celestron did nothing wrong, and was found to have done nothing wrong. Even though Ningbo Sunny may have made misrepresentations to the Court, Orion has already exercised its only remedies—which are, once again, against Ningbo Sunny, not Celestron.

### A.    <u>BHB's First Failed Attempt to Allege Celestron Committed Fraud on the Court.</u>

On July 2, 2020, Orion (represented by BHB) previously sought and obtained a TRO against Celestron by claiming Celestron was aiding and abetting fraud by Ningo Sunny by buying Ningbo Sunny equipment indirectly from a trading company. (Frost Decl. ¶ 6; *Orion* Litigation, ECF Nos. 702, 703.) The problem with Orion's argument was that Celestron had every right to buy inventory from a trading company. In fact, Celestron had no choice because Ningbo Sunny quit supplying Celestron after Celestron started paying Orion for received equipment once the judgment lien was in place. The relationship with the trading company did not implicate the judgment lien because Celestron was not purchasing from Ningbo Sunny and owed it no money. The trading company sourced the inventory not dictated by Celestron or any other customers, and the trading company was responsible for its own relationships with the manufacturers. At the preliminary injunction hearing, this Court expressed great skepticism that Celestron's actions constituted any wrongdoing. Nevertheless, on a break in the proceedings, the parties agreed to a stipulated order that any money owed to Ningbo Sunny by the trading company would be paid by Celestron, and going forward, Celestron would pay Orion for inventory received indirectly from Ningbo Sunny via the trading company. Celestron agreed to do so only because Orion agreed that any further proceedings would be by normal notice instead of TRO because TROs would be profoundly disruptive to Celestron's business. (*See* Frost Decl. ¶ 6; *Orion* Litigation, ECF No. 719.)

**B.**    **BHB's Second Failed Attempt to Allege Celestron Committed Fraud on the Court.**

On June 8, 2021, Orion sought and obtained another TRO on the bald claim that Celestron was still buying from Ningbo Sunny. (Frost Decl. ¶ 7; *Orion* Litigation, ECF Nos. 749, 753.) Orion's argument was based on the bare assumption that no other factories could produce the requisite amount of inventory. This was patently false. Celestron went through the painstaking process of identifying every transaction and tracing it back to a different manufacturer. Celestron even obtained the records from the "other side" of the transaction, showing records on file with the government of the People's Republic of China. Celestron volunteered to provide depositions of Director of Operations, Amir Cannon and CEO, Corey Lee, who explained the transactions. At the preliminary injunction hearing, this Court was satisfied Celestron did nothing wrong and vacated the TRO. (Frost Decl. ¶ 7; *Orion* Litigation, ECF No. 763.)

**C.**    **BHB's Third Failed Attempt to Allege Celestron Committed Fraud on the Court.**

On November 10, 2022, Orion (represented by BHB) filed a separate action in Los Angeles Superior Court, Case No. 22STCV35723 (the "LASC Action") against Celestron seeking relief regarding the very same $4.2 million payment at issue in the Motion. (*See* Frost Decl. ¶ 8, Ex. C. [State Court Complaint].) DPPs failed to mention this fact in its Motion (as it did in the last OSC proceedings described below). In the LASC Action, Orion even went so far as to (unnecessarily) name current counsel in the allegations, and accuse them of participating in the "fraud"—a story that became a Law360 headline and brought much ill-founded attention to counsel. (Frost Decl. ¶ 8.) Such actions demonstrated Orion's counsel's repeated tactic of demanding relief and making serious accusations based on speculation and hyperbole. In that lawsuit, Orion accused Celestron of the same "fraud" it alleges here, and sought to hold Celestron responsible for the same $4.2 million transfer as here. Celestron filed a demurrer, motion to strike and an anti-SLAPP motion in response to Orion's baseless and inflammatory complaint. After several hearings, the Court sustained Celestron's demurrer in its entirety without leave to amend. The Court held that Orion had no cause of action against Celestron as a matter of law. (Frost Decl. ¶ 10, Ex. D [LASC Ruling dated Apr. 7, 2023].) Among other things, the Court found that:

- "Orion never had a claim against Celestron. Celestron, therefore, is permitted to act in its

own interest by paying a business debt" (Frost Decl. ¶ 10, Ex. D at p. 3);

- Orion's "litigation against Ningbo even after it obtained a judgment gave it no claim against its [sic] Ningbo's debtors" (*Id.* at p. 4);

- "Celestron is not obligated to delay paying its existing business debts to help plaintiff collect its judgment by serving levy on Celestron" (*Id.*); and

- "No judicial order imposed any restriction on Celestron's payment of debts it owed to Ningbo." (*Id.*)

The Court found that Celestron did nothing wrong, and that Orion was entitled to no relief. (Frost Decl. ¶ 11.)

### D.    **BHB's Fourth Failed Attempt to Allege Celestron Committed Fraud on the Court.**

Undeterred by this Court's prior rulings, and the ruling from the Los Angeles Superior Court, BHB once again filed an *Ex Parte* Application for an OSC under seal in the *Orion* Litigation on November 28, 2023 asking to freeze Celestron's assets, and showed a complete lack of candor by not informing the Court that the very same issues had already been decided in Celestron's favor and without giving Celestron any notice or opportunity to respond. (*Orion* Litigation, ECF 807; Frost Decl. ¶ 12.) Celestron's counsel requested to see the *ex parte* papers, but BHB ignored the request. Celestron did not even see the application filed by BHB until the Court unsealed a redacted version on Friday, November 30, leaving Celestron only a few business days to prepare a response. The only purported explanation for not giving notice of the OSC to Celestron was that, because of other third parties identified in the papers, BHB was concerned that Ningbo Sunny might abscond with funds from the United States. However, that logic did not apply to Celestron and there was no explanation as to why Celestron was included in the request for relief. Celestron had not made a transfer to Ningbo Sunny in nearly four years, and was given no opportunity to respond to the requested OSC. Before the hearing on the OSC had even occurred in December 2023, Orion's counsel BHB had circulated the Order to Celestron's banking institutions. (*Orion* Litigation, ECF 817-1, ¶ 15; Frost Decl. ¶ 12 .)

At the hearing on this OSC, the Court noted the troubling behavior of BHB:

- "It's not lost on me that the TRO was filed at the height of the Christmas season and there's holiday purchases and it's very disruptive to businesses that otherwise are

legitimate . . ." (*Orion* Litigation, ECF No. 839, 11:3–5.)

- "What's the lay of the land here? You filed this, you suggested that there was some, again, additional evidence of collusive and inappropriate conduct by the party Celestron. Much of this evidence we looked at before." (*Id*. at 30:5–9.)

