J. Noah Hagey, Esq. (SBN: 262331)
hagey@braunhagey.com
Matthew Borden, Esq. (SBN: 214323)
borden@braunhagey.com
Andrew Levine, Esq. (SBN: 278246)
levine@braunhagey.com
Yekaterina Kushnir, Esq. (SBN: 350843)
kushnir@braunhagey.com
BRAUNHAGEY & BORDEN LLP
747 Front Street, 4th Floor
San Francisco, CA 94111
Telephone: (415) 599-0210

Garrett Biedermann, Esq. *(pro hac vice)*
biedermann@braunhagey.com
BRAUNHAGEY & BORDEN LLP
118 W 22nd Street, 12th Floor
New York, NY 10011
Telephone: (646) 829-9403

ATTORNEYS FOR DIRECT PURCHASER PLAINTIFFS

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| IN RE TELESCOPES ANTITRUST LITIGATION | Case No. 5:20-cv-03639-EJD |
| This Document Relates to:<br><br>AURORA ASTRO PRODUCTS LLC, PIONEER CYCLING & FITNESS, LLP, and those similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>CELESTRON ACQUISITION, LLC, SUZHOU SYNTA OPTICAL TECHNOLOGY CO., LTD., SYNTA CANADA INT'L ENTERPRISES LTD., SW TECHNOLOGY CORP., OLIVON MANUFACTURING CO. LTD., OLIVON USA, LLC, NANTONG SCHMIDT OPTO-ELECTRICAL TECHNOLOGY CO. LTD., NINGBO SUNNY ELECTRONIC CO., LTD., PACIFIC TELESCOPE CORP., COREY LEE, DAVID SHEN, SYLVIA SHEN, JACK CHEN, JEAN SHEN, JOSEPH LUPICA, DAVE ANDERSON, LAURENCE HUEN, and DOES 1-50, | Case No. 5:20-cv-03642-EJD<br><br>**DIRECT PURCHASER PLAINTIFFS' NOTICE OF MOTION AND MOTION TO STRIKE AND EXCLUDE OPINIONS OF DAVID P. KAPLAN**<br><br>**Date:** May 15, 2025<br>**Time:** 9:00 a.m.<br>**Judge:** Hon. Edward J. Davila<br>**Courtroom:** 4, 5th Floor<br><br>**Compl. Filed:** June 1, 2020<br>**Fourth Am. Compl. Filed:** September 1, 2023<br>**Trial Date:** None Set |

Defendants.

**NOTICE OF MOTION AND MOTION**

TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE that on May 15, 2025, at 9:00 a.m. or as soon thereafter as the matter may be heard before the Honorable Edward J. Davila in the United States District Court for the Northern District of California at the San Jose Courthouse, located at 280 South 1st Street, Courtroom 4, 5th Floor, San Jose, CA 95113, Direct Purchaser Plaintiffs ("DPPs") will move this Court for an Order excluding the opinions of David P. Kaplan.

This Motion is based on this Notice of Motion and Motion, the accompanying Memorandum, the Declaration of Matthew Borden, the files and records in this action, and on such other written and oral argument as may be presented to the Court.

Dated: March 7, 2025

Respectfully submitted,

BRAUNHAGEY & BORDEN LLP

By: *<u>/s/ Matthew Borden</u>*
Matthew Borden

*Attorneys for Direct Purchaser Plaintiffs*

**TABLE OF CONTENTS**

INTRODUCTION .......... 1

BACKGROUND .......... 3

A. [redacted] .......... 3

B. Dr. Zona's Economic Models and Mr. Kaplan's Attempted Rebuttals .......... 5

1. Dr. Zona's Opinions Regarding the Existence and Magnitude of the Class-Wide Overcharge .......... 5

2. Mr. Kaplan's Attempted Rebuttals .......... 7

C. Dr. Zona's Opinions Regarding Defendants' Market Share and Mr. Kaplan's Attempted Criticism .......... 8

LEGAL STANDARD .......... 9

ARGUMENT .......... 10

I. [redacted] .......... 10

A. [redacted] .......... 10

B. Mr. Kaplan's Affirmative Opinions Should Also Be Excluded Because They Are Speculative and Risk Jury Confusion .......... 13

II. [redacted] .......... 16

A. [redacted] .......... 16

B. [redacted] .......... 18

C. [redacted] .......... 19

III. [redacted] .......... 21

CONCLUSION .......... 22

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amos v. Makita U.S.A.*,
No. 2:09–cv–01304–GMN–RJJ, 2011 WL 43092 (D. Nev. Jan. 6, 2011) .... 11

*Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*,
613 F. Supp. 3d 1308 (S.D. Cal. 2020) .... 22

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*,
509 U.S. 209 (1993) .... 13, 14

