# EXHIBIT 3

ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

**AURORA ASTRO PRODUCTS LLC, PIONEER CYCLING & FITNESS, LLP, and those similarly situated**

**v.** **Case No. 5:20-cv-03642-EJD**

**CELESTRON ACQUISITION, LLC, SUZHOU SYNTA OPTICAL TECHNOLOGY CO., LTD., SYNTA CANADA INT'L ENTERPRISES LTD, SW TECHNOLOGY CORP., *et al***

**<u>Expert Report of J. Douglas Zona, Ph.D.</u>**

May 20, 2024

**I. Introduction** .......... **3**
**II. Economic Analysis** .......... **6**
A. Relevant Antitrust Market .......... 7
1. General Approach .......... 7
2. Application in the Case .......... 9
B. Market Participants .......... 11
1. Synta .......... 12
2. Sunny .......... 13
3. Celestron .......... 13
4. Meade .......... 14
5. Jinghua Optics & Electronics, Co., Ltd .......... 15
C. Market Shares and Market Power .......... 15
1. Market Shares .......... 16
2. Market Power .......... 18
3. Intellectual Property as a Barrier to Entry .......... 21
4. Learning by Doing and Scale Economies as Barriers to Entry .......... 22
**III. Coordinated Effects** .......... **23**
A. Synta and Sunny's Operation is Interconnected .......... 24
B. Synta and Sunny Pursued Joint Operational Goals .......... 26
C. Synta and Sunny Worked Together to Help Sunny Acquire Meade .......... 28
**IV. Antitrust Injury and Measure of Damages** .......... **31**
A. Overcharge .......... 32
1. Economic Theory .......... 33
2. Connor PIC Data Based Model .......... 35
3. Regression Model  Based on Celestron's Transactions Data .......... 37
B. Affected Commerce .......... 41
C. Aggregate Damages .......... 43
D. Antitrust Injury .......... 44
**V. Common Impact** .......... **44**
**VI. Summary and Conclusions** .......... **46**

# I. INTRODUCTION

1. My name is J. Douglas Zona. I received a Ph.D. in economics from the State University of New York in Stony Brook in 1986, with a focus on Industrial Organization and Microeconomic Theory. Since then, I have worked as an adjunct professor at New York University and as a practicing economist, including as a Vice President at National Economic Research Associates, Cornerstone Research, and CRA International, where my work has focused on the economics of antitrust and competition issues. My full qualifications are listed in my CV, which is attached hereto as **Appendix A**.

2. I have published articles in which I applied economic theory and statistical and econometric tools in a variety of applications in the areas of antitrust economics and industrial organization, many of which have been cited widely. I have also been asked to present at conferences and meetings relating to econometrics and antitrust, including on multiple instances before the ABA Section of Antitrust Law, to the Antitrust Division of the United States Department of Justice, and to the Antitrust Law Section of the New York State Bar Association. A fuller list of my publications, papers, and presentations is found on my CV; examples of my relevant publications include:

   a. "Structural Approaches to Estimating Overcharges in Price Fixing Cases," Antitrust Law Journal, 77 No. 2 (2011).

   b. "Collusion," with R. Porter, in *Issues in Competition Law and Policy*: Volume II, Wayne Dale Collins, Ed., ABA Section on Antitrust Law, 2008.

   c. "Competitive Analysis with Differentiated Products" with J. Hausman and G. Leonard, *Annales d' Economie et de Statistique*, 34 (1994) pp. 159-180.

   d. "Bidding, Bid Rigging, and School Milk Prices: Ohio v. Trauth (1994)" (with R. Porter), in *The Antitrust Revolution: Economics, Competition and Public Policy*, Fifth Edition, edited by J.E.Kwoka, Jr. and L.J. White, Oxford University Press, 2008.

   e. "Detection of Bid Rigging in Procurement Auctions" with R. Porter, *Journal of Political Economy*, 3 (1993) pp. 518-538.

3. I have testified in federal and state courts and filed testimony in federal regulatory proceedings. I have provided testimony related to antitrust issues in a variety of cases, for

both plaintiffs and defendants. My attached CV includes the cases in which I have submitted expert reports and/or testified as an expert witness at deposition or trial.

4. In November 2016, telescope distributor Orion filed a lawsuit against telescopes manufacturer, Sunny after settling against Sunny's alleged co-conspirators, Synta and Celestron.[1] Orion alleged that among other things, Sunny and Synta: (1) colluded to fix prices and credit terms for consumer telescopes in the United States; (2) collaborated to facilitate Sunny's acquisition of Meade Instruments Corp.; and (3) divided the telescope market by product type and allocated customers.[2] I served as expert antitrust economist on liability and damages in that case.

5. The Complaint in the present case alleges that Plaintiffs and other direct purchasers of telescopes paid artificially inflated prices for consumer telescopes during the period from and including January 1, 2005 through the present ("Class Period") and have thereby suffered antitrust injury.[3] The proposed Class of plaintiffs in this case includes telescope distributors as Named Plaintiffs and

---

[1] The case is known as Optronic Techs., Inc. v. Ningbo Sunny Electronic Co., Ltd. et al., No. 5:16-cv-06370-EJD-VKD (N.D. Cal.), or the "Orion Litigation." Following a six-week jury trial and two days of deliberation, the jury delivered a verdict in favor of Orion on December 5, 2019, after finding that the Defendants had violated the Sherman Act and the Clayton Act by engaging in a conspiracy to fix the price for, and allocate the market of, telescopes and accessories and to monopolize the domestic consumer telescope market. U.S. District Judge Edward J. Davila delivered a partial final judgment in the amount of $50.4 million by trebling the jury's award and granting post-judgment interest. Orion Litigation, Dkt. Nos., 630, 637. That judgment was later affirmed by the Ninth Circuit Court of Appeals. (Optronic Technologies, Inc. v. Ningbo Sunny Electronic Co. Ltd., No. 20-15837 (9th Cir. 2021), December 6, 2021.

[2] Orion Litigation, Dkt. Nos. 1 (Compaint), 41 (First Amended Complaint).

[3] The relevant complaint is FOURTH AMENDED COMPLAINT FOR VIOLATIONS OF SHERMAN ACT; CARTWRIGHT ACT; AND UNFAIR COMPETITION LAW in AURORA ASTRO PRODUCTS LLC, PIONEER CYCLING & FITNESS, LLP, and those similarly situated, Plaintiffs, v. CELESTRON ACQUISITION, LLC, SUZHOU SYNTA OPTICAL TECHNOLOGY CO., LTD., SYNTA CANADA INT'L ENTERPRISES LTD., SW TECHNOLOGY CORP., OLIVON MANUFACTURING CO. LTD., OLIVON USA, LLC, NANTONG SCHMIDT OPTO-ELECTRICAL TECHNOLOGY CO. LTD., NINGBO SUNNY ELECTRONIC CO., LTD., PACIFIC TELESCOPE CORP., COREY LEE, DAVID SHEN, SYLVIA SHEN, JACK CHEN, JEAN SHEN, JOSEPH LUPICA, DAVE ANDERSON, LAURENCE HUEN, AND DOES 1-50, Defendants.; Case No. 5:20-cv-03642-EJD, filed September 1, 2023 ("Complaint"). Dkt. No. 495.

> "all similarly situated retailers, distributors, and individuals who purchased a telescope manufactured or sold by Defendants from Synta's acquisition of Celestron in 2005 through such time as class notice is given."[4] ("Class.")

According to the Complaint, Celestron Acquisition, LLC and its syndicate of co-conspirators, including its parent company Synta and competitor Ningbo Sunny, colluded on prices and operated their businesses as a conglomerate for the mutual benefit of one another.

6. I have been asked by Counsel for the Plaintiffs to consider the economic evidence of and relating to the anticompetitive conspiracy alleged in this case, the structure and characteristics of the telescope manufacturing market, including the market power of the alleged conspirators in this case, and to evaluate the economic impact of the alleged misconduct on Plaintiffs. I have also been asked whether proof of harm and damages can be determined on a class-wide basis using common evidence.

7. My opinions are detailed more fully throughout the remainder of this report. In sum, based on my economic training, my professional experience working on matters such as this, the relevant economic literature, my investigation of the economic evidence in this case, my review of the documentary record[5], and my economic analysis, I have reached the following general conclusions:

   a. From an economic perspective, the conduct of Defendants reduced competition and prevented telescopes buyers and prospective buyers from enjoying the full benefits of the competitive process, forcing prices above the competitive level; this can be shown by common economic evidence applicable to the proposed class as a whole;

   b. Common economic evidence and analyses can also be used to show that prices for telescopes and accessories were higher as a result of the Defendants' conduct; in other words, common economic evidence and analyses exist to show a supra-competitive overcharge resulting from the conduct;

[4] Complaint, ¶143.

[5] The materials I have relied upon in preparing this report are cited herein and/or listed in **Appendix B**.

c. Standard and reliable economic methods and analyses for computing aggregate damages to the proposed Class as a whole show that all or substantially all Class members paid this overcharge as a result of Defendants' conduct; and,

d. Damages to proposed class members can be determined on a formulaic basis; Estimated aggregate damages are in a range of about $142 to $238 million in overcharges imposed by Defendants' conduct, before trebling.

8. I am being compensated for work on this matter at a rate of $925 per hour, plus reimbursement of expense. I have no financial interest in the outcome of this litigation. I understand that fact discovery in this case is on-going, as is my review of the materials produced to date. Consequently, the opinions I express in this report are subject to revision once this further fact discovery and my review have been completed.

## II. Economic Analysis

9. A telescope is "[a]n optical instrument designed to make distant objects appear nearer, containing an arrangement of lenses, or of curved mirrors and lenses, by which rays of light are collected and focused and the resulting image magnified."[6] Astronomical telescopes are primarily used to view celestial objects, like stars and planets.[7] Consumer telescopes generally are available in three optical configurations, differentiated by their primary light-gathering device: (1) refracting (lens) telescopes, (2) reflecting (mirror) telescopes, and (3) catadioptric (compound lens and mirror) telescopes, each with their own set of advantages and disadvantages surrounding durability, maintenance, performance, and price.[8]

10. Prospective Class members in this action purchased a telescope sold by Defendants at some time during the Damage Period. The complaint alleges that "Defendants conspired with their co-conspirators to fix the prices of telescopes, to allocate the manufacturing and sales of telescopes, to unlawfully acquire assets, and to dominate and monopolize

6 https://en.oxforddictionaries.com/definition/telescope

7 For the remainder of this report, references to "telescopes" connote astronomical telescopes.

8 http://www.astronomy.com/observing/equipment-use/2014/04/telescopes-101

telescope supply and distribution."[9] My assignment in this case is to evaluate the economic impact of the alleged misconduct on Plaintiffs, if any.

