# EXHIBIT 6

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

**AURORA ASTRO PRODUCTS LLC,**
**PIONEER CYCLING & FITNESS, LLP,**
**and those similarly situated**

**v.** **Case No. 5:20-cv-03642-EJD**

**CELESTRON ACQUISITION, LLC, SUZHOU SYNTA OPTICAL TECHNOLOGY CO., LTD., SYNTA CANADA INT'L ENTERPRISES LTD, SW TECHNOLOGY CORP., et al**

**Expert Rebuttal Report of J. Douglas Zona, Ph.D.**
**August 5, 2024**

## I. Introduction

**1.** My name is J. Douglas Zona. I previously submitted a report in this case.[1] In that report, I described my education and experience, including the antitrust cases for which I provided testimony, and attached a copy of my CV. I also submitted a list of materials I considered in forming my opinions, which I have supplemented in Exhibit A with the additional materials I considered in drafting this rebuttal report.

**2.** In my initial report, I showed that:[2]

**i.** From an economic perspective, the conduct of Defendants reduced competition and prevented telescopes buyers and prospective buyers from enjoying the full benefits of the competitive process, forcing prices above the competitive level; this can be shown by common economic evidence applicable to the proposed class as a whole;

**ii.** Common economic evidence and analyses can also be used to show that prices for telescopes and accessories were higher as a result of the Defendants' conduct; in other words, common economic evidence and analyses exist to show a supra-competitive overcharge resulting from the conduct;

**iii.** Standard and reliable economic methods and analyses for computing aggregate damages to the proposed Class as a whole show that all or substantially all Class members paid this overcharge as a result of Defendants' conduct; and,

**iv.** Damages to proposed class members can be determined on a formulaic basis; Estimated aggregate damages are in a range of about $142 to $238 million in overcharges imposed by Defendants' conduct, before trebling.

**3.** David Kaplan, Esq. was asked to review my May 20, 2024 report provided in support of class certification and allegations of anticompetitive behavior engaged in by defendant suppliers of telescopes (e.g., Synta, Sunny, and Celestron) in a

[1] Expert Report of J. Douglas Zona, Ph.D., May 20, 2024 (hereinafter "Zona Report").

[2] Zona Report, ¶ 8.

relevant antitrust market of consumer-grade telescopes sold in the United States between April 1, 2005 and continuing through today.[3]

**4.** Mr. Kaplan's criticisms belie a complete misunderstanding and distortion of my analysis. In his report Mr. Kaplan seeks to highlight what he mistakenly claims to be my "two fundamental and substantial errors"[4] His claims relate to: 1) what he calls my "Before and After Pooled Regression"; and 2) what he calls my "Individual Customer Analysis". These attempted criticisms are incorrect.

## II. Mr. Kaplan's Criticism of My Adjustment to Pre-2005 Prices is Incorrect and Not Economically Justified

**5.** Just the use of the before-and-after terminology calls into question Mr. Kaplan's understanding of my analysis because the allegations and evidence in this case show that there is no real "clean" before period to use as a baseline.

**6.** A key fact in this case is that there is evidence that even before 2005, Synta and Ningbo Sunny were interrelated and not independent of one another. Although the conspirators purchased Celestron in 2005, the complaint also alleges that horizontal competitors Synta and Sunny were not independent of each other prior to 2005 because of overlapping ownership and interlocking officers.[5]

**7.** Therefore as a matter of economics, prices before 2005 would not be expected to reflect but-for competition between these two (or more) independent suppliers. As I said in my prior report, "[t]ypically the determination of overcharges, if any, attributable to the conduct at issue involves comparison of prices during the

---

3 Report of David P. Kaplan, July 15, 2024 (hereinafter "Kaplan Report").

4 Kaplan Report, ¶2.

5 See e.g., Fourth Amended Complaint, ¶17 ("Even though he founded Synta and has run it since its inception, from 2001 to 2005, Chairman Shen was also concurrently an officer of Synta's supposed horizontal competitor, Ningbo Sunny. As Chairman Shen's fixer, Defendant Laurence Huen, explained in an email, "David Shen was appointed as the Vice Chairman of Ningbo Sunny Electronic Co. Ltd. . . . on November 23 2001. . . . David resigned this position on July 2005, in order to avoid any conflict of interest after he acquired Celestron on April 2005."") or Fourth Amended Complaint, ¶18, ("Until 2005, Chairman Shen also held a 26 percent ownership stake in Synta's horizontal competitor Ningbo Sunny. At that time, he transferred his shares to his sister-in-law, Dong Yun Xue. Ms. Dong continues to hold that interest.")

