1  CHRISTOPHER FROST (SBN 200336)
   chris@frostllp.com
2  JOHN MAATTA (SBN 83683)
   john@frostllp.com
3  JOSHUA STAMBAUGH (SBN 233834)
   josh@frostllp.com
4  LAWRENCE J.H. LIU (SBN 312115)
   lawrence@frostllp.com
5  FROST LLP
   10960 Wilshire Boulevard, Suite 2100
6  Los Angeles, California 90024
   Telephone: (424) 254-0441
7
   SHAUNA A. IZADI (Admitted *Pro Hac Vice*)
8  sizadi@izadilegal.com
   IZADI LEGAL GROUP, PLLC
9  13155 Noel Rd, Suite 900
   Dallas, Texas 75240
10
   Attorneys for Defendants Celestron Acquisition, LLC, Synta
11 Technology Corp., Suzhou Synta Optical Technology Co.,
   Ltd., Synta Canada Int'l Enterprises Ltd., SW Technology
12 Corp., Olivon Manufacturing Co. Ltd., Olivon USA, LLC,
   Nantong Schmidt Optoelectrical Technology Co. Ltd.,
13 Pacific Telescope Corp., Corey Lee, David Shen, Sylvia
   Shen, Jack Chen, Jean Shen, Joseph Lupica, Dave Anderson,
14 Laurence Huen

15              **UNITED STATES DISTRICT COURT**

16      **NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION**

17 | IN RE TELESCOPES ANTITRUST LITIGATION | Case No. 5:20-cv-03642-EJD

18 | THIS DOCUMENT RELATES TO: | *Assigned for All Purposes to:*
                               *Hon. Edward J. Davila*
19 | AURORA ASTRO PRODUCTS, LLC, PIONEER
   CYCLING & FITNESS, LLP; and those similarly  | **CELESTRON ACQUISITION, LLC'S**
20 | situated,                                     | **NOTICE OF MOTION AND MOTION**
                Plaintiffs,                        | **FOR SUMMARY JUDGMENT, OR IN**
21 |        vs.                                     | **THE ALTERNATIVE, PARTIAL**
                                                   | **SUMMARY JUDGMENT;**
22 | CELESTRON ACQUISITION, LLC, SUZHOU            | **MEMORANDUM OF POINTS AND**
   SYNTA OPTICAL TECHNOLOGY CO., LTD.,            | **AUTHORITIES**
23 | SYNTA CANADA INT'L ENTERPRISES LTD.,
   SW TECHNOLOGY CORP., OLIVON            | *Filed concurrently with Declaration of*
24 | MANUFACTURING CO. LTD., OLIVON USA,   | *Joshua Stambaugh; Separate Statement of*
   LLC, NANTONG SCHMIDT OPTOELECTRICAL   | *Undisputed Material Facts*
25 | TECHNOLOGY CO. LTD., NINGBO SUNNY
   ELECTRONIC CO., LTD., PACIFIC TELESCOPE | Hearing:
26 | CORP., COREY LEE, DAVID SHEN, SYLVIA   | Date:     TBD
   SHEN, JACK CHEN, JEAN SHEN, JOSEPH     | Time:     TBD
27 | LUPICA, DAVE ANDERSON, LAURENCE        | Crtrm.:   4 (5th Floor)
   HUEN, and DOES 1-50,
28 |                                               | Compl. Filed: June 1, 2020
              Defendants.                          | Trial Setting Conference: May 8, 2025

Case No. 5:20-cv-03642-EJD

CELESTRON ACQUISITION, LLC'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT,
OR IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT

FROST

summary

**TO ALL PARTIES AND TO THEIR COUNSEL OF RECORD:**

**PLEASE TAKE NOTICE** that on _____, at __:___ a.m., or as soon thereafter as counsel may be heard, in the courtroom of the Honorable Edward J. Davila, located in the United States Courthouse, Northern District of California, 280 South 1st Street, San Jose, California 95113, Courtroom 4, 5th Floor, Defendant Celestron Acquisition, LLC ("Celestron") will and hereby does move this Court for summary judgment, or in the alternative, partial summary judgment as to Direct Purchaser Plaintiffs' ("DPPs") Fourth Amended Complaint on the following grounds:

First, each cause of action: (1) Sherman Act § 1 (15 U.S.C. § 1); (2) Sherman Act § 2 (15 U.S.C. 2) and Clayton Act § 7 (15 U.S.C. § 18); (3) California Unfair Competition Law (Cal. Bus. & Prof. Code § 17200 *et seq.*); and (4) Cartwright Act (Cal. Bus. & Prof. Code § 16700 *et seq.*) fails as a matter of law because DPPs cannot establish the common element of antitrust injury or damages. DPPs' theory of antitrust damages rests entirely on their expert, Douglas Zona, Ph.D., whose methodology is totally flawed and findings are inadmissible. Summary judgment should be granted to the entirety of the Fourth Amended Complaint as to Celestron, and all other Defendants, on this ground.

Next, alternatively, even if the Court were to find Dr. Zona's report admissible to prove the existence of damages, DPPs' damages period should be limited to the time period after the Meade Acquisition in 2013, because there is no evidence that Defendants maintained the requisite market power to be liable under U.S. antitrust laws before this time.

This Motion is based on this Notice of Motion and Memorandum of Points and Authorities; the concurrently filed Separate Statement of Undisputed Material Facts; Declaration of Joshua S. Stambaugh and all exhibits attached thereto, all of the pleadings, files, and records in this proceeding, all other matters of which the Court may take judicial notice, and any argument or evidence that may be presented to or considered by the Court prior to its ruling.

DATED: March 7, 2025                    FROST LLP

By: _____

CHRISTOPHER FROST
JOHN D. MAATTA
JOSHUA STAMBAUGH
LAWRENCE J.H. LIU
Attorneys for Defendants Celestron Acquisition, LLC, Synta Technology Corp., Suzhou Synta Optical Technology Co., Ltd., Synta Canada Int'l Enterprises Ltd., SW Technology Corp., Olivon Manufacturing Co. Ltd., Olivon USA, LLC, Nantong Schmidt Optoelectrical Technology Co. Ltd., Pacific Telescope Corp., Corey Lee, David Shen, Sylvia Shen, Jack Chen, Jean Shen, Joseph Lupica, Dave Anderson, Laurence Huen

CELESTRON ACQUISITION, LLC'S MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT

**TABLE OF CONTENTS**

I.    INTRODUCTION ................................................................................................ 1

II.   BACKGROUND ................................................................................................ 2

      A.   DPPs' Motion for Class Certification; Defendants' Motion to Exclude Zona ............... 2

           1.   The Zona Report Applied a Phantom 16.7% Overcharge ................................. 2

           2.   The Zona Report Omitted a Critical Demand Variable ................................... 2

      B.   September 5, 2024 Hearing on Class Certification and *Daubert* Motions .................. 3

      C.   Dr. Zona's Subsequent Deposition and Rebuttal Report ..................................... 4

III.  LEGAL STANDARD ON SUMMARY JUDGMENT .................................................. 4

      A.   Antitrust Standing ..................................................................................... 4

IV.   DPPS' ANTITRUST CLAIMS FAIL AS A MATTER OF LAW BECAUSE THERE IS
      NO EVIDENCE OF ANY DAMAGES ................................................................... 7

      A.   Dr. Zona's Opinions Fail to Establish Any Admissible of Reliable Evidence of
           Damages ................................................................................................. 7

           1.   Dr. Zona Fails to Identify a Proper Benchmark Tethered to DPPs' Theory of
                Liability .......................................................................................... 7

           2.   Dr. Zona's 16.7% Adjustment Is Based on Fatally Flawed Assumptions with
                No Empirical Evidence ....................................................................... 10

V.    EVEN IF DPPS COULD PROVE THE EXISTENCE OF DAMAGES, DPPS CANNOT
      PREVAIL ON ANY OF THEIR CLAIMS PRIOR TO 2013 BECAUSE CELESTRON
      LACKS MARKET POWER ................................................................................ 19

      A.   There Is No Evidence that Celestron Engaged in a Conspiracy Prior to 2013 ............. 21

      B.   Celestron Does Not Possess Market or Monopoly Power In Any Properly Defined
           Relevant Market. ...................................................................................... 22

      C.   DPPs Have Failed to Prove the Alleged Relevant Market ................................... 24

VI.   CONCLUSION ................................................................................................ 25

CELESTRON ACQUISITION, LLC'S MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE,
PARTIAL SUMMARY JUDGMENT

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*AFMS LLC v. United Parcel Serv., Inc.*,
    696 F. App'x 293 (9th Cir. 2017)...................................................................................... 24

*In re Aluminum Phosphide Antitrust Litig.*,
    893 F. Supp. 1497 (D. Kan. 1995) ............................................................................. 8, 19

*Am. Booksellers Ass'n, Inc. v. Barnes & Noble, Inc.*,
    135 F. Supp. 2d 1031 (N.D. Cal. 2001) ........................................................................... 6

*Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*,
    9 F.4th 1102 (9th Cir. 2021) ........................................................................................... 24

*Bailey v. Allgas, Inc.*,
    284 F.3d 1237 (11th Cir. 2002) ...................................................................................... 24

*Berlyn, Inc. v. Gazette Newspapers, Inc.*,
    223 F. Supp. 2d 718 (D. Md. 2002), *aff'd sub nom. Berlyn Inc. v. The Gazette
    Newspapers, Inc.*, 73 F. App'x 576 (4th Cir. 2003) ..................................................... 24

*Bickerstaff v. Vassar College*,
    196 F.3d 435 (2nd Cir. 1999) ........................................................................................... 7

*Blue Cross & Blue Shield United of Wisc. v. Marshfield Clinic*,
    152 F.3d 588 (7th Cir. 1998)............................................................................................. 7

