# EXHIBIT A

**In the Matter Of:**

IN RE: TELESCOPES ANTITRUST LITIGATION

5:20-cv-03642-EJD

---

# J. DOUGLAS ZONA, PH.D.

*December 20, 2024*

---



800.211.DEPO (3376)
EsquireSolutions.com

1              UNITED STATES DISTRICT COURT

2      NORTHERN DISTRICT OF CALIFORNIA - SAN JOSE DIVISION

3                      ---oOo---

4    IN RE TELESCOPES ANTITRUST          :
     LITIGATION                          :
5    _____     :
     AURORA ASTRO PRODUCTS, LLC,         :
6    PIONEER CYCLING & FITNESS, LLP;     :
     and those similarly situated,       :
7                                        :
                    Plaintiffs,          :
8                                        :
             vs.                         :  No. 5:20-cv-03642-EJD
9                                        :
     CELESTRON ACQUISITION, LLC, et      :
10   al.,                                :
                                         :
11                                       :
                    Defendants.          :
12   _____     :

13

14

15                  VIDEO-RECORDED

16        DEPOSITION OF J. DOUGLAS ZONA, Ph.D.

17                December 20, 2024

18

19

20

21

22

23   Job No. J12170725

24   Stenographically reported by:
     LAURA AXELSEN, CSR NO. 6173
25       RMR, CCRR, CRR, CRC, RDR



```
 1                        APPEARANCES

 2

 3   FOR THE PLAINTIFFS:

 4

 5        FROST LLP

 6        BY:  JOSH STAMBAUGH, ESQ.

 7        10960 Wilshire Boulevard, Suite 2100

 8        Los Angeles, Califonria  90024

 9

10   FOR THE DEFENDANTS:

11

12        BRAUNHAGEY & BORDEN

13        BY:  GARRETT BIEDERMANN, ESQ.

14        747 Front Street, 4th Floor

15        San Francisco, California  94111

16

17        There also being present in the deposition room

18   Olivia Smith and Peter Matteson, videographer, and via

19   Zoom Michael McDonald, Lawrence Liu, and Donald Stamper,

20   Exhibit Technician.

21

22                        ---oOo---

23

24

25
```



1          MR. BIEDERMANN:  Objection to form.  Calls for

2    a legal conclusion.

3          THE WITNESS:  I'm not sure what you mean by

4    conspiracy.

5          MR. STAMBAUGH:   Q. Do you have any opinions

6    on whether or not there was a conspiracy to fix prices

7    in your report in this case?

8          MR. BIEDERMANN:  Objection to form.  Calls for

9    a legal conclusion.

10          THE WITNESS:  My understanding was that before

11    2005 in particular, there was cross-ownership and

12    cross-directorships, and that would tend to blunt

13    competition between what might otherwise be two

14    independent competitors.

15          MR. STAMBAUGH:   Q. Do you believe that there

16    was a conspiracy at any point in time?  Is that part of

17    your opinions in this case?

18          MR. BIEDERMANN:  Objection to form.  Calls for

19    a legal conclusion.

20          THE WITNESS:  What I described might be a

21    conspiracy.

22          MR. STAMBAUGH:   Q. I'm not asking about what

23    might be described as a conspiracy.  I'm asking is one

24    of your opinions in this matter that there was a

25    conspiracy to fix prices?



1      Q.   According to what?

2      A.   My analysis.

3      Q.   What analysis did you do that determined the

4  JOC share was -- I believe your word was irrelevant?

5      A.   Well, I'm looking at the share table on

6  page 17 of my report, Exhibit 2, and I suppose they have

7  10 percent market share still after 2016, but before

8  then, it seemed small.

9      Q.   Let's go ahead and move to Exhibit 2.  This is

10  your November 1st or May 20th report.

11      A.   Yes.

12      Q.   Paragraph 98.

13      A.   Yes.

14      Q.   In Paragraph 98, you state in the figure

15  below, I displayed the expected overcharged conditional

16  on the number of cartel members and cartel market share

17  as measured by the Connor PIC data.  The table shows how

18  the expected overcharges -- overcharge increases as

19  market share and number of cartel members increase.  In

20  applying these overcharges, I have used a market share

21  for Synta -- excuse me.  Sunny slash Synta of 40 percent

22  open paren, which likely understates the combined share

23  of Sunny and Synta and is thus conservative close paren

24  for the base period before Synta acquired Celestron in

25  2005.



 1          So, Dr. Zona, you have assumed a market share

 2    of Sunny and Synta of 40 percent prior to 2005; is that

 3    correct?

 4          A.    Yes.

 5          Q.    And you believe that that resulted in

 6    estimated overcharge of 16.7 percent in the pre-2005

 7    period; is that correct?

 8          A.    Well, it did.  There's no belief about it.  It

 9    did result in 16.7 in the -- conditional on two cartel

10    members of conspiracy one, two, and the 40 percent

11    market share.

