# EXHIBIT D

Confidential – Attorneys' Eyes Only
July 15, 2024

AURORA ASTRO PRODUCTS LLC,
PIONEER CYCLING & FITNESS, LLP, and
Those similarly situated,

          Plaintiffs,

v.

CELESTRON ACQUISITION, LLC, SUZHOU
SYNTA OPTICAL TECHNOLOGY CO., LTD.,
SYNTA CANADA INT'L ENTERPRISES LTD.,
SW TECHNOLOGY CORP., *et al*.

          Defendants.

Case No. 5:20-cv-03642-EJD

# EXPERT REPORT OF
# DAVID P. KAPLAN

July 15, 2024



**BRG**
Berkeley Research Group
1800 M Street, NW
Washington, DC 20036

Confidential – Attorneys' Eyes Only
July 15, 2024

4.    Dr. Zona presented a "before and after" regression or "benchmark" analysis in support of his opinion that common evidence can be used here to show claimed injury and damages to proposed class members associated with this claimed anticompetitive conduct.[4]  (By injury, I mean a proposed class member paying a price higher than it would have but-for the alleged anticompetitive conduct and by the use of the word damages, I mean by how much.) This regression or benchmark analysis compares "pooled" telescope prices paid in a "before" period, or benchmark period, here before April 2005 when plaintiffs start their proposed class and allege in their Complaint when the alleged anticompetitive conduct *began*, with the "after" period divided by Dr. Zona here into two periods, first between April 2005 through August 2013, and then between September 2013 through 2021.[5]  (By "pooling" I mean that Dr. Zona analyzes prices of all customers pooled together in this model.)  When advancing his regression, Dr. Zona assumed that defendant firms "would not" have engaged in the conduct as issue.[6]  Based on this regression, Dr. Zona concluded that telescope prices paid by proposed class members were elevated by 3.96 percent in the first "after" period and 7.16 percent in the second.[7]

5.    But Dr. Zona made a ***critical error*** when advancing this regression analysis.  He ***failed to control*** in his regression for a critical economic factor, ***the level of demand for telescopes***.  Of course, Dr. Zona, would not want to assign a claimed elevated price to alleged anticompetitive conduct when the price change was explained by, for example, changes in the

---

[4] Zona Report, at ¶s 101 and 109.
[5] Id., at ¶s 101, 103, and 105.
[6] Id., at ¶ 81.
[7] Id., at ¶ 108.

4

Confidential – Attorneys' Eyes Only
July15, 2024

level of demand for telescopes because of factors such as the financial crisis in 2008 and 2009 or COVID in 2020 and 2021, just by way of example.[8] *But that is exactly what he did*.

      6.      Controlling for the basic drivers of price, such as supply *and demand*, is a basic tenet of regression analysis and is a generally accepted methodology when presenting such analysis. In his seminal work, "Quantitative Methods in Antitrust," noted econometrician, Dr. Rubinfeld (Dr. Zona relies on Dr. Rubinfeld in his report a number of times),[9] concluded that a regression or benchmark analysis *must* control for factors such as cost and level of demand and the failure to control for demand, for example, can "bias" the results of a regression.[10] Dr. Rubinfeld explained that if "demand grew more inelastic," for example, during the relevant period being examined, in ways *not captured* by including variables controlling for changes in levels of demand, then the regressions could generate evidence of an overcharge "for reasons *unrelated* to the existence of the alleged conspiracy" but rather, *explained by the missing variable*.[11] This concept is called omitted variable bias. As explained by leading econometrician, Dr. Wooldridge, when a relevant economic variable is omitted from a regression, the regression results could attribute higher prices to the conduct at issue, but such prices are actually explained by an omitted variable having nothing to do with any anticompetitive conduct, *such as changes in demand levels*.[12]

---

[8] Indeed, one of the proposed class representatives specifically testified how his telescope business, Aurora Astro, was adversely affected by a "downturn" in the economy. (Bielaga Dep. Tr. at 43-44.) In this regard, I also noted that Pioneer Cycling, another proposed class representative, sold out of telescopes in 2020 due to COVID, which Ms. Wolens, with Pioneer Cycling, described as a "crazy time." (Wolens September 18, 2023 Dep. Tr. at 119-121; Wolens January 12, 2024 Dep. Tr. at 50-51; and Wolens February 28, 2024 30(b)(6) Dep. Tr. at 204-205.)
[9] Zona Report, at fts. 25 and 57.
[10] Rubinfeld, Daniel L., "Quantitative Methods in Antitrust," Chapter 30, Issues in Competition Law and Policy, ABA Section of Antitrust Law, 2008 ("Rubinfeld"), at pp. 724-726.
[11] Id. (emphasis added).
[12] Wooldridge, Jeffrey M., Introductory Economics: A Modern Approach, Fifth Edition, South-Western Cengage Learning, 2013, at pp. 88-90.

