UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

|  |  |
|---|---|
| IN RE TELESCOPES ANTITRUST LITIGATION | Case No. 5:20-cv-03642-EJD **ORDER DENYING MOTION TO STRIKE; GRANTING MOTION FOR CLASS CERTIFICATION** Re: Dkt. Nos. 599, 617 |

Plaintiffs Aurora Astro Products LLC and Pioneer Cycling & Fitness, LLP bring this putative antitrust class action on behalf of themselves and a proposed class of plaintiffs who directly purchased telescopes ("direct purchaser plaintiffs" or "DPPs") manufactured or sold by Defendants Celestron Acquisition, LLC, Suzhou Synta Optical Technology Co., Ltd., Synta Canada Int'l Enterprises Ltd., SW Technology Corp., Olivon Manufacturing Co. Ltd., Olivon USA, LLC, Nantong Schmidt Optoelectrical Technology Co. Ltd., Ningbo Sunny Electronic Co., Ltd., Pacific Telescope Corp., Corey Lee, David Shen, Sylvia Shen, Jack Chen, Jean Shen, Joseph Lupica, Dave Anderson, and Laurence Huen ("Defendants"). Fourth Am. Compl. ("FAC"), ECF No. 495.

Before the Court are DPPs' motion for class certification and Defendants' motion to strike DPPs' damages expert report ("motion to strike" or "*Daubert* motion"). Mot. for Class Cert., ECF No. 599; Mot. to Strike, ECF No. 617. Both motions are fully briefed. Opp'n to Mot. for Class Cert, ECF No. 623; Reply in Supp. of Mot. for Class Cert., ECF No. 636; Opp'n to Mot. to Strike, ECF No. 631; Reply in Supp. of Mot. to Strike, ECF No. 633. The Court held a hearing on September 5, 2024, and took the matters under submission. ECF No. 649.

United States District Court
Northern District of California

United States District Court
Northern District of California

For the following reasons, the Court **DENIES** Defendants' *Daubert* motion and **GRANTS** DPPs' motion for class certification.

## I.    BACKGROUND

The Court has previously summarized DPPs' factual allegations in its prior orders and need not repeat them here.  *See, e.g.,* ECF Nos. 596, 589, 539, 502, 173.

In both the *Daubert* motion and opposition to class certification, Defendants rest their arguments entirely on disagreements with DPPs' injury and damages expert, Dr. J. Douglas Zona.  *See* Zona Report, ECF No. 598-4.  DPPs submitted Dr. Zona's report in support of their motion for class certification to prove predominance as to antitrust injury and damages.  In response, Defendants submitted a report by their own injury and damages expert, Mr. David P. Kaplan, who opines that Dr. Zona's methodologies are unreliable and irrelevant.  *See* Kaplan Report, ECF No. 623-2.

The Court will discuss each expert report below.

### A.    Dr. Zona's Report

Dr. Zona holds a Ph.D. in economics since 1986, with a focus on Industrial Organization and Microeconomic Theory.  *Id.* ¶ 1.  He has worked as an economics professor, published articles, presented at conferences on antitrust economics, and testified in other litigation concerning federal regulatory proceedings and antitrust economics.  *Id.* ¶¶ 1, 2.  Notably, Dr. Zona also submitted an expert report in the *Orion* litigation before this Court, where he calculated damages in the telescope industry using generally similar frameworks to those he applies here.  *Id.* ¶ 4; *see Optronic Technologies, Inc. v. Ningbo Sunny Electronic Co., Ltd., et al.*, Case No. 5:16-6370-EJD (N.D. Cal.), ECF No. 623-2.[1]

Dr. Zona uses three models to determine whether antitrust injury and damages can be shown on a class-wide basis using common evidence: (1) a Cournot model; (2) Connor model based on PIC data; and (3) a regression model based on transactional data from this case.  All

---

[1] The Court will discuss Dr. Zona's *Orion* report when relevant in its analysis below.

three models seek to determine the extent to which prices were raised beyond the levels that would have existed without the alleged conspiracy. The parties also refer to this type of analysis as a "but-for" analysis.

Dr. Zona's methodologies generally split the time of damages into three relevant periods: 2005-2013, 2013-2019, and post-2019. DPPs allege that Defendants engaged in their antitrust conspiracy beginning in 2005. FAC, at 26; *id.* ¶ 143. The evidence now shows that in 2005, Celestron came under the control of Synta; in 2013, Meade was acquired; and in 2019, Meade's assets were potentially converted to Orion. Zona Report ¶¶ 67–81. Accordingly, Dr. Zona measures the incremental effect of the elimination of competition in 2005, 2013, and 2019. In some methods, Dr. Zona also examines possible overcharges prior to 2005, when Synta and Sunny were under common ownership, which the Court will discuss further in its analysis below.

The Court will now detail Dr. Zona's three models.

### 1. Cournot Model Economic Theory

First, Dr. Zona uses a Cournot Equilibrium model (or "Cournot model") to show the extent of overcharge resulting from Defendants' alleged conspiracy. Zona Report ¶¶ 89–94. This is a theoretical model of oligopoly competition that shows how a combination of suppliers can impact a market and raise prices above the competitive benchmark for all purchasers. *Id.* This model assumes that competitors will make simultaneous decisions regarding their levels of output depending on the number of competitors in the market in order to maximize their profits, which in turn impacts the price of the product. *Id.* ¶ 89. Under the Cournot model, the same overcharge would be applied to each transaction, regardless of individual purchase characteristics. *Id.* ¶ 123.

Dr. Zona states that he uses a textbook Cournot model to calculate the impact of the alleged conspiracy and anticompetitive acquisitions in this case. *Id.* ¶ 90. The evidence Dr. Zona uses in his method to determine the appropriate number of competitors includes evidence of Defendants' various acquisitions. *See, e.g., id.* ¶¶ 67–78, 91–93.

Under the textbook assumptions of the Cournot model, Dr. Zona begins his calculation

with four equal sized competitors in the but-for world. *Id.* ¶ 90.[2]  For the 2005-2013 period, when Synta, Sunny, and Celestron were allegedly conspiring together, but before Sunny acquired Meade, Dr. Zona assumes that three firms acted together, which reduces the number of competitors from four to two. *Id.* ¶ 91.  According to the Cournot model, this combination leads to an expected increase in price above the competitive benchmark of about 17.4%. *Id.*

For the 2013-2019 period, when Sunny owned Meade and brought it into the conspiracy, Dr. Zona assumes that four firms acted together, which reduces the number of competitors from four to one. *Id.* ¶ 92.  This combination results in an expected price increase of about 35.7%. *Id.*

After 2019, when Sunny divested Meade to satisfy the *Orion* judgment, assuming Meade assets were fully converted to Orion, the model would revert to the 2005-2013 rate of a 17.4%. *Id.* ¶ 93.  However, given evidence of subsidiary judgment collection issues in *Orion*, Dr. Zona assumes in his final calculation that Mead's assets were not completely transferred to Orion, in which case the overcharge would remain at 35.7%. *See id.* ¶ 117.

Dr. Zona concludes that the Cournot model implies aggregate damages of approximately $148 million.[3]  *Id.*

### 2.    Connor PIC Data Based Model

Next, as a second measure of overcharge, Dr. Zona uses the Connor model. *Id.* ¶¶ 95–99.  The Connor model measures data from cartel overcharges in other conspiracies committed in other industries to calculate the extent of the overcharge to the class. *Id.*  This data was compiled by Professor Connor at Purdue University and is known as "PIC" data. *Id.*  PIC data catalogs the size of injuries caused by, and antitrust penalties imposed on, contemporary price fixing cartels from

---

[2] Alternatively, for the period prior to 2005, when Sunny and Synta had common ownership, Dr. Zona assumes the combination of two suppliers.  Dr. Zona Report ¶ 90.  Under the assumptions of this model, Dr. Zona finds that this combination would lead to a 6.9% increase in price prior to 2005. *Id.*  However, the Court only notes this finding here, rather than examine it further above, because Dr. Zona does not include the 6.9% overcharge in his final calculations, and this overcharge calculation is irrelevant to the other models listed below. *Id.* ¶ 117.

