# EXHIBIT 1

| Party | Facts Supporting Summary Judgment | Distinct Legal Defenses |
|---|---|---|
| **(1) Corey Lee** | • Lee had merely requested information on Orion's orders from Suzhou Synta and Ningbo Sunny and received it. DPPs notably omit the actual order statistics that were provided to Lee. A cursory review of these spreadsheets, which are in Chinese, shows that they were prepared by the Chinese suppliers Suzhou Synta and Ningbo Sunny, and not by Orion. )<br><br>• The information was also not stolen from Orion as DPPs allege, but voluntarily provided by the suppliers to Celestron. The suppliers lawfully possessed this information as they fulfilled the orders, and no legal restrictions prevented them from sharing it at their discretion. Neither Lee nor Celestron had any reason to believe the information constituted a trade secret at the time, and such information does not qualify as a protected trade secret.<br><br>• There is also no evidence that Celestron used the Orion order statistics to price-fix or engage in any other anti-competitive conduct. In his product development role at the time, Lee requested such order information from their common suppliers for | • The Supreme Court has held that: "The exchange of price data and other information among competitors does not invariably have anticompetitive effects; indeed such practices can in certain circumstances increase economic efficiency and render markets more, rather than less, competitive. For this reason, we have held that such exchanges of information do not constitute a per se violation of the Sherman Act." U.S. v. U.S. Gypsum Co., 438 U.S. 422, 442 n.16 (1978)<br><br>• **Rule of Reason:** DPPs do not allege any horizontal price-fixing conspiracy between Celestron and its competitors. Instead, DPPs' claim is limited to an alleged vertical conspiracy between Celestron and its suppliers, Suzhou Synta or Ningbo Sunny, which is subject to the rule of reason. |

| | | | |
|---|---|---|---|
| | | product development and market research purposes. | |
| | • | Celestron was concerned that the EQ-8 pricing was unfair given that Celestron had invested in the R&D of the common proprietary technology used in both the EQ-8 and CGE Pro models, which was not reflected in Suzhou Synta's price for the EQ-8 at the time, yet directly and unfairly benefitted Celestron's biggest competitor, Orion, who was able to resell the EQ-8 at lower price without having to contribute to the initial R&D costs, such concerns by Lee were supported by legitimate, pro-competitive business justifications. | |
| | • | None of the allegations regarding the purchase of Meade implicate Lee, who was SVP of Product Development at the time, had no involvement in the 2013 Meade Acquisition. | |
| **(2) Jean Shen and Olivon Entities** | • | Neither Jean Shen nor any other witness testified to or otherwise admitted that she made an agreement or even discussed an agreement regarding pricing with any of the other alleged coconspirators. | • **Monopoly Power:** The Olivon Defendants' paltry sales and miniscule market share also are not enough to establish a "dangerous probability" of monopoly power in an attempted monopolization case. Monopoly power may be shown by means other than share, such as by demonstrating "the power to control prices or exclude competition." United States v. E.I. du Pont de Nemours & Co., 351 U.S. 377, 391 (1956). |
| | • | David Shen and Sylvia Shen did not advise her. | |

|  |  |  |
|---|---|---|
| | - The Olivon Defendants never received loans from David Shen, Sylvia Shen, or any Synta entities.<br><br>- The Olivon Defendants determined their own prices based on procurement costs.<br><br>- The Olivon Defendants source products from multiple suppliers and sold only 98 astronomical telescopes in the United States.<br><br>- The Olivon Defendants have only ever had limited sales, 98 telescopes.<br><br>- Through its retailer, OlivonUSA.com, there were less than 10 total sales.<br><br>- Olivon Manufacturing sold product to Olivon USA for resale.<br><br>- Olivon USA was not profitable and ran in the negative.<br><br>- The Olivon Defendants were a "losing business" with average sales revenue (excluding costs) per year over a ten-year period of $31,000, of which $24,500 accounted for optical products. | |
| **(3) Dave Anderson** | - During Anderson's tenure as CEO, Celestron never shared confidential business information with competitors, further | - **Limitations on Individual Liability:** "Individuals may be liable for the antitrust violations of their employers if they have directly participated in or knowingly approved or ratified 'inherently wrongful' |

