UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| IN RE TELESCOPES ANTITRUST LITIGATION | Case No.   5:20-cv-03642-EJD |
| | **CONTINUED ORDER GRANTING IN PART AND DENYING IN PART MOTIONS FOR SUMMARY JUDGMENT** |
| | Re: Dkt. Nos. 771, 783, 848, 849 |

Before the Court are two motions for summary judgment filed by two groups of Defendants the Court will refer to as "Celestron Defendants" and "Celestron Employee Defendants" (collectively, "Defendants"). Celestron Defs. Mot., ECF No. 771; Opp'n to Celestron Defs. Mot., ECF No. 779-2; Reply in Supp. of Celestron Defs. Mot., ECF No. 784; Celestron Employee Defs. Mot., ECF No. 783; Opp'n to Celestron Employee Defs. Mot., ECF No. 789-2; Reply in Supp. of Celestron Employee Defs. Mot., ECF No. 797. On November 19, 2025, the Court held a hearing on these motions and heard oral arguments from all parties. ECF No. 834.

On March 23, 2026, the Court issued an Order granting in part and deferring in part both motions ("Prior MSJ Order"). Order Granting in Part and Deferring in Part Mots. for Summ. J. ("Prior MSJ Order"), ECF No. 846. The Court found claims regarding the 2013 Meade Acquisition time barred and ordered supplemental briefing on the impact of that finding on the remaining evidence in the record. *Id.* The Court received and reviewed supplemental briefing from all parties on April 2, 2026. Defs. Supp. Brief, ECF No. 848; DPPs Supp. Brief, ECF No. 849. The Court now resolves the remaining issues in Defendants' motions.

Case No.: 5:20-cv-03642-EJD
CONTINUED ORDER GRANTING IN PART AND DEN. IN PART MOTS. FOR SUMM. J.
1

For the reasons explained below, the Court **GRANTS IN PART** and **DENIES IN PART** both motions for summary judgment.

## I.     BACKGROUND

The Court will briefly summarize Defendants' roles and relationships in the alleged scheme before discussing the merits of Defendants' motions. The Court otherwise assumes the reader is familiar with the general facts of this case. *See, e.g.,* ECF Nos. 846, 845, 821, 746, 738, 596, 589, 539, 502, 173.

### A.     Celestron Employee Defendants

Celestron Employee Defendants are Corey Lee ("Lee"), David Anderson ("Anderson"), and Joseph Lupica ("Lupica"). Lee is the current CEO of Celestron. Ex. 5, ECF No. 783-6. He began working at Celestron in 1995 as an engineer, later serving as Vice President of Engineering and Senior Vice President of Product Development before becoming CEO in 2017. *Id.* Anderson was Celestron's CEO prior to Lee. Ex. 9, ECF No. 783-10. He worked at Celestron from 1997 to 2017, beginning as a general accountant before becoming CEO in 2013. *Id.* Lupica was Celestron's CEO prior to Anderson. Ex. 10, ECF No. 783-11. He worked at Celestron for approximately twenty-six years, beginning as CFO and rising to CEO by 1998 before leaving Celestron in June 2013 to become CEO of Meade. *Id.*

### B.     Celestron Defendants

Celestron Defendants consist of both individuals and entities. The individual Celestron Defendants are David Shen, Jean Shen, Sylvia Shen, Jack Chen, and Laurence Huen.[1] Jean Shen and Sylvia Shen are David Shen's sisters, Jack Chen is Sylvia Shen's husband, and Laurence Huen is a Celestron Board Member.

The entity Celestron Defendants are companies that these individuals either founded, operated, or were otherwise involved in: Celestron Acquisition, LLC ("Celestron"); Suzhou Synta Optical Technology Co., Ltd. ("Suzhou Synta"); Nantong Schmidt Opto Electrical Technology

---

[1] Given that some individual Celestron Defendants share the same last name, the Court will refer to all individual Celestron Defendants by their full names in the interest of clarity.

Case No.: 5:20-cv-03642-EJD
CONTINUED ORDER GRANTING IN PART AND DEN. IN PART MOTS. FOR SUMM. J.
2

Co., Ltd. ("Nantong Schmidt"); Pacific Telescope Corp. ("Pacific Telescope"); Synta Technology Corp. ("Synta Taiwan"); Synta Canada Int'l Enterprises Ltd. ("Synta Canada"); SW Technology Corporation ("SW Tech"); and Olivon Manufacturing Co., Ltd. and Olivon USA, LLC ("Olivon Entities").

Synta Canada is an investment company established by David Shen, Sylvia Shen, and Jack Chen, with shares and board positions held by the Shen family. Ex. 1, ECF No. 804-2. Synta Taiwan (also referred to as "Synta Technology") is an assembly shop founded and controlled by David Shen before being placed under the care of his brother Dagong Shen and his sister-in-law Dong Yongxue, who both receive salaries from David Shen. Ex. 2, ECF No. 804-3; Ex. 81, ECF No. 804-26. Synta Taiwan refers to Good Advance as its offshore banking unit. David Shen Decl., ECF No. 710-9. Good Advance contains several entities owned by David Shen and his family members. *Id.* Synta Canada and Good Advance are owners or investors in two manufacturing companies: Suzhou Synta and Nantong Schmidt. Ex. 12, ECF No. 804-11; Ex. 1, ECF No. 804-2; Ex. 14, ECF No. 804-13. Suzhou Synta and Nantong Schmidt source telescopes to Pacific Telescope, which David Shen established to conduct sales and R&D for telescope software. Ex. 4, ECF No. 804-5, Ex. 81, ECF No. 804-26. Synta Canada and Synta Taiwan also formed SW Tech, a holding company in which Sylvia Shen is the sole director. Ex. 1, ECF No. 804-2. SW Tech owns Celestron. Ex. 3, ECF No. 804-4. Celestron is a telescope maker and distributor, and Sylvia Shen, Jack Chen, Laurence Huen are Celestron Board Members. *Id.* Celestron sources products in part from Olivon Entities. Ex. 148, ECF No. 804-39; Ex. 149, ECF No. 804-40. Olivon Entities consist of three trading companies owned and managed by Jean Shen. Ex. 5, ECF No. 804-6.