- "That's my second question is did you file a second lawsuit. I learned of it with the Opposition, and it would have been helpful if you had put that in your moving papers, because that's a critical piece of evidence, isn't it? I—when I discovered it, I thought, why didn't Mr. Borden's team tell us about this? Is this consciousness of guilt? Or is it avoidance? Or what?" (*Id*. at 33:18–24.)

- "So that was a little troubling to me to learn that, oh, wait a minute, they did file another lawsuit and these issues were fleshed out and there's now a full faith and credit issue, or what do we do with this now?" (*Id*. at 34:1–5.)

Thus, despite prior warnings, DPPs continue to withhold the full picture from this Court in their attempt to relitigate an issue already decided numerous times. This Motion is now the ***fifth time*** BHB has requested similar relief against Celestron. (*See* Frost Decl. ¶ 13.) This Court should not sanction this behavior. The Motion should be denied in full based upon the fact that the requests made in the Motion have already been denied by this Court and another court on multiple occasions. The result should be no different here.

### III.    DPPs' MOTION IS A THINLY VEILED ATTEMPT TO IMPROPERLY SEEK DISCOVERY AFTER THE DISCOVERY CUT-OFF.

A further transparent reason for this haphazard Motion is that DPPs failed to serve timely discovery requests and are now attempting to remedy that failure by asking the Court to do their job for them and order discovery responses after the relevant deadline.

On October 1, 2024, three days before the fact discovery cut-off of October 4, DPPs served multiple sets of discovery requests on Celestron, including a Sixth Set of Requests for Production. (*See* Frost Decl. ¶ 18, Ex. I [RFPs].) Those Requests for Production included requests for documents such as "[y]our annual quarterly, and monthly financial statements . . . including balance sheets, income statements, profits and loss statements . . . for all of Your business entities" (RFP No. 140), "all

disbursements, dividends, or other payments to Your owners and their members or affiliates" (RFP No. 144), "[d]ocuments relating to the transfer of Your assets, including cash, outside of the United States" (RFP No. 145), and "[d]ocuments relating to any plan by You to avoid a prospective judgment in this litigation" (RFP No. 146). (Frost Decl. ¶ 18, Ex. I at pp. 6–7.) The belated discovery requests also included a Fourth Set of Special Interrogatories which requested, among other things, that Celestron "[i]dentify all payments, whether direct or indirect from You to any of the Insiders …." (Interrogatory No. 4), "[i]dentify any transfer of assets, whether direct or indirect from You to any of the Insiders …." (Interrogatory No. 5), and to "[i]dentify all property, whether tangible or intangible owned by You or any of your affiliates in the United States or Canada …." (Interrogatory No. 7). (Frost Decl. ¶ 18, Ex. I at pp. 6–7, 3–4.)

Northern District of California Civil Local Rule 37-3 defines the discovery cut-off date as the "date by which all responses to written discovery are due and by which all depositions must be concluded." Civil L.R. 37-3. Therefore, DPPs' Sixth Set of Requests for Production and Fourth Set of Special Interrogatories were untimely and served past the relevant deadline, and DPPs were not entitled to any substantive responses. On October 6, 2024, Defendants' counsel sent an email to DPPs' counsel explaining that the requests were untimely, that no substantive responses would be provided, and that the requests should be withdrawn. (*See* Frost Decl. ¶ 19, Ex. J.) DPPs did not respond. (Frost Decl. ¶ 19.)

Civil Local Rule 37-3 further provides that "no motions related to fact discovery may be filed more than 7 days after the fact discovery cut-off." Thus, if DPPs believed they were somehow entitled to substantive responses, they were required to file a motion to compel no later than October 11, 2024, seven days after the fact discovery cut-off. They failed to do so. (Frost Decl. ¶ 19.)

The instant Motion asks for an Order compelling Defendants to "identify their assets" (Mot. at 7:6) and states that the Court "should order a full disclosure of Defendants' financial statements," the ***very same information and documents DPPs sought in their belated discovery requests***. DPPs have had over four years to request this information through discovery, including through deposition testimony. They failed to do so until it was too late. In light of these failures, it is unscrupulous to now demand that the Court order discovery responses that DPPs were derelict in seeking in the first place.

## IV.    DPPs' MOTION IS PROCEDURALLY AND SUBSTANTIVELY IMPROPER AND PRESENTS NO GROUNDS FOR ANY RELIEF.

Even if the Court were inclined to bypass DPPs' previous failed requests for the same relief, and even if the Court overlooked the procedural deficiencies and attempt to end-run the discovery cut-off, it is clear that under applicable law, the Motion must fail on the merits.

DPPs appear to request relief (at least in part) under Federal Rule of Civil Procedure 64 for preliminary injunctive relief in the form of an asset freeze and accounting of Defendants' assets. However, not only are the cases cited by DPPs legally and factually distinguishable, DPPs misstate the applicable legal standards and mischaracterize the facts and evidentiary record. *First*, DPPs cannot meet, and do not even attempt to meet, the standards for a preliminary injunction, including demonstrating likelihood of success on its merits or irreparable injury. *Second*, DPPs fail to cite any relevant authority to support their request for an asset freeze and accounting. *Third*, even if such prejudgment relief were available, DPPs fail to demonstrate a strong likelihood of dissipation of assets to support such relief.

In other words, DPPs deviate from proper procedure because, strictly speaking, they have no grounds for what they attempt to do here. And, taking in turn each of their purported authorities for the extraordinary relief requested, it is clear there is no caselaw justifying DPPs' requested relief.

### A.    DPPs' Disguised Request for a Preliminary Injunction Must Fail.

"While a court generally has the power 'to preserve the status quo by equitable means [and] [a] preliminary injunction is such a means,' … the equitable power to freeze assets does not exist in all cases: it exists only as 'ancillary relief necessary to accomplish complete justice.'" *Reebok Int'l, Ltd. v. Marnatech Enterprises, Inc.*, 970 F.2d 552, 560 (9th Cir. 1992) ("*Reebok*") (citing *Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1364 (9th Cir. 1988) (*en banc*), *cert. denied*, 490 U.S. 1035 (1989); *F.T.C. v. H. N. Singer, Inc.*, 668 F.2d 1107, 1109 (9th Cir. 1982)).

A preliminary injunction is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. De. Council, Inc.*, 555 U.S. 7, 22 (2008). "A plaintiff seeking a preliminary injunction must establish that (1) he is likely to succeed on the merits, (2) he is likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in his favor, and (4) an injunction is in the public interest." *Jaiyeola v. AT&T Mobility,*

*LLC*, No. 5:23-CV-05182-EJD, 2023 WL 9502956, at *2 (N.D. Cal. Dec. 6, 2023), *aff'd sub nom. Jaiyeola v. AT&T Inc.*, No. 23-4027, 2024 WL 1462921 (9th Cir. Apr. 4, 2024).