*Clear-View Techs., Inc. v. Rasnick*,
No. 13–CV–02744–BLF, 2015 WL 3509384 (N.D. Cal. June 3, 2015) .... 11

*Daubert v. Merrell Dow Pharm., Inc.*,
509 U.S. 579 (1993) .... 9, 10

*Fiona Chen v. Yellen*,
No. 3:14-CV-50164, 2021 WL 4192078 (N.D. Ill. Sept. 15, 2021) .... 20

*Focal Point Films, LLC v. Sandhu*,
No. 19-cv-2898, 2020 WL 5760355 (N.D. Cal. Sept. 28, 2020) .... 20

*Gen. Elec. Co. v. Joiner*,
522 U.S. 136 (1997) .... 10

*In re Google Play Store Antitrust Litigation*,
No. 20-CV-05761-JD, 2023 WL 5532128 (N.D. Cal. Aug. 28, 2023) .... 13, 14

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
No. M 07–1827 SI, 2013 WL 12311008 (N.D. Cal. June 14, 2013) .... 17

*Kumho Tire Co. v. Carmichael*,
526 U.S. 137 (1999) .... 9, 10

*Metabyte, Inc. v. Canal Techs., S.A.*,
No. C-02-05509 RMW, 2005 WL 6032845 (N.D. Cal. June 17, 2005) .... 9

*Nationwide Transp. Fin. v. Cass Info. Sys., Inc.*,
523 F.3d 1051 (9th Cir. 2008) .... 21

*Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*,
20 F.4th 466 (9th Cir. 2021) .... 2, 5, 18

*Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*,
No. 5:16-CV-06370-EJD, 2019 WL 4780183 (N.D. Cal. Sept. 30, 2019)............................ 16, 17

*People v. Kinder Morgan Energy Partners, L.P.*,
159 F. Supp. 3d 1182 (S.D. Cal. 2016)........................................................................... 11

*R & O Constr. Co. v. Rox Pro Int'l Grp., Ltd.*,
No. 2:09–cv–01749–LRH–LRL, 2011 WL 2923703 (D. Nev. July 18, 2011)........................... 11

*Stephens v. Union Pac. R.R. Co.*,
935 F.3d 852 (9th Cir. 2019) ......................................................................................... 13

*Vu v. McNeil–PPC, Inc.*,
No. CV 09–1656 ODW (RZx), 2010 WL 2179882 (C.D. Cal. May 7, 2010) ............................ 11

**Rules**

Federal Rule of Civil Procedure 26(a)(2)(D)........................................................................ 10

Federal Rule of Civil Procedure 26(a)(2)(C)(ii) ..................................................................... 11

Federal Rule of Civil Procedure 702 ........................................................................................ 9

Direct Purchaser Plaintiffs ("DPPs") respectfully submit this memorandum in support of their motion to exclude the opinions of David P. Kaplan.

**INTRODUCTION**

Defendants intend to offer attorney David Kaplan as a purported economic expert to rebut the opinions of DPPs' economic expert, Dr. Douglas Zona, Ph.D. Mr. Kaplan is not qualified to critique many of Dr. Zona's opinions. He uses unreliable methodologies that include selectively ignoring evidence and allegations in the Complaint, and misconstruing the pleadings instead of relying on the record in this case. He does not understand the actual markets at issue. For example, [redacted] (Declaration of Matthew Borden ("Borden Decl."), Ex. 1, Kaplan Dep. Tr. 207:14-208:2.) Instead, [redacted] For the reasons below, Mr. Kaplan's opinions are not based on economic expertise, are not reliable, will not be helpful to the jury and should be excluded.

Although he is offered as a rebuttal expert, [redacted] As detailed at length in DPPs' motion for class certification, Defendants entered into explicit agreements *reflected in produced documents* that they would not compete with one another, that they would fix prices, and that Synta would assist Ningbo Sunny with its acquisition of Meade. [redacted]

[redacted] (*Id.* at 22:17-24:11.) This speculation has no probative value and should also be excluded under Rule 403.

[redacted]

[redacted] is contrary to this Court's prior ruling in the *Orion* litigation, which found that these are permissible methods for calculating damages. [redacted] —"Sunny maintains that Dr. Zona's testimony was insufficiently tied to the facts of the case because he relied on theoretical economic models instead of 'actual data' and did not calculate the actual overcharges Sunny inflicted on Orion"—which likewise rejected this argument and affirmed this Court. *Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*, 20 F.4th 466, 477 (9th Cir. 2021).

[redacted] (Borden Decl., Ex. 2, Kaplan Rep. ¶ 58.)

[redacted]

[redacted]

DPPs respectfully submit that Mr. Kaplan's improper affirmative opinions, his opinions on Dr. Zona's economic modeling and his opinions on Dr. Zona's market share modeling should be excluded in their entirety.