### A. Relevant Antitrust Market

11. The first step in analysis of the competitive effects that antitrust economists typically will take is defining the relevant market for antitrust purposes. Competition takes place in the context of markets and competitive effects are typically evaluated in the context of a properly defined market. Markets are defined by a group of products and locations where those products are sold.

#### 1. General Approach

12. In order to define the market, I apply generally the framework described in the United States Department of Justice and Federal Trade Commission 2010 Horizontal Merger Guidelines ("Merger Guidelines"),[10] an approach that is widely used by antitrust practitioners when evaluating allegations of potential anticompetitive conduct.[11] Although the Merger Guidelines' framework is often used in the merger context, the framework for market definition described in the Merger Guidelines applies beyond mergers and generally to assessments of firm conduct.[12,13] As explained by the Merger Guidelines, "market definition helps specify the line of commerce and section of the country in which

---

[9] Complaint, ¶88.

[10] *See* U.S. DEP'T OF JUST., HORIZONTAL MERGER GUIDELINES (Aug. 19, 2010), https://www.justice.gov/atr/horizontal-merger-guidelines-08192010. ("Merger Guidelines").

[11] OECD COMPETITION COMMITTEE, POLICY ROUNDTABLES, MARKET DEFINITION 11 (June 2012) http://www.oecd.org/daf/competition/Marketdefinition2012.pdf, p. 11.

[12] For example, Professor Baker describes the use of market definition in both merger and conduct assessment,and generally endorses the market definition framework described by the Merger Guidelines. *See* Jonathan B. Baker. Market definition: An analytical overview. 74 ANTITRUST L. J. 129, 132-138 (2007), pp. 132-138.

[13] In addition to the use of market definition for assessing anticompetitive effects, the Merger Guidelines also stress that: "Evidence of competitive effects can inform market definition, just as market definition can be informative regarding competitive effects. For example, evidence that a reduction in the number of significant rivals offering a group of products causes prices for those products to rise significantly can itself establish that those products form a relevant market. Such evidence also may more directly predict the competitive effects of a merger, reducing the role of inferences from market definition and market shares." *See* Merger Guidelines.

the competitive concern arises."[14] Market definition can be a useful tool for assessing potential anticompetitive harm and market power.[15]

13. A relevant antitrust market generally is characterized along two key dimensions. First, the product dimension of the relevant market is typically defined by the set of products that customers view as reasonably close substitutes for one another. Second, the geographic dimension of the relevant market is typically defined by the geographic area in which consumers reasonably can turn for alternative suppliers of the relevant products.

14. The Merger Guidelines define a product market and geographic market using what is often termed the "hypothetical monopolist" test ("HMT"). For a candidate market, the test involves assessing whether: "[A] hypothetical profit-maximizing firm, not subject to price regulation, that was the only present and future seller of those products ('hypothetical monopolist') likely would impose at least a small but significant and non-transitory increase in price ('SSNIP') on at least one product in the [candidate] market.... For the purpose of analyzing this issue, the terms of sale of products outside the candidate market are held constant."[16]

15. The candidate market is deemed a relevant antitrust market if it would likely be profitable for the profit-maximizing hypothetical monopolist to impose at least a SSNIP. By contrast, if imposing a SSNIP would likely not be profitable for the hypothetical monopolist, then the candidate market is too narrow and must be expanded to include other substitutes.[17] The Agencies typically use a SSNIP of 5 percent when implementing the hypothetical monopolist test.[18] The basic idea behind the hypothetical monopolist test

---

[14] *See* Merger Guidelines.

[15] OECD COMPETITION COMMITTEE, POLICY ROUNDTABLES, MARKET DEFINITION 13-14 (June 2012), http://www.oecd.org/daf/competition/Marketdefinition2012.pdf, pp. 11–14. ("Market definition is a widely applied analytical framework to examine and to evaluate competitive concerns.").

[16] It is important to note that the hypothetical monopolist test is first and foremost an abstract thought experiment and may involve some simplifying assumptions in application. *See* Merger Guidelines, p. 9.

[17] *See* Merger Guidelines, pp. 11-15.

[18] *See* Merger Guidelines, p. 10.

is that products or locations outside the market would not be sufficiently close substitutes for products or locations inside the market if producers of the products inside the market could profitably increase price by a small but significant amount.

16. When applying the HMT in a case where anticompetitive conduct has already occurred, such as the present matter, the SSNIP is measured relative to the competitive price, not the actual price.[19] In such cases, actual prices may be inflated by the lack of competition and the anticompetitive conduct. That is, when a market is already monopolized, the HMT could incorrectly suggest that the market should be more broadly defined (also known as "cellophane fallacy").[20] In fact, evidence of high margin can be evidence of a monopolized set of products and locations, which itself supports the market definition. The Merger Guidelines suggest that the HMT should then be assessed from a baseline of the competitive prices that would prevail in the absence of the conduct. Direct evidence of market power, including the size of margins and the anticipated effects of new entrants and price reductions, also can inform the evaluation of market definition.

17. Regarding geographic market definition, the Merger Guidelines explain that the "arena of competition affected by the merger may be geographically bounded if geography limits some customers' willingness or ability to substitute to some products, or some suppliers' willingness or ability to serve some customers."[21]

### 2. Application in the Case

18. In this case, Class members buy finished telescopes[22] from Defendants. The HMT in this context asks whether a single profit-maximizing firm, not subject to price regulation, that was the only present and future seller of finished telescopes would impose at least a small but significant and non-transitory increase in price on at least one telescope product.

[19] *See* Jonathan Baker, Market Definition: An Analytical Overview, 74 ANTITRUST L.J., at 129, 159-160 (2007), pp. 159–160.

[20] *See* Jonathan Baker, Market Definition: An Analytical Overview, 74 ANTITRUST L.J., at 129, 159-160 (2007), pp. 162–165.

[21] *See* Merger Guidelines, p. 13.

[22] And accessories.

19. One way to answer the HMT question is to determine how buyers would respond to a price change. If buyers have many alternatives which can easily substitute for telescopes, then even a small price increase would cause buyers to switch to their next best alternative which may be enough to cause a price increase to be unprofitable.

20. Price elasticity of demand measures how sensitive consumers are to changes in price. Elasticity measures the percentage change in demand associated with a percent change in price. Elasticities are typically measured as negative numbers because price increases generally cause decreases in demand. A price elasticity of -5 means that the percentage decrease in demand will be five times bigger than the percentage increase in price.

21. I have not estimated a formal econometric demand model to measure a price elasticity of demand for telescopes, however, in the Orion Litigation, I explained why an elasticity of -3.8 was a reasonable estimate of price elasticity of demand for Orion's telescopes.[23] A price elasticity of demand of -3.8 shows substantial substitution to alternatives, including other brands of telescopes. If telescope prices in a market were controlled by a single monopolist, consistent with the HMT, then demand for the telescopes industry would be less sensitive to price (because as buyers switch from one telescope to another, there is less effect on the total number of telescopes purchased). As a matter of economic theory and under a reasonable set of assumptions, a market level price elasticity is equal to a firm level elasticity times the firm's market share.[24] In this case, Orion's share of the market was about 15 percent, or less (*see* section II.C.i below), implying a market level price elasticity of demand of about -0.6. A demand elasticity between 0 and -1 is referred to as "inelastic".

[23] *Orion* Litigation, Dkt. No. 275-3, Zona Expert Report, ("Orion Zona Report"), ¶¶93-96, pp. 27-8.

[24] If aggregate industry demand is $Q=f(P)$ and $P=g(Q)$ then $\partial P/\partial q_i=\partial g/\partial q_i=(\partial g/\partial Q)(\partial Q/\partial q_i)=\partial g/\partial Q$. Multiplying both side by $q_i/P$ gives $(q_i/P)\ \partial P/\partial q_i=(q_i/P)\partial g/\partial Q$. The left hand side is the inverse of the price elasticity of demand for the ith firm and the right hand side can be written as $(q_i/Q)(Q/P)\partial g/\partial Q$ which equals market share for firm i times the inverse industry price elasticity of demand. Rearranging gives $\boldsymbol{\varepsilon}_i=\boldsymbol{\varepsilon}/s_i$ or $s_i\boldsymbol{\varepsilon}_i=\boldsymbol{\varepsilon}$ .

22. When demand is inelastic, a monopolist will always find it profitable to raise price above cost, which is a measure of the competitive level of price.[25] Therefore, under the HMT, telescopes are a relevant product market for antitrust purposes.

23. If a hypothetical monopolist were to control the price of telescopes in the United States and raise prices above the competitive level, then buyers would be tempted to purchase telescopes in other areas of the world. But for a consumer telescope it is unlikely for a consumer to find it economical to incur international shipping costs for one telescope in response to a SSNIP. A distributor can ship many telescopes at once and have lower costs. For purposes of this matter, I use the United States as the geographic dimension.[26]

24. The relevant antitrust market in this matter is the market for consumer-grade telescopes in the United States.

### B. Market Participants

25. Having defined the relevant antitrust market, typically the next step is identifying the market participants. There were several firms who were major suppliers of telescopes during the Class period. Typically, economists also consider whether other firms might quickly enter the market in response to a SSNIP. If there are such firms, they should also be considered as market participants.[27] In this case, significant financial investments and intellectual property protections prevent new entry, as I discuss below.

26. Two entities have controlled the lion's share of telescope manufacturing during the Damage period: defendants "Synta" and "Sunny", both of which are described below. Before Synta's acquisition of Celestron, it was an independent manufacturer and distributor of telescopes. Before Sunny's acquisition of Meade, it was also an independent manufacturer and distributor of telescopes. Jinghua Optics & Electronics,

[25] Robert Pindyck and Daniel Rubinfeld, Microeconomics, 9th Edition, (2017), p. 354, "a monopolist will never produce a quantity of output that is on the inelastic portion of the demand curve – i.e., where the elasticity of demand is less than 1 in absolute value".

[26] However, my conclusions are unlikely to be affected by a world-wide geographic market definition.