Damage Period to competitive or 'benchmark' prices, such as prices in another market or in another period unaffected by conspiracy."[6]

**8.** For purposes of computing damages in this particular case, prices in the period before 2005 cannot be used as a competitive benchmark. Mr. Kaplan's interpretation of estimates from analysis comparing prices in the pre-2005 period (he calls "Before" conspiracy), to the periods between 2005 and 2013 and post 2013 (he calls the two "after" agreement periods), as overcharges is wrong because there is no pricing data produced in this litigation before conspiracy.

**9.** Because there is no basis in the pricing data produced by Defendants to assess overcharge during the period before 2005, I have used a different methodology to compute the amount prices were elevated during this period. Mr. Kaplan appears flummoxed by my use of this analysis, but it is explained in my report.[7]

**10.** The 16.7 percent adjustment that I used comes directly from the analysis I conducted of the overcharges in analogous cartels involving two parties, using data in the Private International Cartel dataset.[8] I also used this dataset and analyses in the *Orion* matter, which was accepted by the Court and affirmed by the Ninth Circuit Court of Appeals.

**11.** The 16.7 percent adjustment accounts for the fact that Celestron was already buying telescopes from Synta and Sunny before 2005, and Synta and Sunny were already working together before April 2005, when Celestron was acquired by Synta. In other words, I estimate that there was already an overcharge in the prices paid by Celestron's telescope customers beyond that which can be estimated by comparing prices before the acquisitions and after. Mr. Kaplan has proposed no alternative overcharge estimate for the period before 2005, and implicitly assumes, without evidence, a value of zero. Using zero as the amount

---

6 Zona Report, ¶101.

7 See, for example, Kaplan Report ¶13 "...[Dr. Zona] inexplicably lowers the predicted prices by 16.7 percent."

8 Zona Report, ¶96 through 98.

of overcharge in a market where the two main horizontal competitors are colluding with one another is contrary to basic principles understood by economists and detailed in the studies that I relied on.

**12.** Further, Mr. Kaplan's use of the "before and after" terminology misstates the purpose of my regression analysis. My analysis of pricing data measures *increases (or decreases)* in overcharges during the periods of the two acquisitions at issue here, compared to the anticompetitive effect of the conspiracy before the acquisition of Celestron in 2005.

### A. Kaplan's Criticism of My Regression Analysis is Incorrect and Unfounded

**13.** Mr. Kaplan primarily criticizes one of my three methods of computing overcharges in this case. He criticizes my regression analysis of pricing data produced by Celestron in this case because I omitted from the regression analysis one of the variables I had included in other analysis I have performed in other circumstances in other cases. Specifically, he opines that I neglected to include in the overcharge regression the personal consumption expenditure ("PCE") variable that I included in one of the regressions that I presented in my report in the *Orion* case.

**14.** PCE measures the goods and services purchased by "persons"—that is, by households and by nonprofit institutions serving households (NPISHs)—who are residents in the United States. Most of PCE consists of purchases of new goods and of services by households from private business. PCE transactions are valued in market prices, including sales and excise taxes.[9] Unlike the variables I have included in my model, PCE is attenuated from the price that retailers will pay their suppliers and the pricing behavior of Chinese companies and U.S. distributors.

[9] https://www.bea.gov/resources/methodologies/nipa-handbook/pdf/chapter-05.pdf last accessed August 2, 2024.

**15.** In my report in the *Orion* matter, I presented the results of three regressions: 1) a regression summarizing margin data; 2) a regression to estimate how much of a cost increase Orion would pass on to its customers; and 3) a regression to measure the impact of Sunny's refusal to deal with Orion after October 6, 2016.[10] I did not use regression analysis to measure overcharges in the *Orion* matter.

**16.** Only the refusal-to-deal regression included personal consumption expenditure as an independent variable. In other words, two-thirds of the regressions in my *Orion* report did not include this variable, despite Mr. Kaplan's intimations to the contrary. And the particular regression model in which I included this variable was not an overcharge regression ( It did not even include price as a variable in the regression) like the one I've specified in this case. Additionally, my refusal-to-deal analysis in the Orion litigation forecasted future sales volumes to U.S. consumers, which relates to the aggregate income of U.S. consumers and makes the use of a PCE variable more appropriate. Despite these differences, Mr. Kaplan implies that these two models were similar in purpose and structure.