*Bordonaro Bros. Theatres v. Paramount Pictures*,
    203 F.2d 676 (2d Cir. 1953) ........................................................................................... 21

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986) .......................................................................................................... 4

*In re Citric Acid Litig.*,
    191 F.3d 1090 (9th Cir. 1999).......................................................................................... 21

*City of Oakland v. Oakland Raiders*,
    20 F.4th 441 (9th Cir. 2021).............................................................................................. 5

*City of Vernon v. S. California Edison Co.*,
    955 F.2d 1361 (9th Cir. 1992).................................................................................... 5, 6

*Cogan v. Harford Mem. Hosp.*,
    843 F. Supp. 1013 (D. Md. 1994) .................................................................................. 24

*CollegeNet, Inc. v. Common Application, Inc.*,
    355 F. Supp. 3d 926 (D. Or. 2018)....................................................................... 23

*Crawford v. Newport News Indus. Corp*,
    4:14-cv-130, 2017 U.S. Dist. LEXIS 118879 (E.D. Va., July 28, 2017) .................................... 7

*Dang v. San Francisco Forty Niners*,
    964 F. Supp. 2d 1097 (N.D. Cal. 2013) ..................................................................... 5

*Forro Precision, Inc. v. Int'l Bus. Machines Corp.*,
    673 F.2d 1045 (9th Cir. 1982) .............................................................................. 24

*Franck v. Carborundum Co.*,
    437 F. Supp. 83 (N.D. Cal. 1977) ........................................................................... 21

*FTC v. Qualcomm Inc.*,
    969 F.3d 974 (9th Cir. 2020)............................................................... 20, 21, 22, 25

*Grason Elec. Co. v. Sacramento Mun. Util. Dist.*,
    571 F. Supp. 1504 (E.D. Cal. 1983)......................................................................... 25

*Hamilton v. State Farm Fire & Cas. Co.*,
    270 F.3d 778 (9th Cir. 2001)................................................................................ 10

*Image Tech. Servs., Inc. v. Eastman Kodak Co.*,
    125 F.3d 1195 (9th Cir. 1997) ............................................................................... 23

*Kentucky Speedway, LLC v. Nat'l Ass'n of Stock Car Auto Racing, Inc.*,
    No. CIV.A.05-138(WOB), 2008 WL 113987 (E.D. Ky. Jan. 7, 2008), *aff'd*, 588
    F.3d 908 (6th Cir. 2009)........................................................................................ 24

*Kentucky v. Marathon Petroleum Co.*,
    464 F. Supp. 3d 880 (W.D. Ky. 2020) ....................................................... 7, 19, 20

*In re Live Concert Antitrust Litig.*,
    863 F. Supp. 2d 966 (C.D. Cal. 2012)...................................................................... 24

*Malden Transp., Inc. v. Uber Techs., Inc.*,
    404 F. Supp. 3d 404 (D. Mass. 2019) ....................................................................... 7

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986) ............................................................................................ 22

*McGlinchy v. Shell Chem. Co.*,
    845 F.2d 802 (9th Cir. 1988)............................................................................ 5, 6

*Morgan, Strand, Wheeler & Biggs v. Radiology, Ltd.*,
    924 F.2d 1484 (9th Cir. 1991)............................................................................... 24

CELESTRON ACQUISITION, LLC'S MOTION FOR SUMMARY JUDGMENT

*Munoz v. Orr*,
   200 F.3d 291 (5th Cir. 2000) ........................................................................... 7

*Murphy Tugboat Co. v. Crowley*,
   454 F. Supp. 847 (N.D. Cal. 1978) ................................................................. 12

*NCUA Bd. v. UBS Sec., LLC*,
   2016 U.S. Dist. LEXIS 176576 ......................................................................... 7

*Nelson v. Pima Cmty. Coll.*,
   83 F.3d 1075 (9th Cir. 1996) ............................................................................. 4

*New York v. Microsoft Corp.*,
   209 F. Supp. 2d 132 (D.D.C. 2002) ................................................................... 4

*Ohio v. Am. Express Co.*,
   585 U.S. 529 (2018) ........................................................................... 22, 23, 25

*Optronic Technologies, Inc. v. Ningbo Sunny Electronic Co., Ltd.*
   (N.D. Cal. 5:16-cv-06370-EJD) ......................................................................... 3

*Pac. Steel Grp. v. Com. Metals Co.*,
   600 F. Supp. 3d 1056 (N.D. Cal. 2022) ........................................................... 23

*Persian Gulf Inc. v. BP W. Coast Prod. LLC*,
   632 F. Supp. 3d 1108 (S.D. Cal. 2022), *appeal dismissed sub nom.* 2023 WL
   566364 (9th Cir. 2023) ...........................................................................*passim*

*PharmacyChecker.com LLC v. LegitScript, LLC*
   710 F. Supp. 3d 856 (D. Or. 2024) ................................................................... 4

*Pool Water Products v. Olin Corp.*,
   258 F.3d 1024 (9th Cir. 2001) ........................................................................... 5

*Rebel Oil Co. v. Atl. Richfield Co.*,
   51 F.3d 1421 (9th Cir. 1995) ...................................................................*passim*

*In re REMEC Inc. Securities Litigation*,
   702 F.Supp.2d 1202 (S.D. Cal. 2010) ............................................................... 7

*Robert's Waikiki U-Drive, Inc. v. Budget Rent-a-Car Sys., Inc.*,
   732 F.2d 1403 (9th Cir. 1984) ........................................................................... 1

*Safeway Inc. v. Abbott Labs.*,
   761 F. Supp. 2d 874 (N.D. Cal. 2011) ............................................................. 25

*Sun Microsystems Inc. v. Hynix Semiconductor Inc.*,
   608 F. Supp. 2d 1166 (N.D. Cal. 2009) ..................................................... 1, 12

*T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*,
    809 F.2d 626 (9th Cir. 1987)....................................................................................... 4

*Toscano v. PGA Tour, Inc.*,
    201 F. Supp. 2d 1106 (E.D. Cal. 2002) ...................................................................... 5

*United States v. Cont'l Grp., Inc.*,
    456 F. Supp. 704 (E.D. Pa. 1978), *aff'd*, 603 F.2d 444 (3d Cir. 1979) ................... 21

*United States v. Syufy Enterprises*,
    903 F.2d 659 (9th Cir. 1990)..................................................................................... 23

*United States v. Therm-All, Inc.*,
    373 F.3d 625 (5th Cir. 2004)..................................................................................... 21

*United States v. Various Slot Machines on Guam*,
    658 F.2d 697 (9th Cir. 1981)..................................................................................... 17

*Virgin Atl. Airways Ltd. v. Brit. Airways PLC*,
    69 F. Supp. 2d 571 (S.D.N.Y. 1999) *aff'd*, 257 F.3d 256 (2d Cir. 2001) ................ 6

*Werede v. Allright Holdings, Inc.*,
    2005 U.S. Dist. LEXIS 42436. (10th Cir. 2005) ........................................................ 7

*In re Wireless Tel. Servs. Antitrust Litig.*,
    385 F.Supp.2d 403 (S.D.N.Y. 2005) .......................................................................... 7

**Federal Statutes**

Sherman Act
    § 1 .......................................................................................................... 12, 20, 21, 22
    § 2 ............................................................................................................ 5, 20, 21, 23

**Federal Statutes**

Federal Rule of Civil Procedure 56(a) .............................................................................. 4

Federal Rule of Evidence 702 ............................................................................... 7, 17, 25

**Other Authorities**

Areeda, R. Blair & H. Hovenkamp, Antitrust Law (2d ed. 2000) ..................................... 6

P. Areeda & H. Hovenkamp, Fundamentals of Antitrust Law § 15.02[B] (4th ed.
    2017).............................................................................................................................. 6

FROST

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

DPPs' case is a house of cards built on speculation, inadmissible expert testimony, and claims unsubstantiated by the evidence. Their damages theory hinges entirely on the expert opinion of Dr. J. Douglas Zona, whose report is riddled with baseless assumptions and analytical gaps so glaring that he could not defend them under oath. The Court has already expressed skepticism about Dr. Zona's reliability—now, after his deposition, those doubts have been confirmed in spades, as Dr. Zona admitted to having no empirical basis for the key assumptions underpinning his damages model.

To manufacture a "dirty" benchmark period (contrary to commonly accepted economics), Dr. Zona plucked a 16.7% overcharge figure from thin air by cherry-picking irrelevant data from the Connor PIC dataset. Even assuming the validity of borrowing overcharge data from unrelated industries—already an indefensible leap—the core assumption underlying Dr. Zona's chosen 16.7% figure depends entirely on the premise that Suzhou Synta Optical Technology Co., Ltd. ("Synta") and Ningbo Sunny Electronic Co., Ltd. ("Sunny") controlled a 40% market share prior to 2005, which is the foundational pillar of his damages model. Yet, he conceded in sworn testimony that he has no data, empirical analysis, or even so much as a hint of recollection to support it. This is not expert analysis—it is junk science designed to create the illusion of overcharges by stacking one unsupported assumption atop another. Without Dr. Zona's inadmissible opinion, DPPs have no evidence of damages, no means to quantify harm, and no triable issue for a jury to resolve. *See Robert's Waikiki U-Drive, Inc. v. Budget Rent-a-Car Sys., Inc.*, 732 F.2d 1403, 1406 (9th Cir. 1984) (summary judgment is warranted when no "significant probative evidence" supports the claim).