12          Q.    What do you mean by it did result in a

13    16.7 percent overcharge?

14          A.    I'm just reading the number from the table,

15    and the table is what it says.  The conditional expected

16    value of the overcharge based on the number of cartel

17    members in the cartel market share measured by Connor.

18    So it's just an average -- the expected conditional

19    expectation based on the Connor data.

20          Q.    You didn't do any actual analysis to see if

21    that did happen in the pre-2005 period though, correct?

22          MR. BIEDERMANN:  Objection to form.

23          THE WITNESS:  I don't know how I could

24    possibly do that.  You're asking me did I observe the

25    but-for world.  No, I can't observe the but-for world.



J. DOUGLAS ZONA, PH.D.                                    December 20, 2024
IN RE: TELESCOPES ANTITRUST LITIGATION                              97

1              THE WITNESS:  I gave you my answer.

2              MR. STAMBAUGH:   Q. Is there a reason you

3    can't answer my question?

4        A.    I did answer your question.

5              MR. BIEDERMANN:  Objection; argumentative.

6              MR. STAMBAUGH:  Q.  Did you rely on any

7    empirical data from the telescope industry in order to

8    arrive at your estimated alleged 16.7 percent

9    overcharge?

10             MR. BIEDERMANN:  Objection; asked and

11   answered.

12             THE WITNESS:  16.7 percent is based on

13   Connor's data of the effect of conspiracy on prices, and

14   there's no specific telescopes data that I'm aware of

15   that's part of that dataset.

16             MR. STAMBAUGH:  Q. And therefore, you did not

17   rely on any specific telescope industry data, correct?

18             MR. BIEDERMANN:  Objection to form.

19             THE WITNESS:  In analyzing Connor's data, I

20   didn't rely on data that he didn't have in his dataset.

21             MR. STAMBAUGH:  Q. In order to rely at the

22   16.7 percent estimated alleged overcharge, you didn't

23   look at any sales data in the telescope industry,

24   correct?

25       A.    That would be different analysis.  No, I



1    didn't do the analysis that you're suggesting to come up

2    with 16.7.  I only used the PIC data to come up with the

3    PIC databased 16.7.

4         Q.   Let's pause here.  You've given me a good

5    comparison.  You came up with 16.7 percent under one

6    part of your analysis, one model let's call it, and you

7    came up with 6.9 percent in the pre-2005 using another

8    analysis, another model.  Why did you go to the 16.7

9    instead of the 6.9?

10        A.   I thought that the 16.7 was more specific to

11   the facts and circumstances of the case than Cournot.

12   The Cournot model is, as I tried to explain in my

13   report, and I may not have done it very well, but it's a

14   starting point that most IO economists will use to

15   evaluate the effect of lost competition or conspiracy on

16   market prices.  So I started there, and I have made

17   calculations, came up with 6.9 in that particular

18   circumstance, and other numbers in other circumstances.

19   17.4, 35.7 depending on the number of competitors that

20   are illuminated, so I thought that the Cournot model

21   was, again, a sort of a academic-type starting point,

22   and I applied directly a model that comes from a

23   textbook in coming up with those numbers, which I've

24   cited, and then when I used the PIC data, I'm actually

25   using the facts and circumstances of the telescopes



1    here, but yeah.  I don't recall.

2        Q.   So you don't know what data that you looked

3    at, if any, in order to arrive at 40 percent market

4    share, correct?

5        A.   I don't recall what I used, and I don't have a

6    reference in here.

7        Q.   And you can't tell us here today why you chose

8    that number?  How you arrived at that number?

9        A.   It's the lowest, most conservative of the

10   numbers that I have in my table, which might be why I

11   used 16.7 and why I used, you know, ultimately

12   40 percent.

13       Q.   Is that why you used 40 percent, because you

14   looked at the Connor PIC data and decided to use the

15   lowest market share to perform the calculation; is that

16   the reason?

17       A.   I don't -- as I just said, I don't recall

18   exactly what the reason was for -- for the 40 percent

19   number.  What I observe now is that it is the lowest

20   number.  So if we come up with a higher number than

21   40 percent, it will result in a number bigger than 16.7

22   from the Connor data.

23       Q.   So you didn't do any calculation based on any

24   actual data to arrive at 40 percent?