Confidential – Attorneys' Eyes Only
July 15, 2024

7.     AND DR. ZONA AGREES.  In a paper he authored and specifically cited in his report, entitled "Structural Approaches to Estimating Overcharges in Price-Fixing Cases," Dr. Zona likewise concluded, as did Dr. Rubinfeld and Dr. Wooldridge, that when conducting a regression or "benchmark" analysis, the "analysis *must* identify and control for *all* important economic factors that may explain" differences in prices "other" than any alleged collusion.[13] Dr. Zona explained in this paper that one of these "important economic factors" was the ***level of demand*** (e.g., demand shifts).[14]  He wrote:

> *The benchmark methodology requires the identification of factors affecting **demand** or cost.*  The benchmark methodology (generally) uses the difference between two levels of price to infer overcharge. However, the model ***must*** account for and rule out other possible explanations for the difference such as cost or ***demand shifts***.[15]

8.     NOT ONLY DOES DR. ZONA AGREE IN PRINCIPLE, HE AGREES IN APPLICATION TO THE TELESCOPE INDUSTRY.  In the report he authored in the Orion case, a report he relies on here,[16] Dr. Zona also ran a regression related to telescopes concerning the same conduct alleged here.  He wrote in that report that he "measured the impact of this [alleged] conduct on Orion sales using an econometric forecasting model" and included in this model a measure of "personal consumption expenditures" ***to control for changes in the level of demand***.[17]

---

[13] Zona Report, at ft. 108; and Zona, J. Douglas, "Structural Approaches to Estimating Overcharges in Price-Fixing Cases," *Antitrust Law Journal,* Vol. 77, No. 2, 2011 ("Zona Price Fixing Article"), at pp. 474-480 (emphasis added).
[14] Zona Price Fixing Article, at pp. 480 and 492.
[15] Id., at 492 (bold emphasis added).
[16] Zona Report, at ¶ 21 and fts. 23 and 69.
[17] Expert Report of J. Douglas Zona, Ph.D., dated January 3, 2019, Optronic Technologies, Inc., d/b/a Orion Telescopes & Binoculars v. Ningbo Sunny Electronic Co., LTD., Sunny Optics, Inc., Meade Instruments Corp., et al, Case No. 5:16-cv-06370-EJD, N.D. California ("Zona Orion Report"), at ¶s 127-130 (emphasis added).

9.      But Dr. Zona decided to leave this demand variable *out* of his regression here in a case examining the *same* alleged conduct in the *same* telescope industry covering much of the *same* time period.  I tested the significance of this glaring omission, which is not only inconsistent with his own writings and work in this specific industry involving the same conduct at issue here, but also inconsistent with basic econometric principles.  As noted above, in the Orion matter, Dr. Zona measured changes in the level of demand by including a variable for personal consumption expenditures, a measure of demand which varies significantly during the period in which Dr. Zona runs his pooled before and after regressions.  Given Dr. Zona's choice of a demand variable in the Orion matter, I added this exact same demand variable to his pooled before and after regressions in this matter with no other changes to his data or model and found *no overcharges in either of his two "after" periods*.  (In fact, his model now shows pricing falling slightly in his two "after" periods.)

10.     Dr. Zona made a *critical error* that undermines his conclusions.  He failed to control for economic factors in his pooled "before and after" regression that he admits influence price, i.e., levels of demand. As result, his model is unreliable and generates misleading results.