[3] The Court notices that the aggregate damages chart notably and seemingly without explanation reflects percentages smaller than those in Dr. Zona's findings.  Regardless, the focus of the Court's analysis must be solely on principles and methodology, not on the conclusions that they generate. *Vizcarra*, 339 F.R.D. at 538.

Case No.: 5:20-cv-03642-EJD
ORDER DEN. MOT. TO STRIKE; GRANTING MOT. FOR CLASS CERT.

1990 to 2019. *Id.* ¶ 95. Under this model, the same overcharge would be applied to each

transaction, regardless of individual purchase characteristics. *Id.* ¶ 123.

To compute the expected overcharge here, Dr. Zona employs a regression[4] analysis using

PIC data, which was conditional on (1) the number of cartel members and (2) the market share of

the cartel members. *Id.* ¶ 97.

Regarding the number of cartel members, Dr. Zona analyzes a subset of the PIC data that

provides overcharge rates for price fixing cases with two, three, or four cartel members where the

lead jurisdiction is the United States. *Id.* ¶ 96. The evidence Dr. Zona uses to determine the

number of cartel members again here includes Defendants' various acquisitions. *See, e.g., id.* ¶¶

67–78, 98.

Regarding the market shares, Dr. Zona begins by defining the relevant market using the

framework described in the United States Department of Justice and Federal Trade Commission

2019 Horizontal Merger Guidelines ("Merger Guidelines"). *Id.* ¶ 12. Under this framework, an

antitrust market is generally characterized along two dimensions: product dimensions, as defined

by the set of products that customers view as reasonably close substitutes for one another; and the

geographic dimension of the relevant market, as defined by the geographic area where consumers

can find alternative suppliers of the product. *Id.* ¶ 13. The Merger Guidelines define product

dimensions and geographic dimensions using a hypothetical monopolist test ("HMT"), which

essentially assumes that products or locations outside the market would not be sufficiently close

substitutes for products or locations inside the market if producers inside the market could

maximize profits through increasing prices by a small but significant amount. *Id.* ¶¶ 14–15. After

examining price elasticity in the telescope market, Dr. Zona uses this model to define the relevant

antitrust market here as the market for consumer-grade telescopes in the United States. *Id.* ¶¶ 18–

24.

Dr. Zona then calculates Defendants' market share. Dr. Zona states that the data produced

---

[4] The Court will describe in more detail Dr. Zona's regression analyses and Mr. Kaplan's critiques thereof in the section below.

United States District Court
Northern District of California

by Defendants is insufficient to measure market share, and the sales figures for individual telescopes manufacturers are difficult to collect on his own because most of the industry is privately held. *Id.* ¶ 39. Accordingly, Dr. Zona uses public data on shipping weights to measure market share. *Id.* ¶¶ 39–44. This data is obtained from Import Genius, a database that catalogs information from the Bill of Lading for shipments entering the United States by ship. *Id.* ¶ 40. Dr. Zona believes this is the best available data because there is limited manufacturing of telescopes in the United States and limited shipments by air. *Id.* 44 n.53. He identifies the relevant data to use in his model by searching for all shipments into the United States from 2006-2022 containing "telescope" in the shipping contents description. *Id.* ¶ 40. Dr. Zona then isolates the records primarily composed of telescopes and identifies the telescope manufacturers, also referred to as brands, through other key word searches. *Id.* While Dr. Zona previously identified 29 telescope brands, he only finds data associated with 20 of those brands. *Id.* ¶ 41–42; *see also* Zona Expert Rebuttal Report ¶ 39, ECF No. 636-1.[5] With that data, Dr. Zona computes market shares for the various brands based on the gross weight of the shipping containers. *Id.* ¶ 41. While there was considerable variation in the years, the data shows that Sunny, Synta, and Celestron had a dominant share of the telescopes market since at least 2008. *Id.* ¶ 44. The data also reveals that Synta and Sunny together represented about 70% or more of the telescope imports to the United States in most years between 2006-2022. *Id.* ¶¶ 44, 98 n.113.

Moving to Dr. Zona's methodology, Dr. Zona divides this analysis into four relevant time periods. For the period prior to 2005, Dr. Zona believes that the actual telescope prices during that time do not reflect a true but-for world with independent competitors because the alleged conspiracy began prior to 2005. *Id.* ¶ 98. As evidence of the pre-2005 conspiracy, Dr. Zona points to allegations in the FAC that Synta and Sunny shared common ownership prior to the class period

---

[5] Defendants list several objections to Dr. Zona's rebuttal report but have no objections to this paragraph. *See* Objections, ECF No. 638. Regardless, as the Court explains below, for purposes of class certification, the Court can consider even inadmissible evidence and must examine admissibility only in assigning weight to evidence. This applies to all other evidentiary objections Defendants raise in their briefing.

from 2001-2005. *Id.* To account for the pre-2005 anticompetitive conduct, Dr. Zona assumes that Synta and Sunny held a 40% market share with two cartel members, which results in an expected overcharge of 16.7%. *Id.* However, Dr. Zona notably does not include this figure in calculating the aggregate damages. *Id.* ¶ 117.

For the 2005-2013 period, Dr. Zona assumes a 70% market share with three cartel members. *Id.* The associated overcharge from the PIC data under these assumptions is 35%. *Id.*

For the 2013-2019 period, Dr. Zona assumes an 80% market share with three cartel members. *Id.* The associated overcharge from the PIC data under these assumptions is 39.8%. *Id.*

After 2019, it appears Dr. Zona applies the 39.8% overcharge as well, again assuming that there has not been a full divestment of Meade. *Id.*

Excluding the pre-2005 overcharge calculation, Dr. Zona calculates a total overcharge of $238.5 million. *Id.* ¶ 117.

### 3.  Regression Analysis Using Defendants' Data

Finally, Dr. Zona uses a statistical technique known as a regression analysis using Defendants' transactional data. *Id.* ¶¶ 100–10. This model helps determine the extent of overcharge resulting from the alleged conspiracy by comparing the actual prices during the damage period to the benchmark, while controlling for other factors that would have affected the price. *Id.* ¶ 100.

Dr. Zona identifies Synta and Celestron's telescope sales for this analysis using: (1) "product categories for product codes in Synta/Celestron's sales data through mid-2015," (2) "product information based on a categorical field in the company's SAP sales data, which include Synta/Celestron's sales from mid-2015," and (3) "the identification of telescopes based on specific digits in its product coding." *Id.* ¶ 107. However, Dr. Zona believes this data is incomplete because Synta destroyed older documents, the documents Synta produced do not allow for margin calculations, and Sunny did not produce any data in this action from which it would be possible to calculate profit margin information. *Id.* ¶ 110. Because the data is incomplete, Dr. Zona stresses

United States District Court
Northern District of California

1    the importance of the two prior models to display the full magnitude of the overcharge.  *Id.*

2        Using this available transactional data, Dr. Zona's regression analysis controls "for cost,

3    seasonality and product specific factors affecting supply and demand," *id.* ¶ 108, specifically

4    considering the following factors: (1) "two conspiracy indicator variables, one for the period from

5    April 2005 to August 2013, and another from September 2013 forward;" (2) "the (natural

6    logarithm of ) Celestron unit costs associated with each record;" (3) "indicator variables for the

7    month of the year to control for seasonal effects within each year (for example, the holiday

8    shopping season);" (4) "the quantity of the sale (in natural log form);" (5) "the exchange rate

9    between the U.S. Dollar and Chinese Yuan;" (6) "fixed effects for each customer to control for

10   customer-specific effects;" and (7) "fixed effects for each product SKU to control for product-

11   specific effects," *id.* ¶ 105.

12       When calculating the aggregate damages, Dr. Zona adds a 16.7% overcharge to the

13   benchmark to account for his understanding that the anticompetitive conduct began prior to 2005.