| | | |
|---|---|---|
| | - underscoring the absence of any collusive conduct. (UMF 34.)<br><br>- DPPs can only reference a single email chain written by defendant David Shen and Anderson explaining Mr. Shen's ideas on product diversification. (ECF 495 at ¶ 118, Ex. 10.)<br><br>- While he was CEO of Celestron, he did not discuss day-to-day operations with defendant David Shen. (UMF 10.) He did not handle pricing discussions and negotiations with suppliers. (UMF 11.) And no one exercised supervisory authority over him. (UMF 13.) Anderson explicitly testified that while he was CEO of Celestron, Celestron did not share confidential business information with competitors. (UMF 34.)<br><br>- When Ningbo Sunny acquired Meade in 2013, Anderson viewed Meade as a competitor of Celestron, and was focused solely on safeguarding Celestron's business interests, not engaging in collusive conduct. (UMF 14, 18.) | conduct." In re Calif. Bail Bond Antitrust Litig., No. 19-CV-00717-JST, 2020 WL 3041316, at *17 (N.D. Cal. 2020). "The generality of the [Sherman] Act's prohibition, the often uncertain line between proper and improper conduct, and the social interest in not deterring economically useful conduct by the imposition of excessive risks all of which the Supreme Court recognized … make it appropriate to limit personal liability to cases of participation in inherently wrongful conduct." Murphy Tugboat Co. v. Shipowners & Merchants Towboat Co., 467 F. Supp. 841, 853 (N.D. Cal. 1979) aff'd sub nom. Murphy Tugboat Co. v. Crowley, 658 F.2d 1256 (9th Cir. 1981) ("Murphy") (citing U.S. v. U.S. Gypsum Co., 438 U.S. 422 (1978))<br><br>- While the Ninth Circuit has not defined what constitutes "inherently wrongful conduct," some courts have interpreted this to mean a "per se" violation of the law. See Reifert v. S. Cent. Wisconsin MLS Corp., 368 F. Supp. 2d 912, 914 (W.D. Wis. 2005) ("[Murphy] supports the proposition that individuals who ratify unlawful corporate acts may escape liability if, under all the facts and circumstances it is not clear that the conduct was unlawful per se."). |
| **(4) Joe Lupica** | - Although Lupica was employed by both Celestron and subsequently Meade, he was | - **Rule of Reason:** Agreements "between entities 'up and down a supply chain, such |

| | | |
|---|---|---|
| | never aware of any intent by Peter Ni to acquire Meade because the Federal Trade Commission would have blocked David Shen or Celestron from acquiring Meade.<br><br>• Lupica also had no knowledge of whether or not David Shen was allegedly part of the investor group that acquired Meade on behalf of Ningbo Sunny.<br><br>• Lupica did not provide any guidance or insight into the structure of Ningbo Sunny's acquisition of Meade but understood that the acquisition would help Meade compete better against Synta and Celestron.<br><br>• After Ningbo Sunny acquired Meade, David Shen did not participate in any discussions regarding Meade's business strategies and did not communicate to Lupica any business strategies. | as between a manufacturer and a retailer'— are analyzed under the rule of reason." Don Copeland v. Energizer Holdings, Inc., 716 F. Supp. 3d 749, 765 (N.D. Cal. 2024). |
| **(5) SW Technology** | • SW Technology is a pure holding company with no role in manufacturing, selling, or pricing telescopes that is akin to the unlawful activity that supported liability against the Arandell subsidiary.<br><br>• There is no evidence that SW Technology undertook any unlawful action with its parent companies to advance a price-fixing conspiracy. | • **Independent Conduct:** A subsidiary can only be liable for antitrust conspiracy if evidence shows independent, anticompetitive conduct in furtherance of an alleged conspiracy. Arandell Corp. v. Centerpoint Energy Servs., Inc., 900 F.3d 623, 631 (9th Cir. 2018). "*Arandell* teaches that such unity of purpose under *Copperweld* does not mean that the acts of one entity in a family of companies may be imputed to any other wholly-related entity" without something more. Biddle v. Walt |

| | | |
|---|---|---|
| | - There is no evidence that members of SW Technology manipulated prices at the parent company's direction, because SW Technology never set prices at all.<br><br>- There is no evidence that SW Technology ever sold any products at artificially high prices—because SW Technology never sold a single product.<br><br>- There is no SW Technology direct Celestron in how to run its business let alone with respect to Celestron's approach to the market, pricing, or product strategy.<br><br>- SW Technology had no role in the Meade Acquisition. It did not direct, authorize, or facilitate any part of the Meade Acquisition. SW Technology was organized as a single purpose entity for the purposes of acquiring, acting as a corporate parent to, and holding company for, Celestron.<br><br>- There is simply no evidence of SW Technology being involved in any price-fixing conspiracy, because the evidence shows unequivocally that SW Technology was never involved in setting prices at all. Any alleged agreements in furtherance of an anticompetitive conspiracy is absent from the undisputed evidence, where the only activity undertaken by SW Technology, as a passive holding company, was the acquisition of | Disney Co., No. 22-CV07317-EJD, 2024 WL 3171860, at *10 (N.D. Cal. June 25, 2024) (citing Arandell, 900 F.3d at 633-34); see also Jones v. Varsity Brands, LLC, 618 F. Supp. 3d 713, 723 (W.D. Tenn. 2022) ("a plaintiff asserting a § 1 or § 2 claim under the Sherman Act must still provide 'evidence that each defendant independently participated in the enterprise's scheme, to justify holding that defendant liable as part of the enterprise.' … This involvement must be more than mere ownership."). |