## II.    LEGAL STANDARD

Courts may grant summary judgment on a claim or defense only if the moving party shows "there is no genuine dispute as to any material fact and [that it] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). There is a genuine dispute when enough evidence exists in the record for a reasonable fact finder to decide in favor of the nonmoving party. *Anderson v. Liberty*

United States District Court
Northern District of California

*Lobby, Inc.*, 477 U.S. 242, 248 (1986). And a fact is material when it might affect the outcome of the case. *Id.*

When evaluating whether a moving party has satisfied this standard, courts view all evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *Torres v. City of Madera*, 648 F.3d 1119, 1123 (9th Cir. 2011). The moving party bears the initial burden of showing that there is no genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party meets that burden, the opposing party must produce affirmative evidence "from which a jury could find in [its] favor" to defeat summary judgment. *F.T.C. v. Stefanchik*, 559 F.3d 924, 929 (9th Cir. 2009).

## III.   DISCUSSION

Defendants move for summary judgment on all claims. Given that DPPs' Clayton Act, Cartwright Act, and Unfair Competition Law claims are largely derivative of their Sherman Act claims, the Court will focus its discussion on Sherman Act § 1 and § 2 before briefly discussing the remaining claims.

### A.    Sherman Act § 1

Sherman Act § 1 requires a plaintiff prove that a contract, combination, or conspiracy "unreasonably restrained trade under either a per se rule of illegality or a rule of reason analysis; and [] that the restraint affected interstate commerce." *Solyndra Residual Tr. by & through Neilson v. Suntech Power Holdings Co.*, 62 F. Supp. 3d 1027, 1039 (N.D. Cal. 2014) (citing *Tanaka v. Univ. of S. California*, 252 F.3d 1059, 1062 (9th Cir. 2001)). The Court will examine in turn arguments raised by Celestron Defendants and Celestron Employee Defendants.

#### 1.    Celestron Defendants

Celestron Defendants argue DPPs' § 1 claim fails because: (1) DPPs cannot establish a single enterprise as to multiple "Synta" Defendants; (2) DPPs cannot establish an unreasonable restraint of trade under the per se rule of illegality; (3) individual Celestron Defendants did not engage in any inherently wrongful conduct; and (4) Celestron Defendants' conduct is exempt from U.S. antitrust laws under the Foreign Trade Antitrust Improvements Act ("FTAIA").

Case No.: 5:20-cv-03642-EJD
CONTINUED ORDER GRANTING IN PART AND DEN. IN PART MOTS. FOR SUMM. J.
4

#### a.      Single Enterprise

"A wholly owned subsidiary that engages in coordinated activity in furtherance of the anticompetitive scheme of its parent and/or commonly owned affiliates is deemed to engage in such coordinated activity with the purposes of the single 'economic unit' of which it is a part." *Arandell Corp. v. Centerpoint Energy Servs., Inc.*, 900 F.3d 623, 632 (9th Cir. 2018); *see also Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 769 (1984).  However, a plaintiff cannot impose liability merely because a subsidiary exists within an allegedly conspiratorial family; the acts of one entity in a family of companies may not be imputed to any other wholly related entity. *Biddle v. Walt Disney Co.*, No. 22-CV-07317-EJD, 2024 WL 3171860, at *9 (N.D. Cal. June 25, 2024).  Instead of imputing liability, "[p]laintiffs must put forth evidence that [the subsidiary] engaged in anticompetitive conduct."  *Arandell*, 900 F.3d at 633; *see also In re Packaged Seafood Prods. Antitrust Litig.*, No. 15-MD-2670 DMS (MDD), 2022 WL 836951, at *8 (S.D. Cal. Mar. 21, 2022) ("To hold any defendant directly liable as part of a common scheme, a plaintiff 'must come forward with evidence that each defendant independently participated.'") (quoting *Arandell Corp.*, 900 F.3d at 633).

Celestron Defendants argue that DPPs failed to prove any independent conduct by Olivon Entities, Pacific Telescope, SW Tech, Synta Canada, and Synta Taiwan for two reasons.  First, Celestron Defendants contend that Olivon Entities and Pacific Telescope did not participate in the conspiracy because they are independent businesses.  They highlight evidence that Olivon Entities only sold 98 telescopes in the U.S. market and primarily sell bird-watching scopes and hunting tripods acquired from unaffiliated suppliers; and Pacific Telescope maintained an independent distribution business in Canada separate from the U.S. market.  Second, Celestron Defendants argue that SW Tech, Synta Canada, and Synta Taiwan did not manage any of Celestron's business activities because they are merely "passive" holding companies.  SW Tech is Celestron's parent company, and it is owned by Synta Taiwan and Synta Canada.

The Court finds Celestron Defendants' arguments unpersuasive.  The record contains sufficient evidence to create a genuine dispute as to whether these Celestron Defendants acted as

Case No.: 5:20-cv-03642-EJD
CONTINUED ORDER GRANTING IN PART AND DEN. IN PART MOTS. FOR SUMM. J.
5

a single Synta enterprise and participated in the conspiracy.

First, there is evidence from which a reasonable jury could find Olivon Entities and Pacific Telescope were not operating as "independent" businesses. Olivon Entities are all trading companies owned and managed by Jean Shen. Ex. 5, ECF No. 804-6; Ex. 144, ECF No. 781-93; Ex. 148, ECF No. 804-39; Ex. 149, ECF No. 804-40; Ex. 57, ECF No. 804-2; Ex. 150, ECF No. 804-41; Ex. 5, ECF No. 804-6; Ex. 151, ECF No. 151, ECF No. 781-100. These entities largely operate by sourcing products from various suppliers and selling them to customers including Olivon USA and Celestron, with Sylvia Shen controlling prices. *Id.* There is also evidence that David Shen established Pacific Telescope as "Synta Group's international office, R&D center" to "link Synta/Pacific together," now controlled by Sylvia Shen. Ex. 81, ECF No. 804-26; Ex. 4, ECF No. 804-5; Ex. 17, ECF No. 804-14; Exs. 136–141, ECF Nos. 804-32–804-37. Pacific Telescope had thirty-seven sales with Good Advance and sourced telescopes from Suzhou Synta and Nantong Schmidt, presenting itself as a "branch office" of Suzhou Synta. *Id.* This follows the Celestron Board's stated goal for "Celestron + Synta + Pacific + Sunny" to be one "organization" to "lead and shape the overall competitive landscape." Ex. 142, ECF No. 781-91.