### 1.    DPPs Fail to Demonstrate a Likelihood of Success.

"The most important *Winter* factor is likelihood of success on the merits." *Hall v. U.S. Dep't of Agric.*, 467 F. Supp. 3d 838, 844 (N.D. Cal.), *aff'd sub nom. Hall v. United States Dep't of Agric.*, 984 F.3d 825 (9th Cir. 2020) ); *Garcia v. Google, Inc.,* 786 F.3d 733, 740 (9th Cir. 2015) ("[W]hen a plaintiff has failed to show the likelihood of success on the merits, we need not consider the remaining three [*Winter* elements]") (internal quotes omitted).

DPPs do not even attempt to demonstrate a likelihood of success on the merits, a critical requirement to obtain the relief they seek. This failure is fatal to their Motion. Instead, DPPs conflate the requirement of demonstrating "likelihood of success" on the merits with the "likelihood of dissipation of assets if relief is not granted." This is not the correct standard for injunctive relief, but even if it were, DPPs fail to make any showing under this standard, as discussed below. *See infra*, IV.B.2.

Instead, DPPs resort to the familiar playbook of mischaracterizing the *Orion* case and other aspects of the procedural record in this case to support their yet-to-be-proven and presently contested claims of Defendants' "blatant violations of law." As an undisputed preliminary matter, Defendants were not parties to the *Orion* case and no judgment was issued against them. *See Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*, 20 F.4th 466 (9th Cir. 2021). DPPs' suggestion that Defendants did not contest liability in their Opposition to DPPs' Motion for Class Certification (ECF No. 656, 15:14–15) is both untrue and irrelevant. Rather, the Court has taken under submission both DPPs' Motion for Class Certification (ECF No. 599) and Defendants' Motion to Strike the Opinions of DPPs' Expert, Dr. Douglas J. Zona (ECF No. 617), and at the hearing on September 5th, the Court expressed doubts regarding Dr. Zona's tainted methodology used to support the existence of class wide damages or injury. (*See* Frost Decl. ¶ 16, Ex. G [Mot. Class Cert. Hrg. Tr. (ECF No. 653)] at 29:20–23 ["Well, that was my question to Mr. Borden is I'm trying to understand where did that number, the 16.7 percent, come from? Was there a calculus that show[s] me your work? Where did that come from?"]; 33:6–9 ["I wanted to find out, and that was my initial question was where did that come from? And what is the math? What is the analysis that yielded 16.7 percent? That's the question I posed."].) The Court's skepticism of the

inconsistencies in DPPs' expert's methodology alone cuts strongly against DPPs' likelihood of success on the merits.

Procedural aspects aside, DPPs grossly mischaracterize the evidence that they cite or draw speculative conclusions that do not support the merits of their case.[2]

**Cross-Ownership Between Horizontal Competitors.** DPPs vaguely assert that "Defendants' internal documents admit that David Shen and/or his family own interest in both Synta and its main 'competitor,' Ningbo Sunny." (Mot. at 8:20–21.) But DPPs fail to explain how David Shen's sister-in-law's minority interest in Ningbo Sunny is somehow imputed to him. Nor do DPPs explain how this allegation, even if true, resulted in any substantial lessening of competition in the marketplace to establish an antitrust violation.

**Price-Fixing.** DPPs cite to documents from the *Orion* case that purport to show that "Synta's employee Joyce Huang was responsible for selling Ningbo Sunny's telescopes and controlled how much Ningbo Sunny charged." (Mot. at 8:26–28.) But DPPs grossly mischaracterize these documents, which are taken out of context. DPPs' cited evidence (Borden Decl. Exs. 39, 41, and 42) relate to pricing or supply terms solely affecting Orion, who is not a putative class member. DPPs do not explain how these documents reflect antitrust injury to any member of the putative DPP class. Similarly, Exhibit 40 reflects

---

[2] **Defendants hereby assert the following evidentiary objections to the Borden Declaration:** <u>Borden Decl. ¶ 2</u> - Lacks Foundation; Speculation (FRE 602, 701). Inadmissible Settlement Communication; Mediation Privilege (FRE 408; *see also* Frost Decl. ¶ 20). Hearsay (FRE 801, 802). Relevance (FRE 401, 402). Improper Argument. Civil L.R. 7-5(b); <u>Exs. 1–15 ("Synta Entities as a Slush Fund." Mot. at 2:20–4:4)</u> - Lacks Foundation, Speculation (FRE 602, 701). Relevance (FRE 401, 402). Hearsay (FRE 801, 802). Improper Legal Conclusion (FRE 704). Misstates the Record. <u>Exs. 16–25, 28-30 ("Defendants Have Engaged in Numerous Money Transfers from the US to China." Mot. at 4:9–5:2)</u> - Lacks Foundation (FRE 602, 701). Relevance (FRE 401, 402). Hearsay (FRE 801, 802). Improper Legal Conclusion (FRE 704); <u>Exs. 31–36 ("Synta's Fraudulent Organization." Mot. at 5:3–6:12</u> - Lacks Foundation; Speculation (FRE 602, 701). Relevance (FRE 401, 402). Hearsay (FRE 801, 802). Improper Legal Conclusion (FRE 704). Misstates the Evidence. <u>"Violations of Law": Exs. 32, 38, 37 ("Cross-Ownership between horizontal competitors." Mot. at 8:20–24); Exs. 39-44 ("Price Fixing." Mot. at 8:25–9:4); Exs. 45–49 ("Market Allocation." Mot. at 9:5–9:26); Exs. 50–51 (impropriety of Meade Acquisition. Mot. at 9:27–10:4); Ex. 52 (to show alleged improper "Business Coordination." Mot. at 10:5–10:24)</u> - Lacks Foundation; Speculation (FRE 602, 701). Relevance (401, 402). Hearsay (FRE 801, 802). Improper Legal Conclusion (FRE 704); <u>Borden Decl. ¶ 2 & Exs. 1–15, 16–18, 20–23, 31–36 ("Likelihood of Dissipation of Assets" (Mot. at 10:25–12:5)</u> - Lacks Foundation; Speculation (FRE 602, 701). Relevance (FRE 401, 402). Hearsay (FRE 801, 802). Improper Legal Conclusion (FRE 704). Misstates the Evidence. Misstates the Record.

a discussion in response to an individual inquiry from a European customer, who is not a putative class member. These emails also display legitimate business reasons, such as the order quantity being too small (Ex. 40) and "high-cost components" (Exs. 41 and 42), which necessitated such discussions for price increases.