**BACKGROUND**

Defendants intend to offer a lawyer to rebut the expert opinions of economist Dr. J. Douglas Zona, Ph.D. Mr. Kaplan does not have a Ph.D. in economics and no prior experience in the telescope industry. His opinions that are relevant to DPPs' motion are briefly discussed below.

[redacted] (Borden Decl., Ex. 2, Kaplan Rpt. ¶ 16.) [redacted] (*See id.*) [redacted] (*See id.*, Ex. 1, Kaplan Dep. Tr. 72:13-18.) [redacted] (*See id.*, Ex. 2, Kaplan Rpt.)

[redacted] (*Id.* ¶¶ 62-93.) [redacted] (*Id.* ¶ 61.) [redacted] (*Id.*) [redacted]

[redacted]

- [redacted]

  (*Id.* ¶ 63.)

- [redacted] (*Id.* ¶ 67.)

- [redacted]

  (*Id.* ¶ 69.)

- [redacted] (*Id.* ¶ 75.)

- [redacted] (*Id.* ¶ 80.)
- [redacted] (*Id.* ¶ 82.)
- [redacted] (*Id.* ¶ 83.)

**B. Dr. Zona's Economic Models and Mr. Kaplan's Attempted Rebuttals**

[redacted]

**1. Dr. Zona's Opinions Regarding the Existence and Magnitude of the Class-Wide Overcharge**

To determine the extent to which Defendants' anticompetitive conduct harmed the class, Dr. Zona uses three methodologies.

*First*, Dr. Zona uses a textbook Cournot Equilibrium model to show the extent of the overcharge customers experienced. (Borden Decl., Ex. 3, Zona Rpt. ¶¶ 89-94.) *See also Optronic*, 20 F.4th at 477-78 ("Dr. Zona separately looked to the structural theory of Cournot Equilibrium, an economic model where competitors simultaneously choose levels of output to maximize their profits."). As he explains, the Cournot Equilibrium model shows how a combination between telescope suppliers impacts telescope prices and raises them above the competitive benchmark for the entire class. (Borden Decl., Ex. 3, Zona Rpt. ¶¶ 89-94.) The Cournot model shows the magnitude of the classwide impact as follows: (a) a 6.9% overcharge prior to 2005 (when Synta acquired Celestron), which reflects the fact that there is evidence of overlapping ownership between Synta and Sunny prior to 2005; (b) a 17.4% overcharge from 2005 to 2013 (when Synta, Sunny and Celestron were conspiring together, but before Ningbo Sunny acquired Meade); (c) a 35.7% overcharge from 2013 to 2019 (the time period Ningbo Sunny owned Meade and brought it

into the conspiracy); and (d) a 17.4% overcharge after 2019 (when Ningbo Sunny divested Meade to satisfy the *Orion* judgment). (*Id.*)

*Second*, Dr. Zona uses literature on measured cartel overcharges compiled by Purdue University—known as the "PIC" data—to calculate the extent of the overcharge to the class. (*Id.* ¶¶ 95-99.) Like the Cournot Equilibrium model, the PIC model shows how the combination of multiple cartel members impacts class-wide prices. (*Id.*) Dr. Zona analyzes a subset of the PIC data pertaining to the United States containing two, three or four cartel members. (*Id.* ¶ 96.) As a result of that analysis, he assumes a baseline market share for Sunny and Synta of 40% prior to 2005 (reflecting their overlapping ownership prior to 2005). (*Id.* ¶ 98.) From 2005 to 2013, Dr. Zona uses a market share of 70%, which represents Celestron's approximate market share before Meade joined the conspiracy. During that time period, Dr. Zona calculates an overcharge of 35% using a regression model. (*Id.*) From 2013 to 2019, when Ningbo Sunny, Synta, Celestron and Meade were all part of the conspiracy, Dr. Zona uses a market share of 80% and finds an overcharge of approximately 39.8%. (*Id.*) From 2019 on, Dr. Zona's PIC model estimates a market share of 70% following the divestment of Meade and calculates an overcharge of 35%. (*Id.*)