[27] *See* Merger Guidelines, Section 5.1

Co., Ltd, which operates under the Bresser and other brands, also had manufacturing capacity during the Damage Period.[28]

**1. Synta**

27. There are various entities in the telescopes and related businesses owned and/or controlled by Dar Tson (David) Shen and his family.[29] I will use the term "Synta" in this report to describe this syndicate of entities. Since 2005,[30] Synta has owned Celestron,[31] the Celestron brand and its Sky-Watcher brand[32]. There is a complicated legal ownership structure with some parties unaware of the details of even the entities they purportedly own.[33]

28. Synta describes itself on its LinkedIn page as "the biggest leading amateur astronomy telescope manufacturer in the world. Owning both Celestron and Sky-Watcher, the top

[28] Orion was mostly a distributor of telescopes manufactured by others or under contract during the Class Period. However, it purchased Meade's assets in 2019 after Meade filed for bankruptcy. Since it has owned Meade it nominally had some manufacturing capacity, but I understand that not all assets were obtained to allow continued manufacturing.

[29] These entities include at least (1) Synta Technology Corp. (also known as "Synta Taiwan"); (2) Suzhou Synta Optical Technology Co., Ltd. ("Suzhou Synta"); (3) Nantong Schmidt Opto-Electrical Technology Co. Ltd. ("Nantong Schmidt"); (4) SW Technology Corp.; (5) Synta Canada International Enterprises, Ltd.("Synta Canada"); (6) Pacific Telescope Corp.; (7) Olivon Manufacturing Co., Ltd.; (8) Olivon USA LLC; and (9) various shell companies in multiple jurisdictions under the name "Good Advance," including at least Good Advance Hong Kong and Good Advance in the British Virgin Islands.

[30] DEFS000000025; DEFS000774569.

[31] Synta controlled Celestron throughout the relevant time period through an Executive Committee, called "Excom," Excom is comprised of at least Ta Kuo (Sylvia) Shen (David Shen's sister), Chin Chuan (Jack) Chen (Sylvia Shen's husband), and Laurence Huen (financial advisor to the Shen family). Lee 3/28 30(b)(6) Dep. 12:5-13:3; Lupica Dep. Tr. 23:3-24:3; *see also* DEFS005889158 (January 2006 email from Laurence Huen stating: "I have been positioned as a consultant to David and Sylvia on the one hand and a member of the newly established Executive Committee on the other. This will also enable me to help align the synergy of Celestron, Synta in SuZhou and Pacific Telescope in Canada.") Excom reported to David Shen. Lupica Dep. Tr. 23:3-24:3.

[32] DEFS000000025; DEFS000774569.

[33] On paper, both Synta Technology and SW Technology (and in turn, Celestron) are largely owned by Ta Kung Shen (also known as Dagong Shen), and his family, including his wife, Yung Shueh Tung (also known as Dong Yongxue), and their children. Dagong Shen is the older brother to David Shen. DEFS001224632. He testified that he has no idea what Celestron is, that he has never received payment from Celestron, and that he does not have any contact or business dealings with Celestron—the company that he purportedly owns. DEFS001224632; *see also* Dagong Shen Dep. Tr. at 33:2-36:22. Similarly, nobody at Celestron even knew who DaGong was until his signature was needed for banking documents. DEFS002621723.

two brands of telescope, and holding many patents related to the industry, with Products selling to over 100 countries in the world, making up to 70 percent of the industry market."[34]

### 2. Sunny

29. Defendant Ningbo Sunny Electronic Co., Ltd. ("Sunny") is a company located in Yuyao, Zhejiang, China that manufactures consumer telescopes. Ningbo Sunny's Chairman and/or President is Wenjun ("Peter") Ni. Synta's principal owner, David Shen, owned an interest in Ningbo Sunny and then transferred that interest to his brother, Dagong.[35] Dagong then transferred his ownership to his wife and David Shen's sister-in-law, Dong Yongxue.[36] Ms. Dong continues to hold an ownership interest in Ningbo Sunny and is also part owner of Synta Technology.[37] David Shen was also an investor of Sunny HK, an affiliate of Ningbo Sunny, and held the title of "Vice Chairman" at Ningbo Sunny at the same time as he was running Synta.[38] I will use the term "Sunny" in this report to describe this syndicate of entities.

### 3. Celestron

30. Celestron was founded in 1960 as a division of Valor Electronics by Tom Johnson. Celestron was purchased in 1980 by Diethelm Keller Holding, a Swiss manufacturing conglomerate ("Diethelm").

31. In 1990, Diethelm and the then-parent company of Celestron's competitor Meade Instruments, Harbour Group Investments, L.P., ("Harbour Group") attempted to combine Celestron and Meade into a single joint venture. The Federal Trade Commission issued a complaint charging that the Celestron-Meade mergers would "violat[e] Section 5 of the

---

[34] https://www.linkedin.com/company/nantong-schmidt-opto-electrical-technology-co-ltd accessed Jan 9, 2024.

[35] Dagong Shen Dep. Tr. 22:9-28:1; *see also* SMRH-0010493.

[36] Dong Dep. Tr. 38:3-40:3; *see also* SMRH-0000986.

[37] Dong Dep. Tr. 25:2-14; SW Technology 30(b)(6) Dep. Tr. 43:3-44:11.

[38] DEFS000777210; SMRH-0000986.

Federal Trade Commission Act . . . and Section 7 of the Clayton Act" because it "would create a virtual monopoly in the relevant market [for Schmidt-Cassegrain telescopes]." The parties ultimately agreed to a consent decree prohibiting Meade or its parent company from acquiring any ownership interested in any business that manufactured or sold Schmidt-Cassegrain telescopes in the United States for a period of ten years.[39]

32. In 1997, Celestron was purchased by telescope distributor Tasco Worldwide, which subsequently went bankrupt. In 2002, Meade attempted to purchase Celestron out of the Tasco bankruptcy estate, but was blocked from doing so by the FTC.[40]

33. Celestron's founders purchased it out of the Tasco bankruptcy estate in 2002. Throughout this period, Celestron competed in the market for manufacturing and distribution of telescopes in the United States, including aggressively competing against Meade, discussed below. Celestron manufactured its own telescopes and distributed those made by other manufacturers, including Synta.

34. In April of 2005, Celestron was acquired by Synta. Synta has largely phased out Celestron's manufacturing capabilities, and Celestron now primarily serves as a U.S. distributor for Synta-manufactured telescopes.

#### 4. Meade

35. Meade Instruments Corporation ("Meade") is a manufacturer and distributor of telescopes based in Irvine, CA. It has a factory at which it manufactures telescopes in Tijuana, Mexico. Meade was formerly the largest manufacturer of telescopes in the world.

36. As a result of financial difficulties in 2008 and 2009, Meade sold Meade Europe, its European subsidiary, in 2009. Meade continued to experience sales declines over the next four years and put itself on the market in early 2013. In May 2013, Meade had entered into discussions to sell itself to Chinese telescope manufacturer Jinghua Optics &

---

[39] *In re Harbour Group Investments, LP*, 114 F.T.C. 503 (1991); J. Lupica Dep. 140:20-141:11.

[40] Dep. Ex. 78; J. Lupica Dep. 143:2-11.

Electronics, Co., Ltd (discussed below).[41] In June 2013, Meade announced a new merger agreement with Ningbo Sunny Electronic Co. Ltd.[42] Meade was acquired by Sunny on September 13, 2013. In 2019, Meade filed for bankruptcy. In June 2021, Orion acquired Meade's assets.[43]

#### 5. Jinghua Optics & Electronics, Co., Ltd

37. Jinghua Optics & Electronics, Co., Ltd, (or "JOC", also known as Guangzhou Jinghua Optics & Electronics Co., Ltd.) is a manufacturer and distributor of telescopes headquartered in Guangzhou, China. Established in 1997, JOC has two plants located in Guangzhou and Kunming.[44] JOC's products range from optical instruments, consumer optoelectronic[45] products, precision optical lenses and other products. JOC owns the five valued brands of Maxvision, Smart PC, Skywalker, Explore and Observer in China, and two famous brands of Bresser and Explore Scientific in overseas markets. JOC has more than 20 IP claims including inventions, utility models and design patents.

### C. Market Shares and Market Power

38. Market share data for the telescope manufacturing industry is difficult to come by as most of the manufacturers are private. However, it appears that Sunny and Synta together account for the lion's share of the market. In fact, Synta entity Nantong Schmidt claims

---

[41] *Meade Instruments Corp. to be acquired by Jinghua Optics & Electronics*, Astronomy (May 21, 2013), *available at* http://www.astronomy.com/news/2013/05/meade-instruments-corp-to-be-acquired-by-jinghua-optics--electronics (last accessed on January 3, 2019).

[42] Dep. Ex. 254.

[43] https://www.telescope.com/content.jsp?pageName=Orion_Announces_Acquisition_of_Meade_Instruments&src=footer2 (accessed May 8, 2024.)

[44] https://web.archive.org/web/20130121174709/http://www.joctech.com/newweb/html-E/introduce.html (accessed May 15, 2024).

[45] "Optoelectronics is the study and application of light-emitting or light-detecting devices. It is widely considered a sub-discipline of photonics. Photonics refers to the study and application of the physical science of light." https://www.ttelectronics.com/blog/optoelectronics/#:~:text=Optoelectronics%20is%20the%20study%20and,the%20physical%20science%20of%20light (accessed May 16, 2024).

on its Linkedin page, that it is the largest in the world, "making up 70 percent of the industry market."[46]

### 1. Market Shares

39. The data produced by Defendants in this case was quite limited and are insufficient to measure market share. Synta's corporate representative testified that Synta never measured its own market share or the market shares of its competitors.[47] It is difficult to find sales figures for individual telescopes manufacturers. The total market size for consumer telescopes is difficult to estimate since the majority of the industry is privately held.[48]

40. I obtained data from Import Genius.[49] The data contains import information from the Bill of Lading for shipments entering the U.S. by ship – e.g. shipping containers. The raw data consists of all available information on the bill of lading for each shipment entering a U.S. port via ocean and is considered public record. I selected data for all shipments into the US[50] for the period 2006 to 2022 containing "telescope" in the shipping contents description. In order to isolate records within that dataset to those primarily composed of telescopes from telescopes manufacturers, I identified a subset of shipping entities within the dataset. I also excluded shipments if the product descriptions included certain keywords indicating the shipment was a combination of multiple product types (*e.g.*, "tire", "chair") to further exclude shipments from logistics companies and freight

[46] "Nantong Schmidt Opto-Electrical Technology co. LTD. was founded in 2011, by Canada, Hong Kong members with an investment of 28 million, It is the biggest leading amateur astronomy telescope manufacture in the world. Owning both Celestron and Sky-Watcher, the top two brands of telescope, and holding many patents related to the industry, with Products selling to over 100 countries in the world, making up to 70 percent of the industry market." https://www.linkedin.com/company/nantong-schmidt-opto-electrical-technology-co-ltd/ (accessed 2024-05-01)

[47] M. Sun 30(b)(6) Dep. Tr. at 236:19-237:19.