**17.** Typically, an economist would offer some theory as to why a particular variable would be included in a model before inserting the variable into the model. Mr. Kaplan has offered no economic theory as to why purchases made by persons residing in the U.S. would explain prices that direct purchasers of telescopes paid for products made in China and sold all over the world. The only explanation he gives for inserting the variable is that I used it in another regression model in another case, for another purpose, to compute a different kind of damages. The literature cited by Mr. Kaplan to advance his claim that PCE should be included in my regression, including my own writings, does not say what he claims it says on this topic. The literature cited by Mr. Kaplan refers to "variables" affecting

10 "I have measured the impact of this conduct on Orion sales using an econometric forecasting model. The forecasting model ... used OLS regression to model the logarithm of Orion's telescope sales as a function of last month's … sales …, monthly fixed effects to capture seasonality …, a trend … and personal consumption expenditure to control for demand effects (lpce in the output). I also include a variable that allows for an estimation of the effect of the refusal to deal (effect in the output). The effect variable is a linear trend which is zero before October 2016 and then counts the months from that point on." Expert Report of J. Douglas Zona, Ph.D, January 3, 2019 in *Optronic Technologies, Inc. v Ningbo Sunny Electronic Co., Ltd. et al*, ¶126-8.

demand, among other things.[11] There is no place where any of these citations require the inclusion of the specific macro-level variable included by Mr. Kaplan.

**18.** Consistent with my prior writing on this topic, I use a combination of hundreds of variables and control for the factors important to estimating the prices of Celestron telescopes, including demand. Specifically, I use two conspiracy indicator variables, one for the period from April 2005 to August 2013, and another from September 2013 forward; the (natural logarithm of) Celestron unit costs associated with each transaction; indicator variables for the month of the year to control for seasonal effects within each year (for example, the holiday shopping season); the quantity of the sale (in natural log form) to account for quantity discounts[12]; the exchange rate between the U.S. Dollar and Chinese Yuan; over 900 fixed effects for each customer to control for customer-specific effects; and nearly 600 fixed effects for each product SKU to control for product-specific effects.

**19.** Mr. Kaplan's suggestion that "Declining Prices" are evidence contrary to anticompetitive behavior is economically naïve.[13] It is not the case that raw, average price levels need to be increasing over time in order to identify overcharges. Declining overall price trends are prevalent in several markets in which anti-competitive activity occurred. For instance, prices for LCD TVs in 2005 were about 17 percent of the value of prices in 1999, whereas the Celestron telescope prices in Kaplan Exhibit 15 at the end of 2021 were 30 percent of the value of prices at the beginning of 2001. Nonetheless, various

---

11 Rubinfeld, Daniel L., "Quantitative Methods in Antitrust," Chapter 30, Issues in Competition Law and Policy, ABA Section of Antitrust Law, 2008, p.724. "A typical reduced-form model might explain the variation in the price of a product as a function of a series of variables relating to cost, demand, and market structure".

12 Mr. Kaplan is incorrect that individual quantities cannot be used in my model specification as an explanatory variable. Mr. Kaplan claims that individual order quantities are jointly determined with market prices and therefore endogenous. However, price is determined by market forces of supply and demand, not individual order size. Mr. Kaplan provides no test statistic to support his claim that the variable is endogenous in my model specification.

13 Kaplan Report, ¶65.

competition authorities around the globe fined manufacturers of these LCD TVs hundreds of millions of dollars related to their anticompetitive behavior, a jury awarded millions of dollars in damages in one related case, and settlements were reached in civil cases against these manufacturers amounting to a billion dollars.[14]

**20.** As I noted in the declaration I submitted in response to Defendants' Daubert motion, Mr. Kaplan did not run any analysis to isolate what effect, if any, adding a PCE variable would have on my model. The PCE variable brings little additional information to the regression, as about 90 percent of the variation in PCE is explained by the factors I have already included in my model.[15]

**21.** I further explained in that declaration that because my model already controlled for demand, adding another similar variable would skew the results under basic principles of multicollinearity. Multicollinearity is a statistical property of the data in which two or more predictor variables in a regression model are highly linearly related (correlated). Multicollinearity can lead to inflated standard errors of the regression coefficients, making it difficult to determine which variables are statistically significant. It can also destabilize the coefficient estimates, making them sensitive to small changes in the data. Economists often look to a statistic which can detect problematic multicollinearity called the Variance Inflation Factor ("VIF").[16] There is no bright line for VIF as to when multicollinearity is too severe, but as a general rule of thumb, when the VIF for a variable is greater than 10, it indicates a problem.[17] I conducted this test for the PCE variable against the

14 Freifeld, Karen. "LCD makers settle price-fixing case for $553 million", Reuters, Dec 27, 2011. Available at https://www.reuters.com/article/us-lcd-settlement-idUSTRE7BQ0KK20111227/, accessed August 1, 2024; Lee, Chung-joo; Kim, Andrew Eungi. "Pervasiveness of Price Fixing in Korea: An Analysis of Causal Factors in Comparison with the United States", Korea Observer, 2013, 44(3), 443-466.

15 See produced file PCE VIF.xlsx

16 "VIF shows how the variance of an estimator is inflated by the presence of multicollinearity" (Gujarati and Porter, p. 328, "Basic Econometrics" 5th ed.)