Equally fatal, DPPs cannot extend their conspiracy claims before 2013, as they lack any proof that Celestron colluded with Meade Instruments Corporation ("Meade") or held market power before Sunny's acquisition of Meade. The record shows that Meade and Celestron were direct competitors, negating any inference of collusion. Antitrust law is clear: without competent proof of harm caused by a defendant's conduct, a plaintiff cannot survive summary judgment. *See Sun Microsystems Inc. v. Hynix Semiconductor Inc.*, 608 F. Supp. 2d 1166, 1194 (N.D. Cal. 2009). Accordingly, summary judgment is warranted and proper.

## II.    BACKGROUND

### A.    DPPs' Motion for Class Certification; Defendants' Motion to Exclude Zona

DPPs filed their Motion for Class Certification on May 20, 2024, which included a report ("Zona Report") from their expert, Dr. Zona. (ECF 599, 599-1.) On July 15, 2024, Defendants simultaneously filed their Opposition to Motion for Class Certification (ECF 620) and a *Daubert* Motion (ECF 617) seeking to exclude the Zona Report. In the *Daubert* Motion, Defendants identified two major flaws (among others) with Dr. Zona's model:

### 1.    The Zona Report Applied a Phantom 16.7% Overcharge

***Step 1:*** Dr. Zona assumed a **pre-2005 conspiracy** that contradicted, and was untethered to, the antitrust theories alleged in the Fourth Amended Complaint ("4AC"), which expressly alleges that "The Conspiracy Begins in 2005." (UMF 3; *see also* 4AC, 25:1, ¶ 25 [ECF 495].)

***Step 2:*** In doing so, Dr. Zona applied a **16.7% overcharge** for the pre-2005 period based on a faulty comparison to cartel datasets of other completely unrelated industries (the "Connor PIC" data) and a baseless assumption of a combined 40% market share of Synta and Sunny. (UMF 7-9, 13-17.) In essence, Dr. Zona *assumed*, without any empirical data or evidence, the antitrust conspiracy and overcharge results that he was trying to achieve. By applying an assumed overcharge to the pre-conspiracy period, Dr. Zona violated the basic econometric principle that a regression model, *by definition*, requires applying a "clean" benchmark—*i.e.*, a period in which prices are free from anti-competitive conduct—so that it can properly predict "the difference between the predicted prices in the 'no conspiracy' world and the actual prices in the damages period…." *See Persian Gulf Inc. v. BP W. Coast Prod. LLC*, 632 F. Supp. 3d 1108, 1165 (S.D. Cal. 2022), *appeal dismissed sub nom.* 2023 WL 566364 (9th Cir. 2023).

***Step 3:*** Having already assumed the existence of a 16.7% overcharge before the class period starting in 2005, Dr. Zona concludes that a majority of class members were injured during the relevant period based on his faulty regression analysis.

### 2.    The Zona Report Omitted a Critical Demand Variable

Next, Dr. Zona failed to include an essential variable to control for changes of demand over

time. In the *Orion*[1] litigation, Dr. Zona applied a personal consumption expenditure (PCE) variable but inexplicably omitted such variable in this case. (UMFs 22, 26.)[2]

**B.    September 5, 2024 Hearing on Class Certification and *Daubert* Motions**

On September 5, 2024, the Court heard oral argument concurrently on both DPPs' Motion for Class Certification and Defendants' *Daubert* Motion. During the hearing, the Court opened by asking DPPs' counsel: "I'm curious about PCE, I am curious about demand control, I'm curious about 16.7 percent. Is this arbitrary? Where did that come from? Is there foundation for that?" (*See* Sept. 5 Hr'g. Tr. [ECF 653], 4:12–15). The Court was highly skeptical of DPPs' attempts to explain the 16.7% overcharge in Dr. Zona's regression analysis, stating: "Yes, if you could just point me to the report that Ms. Greico, your third grade math teacher said show me the work, if you just point it out, I will look at it." (*Id.* at 50:23–25).

In response to Defendants' argument that the 16.7% figure was based on pure speculation, the Court responded: "Well, that was my question to Mr. Borden is I'm trying to understand where did that number, the 16.7 percent, come from? Was there a calculus that show [*sic*] me your work? Where did that come from?" (*Id.* at 29:17–23); "I wanted to find out, and that was my initial question was where did that come from? And what is the math? What is the analysis that yielded 16.7 percent? That's the question that I posed." (*Id.* at 33:6–9). Although DPPs repeatedly falsely claimed that "it's the same analysis he did in *Orion*[,]" the Court rejected the argument stating: "Let's take *Orion* out of it. Because he did in *Orion* is not a pass for all of his future cases." (*Id.* at 45:24-46:2). The Court also wryly noted that despite DPPs' attempts to relate Dr. Zona's methodology to the one employed in the *Orion* litigation, "there might be a small distinction maybe between *Orion*." (*Id.* at 48:10–12).

The matter was then taken under submission, and the Court informed the parties that it may seek additional information if needed. (*See* ECF 653 at 53:21–23).

---

[1] *Optronic Technologies, Inc. v. Ningbo Sunny Electronic Co., Ltd.* (N.D. Cal. 5:16-cv-06370-EJD).

[2] While Dr. Zona claims that he used "hundreds of variables" to control for such changes in demand, the six that he has identified: (i) conspiracy indicators, (ii) seasonal effects, (iii) quantity of sale, (iv) exchange rate, (v) customer specific effects, and (vi) product-specific effects—have all been refuted by the Report by Defendants' expert, Mr. Kaplan. (UMF 23 [Kaplan Report, ¶¶ 117, 118, 121])

### C. Dr. Zona's Subsequent Deposition and Rebuttal Report

On November 1, 2024, DPPs later re-designated Dr. Zona as their merits expert who re-produced the same flawed May 20th Zona Report from the class certification briefing to support DPPs' arguments regarding the merits of their antitrust claims. On December 20, 2024, Defendants took the deposition of Dr. Zona and asked him to explain the basis behind the 16.7% adjustment and missing PCE demand variable. The response from Dr. Zona was a deafening silence.

### III. LEGAL STANDARD ON SUMMARY JUDGMENT

Summary judgment must be granted when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1432 (9th Cir. 1995) ("Summary judgment is appropriate when the pleadings, affidavits and other material present no genuine issue of material fact and the moving party is entitled to judgment as a matter of law."). When there is "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Thus, "[i]f the moving party shows that there is an absence of evidence to support the plaintiff's case, the nonmoving party bears the burden of producing evidence sufficient to sustain a jury verdict on those issues for which it bears the burden at trial." *Rebel Oil*, 51 F.3d at 1435 (citing *Celotex*, at 324). Moreover, "the nonmoving party may not rely on the mere allegations in the pleadings in order to preclude summary judgment." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987); *Nelson v. Pima Cmty. Coll.*, 83 F.3d 1075, 1081–82 (9th Cir. 1996) ("mere allegation and speculation do not create a factual dispute for purposes of summary judgment.").

### A. Antitrust Standing

"When deciding whether a plaintiff has antitrust standing, courts consider (1) the nature of the plaintiff's alleged injury; that is, whether it was the type the antitrust laws were intended to forestall; (2) the directness of the injury; (3) the speculative measure of the harm; (4) the risk of duplicative recovery; and (5) the complexity in apportioning damages." *PharmacyChecker.com LLC v. LegitScript* LLC, 710 F. Supp. 3d 856, 862 (D. Or. 2024) (internal citations omitted); *see also New York v. Microsoft Corp.*, 209 F. Supp. 2d 132, 139 (D.D.C. 2002) (internal citations omitted)

(reflecting the Supreme Court's articulations that antitrust standing does not encompass every harm that can be traced back to the alleged antitrust wrongdoing, but only those antitrust injuries which plaintiff can demonstrate a direct link with the antitrust violation).

Particularly, antitrust injuries—the type of injury the antitrust laws were intended to prevent—must flow from that which makes defendants' acts unlawful and be suffered in the specific market where competition is being restrained. *Dang v. San Francisco Forty Niners*, 964 F. Supp. 2d 1097, 1111 (N.D. Cal. 2013). Put simply, "[courts] have identified four requirements for antitrust injury: (1) unlawful conduct, (2) causing an injury to the plaintiff, (3) that flows from that which makes the conduct unlawful, and (4) that is of the type the antitrust laws were intended to prevent." *City of Oakland v. Oakland Raiders*, 20 F.4th 441, 456 (9th Cir. 2021) (internal citation omitted). "To show antitrust injury, a plaintiff must prove that his loss flows from an anticompetitive aspect or effect of the defendant's behavior, since it is inimical to the antitrust laws to award damages for losses stemming from acts that do not hurt competition. If the injury flows from aspects of the defendant's conduct that are beneficial or neutral to competition, there is no antitrust injury, even if the defendant's conduct is illegal *per se*." *Pool Water Products v. Olin Corp.*, 258 F.3d 1024, 1034 (9th Cir. 2001).

"Consequently, summary judgment for defendants is proper if the plaintiff's proof of damages is 'speculative' because (1) there is no admissible evidence of damages, or (2) if the plaintiff's sole evidence of damages is seriously flawed in some way that cannot be remedied before or at trial." *Toscano v. PGA Tour, Inc.*, 201 F. Supp. 2d 1106, 1124 (E.D. Cal. 2002); *see City of Vernon v. S. California Edison Co.*, 955 F.2d 1361 (9th Cir. 1992) (finding summary judgment appropriate where the plaintiff's damage study was so "seriously flawed" that there was an independent reason to grant summary judgment); *see also Rebel Oil*, 51 F.3d at 1443 (affirming summary judgment on a Sherman Act § 2 where the plaintiff failed to produce sufficient evidence of monopoly power and so defendant's pricing scheme was not an antitrust injury suffered by plaintiff under Sherman Act § 2).