25       A.   I didn't say that.



```
 1              MR. BIEDERMANN:  Objection to form.

 2              MR. STAMBAUGH:   Q. What calculation did you

 3    perform, Dr. Zona, to arrive at 40 percent?

 4         A.   I'm telling you I don't remember what it was.

 5         Q.   You told me earlier that there are two

 6    foundational pieces of the Connor PIC data, right?

 7    There's number of competitors and market share.  And

 8    what you're telling us now is that you had no basis that

 9    you can explain to us as to why you arrived at a

10    40 percent combined market share for Sunny and Synta --

11              MR. BIEDERMANN:  Objection to form.

12              MR. STAMBAUGH:   Q. -- is that correct?

13         A.   Your question really suggests that you

14    don't -- that I'm not communicating the method that was

15    used because that's -- there's a lot of misunderstanding

16    embodied in your question.  There are two important --

17    there are two important dimensions in determining the

18    affect of conspiracy on market price, and they're -- the

19    number of competitors that are involved and the market

20    share that they command, those are two numbers that

21    aren't from the PIC data.

22              They're from economic theory and from

23    industrial organization economics.  So if you're looking

24    at that all the empirical analysis that's built into

25    that.  So those two numbers are the two characteristics
```



1    model is going to spit out and with respect to one of

2    those two dimensions, you have no idea how you arrived

3    at the 40 percent market share figure; isn't that

4    correct, sir?

5         A.   No.

6              MR. BIEDERMANN:  Objection to form.

7              MR. STAMBAUGH:   Q. How did you arrive at

8    40 percent market share?  You testified that you

9    observed there were two co-conspirators.  You said that

10   you looked at market data with respect to the market

11   share post-2005.  Are there things that you observed?

12   You were actually able to review data.  What did you do?

13   What data did you look at to arrive at the 40 percent

14   market share figure pre-2005?

15             MR. BIEDERMANN:  Objection to form.

16             THE WITNESS:  I don't recall what I did for

17   the 40 percent number and I don't have a footnote.

18             MR. STAMBAUGH:   Q. If you --

19        A.   That doesn't mean I didn't do anything or

20   don't have a method.  It means I don't remember as I'm

21   sitting here right now.

22        Q.   Well --

23        A.   Your question was suggesting that I don't have

24   a method.

25        Q.   You can't tell us here today, Dr. Zona, how



1   you arrived at a 40 percent market share, correct?

2           MR. BIEDERMANN:  Objection to form.

3           THE WITNESS:  I don't remember the basis for

4   this 40 percent share that's in the sentence in

5   Paragraph 98 in my report, and there's no footnote that

6   will remind me what it is -- what it was.

7           MR. STAMBAUGH:   Q. And, in fact, you can't

8   tell us anything about how you arrived at that

9   40 percent market share, as you sit here today, correct?

10          MR. BIEDERMANN:  Objection; asked and answered

11  about six times.  If you want to answer it again,

12  Dr. Zona, feel free.

13          MR. STAMBAUGH:  I can understand your

14  frustration counsel, but I am entitled to an answer.

15          MR. BIEDERMANN:  Yeah, and you've received it

16  about five times.  So --

17          MR. STAMBAUGH:  That was a separate question.

18  Isn't it true that, sitting here today, you can't tell

19  us anything about how you arrived at the 40 percent

20  market share figure for Sunny and Synta pre-2005?

21          MR. BIEDERMANN:  Asked again about seven

22  times.  If you want to answer it again, Dr. Zona, feel

23  free.

24          MR. STAMBAUGH:  Pretty sure the record will

25  reflect that he didn't answer it the last time.  Do you



1    have the question in mind?

2          THE WITNESS:  No.  Why don't you ask me one

3    more time?

4          MR. STAMBAUGH:   Q. To be fair, you didn't

5    answer it that time either.  I got witnesses.  Dr. Zona,

6    isn't it correct that you cannot tell us anything about

7    how you arrived at the 40 percent market share figure

8    for Synta and Sunny pre-2005 -- for Sunny and Synta

9    pre-2005, as you sit here today?

10          MR. BIEDERMANN:  Objection to form.  Misstates

11    testimony.

12          THE WITNESS:  I told you that I think that's

13    incorrect.

14          MR. STAMBAUGH:   Q. Why is it incorrect?

15      A.   It's incorrect because I believe that's my

16    understanding of what Synta and Sunny's share was in

17    that time period.  I have an understanding of what that

18    is.  I also said before that it happens to produced the

19    smallest number of the ones in the table here.  So it

20    would be most beneficial to you.

21          If you want to argue for a bigger number, you

22    know, we could do that and recalculate damages, but that

23    one is the one that produces the smallest ones of the

24    ones in the table here.  So there are things that I'm

25    telling you about 40 percent and how I got to it.



1          Q.    I'll object as --

2          A.    But I don't --

3          Q.    Please.

4          A.    But I don't recall specifically how I got the

5    40 percent, and I don't have a footnote where I probably

6    should have.

7          Q.    I'll object as non-responsive and move to

8    strike.  What is the basis for your, quote,

9    understanding that they had a combined market share of

10   40 percent?

11         A.    I understand that they weren't the only

12   manufacturers at that time.  The other -- I mean, I'm

13   not sure that the basis for that was the Orion, you

14   know, information from the Orion trial or not.  I just

15   don't recall exactly what gives me that understanding,

16   but that's my understanding.