### B. Individual Customer Analysis

11.     Dr. Zona also made a *second critical error*.  Using the same economic variables, he used in his before and after pooled regression, again excluding the necessary demand variable, Dr. Zona presented results focused on prices paid by individual customers.  In this analysis he claimed to have examined actual prices paid by customers during his two "after" periods, presumably elevated by the conduct at issue according to Dr. Zona, and compared them to the

Confidential – Attorneys' Eyes Only
July 15, 2024

another document dated May 29, 2014 discusses competition between Celestron and Meade for another customer, TSA.[117]  Another Celestron document dated in 2015 discusses competition between Celestron and Meade for sales to Big 5 Sporting Goods.[118]  A document dated June 3, 2020 discussed competition between Celestron and Meade for Costco telescope sales.[119]  Another Celestron document discusses telescopes supplied by Meade and that Meade offers "lower dealer pricing."[120]  Another Celestron document dated May 1, 2022 discusses "undercut[ing] Meade's telescope prices.[121]

64.    In **Exhibit 13**, I include products and prices included in Meade's website in 2013. Comparing this product listing to the similar Celestron 2013 list in **Exhibit 5** reveals a substantial amount of product overlap by price category.  In **Exhibit 14**, I highlight the overlap by price category between those telescopes marketed by Celestron and Meade in 2013.

### E. Declining Prices

65.    I also noted in reviewing the telescope pricing data used by Dr. Zona in his regression analysis, that telescope prices declined substantially from average prices over $400 in 2001 to around $100 in 2021.  These data are included in **Exhibit 15**.  (The dotted red line in **Exhibit** 15 represents a trend line related to the included prices.)  And it should be noted that these prices do not include the discounts discussed above and reflected in **Exhibits 11** and **12**, for the relevant included years.

---

[117] DEFS000504962-963.
[118] DEFS000745774.  See also DEFS001899940.
[119] DEFS013122140-142.
[120] DEFS009661827.
[121] DEFS012662757.

Confidential – Attorneys' Eyes Only
July 15, 2024

**Exhibit 18**, I provide examples of containers that included telescopes and some other optical products such as binoculars that Dr. Zona also excluded from his market share analysis.

72.     Dr. Zona also limited his market share analysis to 29 brands he selected.[129]  In fact, despite suggesting he included 29 brands in his market share analysis, he only included 20. As a result, Dr. Zona's market share calculations are incomplete and exclude telescopes sold by over 20 different suppliers of telescopes. I identify these suppliers in **Exhibit 19**.  For example, he excludes Unistellar, a French telescope company, which was founded in 2015.[130]  Founder Optics also is a supplier of telescopes and was not counted by Dr. Zona.[131]

73.     Celestron discusses competition with other brands of telescopes and private label telescopes in their internal business documents.  For example, in a document dated in July 2015, Celestron discusses competition with "AstroTech and the private label brands," including "home brands" such as AstroTech and TPO, and notes that "customers often buy" from dealers who "sell private label products that 'compete' with" Celestron's products.[132]  Another document identifies Apertura, Stellarvue, and Vixen as competitors.[133]  Another document discussed Astro-Tech in detail, including that Astro-Tech had become a "popular leader" based on product attributes and pricing.[134]  Another Celestron document dated in 2012 lists competitors to

---

[129] Zona Report, at ¶ 41.
[130] "Unistellar (Consumer Durables)," PitchBook, https://pitchbook.com/profiles/company/154275-22#overview. See also Lee Dep. Tr. at 194-195.
[131] "History," Founder Optics, https://www.founderoptics.com/index.php?action=about; and "Founder Optics – FOT series is 2 ED APO triplet refractor," Founder Optics, https://www.founderoptics.com/index.php?action=productA#. Any number of these companies entered during the proposed class period, evidence inconsistent with Dr. Zona's claims of entry barriers. (Zona Report, at ¶s 51-59.)
[132] DEFS000785066.
[133] DEFS000608073, 077, and 080.
[134] DEFS000602360.

Confidential – Attorneys' Eyes Only
July15, 2024

Zona, collects data on estimated overcharges in international cartel cases and other data related to, for example, the number of cartel members and industry concentration.[191]  As discussed below, Dr. Zona selected 61 of the cartel cases examined by Dr. Connor based on cases involving two, three, or four cartel members and the lead jurisdiction in the case being the United States.[192]  These 61 cases involved 61 different industries or "markets."[193]  Dr. Zona then used the overcharge data in these 61 industries he selected from Dr. Connor's data and represented it as reflecting "overcharge[s]" related to the conduct at issue with respect to telescopes based on assumptions concerning the number of telescope competitors.[194]  Dr. Zona also ran a regression using these data attempting to show a relationship between the number of cartel members, their combined market share, and overcharges.[195]  ***This analysis is unreliable and of no substantive value***.