14   *Id.* ¶¶ 101, 102, 117.  Because Dr. Zona states that he does not have data predating 2005, the

15   16.7% overcharge is based on PIC data, which the Court described in the section prior.  *Id.* ¶ 98.

16       For the 2005-2013 period, Dr. Zona finds an overcharge of 3.96%.  *Id.* ¶ 108.  It appears

17   that Dr. Zona then adds the 16.7% benchmark for a total overcharge of 20.7%.  *Id.* ¶ 117.

18       For the 2013-2019 period, Dr. Zona finds an overcharge of 7.16%.  *Id.* ¶ 108.  Dr. Zona

19   then adds the 16.7% benchmark again for a total overcharge of 23.9%.  *Id.* ¶ 117.

20       After 2019, Dr. Zona assumes that Meade's assets have not been fully transferred to Orion,

21   in which case the overcharge remains at 23.9%.  *Id.*

22       Dr. Zona also uses this data to conclude that about 98% of the nearly 6,000 customers who

23   purchased telescopes from Celestron between 2005-2022 paid an overcharge at least once.  *Id.* ¶

24   124.

25       Taking into consideration the estimated overcharge for pre-2005 conduct, Dr. Zona

26   calculates the overcharges to result in $142.7 million.  *Id.* ¶ 117.

27

28   Case No.: 5:20-cv-03642-EJD
ORDER DEN. MOT. TO STRIKE; GRANTING MOT. FOR CLASS CERT.

### B.    Mr. Kaplan's Report

Mr. Kaplan holds a Bachelor of Arts and Master of Arts in economics from George Washington University, as well as a Juris Doctor from George Washington University National Law Center.  Kaplan Report ¶ 30.  He has also worked as an economics professor, published articles, presented at conferences on antitrust economics, and testified in other litigation concerning federal regulatory proceedings and antitrust economics.  *See id.* ¶¶ 22–29.  Mr. Kaplan specializes in analyzing economic issues related to proposed class actions alleging antitrust violations.  *Id.* ¶ 1.

Mr. Kaplan's report examines Dr. Zona's methodologies and concludes that they are unreliable and irrelevant, and that individualized issues prevent DPPs from being able to reliably use common evidence to establish class-wide injury and damages.  *Id.* ¶ 2.  Mr. Kaplan's primary critiques are essentially that the Cournot and Connor PIC data models are unreliable hypothetical constructs based on different industries, and Dr. Zona's regression analysis fails to account for demand and artificially adjusts the benchmark period.  *See, e.g., id.* ¶¶ 16–20.

The Court will discuss in detail these and other opinions from Mr. Kaplan's report when relevant to its analysis below.

## II.    LEGAL STANDARDS

### A.    *Daubert* Motion

Courts act as the gatekeeper of expert testimony to ensure that such testimony is reliable and relevant under Federal Rule of Evidence 702.  *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999); *see also Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).  The proponent of expert testimony has the burden of proving admissibility.  *In re Korean Ramen Antitrust Litig.*, 281 F. Supp. 3d 892, 931 (N.D. Cal. 2017) (citations omitted).  Before an expert can offer her opinions, she must be qualified by "knowledge, skill, experience, training, or education."  Fed. R. Evid. 702.  Once she is qualified, Rule 702 permits her to testify as long as "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c)

United States District Court
Northern District of California

United States District Court
Northern District of California

the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." *Id.* This multifactor inquiry is flexible, and "Rule 702 should be applied with a 'liberal thrust' favoring admission." *Wendell v. GlaxoSmithKline LLC*, 858 F.3d 1227, 1232 (9th Cir. 2017) (citations omitted).

Although courts must screen expert testimony for reliability, what they assess "is not the correctness of the expert's conclusions but the soundness of [her] methodology." *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1044 (quoting *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010)). In other words, Daubert is not a "guarantee[] of correctness." *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 855 (Fed. Cir. 2010). "[T]he case law—particularly Ninth Circuit case law—emphasizes that a trial judge should not exclude an expert opinion merely because he thinks it's shaky, or because he thinks the jury will have cause to question the expert's credibility. So long as an opinion is premised on reliable scientific principles, it should not be excluded by the trial judge." *In re Roundup Prods. Liab. Litig.*, 390 F. Supp. 3d 1102, 1109 (N.D. Cal. 2018).

### B.    Motion for Class Certification

Rule 23 sets forth the two-step process for certifying class actions. First, a plaintiff must establish that "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a). Second, the plaintiff must separately show that the proposed class fits into one of the three categories of Rule 23(b). In the present case, DPPs seek to invoke the third category, Rule 23(b)(3), which requires the Court to find that "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

To meet their obligations under Rule 23, plaintiffs "must actually prove—not simply plead—that their proposed class satisfies each requirement of Rule 23" by a preponderance of the

United States District Court
Northern District of California

1  evidence. *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 664–65

2  (9th Cir. 2022) (en banc) (citation omitted), *cert. denied*, 143 S. Ct. 424 (2022).  Courts must

3  conduct a "rigorous" analysis of the Rule 23 factors that will often "entail some overlap with the

4  merits of the plaintiff's underlying claim." *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 980

5  (9th Cir. 2011) (quoting *Wal-Mart Stores, Inc. v. Dukes,* 564 U.S. 338, 351 (2011)).  However,

6  "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification

7  stage. Merits questions may be considered to the extent—but only to the extent—that they are

8  relevant to determining whether the Rule 23 prerequisites for class certification are satisfied."

9  *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013).

10  ### III.    DEFENDANTS' MOTION TO STRIKE DR. ZONA'S EXPERT REPORT

11          Defendants ask the Court to strike Dr. Zona's report on the ground that it is inadmissible

12  under Rule 702 and therefore cannot be used to support DPPs' motion for class certification.[6]

13          The Ninth Circuit has held that, "in evaluating challenged expert testimony in support of

14  class certification, a district court should evaluate admissibility under the standard set forth in

15  *Daubert*. But admissibility must not be dispositive. Instead, an inquiry into the evidence's ultimate

16  admissibility should go to the weight that evidence is given at the class certification stage." *Sali v.

17  Corona Reg'l Med. Ctr.*, 909 F.3d 996, 1006 (9th Cir. 2018).  In line with Ninth Circuit precedent

18  and the series of district court cases that followed, the Court will not exclude any part of Dr.

19  Zona's report due to inadmissibility.  *See, e.g., Aberin v. Am. Honda Motor Co., Inc.*, No. 16-CV-

20  04384-JST, 2021 WL 1320773, at *4 (N.D. Cal. Mar. 23, 2021) (collecting cases) (citing *Bally v.*

21  *State Farm Life Ins. Co.*, 335 F.R.D. 288, 297 (N.D. Cal. 2020) (denying motion to strike expert

22  testimony because *Sali* "explicitly instruct[s] that a *Daubert* analysis alone, while relevant, should

23  not prevent a court from considering expert testimony at the class certification stage"); *Bess v.*

24  *Ocwen Loan Servicing LLC*, 334 F.R.D. 432, 437, 400 (W.D. Wash. 2020) (finding that an

25  expert's methodology had "little or no persuasive value" but denying motion to exclude pursuant

26

27  ───────────────

[6] Notably, Defendants' arguments in this motion are nearly identical to those raised in their opposition to DPPs' motion for class certification.

28  Case No.: 5:20-cv-03642-EJD
ORDER DEN. MOT. TO STRIKE; GRANTING MOT. FOR CLASS CERT.

1   to *Sali*); *Vasquez v. Leprino Foods Co.*, No. 17-cv-00796-AWI-BAM, 2020 WL 1527922, at *8

2   (E.D. Cal. Mar. 31, 2020) (applying *Sali* to "expert testimony that supports class certification"));

3   *see also Flodin v. Cent. Garden & Pet Co.*, No. 21-CV-01631-JST, 2024 WL 4565340, at *2–3

4   (N.D. Cal. Oct. 23, 2024) (denying motion to exclude and considering "both parties' arguments as

5   to the reliability of the proffered expert testimony to assist in evaluating the weight of the evidence

6   as it relates to class certification"); *Heredia v. Sunrise Senior Living, LLC*, No.