| | | | |
|---|---|---|---|
| | | Celestron in 2005 and distribution of dividends. | |
| **(6) Synta Canda** | • | Synta Canada's conduct during the relevant period was limited to acting as a passive investment company, over which it exercised no control.<br><br>• Synta Canada served as primarily a passive holding company which held ownership interests in Suzhou Synta, SW Technology, and Nantong Schmidt.<br><br>• Synta Canada is not owned by Synta Technology.<br><br>• Synta Canada is a holding company with no role in manufacturing, selling, or pricing telescopes.<br><br>• There is no evidence that Synta Canada undertook any action with its owners or subsidiaries to advance a price-fixing conspiracy, nor is there any evidence that Synta Canada manipulated prices at the Shen family's direction, nor there is there evidence that Synta Canada ever sold any products at artificially high prices—because Synta Canada never sold a single telescope.<br><br>• Synta Canada was never a manufacturer or distributor of telescopes in the United States or anywhere else. | • **Single Entity Rule:** The Supreme Court has long held that a parent company cannot conspire with its wholly owned subsidiary. Copperweld, 467 U.S. at 769. "Section 1, like the tango, requires multiplicity: A company cannot conspire with itself." Freeman v. San Diego Ass'n of Realtors, 322 F.3d 1133, 1147 (9th Cir. 2003), as amended on denial of reh'g (Apr. 24, 2003) (citing Copperweld Corp. v. Indep. Tube Corp., 467 U.S. 752, 769 (1984) ("Copperweld").) "To 'conspire' within the meaning of the Sherman Act, corporate entities within a single organization must be sufficiently independent of each other for their concerted action to raise antitrust concerns." Las Vegas Sun, Inc. v. Summa Corp., 610 F.2d 614, 617 (9th Cir. 1979) (citing Harvey v. Fearless Farris Wholesale, Inc., 589 F.2d 451, 455-58 (9th Cir. 1979)).<br><br>• **Rule of Reason:** Accordingly, such combinations are judged under a rule of reason, an inquiry into market power and market structure designed to assess the combination's actual effect." Copperweld, 467 U.S. at 768 (citations omitted). In other words, "where, … 'the conduct at issue is not a garden-variety horizontal division of a market, [courts] have eschewed a per se rule |

| | | |
|---|---|---|
| | - There is simply no evidence that could impute the alleged activities of David Shen or manufacturers Suzhou Synta and Nantong Schmidt to Synta Canada, as Synta Canada was not a distributor or manufacturer.<br><br>- Nowhere do DPPs specifically allege that Synta Canada had any real market power. Synta Canada was thus not a horizontal competitor of any of the companies which DPP alleges to have conspired.<br><br>- The undisputed facts also indicate that Synta Canada was not involved in Ningbo Sunny's 2013 acquisition of Meade.<br><br>- Not one email attached to DPPs' Fourth Amended Complaint indicates that Synta Canada shared sensitive trade secrets or nonpublic information. DPPs' allegations of Defendants improperly sharing confidential information are directed at other Defendants.<br><br>- Synta Canada played no active role in the management or control of SW Technology or its subsidiary, Celestron. | and instead have utilized rule of reason analysis.'" California ex rel. Harris v. Safeway, Inc., 651 F.3d 1118, 1137 (9th Cir. 2011).<br><br>- **Effect on Domestic Commerce:** Those seeking to establish antitrust liability against foreign entities must meet a high bar. Only "activities [that] adversely affect domestic commerce, imports to the United States, or exporting activities of one engaged in such activities within the United States" are excepted from the FTAIA's reach. U.S. v. Hui Hsiung, 778 F.3d 738, 751 (9th Cir. 2015) (citing F. Hoffman-La Roche Ltd. v. Empagram S.A., 542 U.S. 155, 161 (2004)).<br><br>- **Independent Conduct:** A subsidiary can only be liable for antitrust conspiracy if evidence shows independent, anticompetitive conduct in furtherance of an alleged conspiracy. Arandell Corp. v. Centerpoint Energy Servs., Inc., 900 F.3d 623, 631 (9th Cir. 2018). "Arandell teaches that such unity of purpose under Copperweld does not mean that the acts of one entity in a family of companies may be imputed to any other wholly-related entity" without something more. Biddle v. Walt Disney Co., No. 22-CV07317-EJD, 2024 WL 3171860, at *10 (N.D. Cal. June 25, 2024) (citing Arandell, 900 F.3d at 633-34); see also Jones v. Varsity Brands, LLC, 618 |