Second, although SW Tech, Synta Canada, and Synta Taiwan may be "passive holding companies," there is evidence to support a finding that they too actively participated in the conspiracy. SW Tech was formed in 2005 by Synta Taiwan and Synta Canada to acquire Celestron, with Sylvia Shen as the sole director. Ex. 1, ECF No. 804-2; Ex. 38. SW Tech received financials from Celestron two to three times annually during monthly review meetings, which involved individuals from all entities. *Id.* Evidence also suggests that TW Tech serves as a gateway for Celestron to pay the Synta family of companies' management fees. Ex. 38, ECF No. 804-17. As for Synta Canada, this entity was established by David Shen, Sylvia Shen, and Jack Chen, and evidence suggests it was used to facilitate money transfers from Synta to Celestron to Ningbo Sunny. Ex. 1, ECF No. 804-2, Ex. 114, ECF No. 781-63. Synta Taiwan was also founded and controlled by David Shen before being placed under the care of his brother and sister-in-law, who both receive salaries from David Shen. Ex. 2, ECF No. 804-3; Ex. 11, ECF No. 805-4; Ex.

Case No.: 5:20-cv-03642-EJD
CONTINUED ORDER GRANTING IN PART AND DEN. IN PART MOTS. FOR SUMM. J.
6

13, ECF No. 804-23.  There is evidence to suggest that Synta Taiwan is used to broker sales, set prices, and finance transactions between entities.  *Id.*

Viewing this record in the light most favorable to DPPs, a reasonable jury could find that each of these Celestron Defendants independently participated in the anticompetitive conspiracy.

### b.   *Per Se* Violation

A plaintiff can prove unreasonable restraint of trade under the per se rule of illegality by presenting evidence of horizontal price-fixing and market allocation.  *See Don Copeland v. Energizer Holdings, Inc.*, 716 F. Supp. 3d 749, 765 (N.D. Cal. 2024) ("Typically only 'horizontal' restraints—restraints imposed by agreement between competitors—qualify as unreasonable per se.").

Celestron Defendants contend there is no evidence of horizontal price-fixing or market allocation because the only horizontal competitors in the "Manufacturing Market" are Ningbo Sunny, Suzhou Synta, and Nantong Schmidt, with Celestron as the sole Defendant in the separate "Distribution Market."  They also deny an agreement between Sunny and Synta to allocate markets, noting that Suzhou Synta manufactured many other inexpensive models sold in a different class of markets.

Again here, the Court finds sufficient evidence to create a dispute of fact.  There are a variety of emails and internal documents that could show agreements to set prices and divide the market—suggesting that the conspiracy was integrated across both the Manufacturing Market and the Distribution Market, with Celestron and Synta entities participating in and facilitating the manufacturers' horizontal agreements.  For example, a reasonable jury could find the following evidence shows price fixing: (1) Synta controlled Ningbo Sunny's prices through Joyce Huang, Ex. 68, ECF No. 781-17; (2) Joyce Huang, acting on behalf of Synta, instructed Ningbo Sunny to cut off Orion's credit to ensure Ningbo Sunny's credit terms to Orion were "the same as Suzhou," Ex. 69, ECF No. 805-20; Ex. 70, ECF No. 792-9; Ex. 71, ECF No. 71, ECF No. 805-21; (3) Laurence Huen acknowledged the price fixing agreement between Ningbo Sunny and Synta, Ex. 72, ECF No. 792-11; and (4) Lee asked David Shen to raise the prices charged to Celestron's

Case No.: 5:20-cv-03642-EJD
CONTINUED ORDER GRANTING IN PART AND DEN. IN PART MOTS. FOR SUMM. J.
7

United States District Court
Northern District of California

competitors, and Synta complied, Ex. 80, ECF No. 781-29; Ex. 81, ECF No. 804-26.  And regarding market allocation, a reasonable jury could find that the following evidence shows Defendants coordinated to avoid conflict in the market and control biddings: (1) "Bidding with Costco between May and June (compete with Celestron for the price). This is a very important issue. This needs Director Ni to communicate face-to-face with DAVE [Anderson] when he goes to the United States. Don't bid. If you let the thing go by doing this, how would you deal with everything in the future? . . . Following a conflict, celestron would not trust sunny any longer," Ex. 88, ECF No. 781-37; (2) "[W]e need to consider how to avoid conflict with Celestron products. If the customer visits our factory and confirms their intention to cooperate with us, we will consider the strategy of separation from Celestron products or adopt different product prices to protect Celestron," Ex. 89, ECF No. 781-38; and (3) "The best way in the future is to divide the products and sell them into different markets to reduce conflicts . . . . No company can replace CELESTRON … SKYWATCHER …MEADE," Ex. 90, ECF No. 781-39.

Celestron Defendants characterize this evidence as reflecting ordinary business relations or amounting to classic puffery, blustering, or boasting.  But the Ninth Circuit in *Orion* characterized a similar record as "substantial evidence" supporting the jury's verdict that "Sunny and Synta committed a *per se* Section 1 violation by conspiring to fix the prices that they charged Synta's subsidiary Celestron and Orion" and that "Sunny engaged in *per se* illegal market allocation with Synta." *Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*, 20 F.4th 466, 481 (9th Cir. 2021).  A jury may ultimately agree with Celestron Defendants' portrayal of the record, but when viewing the facts in the light most favorable to DPPs, the Court finds a reasonable jury could also find DPPs met their burden to show price-fixing and market allocation.

### c.    Inherently Wrongful Conduct

As for Jean Shen, Sylvia Shen, and Jack Chen, Celestron Defendants also contend that there is no evidence they engaged in or knowingly approved of any "inherently wrongful" conduct, which they contend is required for personal antitrust liability against individuals, citing to *In re California Bail Bond Antitrust Litig.*, No. 19-CV-00717-JST, 2020 WL 3041316, at *17

Case No.: 5:20-cv-03642-EJD
CONTINUED ORDER GRANTING IN PART AND DEN. IN PART MOTS. FOR SUMM. J.

United States District Court
Northern District of California

United States District Court
Northern District of California

(N.D. Cal. Apr. 13, 2020).