**Market Allocation.**   To support their market allocation theory, DPPs again rely on a series of translated emails taken out of context. (Borden Decl. Exs. 45–49.) Exhibit 45 reflects David Shen's opinion that the acquisition of Hayneedle assets by Orion was a net benefit for everyone in the industry, including Celestron and Meade. (Mot. at 9:6–10.) At the time, the telescope market was heavily concentrated. Thus, it was not unusual for companies to discuss ways to cooperate to ensure the overall health of the industry and protect against the risk of systemic failures from the insolvency of any major player. Exhibit 46 only reflects Ningbo Sunny's suggestion to avoid a conflict with Celestron products. (*Id*. at 9:10–13.) There is no response by Joyce Huang to James Qiu's email about any intent to cooperate. (Borden Decl. Ex. 46.) And again, such cooperation would have been supported by legitimate business reasons to ensure the availability of a diverse product marketplace. The same is true for Exhibits 47 through 49, which discuss general aspirations and puffery, but do not reflect any actual execution or coordination. (Mot. at 9:15–26.)

**Meade Acquisition.** DPPs cite to an email between Synta and Celestron discussing the acquisition of Meade, attempting to frame the transaction as anticompetitive. (*Id.* at 9:27–10:4.) The quote taken from the email in Exhibit 50 is again attributable to Ningbo Sunny, to which Defendants did not respond. (*Id.* at 10:1–4; Borden Decl. Ex. 50.) As explained below, Defendants had legitimate business reasons to ensure the viability of Meade to preserve the overall health of the telescope industry and therefore be skeptical of the potential acquisition of Meade by JOC, a smaller/newer company with less proven track record. The emails reflect legitimate business concerns to prevent Meade's financial collapse, rather than anticompetitive or unlawful intent. At the time, Meade was on the brink of bankruptcy, and its financial collapse would have caused systemic disruptions across the telescope industry, affecting manufacturers, distributors, and purchasers. Any involvement Celestron had in Ningbo Sunny's acquisition of Meade was driven by legitimate business concerns to maintain stability in the market and prevent widespread disruption, not stifle competition. Moreover, DPPs fail to connect

this business transaction to any injury affecting the putative DPP class. Mr. Huen's email to Sylvia Shen (Mot. at 10:2–4; Borden Decl. Ex. 51) that several of the biggest players in the concentrated market had the combined power to shape the overall landscape of the telescopes industry was in fact true at the time and does not reflect any nefarious intentions. The emails DPPs rely on again demonstrate routine business considerations, not a scheme to disadvantage the market or harm competition.

**Business Coordination.**    Finally, DPPs' supposed evidence of business coordination (*Id.* at 10:5–12) is belied by the omitted portions of Corey Lee's email explaining that diminishing profit margins would "not [be] good for the industry in general." (Borden Decl. Ex. 52.) Mr. Lee explains: "When both companies make a decent profit, they can afford to spend more on marketing and activities that promote the astronomy hobby. That is how we can grow the amateur astronomy market. It is easy to cut prices and gain some immediate sales, but the biggest challenge is to grow the interest within the hobby and expand the market. Celestron is attempting to do that on the mid-range product with mobile device telescope control and telescopes with full automatic alignment capability." (*Id.*) This omitted portion of Mr. Lee's email shows legitimate and pro-competitive business reasons behind Mr. Lee's suggestions on Meade's future leadership. Mr. Lee further opines that "Meade needs somebody with product and high end market knowledge. Meade's reputation in its core market has become really poor in recent years. Meade needs to reconnect with the amateur astronomy community and get the activists within the hobby to get behind the brand again. Rebuild brand loyalty among the core audience." (*Id.*) This further shows Defendants' intention to ensure qualified leadership to preserve Meade's goodwill and reputation for the benefit of the overall industry.

None of the evidence cited by DPPs, much of which is taken out of context, demonstrates actual anticompetitive violations. DPPs have not met their burden of showing any likelihood of success.

### 2.    There is No Risk of Irreparable Injury.

DPPs carry the burden of establishing "a significant threat of irreparable injury, irrespective of the magnitude of the injury." *Big County Foods, Inc. v. Board of Educ. of the Anchorage Sch. Dist.*, 868 F.2d 1085, 1088 (9th Cir. 1989). "A plaintiff seeking preliminary relief must 'demonstrate that irreparable injury is likely in the absence of an injunction.'" *Jaiyeola*, 2023 WL 9502956 at *6 (quoting *California v. Azar*, 911 F.3d 558, 581 (9th Cir. 2018)). "The analysis focuses on irreparability,

'irrespective of the magnitude of the injury.'" *Id.* "To demonstrate the likelihood of irreparable harm, DPPs must show that 'remedies available at law, such as monetary damages, are inadequate to compensate for the injury.'" *Cisco Sys. Inc. v. Shenzhen Usource Tech. Co.*, No. 20-cv-4773-EJD, 2020 WL 5199434 *8, 26 (N.D. Cal. 2020) ("*Cisco*") (quoting *Herb Reed Enters., LLC v. Fl. Entm't Mgmt., Inc.*, 736 F.3d 1239, 1249 (9th Cir. 2013)). It is well established that "[s]imple monetary harm does not constitute an immediate threat of irreparable harm." *Blocktree Properties, LLC v. Pub. Util. Dist. No. 2 of Grant Cnty. Washington*, 783 F. App'x 769, 770 (9th Cir. 2019).

DPPs fail to demonstrate a likelihood of irreparable injury if the requested relief is denied, and this failure warrants the denial of their Motion. DPPs offer no actual evidence whatsoever to support their claim of irreparable injury. Instead, they rely on circular, conclusory assertions that DPPs will suffer irreparable harm if Defendants are allowed to move assets. (Mot. at 13:15–21.) Because DPPs cannot point to any actual evidence of irreparable harm apart from pure speculation and conjecture, they appear to argue that irreparable harm exists simply because it *might* occur *if* Defendants move their assets. (Mot. at 13:10–13, 15–17, 19–21, 22–24.) In other words, DPPs' theory of irreparable injury is entirely hypothetical. This reasoning is legally insufficient and without merit. *See Facebook, Inc. v. BrandTotal Ltd.*, 499 F. Supp. 3d 720, 732 (N.D. Cal. 2020) ("Irreparable harm must be likely—it is no longer sufficient to grant a preliminary injunction upon a mere showing of a "possibility" of irreparable harm when the other factors weigh heavily in favor of the plaintiff.").