*Third*, Dr. Zona uses a standard multiple regression analysis using Celestron's transactional data to determine the class-wide impact Defendants' conduct had on the prices Celestron charged to class members. To perform his analysis, Dr. Zona uses the 2001 to 2005 period as a "benchmark" for the but-for world that would exist absent Defendants' anticompetitive conduct, although he explains that the "before" period in this case does not reflect a true but-for world with independent competitors, because Synta and Ningbo Sunny were under common ownership even prior to the Class Period. (*Id.* ¶¶ 102-103.) As Dr. Zona explains, he would "typically" use a before or after period as a benchmark for prices that would exist in a but-for world absent Defendants' anticompetitive conduct. (*Id.* ¶ 102.) He explains, however, that "in this case, there is evidence that even before the acquisition in 2005 of Celestron by Synta, Synta and Ningbo Sunny were interrelated and not independent of one another. Therefore, the pre-2005 prices would not be expected to reflect but-for competition between these two independent suppliers, among others." (*Id.*; *see also* Borden Decl., Ex. 4, Zona Decl. ¶ 13.) Because pre-2005 prices cannot serve as a

benchmark, Dr. Zona reduces those pre-2005 prices by 16.7%, which is the magnitude of the expected overcharge predicted by the PIC data discussed above during that time period. (*Id.*, Ex. 3, Zona Rpt. ¶ 98; Ex. 4, Zona Decl. ¶¶ 14-15.) By removing this 16.7% overcharge, Dr. Zona derives an accurate "before period" price to use as a benchmark for his regression model. (*Id.*) Dr. Zona's regression analysis shows that prices Celestron charged to the Class were inflated throughout the class period as compared to the pre-2005 period. (*Id.* ¶¶ 108-109.) The regression shows that "after controlling for cost, seasonality and product specific factors affecting supply and demand, prices are about 3.96 percent higher during the period April 2005 to August 2013, while prices were about 7.16 percent higher from September 2013 through 2021, compared to before April 2005." (*Id.* ¶ 108.)

**2. Mr. Kaplan's Attempted Rebuttals**

Mr. Kaplan takes issue with all three of Dr. Zona's economic models.

[redacted] (*See* Borden Decl., Ex. 2, Kaplan Rpt. ¶¶ 27-37.) [redacted] (*Id.* ¶ 29.) [redacted] (*Id.*, Ex. 1, Kaplan Dep. Tr. 226:2-7.)

[redacted] (*Id.*, Ex. 2, Kaplan Rpt. ¶¶ 41-46.) [redacted]

[redacted] (*Id.*, Ex. 1, Kaplan Dep. Tr. 21:3-7.) [redacted] (*Id.*, Ex. 2, Kaplan Rpt. ¶ 41.).

[redacted] (*Id.* ¶ 50.) [redacted] (*See id.*, Ex. 1, Kaplan Dep. Tr. 246:14-247:1; 252:20-253:22.)

### C. Dr. Zona's Opinions Regarding Defendants' Market Share and Mr. Kaplan's Attempted Criticism

Dr. Zona measured Defendants' market share using publicly available customs data. As he explained, the data Defendants produced in this action "was quite limited and . . . insufficient to measure market share." (Borden Decl., Ex. 3, Zona Rpt. ¶ 39.) Synta admittedly never measured its own market share or its competitors' market share, and sales figures for individual telescope manufacturers are essentially nonexistent. Moreover, most of the telescope industry is privately held and does not publicly report any relevant sales data. To overcome these data acquisition barriers, Dr. Zona used Import Genius customs data reflecting the bill of lading for each shipment entering a U.S. port via ocean, and detailed the process by which he screened telescope shipments in his report. (*See id.* ¶¶ 39-44.) He calculated market shares for telescope brands "based on the gross weight of the shipping containers, in pounds" for telescopes shipped by each brand, and detailed the results of his analysis in his report from 2006 through 2022. (*Id.* ¶ 42.) These were the same techniques that Dr. Zona used to calculate market share in the *Orion* litigation.

Dr. Zona's market share analysis shows that "Synta and Sunny together, represent at about 70 percent, or more, of telescope imports to the United States in most years between 2006 through 2022" and that, "[w]hile there is considerable variation from year to year given the nature of the data, it is clear that Sunny/Synta/Celestron has had a dominant share of the telescopes market since at least 2008." (*Id.* ¶ 44.)

[redacted] (Borden Decl., Ex. 2, Kaplan Rpt. ¶¶ 95-103.) [redacted] (*Id.*)

**LEGAL STANDARD**

Under Rule 702 of the Federal Rules of Evidence, a witness may testify as an expert only if "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." The party proffering expert testimony must show, by a preponderance of the evidence, that the testimony satisfies each requirement of Rule 702. *Metabyte, Inc. v. Canal Techs., S.A.*, No. C-02-05509 RMW, 2005 WL 6032845, at *2 (N.D. Cal. June 17, 2005) (citing *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592 n. 10 (1993)).

Courts have a "gatekeeping responsibility" to determine whether the testimony an expert seeks to offer satisfies these criteria. *Daubert*, 509 U.S. at 589 n.7, 592 n.10 (1993). Under *Daubert*, an expert's opinion is "the product of reliable principles and methods" and "based on sufficient facts or data" under Rule 702 if it "can be (and has been) tested," has been "subjected to peer review and publication," has a known or potential rate of error and is widely accepted in the community. 509 U.S. at 593-94. "[A] trial court may consider one or more of the more specific factors that *Daubert* mentioned when doing so will help determine that testimony's reliability." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999). Experts may apply a specific analytical

framework to the facts of a case or may base their testimony on "professional studies or personal experience," but in either scenario, *Daubert* requires a court to ensure that the expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.* at 152.

"Nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). Expert testimony likewise must be excluded under Rule 403 "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." *Daubert*, 509 U.S. at 595. "[I]n weighing possible prejudice against probative forces under Rule 403 . . . [the Court] exercises more control over experts" than lay witnesses. *Id.* (internal quotation omitted).

## ARGUMENT

**I.** [redacted]

**A.** [redacted]

Under Federal Rule of Civil Procedure 26(a)(2)(D), "[a] party must make [expert] disclosures at the times and in the sequence that the court orders." Pursuant to the Court's scheduling orders, opening expert reports on issues as to which a party has the burden of proof were due November 1, 2024, opposing expert reports were due January 10, 2025, and rebuttals to the opposing expert reports were due February 7, 2025. (Dkts. 582, 614, 664.) Mr. Kaplan is an opposing expert and his report was served on January 10, 2025. His opinions therefore are rebuttal opinions and cannot exceed the scope of permissible rebuttal testimony.

A rebuttal expert's testimony must be "intended solely to contradict or rebut evidence on the same subject matter identified by an initial expert witness." *Clear-View Techs., Inc. v. Rasnick*, No. 13–CV–02744–BLF, 2015 WL 3509384, at *2 (N.D. Cal. June 3, 2015) (quoting *R & O Constr. Co. v. Rox Pro Int'l Grp., Ltd.*, No. 2:09–cv–01749–LRH–LRL, 2011 WL 2923703, at *2 (D. Nev. July 18, 2011)). In contrast, "[i]f the rebuttal expert's testimony is offered . . . to contradict an expected and anticipated portion of the other party's case-in-chief, then the witness is not a rebuttal witness or anything close to one." *Id.* (quoting *Amos v. Makita U.S.A.*, No. 2:09–cv–01304–GMN–RJJ, 2011 WL 43092, at *2 (D. Nev. Jan. 6, 2011)).

For example, in *People v. Kinder Morgan Energy Partners, L.P.*, 159 F. Supp. 3d 1182, 1191 (S.D. Cal. 2016), the City of San Diego sued defendants seeking property remediation, including groundwater remediation. *Id.* at 1188. Although Kinder Morgan submitted initial expert reports regarding groundwater hydrology, the City did not do so and instead later submitted a rebuttal report by a hydrology expert. *Id.* at 1191. The Court found that the City's expert did "not solely contradict or rebut" Kinder Morgan's experts and instead advanced new opinions that were part of the City's case-in-chief. *Id.* The court noted that "the City's response—that [the expert] opines on the same subject matter as Kinder Morgan's expert's, and is therefore a proper rebuttal expert—is insufficient." *Id.* at 1192 (quoting *Vu v. McNeil–PPC, Inc.*, No. CV 09–1656 ODW (RZx), 2010 WL 2179882, at *3 (C.D. Cal. May 7, 2010)). The court noted that "If the phrase 'same subject matter' is read broadly to encompass any possible topic that relates to the subject matter at issue, it will blur the distinction between 'affirmative expert' and 'rebuttal expert.' More importantly, such a broad reading of Rule 26(a)(2)(C)(ii) will render the scope of the subject matter limitless and will lead to unjust results." *Id.* at 1192. The Court then excluded the City's improper rebuttal expert. *Id.* at 1193; *see also Amos*, 2011 WL 43092, at *1 (finding, where central issue in the case was whether defendant's battery had caused fire and defendant offered a rebuttal expert to testify as to "a new, alternative theory of the fire's origin," that the expert's opinion was not rebuttal and was instead a response to the plaintiff's anticipated case-in-chief on causation).

[redacted]

[redacted] (Borden Decl., Ex. 2 ¶ 63); (2) [redacted] (*id.* ¶ 67); (3) [redacted] (*id.* ¶ 69); (4) [redacted] (*id.* ¶ 75); (5) [redacted] (*id.* ¶ 80); (6) [redacted] (*id.* ¶ 82.); and (7) [redacted] (*id.* ¶ 83).

[redacted]

[redacted] (Borden Decl., Ex. 1, Kaplan Dep Tr. 117:11-118:22.) [redacted] (*Id.* at 128:20-129:12.)

None of these opinions are a proper rebuttal to Dr. Zona. Dr. Zona does not seek to establish the existence of an anticompetitive agreement—he cites evidence in the record regarding Defendants' anticompetitive agreement that will be part of DPPs' *prima facie* case. (*See, e.g.*, *id.*, Ex. 3, Zona Rpt. ¶¶ 61-79.) Therefore, like the City's expert in *Kinder Morgan*, Mr. Kaplan offers these opinions as an affirmative expert rather than a rebuttal expert. Defendants did not submit as an affirmative expert report by Mr. Kaplan, [redacted] should be excluded as outside the proper scope of rebuttal.