[48] J. Lupica Dep. 189:13-190:17 ("Q. Do you have any sense of whether these numbers are accurate? A. No. Most companies are private.") (discussing a Celestron estimate of size of the global consumer telescope market).

[49] https://www.importgenius.com/faq

[50] Port of unlading is a U.S. port.

aggregators. Further, I excluded records if the shipment included other optical instruments (*e.g.*, binoculars, riflescopes).

41. The remaining shipments were associated with a particular "brand" based on the appearance of keywords in the record's consignee, shipper, description, and/or markings values.[51] Records that could not be associated with one of 29 telescope brands I identified were excluded.

42. I have computed market shares for the various brands based on the gross weight of the shipping containers, in pounds. I present the computed market shares for telescopes imported to the United States, by brand, in the figure below.

| Year | Celestron | Meade | Orion | Bresser | Ioptron | Bushnell | Vivitar | Other Brands |
|---|---|---|---|---|---|---|---|---|
| 2006 | 21.9% | 67.3% | 0.0% | 0.0% | 0.0% | 8.3% | 0.0% | 2.5% |
| 2007 | 13.7% | 84.1% | 0.0% | 0.0% | 0.0% | 1.6% | 0.0% | 0.6% |
| 2008 | 57.3% | 29.3% | 6.1% | 0.0% | 1.4% | 4.1% | 0.0% | 1.7% |
| 2009 | 64.8% | 18.5% | 0.5% | 8.1% | 0.9% | 0.1% | 0.0% | 7.0% |
| 2010 | 60.6% | 15.8% | 4.7% | 1.2% | 6.2% | 6.8% | 0.0% | 4.7% |
| 2011 | 74.0% | 4.1% | 4.2% | 0.0% | 5.1% | 6.3% | 0.0% | 6.3% |
| 2012 | 51.7% | 3.2% | 14.5% | 9.1% | 7.9% | 7.1% | 0.0% | 6.6% |
| 2013 | 85.5% | 2.0% | 0.6% | 2.0% | 4.0% | 2.9% | 0.0% | 3.0% |
| 2014 | 82.0% | 4.3% | 1.6% | 6.6% | 2.5% | 1.3% | 0.6% | 1.0% |
| 2015 | 67.7% | 1.3% | 18.2% | 7.1% | 1.8% | 2.0% | 0.0% | 1.9% |
| 2016 | 56.1% | 0.0% | 20.5% | 11.3% | 0.9% | 1.9% | 6.1% | 3.3% |
| 2017 | 61.2% | 2.5% | 17.4% | 12.8% | 1.0% | 0.7% | 4.2% | 0.3% |
| 2018 | 71.5% | 0.5% | 12.7% | 8.4% | 1.7% | 0.3% | 4.6% | 0.3% |
| 2019 | 65.8% | 0.5% | 7.9% | 19.5% | 1.8% | 0.0% | 4.2% | 0.4% |
| 2020 | 71.3% | 0.6% | 5.1% | 17.6% | 1.5% | 0.9% | 2.7% | 0.2% |
| 2021 | 69.3% | 3.8% | 4.6% | 16.6% | 1.2% | 1.4% | 2.8% | 0.3% |
| 2022 | 71.0% | 0.4% | 2.6% | 18.8% | 2.8% | 0.4% | 3.8% | 0.1% |
| Total | 65.4% | 7.8% | 8.1% | 11.2% | 1.9% | 1.7% | 2.5% | 1.4% |

43. The brands can be mapped to the respective owner of that brand which is the manufacturer in many cases. For example, as discussed above, Celestron is owned by

[51] For instance, shipments are associated with Celestron based on keywords like "Celestron", "Nexstar", "and "Astromaster". Products are also designated as Celestron telescopes based on certain shipper names like Nantong Schmidt, Ningbo Sunny, Ningbo Huada, and Suzhou Synta, except in instances where the shipments also contain keywords pertaining to the Meade or Orion brands.

Synta, Meade was owned by Sunny during most of the period, Bresser is owned by JOC. The other brands are often manufactured by Synta or Sunny, therefore the brand mapping provides a conservative measure of Synta and Sunny's market share.

44. The data shows that Synta and Sunny[52] together, represent at about 70 percent, or more, of telescope imports to the United States in most years between 2006 through 2022.[53] While there is considerable variation from year to year given the nature of the data, it is clear that Sunny/Synta/Celestron has had a dominant share of the telescopes market since at least 2008.

### 2. Market Power

45. As a general matter, market power is often defined as the ability to profitably raise prices or otherwise alter the terms of trade free from competitive pressures in a properly defined relevant market. Alternatively, market power is sometimes defined as the ability of a firm to profitably set its price above marginal cost.[54] However defined, the essence of market power is the ability of a firm to operate in a relevant market less constrained by competitive forces.

46. According to the DOJ, market power is "conventionally demonstrated by showing that both (1) the firm has a high share of a relevant market and (2) there are entry barriers—perhaps ones created by the firm's conduct itself—that permit the firm to exercise substantial market power for an appreciable period. Unless these conditions are met, defendant is unlikely to have either the incentive or ability to exclude competition."[55] However, market share data is not conclusive and should generally be

[52] As identified based on shipments for Celestron, or Meade after Sunny's purchase in 2013.

[53] These shipments are by cargo container ship. I understand that there is limited manufacturing of telescopes in the United States at this point and that shipments by air are limited.

[54] *See, e.g.*, Dennis W. Carlton and Jeffrey M. Perloff. Modern Industrial Organization, 2005, Fourth Edition, Boston: Pearson ("Carlton and Perloff (2005)"), pp. 92-93 and 642-644.

[55] U.S. Department of Justice, "Competition and Monopoly: Single-Firm Conduct Under Section 2 of the Sherman Act" (2008). *See* online at: http://www.justice.gov/atr/public/reports/236681_chapter2.htm#N_16_, p. 21.

considered in conjunction with other relevant evidence on demonstrable competitive effects.[56]

47. The mere presence of some degree of market power is common in most markets and industries and not particularly notable for assessing competitive effects. Virtually all markets, except purely theoretical ones (*e.g.*, the canonical "perfectly competitive" market used pedagogically in economics textbooks), are generally characterized by firms which possess some degree of market power, however slight.[57] For present purposes, when I refer to market power I mean market power sufficient to impact competitive outcomes in a meaningful way and for a sustained period of time.[58]

48. Empirical evidence of high market shares can sometimes be used as an inferential indicator of market power.[59] But high market shares are, by themselves, often inconclusive. For example, Carlton and Perloff (2005) note that "if entry is easy, then the industry pricing is severely constrained regardless of whether an existing firm has a large market share."[60] Since static market shares can be misleading or inconclusive with respect to market power, especially in the absence of significant barriers to entry, it is common to consider broader market dynamics and the stability of market shares over time when assessing their significance.[61]

49. Empirical evidence of high profits is also, but is not always, used as an inferential indicator of market power, since some theories of oligopoly behavior imply a positive

---

[56] *See, e.g.*, Merger Guidelines, pp. 15-19.

[57] *See, e.g.*, Robert Pindyck and Daniel Rubinfeld, Microeconomics, 2013, Eighth Edition, New York: Pearson Addison Wesley ("Pindyck and Rubinfeld (2013)"), pp. 279-281. *See also* Carlton and Perloff (2005), pp. 642-643; and Louis Kaplow and Carl Shapiro, "Antitrust," Handbook of Law and Economics, Volume 2, Edited by A. Mitchell Polinsky and Steven Shavell, p. 1079.

[58] Whereas "market power" refers to the ability of a firm to price above marginal cost, "monopoly power" refers to the ability of a firm to price without regard to competition from any competing supplier. Carlton and Perloff (2005), p. 88.

[59] *See, e.g.*, Lutz and Stiroh (2003), p. 27.

[60] *See, e.g.*, Carlton and Perloff (2005), p. 644.

[61] *See, e.g.*, Merger Guidelines, p. 18.

relationship between concentration and firm profits.[62] However, profit margins should be interpreted in context and with caution. High profit margins are not necessarily indicative of market power and low profit margins are not necessarily indicative of the absence of market power.[63]

50. A market share of 50 percent or more has been viewed by the courts as a threshold for market power.[64] The commonly accepted measure of industry concentration, the Herfindahl–Hirschman Index ("HHI") indicates a market is highly concentrated by the standards of the U.S. antitrust enforcement agencies when its HHI exceeds 2,500 in each year.[65] In this case, the HHI index for the relevant market for telescopes has ranged from 3,091 to 7,348 since 2006. These persistent market shares and HHIs are consistent with the fact that Sunny and Synta together have substantial market power in the relevant market for telescopes.

51. Barriers to entry allow market participants with high market share to continue to exercise market power. There is evidence of barriers to entry into the telescope manufacturing that prevent new entrants from challenging the Sunny/Synta combination.

---

[62] *See, e.g.*, Micha Gisser and Raymond D. Sauer, "The Aggregate Relation between Profits and Concentration Is Consistent with Cournot Behavior," *Review of Industrial Organization*, Vol. 16 (2000), p. 230.

[63] *See, e.g.*, Robert H. Bork and J. Gregory Sidak, "The Misuse of Profit Margins to Infer Market Power, *Journal of Competition Law & Economics*, Vol. 9, No. 3, (2013), pp. 511–530.

[64] https://www.justice.gov/atr/competition-and-monopoly-single-firm-conduct-under-section-2-sherman-act-chapter-2, sec. A.1.

[65] *See* Merger Guidelines § 5.3. Under the most recent guidelines, a lower HHI value of 1800 is considered to be the threshold for a highly concentrated market.

### 3. Intellectual Property as a Barrier to Entry

52. Intellectual property protections, such as patents, trademarks and trade secrets, can serve as a barrier to entry and create or reinforce market power.[66] IP appears to be a substantial barrier to entry in this case.

53. Meade's most recent 10-K before being acquired by Sunny states, "[Meade] relies on a combination of patents, trademarks and trade secrets to establish and protect its proprietary rights and its technology. … The Company believes that its patents, proprietary technology, know-how and trademarks provide significant protection for the Company's capabilities, and the Company intends to protect and enforce its intellectual property assets."[67]

54. Sunny and Synta, or their affiliates, control substantial portfolios of IP.[68] Orion estimated that IP may represent as much as 10 percent of the cost of the telescope products it bought.[69] This would represent a substantial barrier to entry, giving any new entrant a substantial cost disadvantage relative to incumbent firms, Sunny and Synta.