17 "If VIF is above 10 (equivalently, R2 is above 0.9), then we conclude that multicollinearity is a 'problem'" (Wooldridge, p. 98, "Introductory Econometrics" 5th ed.) "As a rule of thumb, if the VIF of a

variables I included in my model and I computed a VIF of 9.3 which is at the threshold indicating the potential for problematic multicollinearity affecting the regression results.[18]

**22.** When Mr. Kaplan's PCE variable is used in my model, and nothing else is changed damages still exceed $96 million (as opposed to the $142.7 million I previously calculated) in spite of his overcharge estimates which decrease over time. The figures are displayed in the table below. As detailed in paragraph 33 below, including Mr. Kaplan's PCE variable would show that 95.7 percent of the class was injured. Simply plugging Mr. Kaplan's PCE variable into my model and changing nothing else thus shows that his criticisms (1) that decreasing prices somehow eliminate the possibility of an overcharge and (2) failure to include his PCE materially alters the analysis, are both incorrect.

**Summary of Alternative Computed Overcharges**

| Period | Estimated | Church and Ware | | Connor PIC Model | | Econometric Based | | Kaplan Method [4] | |
|---|---|---|---|---|---|---|---|---|---|
| | (Celestron/ Skywatcher/ Meade) | Overcharge | Computed Damages | Overcharge | Computed Damages | Overcharge | Compute d Damages | Overcharge | Computed Damages |
| April 2005 to Aug 2013 | $143.9 [1] | 13.1% | $18.9 | 35.0% | $50.4 | 20.7% [2] | $29.8 | 16.5% [2] | $23.7 |
| Sep 2013 to Dec 2019 | $283.4 | 27.4% | $77.6 | 39.8% | $112.7 | 23.9% | $67.7 | 15.3% | $43.4 |
| Jan 2020 to Dec 2022 | $189.5 | 27.4% [3] | $51.9 | 39.8% [3] | $75.4 | 23.9% [3] | $45.3 | 15.3% [3] | $29.0 |
| Total | $616.8 | | $148.4 | | $238.5 | | $142.7 | | $96.1 |

Notes:
1) Meade data are not included before Meade was acquired by Sunny
2) Overcharge includes base overcharge from Connor model.
3) Overcharge is not affected because of incomplete transfer of Meade assets to Orion
4) Kaplan Method based on coefficients in his "No Qty.xlsx" estimation which includes his PCE variable and excludes the log of units purchased. Note that the coefficient that he estimates for the first conspiracy period is not statistically significant.

## B. Kaplan's "Pooling" Criticism of My Regression Analysis is Incorrect and Unfounded

**23.** Class-wide statistical analyses of prices paid, like the regression analysis I reported in my previous report, are a common type of evidence often presented

variable exceeds 10, that variable is said to be highly collinear" (Gujarati and Porter, p. 340, "Basic Econometrics" 5th ed.).

18 See produced file PCE VIF.xlsx

in antitrust price-fixing matters to prove damages and class-wide impact. The aggregate overcharge is typically estimated as a fixed percentage (perhaps for a particular product type) which applies over the class period. Typical class-wide price regression models specify a statistical relationship between the prices at which transactions take place and economic variables such as the characteristics of the product(s) and other factors controlling for supply, demand and the nature of strategic interaction in the market (like a conspiracy dummy). In this particular instance, I have included fixed effects variables that control for differences by product and by customer. Here, each customer has an indicator variable assigned to it, which allows for different types of customer data to be used in the same calibration. This is a widely-accepted method of including data from customers of different size, and products of varying prices, into the same regression equation and controls for any material differences between those customers for purposes of the regression analysis.

**24.** These models are so-called reduced form econometric models because they represent the often complex workings of market forces reduced to a single statistical relationship between the variable of interest, in this case price, and the underlying factors that determined transaction prices in the particular circumstances.[19] In the context of a price-fixing matter, output from these models shows the estimated relationship between the transaction price, and the factors that have been included in the model, including the possible effect of conspiracy.

**25.** Assuming a well-specified model, a statistically significant positive overcharge coefficient implies that there is a positive overcharge, *on average*.[20] The literature supports the use of regressions with an aggregate overcharge measure, rather than measures that rely on individualized inquiry, as Mr. Kaplan

---

19 "Reduced form price equations are the workhorse empirical methods for antitrust litigation for several reasons." Baker, Jonathan B. and Daniel L Rubinfeld, "Empirical Methods in Antitrust Litigation: Review and Critique, American Law and Economics Review, Fall 1999, Vol. 1, No. 1/2 (Fall 1999), pp. 386-435.

20 A positive average means that at least one transaction and therefore at least one putative class member was impacted. In t

has suggested. But there is nothing about the form of the estimated aggregate overcharge model that necessarily imposes a constant overcharge across all individuals[21] and there is no need to look to individualized regressions to measure aggregate overcharges, as Mr, Kaplan has suggested. In other words, a regression analysis such as the one I have created does not simply assume an equal impact across all class-members—it can ascertain impact as to individual class members without resorting to individualized regressions.