Specifically, "[s]ummary judgment is appropriate where appellants have no expert witnesses or designated documents providing competent evidence from which a jury could fairly estimate damages." *McGlinchy v. Shell Chem. Co.*, 845 F.2d 802, 808 (9th Cir. 1988); *see* Areeda, R. Blair &

H. Hovenkamp, Antitrust Law ¶ 391, at 481 (2d ed. 2000) ("Damage evidence will be deemed insufficient as a matter of law if it permits no more than 'pure speculation and guesswork.' Thus, in the world of antitrust damages, 'speculative' is an epithet that is used to characterize insufficient damage proof and dooms the damage calculation.")

In *American Booksellers Ass'n, Inc. v. Barnes & Noble, Inc.*, the Ninth Circuit affirmed summary judgment in favor of the defendant where it found that the plaintiffs' expert's damages model was fatally flawed because it "***contain[ed] entirely too many assumptions and simplifications that are not supported by real-world evidence***," and "[a]s a result, its conclusions that the discounts defendants received caused actual injury to the individual plaintiffs, and the ***amount of damages caused by that injury, [we]re entirely too speculative to support a jury verdict***." 135 F. Supp. 2d 1031, 1041–42 (N.D. Cal. 2001) (emphasis added). Similarly, in *City of Vernon*, the Ninth Circuit upheld summary judgment in favor the defendant because "the serious flaws in the only damage study which could be proffered to the jury placed [the plaintiff] in the position of having no proper proof of damages at all." 955 F.2d at 1371–73; *see Virgin Atl. Airways Ltd. v. Brit. Airways PLC*, 69 F. Supp. 2d 571, 579–80 (S.D.N.Y. 1999) *aff'd*, 257 F.3d 256 (2d Cir. 2001) (granting summary judgment on Section 1 and 2 claims where plaintiff's expert's "implicit assumption… without the support of any direct evidence…[wa]s mere speculation.").

The Ninth Circuit has found that "some sort of study estimating the amount of damages" is essential to an antitrust plaintiff's case. *McGlinchy*, 845 F.2d at 808. Therefore, antitrust plaintiffs "must provide evidence such that the jury is not left to speculation or guesswork in determining the amount of damages to award." *Id.* (internal quotation marks omitted) (quoting *Dolphin Tours, Inc. v. Pacifico Creative Serv., Inc.*, 773 F.2d 1506, 1509–10 (9th Cir. 1985)). Therefore, "[s]ummary judgment is appropriate where [antitrust plaintiffs] have no expert witnesses or designated documents providing competent evidence from which a jury could fairly estimate damages." *Id.*

In other words, when an expert's opinion "is not supported by sufficient facts to validate it in the eyes of the law or when indisputable record facts contradict or otherwise render the opinion unreasonable, summary judgment is appropriate." *Rebel Oil*, at 1440 (cleaned up).

## IV.    DPPS' ANTITRUST CLAIMS FAIL AS A MATTER OF LAW BECAUSE THERE IS NO EVIDENCE OF ANY DAMAGES

DPPs' theory of damages is based solely on the analysis of Dr. Zona whose Report and analysis are fatally flawed and subject to Defendants' currently pending *Daubert* Motion (ECF 617.) Following the hearing, Defendants took Dr. Zona's deposition and confirmed that such flaws were based on purely speculation and zero empirical evidence.

### A.    Dr. Zona's Opinions Fail to Establish Any Admissible of Reliable Evidence of Damages

"While a forecasting regression analysis is a generally accepted econometric approach to determining causation and damages in the antitrust context, . . . the [c]ourt must examine whether [an expert's] specific application of that methodology in this case meets Rule 702 and *Daubert* standards for reliability and relevance." *Persian Gulf* , 632 F. Supp. 3d at 1165. Where an expert's regression model fails to control for major independent variables, courts have properly excluded such evidence as unreliable and irrelevant.[3]

### 1.    Dr. Zona Fails to Identify a Proper Benchmark Tethered to DPPs' Theory of Liability

"Forecasting regression methodology requires an expert ***to first identify a benchmark period free of anticompetitive conduct and a damages period*** when the allegedly anticompetitive conduct occurred." *Persian Gulf*, at 1165 (citing Halbert White, Robert Marshall & Pauline Kennedy, *The*

---

[3] *See e.g.*, *Crawford v. Newport News Indus. Corp*, 4:14-cv-130, 2017 U.S. Dist. LEXIS 118879 (E.D. Va., July 28, 2017) (excluding expert's regression analysis where it failed to account for a major factor and was therefore "so incomplete as to be inadmissible as irrelevant"); *Kentucky v. Marathon Petroleum Co.*, 464 F. Supp. 3d 880 (W.D. Ky. 2020) (excluding expert testimony for failure to control for major independent variables in a regression analysis); *In re Wireless Tel. Servs. Antitrust Litig.*, 385 F.Supp.2d 403, 427 (S.D.N.Y. 2005) (excluding expert's regression analysis as unreliable and irrelevant for failing to incorporate major independent variables); *In re REMEC Inc. Securities Litigation,*702 F.Supp.2d 1202, 1274 (S.D. Cal. 2010) (court excluded the expert's regression analysis as unreliable and irrelevant due to the omission of key independent variables); *Blue Cross & Blue Shield United of Wisc. v. Marshfield Clinic*, 152 F.3d 588, 593 (7th Cir. 1998); *Bickerstaff v. Vassar College,* 196 F.3d 435, 448-49 (2nd Cir. 1999); *Malden Transp., Inc. v. Uber Techs., Inc.*, 404 F. Supp. 3d 404 (D. Mass. 2019); *NCUA Bd. v. UBS Sec., LLC*, 2016 U.S. Dist. LEXIS 176576. 10th Cir Dec 20, 2016); *Munoz v. Orr*, 200 F.3d 291 (5th Cir. 2000); *Werede v. Allright Holdings, Inc.*, 2005 U.S. Dist. LEXIS 42436. (10th Cir. 2005).

*Measurement of Economic Damages in Antitrust Civil Litigation*, 6 Econ. Comm. Newsl. 17, 17–22 (2006) (emphasis added)).[4] "The expert then calculates the relationship between various factors impacting prices (e.g., the cost of raw materials) and the resulting prices during the ***benchmark***, ***to establish a baseline for how those factors influenced prices during a 'clean' period without anticompetitive behavior***." *Id.* (emphasis added). "Using the data from the benchmark period, the expert then predicts what prices would have been in the damages period without the defendants' allegedly anticompetitive conduct." *Id.* "The difference between the predicted prices ***in the 'no conspiracy' world*** and the actual prices in the damages period constitutes the class damages." *Id.* (emphasis added). "By isolating and quantifying the effects of the allegedly anticompetitive conduct in this way, a valid regression model can also tend to show that the price differential is attributable to the alleged anticompetitive conduct and serve as evidence of causation." *Id.* at 1165-66.

In *Persian Gulf*, the court excluded the plaintiffs' expert witness who relied on a benchmark period between January 2005 and January 2015, which conflicted with the plaintiffs' complaint originally alleging that the price-fixing conspiracy first occurred in 2012 and not 2015. *Persian Gulf*, at 1167. The court found that plaintiff's expert's selection of a benchmark period "so significantly misaligned with the case . . . renders his analysis ***fundamentally flawed and methodologically unsound***." *Id.* at 1168 (emphasis added).[5] Here, Dr. Zona's 16.7% pre-2005 overcharge theory is premised on an improper benchmark and must be disregarded. He loosely alleges that ***before 2005***, "Synta and Ningbo Sunny were interrelated and not independent of one another" and thus such prices did not reflect "but-for competition" at the time. (UMF 8.) But this "***Before 2005***" description is insufficient to define a benchmark—*i.e.*, a "clean" period of time "free of anticompetitive conduct." *See Persian Gulf*, at 1165. Moreover, since a benchmark necessarily measures a baseline prior to the

---

[4] "The goal of a prudent economist in performing the 'before and after' analysis is to determine the hypothetical or 'counter-factual' prices that would have prevailed during the conspiracy period, ***but for the conspiracy***." *In re Aluminum Phosphide Antitrust Litig.*, 893 F. Supp. 1497, 1503 (D. Kan. 1995) (citing Samuelson, P. and Nordhaus, W.D., Economics (13th ed.) at 7) (emphasis added).

[5] "[T]he selection of a benchmark period needs to be grounded in econometric principles and bear some logical relationship to the evidence in the case. Where the selection of the benchmark period is neither grounded in econometric principles nor the record, all of the econometric assumptions that flow from the identification of a 'clean' period are rendered unsound." *Id.*

alleged antitrust conduct, by definition, DPPs' pre-2005 conspiracy period cannot serve as a valid benchmark.

At the hearing on DPPs' Motion for Class Certification, the Court correctly expressed concern about the reliability and validity of Dr. Zona's methodology, particularly with respect to his adoption of the 16.7% overcharge figure. (ECF 653 at 4:9–15, 48:22–49:16.) Indeed, after the Court inquired whether Dr. Zona derived the 16.7% figure through analysis or simply selected it arbitrarily as a starting point (*Id.* 9:18–20]), subsequent deposition testimony confirms that he had, in fact, arbitrarily chosen the 16.7% figure first and then conducted his analysis around that number (UMF 13.)

Specifically, to reach the 16.7% figure, Dr. Zona imported overcharge estimates from the Connor PIC dataset, which includes overcharge data from industries such as blood pressure medicine, diamonds, chemicals, and vitamins, and other unrelated markets. (UMFs 13-15.) However, Dr. Zona provides no basis for assuming that these markets exhibit the same competitive structure or pricing behaviors as consumer-grade telescopes. Notably, Dr. Zona conceded in his deposition that he did not use empirical data in the telescope industry to arrive at the 16.7% figure. (UMFs 13-15.)