17         Q.    So there's nothing you can tell us here today

18   that you would base that understanding on?

19         A.    I've told you many times that I don't recall

20   where the 40 percent comes from in this particular

21   circumstance.

22         Q.    And I can appreciate that.

23         A.    The one number in here I don't remember --

24         Q.    I can appreciate that.  I just --

25         A.    -- how it got there.



1      Q.   I'm sorry.  I appreciate that you may not

2  recall.  I'm simply clarifying the record that you

3  provided us no basis for that understanding here today;

4  isn't that correct?

5            MR. BIEDERMANN:  Objection; form.  Asked and

6  answered.

7            THE WITNESS:  I told you I don't recall.

8            MR. STAMBAUGH:   Q. So it's correct that you

9  can't tell us anything about how you arrived at that

10  figure; isn't that right?

11      A.   You said --

12            MR. BIEDERMANN:  Object to form.  Asked and

13  answered.

14            THE WITNESS:  You said anything again, and

15  I'll tell you what.  I mean, I do have information about

16  40 percent is my understanding, and I'm not sure exactly

17  how I have that understanding.  I also know that it's

18  the most conservative number on behalf of your client.

19            MR. STAMBAUGH:   Q. Are there other opinions

20  that you have in your report that are based on your

21  understanding, but you don't have any evidence in

22  support of that understanding?

23            MR. BIEDERMANN:  Object to form.

24  Argumentative.

25            THE WITNESS:  I wouldn't --



1   I don't recall as I sit here right now.  There's --

2        Q.   Understood.

3        A.   We could go through each of the sentences in

4   here, I mean, I wouldn't have -- before you asked me, I

5   wouldn't have said do you -- is there another place

6   where you don't remember what you did and it's not

7   indicated by a footnote?  And I would say -- I would

8   have thought that there aren't any such things, but you

9   found one.

10       Q.   Well, the one that I found.

11       A.   I'm not aware of any other ones, but we could

12  go through each thing.  My name is John Douglas Zona.  I

13  received a Ph.D. in economics.  I mean, I have a basis

14  for that.  I've seen my diploma.

15       Q.   All right.  The difference is, Dr. Zona, your

16  name and your diploma are not one of the two

17  foundational inputs in your model that leads you to

18  arrive at a 16.7 percent overcharge that you apply

19  across the board.  So, to be fair, and I think it will

20  be clear to a judge or a jury when I asked what the

21  basis is for one of those two foundational inputs an

22  answer like I have an understanding, but I don't know

23  where I got that understanding is a little

24  disconcerting.

25            So I will ask -- we're going to move on, but



1    I'm going to ask my other question again.  Are there

2    other conclusions that you arrived at -- and these are

3    primary conclusions in your report -- are there any

4    other conclusions for which you have no basis to make an

5    opinion other than your own understanding apart from the

6    40 percent market share figure?

7         A.   So I just --

8              MR. BIEDERMANN:  I'm going to object to

9    counsel's argument.  If you found a question there,

10   you're free to answer it, Mr. Zona -- Dr. Zona.

11             THE WITNESS:  I just disagree with the

12   premise.

13             MR. STAMBAUGH:   Q. You're free to disagree

14   with the premise.

15        A.   I disagree with the premise, and I can't

16   answer the question.

17        Q.   Why can't you answer the question?

18        A.   Because I disagree with the premise.  The

19   premise is false.  So I can't answer a question with a

20   false premise.

21        Q.   Let's try this one more time.  What's false

22   about the premise?

23             MR. BIEDERMANN:  Objection; argumentative.

24             THE WITNESS:  What's false about the premise

25   is that you say that there are -- you're asking the



1   question about whether there are other examples where I

2   have no basis for a number that's reported in the

3   report.  That presumes that the 40 percent number that

4   we've been talking about has no basis.  I don't agree

5   with that.

6           MR. STAMBAUGH:   Q. But what is the basis?

7   I'm sorry.

8       A.   You've asked this question many times, and I

9   told you I don't remember, as I sit here right now, and

10  my notes are insufficient to provide me with -- to

11  refresh my recollection.

12      Q.   Fair enough.

13      A.   I think that if I can go back to my work

14  papers, I'll find a basis for it.

15      Q.   Doubtful, but fair enough.

16      A.   Why is it doubtful?

17      Q.   Are there any other conclusions listed in your

18  report, foundational inputs or outputs for which you

19  don't recall the basis for those figures, as you sit

20  here today?

21      A.   I don't.

22          MR. BIEDERMANN:  Objection; argumentative.

23  Asked and answered about seven times.

24          THE WITNESS:  I don't know.  We can go through

25  each one.



1    we try again or repeat it or something?

2         Q.    Dr. Zona, what was Meade's share as the

3    largest supplier of telescopes in the U.S. pre-2005?