A. **Connor and Telescopes**

98.    Connor's analysis includes ***no*** data – prices, sales, etc. – related to telescopes. Rather, as illustrated in **Exhibit 22**, the industries listed in the Connor data and included by Dr. Zona in his analysis reflect, for example, completely unrelated industries such as blood pressure medicine, diamonds, chemicals, and vitamins.  Dr. Zona has presented ***no evidence*** that any of the industries included in Dr. Connor's data has anything to do with the effects, if any, of the conduct at issue in this matter, including the prices paid by proposed class members for telescopes.  Nor has Dr. Zona provided any analysis whatsoever comparing the many economic

---

[191] Id.
[192] Id.
[193] Id.
[194] Id.
[195] Id., at ¶ 97.

Confidential – Attorneys' Eyes Only
July15, 2024

characteristics of these many industries studied by Dr. Connor to test if they are comparable to the sale of telescopes. For this reason alone, its use by Dr. Zona here should be rejected.

### B. Dr. Zona's Connor Regression

99.     To test his premise that higher cartel market share would necessarily lead to higher prices in telescopes, Dr. Zona ran a regression based on the Connor PIC data he analyzes to test the relationship between cartel market share and reported overcharges.[196] The results are included in **Exhibit 23**, which reflects Dr. Zona's workpaper. As indicated in the column "tValue," each of the results is ***not statistically significant*** (t-value generally less than a value of two) meaning that Dr. Zona has provided ***no evidence that Dr. Connor's data is consistent with any relationship between concentration data and overcharges.*** This finding, based on Dr. Zona's own work product, ***totally undermines*** his claim that he can use reported overcharges in other industries and apply them to telescopes because he claims the telescope industry is characterized by a high cartel share with few competitors.

100.     Testing for statistical significance is, of course, critical when examining regression results given that regressions are generating predictions of actual values, and these predictions may be inaccurate. Such tests are generally accepted and discussed in the literature.[197] In fact, Dr. Zona performs statistical testing on his pooled before and after

---

[196] Id., at ¶ 97.

[197] Dr. Rubinfeld wrote that tests for statistical significance are "appropriate" when analyzing "time-series" data, as Dr. Zona is doing here. (Rubinfeld, Daniel L., "Reference Guide on Multiple Regression," in Reference Manual on Scientific Evidence, Third Edition, The National Academies Press, at pp. 319-321.) Yet another economist, Dr. Wooldridge, concluded that in the absence of statistical significance testing, "I see a growing problem of instances" where researchers "push a particular story or policy." (Wooldridge, Jeffery M., "Statistical Significance is okay, too: comment on 'Size Matters,'" *The Journal of Socio-Economics*, Vol. 33, 2004, at p. 578.) Dr. Wooldridge also wrote that the "most important thing" when addressing econometric results "is to discuss the interpretation and strength of your empirical results," including whether they are "statistically significant." (Wooldridge, Jeffrey M., Introductory Econometrics: A Modern Approach, Fifth Edition, South Western Cengage Learning, 2013, at p. 691.)

116.    Dr. Zona may attempt to respond to these results by claiming that other variables in his model are designed to capture the effect of changes in levels of demand in order to avoid admitting his critical error.  Such responses are of no significance and do not change the unreliable nature of his findings.

### 1.  Seasonal Dummies

117.    Dr. Zona includes monthly "dummies" in his regression designed to pick up any seasonal effects associated with the sales of telescopes.[225]  But such dummies are not measures of changes in the level of demand associated with, for example, the financial crisis or the COVID pandemic.  In fact, in his Orion litigation regression, where he made use of a separate demand variable measured by personal consumption expenditures, he *also* included such monthly dummies.[226]

### 2.  Fixed Effects

118.    And any suggestion that the use of customer or product fixed effects is somehow a substitute for an actual demand variable like Dr. Zona used in his previous telescope regression in the Orion matter is wrong.  A customer fixed effect variable is designed to capture customer-specific or firm-related impacts, not macro-level effects.  This variable always has a value of 1

---

in 2005" after Synta purchased Celestron. (Amended Complaint, at p. 25 and ¶ 91 (emphasis added).)  Plaintiffs claim that after the acquisition in 2005, the defendants "began colluding" and began implementing their "anticompetitive activities." (Id. (emphasis added).)  I also noted in this regard that Dr. Zona refers to conduct in 2006 and 2008 when discussing certain activities, he deems anticompetitive. (Zona Report, at ¶s 67-68.)  And, as noted above, in the Orion matter, it was alleged that the claimed overcharges began in 2013.  (Orion Complaint, at ¶s 3, 74, and 116.)  Dr. Zona also claims the regression does not capture the "full magnitude" of any claimed overcharge because it does not include certain profit data. (Zona Report, at ¶ 82.)  But any such profit data would be directly related to Celestron price data, which is included in Dr. Zona regression (even if incomplete).  And in the previous Orion report, Dr. Zona concluded that "high profits" are "not necessarily indicative of market power." (Zona Orion Report, at ¶ 50.)