7   818CV01974JLSJDE, 2021 WL 6104188, at *5 (C.D. Cal. Nov. 16, 2021), *aff'd*, No. 22-55332,

8   2023 WL 4930840 (9th Cir. Aug. 2, 2023) (same).  Instead, the Court will examine Defendants'

9   *Daubert* arguments when determining how much weight, if any, to give Dr. Zona's methodologies

10  in DPPs' motion for class certification.

11      Defendant's *Daubert* motion is therefore **DENIED**.  The Court will examine Defendants'

12  *Daubert* arguments in its class certification analysis below.

## IV.    DPPS' MOTION FOR CLASS CERTIFICATION

14      The Court finds that DPPs have carried their burden under Federal Rule of Civil Procedure

15  23(a) and (b)(3) and **GRANTS** DPPs' motion to certify the class.

### A.    Rule 23(a) Requirements

17      As the Court recited above, Rule 23(a) requires DPPs to establish: (1) numerosity, (2)

18  commonality, (3) typicality, and (4) adequacy.  Defendants concede the Rule 23(a) factors in their

19  opposition to Plaintiffs' motion for class certification.  Nevertheless, the Court will conduct its

20  own independent examination of each element in turn.

#### 1.    Numerosity

22      Although there is no exact numerical cut-off for when a proposed class is "so numerous

23  that joinder of all the class members is impracticable," courts often will presume that this

24  requirement is satisfied when the class exceeds forty members.  Fed. R. Civ. P.23(a)(1); *see, e.g.,*

25  *Arroyo v. Int'l Paper Co.*, 2019 WL 1508457, at *2 (N.D. Cal. Apr. 4, 2019).

26      Here, the class includes nearly 6,000 members, making joinder impracticable.  The Court

27  finds this sufficient to meet the numerosity requirement.

28  Case No.: 5:20-cv-03642-EJD
    ORDER DEN. MOT. TO STRIKE; GRANTING MOT. FOR CLASS CERT.

United States District Court
Northern District of California

### 2.    Commonality

Commonality requires there to be "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). A common question is one that "is capable of classwide resolution," meaning that answering the question "will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart*, 564 U.S. at 350. The key factor is whether the common question generates "common answers." *Id.* However, plaintiffs need not show that all questions are common; they need only identify a "single significant question of law or fact." *Stockwell v. City & Cnty. of San Francisco*, 749 F.3d 1107, 1111 (9th Cir. 2014).

Here, common questions capable of class-wide resolution include: (1) whether Defendants conspired to fix prices, divide the market, and engage in unlawful acquisitions; (2) the identity of the conspirators; and (3) whether Defendants' conduct violated Sections 1 and 2 of the Sherman Act and Section 7 of the Clayton Act. The Court finds that these common questions of law and fact sufficiently demonstrate commonality.

### 3.    Typicality

To satisfy Rule 23's typicality requirement, class representatives must show that their claims are "reasonably coextensive with those of absent class members," though their claims "need not be substantially identical." *Just Film, Inc. v. Buono*, 847 F.3d 1108, 1116 (9th Cir. 2017). But when "there is a danger that absent class members will suffer [because] their representative is preoccupied with defenses unique to it," a class representative is not typical. *Hanon v. Dataprods. Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) (citation omitted).

Here, all class members, including class representatives, allege that they purchased consumer telescopes and were injured by overpaying for the telescopes they purchased. There is no indication that class representatives will be preoccupied with defenses unique to them. The Court therefore finds that DPPs have sufficiently demonstrated typicality as well.

### 4.    Adequacy

Finally, DPPs have demonstrated adequacy. The Court examined the adequacy of the class representatives and counsel at great length in its prior Order on Defendants' motion to deny class

certification and need not repeat that analysis here.  *See* Order, ECF No. 596.

### B.    Rule 23(b)(3) Requirements

Rule 23(b)(3) requires DPPs to establish: (1) predominance and (2) superiority. Defendants also concede superiority in their opposition, choosing to rest their entire opposition on predominance.  The Court will nevertheless proceed by examining each element in turn.

#### 1.    Predominance

The predominance requirement "asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) (internal quotation marks and citation omitted).  This inquiry "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Id.* (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997)).  "Predominance is not, however, a matter of nose-counting." *Ruiz Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1134 (9th Cir. 2016) (citation omitted).  More important questions will be given correspondingly more weight in the predominance analysis over individualized questions that are less significant to the class claims.  *Id.*  If individualized issues are "limited to a small number of class members," they generally do not defeat predominance. *Van v. LLR, Inc.*, 61 F.4th 1053, 1067 n.11 (9th Cir. 2023).

DPPs have the burden to prove that a common question predominates over individual questions by showing "that the common question relates to a central issue in the plaintiffs' claim." *Olean*, 31 F.4th at 666.  To prove this, "plaintiffs must establish that essential elements of the cause of action . . . are capable of being established through a common body of evidence, applicable to the whole class." *Id.* at 666 (internal quotation marks omitted).

The general elements of an antitrust action such as this are "(i) the existence of an antitrust violation; (ii) antitrust injury or impact flowing from that violation (i.e., the conspiracy); and (iii) measurable damages." *Id.* (internal quotation marks omitted).  DPPs introduce Dr. Zona's expert report here to show how class-wide injury and damages can be proven using common evidence.

United States District Court
Northern District of California

### a.    Antitrust Violation

Whether an antitrust violation exists is a common question that predominates over other issues "because proof of an alleged conspiracy will focus on defendants' conduct and not on the conduct of individual class members." *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 267 F.R.D. 291, 310 (N.D. Cal. 2010) (citing cases); *Giuliano v. Sandisk Corp.*, No. C 10-2787 SBA, 2015 WL 10890654, at *17 (N.D. Cal. May 14, 2015) ("[W]hether there has been an antitrust violation is a common issue rather than an individual one. In no event will the individual circumstances of particular class members be relevant to the inquiry of whether such a violation has occurred.").

Here, as discussed in the section examining commonality, common questions include: (1) whether Defendants conspired to fix prices, divide the market, and engage in unlawful acquisitions; (2) the identity of the conspirators; and (3) whether Defendants' conduct violated Sections 1 and 2 of the Sherman Act and Section 7 of the Clayton Act.  These questions concern Defendants' conduct irrespective of the individual characteristics of class members, so common issues necessarily predominate over individual ones.  Likewise, the evidence needed to resolve these questions is common to the class, i.e., emails between Defendants relevant to price fixing and market allocation, Defendants' price lists, and prior depositions and testimony in *Orion*, which the Court discusses further below.  This is not disputed by Defendants.

The Court therefore finds that DPPs have met their burden to show predominance as to the alleged antitrust violation.

### b.    Antitrust Injury

This inquiry examines whether DPPs can present common evidence to show that Defendants' "collusion had a common, supra-competitive impact on a class-wide basis." *Olean*, 31 F.4th at 682.

Predominance as to antitrust injury is the first element Defendants have disputed thus far. Mr. Kaplan critiques Dr. Zona's expert report on multiple fronts that are relevant here, most of which also implicate antitrust damages.  For ease of analysis, the Court examines these arguments in the next section regarding predominance as to damages.

1    However, most relevant to this discussion the Court highlights Mr. Kaplan's critique of Dr.

2   Zona's conclusion that 98% of the class was injured.  *See* Kaplan Report 27.  Mr. Kaplan opines

3   that the regression model Dr. Zona uses critically fails to account for demand and artificially

4   inflates the benchmark, and when Mr. Kaplan corrects these errors, he finds the data shows that

5   60% of the class were unharmed.[7]  *Id.* ¶ 133.  For the reasons discussed in the next section

6   examining damages, the Court ultimately finds that Dr. Zona's analysis reliably accounts for

7   demand, but the inflated benchmark renders the analysis irrelevant to the theory of DPPs' case.