| | | | |
|---|---|---|---|
| | | | F. Supp. 3d 713, 723 (W.D. Tenn. 2022) ("a plaintiff asserting a § 1 or § 2 claim under the Sherman Act must still provide 'evidence that each defendant independently participated in the enterprise's scheme, to justify holding that defendant liable as part of the enterprise.' … This involvement must be more than mere ownership."). |
| **(7) Pacific Telescopes** | • | Pacific Telescope had no involvement whatsoever in the acquisitions of Celestron or Meade. | • | **Rule of Reason:** Accordingly, such combinations are judged under a rule of reason, an inquiry into market power and market structure designed to assess the combination's actual effect." Copperweld, 467 U.S. at 768 (citations omitted). In other words, "where, … 'the conduct at issue is not a garden-variety horizontal division of a market, [courts] have eschewed a per se rule and instead have utilized rule of reason analysis.'" California ex rel. Harris v. Safeway, Inc., 651 F.3d 1118, 1137 (9th Cir. 2011). |
| | • | At no point did Pacific Telescope exercise, possess, or have the ability to exert control over either Celestron or Meade. | | |
| | • | Pacific Telescopes was neither a marketing nor a manufacturing company. The evidence clearly shows that its business was limited to selling telescopes within the Canadian market. | | |
| | • | DPPs allege Pacific Telescopes was, "aware of and approved Celestron's involvement" in the acquisition of Meade, but it does not suggest that Pacific Telescope played any active role in these alleged activities. | | |
| | • | Plaintiffs have no evidence to "show an explicit understanding" between Pacific Telescope and any other alleged co- | | |

|  |  |  |
|---|---|---|
|  | • conspirator to fix the prices of telescopes that were sold into the United States market.<br><br>• Pacific Telescope never sold telescopes to U.S. consumers or U.S. dealers, except in a single instance after ceasing operations - during its clearance sale from late 2019 to early 2020 – when it liquidated less than $100,000 worth of telescope inventory to Celestron.  Apart from that limited post-dissolution clearance sale, Pacific Telescope's sales were exclusively confined to the Canadian market.<br><br>• There is no evidence of any activity by Pacific Telescope that contributed to or influenced the development of the U.S. telescope market. Pacific Telescope imported telescopes from China, which were only sold within the Canadian market.<br><br>• DPPs have failed to adduce evidence that any of Pacific Telescope's alleged foreign conduct had a direct, substantial, and foreseeable effect on U.S. commerce, and thus, the FTAIA insulates Pacific Telescope from DPPs Sherman Act claims against it.<br><br>•  DPPs fail to direct any specific allegations towards Pacific Telescope with regard to the acquisition of Meade. |  |
| **(8) Synta Technology Corporation** | • Synta Taiwan functioned solely as a passive investment holding company. It did not | • **Single Entity Rule**: Courts routinely hold that parent companies, wholly owned |

| | |
|---|---|
| manufacture telescopes, set prices, or engage in distribution. Because it lacked independent decision-making or economic divergence from its affiliates, it could not conspire under Section 1.<br><br>• Synta Taiwan had no role in the Meade Acquisition, and there is no allegation or evidence of any subsequent attempt at monopolization or merger by any of the Defendants.<br><br>• Synta Taiwan's limited activity was: (1) a small telescope accessory assembly workshop in the early 1990s; (2) a trading company for its only customer and Celestron's competitor Orion from 2004 until 2017; and (3) a passive holding company with only an indirect minority interest in Celestron beginning in 2005.<br><br>• Synta Taiwan's commercial activity was limited only to assembling small volumes of telescope eyepieces and facilitating Orion's purchases of certain 60mm telescopes from Ningbo Sunny, neither of which had any substantial direct effect on the U.S. market.<br><br>• Synta Taiwan had no market power in either the manufacturing or distribution market and could not be liable for attempted monopolization or conspiracy to monopolize the U.S. telescope market. | subsidiaries, commonly controlled firms, and entities with aligned economic interests cannot conspire under Section 1. Las Vegas Sun, Inc. v. Summa Corp., 610 F.2d 614, 617 (9th Cir. 1979); Bell Atl. Bus. Sys. Servs. v. Hitachi Data Sys. Corp., 849 F. Supp. 702, 705 (N.D. Cal. 1994). The dispositive issue is economic unity whether the entities pursue separate interests or act as a single unit. Jack Russell Terrier Network of N. Ca. v. Am. Kennel Club, Inc., 407 F.3d 1027, 1034 (9th Cir. 2005).<br><br>• **Rule of Reason**: Vertical agreements such as those between manufacturers and retailers are subject to the rule of reason, which requires a fact-specific analysis of market power and actual competitive effects. In re Musical Instruments & Equip. Antitrust Litig., 798 F.3d 1186, 1191 (9th Cir. 2015); Amex, 585 U.S. at 541. |