But the Court need not examine whether these Celestron Defendants were involved in "inherently wrongful" conduct because the Court agrees with DPPs that this is not required for claims against Jean Shen, Sylvia Shen, and Jack Chen.[2]  The cases cited by Celestron Defendants hold that "[i]ndividuals may be liable for the antitrust violations *of their employers* if they have directly participated in or knowingly approved or ratified 'inherently wrongful' conduct."  *In re California Bail Bond Antitrust Litigation*, 2020 WL 3041316, at \*17 (quoting *Murphy Tugboat Co. v. Shipowners & Merchants Towboat Co., Ltd.*, 467 F. Supp. 841, 852–53 (N.D. Cal. 1979) *aff'd sub nom. Murphy Tugboat Co. v. Crowley*, 658 F.2d 1256 (9th Cir. 1981) (emphasis added)).  This is DPPs' theory as to Celestron Employee Defendants, as the Court discusses below in Section III.B.2.c.  But DPPs are not attempting to hold Jean Shen, Sylvia Shen, and Jack Chen liable for the acts of their employers—DPPs are attempting to hold them liable *for their own acts* committed in furtherance of the conspiracy.  The correct standard here provides that liability applies to all members of the conspiracy, "regardless of the nature of [their] own actions." *Beltz Travel Serv., Inc. v. Int'l Air Transp. Ass'n*, 620 F.2d 1360, 1367 (9th Cir. 1980).  The Court finds sufficient evidence in the record to defeat summary judgment under this standard. *See, e.g.,* Ex. 58, ECF No. 805-17; Ex. 59, ECF No. 791-28; Ex. 60, ECF No. 791-29; Ex. 61, ECF No. 804-24; Ex. 62, ECF No. 804-25; Ex. 90, ECF No. 781-39; Ex. 127, ECF No. 781-76; Ex. 130, ECF No. 781-79; Ex. 148, ECF No. 804-39; Ex. 149, ECF No. 804-40; Ex. 159, ECF No. 781-108.

### d.     FTAIA Exemption

Finally, Celestron Defendants argue that their conduct is exempt from U.S. antitrust laws under the FTAIA.  The FTAIA exempts "conduct involving trade or commerce (other than import trade or import commerce) with foreign nations" from antitrust laws, 15 U.S.C. § 6a, unless the effect on U.S. commerce is direct, substantial, and reasonably foreseeable, and "give[s] rise" to the antitrust claim. *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 546 F.3d 981,

---

[2] Defendants largely dropped this argument in their reply, citing to this standard only twice in passing.  Reply in Supp. of Celestron Defs. Mot. 14, 15.

Case No.: 5:20-cv-03642-EJD
CONTINUED ORDER GRANTING IN PART AND DEN. IN PART MOTS. FOR SUMM. J.
9

986 (9th Cir. 2008).

The Court finds the FTAIA does not exempt Defendants' conduct from U.S. antitrust laws. DPPs allege they were injured after purchasing telescopes imported into the United States, which is explicitly excluded from the FTAIA. Although Celestron Defendants contend they had no *direct* involvement in the importation of telescopes, the Ninth Circuit in *United States v. Hui Hsiung*, 778 F.3d 738, 751 (9th Cir. 2015), plainly held the fact that individual co-conspirators were not the direct importers is irrelevant so long as the conspiracy resulted in products being imported into the United States. Given that Defendants' conduct is outside the scope of the FTAIA, the Court need not examine arguments regarding whether the effect on U.S. commerce was direct, substantial, and reasonably foreseeable, or whether this effect gave rise to the claim.

* * *

Accordingly, the Court **DENIES** Celestron Defendants' motion for summary judgment on DPPs' § 1 claims.

### 2.    Celestron Employee Defendants

Celestron Employee Defendants argue DPPs' § 1 claim fails for one reason—there is no evidence that they knowingly joined and participated in any conspiracy.

Liability for price fixing and market allocation can "only be predicated on the knowing involvement of each defendant, considered individually, in the conspiracy charged." *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 463 (1978); *Esco Corp. v. United States*, 340 F.2d 1000, 1009 (9th Cir. 1965) (A defendant's "participation must be proved by evidence relating to its participation."). In other words, regardless of evidence DPPs may have regarding other Defendants, DPPs must prove that each Celestron Employee Defendant separately "joined the conspiracy and played some role in it because, at the heart of an antitrust conspiracy is an agreement and a conscious decision by each defendant to join it." *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 586 F. Supp. 2d 1109, 1117 (N.D. Cal. 2008) (quoting *In re Elec. Carbon Prods. Antitrust Litig.*, 333 F. Supp. 2d 303, 311–12 (D.N.J. 2004)); *In re Vitamins Antitrust Litig.*, 320 F. Supp. 2d 1, 15 (D.D.C. 2004) ("In order to establish the requisite knowledge of the conspiracy,

Case No.: 5:20-cv-03642-EJD
CONTINUED ORDER GRANTING IN PART AND DEN. IN PART MOTS. FOR SUMM. J.
10

Plaintiffs must prove that each defendant was united in a common unlawful goal or purpose, or knew of the conspiracy's general scope and purpose.").

To meet their burden, DPPs must point to direct or circumstantial evidence that each Celestron Employee Defendant knowingly joined and participated in the alleged price-fixing or market allocation conspiracy. *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984); *In re Citric Acid Litig.*, 191 F.3d 1090, 1093 (9th Cir. 1999). However, antitrust law "limits the range of permissible inferences from ambiguous evidence" in a conspiracy case. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). "[C]onduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy." *Id.* Therefore, unless DPPs "present evidence 'that tends to exclude the possibility' that [the Celestron Employee Defendants] acted independently," summary judgment is appropriate. *Id.* (quoting *Monsanto*, 465 U.S. at 764)).

The Court will examine in turn evidence specific to Lee, Lupica, and Anderson.

### i.    Lee

The Court finds sufficient evidence in the record to create a dispute of fact regarding Lee's involvement in the conspiracy.