Moreover, DPPs' harm is purely economic, and any alleged concern can be adequately addressed through money damages. The law is clear that conjecture and hypothetical assertions do not satisfy the standard for irreparable injury. *See e.g., Fin. & Sec. Prod. Ass'n v. Diebold, Inc.*, No. C 04-04347 WHA, 2005 WL 1629813, at *6 (N.D. Cal. 2005) ("Irreparable harm must not be speculative or merely alleged to be imminent; in other words, a plaintiff must demonstrate immediate threatened injury as a prerequisite to preliminary injunctive relief."); *California v. Trump*, 379 F. Supp. 3d 928, 956 (N.D. Cal. 2019), *aff'd*, 963 F.3d 926 (9th Cir. 2020) (quoting *Winter*, 555 U.S. at 22) ("Mere 'possibility' of irreparable harm does not merit a preliminary injunction."); *Churchill Vill., L.L.C. v. Gen. Elec. Co.*, 169 F. Supp. 2d 1119, 1129 (N.D. Cal. 2000), *aff'd sub nom. Churchill Vill., L.L.C. v. Gen. Elec.*, 361 F.3d 566 (9th Cir. 2004) ("[P]laintiffs can only suggest the possibility of irreparable harm. Speculative

injury, however, does not constitute irreparable injury."); *Disney Enterprises, Inc. v. VidAngel*, Inc., 224 F. Supp. 3d 957, 966 (C.D. Cal. 2016), *aff'd,* 869 F.3d 848 (9th Cir. 2017) ("[A]pplicant must demonstrate that immediate or imminent irreparable harm is likely: Speculative injury does not constitute irreparable injury sufficient to warrant granting a preliminary injunction.") (quotes omitted).

Instead, the law requires DPPs to demonstrate harm that cannot be compensated by money damages alone. DPPs have failed to demonstrate this fundamental element by any measure here.

### 3.    The Balance of Hardships Weighs in Defendants Favor.

"Courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Cisco*, 2020 WL 5199434, at *9 (citing *Winter*, 555 U.S. at 24). DPPs assert that granting prejudgment relief "would impose only minimal burdens on Defendants[,]" while DPPs would suffer irreparably if interim relief is denied. (Mot. at 14:7–8.) This assertion is false and entirely unsupported by the evidence. In reality, DPPs would be in the exact same position they are already in, even in the absence of their requested relief. On the other hand, Defendants will suffer significant burdens if the Court grants DPPs' requested relief. DPPs seek to impose drastic, preemptive measures that would interfere with Defendants' routine business operations and restrict their ability to manage assets in the ordinary course of business. Such punitive measures would severely disrupt Defendants' business operations, including lawful asset transfers and routine financial transactions in the ordinary course of business. DPPs have failed to demonstrate any actual harm they would suffer if relief is denied, while the burdens on Defendants if relief is granted are substantial and far-reaching, particularly in the midst of the holiday season. Granting the Motion would impose undue hardship for Defendants based purely on speculative, unsupported, and refuted allegations.

### 4.    Public Interest Favors Denying DPPs' Requested Prejudgment Relief.

The public interest does not favor preliminary injunctions or asset freezes based on a limited factual showing and only speculative allegations. This kind of precedent would create a slippery slope allowing every plaintiff to tie up a defendant's assets before obtaining a judgment, and more importantly, before any determination of any wrongdoing or illegal conduct has been made. This would harm the public interest and enable plaintiffs to weaponize injunctive relief based on unsubstantiated claims and when no true risk of immediate and irreparable harm exists. *See De Beers Consol. Mines v. United*

*States*, 325 U.S. 212, 215 (1945) ("*De Beers*") (reversing a preliminary injunction sought by the United States under the Sherman Act against corporate defendants in the gem and diamond industry on the basis that sustaining the challenged order would create a sweeping effect allowing every plaintiff to obtain injunctive relief based solely on speculative statements that defendants will abscond with assets).

As the Supreme Court succinctly explained:

> ***To sustain the challenged order would create a precedent of sweeping effect.*** This suit, as we have said, is not to be distinguished from any other suit in equity. What applies to it applies to all such.
>
> Every suitor who resorts to chancery for any sort of relief by injunction may, on a mere statement of belief that the defendant can easily make away with or transport his money or goods, impose an injunction on him, indefinite in duration, disabling him to use so much of his funds or property as the court deems necessary for security or compliance with its possible decree.
>
> And, if so, it is difficult to see why a plaintiff in any action for a personal judgment in tort or contract may not, also, apply to the chancellor for a so-called injunction sequestrating his opponent's assets pending recovery and satisfaction of a judgment in such a law action. ***No relief of this character has been thought justified in the long history of equity jurisprudence.***

*De Beers*, 325 U.S. 212, 222–23 (emphasis added).

DPPs argue that the public interest weighs in favor of granting DPPs relief because "[i]f Defendants are permitted to flout the law and deft the Court's judgments with impunity, the very integrity of the free-market system and effectiveness of the antitrust laws will be undermined." (Mot. at 14:21–23.) These are precisely the type of speculative and premature allegations the court emphasized in *De Beers* as insufficient to obtain injunctive relief. To begin with, no judgment exists in this case, let alone any violation of a judgment. DPPs have no basis to rush to this Court with unfounded allegations of judgment avoidance and asset dissipation. As the Supreme Court in *De Beers* stated, "[i]f the process be justified in the present posture of the case there is nothing to prevent other and further seizures of property or money brought into the United States in connection with transactions unrelated to any supposed violation of the Anti-Trust laws." *De Beers*, 325 U.S. at 222.

**B.**     <u>**Neither Rule 64 nor the Court's Inherent Equitable Powers Authorize an Asset**</u>
<u>**Freeze or Accounting of Funds Here.**</u>

Rule 64 "permits state seizure provisions to be used in federal courts[;] it also permits seizures authorized by federal law; indeed, it explicitly states that 'any existing statute of the United States governs to the extent to which it is applicable.'" *Reebok Int'l, Ltd. v. Marnatech Enterprises, Inc.*, 970 F.2d 552, 558 (9th Cir. 1992) ("*Reebok*") (citing Fed. R. Civ. P. 64).

> While a court generally has the power "to preserve the status quo by equitable means [and] [a] preliminary injunction is such a means," … **the equitable power to freeze assets does not exist in all cases: it exists only as "ancillary relief necessary to accomplish complete justice."**

> "Because the authority to issue a preliminary injunction rests upon the authority to give final relief, **the authority to freeze assets by a preliminary injunction must rest upon the authority to give a form of final relief to which the asset freeze is an appropriate provisional remedy.**"

*Id.* at 560 (internal citations omitted).

Thus, "[t]he right to preliminary relief turns on a potential right to final relief of the same nature." *Kokka & Backus, PC v. Bloch*, No. C 10-0110 RS, 2010 WL 331336, at *2 (N.D. Cal. 2010) (citing *In re Focus Media Inc.*, 387 F.3d 1077, 1085 (9th Cir. 2004)).