### B. Mr. Kaplan's Affirmative Opinions Should Also Be Excluded Because They Are Speculative and Risk Jury Confusion

[redacted] Courts do not permit experts to speculate and offer *ipse dixit* opinions to the jury. "When an expert opinion is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable, it cannot support a jury's verdict." *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993). "Expert testimony is useful as a guide to interpreting market facts, but it is not a substitute for them." *Id.*; *see also Stephens v. Union Pac. R.R. Co.*, 935 F.3d 852, 856 (9th Cir. 2019) ("Expert testimony cannot create a genuine issue of material fact if it rests on assumptions that are not supported by evidence.").

For example, *In re Google Play Store Antitrust Litigation* was a case in which plaintiffs challenged the Google Play Store as creating an anticompetitive app distribution market. No. 20-

CV-05761-JD, 2023 WL 5532128, at *9 (N.D. Cal. Aug. 28, 2023). In that case, Judge Donato excluded an economic expert's "consumer subsidy" economic models, in which the expert assumed that the "structure of Play Points"—Google's rewards program—was "a reasonable facsimile of what an expanded program might look like in a competitive but-for world" and that "consumers would have enhanced economic incentives to enroll and participate in a Play Points offering more valuable incentives in the but-for world, just as consumers have more incentives to participate in a more generous credit card rewards program." *Id.* at *9. Judge Donato found that these factual assumptions were "wholly speculative assumptions that make [the expert's] opinions ipse dixit unsuitable for admission at trial." *Id.* at *9. The Court likewise excluded the expert's market-share-related opinions where the expert compared the economics of the Google app store in the but-for world to "long distance service in the 1980s and early 1990s" with no explanation. *Id.*

[redacted] (Borden Decl., Ex. 2, Kaplan Rpt. ¶ 16.) Like the expert in *Google Play Store*, [redacted]

[redacted] These opinions risk confusing the jury about the facts in evidence because "indisputable record facts contradict or otherwise render [them] unreasonable." *Brooke Grp.*, 509 U.S. at 242. For example, the following evidence cited in connection with DPPs' pending motion for class certification conclusively demonstrates Defendants' anticompetitive conduct and eliminates the need for any speculation:

- Defendants' emails expressly admit to price fixing. For example, a January 20, 2014 email from Celestron Board member Laurence Huen to Mr. Shen states: "Today's meeting went smoothly, and the atmosphere was good. Thank you, David, for your instructions and arrangements. Sunny's pricing for next year has been concluded as follows . . . ." (*See* Dkt. 629-3.)
- Defendants' emails likewise discuss market allocation. For example, in notes of a 2008 Celestron Board meeting, Celestron's then-CEO Joseph Lupica wrote that Synta and Ningbo Sunny were coordinating to "[c]hange selling method of lower end products to Wal-Mart": "David S to pass onto Sunny this idea and coordinate for further action." (*See* Dkt. 629-4.)
- Michael Sun, Synta's factory manager, confirmed that Synta and Ningbo Sunny were able to make the same types of telescopes, but could only remember one instance in which a customer transitioned manufacturing a type of telescope from Synta to Ningbo Sunny. (*See* Dkt. 629-26.)
- Internal emails show that Synta, Celestron and Ningbo Sunny colluded to have Ningbo Sunny purchase Celestron's competitor Meade "to prevent JOC to buy Meade" while evading the FTC, which would not let Celestron and Meade combine. (*See* Dkt. 629-5.)
- As Mr. Huen summed up in a March 8, 2011 email to Celestron's Board: "What I see in the coming year, and as Celestron + Synta + Pacific + Sunny combined, our organization is leading and shaping the overall competitive landscape of the Telescopes industry." (*See* Dkt. 629-8.)
- Defendant Lee asked for and received information from Ningbo Sunny concerning the prices Celestron's competitors, such as Bushnell, paid for telescopes. (*See* Dkt. 629-27.) Mr. Lee told his executive team to "keep the information [concerning Sunny's pricing to Bushnell] within Celestron. We certainly don't want Bushnell or other vendor knows [sic] about the information sharing between Celestron and Sunny." (*Id.*)

- Mr. Lee also told Mr. Shen to raise the prices charged to Celestron's competitors, which Synta did. (*See* Dkts. 629-28, 629-29.)

[redacted] Doing so risks confusing the jury and would be more prejudicial than probative.

**II.** [redacted]

[redacted]

**A.** [redacted]

[redacted] (Borden Decl., Ex. 2, Kaplan Rpt. ¶ 50.)