55. Sunny and Synta have multiple patents covering "Goto" technology. This popular feature enables users to automatically direct their telescopes to objects of interest using GPS. These patents deter would-be market entrants from selling telescopes with these features and further shrink the universe of potential customers any market entrant would be able

---

[66] See, e.g., "Antitrust Guidelines for the Licensing of Intellectual Property" ("DOJ/FTC Antitrust Guidelines"), U.S. Department of Justice and the Federal Trade Commission, January 12, 2017, p. 4, https://www.justice.gov/atr/IPguidelines/download. The document states: "Although the intellectual property right confers the power to exclude with respect to the specific product, process, or work in question, there will often be sufficient actual or potential close substitutes for such product, process, or work to prevent the exercise of market power." A patent can but does not necessarily provide market power in a properly defined antitrust market, as there are often sufficient actual or potential substitute products to prevent the exercise of any market power. *See, e.g.*, Carlton and Perloff (2005), p. 644.

[67] Meade 10-K 2013, p.5. https://www.sec.gov/Archives/edgar/data/1032067/000119312513241808/d445056d10k.htm (retrieved Jan 3, 2019).

[68] Including patents 61537026, 61539848, 6161726, 6215802, 6392799, 7054518, 7079317, 7092156, 7149377, 7190515, 7209229, 7248405, 7339731, 7482564, D534079, D518079, D515603, D422610, D417881, D412920, D392657, 8477419, 8401307, 8477419, 6392799, 6563636, 7339731, D268768, 8684745, 7324733, 6972902, 7228253, 7369315, 7301698, 8684745.

[69] Orion Zona Report, ¶63, p. 18.

to compete for. As noted above, patents could also prevent existing market participants, such as JOC, from competing for sales of medium- to high-end products, which use Goto technology.

### 4. Learning by Doing and Scale Economies as Barriers to Entry

56. Defendants' emails reflect that manufacturing expertise is required to open a new factory for telescope manufacture, with substantial lead times for efficient production. Michael Sun, Synta's factory manager at both its Suzhou Synta and Nantong Schmidt manufacturing facilities, explains that "Astronomical product is a technology-intensive industry, and it takes long time period to grow stable on the efficiency and production quantity. Our new factory has just been operating for more than one year. 80% of the staff are new, so the production efficiency is not as good as Suzhou [Synta's existing factory], thus the production cost are higher than Suzhou. This is a normal process. I believe, it will take two years to get close to the efficiency of Suzhou."[70] Thus, even an experienced telescope manufacturer such as Synta with 20 percent legacy staff requires two years to achieve full efficiency in a new factory; the learning curve for new entrants will be even steeper.

57. The barriers in terms of efficiency, knowledge, and experience to building a competitor is, as I understand, reflected in the poor performance of Sunny and Synta's competitors. Potential competitors lack the long-term know-how and manufacturing sophistication to compete with established market participants, which allows Sunny and Synta to exercise market power.

58. The largest alternative option to Sunny/Synta is JOC/Bresser. However, Defendants appear to understand that they have no meaningful competitors. Defendants comment in internal emails "JOC/GOS/BOSMA/IOPTRON . . . No company can replace CELESTRON . . . SKYWATCHER . . . MEADE. . ."[71] Synta chief David Shen wrote to

[70] OTB01526451 at 52.

[71] NSE00073782

Sunny that, "Dave [Anderson, CEO of Celestron] does not believe that JOC has the ability to supply (mid, high-end product)."[72]

59. Another barrier to entry is the fact that the telescope market is relatively small, and Celestron is the main United States telescope distributor. These facts disincentivize potential entrants from sinking costs into building manufacturing facilities because the majority of the market would be unobtainable.

-ooo-

60. In sum, Sunny and Synta, through their ownership of and conspiracy with Celestron and Meade, have market power in the relevant antitrust market for telescopes sales to distributors and other Class members in the United States. The evidence presented above is common evidence and would apply class-wide.

## III. Coordinated Effects

61. Defendants are accused of conspiring to reduce competition for the manufacture and sales of telescopes and components, restrain output, and increase prices paid by Plaintiffs. Competition is the process by which the supply function is distributed to the most efficient firm. The competitive process rewards suppliers who best meet consumers' needs and punishes those who are not sufficiently efficient. Defendants are accused of disrupting the competitive process through coordinated interaction.

62. As a matter of economics, coordinated interaction involves conduct by multiple firms that is profitable for each of them only as a result of the accommodating reactions of the others.[73] These reactions can blunt a firm's incentive to offer customers better deals by undercutting the extent to which such a move would win business away from rivals. They also can enhance a firm's incentive to raise prices, by assuaging the fear that such a move would lose customers to rivals. Coordinated interaction can involve the explicit

[72] NSE00073782

[73] Merger Guidelines, §7.0

negotiation of a common understanding of how firms will compete or refrain from competing.

63. The U.S. market for consumer telescopes is particularly conducive to price fixing because of inelastic demand, barriers to entry, the dominance by Synta, Sunny and Celestron, and high degree of cooperation between Synta, Sunny, and Celestron, in which they often acted as a single entity and shared information about prices paid by other market participants. Basic economic principles hold that these conditions would cause a baseline increase in the prices that all market participants pay

### A. Synta and Sunny's Operation is Interconnected

64. The record shows that Synta and Sunny and their respective corporate families are interrelated. In the figure below, I display the interrelated Synta and Ningbo Sunny entities and personnel. In the figure, the blue circles represent individualism while the red circles represent corporate entities. The size of the circle represents the number of interconnections that an individual or entity has. For example, Nantong Synta has one connection to David Shen, thus has the smallest size circle in the figure, whereas, David Shen is connected to 13 other individuals or entities through directorship or ownership.

**Interrelated Synta and Ningbo Sunny Entities and Personnel**



65. The figure shows a tangled web of interrelated individuals and companies. The figure shows a substantial relationship between Sunny and Synta. For example, Sky Rainbow, a Hong Kong entity, jointly owned by Peter Ni and David Shen, provided the funding for Ningbo Sunny to purchase Meade.

66. The figure does ***not*** show two sets of fierce rivals competing to deliver the next products for the best prices and lowest costs.

**B. Synta and Sunny Pursued Joint Operational Goals**

67. David Shen of Synta and Peter Ni of Sunny regularly attended strategy meetings together.[74] In 2006, Joe Lupica, Celestron's former CEO, prepared a memo to memorialize his notes from a meeting with ExCom about Celestron's goals.[75] In that memo, he noted that "[a]ll new products should be designed to be manufactured by Synta and/or Sunny. We are sister companies and the success of all three companies must be considered when expanding our product lines."[76] Sylvia Shen echoed this approach and told Lupica "[r]egarding mass market business, David suggested that Celestron and Sunny work together."[77]

68. Lupica also wrote a memo in favor of selling more product to mass retailers in which he argued that doing so would help "take sales from suppliers that compete with Synta and Sunny."[78] In 2008, the companies worked towards a "suitable mass market plan" to address David Shen's concerns about the "global contraction of astronomical market" via

---

[74] *See e.g.*, DEFS000680813; Anderson Dep. Ex. 29; 21-SER-4939; 21-SER-5087; 21-SER-4896; 21-SER-4968; 5-ER-879.

[75] DEFS000661324.

[76] DEFS000661324; Lupica proposed that Ningbo Sunny "exclusively distribute" its products to Celestron and that the three companies "work together where Celestron places all orders with Sunny and Synta for sales to the U.S." He further noted: "it is important for the three of our companies to look to the world as one strong group of companies." *See* DEFS005890906.

[77] DEFS002915762.

[78] DEFS002574899.

"competition" and "cost escalation." The plan involved moving Synta's business with big-box customers, including Wal-Mart, Costco, Sams Club, away from Synta/Celestron and to Sunny.[79] Synta and Ningbo Sunny further sought to "weaken major competitor[s]" in the U.S. by "delay[ing] the shipment" of telescope products to competitors and "limiting the quantity sold."[80]

69. There is also evidence to show that Defendants appeared to engage in price-fixing. For example, Synta's employee Joyce Huang was responsible for selling Ningbo Sunny's telescopes and controlled how much Ningbo Sunny charged.[81] She asked Ningbo Sunny to raise its prices.[82] Through Ms. Huang, Synta also told Ningbo Sunny to cut off Orion's credit to ensure that Ningbo Sunny's credit terms to Orion were "the same as Suzhou [Synta]."[83] Additionally, Celestron's CEO, Corey Lee asked for and received information from Ningbo Sunny about the prices that Celestron's competitors, such as Bushnell, paid for telescopes.[84] Mr. Lee told his executive team to "keep the information [concerning Sunny's pricing to Bushnell] within Celestron. We certainly don't want Bushnell or other vendor knows [sic] about the information sharing between Celestron and Sunny."

70. Lee also told David Shen to raise the prices charged to Celestron's competitors, which Synta did.[85] Ningbo Sunny's price lists show that for some of the most popular telescopes, it charged Orion over 50 percent more than what it charged Celestron for identical products.[86]

---

[79] DEFS001767435.

[80] DEFS002416861.

[81] Orion Dkt. 304-54.

[82] 22-SER-5156.

[83] 21-SER-5117; 22-SER-5130; 14-SER-3392; 21-SER-5116.

[84] Lee Ex. 84.

[85] David Shen Ex. 118; David Shen Dep. Tr. at 40:12-42:4.

[86] 22-SER-5206; 15-SER-3634–56.

71. Sunny and Synta also appeared to divide the market between themselves. Sunny and Synta are both able to make competing lines of telescopes.[87] But they never did.[88] Instead, they agreed "we need to consider how to avoid conflict with Celestron products. If the customer visits our factory and confirms their intention to cooperate with us, we will consider the strategy of separation from Celestron products or adopt different product prices to protect Celestron."[89] David Shen told Celestron and Sunny that "[t]he best way in the future is to divide the products and sell them into different markets to reduce conflicts . . . . No company can replace CELESTRON … SKYWATCHER … MEADE."[90] He also warned: "[b]idding with Costco between May and June (compete with Celestron for the price). This is a very important issue. This needs Director Ni to communicate face-to-face with DAVE [Anderson] when he goes to the United States. Don't bid. If you let the thing go by doing this, how would you deal with everything in the future? . . . Following a conflict, celestron would not trust sunny any longer."[91] This appears to be a classic form of anticompetitive conduct, limiting competition between suppliers.

### C. Synta and Sunny Worked Together to Help Sunny Acquire Meade

72. Sunny and Synta's cooperation continued with their efforts to acquire Meade in 2013. Both Synta and Celestron personnel actively participated in and assisted with Sunny's acquisition of Meade.