**26.** The benefit of pooling all the observations and estimating a single regression is that the individual coefficients are estimated more precisely. Using more data is better and results in greater statistical precision, all else equal. Mr. Kaplan dis-aggregates the data and runs many separate regressions, with each generally less precisely estimating factors that are common. For example, Mr. Kaplan's estimate of the average effect of the additional overcharge from an individual regression will be less precise because it is based on only a subset of the data.

**27.** Mr. Kaplan's partition of the data is based simply on the availability of observations, as opposed to any economically meaningful distinction. For just 95 out of more than 950 large customers[22] (less than 10 percent), Mr. Kaplan runs individual regressions. A more careful examination of Mr. Kaplan's results shows they are all over the map, with overcharge coefficient estimates as high as 218 percent, and as low as negative 51 percent, demonstrating the imprecision of his method of analysis and calling into question his methodology. This lack of stability is one of the reasons why pooled regressions are superior tools for assessing market-wide effects than arbitrary sub-regressions such as those constructed by Mr. Kaplan.

---

[21] Although, of course, if individual overcharges are all the same, then the average will be a reasonable measure of each as there is no variation.

[22] and ignoring the group of small customers for these purposes.

**28.** However, when I look at the average of the estimates Mr. Kaplan created, I find that those averages are similar to the estimates obtained by pooling the data (as I have done in my model). The simple average across the 95 customers Mr. Kaplan used in his sub-regressions is 0.0786 for the first conspiracy period and 0.0876 for the second conspiracy period. If I pool the 95 customers as a single regression, the estimates are 0.0388 for the first conspiracy period and 0.0691 for the second conspiracy period. These are both reasonably close to the estimates of 0.0396 and 0.0716, for the first and second conspiracy periods, respectively, obtained using the full model and data.

**29.** Mr. Kaplan acknowledges that there are several customers where data is insufficient to run one of his customer-level sub-regressions (as he did for the 95 described above). For 134 of these customers, he runs a different pooled regression with a different subset of the data. However, this regression ignores observations for an additional 458 customers that do not have observations both before and after April 2005, that could have been included. With this limited set of data, based on Mr. Kaplan's own parsing of Celestron's customers, the values of the estimated additional effect of the conspiracy are 0.0359 for the first conspiracy period and 0.0650 for the second conspiracy period (compared to the 0.0396 and 0.0716 I estimated in my original model).

**30.** Finally, and more fundamentally, Mr. Kaplan's sub-regression methodology cannot establish an overcharge unless a customer purchased telescopes from Celestron both before and after April 2005. This further highlights the superiority of a pooled regression, especially in this matter where many class members only purchased once, and only during the periods in which prices were allegedly inflated.

## III. Kaplan's So-Called "Individual Customer Analysis" Is Unscientific and Does Not Improve my Main Model

**31.** In my Report, I have looked at every transaction to determine the but-for price implied by the model. This includes removing the effect measured by the conspiracy variables and the effect of the conspiracy that existed before April

2005. I have compared the but-for price implied by the regression-based model to the actual price paid in the transaction to determine the injury or damage for every transaction. I determine that substantially all (about 98 percent) of the nearly 6,000 customers who purchased telescopes from Celestron between April 2005 and December 2021 paid an overcharge at least once during the damage period.

**32.** As I have discussed above, Mr. Kaplan, by contrast, has submitted a misleading analysis of individual impact in this matter. Mr. Kaplan modifies my model in two important ways in order to make the claim that a large number of Celestron's customers were not affected by the alleged conspiracy. First, he sets the effect of the conspiracy before 2005 to zero. Second, Mr. Kaplan also modifies the regression itself to include the US personal consumption expenditure variable described above. The net effect he finds with these two modifications is that "over 60% of customers were uninjured".

**33.** To test Mr. Kaplan's arguments, I reran my model including the PCE variable, but did not accept Mr. Kaplan's assumption that the collusion between the two principal horizontal competitors before April 2005 had no effect on pricing (which Mr. Kaplan did not do).. This experiment shows that erroneously adding a PCE variable does not radically change the results. It shows that 95.7 percent of customers paid an overcharge at least once between April 2005 and December 2021 – or fewer than five percent of customers were uninjured with Mr. Kaplan's modification to my model. Therefore, Mr. Kaplan's claim that "over 60% of customers were uninjured" is mainly predicated on his economically incorrect assumption that the pre-2005 conspiracy had no effect on prices. Mr. Kaplan's results are therefore driven by his assumptions, not economic analysis.