When questioned about Dr. Zona's methodology at the class certification hearing, DPPs' counsel falsely represented to the Court that the 16.7% overcharge figure was based on the same data and methods Dr. Zona employed in the *Orion* litigation. (ECF 653 at 9:3–5, 9:9–12.) Dr. Zona testified during deposition that he did not use the same data or methodology from the *Orion* litigation for his market share analysis in this action. (UMF 25.)

Most problematic and fatal to DPPs' assessment of damages, however, is that the underlying building block Dr. Zona uses to justify his selection of the 16.7% overcharge figure is premised on his manufactured assumption that Synta and Sunny had a combined market share of 40% before 2005. (UMFs 10, 14.) However, his analysis does not include any independent empirical verification of this 40% market share figure. Dr. Zona admitted during his deposition that he could not recall what, if any, data, calculations, or methodology he used to arrive at this 40% market share figure, nor could he identify any source or documented support for this figure within his report. (UMF 18.) He further conceded that he did not reference any pre-2005 telescope industry sales data or market analysis to substantiate his unfounded 40% market share assumption. (*Id.*) Therefore, the bedrock of Dr. Zona's

CELESTRON ACQUISITION, LLC'S MOTION FOR SUMMARY JUDGMENT

1    entire damages analysis is not merely speculative; it is wholly baseless.

2    　　　Moreover, Dr. Zona's deposition testimony revealed that he lacked basic market information

3    that would have been essential to support even a minimal inference about pre-2005 market share. For

4    instance, when asked about the specific market shares of leading telescope suppliers such as Meade

5    and Celestron in the United States pre-2005, Dr. Zona conceded that he did not know their actual

6    market shares, admitting only that he knew they were "large." (UMFs 19, 20.) Similarly, Dr. Zona

7    could not recall pre-2005 market share information for Jinghua Optical Corporation ("JOC"), another

8    major competitor. (UMF 21.) Absent a credible basis, let alone any basis, for Dr. Zona's arbitrary

9    40% market share assumption, the entire damages model is unreliable. DPPs are judicially estopped

10   from relying on a *pre*-2005 conspiracy theory.[6] Having asserted that the relevant conspiracy period

11   began in 2005, they cannot now rely on Dr. Zona's regression analysis, which concludes classwide

12   damages based on a new conflicting theory of a pre-2005 conspiracy to support their damages.

13   　　　　　**2.      Dr. Zona's 16.7% Adjustment Is Based on Fatally Flawed Assumptions**

14   　　　　　　　**with No Empirical Evidence**

15   　　　Here, the damages model proffered by Dr. Zona is a masterclass in junk econometrics and

16   statistical manipulation, designed to conjure overcharges where none exist by arbitrarily adjusting

17   predicted prices to skew his results and create spurious damages. The Court's instincts at the class

18   certification hearing were precisely correct: the foundational assumptions underlying Dr. Zona's

19   analysis—the arbitrary 16.7% overcharge and even more egregiously, the fabricated 40% market

20   share assumption pre-2005—are entirely unsupported, speculative, and contrary to the record

21   evidence and all notions of econometric modeling. As the Court astutely inquired:

22   　　　　That's really what I have some questions about, too, Dr. Zona's report regarding
     　　　　methodology, regarding different strategies that he engaged. … I'm curious about PCE,
23   　　　　I am curious about demand control, I'm curious about 16.7 percent. ***Is this arbitrary?***
     　　　　***Where did that come from? Is there foundation for that?***
24

25   (ECF 653 at 4:9–15 (emphasis added).)

26

27   ─────────────────────
     [6] "Judicial estoppel is an equitable doctrine that precludes a party from gaining an advantage by
28   asserting one position, and then later seeking an advantage by taking a clearly inconsistent position."
     *Hamilton v. State Farm Fire & Cas. Co.*, 270 F.3d 778, 782 (9th Cir. 2001).

As the Court correctly anticipated, the foundational elements of Dr. Zona's analysis required further scrutiny. Dr. Zona's deposition testimony has now confirmed the Court's worst suspicions: the 16.7% figure is indeed entirely arbitrary, devoid of foundation, and conjured from fanciful assumptions utterly disconnected from *any* empirical analysis or market realities. In fact, when the Court specifically questioned DPPs' counsel on the methodology behind the 16.7% figure, counsel unequivocally stated:

> MR. BORDEN: [T]he 16.7 percent is based on the **same methodologies that he used in *Orion*…**
>
> …
>
> THE COURT: So where did the 16.7 come from? What is the foundation for that?
>
> MR. BORDEN: That's the Cournot and the PIC models from Dr. Zona. **It's the same technique that he used in *Orion*.**

(ECF 653 at 9:3–4, 9:9–12.)

DPPs' counsel's representations to the Court were false. In his deposition, Dr. Zona specifically stated that he did *not* use the same methodologies he employed in the *Orion* litigation:

> Q: Did you use the exact same data to perform the market share analysis in this case as you did in the *Orion* matter?
>
> A: *No.*

(UMF 25.)

The Court further inquired whether Dr. Zona derived the 16.7% figure through empirical methods or simply selected it arbitrarily and then conducted his analysis around that number.

> THE COURT: …Did he run the theory and then did that yield a 16.7 percent, or did he use 16.7 percent and then do his work?
>
> …
>
> THE COURT: What is the connection? That's the piece I'm curious about. Is it untethered or–
>
> MR. BORDEN: It is not untethered. … if you go back to paragraph 98, it is the lowest amount of overcharge that there could be. …[H]e's picked it because it is the most conservative estimate of what that overcharge could possibly be. ***There has to be some overcharge.*** There's going to be at least 16.7.

(ECF 653 at 9:18–20, 48:22–49:16] (emphasis added).)

The answer to the Court's inquiry, as confirmed by Dr. Zona's deposition, is the latter:

> Q: Did you rely on any empirical data from the telescope industry in order to arrive at your estimated alleged 16.7 percent overcharge?

…

**A:** 16.7 percent is based on Connor's data of the effect of conspiracy on prices, and there's no specific telescopes data that I'm aware of that's part of that dataset.

…

**Q:** In order to rely [on] the 16.7 percent estimated alleged overcharge, you didn't look at any sales data in the telescope industry, correct?

**A:** That would be different analysis. ***No, I didn't do the analysis that you're suggesting to come up with 16.7.*** I only used the PIC data to come up with the PIC data-based 16.7.

…

**Q:** In addition to what and the Connor data you used to arrive at a 16.7 percent conclusion?

**A:** So the Connor data is the basis of the 16.7, which is a measure of the amount that prices were inflated with a conspiracy among two competitors.

(UMF 13.)

Rather than conducting a rigorous econometric analysis to determine whether an overcharge existed in the pre-2005 period, Dr. Zona simply assumed that a 16.7% overcharge applied and then backfilled his analysis to justify that assumption. Dr. Zona's justification for this, as articulated at the hearing by DPPs' counsel, is even more alarming: "[t]here *has to be* some overcharge." (ECF 653 at 49:15–16.) This statement is illustrative of the fatal flaw in DPPs' entire damages theory. There is no empirical evidence establishing an overcharge—only an assumption that "there has to be some overcharge," which is pure speculation dressed up as expert opinion. Not only is this presupposition that there "has to be" an overcharge improper from an economic perspective, but it is also patently false from a legal perspective. Indeed, "a violation of Section 1 or 2 may occur without resultant damage; ***a plaintiff may, for example, prove the existence of an illegal price-fixing agreement and yet fail to prove recoverable damages.***" *Murphy Tugboat Co. v. Crowley*, 454 F. Supp. 847, 852 (N.D. Cal. 1978) (emphasis added); *see Sun Microsystems*, 608 F. Supp. 2d at 1194 (N.D. Cal. 2009) ("Litigation of a successful antitrust claim requires more than proof of a defendant's antitrust violation. It requires… that a plaintiff prove … 'injury in fact'—i.e., the fact of harm to plaintiff, caused by the defendant's conduct."). From the inception of this litigation, DPPs have asserted that antitrust violations automatically equate to antitrust impact, but that is simply not true. (*See* ECF 653 at 6:4–8 (DPPs' counsel stating, "the best and most compelling evidence of classwide impact, is the evidence of all of these antitrust violations").)

Instead of using empirical pricing data from the consumer telescope market, Dr. Zona selects 61 industries from the Connor PIC dataset as purported "yardsticks" for his overcharge estimates, despite failing to demonstrate that these industries share comparable or relevant competitive characteristics with the telescope market. Although the Connor PIC dataset itself spans hundreds of industries, Dr. Zona limited his analysis to 61 cartel observations where two to four firms were involved and the United States was the lead jurisdiction. (UMF 16.) In his deposition, Dr. Zona testified that these industries are "comparable" based solely on the number of conspirators and the size of the market they captured. (UMF 17.) These selected industries, however, include sectors such as blood pressure medicine, cement and ready-mix concrete, marine construction, and industrial chemicals—none of which bear any meaningful similarity to the consumer telescope industry. (*See* UMF 15.)

In his deposition, Dr. Zona repeatedly acknowledged that the 16.7% figure was not derived from empirical analysis or data specific to the telescope market. Instead, he candidly admitted that the figure was based solely on generalized his assumptions drawn from the Connor PIC dataset:

> **Q:** [I]s it your assumption that Celestron, an independent manufacturer and distributor at this time, pre-2005, charged prices 16.7 percent above the competitive benchmark?
>
> **A:** Yes.
>
> **Q:** What is the basis for that assumption?
>
> **A:** Well, the number you quoted is based on the PIC data, so it must be the PIC data.

(UMF 13.)