4         A.    You asked me that question.  I told you that I

5    didn't know.

6         Q.    What about Celestron's market share?

7         A.    I don't know specifically.  I just know that

8    they were large.

9         Q.    What about --

10         A.    They were the largest and the second largest.

11         Q.    What about Tasco's share -- market share?

12         A.    I told you before that I didn't separate out

13    Tasco -- Tasco Worldwide versus Celestron.

14         Q.    What about JOC's market share pre-2005?

15         A.    I don't recall.  We went through this.  I

16    don't recall specific market shares in that particular

17    time period.

18         Q.    Did you do an analysis of market shares

19    pre-2005?

20         A.    What do you mean by analysis?

21         Q.    Did you look at any market share data or any

22    other empirical analysis to determine those market

23    shares?

24              MR. BIEDERMANN:  Objection; asked and

25    answered.



```
 1              THE WITNESS:  The corporate representatives of
 2    the largest manufacturers -- manufacturer does not
 3    compute market shares of itself or its competitors.
 4    There's not market share data readily available.  So,
 5    no, I haven't looked at market share data.
 6              MR. STAMBAUGH:  Q. Then how in the world
 7    could you estimate a 40 percent market share for Synta,
 8    Sunny and Synta?
 9         A.   I don't --
10              MR. BIEDERMANN:  Objection; argumentative.
11    Asked and answered.
12              MR. STAMBAUGH:  Q. Does that make sense to
13    you?
14              MR. BIEDERMANN:  Same objections.
15              THE WITNESS:  No, it doesn't make sense to me.
16              MR. STAMBAUGH:  Q. Does it make sense to you
17    that you could come up with a combined market share of
18    40 percent for Sunny and Synta when you just told me no
19    market share was available?  None of the entities keep
20    data on it, and there was no other way to calculate it
21    with respect to, for instance, the distributor or
22    retailer side?
23              MR. BIEDERMANN:  Objection; argumentative.
24              MR. STAMBAUGH:  How would you possibly come up
25    with that 40 percent figure for Sunny and Synta?
```



1          MR. BIEDERMANN:  Objection; argumentative.

2   Compound.  Asked and answered.

3          THE WITNESS:  I think I've told you I don't

4   recall.

5          MR. STAMBAUGH:  Q. Let's take a look at

6   Paragraph 50 of the November 1st or May 20th report,

7   depending on how you look at it.  In Paragraph 50 you

8   state a market share of 50 percent or more has been

9   viewed by the courts as a threshold for market power.

10  Do you agree with that statement?

11       A.   Yes.

12       Q.   So what analysis did you do to determine that

13  a combined market share of 40 percent is sufficient for

14  Synta and Sunny to exercise market power in the pre-2005

15  time period?

16          MR. BIEDERMANN:  Objection; misstates his

17  opinion.

18          THE WITNESS:  I don't have that opinion.

19          MR. STAMBAUGH:  Q. You don't believe that

20  Sunny and Synta had market power pre-2005?

21       A.   I do, yes.

22       Q.   What is that opinion?

23       A.   That they had market power.  They were able to

24  raise price above the competitive levels by acting

25  together.



1      Q.   Let's take it very slowly.  Dr. Zona, is it

2   your opinion that Sunny and Synta had market power

3   pre-2005?

4      A.   Yes.

5      Q.   Not to rehash old wounds, is it your opinion

6   that during that time, pre-2005, Sunny and Synta had a

7   combined 40 percent market share?

8      A.   My opinion is that that is -- is that is a

9   reasonable number to use for the purpose of calculating

10   an overcharge during that time period in the way that

11   I've done it.

12      Q.   What analysis did you perform in order to

13   determine that Sinna -- Synta and Sunny's combined

14   40 percent market share was sufficient to exercise

15   market power in the pre-2005 time period?

16      A.   So -- so could we -- I know this is a

17   question.  But could we -- could we take this as a

18   question as of is 40 percent sufficient to establish

19   market power?  Is that your question enough?

20      Q.   No, sir.  I'd appreciate an answer to my

21   question.

22      A.   Okay.  Then you have to break it down for me

23   further.

24      Q.   What analysis did you do to determine that the

25   combined 40 percent market share for Synta and Sunny was



1    powers, high market share, high barriers to entry.  So I

2    looked at high barriers to entry.  None of it was

3    specific to that time period.  It was all general over

4    the whole time period, but I believe that I.P. was

5    important.  I believe that there's still scale issues

6    and significant learning by doing.  It makes sense in

7    this kind of industry.

8        Q.   And based on this analysis, is it your

9    assumption that Celestron, an independent manufacturer

10   and distributor at this time, pre-2005, charged prices

11   16.7 percent above the competitive benchmark?

12             MR. BIEDERMANN:  Objection; form.

13             THE WITNESS:  Yes.

14             MR. STAMBAUGH:  Q. What is the basis for that

15   assumption?