[225] Zona Report, at ¶ 105.
[226] Zona Orion Report, at ¶s 128-130.

Confidential – Attorneys' Eyes Only
July15, 2024

for a particular customer's observations in the regression for every customer purchase. So, every Amazon observation, for example, always has the value of 1 associated with the customer fixed effects dummy variable, as it would for every other customer's fixed effects dummy variable. If Amazon ordered one million telescopes in 2009, for example, and two million telescopes in 2010, the Amazon fixed effect value would be 1 for both observations. Since there is *no change* in the fixed effect variable, this variable *cannot* account for the change in the number of telescopes ordered by Amazon between 2009 and 2010 in this example. Fixed effects cannot capture any changes over time because the value of the fixed effect variable for a particular customer *does not change*.

119.   But a measure such as personal consumption expenditures *does change* over the years and is, therefore, capable of picking up changes in levels of demand.[227]  Indeed, as reflected in **Exhibit 25**, this measure changes monthly over time with changes, for example, from values such as slightly less than $7 billion a month, to over $10 billion a month to over $16 billion a month, and growing over time.

120.   In **Exhibit 26**, I reflect Celestron's unit sales of telescopes on a yearly basis using the unit sales data relied on by Dr. Zona in his pooled regression. The data in **Exhibit 26** reflect a substantial increase in Celestron's unit sales, which are, of course, substantially influenced by the price at which they are sold. The increase in personal consumption expenditures reflected in **Exhibit 25** explain, in important part, Celestron's prices which then impact Celestron's sales. In fact, the regression coefficient on the personal consumption variable is positive and significant as reflected in **Exhibit 24**, consistent with a finding that this growing level of demand, as reflected

---

[227] In his Orion regression, Dr. Zona also included a so-called time trend variable in addition to a demand variable. (Zona Orion Report, at ¶s 128-130.)  Dr. Zona's conspiracy coefficients here continue to exhibit no overcharges when his chosen demand variable, personal consumption expenditures, is included with this time trend variable.

in the growing level of personal consumption expenditures, would cause telescope prices, as measured by Dr. Zona, all other things held equal, to increase over time. Indeed, when personal consumption expenditures are added to Dr. Zona's pooled "before and after" regression, consistent with Dr. Zona's approach in the Orion matter, they do, in fact, explain part of the measured Celestron price changes and once included, ***no overcharges exist***.

### 3. Volume Variable

121.    Nor is Dr. Zona's volume variable a proper measure of changes in levels of demand. Such a variable merely evidences if the volume sold has changed, ***but not why***. By excluding the "why," Dr. Zona's regression is attributing claimed overcharges in his pooled "before and after" regression model to the conduct at issue that go-away when his personally chosen variable designed to capture changes in the level of demand – personal consumption expenditures – is included in this model. And this is another issue that is not open to debate by Dr. Zona because when attempting to explain changes in Orion's telescope sales in the Orion litigation, he ***included*** this measure of changes in demand levels to explain any such changes.

122.    Moreover, Dr. Zona should not have included his volume variable in his regression. The inclusion of the telescope volume variable in this model is ***not*** consistent with generally accepted econometric principles for a simple reason. This variable has the property of being "endogenous" because it is not independent of the dependent variable in the model, here, the price of telescopes. In econometrics, the inclusion of such an "endogenous" variable can render the regression as biased.

123.    The concept of endogeneity is straightforward. Dr. Zona's regression is attempting to explain how the price of telescopes was affected, if at all, by the defendants'

68

Confidential – Attorneys' Eyes Only
July15, 2024

conduct at issue, after controlling for other "independent" or explanatory variables not affected by that conduct. In attempting to control for these independent variables, Dr. Zona should be focused on isolating the impact of the conduct at issue on the variable of interest, the price of telescopes. But independent variables are not, in fact, independent if they also could be affected by the alleged conduct at issue. Thus, if one includes an "independent" variable in the regression that also is affected by the conduct at issue, one can have no confidence that the regression will reliably isolate the effect of only the conduct at issue.