8   Regardless, for purposes of class certification, the Court finds that other common evidence in the

9   record can still be used to show class-wide injury.

10    As the Ninth Circuit noted in *Olean*, there is a "prevailing economic view that price-fixing

11   affects all market participants, creating an inference of class-wide impact even when prices are

12   individually negotiated."  *Olean*, 31 F.4th at 671 (internal quotation marks and brackets omitted)

13   (quoting *In re Urethane Antitrust Litig.*, 768 F.3d 1245, 1254 (10th Cir. 2014)).  Here, separate

14   and apart from Dr. Zona's report, there is strong common evidence that can be used to establish

15   price-fixing, including emails between Defendants relevant to price fixing and market allocation,

16   Defendants' price lists, and prior depositions and testimony from *Orion*.  This same evidence can

17   be used to at least infer a class-wide impact for these purposes.  *See id.* (indicating that "other

18   evidence in the record, including the guilty pleas and market characteristics, showed that class

19   members suffered a common impact"); *see also, e.g., Capacitors Antitrust Litigation (No. III)*, No.

20   14-CV-03264- JD, 2018 WL 5980139, at *8 (N.D. Cal. Nov. 14, 2018) ("DPPs have a substantial

21   body of factual evidence in the form of defendants' own documents and criminal guilty pleas. A

22   good argument can be made that these sources are enough in themselves to establish common

23   proof."); *In re High-Tech Emp. Antitrust Litig.,* 985 F. Supp. 2d 1167, 1217 (N.D. Cal. 2013)

24   ("[T]he importance of these statistical models is diminished in light of the extensive documentary

25   evidence that supports DPPs' theory of impact.").

26

27   _____

[7] Mr. Kaplan also adds an additional variable for demand that the Court finds unnecessary in its analysis below.  *E.g.,* Kaplan Report ¶ 133.

28   Case No.: 5:20-cv-03642-EJD
ORDER DEN. MOT. TO STRIKE; GRANTING MOT. FOR CLASS CERT.

*United States District Court*
*Northern District of California*

Further, Dr. Zona's report provides common evidence unrelated to his final regression analysis that can be used to show an antitrust injury. For example, Dr. Zona opines that the telescope industry is structurally conducive to supracompetitive pricing given Defendants' high combined market share and the barriers to entry in the form of factory and equipment resources, intellectual property owned by Synta and Sunny, and participation in the conspiracy by the largest United States distributor. Zona Report ¶¶ 38–60, 63. Dr. Zona reaches these conclusions by examining common evidence including: (1) market shares for various telescope brands based on the gross weight of the shipping containers across the United States to determine market share; (2) Defendants' portfolios of IP, including approximately thirty-five patents; (3) Meade's 10-K; and (4) Defendant's emails reflecting the manufacturing expertise and time needed to open a new telescope manufacturing factory. *See* Zona Report ¶¶ 38–60. The Ninth Circuit found similar evidence can also be used to show a class-wide impact. *See Olean*, 31 F.4th at 671 (finding an expert opinion that the market was conducive to price-fixing because of dominance in the market and barriers to entry capable of showing class-wide impact).

Defendants are, of course, permitted to question Dr. Zona at trial regarding his failure to calculate the precise percentage of the class impacted by Defendants' conduct. Certainly, this would have been the strongest evidence. However, for the purposes of class certification, the Court finds that the common evidence described above can be used to show a class-wide injury.

### c.    Antitrust Damages

To demonstrate predominance in the context of damages, DPPs "must proffer a damages model showing that 'damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3).'" *Vizcarra v. Unilever United States, Inc.*, 339 F.R.D. 530, 553 (N.D. Cal. 2021) (quoting *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013)).

Predominance as to antitrust damages is the largest point of contention and the focus of both experts' opinions. DPPs argue that Dr. Zona's expert report shows how class-wide damages can be proven using the common evidence he applies in the Cournot model, Connor PIC data model, and regression analysis. In opposition, Defendants use Mr. Kaplan's report to argue that

United States District Court
Northern District of California

United States District Court
Northern District of California

1 | Dr. Zona's methodologies are unreliable and irrelevant because: (1) he misapplies the Cournot

2 | Model; (2) he misapplies the Connor PIC data and uses insufficient data to calculate the market

3 | shares in the PIC analysis; and (3) his regression analysis contains critical errors, including failing

4 | to account for demand, relying on pooling methods, and artificially inflating the benchmark.  The

5 | Court will examine the reliability of all three models, as well as Mr. Kaplan's critiques thereof, in

6 | turn.[8]

7

### i.    Cournot Model

8 | Mr. Kaplan opines that Dr. Zona's application of the Cournot model is unreliable because

9 | it assumes a fixed number of competitors and a homogeneous product market without accounting

10 | for the reality of the telescope market.  *See* Kaplan Report ¶¶ 104–113.  In other words, rather than

11 | relying on an empirical analysis of actual telescope prices, the model relies on theoretical

12 | simulations.  *See id.*  He also disagrees with the model's assumption that firms make a single

13 | simultaneous decision on output without considering future interactions or competitive responses;

14 | assumptions regarding the number and size of competitors; and the failure to account for

15 | substantial year-to-year variability in market shares.  *Id.*

16 | The Court finds Defendants' arguments unpersuasive.  Notably, the textbook Cournot

17 | model and its application to the telescopes industry is not unique to this case.  This Court

18 | previously examined Dr. Zona's similar Cournot analysis in *Orion*.  There, the Court found no

19 | issue with the model's reliance on theory rather than actual data from the telescopes industry,

20 | holding that Dr. Zona's Cournot model employed a "'textbook' analysis of efficient companies

21 | who endeavor to maximize their profits," and "the methodology underlying the structural model

22 | meets the standards for reliability."  *Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.* ("*Orion*"),

23 | No. 5:16-CV-06370-EJD, 2019 WL 4780183, at *5 (N.D. Cal. Sept. 30, 2019), *aff'd*, 20 F.4th 466

24 | (9th Cir. 2021).  The Ninth Circuit affirmed, finding that "Dr. Zona's expert report and

25 | testimony," which included the Cournot model, "were sufficiently tied to the facts of this case."

26

27 | [8] The Court makes no determination as to ultimate admissibility.  The Court only examines admissibility to assign appropriate weight to the evidence in this analysis.

28 | Case No.: 5:20-cv-03642-EJD
ORDER DEN. MOT. TO STRIKE; GRANTING MOT. FOR CLASS CERT.

*Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*, 20 F.4th 466, 478 (9th Cir. 2021).

Here, Dr. Zona applies the textbook Cournot model with its textbook assumptions, which is widely accepted by economists as a reliable way to calculate overcharge. Indeed, Defendants characterized the model as a "well respected authorit[y]" in the hearing on this matter. Similar to the Court's finding in *Orion*, Defendants have again failed to show how the telescope industry is so unique as to render this model unreliable or irrelevant here. *See, e.g., Orion*, 2019 WL 4780183, at *5.

Further, the Court finds that Dr. Zona's analysis under the Cournot model is reliable enough for consideration at class certification. As the Court described in detail in Section I.A.1., Dr. Zona begins his method by assuming four equal sized competitors in the but-for world. Zona Report ¶ 90. Based on the evidence of various acquisitions and conduct in 2005, 2013, and 2019, Dr. Zona then: (1) assumes that three firms acted together in 2005-2013, which reduces the number of competitors from four to two and results in an expected overcharge of 17.4%; (2) assumes that that four firms acted together in 2013-2019, which reduces the number of competitors from four to one and results in an expected overcharge of 35.7%; and (3) assumes that conditions after 2019 remained unchanged. *See id.* ¶¶ 67–78, 89, 91–93. These facts are notably distinguishable from *Heary*, the only case Defendants cite where a court rejected an expert's analysis using the Cournot model. *See Heary Bros. Lightning Prot. Co. v. Lightning Prot. Inst.*, 287 F. Supp. 2d 1038, 1067–68 (D. Ariz. 2003). The expert there applied a different methodology to calculate market share that contained irreconcilable inconsistencies not at issue here. *See id*.