|  |  |  |
|---|---|---|
|  | - Although Synta Taiwan began as a small telescope and accessory manufacturing company, it pivoted from the manufacturing of telescopes to an import-export trading business for Orion from 2004 until 2017.<br><br>- Good Advance BVI was established as an OBU to facilitate lawful trade between Orion and Ningbo Sunny, given China's restrictions on direct trade with Taiwan.<br><br>- Synta Taiwan did not manufacture telescopes and only sold a limited number of telescopes to Orion.<br><br>- Synta Taiwan did not manufacture telescopes and thus could not coordinate with Ningbo Sunny to divide the manufacturing market.<br><br>- DPPs' allegations of Defendants improperly sharing confidential information are directed at David Shen or Suzhou Synta, which as explained before, are not related to Synta Taiwan who acted at an arms' length from them. |  |
| **(9) Celestron** | - An expert cannot simply claim that he believes a figure in his analysis number is correct without sufficient evidence to support it. See United States v. Various Slot Machines on Guam, 658 F.2d 697, 700 (9th Cir. 1981) ("In the context of a motion for | - **Expert Damages Analysis:** An expert cannot simply claim that he believes a figure in his analysis number is correct without sufficient evidence to support it. See United States v. Various Slot Machines on Guam, 658 F.2d 697, 700 (9th Cir. 1981) ("In the context of a motion for summary |

| | | |
|---|---|---|
| | summary judgment, an expert must back up his opinion with specific facts.") | judgment, an expert must back up his opinion with specific facts.") |
| | • Defendants took Dr. Zona's deposition and confirmed that such flaws were based on purely speculation and zero empirical evidence. | • **Monopoly or Market Power:** In the context of Section 1 claims, courts look for "market power," defined as "the ability to raise price profitably by restricting output." Amex, 585 U.S. at 549 (italics in original). Typically, a plaintiff will try to prove market power by establishing that the defendant has a large (though not monopoly) share of the relevant market, normally at least 30 percent. See, e.g., Rebel Oil, 51 F.3d at 1438. A low market share will typically preclude a finding of market power, whereas a high market share indicates the possibility that market power exists. |
| | • At the hearing on DPPs' Motion for Class Certification, the Court correctly expressed concern about the reliability and validity of Dr. Zona's methodology, particularly with respect to his adoption of the 16.7% overcharge figure. (ECF 653 at 4:9–15, 48:22–49:16.) Indeed, after the Court inquired whether Dr. Zona derived the 16.7% figure through analysis or simply selected it arbitrarily as a starting point (Id. 9:18–20]), subsequent deposition testimony confirms that he had, in fact, arbitrarily chosen the 16.7% figure first and then conducted his analysis around that number. | |
| | • The underlying building block Dr. Zona uses to justify his selection of the 16.7% overcharge figure is premised on his manufactured assumption that Synta and Sunny had a combined market share of 40% before 2005. However, his analysis does not include any independent empirical verification of this 40% market share figure. Dr. Zona admitted during his deposition that he could not recall what, if any, data, calculations, or methodology he used to | |

|  | arrive at this 40% market share figure, nor could he identify any source or documented support for this figure within his report. |  |
|---|---|---|
|  | - Rather than conducting a rigorous econometric analysis to determine whether an overcharge existed in the pre-2005 period, Dr. Zona simply assumed that a 16.7% overcharge applied and then backfilled his analysis to justify that assumption. |  |
|  | - DPPs have not made any allegation or produced any evidence— whether documentary, testimonial, or economic—demonstrating that Celestron was involved in any agreement to fix prices, allocate markets, or otherwise restrain trade prior to 2013. |  |
|  | - The 4AC alleges that the purported conspiracy involving Celestron began in 2013 with Sunny's acquisition of Meade. Specifically conceding, Meade and Celestron were direct competitors, and it was only through the acquisition—allegedly facilitated by financial and strategic assistance from Celestron and Synta—that Meade ceased to function as an independent competitor. (4AC ¶¶ 96107.) |  |