The following evidence, when considered together, could show that Lee assisted Celestron's Executive Committee—i.e., David Shen, Laurence Huen, Sylvia Shen, and Jack Chen—in price fixing, allocating the market, and conspiring to monopolize: (1) Lee served in executive positions at Celestron for over two decades before becoming CEO in 2017, *see* Ex. 69, ECF No. 805-20; (2) Lee received an email in 2011 from Celestron's Vice President explaining that "Synta is Sunny's sales arm," Ex. 63, ECF No. 805-18; (3) Lee obtained the prices Ningbo Sunny charged Celestron's competitors in 2012 and instructed his team to "keep the information [] within Celestron," Ex. 15, 790-16; (4) Lee emailed Ningbo Sunny in 2013 asking for any information they had on what their customers were buying and for how much, Ex. 64, ECF No. 792-3; (5) Lee asked David Shen in 2013 to delay supply and raise the prices Synta charged to competitors, Ex. 13, ECF No. 790-14; and (6) after becoming CEO in January 2017, Lee obtained

Case No.: 5:20-cv-03642-EJD

Ningbo Sunny's pricing for Meade and relayed it to Celestron's Board, Ex. 70, ECF No. 792-9; Ex. 71, ECF No. 805-21.

The Court agrees with Celestron Employee Defendants that evidence showing Lee was copied onto emails, such as the 2011 email indicating that Synta was Sunny's sales arm, is insufficient on its own to show participation in the conspiracy. And their argument that DPPs misrepresented some evidence in the record is well-taken. For example, DPPs contend that Exhibit 14 proves Lee asked David Shen to raise the prices charged to Celestron's competitors. Opp'n to Celestron Employee Defs. Mot. 2. But instead, the cited portion of the deposition transcript contains a dialogue where DPPs summarized their allegations to David Shen and asked if those allegations are correct, to which David Shen replied "no." Ex. 14, ECF No. 805-6 ("Q. And you understand that our allegations in the case are that you understood that American regulators had a problem with Synta or Celestron purchasing Meade, and as a result, you came up with a plan to have Ningbo Sunny buy Meade and that Sunny and Synta coordinated their business together for the good of both companies and that you helped Ningbo Sunny with the acquisition and had officers of Celestron help Ningbo Sunny with the acquisition and that Synta and Celestron continued to provide Ningbo Sunny with support throughout the acquisition and afterward? Are those allegations true, Mr. Shen? . . . A. No.").

However, when all relevant evidence is viewed in its totality and in the light most favorable to DPPs, the record could still show that Lee spent several years operating under the directive that Synta was Sunny's sale arm and engaged directly with both companies to obtain pricing and purchasing information, delay supply, and manipulate prices. In other words, a reasonable jury could find this evidence tends to exclude the possibility that Lee acted independently. This is sufficient to defeat summary judgment.

### ii.    Lupica

Similarly, the Court finds sufficient relevant evidence in the record to create a genuine dispute as to Lupica's involvement in the conspiracy.

Though most of the evidence DPPs introduced regarding Lupica focused on the 2013

Case No.: 5:20-cv-03642-EJD
CONTINUED ORDER GRANTING IN PART AND DEN. IN PART MOTS. FOR SUMM. J.

United States District Court
Northern District of California

Meade Acquisition, which the Court is no longer considering given its Prior MSJ Order, the following evidence could still show that Lupica assisted Celestron's Executive Committee in price fixing, allocating the market, and conspiring to monopolize: (1) Lupica spent twenty-six years working for Celestron, becoming the CFO and CEO in 1998 before he retired in 2013 to become the CEO of Meade, *see* Ex. 33, ECF No. 805-10; Ex. 68, ECF No. 792-7; (2) he stated in an email in 2005 that Synta, Ningbo Sunny, and Celestron would "look to the world as one strong group of companies," Ex. 5, ECF No. 790-6, Ex. 5; (3) he told Celestron's Board in 2006 that "[a]ll new products should be designed to be manufactured by Synta and/or Sunny" because "[w]e are sister companies and the success of all three companies must be considered," Ex. 127, ECF No. 781-76; (4) he presented a PowerPoint to the Board in 2006 illustrating the horizontal relationship between Synta and Ningbo Sunny with a dotted line, Ex. 32, ECF No. 805-9; and (5) he authored an internal memorandum in 2007 recommending ways to "take sales from suppliers that compete with Synta and Sunny," Ex. 34, ECF No. 791-3.

Again here, the Court agrees with Celestron Employee Defendants that DPPs mischaracterized some evidence. For example, DPPs claim that Lupica admitted he aided in the 2013 Meade Acquisition despite knowing that a combination would violate the antitrust laws, citing the following language from Exhibit 30: "[Y]ou didn't think that a combination would be permitted to move forward, correct?" A. "Correct." Q. "Because it would violate the antitrust laws, correct?" A. "Yes." Opp'n to Celestron Employee Defs. Mot 4–5. But this testimony was about a possible acquisition of Celestron by Meade in the 1990s and early-2000s, not the 2013 Meade Acquisition. Ex. 30, ECF No. 805-7.

However, setting aside DPPs' misrepresentation—which, regardless, is no longer relevant given the exclusion of the 2013 Meade Acquisition—a reasonable jury could still find that Lupica participated in the conspiracy. When viewing the evidence in the light most favorable to DPPs, a reasonable jury could find that Lupica actively worked to ensure the success of Synta, Ningbo Sunny, and Celestron's anticompetitive conduct throughout his longstanding executive career at Celestron by ensuring collaboration and communication across companies. This evidence could

Case No.: 5:20-cv-03642-EJD
CONTINUED ORDER GRANTING IN PART AND DEN. IN PART MOTS. FOR SUMM. J.
13

United States District Court
Northern District of California

be sufficient to exclude the possibility that Lupica acted independently and defeat summary judgment.

### iii.    Anderson

Anderson, however, presents a different case.  Unlike Lee and Lupica, nearly all relevant evidence remaining after the Court excluded the 2013 Meade Acquisition consists of emails copying Anderson.  DPPs Supp. Brief 8 (citing Ex. 90, ECF No. 781-39; Ex. 88, ECF No. 781-37; Ex. 60, ECF No. 791-29).[3]  There are only two pieces of evidence DPPs cite showing that Anderson later took some sort of action: (1) Anderson forwarded Lee in January 2014 an email indicating that Shen and Ni had agreed on Ningbo Sunny's pricing for the following year, Ex. 27, ECF No. 790-28; and (2) Anderson sent an email summarizing a "courtesy visit" with Mead in August 2015.  Ex. 62, ECF No. 792-1.  As for other evidence in the record, the Court again notes DPPs' mischaracterization—for example, in their original opposition, DPPs implied that Exhibit 48 shows Anderson recognizing that "[a]ny tie up between Celestron and Meade post-closing would raise the same antitrust issues that exist today."  Opp'n to Celestron Employee Defs. Mot. 7–8.  But these were not Anderson's words; this is a legal opinion from counsel to Lupica.  Ex. 48, ECF No. 791-17.  Anderson was not even copied onto the email.