But "[a]s a general rule, a federal court cannot issue an 'asset freeze' . . . simply to ensure that any judgment a plaintiff may ultimately obtain will be collectible." *Kokka & Backus*, 2010 WL 331336, at *2 (N.D. Cal. 2010) (citing *Grupo Mexicano de Desarollo, S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 319–320 (1999) [holding that in an action for money damages, a district court has no power to issue a preliminary injunction preventing a defendant from transferring assets in which no lien or equitable interest is claimed]). "Because the authority to issue a preliminary injunction rests upon the authority to give final relief, the authority to freeze assets by a preliminary injunction must rest upon the authority to give a form of final relief to which the asset freeze is an appropriate provisional remedy." *F.T.C. v. H. N. Singer, Inc.*, 668 F.2d 1107, 1112 (9th Cir. 1982).

Here, DPPs rely solely on inapplicable Ninth Circuit and related district court case law enabling district courts' inherent authority to grant equitable relief solely in the context of ***trademark***

*counterfeiting cases*. None of DPPs' cited cases involve claims in the antitrust context. DPPs beg the Court to take an erroneous and expansive interpretation of its inherent equitable powers.

      **1.**      **DPPs' Reliance on Trademark Counterfeiting Cases Does Not Support the Provisional Remedies That They Seek.**

DPPs rely on *Reebok* to support their argument that under Rule 64, "[t]he court also has inherent equitable power to prevent a defendant from dissipating assets in order to preserve the possibility of equitable remedies." (*See* Mot. at 6:16–20 (internal quotes omitted).) *Reebok*, however, dealt with a trademark infringement and counterfeiting case involving claims under the Lanham Act. The Ninth Circuit affirmed a prejudgment asset freeze against defendants who were selling counterfeit Reebok shoes in Mexico. The court held that although there was no state law basis for such prejudgment freeze or seizure, Rule 64 permitted such preliminary injunctive relief under its "inherent equitable power to issue provisional remedies ancillary to its authority to provide final equitable relief." *Id.* at 559. The court held that such ancillary relief was warranted "[b]ecause the Lanham Act authorizes the district court to grant Reebok an accounting of [the defendants'] profits as a form of final equitable relief, the district court had the inherent power to freeze [the defendants'] assets in order to ensure the availability of that final relief." *Id.* Because 15 U.S.C. § 1117(a) of the Lanham Act specifically authorized an accounting of funds as a form of final equitable relief, *Reebok* held that it was appropriate to issue ancillary injunctive relief "to freeze [the defendants'] assets in order to ensure the availability of that final relief." *Id.* at 559–60. Here, unlike in *Reebok* where an asset freeze and accounting were ancillary to the remedies under 15 U.S.C. § 1117(a) of the Lanham Act, DPPs do not identify the type of final relief under their antitrust claims that entitles them to seek an asset freeze or accounting as an ancillary remedy.

Additionally, DPPs cite two distinguishable district court cases that actually serve to demonstrate that the power to make preliminary asset freezes does not arise in a vacuum—there must be another statutory authority that opens the door to such extraordinary relief—and the thrust of the action must be equitable relief not monetary damages to give rise to this sort of invasive power. DPPs cite *Innovation Ventures, LLC v. Pittsburg Wholesale Grocers*, No. C 12-5523 WHA, 2013 WL 3622016 (N.D. Cal. 2013) ("*Innovation Ventures*") and *UL, LLC v. Space Chariot, Inc.*, No. CV16–8172–CAS (AFMx),

2017 WL 6271272, *1 (C.D. Cal. 2017) ("*Space Chariot*") to argue that their requested relief is "modest and practical." (Mot. at 7:7–14.) Both cases are once again totally irrelevant and involve counterfeit goods—with the power for equitable relief in the form of monetary injunction arising from the **trademark statute**.

DPPs conspicuously fail to inform the Court that *Space Chariot* involved a **stipulated** preliminary injunction for an asset freeze. *Space Chariot* 2017 WL 6271272 at *1. *Innovation Ventures*, on the other hand, actually supports Defendants. There, the court **denied** the plaintiffs' request for an asset freeze finding that the plaintiffs failed to meet their burden of demonstrating a "strong likelihood of dissipation of assets" to support such "drastic relief." *Innovation Ventures*, 2013 WL 3622016 at *2, 3. Instead, the court granted a limited injunction against the individual defendants from transferring funds outside the ordinary course of business and ordered them to submit a monthly accounting to the plaintiffs. *Id.* at *3. This relief, however, was based on the defendants' "pattern of violating court orders" *in that case*, and which included evading or violating three separate orders for seizure, TRO, and preliminary injunction. *Id.* at *1–5. No such facts are present here. DPPs cannot point to a single instance where the Court has found Defendants have violated a seizure order or injunction. To the contrary, as already explained, this issue was already litigated multiple times in Defendants' favor.

Finally, DPPs cite to *Cisco Sys. Inc. v. Shenzhen Usource Tech. Co.*, No. 20-cv-4773-EJD, 2020 WL 5199434 *10 (N.D. Cal. 2020) ("*Cisco*"), which is yet another trademark counterfeit goods case, where this Court granted a preliminary injunction and asset freeze against defendant counterfeiters. In a lengthy and detailed ruling, the Court found "blatant" trademark violations stemming from the defendants' sale of counterfeit goods, where the plaintiff proffered undisputed evidence that its expert had actually received and examined counterfeit goods from the defendants, which was sufficient to establish a likelihood of success and irreparable harm to support the request for a TRO. *Id.* at *3, 6–9. Here, DPPs do not and cannot establish any facts to support a likelihood of success, and instead rely on rank speculation and mischaracterizations of evidence and the procedural record. *See* n.2 [Evid. Objections].

On the other hand, in *De Beers*, 325 U.S. 212—an actual antitrust case that was distinguished by *Reebok* (because of the differences in the nature of Reebok's trademark claims), the Supreme Court

reversed an order granting the plaintiff's request for an asset freeze, finding that the injunction sought "deal[t] with a matter lying wholly outside the issues in the suit" and was therefore "not authorized either by statute or by the usages of equity." *Id.* at 220, 223 (holding that preliminary injunction is only "appropriate to grant intermediate relief of the same character as that which may be granted finally"). Other Supreme Court cases have similarly limited injunctive asset freezes to where the gravamen of an action is based on claims that authorize final equitable relief. *See e.g.*, *Deckert v. Independence Shares Corp.*, 311 U.S. 282 (1940) (holding that district court had power to enjoin a defendant from transferring a specified amount of money where asset freeze was tied to particular equitable remedies central to the case); *Grupo Mexicano de Desarrollo v. Alliance Bond Fund,* 527 U.S. 308 (1999) (holding that a federal court lacks the authority to issue injunctive relief freezing assets in actions for money damages in which no lien or equitable interest is claimed).