These opinions are unreliable because they are contrary to law. This Court previously found that Dr. Zona's substantially similar analyses using the PIC data and Cournot model were reliable and permitted Dr. Zona to testify to these theories at trial. *See Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*, No. 5:16-CV-06370-EJD, 2019 WL 4780183, at *4 (N.D. Cal. Sept. 30, 2019). The defendants in the *Orion* case [redacted] "Defendants argue that Dr. Zona's overcharge analysis should be excluded because it relies on a study by another author that analyzed overcharges in other cartel cases instead of data from this case." *Id.* In the *Orion* case, Dr. Zona did exactly what he did in this case: "Dr. Zona used the study by applying a subset of the data therein that most closely resembles this case—cartels with three members that control more than 70 percent of the market—to his model." *Id.* In rejecting defendants' arguments, the Court explained that "In a 2013 antitrust matter in the Northern District,

another court considered a challenge regarding an expert's testimony as to typical cartel overcharges that was based on an earlier study by the same author of the study upon which Dr. Zona relies. There, the court declined to exclude the testimony …." *Id.* (quoting *In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. M 07–1827 SI, 2013 WL 12311008, *2 (N.D. Cal. June 14, 2013)). The Court held: "If Defendants disagree with the data that Dr. Zona used in his overcharge analysis, they may cross-examine him, but that disagreement is not grounds to exclude his testimony." *Id.*

Likewise, this Court reached the same conclusions about Dr. Zona's use of the Cournot model [redacted]:

> Defendants also challenge Dr. Zona's structural model because it does not use Orion's or Defendants' prices and costs to reach the conclusion that Orion's profits would be 77 percent higher in a duopoly than a monopoly. Thus, they contend, the structural model is not sufficiently tethered to the facts of the case. This argument, though, overlooks how Dr. Zona reached his conclusion. The structural model is designed to predict the behavior of efficient companies that aim to maximize their profits. Zona Rep. ¶¶ 109-13. He applied the Cournot Nash equilibrium to determine equations for what Orion's per unit profit would be if Orion's upstream suppliers (*i.e.*, Synta and Sunny) were competing and what it would be if they were colluding. *Id.* ¶¶ 113-14. From there, he calculates that if the upstream suppliers were competitive, Orion's per unit profit would be 77 percent higher than if they were monopolistic. *Id.* ¶ 118. Defendants do not dispute that the methods and analysis employed by the model are widely accepted by economists.

*Id.* at *5. The Court held: "The court finds that the methodology underlying the structural model meets the standards for reliability." *Id.*

The Ninth Circuit affirmed this Court's reasoned opinions:

> Dr. Zona used two methods—direct and structural—to calculate damages. For the direct method, Dr. Zona's elasticity, margin, and pass-through calculations were based on data from the telescope manufacturing market, but he explained that the overcharges inflicted on Orion are not directly observable. Dr. Zona estimated these overcharges by looking to the number of alleged co-conspirators and considering the market shares of manufacturers in the relevant market. One method measured cartel overcharges from other conspiracies with similar market compositions, though Dr. Zona noted that his estimates could be conservative because the telescope market had so few buyers, which would likely magnify the

> overcharges. Dr. Zona separately looked to the structural theory of Cournot Equilibrium, an economic model where competitors simultaneously choose levels of output to maximize their profits. He adjusted this analysis to reflect the relevant market structure, of which two colluders—Sunny and Synta—controlled more than 70% of the market, based on data taken directly from this case. This Cournot Equilibrium model corroborated the results that Dr. Zona derived from his analysis of cartels operating in markets with compositions similar to the telescope market. Dr. Zona separately calculated damages through the structural method to check his direct method calculations. Dr. Zona's expert report and testimony were sufficiently tied to the facts of this case such that the district court properly admitted this evidence.

*See Optronic*, 20 F.4th at 477-478.

[redacted] (Borden Decl., Ex. 1, Kaplan Dep. Tr. 246:14-247:1; 252:20-253:22.) [redacted] (*Id.* at 257:10-17.) His opinions on these topics are not informed and are contrary to law, as both this Court and the Ninth Circuit have held.

Accordingly, the Court should exclude Mr. Kaplan's opinions [redacted]

**B.** [redacted]

[redacted] (Borden Decl., Ex. 2, Kaplan Rpt. ¶ 29.) [redacted] (*Id.*, Ex. 5, Zona Reb. Rpt. ¶ 38.) [redacted]

[redacted] (*Id.*, Ex. 1, Kaplan Dep. Tr. 226:2-7.)