73. Synta recognized that the FTC would oppose Synta or Celestron acquiring Meade directly because they had done so twice in the past. For example, Laurence Huen wrote in 2010 that "Direct acquisition of MEADE by Celestron has always faced antitrust

---

[87] 15-SER-3785–86; 15-SER-3786–95; 15-SER-3796–800; 15-SER-3803–04; 13- SER-3066; 22-SER-5203 (describing Sunny factory capabilities); 21-SER- 5058 (same).

[88] 15-SER-3793; Sun Dep. at 51:2-11.

[89] 21- SER-4994.

[90] 5-ER-890.

[91] 5-ER-898.

obstacles and is not feasible. Also, the Meade's board will not agree to it. The only roles Celestron can play are providing support behind the scenes during the acquisition process and serving as advisors after the acquisition. This will bring stability to the market in the long term."[92]

74. Huen also told Joe Lupica in 2010 that, because there was a "technical barrier preventing an acquisition of Meade by Celestron," David Shen would "invite [Lupica] to assess the possibility of talking Sunny into an acquisition" of Meade to "fence off Bresser in having Meade USA, thus our direct competitor."[93] In another email, Lupica agreed and assisted Sylvia Shen in writing a letter for Peter Ni to send to the CEO of Meade to explore a potential transaction.[94] David Shen and Peter Ni met with the CEO of Meade together to explore such a transaction.[95]

75. In 2013, David Shen learned that JOC and its distributor subsidiary, Bresser, were actively pursuing an acquisition of Meade. David Shen recognized that JOC and Bresser acquiring Meade would represent a significant competitive threat to his business empire, writing that "I see the need of imminence and urgency to join hand in fenc[ing] off (our) competition by integrating all dispensable resources Celestron and Synta possesses."[96]

76. Celestron's then-CEO and CFO, Joe Lupica and Dave Anderson, worked with Excom-member Laurence Huen to close Sunny's acquisition of Meade.[97] At David Shen's direction, it withheld payment from Synta to enable Celestron to pre-pay invoices

---

[92] Huen Dep. Ex. 13. Huen further explained: "David thinks that if the acquisition [of Meade] went through, the majority of the Telescope market would be in Synta (as a supplier), Celestron (as a strong high end product distributor and a reasonable mid / entry level distributor) and Sunny (Meade's brand) hand. So we can equitably discuss a win win situation, in a legally palatable fashion. (I told David we cannot mention this to any outside party …)." Huen Ex. 15.

[93] DEFS005846579.

[94] DEFS000689264.

[95] DEFS000759376.

[96] DEFS002643151.

[97] *See, e.g.*, Anderson Dep. Ex. 13.

to Ningbo Sunny, thereby helping finance Ningbo Sunny's purchase of Meade.[98] These prepayments allowed Sunny to be in a position to loan the money to Meade for their "short term operational payment capacity."[99] All the while, Synta and Celestron maintained to the FTC that Synta had no involvement in the Meade acquisition.[100]

77. Finally, following the close of Sunny's investment in Meade, Meade worked to benefit the combined Synta and Sunny family. Defendant Huen instructed Defendant Anderson (Celestron's then-CEO) and Celestron's CFO to "Maximize inter company purchase (Meade/Sunny/Synta)."[101] Joe Lupica, who was then Meade's CEO after serving as Celestron's CEO, invited Celestron's engineers to consult for Meade to improve the operations of its Mexican factory.[102] Moreover, David Shen and Peter Ni continued to meet to discuss Meade's operations.[103]

78. Celestron and Synta also continued to pursue ways in which they could acquire or merge with Meade, despite knowing that the FTC had opposed such a transaction.[104] Lupica wrote that he understood David Shen and Peter Ni's vision "of how the four companies are to cooperate for the benefit of the entire group of companies (Sunny, Synta, Meade, and Celestron)."[105] Mr. Lupica also described how "the four companies can dominate the telescope industry."[106]

[98] DEFS000602711; Pearson Dep. Ex. 2; Anderson Dep. Ex. 18. David Shen's view was that "Synta should wholeheartedly support the payment matter concerning Sunny[,]" and "[f]acilitating an early payment to Sunny is in both parties' interest. Payments to Synta can be deferred, all in the interest of long-term cooperation. Should Celestron face a cash crunch, Synta Canada can secure a loan from the SW company, using it as collateral to enhance Celestron's liquidity." *See* DEFS005605254.

[99] Roth Ex. 35, DEFS002619583

[100] "David Shen has no role in the proposed acquisition of Meade by Sunny." 21-SER-5026.

[101] Huen Ex. 18.

[102] Anderson Dep. Ex. 22.

[103] Anderson Dep. Ex. 29; 21-SER-4939 (2013 Messrs. Ni, Shen, Lupica meeting agenda re Meade strategy); 21-SER-5087; 21-SER-4896 (2013 visit); 21-SER-4968 (2014 visit); 5-ER-879 (2016 visit).

[104] DEFS000756356; SMRH-0001136; SMRH-0010493.

[105] 4-ER-749.

[106] 4-ER-742.

-ooo-

79. In sum, in spite of representing themselves as independent competitors to the marketplace, Sunny and Synta conspired with one another to eliminate competition amongst themselves and foreclose the market from other competitors. Because of Synta and Sunny's market power, the record reflects that they were in fact able to raise the costs to their rivals. All of the foregoing economic analysis is common evidence and part of class-wide proof of the impact and antitrust injury.

## IV. Antitrust Injury and Measure of Damages

80. I have been asked to determine whether Defendants' anticompetitive conduct as set forth above resulted in classwide antitrust injury and, if so, whether the extent of the antitrust injury is capable of determination with evidence that is common to the Class. Here, that process involves estimating (i) the difference between the observed prices and the prices that would have prevailed but-for the conspiracy (i.e., the overcharge); and (ii) the volume of business affected by the alleged anticompetitive act.[107] Typically, damages are then estimated by taking the product of these two parts.[108]

81. For the purpose of assessing antitrust injury and calculating damages, it is customary to assume that in the but-for world, the defendants would not have engaged in anticompetitive activity. I will therefore assume that, in the but-for world, Synta and its co-conspirators would not have colluded to set prices, acquire competitors and divide the relevant market between themselves.

[107] As early as 1906, we see this issue arise in *Chattanooga Foundry & Pipeworks v. City of Atlanta*, 203 U.S. 390, 396 (1906). More recent examples of this type of damages computation include In re Processed Egg Prods. Antitrust Litig., 881 F.3d 262, 276 (3d Cir. 2018) (quoting *Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*, 424 F.3d 363, 374 (3d Cir. 2005) ("[T]he 'typical measure' of damages on [a price-fixing] claim is the overcharge paid by the plaintiff, that is 'the difference between the actual price and the presumed competitive price multiplied by the quantity purchased.'")).

[108] Zona, J. Douglas. "Structural Approaches to Estimating Overcharges in Price-Fixing Cases," Antitrust Law Journal, Vol. 77, No. 2, 2011, pp. 473–494.

82. As set forth below, I find, using a regression model applied to Celestron's sales data, that there is objective evidence that Defendants' conspiracy led to an overcharge. The regression model does not capture the full magnitude of the classwide overcharge, however, because it does not account for the supracompetitive profits both Synta and Ningbo Sunny were able to realize through their relationship with Celestron. I therefore use structural economic analysis and a model based on data from similar anticompetitive cartels to capture the magnitude of the classwide overcharge, which is similar to the model I used in the *Orion* Litigation.

### A. Overcharge

83. In constructing a measure of overcharge damages model, one typically compares actual economic results to those in a "but-for world", which is a reference to the counterfactual situation in which the Defendants did not engage in the alleged misconduct and instead pursued their next-best (*i.e.*, profit-maximizing) legal course of action.[109] In this case, I will refer to the prices realized in the "but-for world" as the "but-for prices". The overcharge is the difference between the observed prices (which have been subject to the anticompetitive conduct, as alleged) and the but-for prices. But-for prices typically reflect a competitive benchmark, where prices are set by competition rather than conspiracy or anticompetitive acquisition.

84. Before 2005 (the time of the Celestron acquisition by Synta) the but-for price would reflect the true level of competition between Sunny and Synta (and the other suppliers, including independent Celestron and Meade). In this case, there is evidence that before 2005, Synta and Ningbo Sunny were interrelated and not independent of one another. Therefore, the before-period prices would not be expected to reflect but-for competition

[109] *See, e.g.,* Mark A. Allen, Robert E. Hall & Victora A. Lazear *Reference Guide on Estimation of Economic Damages*, Reference Manual on Scientific Evidence, Third Edition, Federal Judicial Center, 2011 ("Reference Guide on Damages") at 432 ("The characterization of the harmful event begins with a clear statement of what occurred. The characterization also will include a description of the defendant's proper actions in place of its unlawful actions and a statement about the economic situation absent the wrongdoing, with the defendant's proper actions replacing the unlawful ones (the but-for scenario). Damages measurement then determines the plaintiff's hypothetical value in the but-for scenario. Economic damages are the difference between that value and the actual value that the plaintiff achieved.").

between two (or more) independent suppliers. Assuming four equal sized competitors before 2005 in the but-for world, conspiracy between Sunny and Synta would reduce the number to three.

85. Between 2005 and 2013, an additional consolidation occurred – Celestron was acquired by Synta. Assuming four equal sized competitors in the but-for world, conspiracy between Sunny and Synta and an acquisition of Celestron by Synta would reduce the number to two.

86. From 2013 to 2019, a further consolidation occurred as Meade was acquired by Sunny. Assuming four equal sized competitors in the but-for world, conspiracy between Sunny and Synta and an acquisition of Celestron by Synta and an acquisition of Meade by Sunny would reduce the number to one.

87. After 2019, Meade was spun off from Sunny to Orion which would be expected to increase competition in the actual world. Of course, if all of the assets required to allow Meade to continue to compete were not transferred, then a full increase in competition should not be expected.

88. So, there may be three different measures of overcharge corresponding to each unique time segment in the Class Period (2005-2013, 2013-2019 and 2019-). In addition I have considered three independent ways to determine overcharges: i) economic theory using a so-called Cournot Model; ii) the empirical literature on cartel overcharges; and iii) econometric analysis (*i.e.*, a regression model) of transactions data produced in this litigation. I discuss these below.

### 1. Economic Theory

89. First, I use the standard theoretical model of oligopoly competition that I used in the *Orion* Litigation to determine the magnitude of the classwide overcharge. Cournot Equilibrium is the outcome of an economic model where competitors simultaneously choose levels of output to maximize their own profits. Under standard textbook

ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

assumptions, the Cournot Equilibrium with different numbers of competitors can be used to show the effect of a reduction in the number of Cournot competitors on market price.[110]

90. I have used a textbook Cournot model to calculate the impact of the conspiracy and anticompetitive acquisitions in the present context. For purposes of this calculation, I have assumed four equal sized competitors in the but-for world. In the alternative, I consider a combination among two suppliers, (analogous to Sunny and Synta conspiring before 2005). Under the assumptions of the model, I find that this combination would lead to an increase in price above the competitive benchmark of about 6.9 percent.