**34.** As a separate point, Mr. Kaplan also criticizes the way that I have treated Celestron's direct sales customers. There are over 5,000 of these customers, who purchased products through Celestron's direct sales channel. All of them receive the same pricing information from Celestron's website. Many of them only make one purchase. Therefore, it makes economic sense to group these

purchases together. Mr. Kaplan suggests that these customers should not be grouped and treated equally, because, as Mr. Kaplan argues, it would be easy for Celestron to "cheat" on any agreement to raise price with these types of one-off purchases, such as the purchase made by plaintiff Jason Steele.[23] For that to be true, Celestron would need to know exactly when Mr. Steele or those similarly situated would be visiting Celestron's website, as well as which products they intended to purchase. It would then need to temporarily lower the prices shown to those customers (and all other customers visiting the website at the same time), and then immediately restore them to their original levels. This hypothetical lacks any credibility.

## IV. Other Arguments Raised by Mr. Kaplan

**35.** Mr. Kaplan makes a number of other criticisms, which I address below. None of these criticisms would cause me to change the conclusions in my report.

### A. Mr. Kaplan's Criticism of My Market Share Analysis is Incorrect and Irrelevant

**36.** As I explained in my initial report, market share data for the telescope manufacturing industry is difficult to come by as most of the manufacturers are private. Mr. Kaplan criticizes my use of container weight as a means of calculating market share. Indeed, Mr. Kaplan points to no other source for market shares that could serve as an alternative to the figures I have calculated.

**37.** Often when data on sales or productive capacity are readily available, revenue or capacity can be used to compute market shares. This is not the case in this industry, and Mr. Kaplan does not seem to disagree. Additionally, one of the standard ways in economics to measure market share is in physical terms through shipments.[24]

---

23 Kaplan Report, ¶52.

24 See, e,g., Horizontal Merger Guidelines, (1992) https://www.justice.gov/atr/horizontal-merger-guidelines-0#14 Section 1.41 "Market shares can be

**38.** As Mr. Kaplan is aware, the source I used for this analysis does not contain the monetary value of the products. Weight is the only consistent unit of quantification available. The use of weight is also why it is important to isolate the market share analysis to those shipments composed exclusively of telescopes, as I did. Shipments that include other products (e.g., shoes and tools as referenced by Mr. Kaplan[25]) would incorrectly bias the weights of those shipments in the share calculations. It should be noted that I performed a similar analysis of market share in the *Orion* matter. My report in that case was accepted by the Court and further confirmed on appeal. Mr. Kaplan does not identify any purportedly more accurate method of calculating market share. There is none of which I am aware.

**39.** Mr. Kaplan asserts that I did not include all relevant competitors to Celestron in my market share analysis. He claims that my report misstates my incorporation of 29 telescope brands into my analysis, and that I only used 20. This is inaccurate. I searched the shipment information for 29 brands. Of those 29 brands, 20 brands were identified in the data. The remaining nine brands were not ignored – they had zero relevant shipments in the dataset. Mr. Kaplan did not provide corrected market shares including these nine brands, given that those results would be identical to the ones I provided in my initial report.

**40.** Mr. Kaplan also identifies additional brands that he alleges are competitors of Celestron, and criticizes me for ignoring them in my analysis. Mr. Kaplan has provided no data for these "brands", such as US sales or productive capacity. In this list, he has included manufacturers such as Little Experimenter, whose advertisement for its "Telescope for Kids" (included in Kaplan Exhibit 19) includes the ability to "..project bright, space-themed pictures on your bedroom wall…" Nonetheless, to test the validity of his criticism, I re-ran the market share analysis including all of the brands he suggests I overlooked. Unsurprisingly, Celestron's

expressed either in dollar terms through measurement of sales, shipments, or production, or in physical terms through measurement of sales, shipments, production, capacity, or reserves"

[25] Kaplan Report, ¶71.

market share is virtually unchanged by the inclusion of these "important" competitors. In my Report, I calculated Celestron's overall market share from 2006 to 2022 as 65.4 percent. After incorporating all of Mr. Kaplan's additional brands, Celestron's average market share over this time period is 65.3 percent.

**41.** Furthermore, while complete data are not available in the record, point estimates in documents produced by Celestron in this matter are consistent with the figures I calculate. For instance, an estimate of Celestron's market share from March 2010 to February 2011 put that figure at 57 percent.[26] In my analysis, Celestron's market share for 2010 is estimated at 60.6 percent.

## B. Mr. Kaplan's Information on Off-Invoice Discounts is Incorrect and Unfounded

**42.** Mr. Kaplan identifies "millions of dollars" in discounts that Celestron provided to customers, and incorrectly criticizes me for not incorporating them.[27] As an initial matter, I disagree with Mr. Kaplan's critique because such discounts would have been paid even absent the anticompetitive conspiracy alleged in this case. An overcharge would still exist because the baseline price offered to all customers would be elevated by the alleged conduct, regardless of Defendants' discounting.