Essentially, all Dr. Zona relies upon to manufacture this phantom 16.7% overcharge is the Connor PIC dataset, but this is pure statistical alchemy. It amounts to cherry-picking a number in the abstract and imposing it onto the consumer telescope market without any empirical validation. Even assuming arguendo that the Connor PIC dataset could provide insight into cartel behavior, Dr. Zona's application is indefensible. He does not analyze whether cartel behavior in the telescope market would yield the same overcharge as in the pharmaceutical or cement-mixing industry; he simply assumes it does without justification. Even more problematic, the 16.7% figure is not the *result* of Dr. Zona's analysis—it is the *starting point* around which he built his model. He assumed an overcharge,

1   imposed a figure, and declared his work done. Far from expert opinion, this is advocacy masquerading

2   as economics. As the gatekeeper, the Court need not and should not accept it.

### 3. The 16.7% Overcharge Rests on a Baseless 40% Market Share Argument

5   To arrive at their 16.7% overcharge, Dr. Zona relied on another faulty underlying assumption

6   that Synta and Sunny controlled a 40% market share in the pre-2005 period. Dr. Zona admits he has

7   no evidence to support this 40% figure, yet it serves as the linchpin of his entire damages model.

8   Without it, his entire overcharge analysis collapses.

9   To understand the severity of this flaw, it is important to walk through how Dr. Zona

10  constructed his pre-2005 overcharge estimate. His methodology relies on the Connor PIC dataset,

11  which purportedly estimates the typical overcharge in cartelized markets based on two key inputs:

12  (1) the number of cartel members, and (2) the cartel's market share. (UMF 12.) The crucial input, and

13  the catastrophic failure in Dr. Zona's analysis, is the market share figure. He simply *assumes* that

14  Synta and Sunny controlled 40% of the market before 2005, without any supporting data, calculation,

15  or reference to actual market conditions at the time.

16  At the class certification hearing, the Court asked DPPs' counsel a pointed question:

17  **THE COURT:** And then [Dr. Zona] did those two… analyses. And what did he do
    with the results of those that yielded 16.7? Do you add them? Do you divide them?
18  Do you square root them? What do you do?

19  **MR. BORDEN:** He used regression on that to figure out.…

20  (ECF 653 at 50:17–22.)

21  DPPs' counsel's statement was utterly false. Dr. Zona did not "use[] regression" to determine

22  the 16.7 figure. Instead, he simply assumed a 40% market share and then mechanically applied the

23  Connor PIC dataset's overcharge estimate to produce the 16.7% figure. Indeed, Dr. Zona's deposition

24  testimony removes any doubt about the arbitrary nature of his approach:

25  **Q:** So, Dr. Zona, you have assumed a market share of Sunny and Synta of 40 percent
    prior to 2005; is that correct?
26

27  **A:** Yes.

28  **Q:** And *you believe that that resulted in estimated overcharge of 16.7 percent in the
    pre-2005 period*; is that correct?

**A:** Well, it did. There's no belief about it. It did result in 16.7 in the – conditional on two cartel members of conspiracy one, two, and the 40 percent market share.

**Q:** What do you mean by it did result in a 16.7 percent overcharge?

**A:** *I'm just reading the number from the table, and the table is what it says.*

…

**Q:** So you don't know what data that you looked at, if any, in order to arrive at 40 percent market share, correct?

**A:** I don't recall what I used, and I don't have a reference in here.

**Q:** And you can't tell us here today why you chose that number?· How you arrived at that number?

**A:** *It's the lowest, most conservative of the numbers that I have in my table, which might be why I used 16.7 and why I used, you know, ultimately 40 percent.*

(UMF 14.)

*This is not econometrics analysis.* It is picking a number from thin air and hoping no one asks questions. But the Court *did* ask questions, and when pressed at his deposition, Dr. Zona could not provide a *single* piece of evidence to justify his 40% market share assumption. The only justification Dr. Zona offered was that it was the "lowest, most conservative" number in his table—but that is not a substitute for a reliable methodology, it is a tacit admission that Dr. Zona did not employ a real methodology. At bottom, this a rhetorical crutch used by Dr. Zona to paper over his glaring analytical failure. Instead of deriving the 40% market share figure through a rigorous analysis, he started with this assumption, picked the lowest number that would still yield an overcharge, and worked backwards to force his model to fit that assumption. Again and again, Dr. Zona's testimony confirmed that he had no support for the 40% figure:

**Q:** What calculation did you perform, Dr. Zona, to arrive at 40 percent?

**A:** I'm telling you I don't remember what it was.

…

**Q:** How did you arrive at 40 percent market share? You testified that you observed there were two co-conspirators. You said that you looked at market data with respect to the market share post-2005. Are there things that you observed? You were actually able to review data. What did you do? What data did you look at to arrive at the 40 percent market share figure pre-2005?

**A:** I don't recall what I did for the 40 percent number and I don't have a footnote.

…

**Q:** You can't tell us here today, Dr. Zona, how you arrived at a 40 percent market share, correct?

…

**A:** I don't remember the basis for this 40 percent share … and there's no footnote that will remind me … what it was.

…

**Q:** … [I]sn't it correct that you cannot tell us anything about how you arrived at the 40 percent market share figure … for Sunny and Synta pre-2005, as you sit here today?

…

**A:** I told you that I think that's incorrect.

**Q:** Why is it incorrect?

**A:** It's incorrect because I believe that's my understanding of what Synta and Sunny's share was in that time period. … I also said before that it happens to produced the smallest number of the ones in the table here. So it would be most beneficial to you.…

…

**A:** But I don't recall specifically how I got the 40 percent, and I don't have a footnote where I probably should have.

**Q:** …What is the basis for your, quote, understanding that they had a combined market share of 40 percent?

**A:** I understand that they weren't the only manufacturers at that time. …I'm not sure that the basis for that was … information from the *Orion* trial or not. I just don't recall exactly what gives me that understanding, but that's my understanding.

**Q:** So there's nothing you can tell us here today that you would base that understanding on?

**A:** I've told you many times that I don't recall where the 40 percent comes from in this particular circumstance.

**Q:** …I'm simply clarifying the record that you provided us no basis for that understanding here today; isn't that correct?

…

**A:** I told you I don't recall.

…

**A:** …[Y]ou're asking the question about whether there are other examples where I have no basis for a number that's reported in the report. That presumes that the 40 percent number that we've been talking about has no basis. I don't agree with that.

**Q:** But what is the basis?…

**A:** You've asked this question many times, and I told you I don't remember, as I sit here right now, and my notes are insufficient to provide me with – to refresh my recollection.

CELESTRON ACQUISITION, LLC'S MOTION FOR SUMMARY JUDGMENT

1    (UMF 18.)

2    **An expert cannot simply claim that he believes a figure in his analysis number is correct**

3    **without sufficient evidence to support it.** *See United States v. Various Slot Machines on Guam*, 658

4    F.2d 697, 700 (9th Cir. 1981) ("In the context of a motion for summary judgment, an expert must

5    back up his opinion with specific facts.") Yet, that is exactly what Dr. Zona has done. He did not make

6    a reasonable inference to arrive at this number based on available data—there was no data, no

7    research, no analysis, and as confirmed by his deposition testimony, no basis for his assumption. He

8    made an assumption in order to fabricate an overcharge:

9      **Q:** …[I]s it your opinion that during that time, pre-2005, Sunny and Synta had a
       combined 40 percent market share?

10

11     **A:** My opinion … is that is a reasonable number to use for the purpose of calculating
       an overcharge during that time period in the way that I've done it.

12    (UMFs 10, 18.)

13    Dr. Zona prepared for and sat for deposition, but evidently, had *no evidence* in support of his

14    foundational 40% market share assumption that led to his arbitrary, manufactured, and manipulated

15    16.7% overcharge estimate. He admits that he does not actually know whether Synta and Sunny did,

16    in fact, have a 40% market share before 2005. (*See* UMF 10.) And when pressed, Dr. Zona admitted

17    that he did know not what Celestron's, Meade's, or JOC's market shares were before 2005. (UMF

18    19.) In other words, the very foundation of his model—the assumption that underpins his entire

19    damages calculation—is merely a guess. And from that guess, he derived an equally arbitrary

20    overcharge figure to invent damages out of whole cloth. The Court itself recognized this glaring

21    analytical leap, pointedly telling DPPs' counsel: "your third grade math teacher said show me the

22    work, if you just point it out, I will look at it." (ECF 653 at 50:23–25.) But as Dr. Zona's deposition

23    testimony makes clear, there was no math involved at all, and no "work" to show to the Court.

24    As the gatekeeper, this Court should not allow such transparently flawed analysis to reach a

25    jury. DPPs, having staked their entire damages case on this house of cards, cannot meet their burden

26    under Rule 702 and *Daubert*. The only appropriate course of action is for the Court to exclude Dr.

27    Zona's testimony in its entirety and grant summary judgment in favor of Celestron.

28

**B.      Dr. Zona's Methodology In This Action Contradicts His Prior Work In the _Orion_ Action**

Dr. Zona attempts to justify applying his phantom 16.7 percent overcharge to his pre-2005 benchmark by claiming that "[i]n this particular case, it is very difficult to find a competitive benchmark" because "there is evidence that even before the acquisition in 2005 of Celestron by Synta, Synta and Ningbo Sunny were interrelated and not independent of one another." (UMF 8.) **Dr. Zona thus admits that his 16.7 percent overcharge is based on his assumption of a conspiracy before 2005.** (UMF 6.)

**But this is completely contrary to what Dr. Zona did in the _Orion_ case.** In _Orion_, Dr. Zona used a pre-2013 benchmark for his regression analysis. (UMF 27.) Dr. Zona similarly testified in that case there was evidence of a conspiracy before 2013. (UMF 28.) Yet, he testified that he did not "account[] for any overcharges that may have occurred before that time period." (UMF 29.) In his report in _Orion_, Dr. Zona even states: "In constructing a damages model, one typically compares actual economic results to those in **_a 'but-for world', which is a reference to the counterfactual situation in which the defendants did not engage in the alleged misconduct_** and instead pursued their next best (_i.e._ profit-maximizing) legal course of action. … **_Damages are the difference between plaintiff's actual economic results and those in the but-for world._**" (UMF 30, emphasis added.) This opinion is consistent with well-established econometric principle that a regression model requires applying a "clean" benchmark—_i.e._, one that assumes a period of time truly free of anticompetitive conduct.