16       A.   Well, the number you quoted is based on the

17   PIC data, so it must be the PIC data.

18       Q.   Is it based on anything else?

19       A.   You asked me about a specific number.  You

20   could -- if you -- given that you're asking about a

21   specific number, the basis for that specific number is

22   the PIC data if you said more than 10 percent, then I

23   might tell you something else, but you're asking about a

24   very specific number.

25       Q.   What analysis or investigation did you conduct



1    to determine that Celestron would or could raise prices

2    16.7 percent in response to the anti-competitive

3    conduct?

4         A.   May I have the question again?

5         Q.   Could you please read it back?

6         A.   I'm not sure who to ask.

7            (Record read by the reporter:

8             "QUESTION: What analysis or investigation

9             did you conduct to determine that Celestron

10            would or could raise prices 16.7 percent in

11            response to the anti-competitive conduct?")

12            THE WITNESS:  So are you referring to 2001 to

13    2005?  What time period are you referring to?

14            MR. STAMBAUGH:   Q. Let me clarify for this

15    question as has been the case for the last hour.  I'm

16    referring to the pre-2005 time period.  We're going to

17    continue to refer to that time period for purpose of my

18    question.  What analysis did you do to support your

19    assumption that Celestron could or would raise prices

20    16.7 percent in response to the anti-competitive

21    conduct?

22         A.   So the conclusion that, based on the PIC data,

23    which is one measure of a price inflation based on the

24    conspiracy of Synta and Sunny before 2005 when they

25    acquired their competitor, before that time period, when



1    they acquired their competitor, based on the industry

2    characteristics and measured with Connor's PIC dataset,

3    which reflects how well conspiracies were able to raise

4    price above to competitive level the number

5    16.7 percent.

6            So that's -- that's the -- the line of -- the

7    reasoning, chain of reasoning, for the 16.7, and it

8    would raise, you know, under that model, the market

9    price would be raised by 16.7 percent, and all the

10   participants, the conspirators, the non-conspirators,

11   including Meade and Celestron would have been able to

12   enjoy that elevated price.

13       Q.   Is it your opinion that Celestron actually did

14   charge or raise prices 16.7 percent above the

15   competitive benchmark from 2001 to 2005?

16       A.   16.7 is one number based on one method.  I

17   mean, whether it's -- it might be more than 16.7, it

18   might be less, but the best estimate that I have based

19   on the PIC data is 16.7 percent.

20           MR. BIEDERMANN:  I'll object as non-responsive

21   and move to strike.  Can you read back the question,

22   please?

23           (Record read by the reporter:

24            "QUESTION: Is it your opinion that

25            Celestron actually did charge or raise



1        A.    He said when you are giving --

2              MR. BIEDERMANN:   Let's not disclose the --

3              THE WITNESS:   -- the contents.   Okay.

4              MR. BIEDERMANN:   We're -- I can represent we

5     did not discuss the content of Dr. Zona's opinions.

6              MR. STAMBAUGH:    Q.  Do you agree with that

7     representation?

8        A.    Yes.

9        Q.    Dr. Zona, it's no secret there's been some

10    discussion about the PCE variable between the experts in

11    this case.  I want to draw your attention to Exhibit 4,

12    which is the rebuttal report.

13       A.    Okay.

14       Q.    Paragraph 16 in particular.

15       A.    Yes.

16       Q.    Paragraph 16, about midway through the

17    paragraph, you state, Additionally, my refusal to deal

18    analysis in the Orion litigation forecasted future sales

19    volumes to U.S. consumers, which relates to the

20    aggregate income of U.S. consumers and makes the use of

21    a PCE variable more appropriate.  You see where that's

22    listed?

23       A.    Yes.

24       Q.    Okay.  And I believe the reason you're having

25    this discussion is there was mention of the fact that



1    you did include the PCE variable in your Orion expert

2    analysis, correct?

3        A.    I did include the PC -- PCE variable in some

4    of in my opinion Orion analysis.  Yes, I did.

5        Q.    Okay.  And that's why you're saying here it

6    was appropriate in the Orion litigation because you were

7    forecasting future sales volumes to U.S. consumers,

8    which relates to the aggregate income of U.S. consumers

9    and makes the use of a PCE variable more appropriate.

10            Is it your position, Dr. Zona, that the PCE

11   variable is a measure of U.S. consumers' aggregate

12   income?

13       A.    No, it's expenditures.

14       Q.    Is it your position that the aggregate income

15   of U.S. consumers affects the sales volume of telescopes

16   to U.S. consumers?

17       A.    I think that was the idea in the Orion model

18   of specifically forecasting volumes, not prices.  So I

19   was trying to predict what Orion's volumes would be.  So

20   I'm trying to use variables that would meet with that

21   volumes.  So, I mean, the purpose of this paragraph --

22   you said why did I write 16 -- I'm trying to

23   differentiate a situation where I'm forecasting volumes

24   with a price regression, which is what I have in the

25   current case.