124. Telescope volume is just such a variable because it is a measure of telescope supply that may have been affected by the conduct at issue. In other words, Dr. Zona is trying to explain how the alleged conduct at issue impacted telescope prices but is including a purported independent variable in his regression, telescope volume, that also could be affected by the same conduct.

125. Leading economic literature reaches the same conclusion. An article authored by Dr. Halbert White (writing with others), concluded that "use of explanatory variables that are impacted" by the conduct at issue "can easily lead to misleading estimates of but-for prices" and, in fact, when such variables are used in a regression, Dr. White concluded that "misleading results will arise."[228] Another leading econometrician, Dr. Rubinfeld, writing with another author, reached the same conclusion, reporting that when purported independent variables can be affected by the conduct at issue, a regression using such variables is not "appropriate."[229]

---

[228] White, Halbert, Robert Marshall, and Pauline Kennedy, "The Measurement of Economic Damages in Antitrust Civil Litigation," ABA Section of Antitrust Law, Economics Committee Newsletter, Vol. 6, No. 1, 2006, at pp. 19 and 22.

[229] McCrary, Justin, and Daniel L. Rubinfeld, "Measuring Benchmark Damages in Antitrust Litigation," *Journal of Econometric Methods*, Vol. 3, No. 1, 2014, at p. 64.

Confidential – Attorneys' Eyes Only
July 15, 2024

telescopes were higher or lower than any purported losses associated with paying allegedly

higher prices to defendants for telescopes.

_David P. Kaplan_

David P. Kaplan

# Exhibit 22

Confidential - Attorneys' Eyes Only
July 15, 2024

**Market Descriptions**
**For Dr. Zona's 61 Connor Observations**

Aggrenox, treatment for stroke, pay for delay, US

Altace (blood pressure) pay-for-delay, US

Aluminum Phosphide, US

AndroGel (testosterone), pay-for-delay, US

Anti-anxiety drugs, US

Auction houses, art, buyers' & sellers' fees

Bandages, specialized military, US

Bank cards' transaction fees 1 ("Wal-Mart" case), US

Bank cards' transaction fees 2 ("AMEX & Discover"), US

Bank cards' transaction fees 3 ("Merchant Discount"), US

BAR/BRI bar review courses 1, US

Bromines

Buspirone anti-anxiety drug, pay-for-delay, US

Carbon Black

Carbon Cathode Block

Cardizem CD hypertension drug, pay-for-delay, US

Celebrex (celecoxib) pay-for-delay, US

Cement and Concrete, ready-mix, Coastal Georgia, US

Cipro, Pay-for-Delay, US

Construction, Heavy-Lift Marine

Diamonds, Industrial

Doryx (doxycycline) Pay-for-Delay, US

DRAMs (digital random access memory semiconductors)

DRAMs 2, US

Ferrosilicon, US

Glass, flat 2, construction and auto, EU & US

Insurance, commercial, brokerage fees, US & UK

K-Dur, Pay-for-Delay, US

Lamictal, epilepsy drug, pay-for-delay, US

LCDs (Liquid Crystal Display Panels), TFP (thin film) type

LCDs, TFT Type, sold to Apple

LCDs, TFT Type, sold to Dell

LCDs, TFT Type, sold to Motorola (now Motorola Mobility)

Lenses, contact, disposable 2, US

Lipitor, pay-for-delay, US

Marine hose (bid rigging vs. petrol. cos.& Navy)

Methylglucamine, Pharma Grade for X-rays

MSG and Nucleotides (IMP, GMP)

Nexium (Esomeprazole) generic pay-for-delay, US (poss. EU)

Niaspan generic pay-for-delay, US

Nitrile Synthetic Rubber (NBR or acrylo-nitrile-butadiene rubber)

Opana ER pay-for-delay, US

Polyester staple, US and CA

Polyols, polyester aliphatic, US+CA

Provigil (modafinil) generic pay-for-delay, US & EC

Shipping (marine frieght lines) US-Puerto Rico

Shipping, Parcel Tankers, Chemicals

Skelaxin (metaxalone) pay-for-delay, US

Sulfuric acid, US & CA

Vitamin A

Vitamin B1

Vitamin B2

Vitamin B3 (niacin)

Vitamin B5

Vitamin C

Vitamin C, US imports from China

Vitamin E

Vitamins: Astaxanthin & Canthaxanthin

Vitamins: Beta Carotene

Wellbutrin XL generic pay-for-delay, US

Zantac generic pay-for-delay, US

Source:  Zona's backup file:  "Cartel_data.csv".