The Court therefore finds that Dr. Zona's Cournot model analysis—along with its textbook assumptions regarding the number of competitors, homogenous products, simultaneous decisions regarding output, and variability in market shares—is a reliable method to show class-wide damages that is properly tethered to this case and relevant to determining overcharge in the telescopes industry on a class-wide basis for the purposes of class certification.

### ii.    Connor PIC Data

Next, Mr. Kaplan opines that Dr. Zona's Connor model is flawed because PIC data relates

1    to a wide range of industries unrelated to telescopes, and Dr. Zona fails to provide any

2    comparative analysis or evidence that these industries are economically comparable to the

3    telescope market.  Kaplan Report ¶¶ 97–103.  He also claims that Dr. Zona's analysis does not

4    establish a statistically significant relationship between cartel characteristics and overcharges, and

5    Dr. Zona uses insufficient data to define the market and calculate market share.  *Id.*

6        The Court similarly finds Defendants' arguments unpersuasive.  Using PIC data to

7    calculate overcharges in the telescope industry is also not unique to this case.  This Court

8    previously examined Dr. Zona's similar use of PIC data in *Orion* as well, finding that his choice of

9    data did not render his methodology unreliable, and "[i]f Defendants disagree with the data that

10   Dr. Zona used in his overcharge analysis, they may cross-examine him, but that disagreement is

11   not grounds to exclude his testimony."  *Orion*, 2019 WL 4780183, at *4.  The Ninth Circuit

12   affirmed, finding that Dr. Zona's use of PIC data, though compiled from other industries, was

13   "sufficiently tied to the facts of this case."  *Optronic*, 20 F.4th at 478.

14       Here, Dr. Zona's use of PIC data in the Connor model, in lieu of data from the telescope

15   industry, is appropriately applied in this case.  As Defendants conceded during the hearing, PIC

16   data is also a "well-respected authorit[y]."  Defendants are free to disagree with the data at trial,

17   but for these purposes, the Court finds Dr. Zona's use of PIC data in the Connor model is

18   sufficient.  *See, e.g., Orion*, 2019 WL 4780183, at *4 (*citing In re TFT-LCD (Flat Panel) Antitrust

19   Litig.*, 2013 WL 12311008, at *2 (N.D. Cal. June 14, 2013)).

20       The Court also finds that Dr. Zona properly tethered his analysis to this case by using

21   evidence of Defendants' acquisitions to apply a subset of PIC data that most closely resembles the

22   circumstances here—cartels with two, three, or four cartel members that control 40%, 70%, and

23   80% of the market where the United States is the lead jurisdiction.

24       Regarding Dr. Zona's definition of the relevant market and market share calculations, as

25   the Ninth Circuit has explained, "there is no requirement to use any specific methodology in

26   defining the relevant market."  *Optronic*, 20 F.4th at 482.  Courts regularly find that reasonable

27   estimates concerning market definition and market share performed using all the available data are

28   Case No.: 5:20-cv-03642-EJD
     ORDER DEN. MOT. TO STRIKE; GRANTING MOT. FOR CLASS CERT.

United States District Court
Northern District of California

sufficient. *See United States v. Energy Sols., Inc.*, 265 F. Supp. 3d 415, 441 (D. Del. 2017) ("[T]he government need not present market shares with the precision of a NASA scientist. The closest available approximation often will do." (quoting *FTC v. Sysco Corp.*, 113 F.Supp.3d 1, 55 (D.D.C. 2015)); *United States v. H & R Block, Inc.*, 833 F. Supp. 2d 36, 72 (D.D.C. 2011) ("A reliable, reasonable, close approximation of relevant market share data is sufficient."). Here, the Court finds that Dr. Zona reliably applies the Merger Guidelines and HMT to define the market, and reliably uses shipping data, the best data available to him, to calculate market share.[9] This is sufficient at this stage.

The Court also notes that Mr. Kaplan did not try to calculate overcharges using a modified model that corrected any of his critiques. Though the burden of proof to show reliability is on DPPs, as Defendants highlighted, they must do more than simply point to errors without showing the difference the errors make in the damages calculations. Mot. to Strike 22 (citing *Sobel v. Yeshiva University*, 839 F.2d 18, 34 (2d Cir. 1988) ("We read Bazemore to require a defendant challenging the validity of a multiple regression analysis to make a showing that the factors it contends ought to have been included would weaken . . . the analysis")).

The Court therefore finds that Dr. Zona's Connor model analysis using PIC data, including his market definition and market share analysis, is a reliable method that is appropriately tethered to this case and relevant to determining overcharge in the telescopes industry for the purposes of class certification.

### iii. Regression Analysis with Defendants' Data

Finally, Defendants raise several issues with Dr. Zona's final regression analysis, arguing that he erroneously: (1) fails to account for demand using the PCE variable; (2) relies on pooling methods; and (3) reduces the benchmark prices by 16.7%.

**Accounting for Demand Using the PCE Variable**

Mr. Kaplan opines that Dr. Zona's analysis is flawed and unreliable because his pooled

---

[9] While the Court notes Dr. Zona also calculated the 16.7% benchmark in this model, he ultimately did not use it in his total damages calculation. *See* Zona Report ¶ 117.

United States District Court
Northern District of California

"before-and-after" regression analysis fails to control for changes in the level of demand, namely, a variable for personal consumption expenditures ("PCE").[10]  Kaplan Report ¶¶ 115–125.  When Mr. Kaplan introduces a PCE variable to account for supply and demand, as Dr. Zona had previously done in his damages analysis in *Orion*, Dr. Zona's model shows no overcharges and indicated a slight decrease in prices after 2005.  *Id.* ¶ 115.

Courts generally do not "dictate which factors must be included in regression studies." *Rudebusch v. Hughes*, 313 F.3d 506, 516 (9th Cir. 2002).  Even outside the context of class certification, "the propriety of controlling for particular variables in a regression analysis goes to weight rather than admissibility."  *Id.* (citing *Bazemore v. Friday*, 478 U.S. 385, 400 (1986) ("Normally, failure to include variables will affect the analysis' probativeness, not its admissibility.")); *see also Obrey v. Johnson*, 400 F.3d 691, 695–96 (9th Cir. 2005) (quoting *Maitland v. Univ. of Minn.*, 155 F.3d 1013, 1017 (8th Cir.1998) ("[A] regression analysis does not become inadmissible as evidence simply because it does not include every variable that is quantifiable and may be relevant to the question presented . . . . [I]t is for the finder of fact to consider the variables that have been left out of an analysis, and the reasons given for the omissions, and then to determine the weight to accord the study's results . . . .")); *Giuliano*, 2015 WL 10890654, at *11 ("The selection of variables to include in a regression analysis is normally a question that goes to weight of the expert's analysis rather than its admissibility.").  However, there are circumstances where a model's omission of significant variables can render the model "so incomplete that it is inadmissible as irrelevant and unreliable."  *In re REMEC Inc. Sec. Litig.*, 702 F. Supp. 2d 1202, 1273 (S.D. Cal. 2010).

Here, the Court finds that Dr. Zona's omission of the PCE variable does not render his model so incomplete that it is irrelevant or unreliable.  As DPPs highlight, Dr. Zona's method sufficiently accounts for demand with variables including those accounting for the timing and

---

[10] While the Court reviewed the other more minor variables Mr. Kaplan discusses in his report, Defendants' arguments focused on the importance of the PCE variable, so the Court will focus its analysis there as well.

introduction of new products, for changes in the numbers of customers, and for the dollar-yuan exchange rate.  Defendants have provided no authority to suggest that the PCE variable is required to reliably control for supply and demand in addition to, or instead of, the factors Dr. Zona uses in his method.  While Defendants argue that "a measure *such as* PCE is *capable* of picking up changes in demand whereas other variables cannot," they do not argue or show that the PCE variable is the only way to capture changes in demand here.  Reply 6 (emphasis added).