To find Anderson participated in the conspiracy from the record presented by DPPs, a jury would have to speculate based on the limited ambiguous evidence of Anderson being copied onto several emails, forwarding one email, and engaging in a "courtesy visit" to Meade.  This type of speculation is impermissible in antitrust cases such as this.  As the Ninth Circuit has held, "[a] special consideration applies in antitrust cases involving an allegation of conspiracy under § 1 of the Sherman Act" because "antitrust law limits the range of permissible inferences from ambiguous evidence."  *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 632 (9th Cir. 1987) (citing *Matsushita*, 475 U.S. at 588).  Given the ambiguous state of the limited

---

[3] After the Court granted in part Defendants' motions on claims regarding the 2013 Meade Acquisition, the Court ordered supplemental briefing on the impact of that order on Defendants, specifically directing the parties to discuss Celestron Employee Defendants.  This is the only evidence DPPs cited as to Anderson.

United States District Court
Northern District of California

evidence against Anderson, the Court finds the record insufficient to establish a § 1 violation.

* * *

Accordingly, the Court **GRANTS** summary judgment on DPPs' § 1 claim in favor of Anderson and otherwise **DENIES** summary judgment as to Lee and Lupica.

### B.    Sherman Act § 2

Sherman Act § 2 makes it unlawful to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce . . . . " 15 U.S.C. § 2.  DPPs allege a violation of all three.

The Court will again discuss in turn arguments raised by Celestron Defendants and Celestron Employee Defendants.

### 1.    Celestron Defendants

Celestron Defendants argue that DPPs' § 2 claims fail because they have not sufficiently defined the market and there is insufficient evidence of monopoly power.[4]

### a.    Market Definition

"Summary judgment in an antitrust case is appropriate where the plaintiff fails to define a cognizable market." *AFMS LLC v. United Parcel Serv., Inc.*, 696 F. App'x 293, 294 (9th Cir. 2017).   "Market definition is an essential predicate to the entire case, for '[w]ithout a definition of [the] market there is no way to measure [the defendant's] ability to lessen or destroy competition.'" *Coronavirus Rep. v. Apple Inc.*, No. 21-CV-05567-EMC, 2021 WL 5936910, at *6 (N.D. Cal. Nov. 30, 2021).

Celestron Defendants argue that DPPs' market definitions fail under *AFMS* because the definitions of a "Manufacturing Market" (global) and a "Distribution Market" (U.S.) in the operative complaint are inconsistent with their expert opinions—Dr. Zona defines the relevant market as the market for "consumer-grade telescopes in the U.S," and Mr. George identifies it as "consumer-grade or *amateur telescopes*" in the U.S.  Celestron Defendants argue that both

---

[4] The Court resolved Celestron Defendants' third argument regarding the statute of limitations as to claims regarding the 2013 Meade Acquisition in its Prior MSJ Order.

definitions are vague, inconsistent, and untethered to DPPs' complaint, and the definitions fail to clarify whether they encompass telescopes manufactured for sale or distribution in the United States.

The Court disagrees.  The Fourth Amended Complaint defines two markets: (1) the upstream market "for consumer telescope and telescope accessory manufacturing for import into the United States," with a global geographic scope ("Manufacturing Market"), FAC ¶ 73, ECF No. 495; and (2) the "downstream market . . . . for consumer telescope distribution," with a geographic scope within the United States, *id.* ¶ 77.  Dr. Zona and Mr. George's expert opinions do not meaningfully conflict with these definitions.  In a competitive market, distribution and manufacturing are separate; but DPPs' theory is that this is not a competitive market.  DPPs allege that Defendants had a monopoly in the supply market and then leveraged this monopoly into the distribution market by colluding with one another and blocking out other competitors.  When there is an alleged integration such as this, the manufacturing and distribution markets can lose a degree of distinction.  Although DPPs allege the Manufacturing Market is factually relevant to DPPs' allegations, Dr. Zona ultimately chose to analyze the Distribution Market as the relevant market for this case because DPPs purchased their telescopes from Celestron and Meade and were injured in that market.  The Distribution Market has consistently been defined by both experts and the Fourth Amended Complaint as consumer-grade telescopes in the United States.  This consistent definition of the product and the geographic scope are sufficient to defeat summary judgment. *Optronic*, 20 F.4th at 482 ("To define a market, the district court must determine: (1) the field in which the plaintiff was engaged . . . in geographic and distributional terms, and (2) the product (or product line) that competes in that field.") (internal quotation marks omitted).

### b.    Monopoly Power

Monopoly power is "the power to control prices or exclude competition." *United States v. E. I. du Pont de Nemours & Co.*, 351 U.S. 377, 391, 76 S. Ct. 994, 100 L. Ed. 1264 (1956). "When proving monopoly power by circumstantial evidence, a plaintiff must show (1) 'that the defendant owns a dominant share of the market' and (2) 'that there are significant barriers to entry

Case No.: 5:20-cv-03642-EJD
CONTINUED ORDER GRANTING IN PART AND DEN. IN PART MOTS. FOR SUMM. J.
16

United States District Court
Northern District of California

and . . . existing competitors lack the capacity to increase their output in the short run.'" *Advanced Microtherm, Inc. v. Norman Wright Mech. Equip. Corp.*, No. C 04-02266 JW, 2010 WL 11478992, at *4 (N.D. Cal. July 21, 2010), *aff'd,* 525 F. App'x 612 (9th Cir. 2013). "[I]f there are undisputed facts about the structure of the market that render the inference economically unreasonable, the expert opinion is insufficient to support a jury verdict." *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1435–36 (9th Cir. 1995).

Celestron Defendants argue that DPPs' experts assume a concentrated market then infer monopoly power without imperial validation. When Defendants' expert Mr. Kaplan reconstructed the same data that Dr. Zona relies on, Mr. Kaplan's calculations demonstrate that telescope prices fell 67% concurrently with an eight-fold increase in Celestron's unit sales, which Celestron Defendants argue represents a hallmark competitive marketplace under *Rebel Oil*. Celestron Defendants also contend that Dr. Zona's report contains other various errors—most notably, that he improperly aggregates separate legal entities (Celestron, Synta, and Sunny) to assert an inflated 80% market share despite the lack of data prior to 2005; substitutes shipping container weight for actual sales revenue or unit volume; and omits competitors from his market share analysis.