Here, DPPs thus fail to identify any final relief or equitable basis under their antitrust claims that would permit them to seek an asset freeze or accounting as an ancillary remedy. *See Reebok*, 970 F.2d at 559-60; *Cisco*, 2020 WL 5199434 at \*10. Accordingly, the Motion should be denied.

### 2.    DPPs Fail to Show a Strong Likelihood of Dissipation of Assets.

Even assuming DPPs' request for an asset freeze and accounting were an appropriate ancillary relief in this case, DPPs cannot meet their high burden for establishing a "strong likelihood of dissipation of funds" to support such drastic relief. *See Innovation Ventures,* 2013 WL 3622016, at \*2.

"A party seeking an asset freeze must show a likelihood of dissipation of the claimed assets, or other inability to recover monetary damages, if relief is not granted." *Cisco*, 2020 WL 5199434, at \*10 (citing *Johnson v. Couturier*, 572 F.3d 1067, 1085 (9th Cir. 2009)). "And, of course, a likelihood of success on the merits must be shown." *Innovation Ventures,* 2013 WL 3622016, at \*2. "[A]lthough it is not necessary to show that defendants are planning to dissipate assets in order to find a 'strong likelihood' of dissipation, district courts in our circuit have often pointed to evidence that suggests defendants are in the process of dissipating assets, or are strategizing to do so in the future, when deciding whether to freeze assets." *Id.* "For example, our court of appeals affirmed when a district court 'expressly' found that it 'was not only possible, but probable' that defendant would dissipate assets based on her past history of fraudulent intra-family transfers, concealment of assets in defiance of a

court order, and a conveniently timed divorce settlement." *Id.* (citing *Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills*, 321 F.3d 878, 881 (9th Cir. 2003)).

Here, DPPs make a false comparison with the facts in *Cisco* to try and argue that "Defendants' legal violations are blatant." (Mot. at 10:27.) DPPs present no facts to show that Defendants "are in the process of dissipating assets, or are strategizing to do so in the future" so as to render themselves judgment proof. *See Innovation Ventures,* 2013 WL 3622016, at *2. Instead, DPPs cite to a number of baseless factual theories unsupported by the evidence. (*See* Mot. at 8:20–10:24.) DPPs even resort to improperly referencing (and mischaracterizing) inadmissible confidential settlement communications made during the partes' recent mediation. (*See* Borden Decl. ¶ 2; Frost Decl. ¶ 20.)

> (a)    **There Is Nothing Fraudulent About Defendants' Corporate Structure.**

DPPs' references to the entity, Good Advance (BVI), as a "slush fund" (Mot. at 1:23) and "the white hot center of [Defendants'] price-fixing enterprise" (Mot. at 1:25-26) is based entirely on unfounded and inadmissible speculation and refuted by the actual evidence in the record. DPPs had ample opportunity to conduct discovery on Good Advance and did so. In fact, Defendant David Shen testified at length about its innocuous purpose, which was to help facilitate Defendant Synta Technologies' trading business between Orion and Ningbo Sunny. (*See* Frost Decl. ¶ 17, Ex. H [David Shen Dep. II] at 37:10–18, 42:2–44:6.) In or around the year 2000, Tim Geisler, the then owner of Orion, sought David Shen's assistance to purchase and deliver certain 60mm diameter telescopes that were not manufactured by David Shen's Synta companies, but instead by a Chinese company, Ningbo Sunny. Mr. Geisler relied on David Shen's product expertise and familiarity with the Chinese market to assist Orion with purchasing these telescopes from Ningbo Sunny. (*Id.* at 40:10–41:16.) At the time, however, direct trade between China and Taiwan was prohibited due to tense political relations, and thus any transfers of goods or money had to be conducted through a vehicle known as an Offshore Banking Unit (OBU). At Orion's behest, David Shen set up Good Advance as an OBU to facilitate transactions with Ningbo Sunny on behalf of Orion because Synta Technologies, a Taiwan entity, could not deal with the Chinese company directly. Good Advance collected a fee for its role in these transactions that was well known to Orion at the time, and the company closed after the last order of telescopes was fulfilled

DEFENDANTS' OPPOSITION TO DIRECT PURCHASER PLAINTIFFS'
MOTION REQUESTING FINANCIAL ASSURANCE AND ASSET INFORMATION

between Orion and Ningbo Sunny. (*Id.* at 42:2–44:6.)

Similarly, the other entity, Good Advance Hong Kong (HK) is another entity formed for an innocuous purpose. When Suzhou Synta ended operations in 2014, its employees moved to Nantong, China to open a new manufacturing company known as Nantong Schmidt. David Shen and his mother created Good Advance HK and invested in their former employees' new company. (*Id.* at 61:25-62:2, 62:9-24, 63:8-13.) Defendants are unaware of the supposed "other 'Good Advance' in BVI" referenced by DPPs (Mot. at 3:26-27), but David Shen's testimony is clear on the distinction between the two Good Advance entities respectively based in the British Virgin Islands and Hong Kong. (Frost Decl. ¶ 17, Ex. H [David Shen Dep. II] 58:16–19.) None of the factual arguments raised by DPPs are based on any newly-discovered evidence, and instead are blatant mischaracterizations of the facts.

### (b)   Defendants Are Not "Expatriating Money" From the U.S.

DPPs fail to state how the alleged "monthly management fee" paid by Celestron to SW Technology is improper or outside the ordinary course of business. Nor do they explain the significance of how the companies' ownership structures involving the Shen family members' interests are unlawful or otherwise improper, particularly where such closely-held private companies operate in a specialized industry of consumer telescopes. DPPs falsely claim that "Celestron has paid millions in 'dividends' and 'special payments' to the same entities and individuals in China." (Mot. at 11:17-20.) None of the cited evidence attached as exhibits to the Borden Declaration show any such transfers of money to China. DPPs may be confused about the distinction between China and Taiwan, as SW Technology is a Taiwanese (not Chinese) entity, and its principals along with Laurence Huen, are based in Canada.

### (c)   DPPs Did Not Timely Oppose or Object to IPPs' Motion for Preliminary Settlement and Cannot Do So Now.

DPPs purport to contest the IPP class settlement. This is not only entirely misplaced within this Motion, but DPPs also lack standing (and do not attempt to argue they possess such standing) to raise any such objection. This Court could not be more clear in stating that non-class members do not have standing to object to a proposed class settlement. *In re Cathode Ray Tube (CRT) Antitrust Litig.*, No. 07-CV-05944-JST, 2020 WL 1873554, at *4 (N.D. Cal. 2020) ("Under Federal Rule of Civil Procedure 23(e), nonclass members have no standing to object to the settlement of a class action.").