[redacted] (*Id.*, Ex. 2, Kaplan Rpt. ¶ 37.) But that is factually untrue. As Dr. Zona showed in his rebuttal report submitted in connection with DPPs' class certification motion, including the PCE variable while holding the rest of Dr. Zona's model constant creates only a small change in his overcharge calculations. (*Id.*, Ex. 6, Zona Class Cert. Reb. Rpt. ¶ 22, Dkt. 636-1.) [redacted] (*Id.*) [redacted]

[redacted] These opinions are wholly unreliable and should be excluded.

**C. [redacted]**

Substantial evidence—including admissions by Defendants—shows that there was cross-ownership between horizontal competitors Synta and Ningbo Sunny prior to 2005. As Dr. Zona opines, "in this case, there is evidence that even before the acquisition in 2005 of Celestron by Synta, Synta and Ningbo Sunny were interrelated and not independent of one another. Therefore, the pre-2005 prices would not be expected to reflect but-for competition between these two independent suppliers, among others." (Borden Decl., Ex. 3, Zona Rpt. ¶ 102.) Because pre-2005 prices cannot serve as a benchmark, Dr. Zona reduces those pre-2005 prices by 16.7%, which is the magnitude of the expected overcharge predicted by the PIC data during that time period. (*Id.* ¶ 98.) By removing this 16.7% overcharge, Dr. Zona derives an accurate "before period" price to use as a benchmark for his regression model. (*Id.*)

[redacted] (Borden Decl., Ex. 2, Kaplan Rpt. ¶ 41.) But that assertion misreads the Complaint, selectively ignores key allegations, and fails to take into account an exhibit attached to the complaint itself, which is an email by Defendants admitting that horizontal competitors Synta and Ningbo Sunny had common directors and ownership before 2005. It also ignores the documents and testimony establishing that David Shen was a Director and 26% owner of his competitor Ningbo Sunny prior to 2005. (*See, e.g.*, 4th Am. Compl. ¶¶ 17-18, Dkt. 495; *id.*, Ex. 1; DPPs' Mot. to Certify Class at 5 and accompanying evidence, Dkt. 599.) [redacted] (Borden Decl., Ex. 2, Kaplan Rep. ¶ 58 ([redacted]).)

[redacted] (Borden Decl., Ex. 1, Kaplan Dep. Tr. 54:20-55:2.) Relying on a selective interpretation of pleadings (and especially to the exclusion of considering actual evidence) is not an expert methodology. *See, e.g.*, *Fiona Chen v. Yellen*, No. 3:14-CV-50164, 2021 WL 4192078, at *5 (N.D. Ill. Sept. 15, 2021) ("Even if the Court were to assume the . . . complaint constituted 'sufficient facts and data' on which an expert could rely, [the expert's] near-universal reliance on one filing without reference to many other filings on record would cast significant doubt on the soundness of his opinions." (citation omitted)). [redacted], which is impermissible as expert testimony. *See Focal Point Films, LLC v. Sandhu*, No. 19-cv-2898, 2020

WL 5760355, at *6 (N.D. Cal. Sept. 28, 2020) ("It is well-established that an expert witness may not explain the law to the jury or tell the jury how to apply the law to the facts of the case.") (citing *Nationwide Transp. Fin. v. Cass Info. Sys., Inc.*, 523 F.3d 1051, 1058-59 (9th Cir. 2008)). [redacted] (Borden Decl., Ex. 1, Kaplan Dep. Tr. 58:15-59:10.) That is not an expert opinion—it is a decision to give one part of a legal document more weight than another. [redacted] (*Id.*, Ex. 2, Kaplan Rpt. ¶ 58.) [redacted]

**III.** [redacted]

[redacted] (Borden Decl., Ex. 1, Kaplan Dep. Tr. 72:13-73:2.) [redacted] (*Id.*, Ex. 2, Kaplan Rpt. ¶ 100.) Dr. Zona has demonstrated that the companies Mr. Kaplan cites have a *de minimis* impact on his market share calculations. (*Id.*, Ex. 6, Zona Class Cert. Reb. Rpt. ¶ 40, Dkt. 636-1.) [redacted] (*Id.*, Ex. 1, Kaplan Dep. Tr. 190:8-19.) [redacted]

[redacted] (*Id.*, Ex. 5, Zona Reb. Rpt. ¶ 71.) *See also Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*, 613 F. Supp. 3d 1308, 1322 (S.D. Cal. 2020), *aff'd*, 9 F.4th 1102 (9th Cir. 2021) ("[E]xpert testimony cannot be presented to the jury solely for the purpose of constructing a factual narrative based upon record evidence.").

## CONCLUSION

For the foregoing reasons, DPPs' motion should be granted and the opinions of Mr. Kaplan should be excluded.

Dated: March 7, 2025

Respectfully submitted,

BRAUNHAGEY & BORDEN LLP

By: *\/s/ Matthew Borden*
Matthew Borden

*Attorneys for Direct Purchaser Plaintiffs*