91. Analogous to the period of time between 2005 and 2013 (after the Celestron acquisition by Synta and before the Meade acquisition by Sunny), for purposes of this calculation, I have assumed that three firms act together which reduces the number of competitors from four to two. Under the assumptions of the model, I find that this combination would lead to an increase in price above the competitive benchmark of about 17.4 percent. or about 10.5 percent above the level analogous to the situation where only Sunny and Synta conspire.

92. Analogous to the period of time between 2013 and 2019 (after the Celestron acquisition by Synta and the Meade acquisition by Sunny), for purposes of this calculation, I have assumed that four firms act together which reduces the number of competitors from four to one. Under the assumptions of the model, I find that this combination would lead to an increase in price above the competitive benchmark of about 35.7 percent. or about 28.7 percent above the level analogous to the situation where only Sunny and Synta conspire.

93. Finally, analogous to the period of time after 2019, to the extent that the Meade assets were fully conveyed to Orion (which I understand to ***not*** be the case), the model would revert back to the situation of 2005 to 2013 with calculated prices above the competitive benchmark by about 17.4 percent. or about 10.5 percent above the level analogous to the situation where only Sunny and Synta conspire.

[110] Jeffrey Church and Roger Ware, Industrial Organization, McGrawHill, 2000, pp. 243-4.

ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

94. I summarize these results in the table below.

**Calculated Overcharges Based on Church and Ware Cournot Model**

| Time Period | Calculated Overcharge |
|---|---|
| pre 2005 | 6.9% |
| 2005 -2013 | 17.4% |
| 2013-2019 | 35.7% |
| post 2019 | 17.4% |

Notes: Jeffrey Church and Roger Ware, Industrial Organization, McGrawHill, 2000, pp. 243-4. Model is calibrated to produce 50 percent margin under monopoly.

### 2. Connor PIC Data Based Model

95. As a second measure of overcharge, I have reviewed the literature on measured cartel overcharges from other conspiracies to inform the present case and to derive an estimate of the magnitude of the classwide overcharge. I also used this method to determine overcharge in the *Orion* Litigation. Professor Connor at Purdue University has been building a data set related to private international cartels ("PIC" data), covering the period 1990 to 2019.[111] The data catalogs the size of, injuries caused by and antitrust penalties imposed on contemporary price fixing cartels. Among the elements in the PIC data set are for a particular cartel, the number of cartel members, the total market share of the cartel members and a calculated overcharge rate.

96. I have analyzed a subset of the PIC data which gives me overcharge rates for price fixing cases with two, three or four cartel members and where "US" is the lead jurisdiction in the case. There are 61 observations of such cartels and the average overcharge is about 42 percent.

[111] Connor, J. (2020).Private International Cartels Full Data 2019 edition. (Version 2.0). Purdue University Research Repository. doi:10.4231/G5GZ-0505.

97. Economic theory and common sense imply that cartel overcharge would be larger when the cartel controls a larger share of the market (because larger market share tends to be associated with greater market power) and also larger when more competitors conspire (because more competition is eliminated through the conspiracy), all else equal. I have used regression analysis to compute the expected overcharge from the Connor PIC data conditional on the number of cartel members and the market share of the cartel members.[112]

98. In the figure below, I display the expected overcharge conditional on the number of cartel members and cartel market share as measured by the Connor PIC data. The table shows how the expected overcharge increases as market share and number of cartel members increase. In applying these overcharges, I have used a market share for Sunny/Synta of 40 percent (which likely understates the combined share of Sunny and Synta and is thus conservative) for the base period before Synta acquired Celestron in 2005. The expected overcharge is 16.7 percent during that time period. For the period after Celestron is acquired but before Meade is acquired, I use a cartel market share of 70 percent[113] The associated overcharge from the table is about 35 percent. Finally, during the period of time when Synta controls Celestron and Sunny controls Meade, I have used an overall market share of 80 percent, which implies an expected overcharge of about 39.8 percent with the four-firm conspiracy.

[112] I discuss regression analysis in the next section.

[113] Based on calculations from the shipping data and documents and statements by the Defendants.

**Expected Overcharge Based on Number on Cartel Members and Cartel Market Share Based on Connor PIC Data**

| | Number of Cartel Members | | |
|---|---|---|---|
| Cartel Market Share | 2 | 3 | 4 |
| 40% | 16.7% | 21.5% | 21.7% |
| 50% | 21.2% | 26.0% | 26.2% |
| 60% | 25.7% | 30.5% | 30.7% |
| 70% | 30.2% | 35.0% | 35.3% |
| 80% | 34.8% | 39.5% | 39.8% |
| 90% | 39.3% | 44.0% | 44.3% |

99. Again, these empirical results generally corroborate the theoretical results in the previous section.

### 3. Regression Model Based on Celestron's Transactions Data

100. To confirm that Defendants' own data objectively show a classwide overcharge, I employ a widely-accepted statistical technique known as multiple regression analysis to assess the impact of the alleged conduct on Celestron's wholesale telescope prices as a third method to measure overcharge.[114] This standard methodology helps determine the extent to which prices for those sales were raised beyond levels that would have existed without the alleged conspiracy. The results of my analysis reveal that prices were indeed elevated above competitive levels. Through this approach, it becomes possible to quantify the overcharges incurred by each prospective Class member.

101. Typically the determination of overcharges, if any, attributable to the conduct at issue involves comparison of prices during the Damage Period to competitive or "benchmark" prices, such as prices in another market or in another period unaffected by conspiracy. A regression model allows for a statistical comparison of prices in the damage period to the

[114] *See, e.g.*, Allen, M. A., Hall, R. E. and Lazear, V. A. "Reference Guide on Estimation of Economic Damages," Reference Manual on Scientific Evidence, Third Edition, Federal Judicial Center, 2011, pp. 425-502.

benchmark while controlling for other factors which affect price, such as cost and seasonal demand.

102. In this particular case, it is very difficult to find a competitive benchmark. Typically, a before- or after-period could be used as a benchmark. But, in this case, there is evidence that even before the acquisition in 2005 of Celestron by Synta, Synta and Ningbo Sunny were interrelated and not independent of one another. Therefore, the pre-2005 prices would not be expected to reflect but-for competition between these two independent suppliers, among others.

103. However, the market became more concentrated and presumably even less competitive after April 2005 because an independent manufacturer (Celestron) came under the control of Synta. Similarly, in 2013, when Meade was acquired the market again became more concentrated. Because the market became more concentrated in April 2005 and then again in September 2013, a regression model can be used to measure a lower bound for the effect of the conspiracy by measuring the incremental effect of the elimination of competition in 2005 and 2013.

104. The effect of the change in concentration on price can be measured using indicator variables in a regression model.[115] An indicator variable takes the value one for some observations to indicate the presence of an effect or membership in a group and zero for the remaining observations. The effect of including an indicator variable is to control for and measure the systematic difference (in price in this case) between the two groups of observations.

105. The model specification explained the dependent variable (the natural logarithm of prices) using:

- two conspiracy indicator variables, one for the period from April 2005 to August 2013, and another from September 2013 forward;

[115] Indicator variables are also often referred to as "dummy variables." Greene, W.H. (2012). *Econometric Analysis*, 7th Ed., p. 149: "One of the most useful devices in regression analysis is the binary, or dummy variable. A dummy variable takes the value one for some observations to indicate the presence of an effect or membership in a group and zero for the remaining observations."

- the (natural logarithm of ) Celestron unit costs associated with each record;
- indicator variables for the month of the year to control for seasonal effects within each year (for example, the holiday shopping season);
- the quantity of the sale (in natural log form);
- the exchange rate between the U.S. Dollar and Chinese Yuan;
- fixed effects for each customer to control for customer-specific effects;
- and fixed effects for each product SKU to control for product-specific effects.

106. The use of natural logarithms is well accepted in econometric analysis of this type because then the effect of indicator variables can be interpreted as percent changes.

107. The dependent variable in this case was derived from Synta/Celestron's transactions data. I removed from the estimation data about 1,000 observations of the about half a million transaction records with prices more than five standard deviations away from the monthly mean price for the SKU[116] I also dropped from the regression data set observations with negative prices or quantities, as well as observations after 2021. I limited the analysis to Synta/Celestron's sales of telescope products. Telescope products were identified using three information sources provided by Synta/Celestron. The first source provided product categories for product codes in Synta/Celestron's sales data through mid-2015.[117] The second source provided product information based on a categorical field in the company's SAP sales data, which include Synta/Celestron's sales from mid-2015 forward.[118] Lastly, Synta/Celestron produced a file enabling the identification of telescopes based on specific digits in its product coding.[119].

[116] The rule is applied for each combination of month and product number in the data.

[117] DEFS021466632.

[118] DEFS021665258.

[119] DEFS021665260. I note that it is possible that some telescope accessories may not be identified using this methodology. To the extent that is true, the measures of damage that I calculate are conservative.

| VARIABLES | Coefficient |
|---|---|
| consp1 | 0.0396*** |
| consp2 | 0.0716*** |
| ln_costitem | 0.115*** |
| ln_qty | -0.0119*** |
| cny_usd | 0.676*** |
| MTH_2 | 0.00586*** |
| MTH_3 | 0.00731*** |
| MTH_4 | -0.00133 |
| MTH_5 | 0.00455*** |
| MTH_6 | 0.00489*** |
| MTH_7 | 0.0102*** |
| MTH_8 | -0.00186** |
| MTH_9 | -0.0159*** |
| MTH_10 | -0.0155*** |
| MTH_11 | -0.0168*** |
| MTH_12 | -0.0165*** |
| Constant | 5.383*** |
| | |
| Observations | 461,659 |
| Adjusted R-squared | 0.993 |

Robust standard errors in parenthese
*** p<0.01, ** p<0.05, * p<0.1

108. The regression results show that after controlling for cost, seasonality and product and customer specific factors affecting supply and demand, prices are about 3.96 percent higher during the period April 2005 to August 2013, while prices were about 7.16 percent higher from September 2013 through 2021, compared to before April 2005 (and after 2001 – the beginning of the data).

109. This particular analysis also supports a liability finding, as after controlling for cost, seasonality and product and customer specific factors affecting supply and demand, prices are statistically significantly higher, consistent with the alleged conduct in this case.