**43.** I also do not believe these discounts can be incorporated into the pricing data, nor do I believe they should be incorporated based on the nature of discounts. Because there is no information on discounts before 2005, any adjustment downward in prices after 2005 (without the appropriate adjustment before 2005) would serve to bias the estimated overcharge coefficients to zero and make an apples-to-apples comparison impossible. For example, if the adjustments had in fact been a constant percentage over time (such as they represent prompt payment discounts or the like), then all prices would tend to be lower and there would be no impact on the overcharge estimates. By using data that only reports

---

[26] See analysis at DEFS000618014.

[27] Kaplan Report, ¶132.

discounts after 2005, then only the prices during the later conspiracy periods would be lower, biasing the estimate of overcharge.

**44.** The primary sources of Mr. Kaplan's discounts are the general ledger files produced by Celestron. The discount records identified by Mr. Kaplan are inadequate in detail, rendering them unusable in the manner he suggests. The data do not identify the time range over which the discounts apply. In other words, it is impossible to know whether a discount entered into the ledger in July 2018 pertained to sales made by Celestron in July 2018, the second quarter of 2018, the first half of 2018, etc. The records do not identify the products relevant to the discounts, and Mr. Kaplan identifies no means of associating these discounts to particular products, or to the marginal price of the products, even if the product were identified. It is possible that these discounts pertain to certain telescopes but not others. It is possible that some of these discounts are for non-telescope products.

**45.** As Mr. Kaplan must also be aware, most of these discounts do not even identify the customer. Mr. Kaplan does not explain (and likely does not know) to which customers each of these discounts apply. Of the discounts identified by Mr. Kaplan from 2005 to 2021, 65 percent of the dollar value cannot be associated with a customer in Celestron's sales data. There is no reasonable or economically sound methodology for applying these incomplete discount records. Understandably, Mr. Kaplan made no attempt to do so.

### C. Mr. Kaplan's Criticism of My Use of the Private International Cartel Dataset is Incorrect and Unfounded

**46.** As explained in my initial report, I have also reviewed the literature on measured cartel overcharges from other conspiracies to inform the present case to derive an estimate of the magnitude of the classwide overcharge. I also used this method to determine overcharge in the *Orion* Litigation. Professor Connor at

Purdue University has been building a data set related to private international cartels ("PIC" data), covering the period 1990 to 2019.[28]

**47.** I disagree with Mr. Kaplan's critique of the records in this dataset. Mr. Kaplan cites a critique of the dataset by James Langenfeld (also a consultant at Mr. Kaplan's firm). Notably, Professor Connor responded that Langenfeld has not shown that any of his assertions are empirically significant.[29] In particular, Mr. Kaplan calls out the so-called "publication bias" of the results, but Dr. Connor concludes that there is no indication whether this bias, if it exists at all, lowers or raises the values reported.[30]

**48.** I used a regression method to summarize the PIC data and compute the expected value conditional on the number of cartel members and their market share. Mr. Kaplan critiques the regression for estimating coefficients that are "not statistically significant"[31]; however, my methodology is a more precise and conservative means of identifying the conditional expected value of the PIC overcharge than other alternatives which ignore the information on the number of cartel members and their market share. Indeed, if I ignore the number of cartel members and their market share, the mean overcharge across all of the cartels in the sample is 42.0 percent. If I estimate overcharge conditioned solely on the number of cartel members, the calculated overcharge would be 39.8 percent. If I estimate the overcharge solely on market share, the resulting value would be 20.2 percent. By comparison, the 16.7 percent that I have used is based on an estimation including both market share and the number of cartel members, and is

28 Connor, J. (2020).Private International Cartels Full Data 2019 edition. (Version 2.0). Purdue University Research Repository. doi:10.4231/G5GZ-0505.

29 Connor, John M. and Robert H. Lande. "Comment on 'The Empirical Basis for Antitrust: Cartels, Mergers, and Remedies,'" International Journal of the Economics of Business, Vol. 24, No. 3, 2017, p. 335.

30 Connor, John M. and Robert H. Lande. "Comment on 'The Empirical Basis for Antitrust: Cartels, Mergers, and Remedies,'" International Journal of the Economics of Business, Vol. 24, No. 3, 2017. "...a 'publication bias' may be present, though its extent and direction are highly speculative." (p.332)

31 Kaplan Report, ¶99.

conservative by comparison. As noted above, Mr. Kaplan cites no academic basis for attributing an overcharge of zero to a cartel of this nature. No academic economist has ever taken this position to my knowledge.