Dr. Zona cannot reconcile his two conflicting benchmark approaches used here and in the _Orion_ case. In _Orion_, he assumed a conspiracy during his pre-2013 benchmark but did not apply any overcharge. Yet in this case, he assumed a conspiracy during his pre-2005 benchmark and inexplicably applied a 16.7% phantom overcharge—contrary to his own well-established principles of applying a clean benchmark when constructing a damage model.

Moreover, in the _Orion_ litigation, Dr. Zona incorporated a PCE variable to account for shifts in demand over time. In the instant case, however, Dr. Zona abandons that approach without justification:

**Q:** …[T]here was mention of the fact that you did include the PCE variable in your *Orion* expert analysis, correct?

**A:** I did include the …PCE variable in some of in my opinion *Orion* analysis.· Yes, I did.

…

**Q:** Is it your position that the aggregate income of U.S. consumers affects the sales volume of telescopes to U.S. consumers?

**A:** I think that was the idea in the *Orion* model of specifically forecasting volumes, not prices. So I was trying to predict what Orion's volumes would be. So I'm trying to use variables that would meet with that volumes. … I'm trying to differentiate a situation where I'm forecasting volumes with a price regression, which is what I have in the current case.

…

**A:** ***Totally different analysis and totally different purpose.***

(UMFs 25, 26.)

Thus, DPPs' counsel's statement that Dr. Zona's 16.7% overcharge was "based on the same methodologies that he used in *Orion*" (ECF 653, 9:3–4), is patently untrue, as confirmed by Dr. Zona's deposition testimony.

Dr. Zona's model fails to distinguish between price changes caused by market-wide fluctuations—such as recessions, the COVID-19 pandemic, consumer trends, and production costs—and those caused by the allegedly anticompetitive conduct. (UMF 24.) Courts throughout the nation have routinely excluded expert analyses that fail to account for independent economic variables affecting price. *See, e.g.*, *In re Aluminum Phosphide Antitrust Litig.*, 893 F. Supp. 1497, 1500–07 (D. Kan. 1995) (excluding expert's damages model where there was "no defensible reason" for the selected benchmark period); *Kentucky v. Marathon Petroleum Co. LP*, 464 F. Supp. 3d 880 (W.D. Ky. 2020) (excluding expert testimony for failure to control for major independent variables in a regression analysis).

## V.    EVEN IF DPPS COULD PROVE THE EXISTENCE OF DAMAGES, DPPS CANNOT PREVAIL ON ANY OF THEIR CLAIMS PRIOR TO 2013 BECAUSE CELESTRON LACKS MARKET POWER

Alternatively, if the Court finds Dr. Zona's report admissible to establish the existence of damages, DPPs' damages period should be limited to starting from 2013. It is undisputed (and Dr.

1   Zona even admits) that Meade and Celestron "aggressively compet[ed]" with each other prior to

2   Ningbo Sunny's acquisition of Meade in 2013. (UMF 31.) In their discovery responses, DPPs do not

3   identify a single anticompetitive act engaged in by Celestron prior to 2013 and do not identify a single

4   fact supporting anticompetitive conduct engaged in by Celestron prior to 2013. DPPs also do not

5   identify a single person with any knowledge of any anticompetitive act engaged in by Celestron prior

6   to 2013 in their discovery responses. (*Id.*)

7       In its previous Order on Defendants' Motion to Dismiss, the Court limited DPPs' Section 7

8   claim to the period beginning in 2013 after the Meade Acquisition, finding that "DPPs fail[ed] to

9   allege a monopoly or attempted monopoly arising from the Celestron acquisition" and thus, "DPPs

10  fail[ed] to allege any conduct giving rise to a § 7 claim with respect to the Celestron acquisition in

11  2005." (ECF 539 at 16:13–17.) DPPs' Section 7 claims are thus limited to Ningbo Sunny's acquisition

12  of Meade in 2013. (*See id.* at 16:8–9, 16:18–19.)

13      DPPs advance claims under Sections 1 and 2 of the Sherman Act against Celestron, for the

14  period prior to the Meade acquisition prior to 2013. There are power and conduct elements to both

15  claims that DPPs must establish. "To establish liability under § 2, a plaintiff must show: (a) the

16  possession of monopoly power in the relevant market; (b) the willful acquisition or maintenance of

17  that power; and (c) causal antitrust injury." *FTC v. Qualcomm Inc.*, 969 F.3d 974, 990 (9th Cir. 2020)

18  (citation and quotation marks omitted). That is, the defendant must be a monopolist, and "plaintiffs

19  are required to prove 'anticompetitive abuse or leverage of monopoly power, or a predatory or

20  exclusionary means of attempting to monopolize the relevant market.'" *Id.* (citation omitted).

21      Section 1 addresses concerted actions that unreasonably restrain trade. "Thus, [t]o establish

22  liability under § 1, a plaintiff must prove (1) the existence of an agreement, and (2) that the agreement

23  was an *unreasonable* restraint of trade." *Id.* at 988–89 (cleaned up). Although some conspiracy

24  claims, such as price fixing, are conclusively presumed to be unreasonable or "per se unlawful," non-

25  conspiratorial claims under Section 1 are judged under the "rule of reason" in a structured

26  consideration of the overall competitive effects of a challenged restraint. "Under § 1, the plaintiff has

27  the initial burden to prove that the challenged restraint has a substantial anticompetitive effect that

28  harms consumers in the relevant market." *Id.* at 991 (internal quotation marks omitted). "If the

plaintiff carries its burden, then the burden shifts to the defendant to show a procompetitive rationale for the restraint. If the defendant makes this showing, then the burden shifts back to the plaintiff to demonstrate that the procompetitive efficiencies could be reasonably achieved through less anticompetitive means." *Id.* (cleaned up). This stepwise, burden-shifting framework is very similar to the way monopolization claims are addressed under Section 2; indeed, so if a court finds that a plaintiff has failed to state its Section 1 claim, any Section 2 claim fails as well. *Id.* at 991–92.

### A.    <u>There Is No Evidence that Celestron Engaged in a Conspiracy Prior to 2013</u>

DPPs have the burden to prove the existence of a conspiracy, including the period in which it existed. *Bordonaro Bros. Theatres v. Paramount Pictures*, 203 F.2d 676, 678 (2d Cir. 1953) ("But the judge properly—we might say inevitably—ruled that the plaintiff must prove that the conspiracy continued from 1946 to 1948, and so charged."); *United States v. Therm-All, Inc*., 373 F.3d 625, 636 (5th Cir. 2004) ("Supreme Court precedent … and persuasive authority of the Ninth Circuit lead us to conclude that the government must produce evidence that the conspiracy continued during th[e] time [alleged]."); *see also United States v. Cont'l Grp., Inc.*, 456 F. Supp. 704, 715–16 (E.D. Pa. 1978), *aff'd*, 603 F.2d 444 (3d Cir. 1979).

Here, it is undisputed that Meade and Celestron were competitors prior to Sunny's acquisition of Meade in 2013. (UMF 31.) DPPs have not made any allegation or produced any evidence— whether documentary, testimonial, or economic—demonstrating that Celestron was involved in any agreement to fix prices, allocate markets, or otherwise restrain trade prior to 2013. Indeed, there is not a single communication, document, or witness testimony suggesting that Celestron engaged in any collusive conduct with Meade or any other firm before that time. The absence of any evidence of a pre-2013 conspiracy is fatal to DPPs' claims for this period.

Courts have consistently rejected antitrust claims where plaintiffs fail to present specific evidence establishing both the *existence* and *duration* of an alleged conspiracy.[7] Here, DPPs rely

---

[7] *See In re Citric Acid Litig.*, 191 F.3d 1090, 1103 (9th Cir. 1999) (affirming summary judgment where, plaintiffs did not produce "specific details" of participation in a conspiracy or an agreement to fix prices, instead relying on inference); *Franck v. Carborundum Co.*, 437 F. Supp. 83, 85 (N.D. Cal. 1977) ("As the Ninth Circuit has held, proof of 'actual agreement or mutual consent' is the essential prerequisite for finding a Sherman Act conspiracy."); *see also Persian Gulf*, 632 F. Supp.

entirely on generalized assertions and hindsight speculation to suggest that Celestron *may* have been engaged in a conspiracy prior to 2013, but such conjecture is insufficient to survive summary judgment. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986) ("conduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy.").

The 4AC alleges that the purported conspiracy involving Celestron began in 2013 with Sunny's acquisition of Meade. Specifically conceding, Meade and Celestron were direct competitors, and it was only through the acquisition—allegedly facilitated by financial and strategic assistance from Celestron and Synta—that Meade ceased to function as an independent competitor. (4AC ¶¶ 96–107.) Thus, DPPs allegations present the acquisition as the pivotal moment when the market shifted from competition to collusion. Without evidence of Celestron's requisite market power before 2013, DPPs cannot extend the conspiracy period further back in time to establish damages beforehand.

## B.    Celestron Does Not Possess Market or Monopoly Power In Any Properly Defined Relevant Market.

Antitrust law focuses on the connection between (a) market or monopoly power; (b) unjustified restraints on competition; and (c) consumer injury. Therefore, a challenged practice must make a durable contribution to the defendant's market power. *See Qualcomm,* 969 F.3d at 989 ("'The rule of reason requires courts to conduct a fact-specific assessment of 'market power and market structure ... to assess the [restraint]'s *actual* effect' on competition.'" (quoting *Ohio v. Am. Express Co.*, 585 U.S. 529, 541 (2018)) ("*Amex*") (italics in original)).