1      Q.   So --

2      A.   Totally different analysis and totally

3  different purpose.

4      Q.   So you would agree that the aggregate income

5  of U.S. consumers affects the sales volumes of

6  telescopes to U.S. consumers?

7      A.   It might.

8      Q.   All things being equal, if the sales of

9  telescopes to U.S. consumers increases, would one expect

10 that to affect the price of telescopes?

11     A.   No.

12     Q.   Why not?

13     A.   Well, prices for profit maximizing firms are

14 based on a mark-up formula where the price, the

15 approximate maximizing price is equal to cost plus

16 something.  It's like just basic industrial organization

17 economics.  So its price is equal to cost plus a mark-up

18 that has to do with how sensitive revenues will be to

19 prices charged.  So it's a -- it's a measure of

20 sensitivity.

21     Q.   So it's your --

22     A.   The sensitivity may or may not change with

23 increases in income.

24     Q.   So it's your testimony that an increase in

25 volume would have no effect on the price of the



1  members, and the average in that case is the 42 percent.

2  That's the basis -- yeah, I mean, that's the basis of

3  the -- those 61 observations are the basis for that

4  table on page 37, which that is notorious 40 percent and

5  16.7 numbers in there.  That's a regression.

6          MR. STAMBAUGH:  Q.  Dr. Zona, do you agree

7  that the economic literature makes clear that yardsticks

8  have to be comparable to the industry in question in

9  order for that analysis to be effective?

10         A.   Yeah, I think so.

11         Q.   What analysis --

12         A.   I wouldn't be surprised.  I don't recall that,

13  but I wouldn't be surprised.

14         Q.   What analysis did you conduct to determine

15  that each of the 61 industries in the Connor PIC data

16  that you used as yardsticks were comparable to the

17  telescope industry?

18         A.   They're comparable because the number of

19  conspirators and the size of the market that the

20  conspirators captured.  That's the relevant information

21  for doing what would be expected to affect the

22  overcharge in the circumstances.

23         Q.   So, for instance, one of those 61 observations

24  is the cement and concrete ready mix industry in coastal

25  Georgia.  Did you do any analysis to determine if that



J. DOUGLAS ZONA, PH.D.                    December 20, 2024
IN RE: TELESCOPES ANTITRUST LITIGATION                    159

1  industry is comparable at all to the consumer telescope

2  industry?

3      A.   Sure.  I did what I just said.  I compared the

4  number of people invol- -- number of firms involved in

5  the cartel between two and four, and I also limited it

6  based on the number of the market share.

7      Q.   Any other independent --

8      A.   Sorry.  I just -- I did not limit it by market

9  share.  I included that as a variable in the regression

10 when I did that analysis.

11     Q.   Any other independent analysis that you

12 conducted other than what you've just mentioned?

13     A.   What I described is what's in my report and

14 that's what I did.

15     Q.   And I'll represent to you that one of those 61

16 observations is the heavy lift marine industry --

17 construction industry.  Did you do any analysis other

18 than what you've already mentioned to see if that's

19 comparable to the consumer telescope industry?

20         MR. BIEDERMANN:  Objection to form.

21         THE WITNESS:  It's comparable in terms of the

22 competitive circumstances.

23         MR. STAMBAUGH:   Q. So the answer --

24     A.   In the same way that the other one was.

25     Q.   So the answer to my question is no, you didn't



1    do any other independent analysis to see if there were

2    any comparisons?

3              MR. BIEDERMANN:   Objection to form.

4              MR. STAMBAUGH:   Q. Other than what you've

5    already mentioned?

6         A.   No, I only did what I've described.

7         Q.   Is it important to control for any differences

8    between the yardstick and a market under consideration?

9         A.   I think I have controlled.  It is important

10   and I have controlled.

11        Q.   How did you control for them, the differences?

12        A.   The way that I've already described.

13        Q.   What controls or independent variables did you

14   include in your Connor PIC regression analysis that

15   would control for the differences between the 61

16   industries and the consumer telescope industry?

17        A.   I think just the -- the number of conspirators

18   in the market share that they commanded those two

19   variables.

20        Q.   Let's turn --

21        A.   I mean, as I recall, neither of those

22   variables were significant in the regression that I did,

23   which means that there's no statistical difference

24   between the rows and columns that appear in the table on

25   page 37.



1  shipment included telescopes as well as other products

2  in the product description?

3       A.   Yes.

4       Q.   Why?

5       A.   Because I didn't want to mix like almost

6  literally apples and oranges.  I was trying to identify

7  those containers that came that contained only

8  telescopes and computed market shares based on the only

9  full containers rather than partial containers.