The Court notes several additional arguments regarding the PCE variable's importance that the Court finds unpersuasive.

First, Defendants cite a string of cases to argue that exclusion of the PCE variable can render a method unreliable, but this case is distinguishable from those Defendants cite.  *See, e.g., In re REMEC Inc. Sec. Litig.*, 702 F. Supp. 2d at 1273 (failure to separate the loss caused by the disclosure of corrective information at issue in the litigation from loss caused by the disclosure of other company-specific information); *see also Kim v. Benihana, Inc*, No. 5:19-CV-02196-JWH-DTBX, 2024 WL 3550390, at *5 (C.D. Cal. May 20, 2024) (omitted the defendant's own prices for the food products and factors that other restaurants used in setting their prices beyond the defendant's conduct); *In re Live Concert Antitrust Litig.*, 863 F. Supp. 2d 966, 975 (C.D. Cal. 2012) (finding that accounting for differences in artist quality and popularity was an omitted major factor, for it is common sense that a more popular musician will command higher ticket prices than a less popular artist); *Smith, et al., v. City of Oakland, et al.*, No. 19-CV-05398-JST, 2025 WL 490474, at *5 (N.D. Cal. Feb. 13, 2025) (finding consideration only of whether the rent control regime affected sales prices failed to consider several other variables, including the age of the buildings and reduced incentive for maintenance); *In re Wireless Tel. Servs. Antitrust Litig.*, 385 F. Supp. 2d 403, 428 (S.D.N.Y. 2005) (failing to "introduce *any* independent variables"); *Blue Cross & Blue Shield United of Wisconsin v. Marshfield Clinic*, 152 F.3d 588, 593 (7th Cir. 1998) (failing to account for any factors not attributable to the defendant's misconduct).  In these cases, the experts either failed to account for any behavior beyond the defendant's conduct, or they failed to account for obvious factors such as a musician's popularity when calculating overcharge in

United States District Court
Northern District of California

1   concert ticket prices, or losses caused by the disclosure of information not subject to the litigation.

2   Defendants have not pointed to any similar case where a court found the omission of a PCE

3   variable, when the expert included the other demand variables used here, a major factor.

4       Second, Defendants argue that the addition of the PCE variable is a major factor because it

5   drastically changes the results, showing instead that 60% of the class is uninjured.  But Defendants

6   failed to support this argument with relevant authority, let alone in-circuit authority or authority

7   authored in the last two decades ago, providing that a change in the results of the calculations

8   *alone* means the new factor is "major."  There is also evidence from Dr. Zona's declaration that

9   adding the PCE variable is not only unnecessary here, but may be improper because it is limited to

10  customers' spent income, which is attenuated from the price that retailers in a class action such as

11  this will pay their suppliers.  Zona Decl. ¶¶ 6, 12, ECF No. 631-8.

12      Finally, Defendants repeatedly stress that Dr. Zona included the PCE variable in *Orion*, so

13  it must be a major factor here as well.  However, the fact that Dr. Zona used different variables in

14  a similar case does not mean that his analysis here is unreliable per se.  Although this is the same

15  market during the same period, this case involves different parties and different class claims.  It

16  remains helpful to look to *Orion* for guidance in examining whether certain economic models are

17  reliable for determining overcharge in the telescope market, but Dr. Zona's opinions in *Orion* do

18  not render the differences in his regression model here unreliable.

19      Ultimately, the true nature of Defendants' dispute is Dr. Zona's choice of demand

20  variables, not the total omission of a significant demand control.  The Court finds that Dr. Zona's

21  omission of the PCE variable does not render the model "so incomplete that it is inadmissible as

22  irrelevant and unreliable."  *In re REMEC Inc. Sec. Litig.*, 702 F. Supp. 2d 1202, 1273 (S.D. Cal.

23  2010).  Accordingly, while this may be an issue the jury weighs at trial, it is not an issue that

24  prevents the Court from considering Dr. Zona's methodology for these purposes.

25      **Reliance on Pooled Regressions**

26      Next, Mr. Kaplan opines that Dr. Zona's methodology of aggregating or "pooling" prices

27  across different customers is unreliable because the approach falsely indicates overcharges and

28

competitive injuries, which vary significantly across class members. Kaplan Report ¶¶ 37, 126–32. Mr. Kaplan also takes issue with Dr. Zona's failure to account for the evidence of discounts in his pooled regression analysis. *Id.* ¶ 135.

"In antitrust cases, regression models have been widely accepted as a generally reliable econometric technique to control for the effects of the differences among class members and isolate the impact of the alleged antitrust violations on the prices paid by class members." *Olean*, 31 F.4th at 677. Accordingly, "any categorical argument that a pooled regression model cannot control for variables relating to the individualized differences among class members must be rejected." *Id.*

Here, the Court finds Dr. Zona's pooled regression analysis sufficient to show that common evidence can be used to prove damages. As an initial matter, Defendants' argument that pooled regressions are generally unacceptable economic models for damages in antitrust class actions directly contradicts Ninth Circuit precedent. *See Olean*, 31 F.4th at 677. To the extent that Defendants make more nuanced arguments regarding the individualized differences in the telescope market, the Court finds these differences are not unique and do not render the model unreliable—the Court is satisfied that Dr. Zona's chosen variables largely mitigate the individualized issues Mr. Kaplan raise. Regarding omitting data for discounts, Dr. Zona highlights that even the customers who received discounts would have still paid an overcharge because the anticompetitive conduct raised the baseline price for everyone. Regardless, DPPs contend that there is no reliable data for discounts here—the only data regarding discounts received from Defendants is from their ledgers, and Defendants previously took the position that their ledgers do not constitute transactional data.

Therefore, the Court finds that Mr. Kaplan's critiques regarding the pooled regression model do not render Dr. Zona's method unreliable for these purposes.

### 16.7% Reduction in the "But-For" Prices

Finally, and most notably, Mr. Kaplan opines that Dr. Zona's method is unreliable and untethered to the facts of this case because he made an unexplained adjustment to the predicated

1  but-for prices by reducing them to 16.7% to account for anticompetitive conduct occurring prior to

2  2005.  Kaplan Report ¶¶ 133–34.

3      The Supreme Court has held that "a model purporting to serve as evidence of damages in

4  [a] class action must measure only those damages attributable to that theory. If the model does not

5  even attempt to do that, it cannot possibly establish that damages are susceptible of measurement

6  across the entire class for purposes of Rule 23(b)(3)." *Comcast*, 569 U.S. at 35.  "In other words,

7  where an expert's damages model is untethered from plaintiff's theory of liability such that it has

8  no possibility of demonstrating the amount of damages in a particular case, *Comcast* holds that a

9  plaintiff may not rely upon it to show that damages are 'capable of measurement on a classwide

10 basis.'" *Lytle v. Nutramax Lab'ys, Inc.*, 114 F.4th 1011, 1027 (9th Cir. 2024).

11     Here, the Court finds that the altered 16.7% benchmark moves Dr. Zona's regression

12 analysis outside the scope of this case.  As the Court previously discussed, Dr. Zona contends that

13 the 16.7% adjustment is necessary here because there is no "clean" period before the start of the

14 2005 conspiracy.  Dr. Zona explains that he would "typically" use a before or after period as a

15 benchmark for prices that would exist in a but-for world absent Defendants' anticompetitive

16 conduct.  Zona Report ¶ 102.  However, "in this case, there is evidence that even before the

17 acquisition in 2005 of Celestron by Synta, Synta and Sunny were interrelated and not independent

18 of one another. Therefore, the pre-2005 prices would not be expected to reflect but-for competition

19 between these two independent suppliers, among others." *Id.*; *see also* Zona Decl. ¶ 13.  Because

20 Dr. Zona believes that the actual pre-2005 prices cannot serve as a benchmark, Dr. Zona reduces

21 those prices by 16.7% using PIC data under the Connor model, as detailed in Section I.A.2.  Dr.