The Court finds DPPs' showing of monopoly power through evidence of a dominant market share, barriers to entry, and market concentration is sufficient to defeat summary judgment. DPPs present evidence that could show Celestron averaged 65% of U.S. consumer telescope sales, exceeding 80% during the class period. "A market share of sixty-five percent or more usually establishes a prima facie case of monopoly power in Section 2 contexts." *Optronic*, 20 F.4th at 484) (citing *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1202, 1206 (9th Cir. 1997). These calculations adequately accounted for the market shares of each relevant brand, and Dr. Zona sufficiently explains the reliability of using gross weight of shipping containers and the exclusion of brands without sufficient data. *See* Order Granting Class Cert., ECF No. 746 (explaining in greater detail Dr. Zona's calculations). Likewise, monopoly power may be implied by Dr. Zona's opinion that significant barriers to entry for non-affiliated distributors include intellectual property protections, institutional knowledge, scale economies, and Synta/Sunny's

Case No.: 5:20-cv-03642-EJD
CONTINUED ORDER GRANTING IN PART AND DEN. IN PART MOTS. FOR SUMM. J.

dominance. Dr. Zona further analyzed market power using the Herfindahl–Hirschman Index ("HHI"), which "indicates a market is highly concentrated by the standards of the U.S. antitrust enforcement agencies when its HHI exceeds 2,500 in each year." Zona Report ¶ 50, ECF No. 780-2. Dr. Zona found that, "[i]n this case, the HHI index for the relevant market for telescopes has ranged from 3,091 to 7,348 since 2006," which is "consistent with the fact that Sunny[/Celestron] and Synta[/Meade] together have substantial market power in the relevant market for telescopes." *Id.*

The Court finds Dr. Zona's opinions reliable, thus Celestron Defendants' critique of the data Dr. Zona used to reach his conclusions and disagreements regarding the significance of any barrier of entry are appropriate issues for a jury, not the Court. Accordingly, the Court finds, when viewing all evidence in the light most favorable to DPPs, a reasonable jury could find sufficient monopoly power.

\* \* \*

Accordingly, the Court **DENIES** Celestron Defendants' motion for summary judgment on DPPs' § 2 claim.

### 2.    Celestron Employee Defendants

Celestron Employee Defendants argue that DPPs' § 2 claims fail because: (1) *Copperweld* bars conspiracy to monopolize claims against them; (2) individual employee defendants are "legally incapable" of monopolization; and (3) they have not engaged in any "inherently wrongful" conduct.[5]

### a.    Applicability of *Copperweld*

Under *Copperweld*, a parent corporation and its subsidiary "are incapable of conspiring with each other for purposes of § 1 of the Sherman Act" because they have a "complete unity of interest." *Copperweld*, 467 U.S. at 777. Celestron Employee Defendants argue that *Copperweld*

---

[5] Celestron Employee Defendants also raise arguments regarding market definition and monopoly power that largely mirror those examined in the section above and do not warrant further discussion.

Case No.: 5:20-cv-03642-EJD
CONTINUED ORDER GRANTING IN PART AND DEN. IN PART MOTS. FOR SUMM. J.
18

bars DPPs' conspiracy to monopolize claim because they share a "unity of interest" with each other, Celestron, and Synta.

The Court finds *Copperweld* inapplicable. The Supreme Court in *Copperweld* addressed the "narrow issue" of whether a parent and wholly owned subsidiary can conspire under § 1 in a single-entity conspiracy. *Id.* at 767 ("We limit our inquiry to the narrow issue squarely presented: whether a parent and its wholly owned subsidiary are capable of conspiring in violation of § 1 of the Sherman Act."). But here, DPPs allege a conspiracy between Defendants/Synta/Celestron and Ningbo Sunny. When corporate officers knowingly participate in an illegal agreement with an outside competitor, as the evidence could show here, they remain subject to antitrust liability, and *Copperweld* does not apply.[6] *See id.*

### b. "Legally Incapable" of Monopolization

Celestron Employee Defendants next argue that individual employees are not "competitors" or "participants" in a market as required for § 2, citing *Name.Space, Inc. v. Internet Corp. for Assigned Names & Numbers*, 795 F.3d 1124, 1131 (9th Cir. 2015) ("Because ICANN is not a competitor in any of the three markets, they cannot serve as the basis for a § 2 monopoly claim.").

The Court finds this position unpersuasive as well. The Ninth Circuit in *Tillamook Cheese & Dairy Ass'n v. Tillamook Cnty. Creamery Ass'n*, explicitly held that corporate executives like Celestron Employee Defendants may be held liable under the Sherman Act. 358 F.2d 115, 118 (9th Cir. 1966) ("The individuals through whom a corporation acts and who shape its intentions can be held liable on a charge of attempted monopolization.").[7] And further, as discussed above and in the section below, "[i]ndividuals may be liable for the antitrust violations of their employers if they have directly participated in or knowingly approved or ratified 'inherently wrongful' conduct." *In re California Bail Bond Antitrust Litigation*, 2020 WL 3041316, at *17

---

[6] Celestron Employee Defendants briefly rebut that it makes no economic sense for Celestron Employees to conspire with one of their suppliers or competitors to grant either a monopoly; but there is no evidence that alleged conspiracy had a negative economic impact on any Defendant.
[7] Celestron Employee Defendants did not respond to this argument in their reply.

Case No.: 5:20-cv-03642-EJD
CONTINUED ORDER GRANTING IN PART AND DEN. IN PART MOTS. FOR SUMM. J.
19

(quoting *Murphy Tugboat*, 467 F. Supp. at 852–53).  The cases Celestron Employee Defendants cite to the contrary are inapplicable—they involved entity defendants that did not compete in the relevant market, not individual defendants and their ability to act as a market participant.  *See, e.g., Name.Space*, 795 F.3d at 1131.