27

Case No. 5:20-cv-03642-EJD
DEFENDANTS' OPPOSITION TO DIRECT PURCHASER PLAINTIFFS'
MOTION REQUESTING FINANCIAL ASSURANCE AND ASSET INFORMATION

Further, the narrow exception permitting non-settling entities to object applies only to instances in which the non-settling entity demonstrates it will sustain formal legal prejudice as a result of the settlement. *Sweet v. Cardona*, No. 23-15049, 2024 WL 4675573 (9th Cir. Nov. 5, 2024). Formal legal prejudice exists where the "settlement agreement formally strips a non-settling party of a legal claim or cause of action, . . . invalidates a non-settling party's contract rights, or the right to present relevant evidence at a trial." *Id.* at *8. Any settlement by the IPP class has no such effect on the DPPs, and DPPs make no arguments to that end. To the extent DPPs attempt to argue they are disproportionately impacted, they rely on completely inapposite authority. DPPs cite *Elder v. Hilton Worldwide Holdings, Inc.,* for the proposition that the court should not approve a class settlement that would harm one class for the benefit of the other. Case No. 16-CV-00278-JST, 2020 WL 11762284, at *7 (N.D. Cal. 2020). However, the *Elder* Court found the proposed settlement agreement, which eliminated a California subclass in favor of a single nationwide class, did not shortchange California class members as they were not entitled to additional relief. Here, DPPs offer no evidence they are susceptible to being similarly shortchanged.

Even in the case where non-settling entities may intervene, they must do so properly under Rule 24. *In re Novatel Wireless Sec. Litig.*, No. 08CV1689 AJB RBB, 2014 WL 2858518, at *2 (S.D. Cal. 2014), *amended in part,* No. 08CV1689 AJB RBB, 2014 WL 3341049 (S.D. Cal. 2014) ("Indeed, while non-class members may not have standing to object to a proposed class action settlement, interjection of the opposing views of a non-class member may proceed via intervention under Rule 24."). DPPs have not and cannot properly intervene in the IPPs' settlement through this Motion for miscellaneous relief.

**C.**    **To the Extent DPPs' Seek a Writ of Attachment, Their Request Must Fail.**

DPPs also appear to seek relief in the form a writ of attachment, but this remedy fails outright under California law. A writ of attachment is an extraordinary remedy, governed by statutory requirements that "'must be strictly followed or no rights will be acquired[.]'" *TVBI Co. Ltd. v. Hong Thoa Thi Pham*, No. 17-CV-05858-SI, 2018 WL 4616283 (N.D. Cal. 2018). California law expressly limits writs of attachment to actions to actions arising only in "claims for money, each of which is based upon a contract, express or implied, where the total amount of the claim or claims is a fixed or readily ascertainable amount not less than five hundred dollars ($500) exclusive of costs, interest, and attorney's

fees." Cal. Code Civ. Proc. § 483.010(a).

DPPs' claims are not based upon any contract, whether express or implied, and thus a writ of attachment is unavailable as a matter of law. Even if this fundamental bar did not exist, DPPs fail to meet the statutory elements required for attachment. To obtain attachment, DPPs must demonstrate, among other things, the probable validity of their claim. In other words, that it is "more likely than not that the applicant will prevail on the claim." *Wells Fargo Bank, N.A. v. Stewart Homes, Inc.*, No. 8:23-CV-01800 DOC (ADSX), 2024 WL 2178245 (C.D. Cal. May 2, 2024). This determination requires the Court to "consider the relative merits of the positions of the respective parties and make a determination of the probable outcome of the litigation." *Id.* For the same reason that DPPs have failed to establish any likelihood of success on the merits, they also cannot establish the probable validity of their claims. Accordingly, to the extent DPPs seek relief by way of writ of attachment, such request clearly fails.

## V.    **CONCLUSION**

For the foregoing reasons, Defendants respectfully request that the Court deny DPPs' Motion in its entirety.

DATED:  November 20, 2024                    FROST LLP


By: _____
CHRISTOPHER FROST
JOHN D. MAATTA
JOSHUA S. STAMBAUGH
LAWRENCE J.H. LIU
Attorneys for Defendants Celestron Acquisition, LLC, Suzhou Synta Optical Technology Co., Ltd., Synta Canada Int'l Enterprises Ltd., SW Technology Corp., Olivon Manufacturing Co. Ltd., Olivon USA, LLC, Nantong Schmidt Optoelectrical Technology Co. Ltd., Pacific Telescope Corp., Corey Lee, David Shen, Sylvia Shen, Jack Chen, Jean Shen, Joseph Lupica, Dave Anderson, Laurence Huen

## PROOF OF SERVICE

**Spectrum Scientifics, LLC et al v. Celestron Acquisition, LLC et al**
**Case No. 5:20-cv-03642-EJD-VKD**

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

At the time of service, I was over 18 years of age and not a party to this action.  I am employed in the County of Los Angeles, State of .  My business address is 10960 Wilshire Boulevard, Suite 2100, Los Angeles, CA 90024.

On November 20, 2024, I served true copies of the following document(s) described as **DEFENDANTS' OPPOSITION TO DIRECT PURCHASER PLAINTIFFS'** on the interested parties in this action as follows:

**SEE ATTACHED SERVICE LIST**

**BY CM/ECF NOTICE OF ELECTRONIC FILING:**  I electronically filed the document(s) with the Clerk of the Court by using the CM/ECF system.  Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.  Participants in the case who are not registered CM/ECF users will be served by mail or by other means permitted by the court rules.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Executed on November 20, 2024, at Los Angeles, California.

/s/ Salina Ruiz
Salina Ruiz

1

2

**SERVICE LIST**
**Spectrum Scientifics, LLC et al v. Celestron Acquisition, LLC et al**
**Case No. 5:20-cv-03642-EJD-VKD**

3    J. Noah Hagey, Esq.
Matthew Borden, Esq.

4    Andrew Levine, Esq.
Ellis E. Herington, Esq.

5    Yekaterina Kushnir, Esq.
**BRAUNHAGEY & BORDEN LLP**                    Attorneys for Plaintiffs:

6    747 Front Street, 4th floor                              *Aurora Astro Products LLC, and*
San Francisco, CA  94111                              *Pioneer Cycling & Fitness, LLP*

7    Telephone: (415) 599-0210
Facsimile: (415) 276-1808

8    Email: hagey@braunhagey.com
Email: borden@braunhagey.com

9    Email: levine@braunhagey.com
Email: herington@braunhagey.com

10    Email: kushir@braunhagey.com

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANTS' OPPOSITION TO DIRECT PURCHASER PLAINTIFFS'
MOTION REQUESTING FINANCIAL ASSURANCE AND ASSET INFORMATION