110. The overcharges calculated in this section are based only on Celestron's transactional data, as (1) Synta destroyed virtually all of its documents predating the Nantong Schmidt factory, (2) the documents Synta produced related to its Nantong Schmidt factory do not allow for margin calculations, and (3) Ningbo Sunny did not produce any data in this

action from which it would be possible to calculate profit margin information. Thus, although I do find a quantifiable overcharge based on Celestron's data, the full magnitude of the overcharge is better calculated in conjunction with either or both of the two methodologies I outline in the preceding two sections.

-ooo-

111. All of the foregoing economic analysis of overcharge is common evidence and part of class-wide proof of the aggregate damages due to the conduct at issue.

### B. Affected Commerce

112. Affected commerce is the total amount of purchases by prospective class members from Defendants. I compute affected sales for Synta and Sunny separately.

113. Overall, Synta/Celestron's annual worldwide sales were between $75 and $90 million in the 2015-2020 time period.[120] Considering a breakdown of U.S./Canadian sales vs. sales to other countries for mid/high level telescopes, the U.S./Canadian sales represent about 60 percent of total sales.[121] Thus US sales alone are expected to be no more than about $40 to $50 million annually during that period.

114. I have gone directly to the produced transactions data and totaled Synta/Celestron transaction revenues for those records with a ship-to or billed-to address in the US. I have excluded transactions indicating repairs, employees, government or promotional sales. The totals for relevant time periods appear in the table below. Total affected commerce is about $549 million from April 2005 through December 2022. The annual average was about $38 million from 2015 to 2020, which is consistent with the aggregate data reported.

[120] *See* Lee Ex. 81

[121] *See* Roth Ex.46

ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

**Celestron Telescope Sales**

| Year | Sales |
|---:|---:|
| 2001 | $12,393,054 |
| 2002 | $11,389,875 |
| 2003 | $20,040,043 |
| 2004 | $12,739,447 |
| Jan - Mar 2005 | $882,319 |
| Apr - Dec 2005 | $7,199,775 |
| 2006 | $9,984,843 |
| 2007 | $14,911,208 |
| 2008 | $14,442,130 |
| 2009 | $13,882,712 |
| 2010 | $18,307,940 |
| 2011 | $23,666,515 |
| 2012 | $29,246,472 |
| Jan - Aug 2013 | $12,297,141 |
| Sep - Dec 2013 | $18,341,673 |
| 2014 | $27,721,703 |
| 2015 | $29,647,618 |
| 2016 | $34,065,903 |
| 2017 | $34,381,915 |
| 2018 | $35,066,287 |
| 2019 | $36,095,071 |
| 2020 | $56,619,714 |
| 2021 | $64,108,642 |
| 2022 | $68,803,587 |
| **Total Sales, Apr 2005 - Dec 2022** | **$548,790,846** |

Notes:
Purchases include all sales of telescope products by Celestron with a bill-to or ship-to address within the United States.
Sales to government/employee/promotional accounts excluded, as well as repair transactions.
SW Technology purchased Celestron in April, 2005.

115. The totals above do not reflect sales by Meade during the period it was owned by Sunny, which would also represent sales to prospective class members. Data available for that commerce is limited, and does not provide the same detail as the Synta/Celestron data. In particular, it does not appear to be possible to identify Sunny/Meade's telescope sales vs. other sales, nor whether the customer was U.S.-based. In total, Sunny/Meade's sales were about $68 million from Sep 2013 through 2019.

**Meade Sales**
**During Sunny Ownership**

| Year | Sales |
|---:|---:|
| Sep - Dec 2013 | $119,482 |
| 2014 | $5,873,911 |
| 2015 | $11,255,568 |
| 2016 | $12,273,799 |
| 2017 | $12,601,019 |
| 2018 | $12,356,657 |
| 2019 | $13,560,249 |
| **Total Sales** | **$68,040,685** |

116. All of the foregoing economic analysis to determine affected commerce is common evidence and part of class-wide proof of the aggregate damages due to the conduct at issue in this case.

### C. Aggregate Damages

117. I have computed aggregate damages based on the value of affected commerce and the estimated overcharge from the various scenarios discussed above. The table below shows the computed aggregate damages. The Cournot Model implies aggregate damages of about $148 million. The Connor PIC-based model implies aggregate damages of about $239 million. The regression model based on Celestron's transactions data implies aggregate damages of about $143 million through December 2022. The figures are displayed in the table below.

**Summary of Alternative Computed Overcharges**

| **Period** | **Estimated Total US Sales** | **Church and Ware Cournot Model** | | **Connor PIC Model** | | **Econometric Based Model** | |
|---|---|---|---|---|---|---|---|
| | (Celestron/ Skywatcher/ Meade) | Overcharge | Computed Damages | Overcharge | Computed Damages | Overcharge | Computed Damages |
| April 2005 to Aug 2013 | $143.9 [1] | 13.1% | $18.9 | 35.0% | $50.4 | 20.7% [2] | $29.8 |
| Sep 2013 to Dec 2019 | $283.4 | 27.4% | $77.6 | 39.8% | $112.7 | 23.9% | $67.7 |
| Jan 2020 to Dec 2022 | $189.5 | 27.4% [3] | $51.9 | 39.8% [3] | $75.4 | 23.9% [3] | $45.3 |
| Total | $616.8 | | $148.4 | | $238.5 | | $142.7 |

Notes:
1) Meade data are not included before Meade was acquired by Sunny
2) Overcharge includes base overcharge from Connor model.
3) Overcharge is not affected because of incomplete transfer of Meade assets to Orion

118. All of the foregoing economic analysis is common evidence and part of class-wide proof of the aggregate damages due to the conduct at issue.

### D. Antitrust Injury

119. In antitrust cases, "injury" includes both injury-in-fact and "antitrust injury."[122] In this case, the impact is an anticompetitive overcharge enabled by a restraint on competition. Overcharges resulting from such a restraint are well-recognized as the type of injury the antitrust laws were intended to prevent. I conclude that, as a matter of economics, based on the nature and cause of the impact, a finding that members of the Class have suffered an injury in the form of supra-competitive prices is also a finding of antitrust injury. All of the foregoing economic analysis is based on common evidence and part of class-wide proof of the effects of the conduct at issue.

## V. Common Impact

120. Plaintiffs are seeking an order pursuant to Federal Rule of Civil Procedure 23(b)(3) certifying a class of independent telescope distributor as defined in ¶5, above. Rule

[122] In re: Rail Freight Fuel Surcharge Antitrust Lit., 292 F. Supp. 3d 14, 89 (D.D.C. 2017)

23(b)(3) requires Plaintiffs to show that "questions of law or fact common to class members predominate over any questions affecting only individual members." I understand that a *common question* is one in which "the issue is susceptible to generalized, class-wide proof."[123] The so-called "predominance" requirement, therefore, is satisfied when the same evidence can be put forward for all (or substantially all) Class Members without the need for individualized inquiries.

121. The liability of each of the Defendants in this matter is based on the participation in an agreement among competitors to fix price, raise price engage in anticompetitive acquisitions and allocate markets. These facts concern the conduct of Defendants, not Plaintiffs, so individualized inquiries into any particular Class Members regarding liability are unnecessary. Because economic evidence regarding the Defendants' liability to any one Class Member can be proven using the same evidence required to prove Defendants' liability to any other Class Member, from an economic perspective, the liability of Defendants to the Class Members for injuries caused by their antitrust violations is a common question that can be proven with common, class-wide evidence.

122. Focusing the predominance inquiry on whether impact and antitrust injury are also common questions susceptible to common proof, I examined the evidence to determine whether the Plaintiffs can show that each Class Member has been injured by using common evidence and a common methodology, *i.e.*, that impact can be established class-wide using common evidence.

123. Impact and injury would be proven based on showing transactions were subject to overcharge. Under the Cournot or PIC models, the same overcharge would be applied to each and every transaction. The models involve common, class-wide evidence.

124. In the case of the regression model based overcharge, I have looked at every transaction to determine the but-for price implied by the regression model. I have compared the but-for price implied by the regression-based model to the actual price paid in the transaction to determine the injury or damage for every transaction. I determine that substantially all (about 98 percent) of the nearly 6,000 customers who purchased

[123] Tyson Foods, Inc. v. Bouaphakeo, 136 S. Ct. 1036, 1051 (2016) (Roberts, C.J., concurring).

telescopes from Celestron between April 2005 and December 2022 paid an overcharge at least once during the damage period.[124] This includes large customers like Adorama Camera, which purchased nearly $22 million in telescopes, as well as small customers like Gene's Camera Store which purchased from Celestron just twice during the class period.[125]

125. I conclude based on the above that injury to each Class Member may be proven using common evidence and a common methodology, *i.e.*, that impact can be established class-wide through the use of common evidence without individual inquiries.

## VI. Summary and Conclusions

126. I have reached the following general conclusions based on my training and professional experience working on matters such as this, the relevant economic literature, my investigation into the economic evidence relevant to Plaintiff's claims, the materials cited herein, and my analyses to date:

a. From an economic perspective, the conduct of Defendants reduced competition and prevented telescopes buyers and prospective buyers from enjoying the full benefits of the competitive process; forcing prices above the competitive level; this can be shown by common economic evidence applicable to the proposed class as a whole;

b. Common economic evidence and analyses can also be used to show that prices for telescopes and accessories were higher as a result of the Defendants' conduct; in other words, common economic evidence and analyses exists to show a supra-competitive overcharge resulting from the conduct;

[124] For purposes of establishing injury to class members, I have used the transaction bill-to customer name in all cases except for Celestron's direct consumer sales through Shopatron and Celestron.com (per Interview with Rick Ayres, April 24, 2023 and May 9, 2023), in which case I use the ship-to customer name. There are just over 5,000 direct Celestron customers with class period purchases in the Celestron transactions data, and just under 700 customers who purchased from Celestron through other channels.

[125] Just over 100 customers do not show injury under the regression-based model. Nearly all of these customers had just one purchase during the class period (six customers had two purchases). In total, they represent 0.007% of the dollar volume of class period sales used in the model. For these customers, I cannot conclude they were harmed, as they would be under basic economic theory with harm to the market, it is just that the available data and the regression model cannot demonstrate their harm definitively.

c. Standard and reliable economic methods and analyses for computing aggregate damages to the proposed Class as a whole show that all or substantially all Class members paid this overcharge as a result of Defendants' conduct; and,

d. Damages to proposed class members can be determined on a formulaic basis; Estimated aggregate damages are in a range of about $142 to $238 million in overcharges imposed by Defendants' conduct, before trebling.



J. Douglas Zona Ph.D.

May 20, 2024