### D. Mr. Kaplan's Criticism of My Use of the Cournot Model is Incorrect and Unfounded

**49.** On pages 61 to 65 of his report, Mr. Kaplan criticizes me for using the Cournot Model as a basis for computing damages. The Cournot model is the standard theoretical model of oligopoly competition that I used in the *Orion* Litigation to determine the magnitude of the classwide overcharge. Cournot Equilibrium is the outcome of an economic model where competitors simultaneously choose levels of output to maximize their own profits. Under standard textbook assumptions, the Cournot Equilibrium with different numbers of competitors can be used to show the effect of a reduction in the number of Cournot competitors on market price. My use of the Cournot Model represents a reasonable methodology to assess the impact of conspiracy on market outcomes as a matter of theory.

**50.** Mr. Kaplan lists several reasons why he believes that the results of the Cournot Model may not comport with a comparison of market outcomes in the actual and but-for worlds. For example, Mr. Kaplan criticizes the Cournot model for not dynamically adjusting to the evolving market circumstances.[32] However, Mr. Kaplan does not show that a change in this manner would have any material effect on the estimated overcharges. He makes other criticisms which he suggests might affect the conclusions, but never tries to calculate overcharges using a modified model.

[32] Kaplan Report, pp, 25-6.

### E. Mr. Kaplan's "Lost Profits" Argument is Unsupported in the Literature

**51.** On pages 73 to 75 of his report, Mr. Kaplan argues that certain class members may wish to pursue a "lost profits theory" as opposed to an "overcharge theory", suggesting that individual inquiry is the only way to resolve these issues.[33]. Mr. Kaplan's "Lost Profits" argument is novel and inapt. In my experience, in class action litigations involving allegations of inflated prices, it is exceedingly common to focus on the overcharge as a result of the illegal acts. Lost profits calculations would involve also computing how much more customers would have purchased in the but-for world, and the loss in value associated with that. In the case of individual consumers, like some of the class members in this case, it is not clear individuals who bought telescopes would want to buy multiple telescopes even if the price were lower. And if there were lower prices, additional sales would be made to additional customers who had not purchased before. Indeed, my understanding of the class in this matter is that it is composed of those people who purchased telescopes and telescope accessories from Celestron. It does not encompass purchases not made.

________________________________

J. Douglas Zona Ph.D.

August 5, 2024

33 Kaplan Report, ¶136.

**Exhibit A**

**Additional Materials Considered for Rebuttal Report**

- Baker, Jonathan B. and Daniel L Rubinfled, “Empirical Methods in Antitrust Litigation: Review and Critique, American Law and Economics Review, Fall 1999, Vol. 1, No. 1/2 (Fall 1999), pp. 386-435.
- Connor, John M. and Robert H. Lande. "Comment on 'The Empirical Basis for Antitrust: Cartels, Mergers, and Remedies,'" International Journal of the Economics of Business, Vol. 24, No. 3, 2017.
- Rubinfeld, Daniel L., "Quantitative Methods in Antitrust," Chapter 30, Issues in Competition Law and Policy, ABA Section of Antitrust Law, 2008, 723-742.
- Freifeld, Karen. “LCD makers settle price-fixing case for $553 million”, Reuters, Dec 27, 2011, at https://www.reuters.com/article/us-lcd-settlement-idUSTRE7BQ0KK20111227/
- Lee, Chung-joo; Kim, Andrew Eungi. “Pervasiveness of Price Fixing in Korea: An Analysis of Causal Factors in Comparison with the United States”, Korea Observer, 2013, 44(3), 443-466
- Gujarati, Damodar N. and Dawn C. Porter, "Basic Econometrics", 5th ed.
- Wooldridge, Jeffrey M. "Introductory Econometrics", 5th ed.
- U.S. Department of Justice and the Federal Trade Commission, Horizontal Merger Guidelines, 1992.
- Chapter 5: Personal Consumption Expenditures (Updated: December 2023), Bureau of Labor Statistics, at https://www.bea.gov/resources/methodologies/nipa-handbook/pdf/chapter-05.pdf.
- Expert Report of J. Douglas Zona, Ph.D., May 20, 2024.
- Report of David P. Kaplan, July 15, 2024.
- 2024.07.15 Opposition to Motion for Class Certification
- Doc. 000617000 - 2024-07-15 - First MOTION to Strike 599 MOTION to Certify Class filed by Dave Anderson Celestron Acquisition
- 2024-07-16 - Bieler Decl. [Ex. 5 to Dkt.620-1].pdf
- 2024-07-16 - Dubroff Decl. [Ex. 4 to Dkt.620-1].pdf
- 2024-07-16 - Fowler Decl. [Ex. 6 to Dkt.620-1].pdf

- 2024-07-16 - Hauk Decl. [Ex. 2 to Dkt.620-1].pdf
- 2024-07-16 - Roth Decl. [Ex. 3 to Dkt.620-1].pdf