In the context of Section 1 claims, courts look for "market power," defined as "the ability to raise price profitably *by restricting output*." *Amex*, 585 U.S. at 549 (italics in original). Typically, a plaintiff will try to prove market power by establishing that the defendant has a large (though not monopoly) share of the relevant market, normally at least 30 percent. *See, e.g.*, *Rebel Oil*, 51 F.3d at 1438. A low market share will typically preclude a finding of market power, whereas a high market share indicates the possibility that market power exists.

3d at 1134 ("unless Plaintiffs' evidence tends to exclude the possibility of independent action, it cannot raise a reasonable inference of conspiracy.").

Monopoly power under Section 2 is conventionally understood to mean 'substantial' market power, *i.e.*, more market share and a demonstrated "power to exclude competition or control prices." *United States v. Syufy Enterprises*, 903 F.2d 659, 664–65 (9th Cir. 1990). "In evaluating monopoly power, it is not market share that counts, but the ability to *maintain* market share." *Id*. at 665–66 (citation omitted; italics in original). Market shares below 50% are generally insufficient to sustain monopoly power claims, with courts typically requiring 65% or more. *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1206 (9th Cir. 1997) ("65% market share to establish a prima facie case of market power."); *Pac. Steel Grp. v. Com. Metals Co.*, 600 F. Supp. 3d 1056, 1073 (N.D. Cal. 2022); *Rebel Oil*, 51 F.3d at 1438 ("less than 50 percent is presumptively insufficient to establish market power."); *CollegeNet, Inc. v. Common Application, Inc.*, 355 F. Supp. 3d 926 (D. Or. 2018).

Prior to 2013, Celestron indisputably lacked both market and monopoly power in any properly defined antitrust market. Prior to Sunny's acquisition of Meade in 2013, Meade and Celestron were direct competitors, vying for market share in the consumer telescope distributor market. Indeed, the presence of multiple independent distributors in the market, including Orion and JOC, certainly prevented Celestron from exercising any meaningful degree of market control, let alone dominating the market.

Critically, antitrust law requires that a firm possess either the ability to control prices or exclude competition to establish monopoly power. *Syufy Enters.*, 903 F.2d at 664 ("There is universal agreement that monopoly power is the power to exclude competition or control prices."). Prior to 2013, Celestron lacked any such power. It could not dictate telescope prices nor restrict output to harm rivals. Any attempt by Celestron to raise prices would have resulted in lost sales to Meade or other competitors, who had the ability and incentive to undercut Celestron's pricing. This lack of price-setting power is fatal to any claim of monopoly power. *See Amex*, 585 U.S. at 549 ("'Market power is the ability to raise price profitably *by restricting output*.'" (quoting P. Areeda & H. Hovenkamp, Fundamentals of Antitrust Law § 15.02[B] (4th ed. 2017) § 5.01 (italics in original)).

Celestron did not possess the market dominance necessary to support a monopolization claim. Prior to 2013, Celestron's market share fell well below the 50% market share threshold. Meade, Orion, and other independent distributors remained viable alternatives to Celestron, and consumers

had meaningful choices among multiple manufacturers. In short, Celestron was merely one player in a competitive market as opposed to a market-dominant force capable of wielding monopoly power.

### C.    DPPs Have Failed to Prove the Alleged Relevant Market

DPPs also bear the burden of proving a well-defined relevant market.[8] "Without a definition of the relevant market, it is impossible to determine market share," and thus impossible to establish whether a defendant has market or monopoly power. *Rebel Oil*, 51 F.3d at 1434.

Market definition requires the plaintiff to take on "highly technical economic question[s]" that require economic testimony and proof. *Morgan, Strand, Wheeler & Biggs v. Radiology, Ltd*., 924 F.2d 1484, 1490 (9th Cir. 1991) (rejecting market definition testimony because there was "no evidence that th[e] two [witnesses] were experts qualified to opine on a highly technical economic question."). As one district court put it, "it would seem impossible to prove such a complex economic question without the assistance of a qualified expert, *viz.*, an economist."[9] Some courts even hold that an antitrust plaintiff cannot prove a relevant market without expert evidence.[10]

Here, DPPs' experts' testimony is both legally and economically insufficient to establish a relevant market. Dr. Zona's proposed market definition—*i.e.*, consumer-grade telescopes in the United States—suffers from multiple defects in methodology that ultimately render it unreliable

---

[8] *See Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*, 9 F.4th 1102, 1112 (9th Cir. 2021); *see also AFMS LLC v. United Parcel Serv., Inc.*, 696 F. App'x 293, 294 (9th Cir. 2017) ("Summary judgment in an antitrust case is appropriate where the plaintiff fails to define a cognizable market."); *In re Live Concert Antitrust Litig.*, 863 F. Supp. 2d 966, 1000 (C.D. Cal. 2012) (excluding expert testimony due to unreliable methodology in defining the relevant product market and granting summary judgment due to lack of other admissible evidence sufficient to establish an economically significant market).

[9] *Berlyn, Inc. v. Gazette Newspapers, Inc.*, 223 F. Supp. 2d 718, 727 n.3 (D. Md. 2002), *aff'd sub nom. Berlyn Inc. v. The Gazette Newspapers, Inc.*, 73 F. App'x 576 (4th Cir. 2003); *see also Forro Precision, Inc. v. Int'l Bus. Machines Corp.*, 673 F.2d 1045, 1059 (9th Cir. 1982).

[10] *See, e.g., Bailey v. Allgas, Inc*., 284 F.3d 1237, 1246 (11th Cir. 2002) ("the relevant market and a showing of monopoly power must be based on expert testimony."); *Cogan v. Harford Mem. Hosp*., 843 F. Supp. 1013, 1020 (D. Md. 1994) ("To allow a jury to make a finding as to the geographic market, [plaintiff] must provide the Court with expert testimony on this highly technical economic question"); *Kentucky Speedway, LLC v. Nat'l Ass'n of Stock Car Auto Racing, Inc.*, No. CIV.A.05-138(WOB), 2008 WL 113987, at *1 (E.D. Ky. Jan. 7, 2008), *aff'd*, 588 F.3d 908 (6th Cir. 2009) ("[plaintiff] was required to prove relevant markets through qualified expert testimony as part of its prima facie case. This it failed to do…. Thus, summary judgment is appropriate.").

1    under the standards prescribed by *Daubert* and Rule 702. Specifically, Dr. Zona's market definition

2    arbitrarily excludes over 20 telescope suppliers, including manufacturers selling branded telescopes

3    and direct imports available through major online retailers such as Amazon. (UMF 32.) These

4    exclusions artificially inflate market shares of Defendants (including Celestron) and create an

5    improperly narrow market definition.

6          Market definition "generally requires a detailed examination of 'market data, figures or other

7    relevant material adequately describing the nature, cost, usage or other features of competing

8    products.'" *Grason Elec. Co. v. Sacramento Mun. Util. Dist.*, 571 F. Supp. 1504, 1521 (E.D. Cal.

9    1983) (quoting *Morton Buildings of Nebraska, Inc. v. Morton Buildings, Inc.*, 531 F.2d 910, 919 (8th

10   Cir. 1976). Direct proof of market or monopoly power requires both supracompetitive prices and

11   reduced output. *See Amex*, 585 U.S. at 548; *Qualcomm*, 969 F.3d at 989–90; *Rebel Oil*, 51 F.3d at

12   1434; *Safeway Inc. v. Abbott Labs.*, 761 F. Supp. 2d 874, 887 (N.D. Cal. 2011).

13         Here, DPPs' expert fails to establish either element. Dr. Zona provides no empirical analysis

14   to support the notion that telescope prices were inflated due to Defendants' alleged market power

15   rather than ordinary supply-and-demand fluctuations. Similarly, he offers no evidence demonstrating

16   a decline in output or sales volume that would accompany an exercise of monopoly power. Instead,

17   he assumes a concentrated market and then infers market power without empirical validation.

18   Specifically, Dr. Zona does not offer any empirical evidence to support that telescope prices were

19   elevated beyond competitive levels, nor does he provide a coherent framework for distinguishing

20   lawful price fluctuations from anticompetitive overcharges.[11] This discredits any claim that Celestron

21   exercised sufficient market power to inflate prices to supracompetitive levels.

22   **VI.    CONCLUSION**

23         For the foregoing reasons, Celestron respectfully requests that the Court grant summary

24   judgment, or in the alternative, partial summary judgment as to DPPs' claims for damages.

25

26

---

27   [11] Finally, Dr. Zona's own data contradicts the existence of supracompetitive prices. The telescope

28   pricing data Dr. Zona employed in his regression analysis demonstrates that telescope prices *declined* from average prices of over $400 in 2001 to approximately $100 in 2021. (UMF 33.)

1  DATED: March 7, 2025                    FROST LLP

2

3                                          By: _____

4                                          CHRISTOPHER FROST
                                           JOHN D. MAATTA
5                                          JOSHUA STAMBAUGH
                                           LAWRENCE J.H. LIU
6                                          Attorneys for Defendants Celestron Acquisition,
7                                          LLC, Synta Technology Corp., Suzhou Synta
                                           Optical Technology Co., Ltd., Synta Canada Int'l
8                                          Enterprises Ltd., SW Technology Corp., Olivon
                                           Manufacturing Co. Ltd., Olivon USA, LLC,
9                                          Nantong Schmidt Optoelectrical Technology Co.
                                           Ltd., Pacific Telescope Corp., Corey Lee, David
10                                         Shen, Sylvia Shen, Jack Chen, Jean Shen, Joseph
                                           Lupica, Dave Anderson, Laurence Huen
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28