10      Q.   For those telescope shipments that you

11  excluded, do you know whether it is more or less likely

12  that the excluded shipments were defendant or

13  non-defendant telescopes?

14      A.   I don't know that.  We might be able to tell,

15  but I didn't do that, and I don't know.

16      Q.   Dr. Zona, do all telescopes have the same

17  weight?

18      A.   No.

19      Q.   So it's possible that two shipments that weigh

20  the same, one shipment may have a larger number of

21  telescopes than the other shipment?

22      A.   Right.

23      Q.   And it's also possible that for two shipments

24  that weigh the same, one shipment may contain

25  higher-priced telescopes than the other shipment?



J. DOUGLAS ZONA, PH.D.                          December 20, 2024
IN RE: TELESCOPES ANTITRUST LITIGATION                      174

1        A.    Sure.

2        Q.    Did you use the exact same data to perform the

3   market share analysis in this case as you did in the

4   Orion matter?

5        A.    No.

6        Q.    Why not?

7        A.    I couldn't get the Panjiva data.  Again -- and

8   I got this -- Import Genius, which is also like a data

9   collector, it's the same sort of stuff based off the

10  bill of lading, but it was available to me for this

11  later time period, not what I was able to get five years

12  ago.

13       Q.    I'm sorry.  Is it your testimony that the data

14  you used for market share analysis in this case was not

15  available five years ago?

16       A.    I don't know whether it was available

17  five years ago or not.  The Panjiva data wasn't

18  available now or I wasn't able to get it.

19       Q.    The data that you used in the Orion case was

20  not available this time around for this case?

21       A.    For -- yeah, for some reason.  It could have

22  been cost.  I don't recall.  It might have been

23  available paying a high price or something.  Panjiva I

24  think is still around, but I don't know that they had

25  that particular data.  I know as we were looking for a



1   data source, we tried to get the Panjiva the same thing,

2   and we got -- determined that there was another source

3   that would be the same Import Genius.

4        Q.   Who is "we" determined?

5        A.   Well, I determined, but we looked, we being

6   Chris Gross that works for me on this particular case.

7        Q.   You're talking about your team?

8        A.   Yeah, my team, me and Chris.

9        Q.   Did counsel at BraunHagey & Borden tell you to

10  use any particular market share data?

11       A.   No, I don't think so.

12       Q.   Let's scroll to Paragraph 115 of this report.

13       A.   Yes.

14       Q.   So in Paragraph 115, you are calculating

15  damages by incorporating Meade sales during the period

16  of Sunny ownership from September 2013 through 2019; is

17  that correct?

18       A.   That's the intent, yes.

19       Q.   And you calculated Meade sales during that

20  time period as approximately 68 million; is that

21  correct?

22       A.   Yes.

23       Q.   Is it possible that some of those Meade sales

24  may be outside the U.S.?

25       A.   It looks like in Paragraph 115, I'm saying



1    that in particular does not appear to be possible to

2    identify Meade's telescope sales versus other sales nor

3    whether the customer was U.S. based, so I can't tell

4    from the data that I had.

5         Q.   You can't tell whether or not the sales were

6    in the U.S. or outside the U.S., correct?

7         A.   Right.   I don't know.

8         Q.   And it's also possible that some of those

9    sales may be in products other than telescopes, correct?

10        A.   It's possible.   I don't know what was produced

11   exactly.

12        Q.   Did you --

13        A.   This is a data that we received.

14        Q.   Did you speak to anyone at Meade about the

15   Meade sales data that you used to calculate the

16   68 million in sales?

17        A.   I'm not sure.   There was a lot of back and

18   forth on data, and I don't know if that was part of it

19   or not.

20        Q.   Did you speak to anyone at Orion regarding the

21   Meade sales data that you used to calculate this

22   68 million in Meade sales?

23        A.   I did not, no.

24        Q.   Do you have any documents or correspondence

25   that explained how to interpret the Meade sales data,



```
1                          CERTIFICATE

2

3         I, the undersigned, a Certified Shorthand

4    Reporter, State of California, hereby certify that the

5    witness in the foregoing deposition was by me first duly

6    sworn to testify to the truth, the whole truth, and

7    nothing but the truth in the within-entitled cause; that

8    said deposition was taken at the time and place therein

9    stated; that the testimony of the said witness was

10   reported by me, a disinterested person, and was

11   thereafter transcribed under my direction into

12   typewriting; that the foregoing is a full, complete, and

13   true record of said testimony; and that the witness was

14   given an opportunity to read it and, if necessary,

15   correct said deposition and to subscribe the same.

16         I further certify that I am not of counsel or

17   attorney for either or any of the parties in the

18   foregoing deposition and caption named, nor in any way

19   interested in the outcome of the cause named in said

20   caption.

21         Executed this 29th day of December, 2024.

22

23                 LAURA AXELSEN, C.S.R. 6173

24

25
```