22 Zona opines that removing this 16.7% overcharge creates an accurate "before period" price to use

23 as a benchmark for his regression model.  *Id.*

24     As an initial matter, the Court finds no issue with Dr. Zona's application of PIC data to

25 reach the 16.7% figure for all the reasons discussed in the section prior.

26     The Court does find issue, however, with Dr. Zona using this data to alter the benchmark

27 because of conduct untethered to the liability of this case.  Defendants can only be held liable for

28

the damages DPPs incurred due to Defendant's conduct as alleged in the FAC.  In the FAC, DPPs allege that Defendants' "[c]onspiracy [b]egins in 2005," and defines the class period as beginning in 2005.  FAC, at 26; *id.* ¶ 143.  If DPPs intended to seek damages for anticompetitive conduct prior to 2005, the FAC should have alleged that the conspiracy began with Synta and Sunny's prior common ownership.  Instead, the FAC merely notes this prior common ownership in its background section defining each Defendant.

The Court understands the economic theory behind why Dr. Zona sought to establish a but-for world free of any possible artificially inflated prices.  But here, the jury will ultimately need to calculate the amount of damages these Defendants caused based on their conduct beginning in 2005.  Thus, this is not a question of economic reliability, but of legal relevance.  Even if the market pre-2005 was already altered, that cannot impact the damages that Defendants can be held liable for here.

Accordingly, the Court finds that reducing the benchmark by 16.7% based on an assumption[11] that anticompetitive conduct began prior to the period of damages exceeds the scope of DPPs' complaint is untethered to the DPPs theory of liability.[12]  The Court therefore assigns little weight, if any, to Dr. Zona's final regression analysis.  *Sali*, 909 F.3d at 1006 ("[A]n inquiry into the evidence's ultimate admissibility should go to the weight that evidence is given at the class certification stage.").

However, issues regarding the inflated benchmark still do not suggest that individual questions regarding damages predominate over common ones; and notably, Dr. Zona does offer some overcharge calculations that are not impacted by the 16.7% benchmark in his report.  As the Court discussed in Section I.A.3., before Dr. Zona adds the 16.7% to his final calculations, while appearing to keep all other factors the same, Dr. Zona finds an overcharge of 3.96% for the 2005-

---

[11] The Court also notes that the "evidence" Dr. Zona relies on is merely an allegation in the FAC.
[12] The Court agrees with DPPs that Dr. Zona's application of PIC data was approved in *Orion*, as the Court noted above, but Dr. Zona's testimony in Orion did not rely on an altered benchmark. While Dr. Zona believed that there may have been anticompetitive conduct prior to the conduct alleged in *Orion*, he did not assume that anticompetitive conduct in his calculations.

Case No.:  5:20-cv-03642-EJD
ORDER DEN. MOT. TO STRIKE; GRANTING MOT. FOR CLASS CERT.

United States District Court
Northern District of California

2013 period; 7.16% for the 2013-2019 period; and 7.16% for the 2019-2021 period.  Dr. Zona Report ¶¶ 108, 117.  To reach these numbers, Dr. Zona relies on common evidence including product categories for product codes in Synta and Celestron's sales data through mid-2015; product information based on a categorical field in the company's SAP sales data, which include Synta/Celestron's sales from mid-2015; and the identification of telescopes based on specific digits in its product coding.  *Id.* at ¶ 107.

Ultimately, while the Court finds Dr. Zona's final damages calculation irrelevant to DPP's legal theory, a closer look at the model and underlying evidence could still support DPP's argument that common evidence can show damages for the purposes of class certification.  If this were the only evidence to show predominance as to damages, it may not be sufficient to meet DPPs' burden here; but in conjunction with the other two models discussed above, the Court finds it, at the very least, helpful to DPPs' position.

\* \* \*

After weighing the evidence put forth by DPPs and examining the reliability of Dr. Zona's methods and Mr. Kaplan's critiques thereof,[13] the Court finds there is sufficient evidence to show that common questions predominate as to damages.

The Court repeats, the purpose of damages experts in class certification proceedings is to show that damages can be proven using common evidence—not prove through expert testimony that there are in fact damages.  *See Lytle*, 114 F.4th at 1025.

Here, Dr. Zona reliably applies common evidence to show class-wide damages in two of his models.  In the Cournot model, Dr. Zona uses evidence of Celestron's acquisition by Synta and Meade's acquisition by Sunny to determine the appropriate number of competitors at a given time.  *See, e.g., id.* ¶¶ 67–78, 91–93.  In his Connor model using PIC data, Dr. Zona also uses evidence of Defendants' various acquisitions to determine the number of cartel members; he defines the market based in part on price elasticity in the telescope industry; and he calculates market share

[13] The Court considered all opinions in Mr. Kaplan's report and discussed in detail only those that Defendants raised and that the Court found potentially dispositive.

United States District Court
Northern District of California

United States District Court
Northern District of California

1  using public shipping data and Defendant's documents and statements.  *See, e.g., id.* ¶¶ 67–78, 98

2  n.113.  The Connor model corroborated the results of the Cournot model, and vice versa.  Even in

3  his final regression analysis, though the Court ultimately finds the analysis beyond the scope of

4  DPPs' theory of liability, the Court also rejects Defendants' arguments that the model is incapable

5  of calculating class-wide damages because of individual issues, instead finding some of his

6  analysis and the common evidence therein at the very least helpful to examining predominance.

7  As the Court indicated above, Defendants are free to attack DPPs' evidence at trial or raise

8  admissibility issues when appropriate, but for the purposes of class certification, the Court finds

9  DPPs have met their burden to show predominance.

10  ### 2.    Superiority

11  Finally, DPPs must show that "a class action is superior to other available methods for

12  fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  This requirement

13  tests whether "classwide litigation of common issues will reduce litigation costs and promote

14  greater efficiency."  *Valentino v. Carter–Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996); *see*

15  *also Stewart v. Quest Diagnostics Clinical Lab'ys, Inc.*, No. 3:19-cv-02043-AGS-DDL, 2022 WL

16  5236821, at *17 (S.D. Cal. Oct. 5, 2022) (finding class action superior where "the cost of litigating

17  individual cases, compared with each class member's amount of damages, make one class action

18  cost effective and will avoid burdening the court with duplicative cases"); *Moore v. Ulta Salon,*

19  *Cosmetics & Fragrance, Inc.*, 311 F.R.D. 590, 622-23 (C.D. Cal. 2015) ("Where recovery on an

20  individual basis would be dwarfed by the cost of litigating on an individual basis, this factor

21  weighs in favor of class certification.").  In making that determination, courts should consider the

22  factors enumerated in Rule 23: "(A) the class members' interests in individually controlling the

23  prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning

24  the controversy already begun by or against class members; (C) the desirability or undesirability

25  of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties

26  in managing a class action."  Fed. R. Civ. P. 23(b)(3).

27  The Court finds that a class action is superior to other available methods to adjudicate this

28  Case No.: 5:20-cv-03642-EJD
ORDER DEN. MOT. TO STRIKE; GRANTING MOT. FOR CLASS CERT.

controversy.  This is a highly litigated and nearly five-year-old action alleging a complex antitrust conspiracy in which Defendants have produced millions of documents.  DPPs represent that most of the class members do not have sufficient individual telescope purchase volume to give them an incentive to prosecute such claims individually, particularly where the overcharge for which each class member individually may collect damages is only a portion of the overall purchase price. The Court is also not aware of other class members initiating separate litigation against Defendants, or vice versa.  Finally, the Court has not identified any issues managing this litigation as a class action that would defeat predominance at this time.

**V.    CONCLUSION**

Based on the foregoing, the Court **DENIES** Defendants' motion to strike for purposes of class certification and **GRANTS** DPPs' motion for class certification.

**IT IS SO ORDERED.**

Dated: March 10, 2025

EDWARD J. DAVILA
United States District Judge

United States District Court
Northern District of California