### c.  No "Inherently Wrongful Conduct"

Finally, the parties return to a discussion of "inherently wrongful conduct" for purposes of § 2.[8]  As noted above in Section III.A.1.c., while the "inherently wrongful" standard does not apply to Jean Shen, Sylvia Shen, and Jack Chen, it does apply to Celestron Employee Defendants because DPPs claim they are "liable for the antitrust violations *of their employers*."  *In re California Bail Bond Antitrust Litigation*, 2020 WL 3041316, at *17 (quoting *Murphy Tugboat*, 467 F. Supp. at 852–53) (emphasis added).  To be held liable for the antitrust violations of an employer, a plaintiff must show that an executive participated in anticompetitive activity via direct action, knowing approval, or ratification of unlawful or inherently wrongful acts.  *Murphy Tugboat*, 467 F. Supp. at 852.

Celestron Employee Defendants contend that all § 2 claims against them are based on their involvement in the 2013 Meade Acquisition.  Mot. 21.  If they were correct, all § 2 claims against them would be dismissed given the Court's Prior MSJ Order.  However, after reviewing the parties' supplemental briefing on this issue, the Court finds that DPPs have put forward sufficient evidence of conduct outside of the 2013 Meade Acquisition to defeat summary judgment.

While DPPs' opposition argued in large part that Celestron Employee Defendants engaged

---

[8] The Court notes that Celestron Employee Defendants discuss this standard only in their § 2 arguments, but it appears this same standard applies to both § 1 and § 2 claims.  *See, e.g., Murphy Tugboat*, 467 F. Supp. at 853 (applying same standard to all antitrust claims); *In re Juul Labs, Inc., Antitrust Litig.*, 555 F. Supp. 3d 932, 962 (N.D. Cal. 2021) (same); *Hightower v. Celestron Acquisition, LLC*, No. 5:20-CV-03639-EJD, 2021 WL 2224148, at *11 (N.D. Cal. June 2, 2021) (same); *Arcell v. Google LLC*, No. 22-CV-02499-RFL, 2025 WL 210877, at *4 (N.D. Cal. Jan. 16, 2025) (same); *GVF Cannery, Inc. v. California Tomato Growers Ass'n, Inc.*, 511 F. Supp. 711, 717 (N.D. Cal. 1981) (same); *In re California Bail Bond Antitrust Litig.*, No. 19-CV-00717-JST, 2020 WL 3041316, at *17 (N.D. Cal. Apr. 13, 2020) (same); *Spectrum Scis., LLC v. Celestron Acquisition, LLC*, No. 5:20-CV-03642-EJD, 2021 WL 2224347, at *8 (N.D. Cal. June 2, 2021) (same).

Case No.: 5:20-cv-03642-EJD
CONTINUED ORDER GRANTING IN PART AND DEN. IN PART MOTS. FOR SUMM. J.
20

in inherently wrongful conduct for purposes of § 2 by participating in or ratifying the 2013 Meade Acquisition, they also contended that Celestron Employee Defendants engaged in inherently wrongful conduct for a "separate and independent" reason: by "directly participat[ing] in—or, at minimum, ratif[ying]—Defendants' anticompetitive conspiracy to collude together." Opp'n to Celestron Employees' Mot. 19–21. In other words, DPPs argue the same anticompetitive conduct discussed Section III.A.1.c. also constitutes "inherently wrongful" conduct for purposes of § 2.

The Court finds, as is common in complex anti-trust cases such as this, that the same evidence used to defeat summary judgment on DPPs' § 1 claims could also show "inherently wrongful" conduct for purposes of § 2. *See, e.g., Sherman v. Brit. Leyland Motors, Ltd.*, 601 F.2d 429, 453 n.48 (9th Cir. 1979) ("The evidence tending to establish an unlawful conspiracy coupled with that relating particularly to the attempted monopolization claim is sufficiently supportive of the conspiracy to monopolize formulation as to sustain against the motion for summary judgment the survival of plaintiff's claim on the latter theory also . . . . [W]e observe that possible jury consideration of the evidence concerning a conspiracy constituting an unreasonable restraint of trade must be kept in mind in determining the sufficiency of evidence to support both the attempted monopolization and conspiracy to monopolize charges without tight compartmentalization."); *see also, e.g., Optronic*, 20 F.4th at 483 ("This Section 1 violation also supports a finding of specific intent to monopolize."). In Section III.A.1.a., the Court found DPPs successfully presented evidence that could show Lee and Lupica each knowingly joined and participated in the conspiracy by assisting Celestron's Executive Committee in price fixing, allocating the market, and conspiring to monopolize. The Court finds a reasonable jury could find this same conduct is "inherently wrongful" for purposes of § 2.

Therefore, the Court finds sufficient evidence to defeat summary judgment on § 2 claims against Lee and Lupica, with the exclusion of Anderson.

\* \* \*

Accordingly, the Court **GRANTS** summary judgment on DPPs' § 2 claim in favor of Anderson and otherwise **DENIES** summary judgment as to Lee and Lupica.

Case No.: 5:20-cv-03642-EJD
CONTINUED ORDER GRANTING IN PART AND DEN. IN PART MOTS. FOR SUMM. J.
21

**C.    Remaining Claims**

The parties agree that DPPs' Clayton Act § 7 claim is now foreclosed by the Court's Prior MSJ Order because it is predicated solely on the 2013 Meade Acquisition.  DPPs Supp. Brief 9. The parties also agree that DPPs' Cartwright Act and UCL claims rise and fall with DPPs' federal antitrust claims.  *Id.* at 6 n.3; Defs. Supp. Brief 1 n.1.

Accordingly, the Court **GRANTS** Defendants' motions for summary judgment on DPPs' Clayton Act § 7 claim.  Consistent with its findings above, the Court also **GRANTS** summary judgment on DPPs' Cartwright Act and UCL claims as to Anderson and otherwise **DENIES** summary judgment on these claims as to all other Defendants.

## IV.    CONCLUSION

Based on the foregoing, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants' motions for summary judgment.

The Court **SETS** a Trial Setting Conference for **June 25, 2026**, at **11:00 a.m**.  The parties' Joint Trial Setting Conference Statement is due by **June 15, 2026**, at **4:00 p.m**.

**IT IS SO ORDERED.**

Dated: April 27, 2026

EDWARD J. DAVILA
United States District Judge

Case No.: 5:20-cv-03642-EJD
CONTINUED ORDER GRANTING IN PART AND DEN. IN PART MOTS. FOR SUMM. J.
22